08-2278 SSW

# EXHIBIT   "A"

BOARD OF PRISON TERMS

STATE OF CALIFORNIA.

**LIFE PRISONER: PAROLE CONSIDERATION**
**PROPOSED DECISION  (BPT §2041)**

I.  [ ]  PAROLE DENIED

If this proposed decision denying parole is approved, the Board will send you a copy of the approved decision, including the reasons for denial of parole, within 30 days of the hearing.

II.  [✓]  PAROLE GRANTED

A. Base Period of Confinement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . _180_ Months

_A 334928_      _1_      _Murder 1st_
Case No.      Count No.      Offense

B. Firearm Enhancement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .+ _24_ Months

C. Other Crimes Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .+ _____ Months

_A 334928_      _2_      _____      36_ mos.
Case No.      Count No.      Offense

_A 334928_      _3_      _____      12_ mos.
Case No.      Count No.      Offense

_____      _____      _____      _____ mos.
Case No.      Count No.      Offense

D. Total Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . = _252_ Months

E. Postconviction Credit From _3/24/79_ To _8/3/88_  – _30_ Months
                              (Date)        (Date)

F. Total Period of Confinement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . = _222_ Months

The period of confinement indicated is a tentative decision proposed by this panel. The decision will be reviewed pursuant to BPT §2041, and, if approved, a copy of the approved decision will be sent to you within 30 days. At that time appropriate pre-prison credits will be applied and a parole release date computed.

You will not engage in any conduct specified in BPT §2451. Such conduct may result in rescission or post-ponement of your parole date.

III.  If the proposed decision denying or granting parole is disapproved, you will receive a copy of the proposed decision and the reasons for disapproval. You will then receive a copy of the modified decision or will be scheduled for a new hearing, as appropriate.

| PANEL HEARING CASE | | |
|---|---|---|
| Name _Anne M. Reddy_ | | Date _8/_ |
| Name _Maureen O'Connell_ | | Date _3/_ |
| Name _Cleo Brown_ | | Date _8/_ |

| NAME | CDC NUMBER | INSTITUTION | HEARING DATE |
|---|---|---|---|
| HERNANDEZ, PETER | C-03015 | CMC-E | 8-3-88 |

Distribution: Whi...
Ca...

PC §3041(a) provides that the BPT shall meet with persons sentenced under PC §1168 and shall normally set a parole release date unless, pursuant to PC §3041(b), the Board determines that a parole date cannot be fixed at this hearing.

This hearing is conducted pursuant to the California Administrative Code (CAC), Division 2, Chapter 3, Article 5, which sets forth parole consideration criteria and guidelines for life prisoners implementing PC §3041.

Statement of Facts

The prisoner was convicted of first degree murder in the shooting death of victim Tony Sanchez. The prisoner went through three trials and was committed to California Department of Corrections (CDC) nearly two years after the murder. The prisoner was arrested as a result of an investigation into a triple shooting which occurred April 25, 1977, at about 9:10 p.m., near 1185 W. 24th Street in Los Angeles. Three victims, Tony Sanchez, Eladoro Rosales and Santo Rodriguez, were accosted by the prisoner and a crime partner while standing in front of the 24th Street address. After a few words between them, the prisoner drew a handgun and began firing. Victim Sanchez was immediately mortally wounded. Victim Rodriguez was shot in the left thigh, but turned and ran. Victim Rosales was subsequently

HERNANDEZ, P.  C-03015          -2-          8/3/88
ld

shot in the buttocks as he and Rodriquez fled on foot.
Victim Rosales died shorty after the shooting, but his
death was not connected to this incident or the prisoner.

Parole Suitability

CAC §2281(a) requires that the panel first determine
whether the prisoner is suitable for release on parole.
Regardless of the length of time served, a life prisoner
shall be found unsuitable for and denied parole if in the
judgment of the panel the prisoner will pose an
unreasonable risk of danger to society if released from
prison.  CAC §2281(c) sets forth circumstances tending to
show unsuitability and CAC §2281(d) sets forth
circumstances tending to show suitability.  These
regulations are guidelines only.

The panel relied on the following circumstances in
determining whether or not the prisoner is suitable for
parole:

1.  The prisoner has no juvenile record of assaulting
others;

2.  The prisoner has a stable social history as
exhibited by his reasonably stable relationships with
others;

3.  While imprisoned, the prisoner enhanced his ability
to function within the law upon release through

HERNANDEZ, P.  C-03015        -3-        8/3/88
1d

FOR
RECORDS OFFICER
USE

Pre-prison
Credit

participation in educational programs; self-help and therapy programs, i.e., Alcolhlics Anonymous (AA) and Narcotics Anonymous (NA); vocational programs, and institutional job assignements;

4. Motivation for crime. The crime was committed as a result of significant stress in the prisoner's life;

5. The prisoner lacks a significant criminal history of violent crime;

6. The prisoner's maturation reduces the probability of recidivism;

7. The prisoner has realistic parole plans which include family support;

8. The prisoner has maintained close family ties while imprisoned via letters and some visits;

9. The prisoner's positive institutional behavior which indicates significant improvement in self-control

10. The prisoner shows signs of remorse and gives indications that he understands the nature and magnitude of the offense. He accepts responsibility for his criminal behavior and he has the desire to change toward good citizenship;

11. The Category X Diagnostic Unit Evaluation dated June 28, 1988, is favorable.

HERNANDEZ, P.  C-03015          -4-          8/3/88
ld

Based on the information contained in the record and considered at this hearing, the panel states as required by PC §3043 that the prisoner would not pose a threat to public safety if released on parole.

Therefore, the prisoner is found suitable for a projected release date.

Base Term of Confinement

PC §3041(a) provides that if a prisoner is found suitable for parole, the Board shall set a parole release date in a manner "...that will provide uniform terms for offenses of a similar gravity and magnitude in respect to their threat to the public." CAC §§2282-2292 implement this policy. CAC §2282 requires that a term be set for the base offense, the most serious of all life offenses for which the prisoner has been committed to prison. Suggested base terms are set forth in CAC §§2282(b) and 2403(c). CAC §§2283 and 2284 set forth circumstances in aggravation and mitigation respectively. All of these regulations are guidelines only.

The term is derived from the matrix at BPT Rules (2282-B) (2282-C), Categories III-C, in that there was no prior relationship with the victim and death was immediate.

The panel assessed 180 months for the base offense and noted that this is the middle term.

HERNANDEZ, P.  C-03015          -5-          8/3/88
ld

FOR
RECORDS OFFICER
USE

Pre-prison
Credit

### Firearm Enhancement

CAC §2285 provides for an additional term of 2 years if the prisoner personally used a firearm in the commission of any life crime unless the panel states specific reasons for not adding enhancement.

The term set forth above is increased by 2 years for the use of a firearm in the offense.

### Non-Life Commitment - Principal Term (BPT §2286(b)(1):

| Offense | PC§ | Case # | Ct. # | Time Assessed |
|---------|-----|--------|-------|---------------|
| Assault with intent to murder | 217 | A334928 | 2 | 36 |
| TOTAL | | | | 36 |

The panel did not enhance for firearm; already did so for the same gun on the murder, and felt the term was sufficient.

### Non-Life Commitments; Subordinate Terms:

| Offenses | PC § | Case # | Count | Time Assessed |
|----------|------|--------|-------|---------------|
| Assault with intent to murder | 217 | | 3 | 12 |
| TOTAL | | | | 12 |

HERNANDEZ, P.  C-03015          -6-          8/3/88
ld

The panel did not enhance for the prior grand theft auto because the prisoner was drunk and he received probation and a $35 fine.

### Post-Conviction Behavior

CAC §2290 establishes procedures for the application of credit for good behavior in prison which may be used to reduce the term or advance a parole date already established.

Statements submitted into prisoner's record pursuant to PC §§1203.01 and 3042 have been considered by the Board panel in this hearing.

March 23, 1979 to March 1980:                    MONTHS

RCC-CIM-SQ, vocational electrical maintenance 5/79 - 12/79, to school full time, group therapy, and disciplinary free -                              4

March 1980 to March 1981:

SQ-Med A, school full time, Catholic chapel worker, group therapy, and disciplinary free-                              4

March 1981 to March 1982:

7/20/87, received a California Department of Corrections (CDC) disciplinary (115) for marijuana

**HERNANDEZ, P.  C-03015        -7-        8/3/88**
ld

possession, 6/12/87, graduated from

high school, Mens Advisory Council

(MAN) vice president, janitor, self-

help-Navy video-with laudatories –                    0

    March 1982 to March 1983:

    MCF, captains clerk with

laudatories, assigned dental clinic,

MAC vice president, college courses –                  4

    March 1983 to March 1984:

    CTF, Medium A, received a CDC

115 for force and violence, maintenance

work crew, vocational TV prod. –                       0

    March 1984 to March 1985:

    CTF, Vocational TV prod, one year

completed, community awareness group,

self-help, and disciplinary free –                     4

    March 1985 to March 1986:

    CTF-CMC 12/85, vocational TV prod.

transferred to procurement clerk, and

disciplinary free –                                    4

    March 1986 to March 1987:

    CMC, vocational electronics,

data processing, participation in AA

and substance abuse group, and

HERNANDEZ, P.  C-03015         -8-         8/3/88
ld

disciplinary free –                                          4

    March 1987 to March 1988:

    CMC, vocational electrinocs,

data processing, participation in AA

and substance abuse group, and

disciplinary free –                                          4

    March 1988 to August 3, 1988:

    CMC-Category he participated in

 the Category X program, AA, and

vocational data processing –                            <u>2</u>

    TOTAL                                          30

Order

    PC §3041.5(b)(1) provides that within ten days

following any meeting where a parole date has been set, the

Board shall send the prisoner a written statement setting

forth his parole date, the conditions he must meet in order

to be released on the date set, and the consequences of

failure to meet such conditions.

    The total period of confinement pursuant to this

decision is composed of:  252 months Base Term and

enhancements; less 30 months post-conviction credits for a

total of 222 months.

    The prisoner shall not engage in the conduct specified

in CAC §2451.  Such conduct may result in rescission or

RECORDS OFFICER
USE
Pre-prison
Credit

postponement of the parole date.

### Parole Conditions

PC §3053 provides that the BPT, upon granting any

parole to any prisoner, may impose on the parole such

conditions as it may deem proper.

The prisoner is to be released pursuant to the notice

and general conditions of parole established in CAC §§2511

& 2512.

In addition, the prisoner is subject to the following

Special Conditions of Parole pursuant to CAC §2513:

    1.  Do not use alcoholic beverages;

    2.  Participate in anti-narcotic testing.

EFFECTIVE DATE OF THIS DECISION _____.

HERNANDEZ, P.  C-03015          -10-          8/3/88
1d

MISCELLANEOUS DECISIONS

## FACTS

8-3-88    —     Life parole consideration hearing conducted at California Mens Colony-East. Parole date granted.

9/19/88   —     Decision Review Committee met and vacated decision of 8/3/88 and ordered new hearing.

## RECOMMENDATION(S)

Schedule for new hearing as soon as possible on next available calendar.

| STAFF (Name) | TITLE | DATE |
|---|---|---|
|  |  |  |

## DECISION(S)

1.

2.

3.

| PANEL HEARING CASE | DECISION DATE |
|---|---|
| NAME   Robert L. Patterson | 10/21/88 |

NAME

NAME

| NAME | NUMBER | INSTITUTION OR REGION (UNIT) |
|---|---|---|
| HERNANDEZ, P. | B-03015 | CMC-EAST |

           PERMANENT ADDENC

BOARD OF PRISON TERMS STATE OF CALIFORNIA
REVIEW OF PROPOSED DECISION

--------------------------------------------------------------------

| ☐ APPROVED | ☒ REFER TO DECISION REVIEW COMMITTEE | ☐ REFER TO RECONSIDERATION PANEL |

| INMATE    Hernandez, Peter | CDC NUMBER   C-03015 |
| TYPE OF HEARING   Life | DATE OF HEARING   August 3, 1988 |

The Decision Review Unit has completed a review of the above hearing and has identified the following issues which need further review. (Attach page 2 if necessary.)

1. The panel, when dictating the "legal status," set forth that the murder first conviction (Count 1) was while armed (12022 PC) and that he used a firearm in the commission of the offense (12022.5 PC).

     Recommendation:   That the "12022/12022.5 "be stricken.

     a)  We believe, however, that notwithstanding the action of the court, the Board may, pursuant to CCR §2285, upon finding that the inmate personally used a firearm in the (a) life crime, the panel may properly assess an additional 24 month enhancement.

2. We also note that the panel chose the base matrix of "III-C" stating, "...that there was no prior relationship with the victim and the death was immediate. While it is true that there was no prior relationship (known), if death was immediate (then the BPT matrix) III B appears to be the appropriate matrix to use. III C relates to "severe trauma."

3. Number 5 for justification, "...prisoner lacks a significant criminal history of violent crime," while this appears to be correct, we discovered during our review that the inmate's juvenile record was destroyed (page 7 Institutional Programming Summary). Accordingly, and

RECOMMENDATION:
     See BPT 1139 Modification Ordered.

| DECISION REVIEW UNIT SIGNATURE                  WILLIAM V. CASHDOLLAR | DATE      August 26, 1988 |

| REVIEWED BY LEGAL COUNSEL ☐ YES ☐ NO | LEGAL COUNSEL INITIALS | RESULT ☐ CONCUR ☐ DISSENT |
| LEGAL COUNSEL COMMENTS. | | |

I have reviewed the above-referenced file and ☒ concur  ☐ dissent with the Decision Review Unit.
COMMENTS.

Refer to Decision Review Committee

| CHIEF DEPUTY COMMISSIONER SIGNATURE | DATE   9/6/88 |

BPT 1139 (4/57)                                                  Page 1 of 2
BOARD OF PRISON TERMS                                                STATE OF CALIFORNIA
REVIEW OF PROPOSED DECISION

BOARD OF PRISON TERMS                                                    STATE OF CALIFORNIA
## DECISION REVIEW COMMITTEE REVIEW OF PROPOSED DECISION

| INMATE Hernandez, Peter | CDC NUMBER C-03015 |
|---|---|
| TYPE OF HEARING Life | DATE OF HEARING August 3, 1988 |

☐ Affirm original decision    ☑ Schedule new hearing    ☐ Modify decision

MODIFICATION ORDERED: (Panel - Please Mark Appropriate Box Above)

1.  Strike the "12022/12022.5 PC" from Count 1, page one of the proposed decision, under the category "Legal Status."
2.  Since the matrix of III C is "14-16-18" and III B is "13-15-17," we order that this entire matter be reheard so that all circumstances may be given proper weight. We recommend that the rehearing panel, absent establishing cause not to, that it seriously consider following the intent of the first panel with respect to the granting of the date.
3.  We order that the rehearing panel determine the appropriateness of relying on the absence of a violent history since we are informed that the inmate's (24 years old at entry into prison) juvenile record had been destroyed and therefore is not available to rely on.
4.  We order a new hearing.

SUPPORTIVE REASONING FOR DECISION:

1.  To comply with the court's finding.
2.  To provide the Board with adequate discretion to structure a sentence in keeping with the facts of this case.
3.  To provide for correct result.
4.  To allow the Board the ability to fully consider all aspects of this case.

| | | |
|---|---|---|
| _Rudolph Castro_ | 9-19-88 | ☑ Concur |
| COMMISSIONER SIGNATURE | DATE | ☑ CONCUR    ☐ DISSENT |
| _Joseph F. Cura_ | 9-19-88 | |
| COMMISSIONER/D. C. SIGNATURE | DATE | ☑ CONCUR    ☐ DISSENT |
| | | ☐ CONCUR    ☐ DISSENT |
| COMMISSIONER/D. C. SIGNATURE | DATE | |

I dissent from the majority for the following reasons:

| | |
|---|---|
| SIGNATURE | DATE |

BPT 1139 (4/87)

=================================================================

absent such a record, reliance on such a "fact" should be reviewed by the Decision Review
Committee.

4.  Calculation error – (Count 3 only; may wish to consider Count 2).

| | Crime | Panel Calculation | | Recommended Calculation |
|---|---|---|---|---|
| Count 1 | 187 | Base | 180 | 180 |
| | 12022 12022.5 | (BPT 2285) | 24 | 24 |
| Count 2 | 217 12022.5 | Principal | 36 Ø | Principal 36 (24)[1] |
| Count 3 | 217 12022.5 | Subordinate | 12 Ø[2] | Subordinate 12 8 |
| | | | 252 months | 264 months (+12 months) |

Note: if Panel
calculation accepted,
then only error relate
to Count 3, regarding
12022.5.

_____

1/  Panel did not enhance for firearm; already did so for the same gun on the murder, and felt
the term was sufficient.  This is entirely appropriate, and we only place the "24" within the
Recommended Calculation category to (1) allow the Decision Review Committee the opportunity
to review, but more importantly (2) to establish that it is entirely appropriate to assess a
24 month enhancement under PC 1170.1 as the enhancement relates to a "violent felony" (PC 667.
and may be used for the life crime and the non-life crime.

2/  Panel failed to mention any reason to mitigate or to not impose.

LIFE PRISONER DECISION F₁

| PERIOD OF CONFINEMENT |
|---|
| *(RECORDS OFFICER USE ONLY)* |

|  | YR | MO | DAY |
|---|---|---|---|
| Adjusted Period of Confinement | 17 | 11 | 10 |
| Reception Date (See BPT §2289) + | 79 | 3 | 23 |
| At Large Time + |  |  |  |
| PAROLE DATE = | 97 | -3 | -5 |

**MISCELLANEOUS**

parole granted
Keep at CMC until finishes Vocation Training.
Place on appropriate progress calendar PH 8/9

**PENAL CODE NOTICES**

SECTION 3042    [X] SENT _____ June 30, 1988 _____
(DATE)

**COMMITMENT OFFENSE**

| 187PC | Murder 1st |
|---|---|
| (CODE SECTION) | (TITLE) |
| A334928 | Ct. 1 |
| (CASE NUMBER) | (COUNT NUMBER) |

| Date Received by CDC | Controlling MEPD |
|---|---|
| 3-23-79 | 9-3-85 |

**Type of Hearing** [ ] INITIAL [X] SUBSEQUENT __3__ (HEARING NO.)
If Subsequent Hearing, Date of Last Hearing 8-6-87

**Department Representative**

| Counsel for Prisoner | Address | 93561 |
|---|---|---|
| Linda Clark | 102 South Robinson, PO Box 26, Tehachapi, CA |
| District Attorney Representative | County |
|  | L.A. |

**PAROLE HEARING CALENDAR**

*The following represents the findings, determination, and order of the Board of Prison Terms, State of California.*

By:

| Presiding (Name) | Date |
|---|---|
| Usher M Leddy | A |
| Concurring (Name) | Date |
| Laureen Olorrell | J |
| Concurring (Name) | Date |
| Eleo Beron | 2 |

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| HERNANDEZ, PETER | C-03015 | CMC-E | 8/88 | 8-3-88 |

## PERIOD OF CONFINEMENT
### (RECORDS OFFICER USE ONLY)

| | | YR | MO | DAY |
|---|---|---|---|---|
| Adjusted Period of Confinement | 15- 05- 10 | 15 - | 11 - | 10 |
| Reception Date (See BPT §2289) | 79- 03- 23 | + 79- | 03 | 23 |
| At Large Time | -0- | + | -0- | |
| PAROLE DATE | 94- 09- 02 | = 95 - | 03 - | 03 |

## MISCELLANEOUS

Parole granted

PH 1/93

**PENAL CODE NOTICES**

SECTION 3042     [X] SENT _____ 11-30-89
                                    (DATE)

**COMMITMENT OFFENSE**

| 187 PC | | MURDER 1ST | |
|---|---|---|---|
| | (CODE SECTION) | | (TITLE) |
| A334928 | | 1 | |
| | (CASE NUMBER) | | (COUNT NUMBER) |

| Date Received by CDC<br>3-23-79 | Controlling MEPD<br>9-3-85 |
|---|---|
| Type of Hearing   [ ] INITIAL   [X] SUBSEQUENT ___ 5 ___ (HEARING NO.) | If Subsequent Hearing, Date of Last Hearing<br>1-25-89 |

**Department Representative**

| Counsel for Prisoner<br>LINDA CLARK | Address<br>P.O. BOX 26 TEHACHAPI, CA. 93561 |
|---|---|
| District Attorney Representative | County<br>LOS ANGELES |

## PAROLE HEARING CALENDAR

*The following represents the findings, determination, and order of the Board of Prison Terms, State of California.*

By:

| Presiding (Name) | Date |
|---|---|
| | |
| Concurring (Name) | Date |
| | 23/90 |
| Concurring (Name) | Date |
| Kay Jaurequi | |

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| HERNANDEZ, PETER | C-03015 | CMC-E | 1-90 | 1-23-90 |

   PERMANENT ADDENDA

CALIFORNIA BOARD OF PRISON TERMS

In the Matter of the                                    Life Prisoner

Hearing of                          Subsequent Parole Consideration (5)

HERNANDEZ, Peter                                            Granted

C-03015

CMC-E

    This matter was heard before the Board of Prison Terms (BPT)

on January 23, 1990, at the California Mens Colony-East.  The

hearing panel was composed of D. Brown, Commissioner; R. Jauregui,

Commissioner; and E. Coldren, Deputy Commissioner.

    Present at the hearing were:  P. Hernandez, Prisoner; L.

Clark, Counsel for Prisoner; and H. Giss, Deputy District Attorney,

Los Angeles County.

    Any others present are identified in the transcript.

    Oral and documentary evidence was submitted and after due

consideration of all the evidence, the panel makes the following

findings:

    Legal Status

    On March 23, 1979, the prisoner was received in prison

pursuant to Penal Code (PC) §1168 for a violation of PC §187 and

pursuant to PC §1170 for a violation of PC §§217/12022.5, first

degree murder and assault with intent to commit murder with use of

a firearm, two counts (Los Angeles County Case No. A-334928,

Counts 1, 2 and 3).  The controlling minimum eligible parole date

(MEPD) was September 3, 1985.

FOR
RECORDS OFFICE:
USE
Pre-prison
Credit

PC §3041(a) provides that the BPT shall meet with persons sentenced under PC §1168 and shall normally set a parole release date unless, pursuant to PC §3041(b), the Board determines that a parole date cannot be fixed at this hearing.

This hearing is conducted pursuant to Title 15, California Code of Regulations (15 CCR), Division 2, Chapter 3, Article 5, which sets forth parole consideration criteria and guidelines for life prisoners implementing PC §3041.

Statement of Facts

The prisoner was convicted of first degree murder in the shooting death of victim Tony Sanchez. The prisoner went through three trials and was committed to the California Department of Corrections (CDC) nearly two years after the murder. The prisoner was arrested as a result of an investigation into a triple shooting which occurred April 25, 1977, at about 9:10 p.m., near 1185 West 24th Street in Los Angeles. Three victims, Tony Sanchez, Eledoro Rosales and Santo Rodriguez, were accosted by the prisoner and a crime partner while standing in front of the 24th Street address. After a few words between them, the prisoner drew a handgun and began firing. Victim Sanchez was immediately mortally wounded. Victim Rodriguez was

HERNANDEZ, P.  C-03015          -2-          1/23/90
km

FOR
RECORDS OFFICER
USE
Pre-prison
Credit

shot in the left eye, but turned and ran.  Victim Rosales
was subsequently shot in the buttocks as he and Rodriguez
fled on foot.  Victim Rosales died shortly after the
shooting, but his death was not connected to this incident
or the prisoner.

   Parole Suitability

   15 CCR §2281(a) requires that the panel first determine
whether the prisoner is suitable for release on parole.
Regardless of the length of time served, a life prisoner
shall be found unsuitable for and denied parole if in the
judgment of the panel the prisoner will pose an
unreasonable risk of danger to society if released from
prison.   15 CCR §2281(c) sets forth circumstances tending
to show unsuitability and 15 CCR §2281(d) sets forth
circumstances tending to show suitability.   These
regulations are guidelines only.

   The panel relied on the following circumstances in
determining whether or not the prisoner is suitable for
parole:

   1.   The prisoner has a stable social history as
exhibited by his reasonably stable relationships with
others including an honorable discharge from the United
States Army.

   2.   While imprisoned, the prisoner enhanced his ability

HERNANDEZ, P.  C-03015          -3-          1/23/90
Km

FOR
RECORDS OFFICER
USE
Pre-prison
Credit

to function within the law upon release through
participation in:

a)    Educational programs which included a high school
diploma on June 12, 1987;

b)    Self-help and therapy programs, notably Alcoholics
Anonymous (AA) with attendance from 1986 and continuing to
the present date;

c)    Vocational programs, i.e., Vocational Television
Production, Vocational Electric Maintenance, Vocational
Electronics and Data Processing, all completed;

d)    Institutional job assignments including Procurement
Clerk and Hospital Purchasing Clerk with exceptional work
reports.

3.    The motivation for crime was committed as a result
of significant stress in the prisoner's life at that time.

4.    The prisoner lacks a significant history of violent
crime.   There was an arrest for robbery on January 8, 1977,
which was reduced to Vehicle Code Section 10851 with a 36
month summary probation and fine.

5.    The prisoner's maturation, growth and understanding
and age upon release reduces the probability of recidivism.

6.    The prisoner has realistic parole plans which
include family support and employment offers.

7.    The prisoner has maintained close family ties while

FOR
RECORDS OFFICER
USE
Pre-prison
Credit

imprisoned via letters and some visits.

8.    The prisoner's positive institutional behavior
indicates significant improvement in self-control.    In
1988, the prisoner was granted a parole date but was not
approved upon review, yet he continued to maintain positive
adjustments giving a good indication of his ability to
function under stress.

9.    The prisoner shows signs of remorse and gives
indications that he understands the nature and magnitude of
the offense.    He accepts responsibility for his criminal
behavior, and has the desire to change toward good
citizenship.

10.    The representative of the District Attorney's
Office of Los Angeles who was at the hearing was not
opposed to parole and this was considered by the Panel.
The comments of the Decision Review Unit Report dated
August 26, 1988 were also considered by the panel.

11.    Psychiatric Factors.    The Psychiatric Evaluation
dated October 25, 1989, authored by Sherman E. Butler,
M.D., Staff Psychiatrist, is favorable for parole release.

The Category X Psychiatric Council Evaluation dated
June 28, 1988, authored by R. A. Orling, Ph.D., Senior
Psychologist, Steven C. Walker, Ph.D., Staff Psychologist,
and Ron Metz, Correctional Counselor II, is favorable and
indicates that the prisoner's violence potential is less

than average and he is expected to remain psychiatrically
stable upon release.

Based on the information contained in the record and
considered at this hearing, the panel states as required by
PC §3043.5 that the prisoner would not pose a threat to
public safety if released on parole.

Therefore, the prisoner is found suitable for a
projected release date.

### Base Term of Confinement

PC §3041(a) provides that if a prisoner is found
suitable for parole, the Board shall set a parole release
date in a manner "...that will provide uniform terms for
offenses of a similar gravity and magnitude in respect to
their threat to the public." 15 CCR §2280-2290 implement
this policy. 15 CCR §2282(a) requires that a term be set
for the base offense, the most serious of all life offenses
for which the prisoner has been committed to prison.
Suggested base terms are set forth in 15 CCR §2282(b). 15
CCR §§2283 and 2284 set forth circumstances in aggravation
and mitigation respectively. All of these regulations are
guidelines only.

Based upon the facts set forth above, the base offense
is first degree murder, PC §187, Case No. A-334928, Count
one.

*16- 11- 3c*
*− 00-06- 2?*

*16- 05- 1(*

The term is derived from the matrix at 15 CCR §2282(b), Category III-B, in that there was no prior relationship existed between the victim and the prisoner and death was immediate.

The panel assessed 204 months for the base offense and noted that this is the aggravated term due to the following reasons:

In committing the offense, the prisoner subjected two other persons to serious injury or death.

<u>Firearm Enhancement</u>

CAC §2285 provides for an additional term of 2 years if the prisoner personally used a firearm in the commission of any life crime unless the panel states specific reasons for not adding enhancement.

The term set forth above is increased by 2 years for the use of a firearm in the offense.

The panel is not assessing any time for the charges for assault with intent to commit murder with use of firearm violation of PC §217 and 12022.5 Case No. A-334928 Counts 2 and three.

The panel elected not to assess any time for non-life commitments because they occurred in the same transaction as the life crime and the panel further believes that the time assessed for the base offense is appropriate for the

16-05-12
+ 02-00-06

18-05-10

HERNANDEZ, P.   C-03015          -7-          1/23/90
km

total incident.

### Post-Conviction Behavior

15 CCR §2290 establishes procedures for the application of credit for good behavior in prison which may be used to reduce the term or advance a parole date already established.

March 1979 to March 1980:                    MONTHS

The prisoner participated in Vocational Electrical Maintenance. He went to school full time, participated in group therapy programming and remained disciplinary free –                                              4

March 1980 to March 1981:

The prisoner went to school full time at SQ.  He was a Catholic Chapel worker and participated in group therapy programming. He remained disciplinary free –                                4

March 1981 to March 1982:

On 7/20/87, the prisoner received a California Department of Corrections (CDC) disciplinary (115) for marijuana possession.  On 6/12/87, he graduated from high school.  He was vice president of the Mens Advisory Council (MAN) and a janitor –              0

HERNANDEZ, P.  C-03015          -8-          1/23/90
km

March 1982 to March 1983:

The prisoner was a Captains Clerk with

laudatories.  He was assigned to the dental

clinic.  He was the Mens Advisory Clinic

(MAC) Vice President and took college courses –          4

March 1983 to March 1984:

The prisoner received a CDC 115 for force

and violence.  He was assigned to the

maintenance crew and Vocational TV Prod. –               0

March 1984 to March 1985:

The prisoner completed one year in

Vocational TV Prod. at CTF.  He was involved

in the community awareness group and participated

in self-help.  He remained disciplinary free –          4

March 1985 to March 1986:

The prisoner was assigned to Vocational

TV Prod. at CTF/CMC.  He was a Procurement Clerk.

He remained disciplinary free –                          4

March 1986 to March 1987:

The prisoner was at CMC and assigned to

Vocational Electronics and Data Processing.

He participated in AA and substance abuse

groups.  He remained disciplinary free –                 4

March 1987 to March 1988:

HERNANDEZ, P.  C-03015          -9-          1/23/90
km

The prisoner continued Vocational

Electronics and Data Processing.  He continued

participation in AA and subtance abuse

groups.  He remained disciplinary free -                    4

March 1988 to March 1989:

The prisoner participated in the Category X

Program at CMC.  He continued participation in

Vocational Data Processing and AA.  He remained

disciplinary free -                                          4

March 1989 to January 23, 1989:

The prisoner was a Procurement Clerk.  He

continued Vocational Data Processing and

his participation in AA.  He remained disciplinary

free -                                                       4

TOTAL                                                       36

18-05-10
- 03-00-00

15-05-12

Statements submitted into the prisoner's record

pursuant to PC §§1203.01 and 3042 have been considered by

the Board panel in this hearing.

Order

PC §3041.5(b)(1) provides that within ten days

following any meeting where a parole date has been set, the

Board shall send the prisoner a written statement setting

forth his parole date, the conditions he must meet in order

to be released on the date set, and the consequences of

failure to meet such conditions.

The total period of confinement pursuant to this
decision is composed of: 228 months Base Term and
enhancements; less 36 months post-conviction credits for a
total of 192 months.

The prisoner shall not engage in the conduct specified
in 15 CCR §2451. Such conduct may result in rescission or
postponement of the parole date.

Parole Conditions

PC §3053 provides that the BPT, upon granting any
parole to any prisoner, may impose on the parole such
conditions as it may deem proper.

The prisoner is to be released pursuant to the notice
and general conditions of parole established in 15 CCR
§§2511 & 2512.

In addition, the prisoner is subject to the following
special conditions of parole pursuant to 15 CCR §2513:

1. Do not use alcoholic beverages.

2. Participate in anti-narcotic testing.

The reason for the imposition of Special Conditions is
that Alcohol abuse was related to the instant offense.

NOTE TO CDC STAFF:

If the prisoner is released to a county other than the
county of the commitment offense, the BPT is to be

HERNANDEZ, P.  C-03015          -11-          1/23/90
km

Pre-prison
Credit

notified.


EFFECTIVE DATE OF THIS DECISION      **FEB 2 2 1990**.


HERNANDEZ, P.  C-03015          -12-          1/23/90
km

BOARD OF PRISON TERMS                                    STATE OF CALIFORNIA  *2135*
## REVIEW OF PROPOSED DECISION

===================================================================
[ ] APPROVED        [X] REFER TO DECISION REVIEW COMMITTEE    [ ] REFER TO RECONSIDERATION PANEL

| INMATE    Peter Hernandez | CDC NUMBER  C 03015 |
|---|---|
| TYPE OF HEARING  Subsequent Parole Consideration Hearing | DATE OF HEARING 1/23/90 |

The Decision Review Unit (LMS) has completed a review of the above hearing and has identified the following issues which need further review.

The hearing panel in assessing the term gave the prisoner 6 months for a prior felony conviction under l5 CCR sec. 2286(c)(2). The conviction for which the time was assessed was a vehicle theft under VC sec. l0851 for which the prisoner was sentenced in l977 to 36 months summary probation and received a fine. This offense was not a felony (see PC § l7(b)(1) and the CII rap sheet). Therefore, six months should not have been assessed for this offense.

RECOMMENDATION:

Eliminate the paragraph (on page 7 of the yellow decision) assessing time for the prior felony conviction, change the total time assessed on page II of the blue decision to 228 months (instead of the panel's assessment of 234 months), and change the total decision time after deduction of credits to 192 months (from l98 months).

| DECISION REVIEW UNIT SIGNATURE | DATE |
|---|---|
| WILLIAM V. CASHDOLLAR | 2·5·90 |

| REVIEWED BY LEGAL COUNSEL | LEGAL COUNSEL INITIALS | RESULT |
|---|---|---|
| [ ] YES  [ ] NO | | [ ] CONCUR   [ ] DISSENT |

LEGAL COUNSEL COMMENTS:

I have reviewed the above-referenced file and  [X] concur   [ ] dissent with the Decision Review Unit.
COMMENTS:
*Refer To Decision Review Committee*

CHIEF DEPUTY COMMISSIONER SIGNATURE                      DATE
*James W. Rowland*                                       2-7-90

BPT 1138 (4/87)                          Page 1 of 1                          BOARD
STATE OF CALIFORNIA

BOARD OF PRISON TERMS                                        STATE OF CALIFORNIA
## DECISION REVIEW COMMITTEE REVIEW OF PROPOSED DECISION
==================================================================================

| INMATE    Peter Hernandez | CDC Number C 03015 |
|---|---|

| TYPE OF HEARING    Subsequent LIFE PAROLE CONSIDERATION | DATE OF HEARING 1/23/90 |
|---|---|

☐ Affirm original decision      ☐ Schedule new hearing      ☒ Modify decision

MODIFICATION ORDERED:

Eliminate the paragraph (on page 7 of the yellow decision) assessing time for the prior felony conviction, change the total time assessed on page II of the blue decision to 228 months (instead of the panel's assessment of 234 months), and change the total decision time after deduction of credits to 192 months (from 198 months).

SUPPORTIVE REASONING FOR DECISION:

This more closely carries out the intention of the hearing panel.

COMMISSIONER SIGNATURE        DATE    2/14/90    ☑ CONCUR    ☐ DISSENT

COMMISSIONER/D.C. SIGNATURE   DATE    2/14/90    ☑ CONCUR    ☐ DISSENT

COMMISSIONER/D.C. SIGNATURE   DATE    2/14/90    ☑ CONCUR    ☐ DISSENT

I dissent from the majority for the following reasons:


SIGNATURE                              DATE
==================================================================================
BPT 1139 (4/87)

60

person's really should be taken away because of maybe's and
innuendos.   And I agree with Mr. Giss, I think letters from
law enforcement agencies should be at least read between the
lines, because, I mean, it's kind of a "them and us"
attitude, you'll pardon me for saying this, Mr. Jauregui,
but I think you know what I'm talking about, the "them and
us" attitude, it seems to me, can go so far that it's
overboard.   And I don't, in my own mind, from having worked
with and talked with Mr. Hernandez for several years, I
don't believe this incident was gang related.   I think it
was what he says it was.   He was counseled by his attorney
or attorneys not to say what it was, not to discuss it, to
the point that finally he came forward himself, after his
appeal process was exhausted, and I believe he came in to a
room like this and told the truth about it for the first
time.   I think he's telling the truth today.   That's all I
have to say.

            **PRESIDING DEPUTY COMMISSIONER COLDREN:**   Thank you,
Miss Clark.   Mr. Hernandez?

            **INMATE HERNANDEZ:**   Yes, sir.   I have nothing.

            **PRESIDING DEPUTY COMMISSIONER COLDREN:**   Okay.   The
time is now eight minutes before 10:00 o'clock.   We're going
to go into recess, deliberate, and we'll go off record at
this time.

                            RECESS

            **PRESIDING DEPUTY COMMISSIONER COLDREN:**   Okay.   The

61

time is 10:40, and all parties previously assembled here,

including the prisoner, Mr. Hernandez.  Mr. Hernandez has

found you suitable for parole and relied upon the following

circumstances in determining that you are suitable and would

not pose a threat to public safety if paroled.  Number one.

Stable social history, as exhibited by reasonably stable

relationships with others, including an honorable discharge

from the U.S. Army.  While in prison, prisoner enhances

ability to function within the law upon release through

participation in educational programs, including a high

school diploma, on 06/12/87.  Self-help and therapy

programs, notably Alcoholics Anonymous, with attendance from

1986 continuing to the present date.  Vocational programs;

Vocational T.V. Production, Vocational Electrical

Maintenance, Vocational Electronics, Data Processing, all

completed.  Institutional job assignments, including

Procurement Clerk and Hospital Purchasing Clerk, all with

exceptional work reports.  Motivation for the crime

committed as a result of significant stresses in the

prisoner's life at that time.  There is a lack of

significant criminal history of violent crime.  There was an

arrest for robbery on 01/08/77, but this was reduced to a

violation of 10851 of the Vehicle Code, with a 36 months

summary probation assessed, as well as a fine.  Prisoner's

maturation, growth, understanding, and age upon release

reduces the probability of recidivism.  Realistic parole

62

plans include family support and employment offers. Prisoner has maintained close family ties while in prison via letters and some visits. There is a positive institutional behavior which indicates significant improvement in self-control. The panel notes that in 1988, the prisoner was granted a parole date, but this was not approved upon review. Yet, prisoner continued to maintain positive adjustments, giving a good indication of his ability to function under stress. Signs of remorse. The prisoner gives indications that he understands the nature and magnitude of the offense, and accepts responsibility for his criminal behavior. He has the desire to change toward good citizenship. Other reasons or information bearing upon suitability for release include the following. The District Attorney's Office of Los Angeles is not opposed to parole, and this was considered by the panel. The comments of the Decision Review Unit Report dated 08/26/88 were also considered by the panel. Under psychiatric factors. The psychiatric report dated 10/25/89, authored by Dr. Butler, is favorable for parole release. The Category X evaluation report dated 06/28/88, authored by Dr. Orling, is favorable, and indicates that prisoner's violence potential is less than average, and he is expected to remain psychiatrically stable upon release. Base term of confinement. Based upon the facts set forth above, the base offense is murder first degree, a violation of Penal Code Section 187, case number

63

A-334928, count one. The term is derived from the matrix at
B.P.T. rules 2282-B, and 2282-C, categories 3-B, in that no
prior relationship existed between the victim and the
prisoner and death was immediate. The panel assessed 204
months for the base offense, and noted that this is the
aggravated term due to the following. In committing the
offense, prisoner subjected two other persons to serious
injury or death. Under firearm enhancement, the panel
assesses 24 months. Under non-life commitment, principle
term, and the other term, subordinate term, those were the
charges of assault with intent to commit murder with use of
firearm, a violation of Penal Code Section 217 and 12022.5
under case number A-334928, counts two and three, the panel
assessed zero time. Panel elected not to assess any term
for non-life commitments because they occurred in the same
transaction as the life crime, and panel further believes
that the time assessed for the base offense is appropriate
for the total incident. Prior felony convictions with
probation. On 01/08/77, for the offense of vehicle theft, a
violation of Penal Code Section 10851 of the Vehicle Code
under Los Angeles County, panel assesses a period of six
months for that offense. Total term, which is the base
offense, the fire enhancement, and other crimes, totals 238
months. Post-conviction credit from 03/23/79 to 01/23/90 is
36 months, giving a total period of confinement of 198
months. Special conditions of parole include the following.

64

1

2  Do not use alcoholic beverages and participate in anti-
3  narcotic testing.  The reasons for the imposition of these
4  special conditions are that alcohol abuse was related to the
5  incident offense.

6    BOARD COMMISSIONER BROWN:  We should also add that
7  if the prisoner is paroled to any County other than the
8  County of commitment, that the Board of Prison Terms is to
9  be notified by the Department of Corrections.

10    PRESIDING DEPUTY COMMISSIONER COLDREN:  That's
11  correct.  And that concludes the reading of the decision.
12  At this time I'll ask any members if they have any comments.

13    BOARD COMMISSIONER BROWN:  Just wish you luck.
14  You've got a date, now.

15    INMATE HERNANDEZ:  Thank you, Mr. Brown, Mr.
16  Coldren, Mr. Jauregui, Mr. Giss, and --

17    PRESIDING DEPUTY COMMISSIONER COLDREN:  You know
18  this has to be reviewed by --

19    INMATE HERNANDEZ:  I understand.

20    PRESIDING DEPUTY COMMISSIONER COLDREN:  -- our
21  office.

22    INMATE HERNANDEZ:  I understand that.  And I just,
23  you know, want to thank you again for giving me this second
24  chance.  I know the seriousness of the crime.  I know what I
25  did.  And nothing, doing this time probably will never pay
26  for what I did.  And I just want to make this the last time
27  I ever, you know, put myself in situations where I'm going

28

65

1  to end up in prison again.

2          **PRESIDING DEPUTY COMMISSIONER COLDREN:**    Okay.    The

3  time --

4          **MR. GISS:**    For my record keeping, have I done this

5  right, he's got 36 months to release?

6          **BOARD COMMISSIONER BROWN:**    No, we don't know.

7          **MR. GISS:**    Okay.

8          **BOARD COMMISSIONER BROWN:**    That would have to be

9  figured out by the records.

10         **MR. GISS:**    Okay.    He had 234,minus 198 for credit?

11         **PRESIDING DEPUTY COMMISSIONER COLDREN:**    No, he had

12 234  minus  36  for  credit,  leaving  a  total  period  of

13 confinement of 198.

14         **MR. GISS:**    Okay.

15         **PRESIDING DEPUTY COMMISSIONER COLDREN:**    And from

16 that,  records  personnel  will  subtract  any  pre-conviction

17 credit,  and  then  any  additional  progress  reports  that  can

18 give  him  additional  good  time  credits  will  be  calculated

19 later.

20         **MR. GISS:**    Okay.    Thank you.

21         **PRESIDING DEPUTY COMMISSIONER COLDREN:**    Okay.    The

22 time is now 12 minutes before the hour of 11:00 o'clock, and

23 we're going to go off record at this time.

66

## CERTIFICATION AND

## DECLARATION OF TRANSCRIBER

I, **LINDA LARSON,** a duly designated transcriber of **PRESTON'S LEGAL SUPPORT** SERVICES, do hereby declare and certify under penalty of perjury that I have transcribed Tape(s) which total **two** in number and cover a total of pages numbered **1 - 65,** and which recording was duly recorded at **San Luis Obispo,** California, in the Matter of **SUBSEQUENT PAROLE CONSIDERATION HEARING OF PETER HERNANDEZ,** on the **23rd day of January, 1990,** and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability. I hereby certify that I am a disinterested party in the above captioned matter and have no interest in the outcome of the hearing.

Dated this **14th day of May, 1990** at Sacramento, California.

**LINDA LARSON**
**TRANSCRIBER**

-oOo-

PRESTON'S LEGAL SUPPORT SERVICES
P.O. BOX 340157, SACRAMENTO, CA 95834-0157
(916) 567-0880

EXHIBIT "B"

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PRISON TERMS

**INMATE**
**COPY**

| | |
|---|---|
| In the matter of the Life | ( |
| Term Parole Consideration | (    CDC Number C-03015 |
| Hearing of: | ( |
| | ( |
| PETER HERNANDEZ | ( |
| | ( |

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

JULY 13, 2006

PANEL PRESENT:

JAMES DAVIS, Presiding Commissioner
DENNIS SMITH, Deputy Commissioner

OTHERS PRESENT:

PETER HERNANDEZ, Inmate
PAUL TURLEY, Deputy District Attorney
KATERA E. RUTLEDGE, Attorney for Inmate
CORRECTIONAL OFFICERS UNIDENTIFIED

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ NO    See Review of Hearing
_____ Yes    Transcript Memorandum

**Patty L. Duran, Northern California Court Reporters**

INDEX

| | Page |
|---|---|
| Proceedings | 1 |
| Case Factors | 9 |
| Pre-Commitment Factors | 19 |
| Parole Plans | 45 |
| Post-Commitment Factors | 55 |
| Closing Statements | 62 |
| Recess | 69 |
| Decision | 70 |
| Adjournment | 78 |
| Transcriber Certification | 79 |

--oOo--

```
                    P R O C E E D I N G S
```

1
2    DEPUTY COMMISSIONER SMITH: We're on the
3    record.
4        PRESIDING COMMISSIONER DAVIS: This is a
5    subsequent parole consideration hearing for Peter
6    Hernandez, CDC number C-03015. Today's date is
7    July the 13th, 2006. We're located at the
8    Correctional Training Facility in Soledad. The
9    inmate was received on March 23rd, 1979, from Los
10   Angeles County and a life term began on March
11   23rd, 1979, with a minimum eligible parole date
12   of September 3rd, 1985. The controlling offense
13   was the inmate had been committed of murder
14   first, case number A334928, count one Penal Code
15   Section 187. The inmate received a term of seven
16   years to life. This hearing is being tape-
17   recorded and for the purposes of voice
18   identification, we'll each state our first and
19   last name. When it reaches you Mr. Hernandez if
20   you'll also give us your CDC number first.
21        INMATE HERNANDEZ: Yes.
22        PRESIDING COMMISSIONER DAVIS: So I'll
23   start in with my left. I'm James Davis, D-A-V-I-
24   S, Commissioner.
25        DEPUTY COMMISSIONER SMITH: My name is
26   Dennis Smith, S-M-I-T-H. I'm Deputy
27   Commissioner.

1    DEPUTY DISTRICT ATTORNEY TURLEY:  Paul

2    Turley, T-U-R-L-E-Y.  DA's Office, LA County.

3    ATTORNEY RUTLEDGE:  Katera E. Rutledge.

4    R-U-T-L-E-D-G-E, Attorney for Mr. Hernandez.

5    INMATE HERNANDEZ:  Peter Hernandez.

6    Prisoner.  Prisoner number C-03015.

7    DEPUTY COMMISSIONER SMITH:  Spell your

8    last name please, sir.

9    INMATE HERNANDEZ:  H-E-R-N-A-N-D-E-Z.

10    DEPUTY COMMISSIONER SMITH:  Thank you.

11    sir.

12    PRESIDING COMMISSIONER DAVIS:  And let

13    the record also reflect we're joined by two

14    Correctional Officers who are here for security

15    purposes only and will not be actively

16    participating in this hearing.  Before we begin,

17    Mr. Hernandez in front of you in the laminated

18    piece of paper if you would read the Americans

19    with Disabilities Act Statement please.

20    INMATE HERNANDEZ:  "ADA,

21    Americans with Disabilities Act.  The

22    Americans with Disability (sic) Act is

23    a law to help people with disability,

24    disability problems that make it hard

25    for some people to see, hear, to read,

26    talk, walk, learn, (inaudible), work,

27    take care of themselves and

1    (inaudible).  Nobody can be kept out of
2    business or activities because of
3    disability.  If you have a disability
4    you have the right to ask for help to
5    get ready for your BPT hearing.
6    (inaudible) hearing, talk, read forms
7    and papers and understand that
8    (inaudible) making sure what you ask
9    for to make sure that you have a
10   disability that is covered by the ADA
11   and that you have asked for the right
12   kind of help.  If you do not get help,
13   or if you don't think you got the kind
14   of help you need, ask for the BPT 1074
15   grievance form.  You can also get help
16   to fill it out."
17   PRESIDING COMMISSIONER DAVIS: That's very
18   good.  Thank you.
19   INMATE HERNANDEZ: You're welcome.
20   PRESIDING COMMISSIONER DAVIS: And I
21   notice you were able to do that without glasses
22   today.  Do you normally wear glasses?
23   INMATE HERNANDEZ: No, I don't.
24   PRESIDING COMMISSIONER DAVIS: Good for
25   you.  And you're able to hear me all right?
26   INMATE HERNANDEZ: Yes, sir.
27   PRESIDING COMMISSIONER DAVIS: You walked

1    here today on your (inaudible)?

2          **INMATE HERNANDEZ:** Yes, sir.

3          **PRESIDING COMMISSIONER DAVIS:** All right.

4          I see we're set and ready to go?

5          **INMATE HERNANDEZ:** Yes, sir.

6          **PRESIDING COMMISSIONER DAVIS:** Excellent.

7    I notice that with regard to the 1073 form, BPT

8    1073 form you reviewed together with staff of the

9    institution and it being that you do not have any

10    disability that would be qualified under the

11    Americans with Disabilities Act.  Is that

12    correct?

13          **INMATE HERNANDEZ:** That's correct.

14          **PRESIDING COMMISSIONER DAVIS:** All right.

15    Can you think of any reason why you would not be

16    able to actively participate in this hearing this

17    afternoon?

18          **INMATE HERNANDEZ:** No, sir.

19          **PRESIDING COMMISSIONER DAVIS:** Okay.

20    Great.  And counselor, you're also satisfied with

21    that?

22          **ATTORNEY RUTLEDGE:** Yes, sir.

23          **PRESIDING COMMISSIONER DAVIS:** Very well.

24    You, this hearing is being conducted pursuant to

25    Penal Code Sections 3041, 3042 and the Rules and

26    Regulations of the Board of Prison Terms covering

27    parole consideration terms for life inmates.  The

1    purpose of today's hearing is we once again
2    consider the number and nature of the crimes for
3    which you were committed, your prior criminal and
4    social history and your behavior in the
5    programming since you were committed. We've had
6    the opportunity to review your Central File and
7    your prior transcripts and you'll be given an
8    opportunity to correct or clarify the record as
9    we proceed. We will reach a decision today and
10   inform you of whether or not we find you suitable
11   for parole and the reasons for our decision. If
12   you are found suitable for parole the length of
13   your confinement will be explained to you.
14   Nothing that happens in today's hearing will
15   change the findings of the court and we're not
16   here to retry your case. The Panel is here for
17   the sole purpose of determining your suitability
18   for parole. Do you understand that sir?
19            INMATE HERNANDEZ:  Yes, sir.
20            PRESIDING COMMISSIONER DAVIS:  And the
21   hearing will be conducted in basically two
22   phases.  First, I will discuss with you the crime
23   for which you were committed, as well as your
24   prior criminal and social history.  And
25   Commissioner Smith will then discuss with you
26   your progress, your counselor's report and your
27   psychological evaluation, as well, as well as

5

1    your parole plans and any letters of support or
2    opposition, if they may exist. Once that's
3    concluded the Commissioner, with District
4    Attorney and your Attorney will be given an
5    opportunity to ask you questions. Questions that
6    come from the District Attorney will be asked
7    through the chair and you will respond back to
8    the Panel with your answer. Next, the District
9    Attorney and then your Attorney and then finally
10    you will be given an opportunity to make a
11    closing statement. Those statements are --
12    should focus on why you believe that you are
13    suitable for parole. California Code of
14    Regulations states that regardless of time served
15    an inmate shall be found unsuitable for and
16    denied parole if in the judgment of the Panel the
17    inmate would pose an unreasonable risk of danger
18    to society if released from prison. You have
19    certain rights. Those rights include right to a
20    timely notice of this hearing, the right to
21    review your Central File and the right to present
22    relevant documents. Counselor, are you satisfied
23    that your client's rights have been met today?
24            ATTORNEY RUTLEDGE:  Yes, sir.
25        PRESIDING COMMISSIONER DAVIS:  All right.
26    Mr. Hernandez, you also have an additional right
27    and that is to be heard by an impartial Panel.

1    Now you've heard Mr. Smith and I introduce

2    ourselves today.  Do you have any reason to

3    believe that we would not be impartial?

4         INMATE HERNANDEZ:  No, sir.

5         PRESIDING COMMISSIONER DAVIS: 'Thank you.

6    And you will receive a written copy of our

7    tentative decision today.  That decision becomes

8    effect within 120 days.  A copy of the decision

9    and a copy of the transcript will be sent to you.

10   You are not required to admit your offense today

11   or discuss your offense, however the Panel does

12   accept the findings of the court to be true.  Do

13   you understand that?

14         INMATE HERNANDEZ:  Yes, sir.

15         PRESIDING COMMISSIONER DAVIS:  Great.

16   The Board has (inaudible) process.  If you

17   disagree with anything in today's hearing you

18   have the right to go directly to court with your

19   complaint.  Mr. Smith, we going to be dealing

20   with anything from the confidential file

21   (inaudible)?

22         DEPUTY COMMISSIONER SMITH:  No, we will

23   not.

24         PRESIDING COMMISSIONER DAVIS: Okay.  I'm

25   going to pass the checklist of documents to both

26   counsel.  If you would take a look at this and

27   make sure we're offering you all the same list of

```
 1   documents.

 2   DEPUTY DISTRICT ATTORNEY TURLEY:  I have

 3   those.

 4   ATTORNEY RUTLEDGE:  Yes, sir.  Thank you.

 5   We have the document.

 6   PRESIDING COMMISSIONER DAVIS:  All right.

 7   Thank you.  Those will be marked as Exhibit 1

 8   then.  (inaudible).  Ms. Rutledge, any additional

 9   documents that you'd like us to consider today?

10   ATTORNEY RUTLEDGE:  No, sir.

11   PRESIDING COMMISSIONER DAVIS:  Any

12   preliminary objections?

13   ATTORNEY RUTLEDGE:  We would just note

14   that Mr. Hernandez's hearing should have been in

15   December of last year.  Is that correct?

16   INMATE HERNANDEZ:  About, yes.

17   ATTORNEY RUTLEDGE:  But, so it's about

18   what, eight months behind?

19   PRESIDING COMMISSIONER DAVIS:  It is.

20   ATTORNEY RUTLEDGE:  Okay.  We just wanted

21   to note for the record that is beings (sic)

22   approximately eight months behind.

23   PRESIDING COMMISSIONER DAVIS:  We -- we

24   apologize for the delay Mr. Hernandez.

25   INMATE HERNANDEZ:  Okay.

26   PRESIDING COMMISSIONER DAVIS:  Will your

27   client be speaking with us today?
```

1    ATTORNEY RUTLEDGE: Yes.

2    DEPUTY COMMISSIONER SMITH: Actually if I

3    can correct that. His last hearing was in

4    January of '05.

5    ATTORNEY RUTLEDGE: Oh.

6    DEPUTY COMMISSIONER SMITH: So, so we're

7    roughly six months --

8    ATTORNEY RUTLEDGE: Yeah.

9    DEPUTY COMMISSIONER SMITH: -- past.

10    That was last year.

11    ATTORNEY RUTLEDGE: Okay. Thank you.

12    DEPUTY COMMISSIONER SMITH: You're

13    welcome.

14    ATTORNEY RUTLEDGE: There was another

15    question you had.

16    PRESIDING COMMISSIONER DAVIS: Will --

17    will Mr. Hernandez be speaking with us today?

18    ATTORNEY RUTLEDGE: Yes, sir. He'll be

19    speaking with you on all subjects and issues.

20    PRESIDING COMMISSIONER DAVIS: Very well.

21    Mr. Hernandez, would you raise your right hand

22    please, sir? Do you solemnly swear that the

23    testimony you will give at the hearing today will

24    be the truth and nothing but the truth?

25    INMATE HERNANDEZ: Yes, sir.

26    PRESIDING COMMISSIONER DAVIS: Okay. All

27    right. Without objection I'm going to

1    incorporate by reference the court of appeals
2    document from April 21st, 1981, pages through,
3    through 8, pages 3 through 8.  And they refer to
4    the summary of the ward report of the 2004
5    calendar starting on page 1 where it states under
6    (a)1.  Summary of the crime:
7        "On 4-25-77 at approximately 9:00
8        p.m. Peter Hernandez and co-
9        defendant Jose Montez approached
10       three Mexican-American males in a
11       residential area of Los Angeles.
12       Following a brief conversation
13       Hernandez pulled a gun from his
14       coat, fired a shot at victim Tony
15       Sanchez, S-A-N-C-H-E-Z, at point
16       blank range killing him with a shot
17       to the heart.  Victims Rosales and
18       Rodriguez, R-O-S-A-L-E-S, and
19       Rodriguez, R-O-D-R-I-G-U-E-Z, ran
20       from the scene, but were pursued by
21       Hernandez who continued firing the
22       gun striking both men in the leg as
23       crime partner Montez, M-O-N-T-E-Z,
24       yelled, 'Get them, get them'.  After
25       emptying the weapon Hernandez and
26       Montez returned to the van that
27       Hernandez had been driving and fled

1  the scene. Hernandez was later
2  identified by the wounded victims.
3  He and Montez were apprehended at
4  their residences on the following
5  morning. Subsequent investigation
6  revealed that Hernandez had
7  attempted to purchase marijuana from
8  the victims and when advised that
9  they had none opened fire. Both
10 Hernandez and Montez denied any
11 involvement in the crime maintaining
12 this denial through three trials,
13 the third of which resulted in
14 Hernandez's conviction for the
15 present case and Montez's conviction
16 for murder second degree. It was
17 noted that all three victims were
18 known gang members and that the
19 motive for the crime was believed by
20 the District Attorney's Office to
21 have been gang related. Hernandez
22 continued to maintain his innocence
23 until exhaustion of all fuels
24 processed at which time he admitted
25 his guilt and the information for
26 this came from the 6158B diagnostic
27 being the evaluation pages 2 through

1     3 and the Probation Officer's quote

2     pages 5 through 7 and a (inaudible)

3     decision made on 6-28-1 pages 8

4     through 12 and 14 through 15."

5     So, Mr. Hernandez, did you commit this

6     crime?

7     INMATE HERNANDEZ: Yes, sir.

8     PRESIDING COMMISSIONER DAVIS: Now I know

9     that you have a, a fairly comprehensive statement

10    in this 2004 report as well. Why don't you tell

11    me in your own words what happened?

12    INMATE HERNANDEZ: That afternoon I'd

13    stopped work and, well a few weeks prior my

14    sister's house was burglarized. We know what,

15    when was the --

16    DEPUTY DISTRICT ATTORNEY TURLEY: Excuse

17    me, please. Could you ask him if he could speak

18    up just a little bit? He's (inaudible).

19    PRESIDING COMMISSIONER DAVIS:

20    (inaudible).

21    INMATE HERNANDEZ: (inaudible).

22    PRESIDING COMMISSIONER DAVIS: (inaudible)

23    this.

24    ATTORNEY RUTLEDGE: You (inaudible).

25    PRESIDING COMMISSIONER DAVIS: You also --

26    INMATE HERNANDEZ: This is not

27    (inaudible).

1    PRESIDING COMMISSIONER DAVIS: (inaudible)

2    get you some water.

3    INMATE HERNANDEZ: Thank you. Two weeks

4    prior my sister's house had been burglarized and

5    we had made police reports about it, about the

6    burglary and at that time I (inaudible) I had low

7    confidence in the police being able to find out

8    who it was. I thought that how, how it would be

9    easier for me to look around and find out more or

10    less anybody was involved in the burglary. I run

11    down every idea that I -- there's a lot of gangs,

12    kids in gangs, people running around doing all

13    kinds of things like that. So that afternoon

14    that I got off, got off of work one, one of the

15    friends that I, a (inaudible) told me he say, he

16    told me that he thought that he knew the person

17    that had the property I was looking for. Cause I

18    had, I had told most of the persons in, in the,

19    in the neighborhood, the things that were missing

20    from my sister's home and that I had to have

21    them, that I needed to get them back. When he

22    told me that he knew more or less the person

23    could have these, these belongings then I told

24    him, "Let's go over there and, and look for

25    them." And that's what we did. We went over

26    there and it must have been I think about six

27    o'clock in the afternoon, something like that.

1   And then I (inaudible) I got to the, to the
2   neighborhood and I spoke to one of the guys there
3   and asked him for, for, for a person by the name
4   of Tito that lived around there and he told me,
5   "Yes." He pointed to a green house and said, "He
6   lives over there." So I went over there to the
7   house. At that point there were three gentlemen
8   that I believe (inaudible) on the porch and one
9   of them came down to the fence as I went to the
10  fence and then he asked me, you know, what I
11  wanted. I told him that I was looking for Tito
12  and he told me that, first he said, "What for?"
13  as I recall and I told him, "Because I, I
14  understand he has some, some hot things for
15  sale." He said, "Well who told you that?" I
16  said that I just needed to talk to him. And at
17  that point one of the other, the guy at the
18  corner had told where the house was came, came on
19  to the site and he says, "This guy's looking for
20  Tito." And he goes, "Yeah, I know." So the, the
21  other person that was on the porch came down and
22  then he, and he, and he talked to -- so that guy
23  asked him what I, what I want and, and he says,
24  "He's looking for Tito for some hot stuff that he
25  says he's trying to, he's trying to get." He
26  said, "No, we don't have nothing like that." So
27  he says, "Who are you anyway?" I said well," I

1 don't know him that much, but you know." He

2 said, "No, you get out of here." And I said,

3 "Wait a minute I'm not leaving till I see him."

4 He says. "You better get out of here." And he

5 pulled out a weapon on me and he pointed it

6 towards me and I said. "Okay, no problem."

7 Probably I, so I, I got in the van and left. A

8 partner, a friend of mine was with me, he told

9 me, "You know what, you shouldn't let him get

10 away with that." I know where's a gun, so we'll

11 get a gun and we'll come back. And I said, "You

12 know what, okay, let's do it." And so we went

13 over there and he went to go see some friends, he

14 came back and he said, "Here, I got a gun." And,

15 and I said. "Okay, let me have it." Then I got

16 it and put it in my jacket pocket. At that point

17 I drove back to that area. I passed through the

18 house, I didn't see nobody there. As I was going

19 by the, as I was going to the corner and I saw

20 three individuals that were standing by, by the

21 corner market store and when I, when I passed

22 through slow I took a look at them then I noticed

23 that at least two of them were the same ones that

24 I was talking to. So then I went around, parked

25 the van, came back and then confronted them.

26 Crossed the street in front of them and, and the

27 first person -- happened to be people that was

1 standing. I didn't know at that time because I

2 didn't know (inaudible). So when, when, when I

3 went, came to the, to the parked cars onto the

4 sidewalk he kind of like went back and was

5 surprised to see us. And goes, "Who are you?" I

6 said, "I'm looking for Tito." He says, "Well

7 what do you want from him?" I said, "I'm looking

8 because he has some belongings that, that belong

9 to me." He says, "No, no, no." He says, "What

10 are you talking about." I said, "You have an

11 amplifier that, that (inaudible) were," excuse

12 me, "those were the things that were, that were

13 missing after the burglary. So I'm, I'm looking

14 for an amplifier and a, and a, and a color TV and

15 a guitar." He said, "No we don't have none of

16 this. Just get out of here." At that point he

17 came toward me and he had his hand in his pocket.

18 My, And I had my, my weapon in my pocket also. My

19 hand was in there. So when he took two, I

20 recall two or three steps towards me I just

21 pulled the gun out and I fired. At that point,

22 after the, after the, the first shot I felt the

23 other guys get up and I just turned around and,

24 and, and I fired at them. And they began to run

25 and till this day I, I couldn't remember my, my,

26 my partner saying, "Get him", or anything. I

27 was, I don't know, I, I just didn't, didn't feel

1   right and I kept firing till the gun went empty

2   and then I ran to, to the van and, and you know,

3   we got, I was shaking very, very hard and I, I

4   don't remember what I told my partner or

5   anything. I just, just go, "You know, we got to

6   get out of here." And I left.

7   PRESIDING COMMISSIONER DAVIS: The, the

8   gun that you got, do you have any idea who, who

9   that came from?

10   INMATE HERNANDEZ: It was some

11   apartments, but I waited outside and my crime

12   partner only went up there and got it.

13   PRESIDING COMMISSIONER DAVIS: Had you

14   ever gotten a gun from that apartment before?

15   INMATE HERNANDEZ: No.

16   PRESIDING COMMISSIONER DAVIS: What kind

17   of gun was it?

18   INMATE HERNANDEZ: I think it was a,

19   looked like a nine millimeter.

20   PRESIDING COMMISSIONER DAVIS: Did you

21   check and make sure it was loaded?

22   INMATE HERNANDEZ: You know, no, I

23   didn't.

24   PRESIDING COMMISSIONER DAVIS: Had you

25   ever fired that kind of gun before?

26   INMATE HERNANDEZ: No. No, I hadn't.

27   PRESIDING COMMISSIONER DAVIS: So you had

1    no idea it was going to work or not?

2    INMATE HERNANDEZ:  No, I didn't.

3    PRESIDING COMMISSIONER DAVIS: Did you

4    test it?

5    INMATE HERNANDEZ:  No, I didn't.

6    PRESIDING COMMISSIONER DAVIS: So you went

7    back and, and confronted the, confronted the

8    person who turned out to be Tito.  Was that the

9    same person that had the weapon before?

10    INMATE HERNANDEZ:  No, it wasn't.

11    PRESIDING COMMISSIONER DAVIS: Did you see

12    a weapon on Tito?

13    INMATE HERNANDEZ:  No, I didn't.

14    PRESIDING COMMISSIONER DAVIS: The other

15    people who were there that you fired at, did you

16    see any weapons that they might have had?

17    INMATE HERNANDEZ:  No, sir.

18    PRESIDING COMMISSIONER DAVIS: Were either

19    one of them the, the person who had the weapon

20    before?

21    INMATE HERNANDEZ:  Yes.  One of them was.

22    PRESIDING COMMISSIONER DAVIS: One of them

23    was.  But you didn't see it the second time,

24    correct?

25    INMATE HERNANDEZ:  No, I didn't.

26    PRESIDING COMMISSIONER DAVIS: After all

27    of this happened, as you shot Tito, you shot the

1    other people, got back in the van and took off,
2    what did you do after that?
3    INMATE HERNANDEZ:  Yeah.  We ran and
4    bought some beer.
5    PRESIDING COMMISSIONER DAVIS: Okay.  You
6    ran and bought some beer, then what?
7    INMATE HERNANDEZ:  And then, and then I
8    went home.
9    PRESIDING COMMISSIONER DAVIS: Then what
10   did you do?
11   INMATE HERNANDEZ:  I remember going to
12   the restroom.
13   PRESIDING COMMISSIONER DAVIS:  What did
14   you do with the gun?
15   INMATE HERNANDEZ:  Oh the gun, I gave it
16   back to my crime partner.
17   PRESIDING COMMISSIONER DAVIS: So you
18   returned it?
19   INMATE HERNANDEZ:  Uh-huh.  Yes, sir.
20   PRESIDING COMMISSIONER DAVIS: When did
21   the police arrive?
22   INMATE HERNANDEZ:  As I recall it was
23   very early in the morning.  Could have been two
24   in the morning.  Something like that.
25   PRESIDING COMMISSIONER DAVIS: What
26   happened that evening?  For you, what happened,
27   what did you do?

1    INMATE HERNANDEZ:  Well after I went

2    back, it was about I think ten o'clock, eleven,

3    then I just, I went to bed.

4    PRESIDING COMMISSIONER DAVIS:  Did you

5    ever find out if these people were in any way,

6    shape or form associated with the original

7    burglary that you were trying to recover the

8    stuff for your sister?

9    INMATE HERNANDEZ:  No.

10    PRESIDING COMMISSIONER DAVIS:  That never

11    came out?  All right.  When you didn't have

12    confidence in the police to find the, the, the

13    equipment once you had tracked down some of this

14    information did you ever think about calling them

15    and giving them that information?

16    INMATE HERNANDEZ:  No, sir.

17    PRESIDING COMMISSIONER DAVIS:  In terms of

18    personal factors, you were born in Las Cruces,

19    New Mexico, you're the second of two children,

20    and if I say anything in here that isn't right or

21    doesn't, isn't right on point please let me know.

22    INMATE HERNANDEZ:  Yes, sir.

23    PRESIDING COMMISSIONER DAVIS:  We'll

24    correct that as we go along.  You were raised by

25    your mother in part and your, in part because

26    your parents divorced when you were two years

27    old, so you were raised by your mom?

1    INMATE HERNANDEZ:  Yes, sir.
2    PRESIDING COMMISSIONER DAVIS: And have a
3    good relationship with all your family members
4    and a stepfather and two half brothers?
5    INMATE HERNANDEZ:  Yes, sir.
6    PRESIDING COMMISSIONER DAVIS: No other
7    family members have a problem with any arrest
8    record or mental health issues, anything like
9    that?
10   INMATE HERNANDEZ:  No, sir.
11   PRESIDING COMMISSIONER DAVIS: But this
12   indicates that your stepfather's an alcoholic.
13   INMATE HERNANDEZ:  Yes, sir.
14   PRESIDING COMMISSIONER DAVIS: And how do
15   you know that?
16   INMATE HERNANDEZ:  Because he used to
17   drink a lot.  He was a hardworking man, but he'd
18   always --
19   PRESIDING COMMISSIONER DAVIS: So he
20   would -- did he abuse you at all?
21   INMATE HERNANDEZ:  No.  He, he never --
22   he was --
23   PRESIDING COMMISSIONER DAVIS: Was a,
24   wasn't a mean drunk then?
25   INMATE HERNANDEZ:  No.  He'd just come
26   home, drink his beer --
27   PRESIDING COMMISSIONER DAVIS: Okay.

1    INMATE HERNANDEZ:  -- and goes out on

2    the, the couch.

3    PRESIDING COMMISSIONER DAVIS: Okay.  And

4    so for all this purposes you had a -- had a

5    pretty normal childhood then?

6    INMATE HERNANDEZ:  Yes.  Yes.

7    PRESIDING COMMISSIONER DAVIS: You

8    attended Belmont High School?

9    INMATE HERNANDEZ:  Yes, sir.

10    DEPUTY COMMISSIONER SMITH:  (inaudible)

11    about that.

12    PRESIDING COMMISSIONER DAVIS:  And you

13    dropped out to enlist in the United States Army?

14    INMATE HERNANDEZ:  Yes, sir.

15    PRESIDING COMMISSIONER DAVIS:  And you

16    served in the army from 2/73 until 2 of '76 and

17    received an honorable discharge?

18    INMATE HERNANDEZ:  Yes, sir.

19    PRESIDING COMMISSIONER DAVIS:  Received,

20    received the rank, or actually earned, it says

21    you earned the rank of an E4 and served seven

22    months in Germany while in the army?

23    INMATE HERNANDEZ:  Yes, sir.

24    PRESIDING COMMISSIONER DAVIS:  And it was

25    in Germany that you began the occasional use of

26    alcohol and marijuana?

27    INMATE HERNANDEZ:  Yes, sir.

1    PRESIDING COMMISSIONER DAVIS: And you
2    said, well you began spending most of your time
3    off duty drinking.  Let me tell you, your first
4    experience with alcohol was when you entered,
5    after you entered the army?  Or had you drunk,
6    had you consumed alcohol before that?
7    INMATE HERNANDEZ: Yes, but not much like
8    in a way I didn't --
9    PRESIDING COMMISSIONER DAVIS: Okay.
10   INMATE HERNANDEZ: Very, very little.
11   PRESIDING COMMISSIONER DAVIS: So it was
12   in the army that you began to, well as abuse
13   alcohol?
14   INMATE HERNANDEZ: Yeah.
15   PRESIDING COMMISSIONER DAVIS: In 1975 you
16   married Ms. Garcia and while you were in the
17   army, and you had one daughter?
18   INMATE HERNANDEZ: Yes.
19   PRESIDING COMMISSIONER DAVIS: Are you
20   still married?
21   INMATE HERNANDEZ: No, sir.
22   PRESIDING COMMISSIONER DAVIS: No?  When
23   did that, when did that marriage end?
24   INMATE HERNANDEZ: Approximately seven
25   years.
26   PRESIDING COMMISSIONER DAVIS: You
27   staying, you stay in touch with your daughter?

1     INMATE HERNANDEZ: Yes, sir.

2     PRESIDING COMMISSIONER DAVIS: How, how do

3  you stay in touch with her? Letters, phone

4  calls?

5     INMATE HERNANDEZ: Yes, sir.

6     PRESIDING COMMISSIONER DAVIS: Okay.

7  Where does she live?

8     INMATE HERNANDEZ: She lives right now in

9  El Paso, Texas.

10     PRESIDING COMMISSIONER DAVIS: So how

11  often --

12     INMATE HERNANDEZ: (inaudible)

13     PRESIDING COMMISSIONER DAVIS: -- were you

14  able, are you able to talk with her?

15     INMATE HERNANDEZ: Once a month.

16     PRESIDING COMMISSIONER DAVIS: How's she

17  doing?

18     INMATE HERNANDEZ: She's doing fine.

19     PRESIDING COMMISSIONER DAVIS: What grade

20  did you drop out of high school?

21     INMATE HERNANDEZ: Ninth grade.

22     PRESIDING COMMISSIONER DAVIS: The ninth

23  grade? Why did you do that?

24     INMATE HERNANDEZ: It was during the

25  summer, I got a job during the summer and I was

26  getting a little money and I was saving up and I

27  was, I was helping my, my mom and then it, it

24

1    just drove me from, from school.

2    PRESIDING COMMISSIONER DAVIS: Huh.

3    INMATE HERNANDEZ: I said why should I go

4    back if I can make (inaudible). And then about a

5    year and a half later after I was working then I

6    tried to enlist in the, in the army so I can get

7    some education.

8    PRESIDING COMMISSIONER DAVIS: So that was

9    the purpose, you wanted to, you wanted to

10    complete your education?

11    INMATE HERNANDEZ: That was one of the

12    purposes.

13    PRESIDING COMMISSIONER DAVIS: Were you

14    involved in any gang activity or anything at that

15    time?

16    INMATE HERNANDEZ: No, sir.

17    PRESIDING COMMISSIONER DAVIS: No?

18    DEPUTY DISTRICT ATTORNEY TURLEY: Ever?

19    PRESIDING COMMISSIONER DAVIS: Ever?

20    INMATE HERNANDEZ: Never.

21    PRESIDING COMMISSIONER DAVIS: No never?

22    INMATE HERNANDEZ: No.

23    PRESIDING COMMISSIONER DAVIS: All right.

24    In terms of an arrest record, looks like you

25    were, no juvenile history that is known. You're

26    arrested by Los Angeles, LAPD in, on 1/8 of 1977

27    for first-degree robbery. You pled guilty to, to

26

1    auto theft.  You were placed on 36 months summary
2    probation without supervision and ordered to pay
3    a fine.  What was, what was the, what were the
4    circumstances of that?
5            INMATE HERNANDEZ:  I -- I took a, a
6    taxicab.
7            PRESIDING COMMISSIONER DAVIS: Okay.
8    While the taxicab driver was in it?
9            INMATE HERNANDEZ:  No.  She just got, she
10   got off --
11           PRESIDING COMMISSIONER DAVIS: Okay.
12           INMATE HERNANDEZ:  -- and that's when I
13   took the cab.
14           PRESIDING COMMISSIONER DAVIS: Okay.  She
15   got out and you got in and took the cab?
16           INMATE HERNANDEZ:  Yeah.
17           PRESIDING COMMISSIONER DAVIS:  Was it a
18   (inaudible)?  What'd you do that for?
19           INMATE HERNANDEZ:  It, it was stupid now.
20   I was drinking, we had been drinking that night
21   and it was on a Saturday night I believe.
22           PRESIDING COMMISSIONER DAVIS:  Okay.  You
23   needed a ride home?
24           INMATE HERNANDEZ:  Actually I did have, I
25   had money, I had enough money I could have paid
26   for it.
27           PRESIDING COMMISSIONER DAVIS:  Okay.  How

27

1    much had you had to drink before you stole the

2    cab?

3          **INMATE HERNANDEZ:**  See I got to that

4    party at about seven o'clock.  I had quite,

5    probably three.

6          **PRESIDING COMMISSIONER DAVIS:**  So, and

7    this is during the time, you're still in the army

8    at this time?

9          **INMATE HERNANDEZ:**  No.  No, sir.

10         **PRESIDING COMMISSIONER DAVIS:** You were

11   out of the army at this time?

12         **INMATE HERNANDEZ:**  Yes.

13         **PRESIDING COMMISSIONER DAVIS:** Okay.  And

14   you're arrested in, on 4/26 of 1977 that actually

15   be for the (inaudible) offense, but now in, this

16   says in, in 1978 there was an arrest for, by the

17   LAPD for shoplifting?

18         **INMATE HERNANDEZ:**  Yes.

19         **PRESIDING COMMISSIONER DAVIS:** What was

20   that about?

21         **INMATE HERNANDEZ:**  I attempted to steal

22   some glasses.  Well, I did steal them.

23         **PRESIDING COMMISSIONER DAVIS:**  Okay.  And

24   then another contact with LAPD for drinking in

25   public?

26         **INMATE HERNANDEZ:**  Yes, sir.

27         **PRESIDING COMMISSIONER DAVIS:** So just

1    the, the one incident where you actually, you

2    received summary probation as well for the

3    shoplifting, so you're placed in probation?

4              **INMATE HERNANDEZ:**  Yes.

5              **PRESIDING COMMISSIONER DAVIS:** Was that --

6    alcohol have anything to do with the shoplifting

7    incident also?

8              **INMATE HERNANDEZ:**  Yes.

9              **PRESIDING COMMISSIONER DAVIS:** So there

10   was a thread running consistently through this?

11             **INMATE HERNANDEZ:**  Yes.

12             **PRESIDING COMMISSIONER DAVIS:**  What about

13   drug use?

14             **INMATE HERNANDEZ:**  I stay away from

15   drugs.

16             **PRESIDING COMMISSIONER DAVIS:** So you

17   (inaudible) that you smoked marijuana

18   occasionally starting at age 19?

19             **INMATE HERNANDEZ:**  Yes, sir.

20             **PRESIDING COMMISSIONER DAVIS:**  But no

21   other substances?

22             **INMATE HERNANDEZ:**  No.

23             **PRESIDING COMMISSIONER DAVIS:**  No

24   cocaine, no methamphetamine?  Nothing like that?

25             **INMATE HERNANDEZ:**  Yes.

26             **PRESIDING COMMISSIONER DAVIS:** Just the

27   alcohol?  The alcohol, so be fair to say that

29

1    alcohol was drug of choice at that time?

2              **INMATE HERNANDEZ:**  Yes, sir.

3              **PRESIDING COMMISSIONER DAVIS:**  Is there

4    anything that we haven't talked about, about the,

5    the offense itself, your history prior to coming

6    to the institution, your arrests, anything prior

7    to the incident offense that, or actually the

8    incident that your, actually prior to you coming

9    to the institution, that we haven't talked about

10   that you feel is important for this Panel to

11   understand?

12             **INMATE HERNANDEZ:**  I was arrested twice

13   as a juvenile --

14             **PRESIDING COMMISSIONER DAVIS:**  Okay.

15             **INMATE HERNANDEZ:**  -- for truancy and I

16   don't think that -- that that was mentioned.

17             **PRESIDING COMMISSIONER DAVIS:**  Right.

18   Right.  I appreciate you bringing that up.  And

19   you were a truant, why?

20             **INMATE HERNANDEZ:**  I just didn't want to

21   go to school.

22             **PRESIDING COMMISSIONER DAVIS:** Just didn't

23   want to go to school?

24             **INMATE HERNANDEZ:**  (inaudible).

25             **PRESIDING COMMISSIONER DAVIS:**  Did you

26   get along all right in school?

27             **INMATE HERNANDEZ:**  Yeah I, I did.  It was

30

1    a (sic) inter, interracial at that time kind of a

2    thing going on in school.

3              **PRESIDING COMMISSIONER DAVIS:**  With just

4    the --

5              **INMATE HERNANDEZ:**  Majority blacks so

6    real, real an interrace (sic).  But it, I had no

7    problems in school.  As a matter of fact I kind

8    of like it, but I kind of let influences, you

9    know, of other people around.

10             **PRESIDING COMMISSIONER DAVIS:**  Was it

11   just your general peer group that was doing the

12   influencing?

13             **INMATE HERNANDEZ:**  Yeah.  A few.  But I

14   was mostly interested in sports.  But, yeah.

15             **PRESIDING COMMISSIONER DAVIS:**  Had you

16   been drinking prior to the incident offense?

17             **INMATE HERNANDEZ:**  Yes, sir.

18             **PRESIDING COMMISSIONER DAVIS:**  How much?

19             **INMATE HERNANDEZ:**  Well, I got off of

20   work, cashed my check.  I had about six of those

21   beers.

22             **PRESIDING COMMISSIONER DAVIS:**  Okay.

23             **INMATE HERNANDEZ:**  And --

24             **PRESIDING COMMISSIONER DAVIS:** Just you

25   personally or were you sharing it with your

26   friends?

27             **INMATE HERNANDEZ:**  No.  Just for me.

31

1          **PRESIDING COMMISSIONER DAVIS:**  Okay.

2          **INMATE HERNANDEZ:**  But the park that I

3    went to there was persons there that I'd give

4    them a beer.  Yeah.

5          **PRESIDING COMMISSIONER DAVIS:**  But you

6    didn't drink a whole six-pack yourself?

7          **INMATE HERNANDEZ:**  No.  I must have given

8    away three or four.

9          **PRESIDING COMMISSIONER DAVIS:**  Okay.  Was

10   that, was that the, the extent that you're, that

11   you'd been at work, you hadn't been drinking

12   during the time you're at work?

13         **INMATE HERNANDEZ:**  No.

14         **PRESIDING COMMISSIONER DAVIS:**  Okay.  So

15   you were drinking after work (inaudible) --

16         **INMATE HERNANDEZ:**  Yeah.  After my

17   work --

18         **PRESIDING COMMISSIONER DAVIS:**  Three or

19   four beers.

20         **INMATE HERNANDEZ:**  -- usually I would

21   (inaudible) after I got off of work.  First thing

22   I do is stop at a liquor store and buy, you know,

23   a six pack or, at that time they had tall boys,

24   maybe a couple of tall boys.

25         **PRESIDING COMMISSIONER DAVIS:**  Okay.  So

26   in addition to a six-pack you had a couple of

27   tall boys too?

32

1        **INMATE HERNANDEZ:**  Yes.

2        **PRESIDING COMMISSIONER DAVIS:** Okay.  So

3   how would you describe your ability to make good

4   judgments and so forth about the time that you

5   were, decided to go and check on this property

6   yourself?

7        **INMATE HERNANDEZ:**  Very bad.  I just, it

8   was a bad, real bad (inaudible).

9        **PRESIDING COMMISSIONER DAVIS:** It almost

10  seems like a pretty dangerous thing to have done

11  to go into a neighborhood that you weren't

12  familiar with and confront somebody about some

13  property.

14       **INMATE HERNANDEZ:**  Some (inaudible) it

15  is, it was dangerous.

16       **PRESIDING COMMISSIONER DAVIS:**

17  (inaudible).

18       **INMATE HERNANDEZ:**  But at that time my

19  reasoning was not, not of someone that's, you

20  know, capable to understand the consequences.

21       **PRESIDING COMMISSIONER DAVIS:**  The person

22  that you were with that day, was he a gang

23  member?

24       **INMATE HERNANDEZ:**  No, sir.

25       **PRESIDING COMMISSIONER DAVIS:** Anything

26  else that we haven't talked about that you feel

27  is, is important for us to understand today?

33

1           **INMATE HERNANDEZ:**  I don't understand

2      that.

3           **PRESIDING COMMISSIONER DAVIS:**  Is -- is

4      there anything that we haven't covered that,

5      that, anything about your, your past history,

6      your family life, any other influences on you,

7      things like that that you think would be

8      important for us to, to review and --

9           **INMATE HERNANDEZ:**  Oh.

10          **PRESIDING COMMISSIONER DAVIS:** -- and

11     understand as we're going through all the

12     information?

13          **INMATE HERNANDEZ:**  Just that I've always

14     tried, you know, to, to be the best I could.  I

15     was always protective of my family and the area

16     that, that I live and where I come from -- one of

17     the other reasons I went into the military is

18     cause I didn't want to get involved with, you

19     know, the atmosphere at that time going around

20     the (inaudible) and I wanted to, to be the first

21     one other than my sister to be able to help our

22     family find a better place to -- to live.  And I

23     let everybody down because it's hard to do

24     anything.  That just became my --

25          **PRESIDING COMMISSIONER DAVIS:**  How did

26     you feel when they, when you were confronted with

27     a gun the first time when he pointed the gun at

34

1    you and, and you had to leave?

2            **INMATE HERNANDEZ:**  I felt scared

3    personally when -- when he pulled the gun out.

4            **PRESIDING COMMISSIONER DAVIS:** How about

5    after you'd already left?  How'd you feel then?

6            **INMATE HERNANDEZ:**  Felt anger and sort of

7    like, well nobody does this to me, you know.

8            **PRESIDING COMMISSIONER DAVIS:**  Feel

9    insulted, disrespected?

10           **INMATE HERNANDEZ:**  Yes, sir.  Very much.

11    So when my partner came with the idea of a gun I

12    made, says let's go.

13           **PRESIDING COMMISSIONER DAVIS:**  Any

14    questions, Commissioner?

15           **DEPUTY COMMISSIONER SMITH:**  Just that a

16    question of -- of clarification.  When

17    Commissioner Davis asked you earlier -- earlier

18    if your knew what kind of a gun it was, you --

19    you said you didn't know.  You thought it might

20    have been nine millimeter?

21           **INMATE HERNANDEZ:**  Yes.

22           **DEPUTY COMMISSIONER SMITH:**  In, in the

23    (inaudible) report when, when you were discussing

24    the commitment offense you'd indicated that when

25    you were in the army that you were trained with a

26    .45 caliber?

27           **INMATE HERNANDEZ:**  Yes, sir.

35

1        **DEPUTY COMMISSIONER SMITH:** And when in
2   fact you had earned an expert badge --
3        **INMATE HERNANDEZ:** Yes, sir.
4        **DEPUTY COMMISSIONER SMITH:** -- in that
5   weapon?
6        **INMATE HERNANDEZ:** Yes, sir.
7        **DEPUTY COMMISSIONER SMITH:** I'm a little
8   confused by some one that would have earned an
9   expert badge shooting a .45 caliber wouldn't know
10  the difference between a nine millimeter, nine
11  millimeter and a .45. I mean they're
12  dramatically different.
13       **INMATE HERNANDEZ:** Of course. It wasn't
14  a .45. I knew that. And the, the only reason it
15  was a nine millimeter that I became aware of just
16  through after the, you know, the arrest and all.
17       **DEPUTY COMMISSIONER SMITH:** Okay. So you
18  knew what it wasn't, you weren't sure what it
19  was?
20       **INMATE HERNANDEZ:** Yes.
21       **DEPUTY COMMISSIONER SMITH:** Okay. Great.
22  I appreciate the clarification. Thank you.
23       **PRESIDING COMMISSIONER DAVIS:** Any further
24  questions?
25       **DEPUTY COMMISSIONER SMITH:** No.
26       **PRESIDING COMMISSIONER DAVIS:** All right.
27  I'll ask you to turn your attention, please, to

36

1    Commissioner Smith.

2         **DEPUTY COMMISSIONER SMITH:**   (inaudible)

3    to the C File you were received at the Department

4    of Corrections on, on March 23rd, 1979.  Received

5    here at CTF on June 24th, 1998.  You have a

6    classification score of 19, which is the lowest

7    classification score that a life inmate can

8    attain.  Your last hearing was held on January 6,

9    2005.  You received a one-year denial and that

10   was your twelfth subsequent hearing.  Since

11   you've been incarcerated you generally had a

12   positive adjustment history.  You've had seven

13   CDC 128A's, the last one being in December of

14   2000 for disobeying staff.  And I would have at

15   that part frankly where although you only have

16   seven 128's (inaudible) having been incarcerated

17   for as long as you have been and you've gone

18   through the number of parole hearings that you've

19   gone, gone through that you would have, worked

20   very hard to avoid even a 128.  I mean although

21   that's roughly five years ago, it's still

22   relatively current.  I'm a little surprised by

23   that.  You've had only four CDC 115's, and the

24   last one being December of '98 and that was from

25   mutual combat and, and three of the four 115's

26   had to do with fighting or mutual combat, which

27   was not simply you, you know, failing to report

1    for work or failing to follow instructions or, or
2    something of that, that nature.  You've received
3    two certificates of completion in the Infectious
4    Disease curriculum.  One in Sexually Transmitted
5    Infections and that's dated November of 2005.
6    The other Hepatitis and that's dated February of
7    2006.  And you received a Certificate of
8    Completion in Entrepreneurship, that was November
9    of 2005.  I haven't seen that before.  What is
10   that?  What is the basis of that program?
11           **INMATE HERNANDEZ:**  Oh it's to start
12   getting into the, into the world of business and
13   how to, the basics of starting a business.
14   The -- the investment that you have to make.
15   The -- the difference between a franchising and a
16   sole -- sole proprietor, different aspects of --
17   of a business.
18           **DEPUTY COMMISSIONER SMITH:**  Okay.  Yeah.
19   As I said I hadn't seen that before.  It sounds
20   like, it was a potentially very valuable program.
21           **INMATE HERNANDEZ:**  Oh, it is.  Yes.
22           **DEPUTY COMMISSIONER SMITH:**  You received
23   ten Certificates of Achievement, Achievement for
24   completion of FEMA (inaudible) courses.
25           **INMATE HERNANDEZ:**  Uh-huh.
26           **DEPUTY COMMISSIONER SMITH:**  They were all
27   issued the same month.

38

1          **INMATE HERNANDEZ:**  Yes.

2          **DEPUTY COMMISSIONER SMITH:**  They were all

3     issued July of 2005.  Did you take them all

4     during that month?

5          **INMATE HERNANDEZ:**  No.  What happened is

6     that when, when I chose a course and then I have

7     to wait for a book and then I sent them all at

8     one time.

9          **DEPUTY COMMISSIONER SMITH:**  Okay.

10         **INMATE HERNANDEZ:**  And that's how it came

11    in order to (inaudible) that.  Because everything

12    would have to stop on each one. So I was, I was

13    keeping them all in --

14         **DEPUTY COMMISSIONER SMITH:**  All at once?

15         **INMATE HERNANDEZ:**  -- and then, then I

16    sent them all at once.

17         **DEPUTY COMMISSIONER SMITH:**  Okay.  I knew

18    there had to be a good reason.  Because you got

19    ten of them in this, all issued the, the same

20    month same year.  The -- the various programs

21    were entitled Decision Making, Managing

22    Volunteers, Leadership, Emergency Planning, State

23    Disaster Management, Orientation to Disaster

24    Exercises, Livestock and Disaster, Building for

25    the Earthquakes of Tomorrow, Introduction Into

26    Hazardous Materials and Functions of an Interview

27    Program Manager.

39

1        **INMATE HERNANDEZ:** Yes, sir.

2        **DEPUTY COMMISSIONER SMITH:** You also

3   participated in the Veterans' Self-help group

4   from August 2004 to February 2005 and your BRAG

5   Membership application was approved in April of

6   2005.  BRAG stands for Balance Re-entry Activity

7   Group.

8        **INMATE HERNANDEZ:** Yes, sir.

9        **DEPUTY COMMISSIONER SMITH:** Is that an

10  ongoing group?

11       **INMATE HERNANDEZ:** Yes.

12       **DEPUTY COMMISSIONER SMITH:** Okay.  So

13  you're still participating in that group?

14       **INMATE HERNANDEZ:** We have, right now

15  because of staff shortages we're having a monthly

16  meeting.  If it wasn't for staff shortage, we

17  would have at least bi-weekly meetings.

18       **DEPUTY COMMISSIONER SMITH:** Describe the

19  program to us.

20       **INMATE HERNANDEZ:** The, the program is

21  to, to help inmates coming into prison to get

22  them adjusted into the different aspects of

23  parole.  To prepare them in education.

24  Vocational wise through in self-study or through,

25  through correspondence.  Give them peer group

26  help in the prison.  Let them know that, that

27  even though you're in prison you can help

40

1    yourself do whatever you, whenever your release
2    comes and we have a lot of, lot of inmates that
3    parole everyday and those are the ones that we,
4    we usually get a hold of so we can be able to
5    (inaudible). If we can help with our, with our
6    own experience of being in prison and how in, in
7    my, my case when I came to prison the, there was
8    no inmate peer trying to help you to better
9    yourself to be able to get out and I felt that
10   the whole story here is of me in prison, had I
11   known about the, that there were any programs
12   like this and then they were going to help me out
13   in understanding way back when I first came to
14   prison instead of letting go two and three years
15   by without doing it.

16           **DEPUTY COMMISSIONER SMITH:** Now, you, in
17   reading a little bit about it you, you had to
18   prepare an application and submit it for approval
19   and acceptance?

20           **INMATE HERNANDEZ:** Yes, sir.

21           **DEPUTY COMMISSIONER SMITH:** Is that
22   right?

23           **INMATE HERNANDEZ:** That's true.

24           **DEPUTY COMMISSIONER SMITH:** Sounds like
25   it's --

26           **INMATE HERNANDEZ:** Only --

27           **DEPUTY COMMISSIONER SMITH:** -- it's not

41

 1    an easy -- an easy program to become a part of;
 2    is that correct?
 3         **INMATE HERNANDEZ:**  (inaudible).  You have
 4    to do it a team.  You get a team to yourself and
 5    that's at least two persons vouching for your,
 6    you can't have no 115, no disciplinary.  You have
 7    to have a good work record.  You have to be sort
 8    of like an outstand still in prison.
 9         **DEPUTY COMMISSIONER SMITH:**  And you're on
10    a number of waiting lists for a period of time.
11    Are you still on waiting lists?
12         **INMATE HERNANDEZ:**  Yes, sir.
13         **DEPUTY COMMISSIONER SMITH:**  What -- what
14    waiting lists are you on?
15         **INMATE HERNANDEZ:**  Two.  I got on one of
16    the, it's a (inaudible) program that, that's
17    known nationally.  It's called Alternative
18    Survivors and I'm on that waiting list and also
19    on the Alcoholics Anonymous.
20         **DEPUTY COMMISSIONER SMITH:**  Okay.  So
21    you're on those.  Okay.  Is it Narcotics
22    Anonymous or Alcoholics Anonymous?
23         **INMATE HERNANDEZ:**  Alcoholic Anonymous.
24         **DEPUTY COMMISSIONER SMITH:**  Okay.  And
25    how long have you been on, on that waiting list?
26    I would guess probably at least a year?
27         **INMATE HERNANDEZ:**  Something like that.

42

1    Yeah.  Because I'll be continuing (inaudible) yet

2    and sometime like when we're locked down that

3    would be like (inaudible) past three weeks some

4    of the sponsors they sort of like lose interest

5    and then we have to find another sponsor to be

6    able to, to, to sponsor the (inaudible).

7         **DEPUTY COMMISSIONER SMITH:**  You were

8    assigned as a culinary clerk until July 2005 and

9    then assigned to the receiving and release clerk.

10   Are you still in that assignment?

11        **INMATE HERNANDEZ:**  No, sir.  I'm back in

12   the culinary.

13        **DEPUTY COMMISSIONER SMITH:**  When -- when

14   did you go back in culinary?

15        **INMATE HERNANDEZ:**  Six months ago.

16        **DEPUTY COMMISSIONER SMITH:**  About the

17   first of the year then?

18        **INMATE HERNANDEZ:**  (inaudible).

19        **DEPUTY COMMISSIONER SMITH:**  Okay.

20        **INMATE HERNANDEZ:**  (inaudible).

21        **DEPUTY COMMISSIONER SMITH:**  And doing

22   clerk functions there in the culinary?

23        **INMATE HERNANDEZ:**  Yes, sir.  The same,

24   the same job I did.

25        **DEPUTY COMMISSIONER SMITH:**  You had a

26   psychological evaluation.  It's somewhat dated,

27   it's July 23 of 2004 prepared by Dr. Hewchuk, H-

43

1    E-W-C-H-U-K.  Before I go to that evaluation, are
2    there any other activities that you've been
3    involved in in the institution since your last
4    hearing that I haven't addressed that we should
5    be aware of?
6           **INMATE HERNANDEZ:**  Yes.  I'm taking now a
7    business course through the Education Department.
8    I have my, my credits.  I've -- I signed up
9    (inaudible) and now I'm doing Business Principles
10   and Management.  And I'm going on unit three,
11   with an overall course average of 93.
12          **DEPUTY COMMISSIONER SMITH:**  Good.  And
13   that's through the --
14          **INMATE HERNANDEZ:**  The Educational --
15          **DEPUTY COMMISSIONER SMITH:**  -- the
16   Education Department?
17          **INMATE HERNANDEZ:**  Yes.
18          **DEPUTY COMMISSIONER SMITH:**  Okay.  And
19   when did you start that?
20          **INMATE HERNANDEZ:**  In, I started that on,
21   on 11/17/2005.
22          **DEPUTY COMMISSIONER SMITH:**  Okay.  Thank
23   you.  Anything else?
24          **INMATE HERNANDEZ:**  No.
25          **DEPUTY COMMISSIONER SMITH:**  Okay.
26   Because the, the psychological evaluation is
27   somewhat dated and wouldn't have been used

44

1   (inaudible) from an assumption that it would have

2   been used at your last hearing I'm going to

3   identify only a couple of sections in what's a

4   fairly brief evaluation to begin with.  And then

5   if there are any comments or any parts of the

6   evaluation that you or Ms. Rutledge would like

7   to, to add for the record I'll certainly give you

8   that opportunity.

9           **INMATE HERNANDEZ:**  Yes, sir.

10          **DEPUTY COMMISSIONER SMITH:**  Running

11   through the, the first page the, the doctor

12   discusses basically your 115's.  And it talks

13   about the, the issue of alcohol abuse and, and

14   that's been, I'm not going to go into detail

15   there because we, we've addressed that with you

16   being on the waiting list for Alcoholics

17   Anonymous.  But the doctor does write,

18          "That during your incarceration you've

19          completed Vocational Programming and

20          Television Production, Data Processing

21          and Basic Electronics."

22          Is that --

23          **INMATE HERNANDEZ:**  Yes, sir.

24          **DEPUTY COMMISSIONER SMITH:**  That is

25   accurate?

26          **INMATE HERNANDEZ:**  Yes, sir.

27          **DEPUTY COMMISSIONER SMITH:**  Okay.

45

1   And that the doctor concludes that,

2           "Currently you are a suitable

3               candidate for parole with these

4               consideration with the recidivism

5               and risk factor no greater than

6               that of the average citizen in

7               community."

8           He goes on to note that,

9               "Due to your marketable skills and close

10              family support it's expected that your

11              transition to freedom and personal

12              responsibility would be relatively

13              smooth."

14          **INMATE HERNANDEZ:** Yes.

15          **DEPUTY COMMISSIONER SMITH:** Any comments

16  or any other sections of that evaluation that you

17  or Ms. Rutledge would like to address for the

18  record?

19          **ATTORNEY RUTLEDGE:** I would.  Yes.  On

20  page 1, third paragraph, it says his last violent

21  based 115 occurred in 1998.  Although Dr. Turedey

22  (phonetic) in his previous report assessed inmate

23  Hernandez,

24              "As low risk in a community setting.

25              The Board expressed some concern

26              about a pattern of, of poor violence

27              based 115 during the 27-year period

```
1              of incarceration.  A review of the
2              actual 115 document is in the C-File
3              and subsequent discussion with
4              inmate Hernandez confirmed that each
5              instance inmate Hernandez was the
6              victim of an assault (inaudible) by
7              another inmate reacted by defending
8              himself.  The recent CC policy
9              classifying a majority of fights
10             between inmates and mutual combat
11             searched with further (inaudible).
12             Actual issues of fact -- and he
13             would -- part of it due to his
14             remarkable skills in (inaudible)
15             family support it is expected that
16             his transition and freedom and
17             personal responsibility would be
18             (inaudible) tight."
19             Thank you.
20        DEPUTY COMMISSIONER SMITH:  Anything
21   else?
22        ATTORNEY RUTLEDGE:  No, sir.
23        DEPUTY COMMISSIONER SMITH:  Okay.  Thank
24   you.  We're going to refer back again to the, the
25   04 Board Report.  Since the current Board Reports
26   I believe referred this all back to that one.
27   Under parole plans it indicates that you'd, you
```

47

1   plan on residing with your brother and sister-in-
2   law who at that time lived in Pacoima.
3          **INMATE HERNANDEZ:** Yes, sir.
4          **DEPUTY COMMISSIONER SMITH:** We have a
5   letter, which I'll address from your brother and
6   sister-in-law shortly, but they now live Sylmar.
7          **INMATE HERNANDEZ:** Yes, sir.
8          **DEPUTY COMMISSIONER SMITH:** And then
9   under employment indicates that you're confident
10  that you can employ, that you can get employment
11  with a Marco Sanchez who's a cousin?
12         **INMATE HERNANDEZ:** Yes.
13         **DEPUTY COMMISSIONER SMITH:** Who owns a
14  body and fender mechanic shop in Rosemead and in
15  the San Fernando Valley.  This -- he owns two
16  businesses?
17         **INMATE HERNANDEZ:** Yes.  He, he owns --
18         **DEPUTY COMMISSIONER SMITH:** And that you
19  would be employed by him to -- doing clerical
20  duties.
21         **INMATE HERNANDEZ:** Yes.
22         **DEPUTY COMMISSIONER SMITH:** And the
23  letter that, that we have, as I indicated is from
24  your brother and sister-in-law.  It stated that
25  December 26, 2005, indicates that writing on your
26  behalf they would welcome you into their home in
27  Sylmar.  And that, you know, they're well

48

1    established people because they're both employed.
2         Do you know what kind of a residence they
3    have in Sylmar?
4         **INMATE HERNANDEZ:** Yeah. It's, and it's
5    not, not considered a house and it's sort of
6    like, I don't know how you would say, duplex I
7    believe or something like that.
8         **DEPUTY COMMISSIONER SMITH:** Like a duplex
9    or a townhouse?
10        **INMATE HERNANDEZ:** Something like that.
11        **DEPUTY COMMISSIONER SMITH:** Something
12   like that? Something larger than an apartment?
13        **INMATE HERNANDEZ:** Yes. Something like,
14   yes.
15        **DEPUTY COMMISSIONER SMITH:** Do you know
16   how many bedrooms it has?
17        **INMATE HERNANDEZ:** I think they have two.
18   I don't honestly --
19        **DEPUTY COMMISSIONER SMITH:** The, the
20   reason I'm asking is that in, in the letter it
21   indicates that beside your brother and his wife
22   'they also have three children.
23        **INMATE HERNANDEZ:** Yeah.
24        **DEPUTY COMMISSIONER SMITH:** So if you
25   were residing there where would you, where would
26   you sleep?
27        **INMATE HERNANDEZ:** Yeah. Good question.

49

1          **DEPUTY COMMISSIONER SMITH:**  It's -- you

2     know, I'm not discounting the, the value of the

3     letter in terms of --

4          **INMATE HERNANDEZ:**  I understand.

5          **DEPUTY COMMISSIONER SMITH:**  -- your

6     brother would like to offer you a residence.

7          **INMATE HERNANDEZ:**  (inaudible).  No.  I'm

8     just (inaudible) --

9          **DEPUTY COMMISSIONER SMITH:**  But I'm, but,

10    but I'm wondering just how --

11         **INMATE HERNANDEZ:**  Exactly.

12         **DEPUTY COMMISSIONER SMITH:**  -- realistic

13    there is in the fact that such a five-person

14    family already --

15         **INMATE HERNANDEZ:**  Uh-huh.

16         **DEPUTY COMMISSIONER SMITH:**  The other

17    question I have is that if you were going to, and

18    I'm not familiar with that, with that area

19    geographically.  If you were going to be

20    residing, for the sake of conversation, in the

21    Sylmar area --

22         **INMATE HERNANDEZ:**  Yeah.

23         **DEPUTY COMMISSIONER SMITH:**  -- how far is

24    that from Rosemead or San Fernando Valley?

25         **INMATE HERNANDEZ:**  To Rosemead, I'd said

26    a good drive.

27         **DEPUTY COMMISSIONER SMITH:**  (inaudible).

50

1   Sometimes a good drive is on a sunny Sunday
2   afternoon and --

3        **INMATE HERNANDEZ:**  Yeah.

4        **DEPUTY COMMISSIONER SMITH:**  -- sometimes
5   it's in commute driving?

6        **INMATE HERNANDEZ:**  Yeah.  This, it, it is
7   a long commute.  It's going to be a long commute
8   for the I believe, you know, first four weeks
9   till I get established.  And then I -- I have a
10  plan also to be able to apply under the Veterans'
11  Assets, which it's going to help me under, for to
12  be able to find a larger place, you know,
13  hopefully, you know, I can use my GI Bill to be
14  able to get a down payment for a home being that
15  my brother's working, and he's also a Veteran,
16  and so these are, these are the things that I
17  have sort of looked at and be able to make it.

18       **DEPUTY COMMISSIONER SMITH:**  And have you
19  contacted the VA regarding those benefits would
20  be available to you?

21       **INMATE HERNANDEZ:**  I have.  Yes, I have.

22       **DEPUTY COMMISSIONER SMITH:**  Okay.

23       **INMATE HERNANDEZ:**  I have letters from
24  them and I have all of the, they sent me a, a
25  whole packet of the (inaudible).

26       **DEPUTY COMMISSIONER SMITH:**  So what's
27  the, what's the most recent letter?  Because

51

1    those are letters that, that this Panel, as past

2    Panels, you know, should be aware of.

3        **INMATE HERNANDEZ:**  And I, and I didn't

4    bring the copy of that letter.  But I'll, I'll be

5    glad to, I, I can show you the latest one that I

6    have.  I think it's, it's about a year old that,

7    that was on - I don't want to take much of your

8    time.

9        **DEPUTY COMMISSIONER SMITH:**  No.  We,

10   this, this is an extremely important hearing.

11   You have all the, all the time that you need.

12       **INMATE HERNANDEZ:**  I don't have it, but I

13   can get in touch with them because the GI Bill I

14   think, I understand it to be, has changed since I

15   think after I think '82.  And in the time that,

16   that I served was during the Viet Nam era time,

17   which means that all my benefits are different

18   than the benefits that are now given.  And in,

19   and in mine a lot of them are still there.  The

20   only, the only one that expired during my

21   incarceration was the education benefit that I

22   had.  That only lasted ten years and, and I'm

23   assuming that expired.  But that's the only

24   benefit that's, that, that has expired since I've

25   been in prison.  The home loan, the 1980 I

26   believe, 1986 Veterans' Benefit Bill that passed

27   by President, I believe it was, I forget the

52

1      President, but I recall --

2              **DEPUTY COMMISSIONER SMITH:** (inaudible).

3              **INMATE HERNANDEZ:** -- that it was, it

4      was, this was to help the Veterans that were

5      homeless and the persons that were, that were

6      also coming out of prison or that needed help in

7      adjustment that that was also going to be

8      beneficial to us.

9              **DEPUTY COMMISSIONER SMITH:** Some --

10     something that, that I'm curious about, you know,

11     the, you know this is your 13th subsequent

12     hearing.

13             **INMATE HERNANDEZ:** Seventeen.

14             **DEPUTY COMMISSIONER SMITH:** No. We had

15     your 12th was in '05. So this, this is your 13th

16     subsequent hearing. So you had one initial,

17     which was 14 and you probably had a couple of

18     document, documentation hearings prior to that.

19             **INMATE HERNANDEZ:** Well, when I came in

20     at the time I never had a document, I had one

21     documentation in '80, in '80 --

22             **DEPUTY COMMISSIONER SMITH:** Well, my

23     point is that, that I'm sure at least, if not in

24     every one of those instances the, in the majority

25     of those instances you would have been counseled

26     on how important it is to have letters of support

27     for residence, employment, from family and

53

1    friends and so forth.

2            **INMATE HERNANDEZ:**  Yes.

3            **DEPUTY COMMISSIONER SMITH:**  And you have,

4    you know, a very positive letter from your

5    brother.

6            **INMATE HERNANDEZ:**  Yes.

7            **DEPUTY COMMISSIONER SMITH:**  You know,

8    certainly some, some questions with regard to the

9    viability of the residential plan that we've

10   already addressed.  But there's no employment

11   letters.

12           **INMATE HERNANDEZ:**  Yes.

13           **DEPUTY COMMISSIONER SMITH:**  And, and I'm

14   wondering why.

15           **INMATE HERNANDEZ:**  Prior to '88 I used to

16   always get letters, a lot of letters, a lot of

17   jobs, opportunity.  I was found suitable in 1988

18   and then on review it was --

19           **DEPUTY COMMISSIONER SMITH:**  Yeah.  But,

20   but we're talking now.  We're talking now 2006.

21           **INMATE HERNANDEZ:**  Well I'm getting, I'm

22   getting there.

23           **DEPUTY COMMISSIONER SMITH:**  Okay.  Well I

24   don't want to roll the clock back for 20 years.

25           **INMATE HERNANDEZ:**  Okay.

26           **DEPUTY COMMISSIONER SMITH:**  But I want to

27   talk about right now, because it, because it's

54

1    right now that's critical to you.

2         **INMATE HERNANDEZ:** Exactly.  I understand

3    that.  And my reason was that every year that I

4    come to this hearing my family, the person that I

5    love, used to get their hopes up high, real high.

6    And being that in 1990 I received a, I was

7    (inaudible) received a, a release date and I held

8    that for two years.  They had me coming home

9    already and then, you know, the extension period

10   and it was taken away and ever since then I kind

11   of like that, that I wasn't going to put them

12   through this again.  My grandmother died during

13   (inaudible) time and, you know, I, I (inaudible),

14   you know why should I be bothering them people

15   out there if I'm not never going to get out.

16        **DEPUTY COMMISSIONER SMITH:**  Well, I -- I

17   understand your, your point of courtesy and

18   certainly we're a long way from making a decision

19   about whether or not we're going to find you

20   eligible today.

21        **INMATE HERNANDEZ:** Right.

22        **DEPUTY COMMISSIONER SMITH:**  But you need

23   to understand that if, if you don't have all the

24   I's dotted and all the, the T's crossed that to

25   an extent you may be handcuffing the Board.  And

26   again, you know, because of, of the number of

27   hearings you've had and, you know, other past

55

1    letters, you know, we'll certainly discuss those

2    at the recess, so I'm not suggesting that, you

3    know, we're not, not going to grant at this

4    point, because again I, I have no idea.  But you

5    need to understand at the very least that by not

6    establishing parole plans, your residence and

7    employment and getting the kinds of letters that

8    may get other people's hopes up that you tend to

9    handcuff the Panels.  And you're not doing

10   yourself the service; you're doing yourself a

11   disfavor.  You need to understand that.  I'm sure

12   you've heard that before.

13           **INMATE HERNANDEZ:**  Yes, I have.

14           **DEPUTY COMMISSIONER SMITH:**  But some,

15   some things bear repeating.

16           **INMATE HERNANDEZ:**  Yes, sir.  I, I

17   appreciate it.

18           **PRESIDING COMMISSIONER DAVIS:**  We'll take

19   a short recess.

20           **DEPUTY COMMISSIONER SMITH:**  Yes.

21                   **R E C E S S**

22           **DEPUTY COMMISSIONER SMITH:**  And the

23   previously identified is back in the hearing

24   room.

25           **PRESIDING COMMISSIONER DAVIS:** All right.

26   I appreciate everyone's indulgence.  It was

27   getting a little stuffy in here for me.  So I've

56·

1    also given everyone permission to shed their

2    ·coats if that's all right with you Mr. Hernandez.

3              **INMATE HERNANDEZ:** Oh, yes.

4              **PRESIDING COMMISSIONER DAVIS:** We don't

5    want to seem to informal to you, but --

6              **INMATE HERNANDEZ:** Sure.

7              **PRESIDING COMMISSIONER DAVIS:** -- it, it

8    sure does get very stuff very quickly, so -- All

9    right.  With that we'll resume where we left off.

10             **DEPUTY COMMISSIONER SMITH:** So we also,

11   also sent out what are known as 3042 notices.

12   Those are letters that go out to the various

13   Criminal Justice Agencies that were involved in

14   your commitment offense.  We didn't receive any

15   responses back to those notices, although you do

16   have Mr. Turley here representing the Los Angeles

17   County District Attorney's Office and he'll be

18   participating in the hearing in just a few

19   moments.  Before I return to Commissioner Davis

20   is there any, any comments that you'd like to

21   make with regard to your parole plans that I

22   haven't addressed?

23             **INMATE HERNANDEZ:** No.

24             **DEPUTY COMMISSIONER SMITH:** Okay.  Thank

25   you.

26             **INMATE HERNANDEZ:** (inaudible).

27             **DEPUTY COMMISSIONER SMITH:** Commissioner.

57

1       **PRESIDING COMMISSIONER DAVIS:**  Tell me
2   about your participation in AA.  How, what, what
3   kinds of things have you found (inaudible) in
4   there?

5       **INMATE HERNANDEZ:**  AA means, it's a grave
6   tool for a person that's in need of, of help
7   dealing with alcoholism.  It made me realize that
8   I can enjoy some activities without, without
9   drinking alcohol.  It made me realize that I
10  missed a lot of special events by drinking
11  alcohol.  I can remember in one day that my
12  sister brought pictures of the wedding.  I could
13  never, I couldn't remember the wedding.  I
14  couldn't remember the members that participated
15  in the wedding.  And because I was always
16  drinking.  And it made me realize that it's also
17  detrimental to your health.  Especially as you
18  get older.  It does a lot of damage to your
19  liver.

20      **PRESIDING COMMISSIONER DAVIS:** You
21  consider yourself to be an alcoholic?

22      **INMATE HERNANDEZ:**  Yes, sir.

23      **PRESIDING COMMISSIONER DAVIS:** Is that a
24  life-long issue for you?

25      **INMATE HERNANDEZ:**  Yes, it is going to be
26  a life long issue.

27      **PRESIDING COMMISSIONER DAVIS:**  What

58

1    things have you had to plan for your ultimate
2    release in terms of identifying AA programs on
3    the outside?

4         **INMATE HERNANDEZ:**  I know that in
5    anywhere, in any city, I can dial 1-800-AA and
6    I'll get a, a sponsor on the line that's going to
7    help me.  There are thousands and thousands of
8    organizations dealing with Alcohol Anonymous.
9    Not only for the alcoholic, but also for the
10   family members, because they too I believe suffer
11   and --

12        **PRESIDING COMMISSIONER DAVIS:**  All right.
13   Commissioner, any questions that you might have?
14        **DEPUTY COMMISSIONER SMITH:**  No.
15        **PRESIDING COMMISSIONER DAVIS:**  Mr.
16   Turley, questions?

17        **DEPUTY DISTRICT ATTORNEY TURLEY:**  Just a
18   couple.  I kind of missed something.  What
19   periods was, was the inmate actively
20   participating in AA?

21        **PRESIDING COMMISSIONER DAVIS:** Do you know
22   when you were participating in AA what years?
23        **INMATE HERNANDEZ:**  I believe it's going
24   on two years right now on, on the waiting list.
25        **PRESIDING COMMISSIONER DAVIS:** Well two
26   years on the waiting list, but prior to that what
27   was your, were you actively participating in AA

59

1   prior to that?

2          **INMATE HERNANDEZ:**   Not AA, but there was

3   a, a span of time that I had stopped

4   participating for what, (inaudible) AA.   That

5   being the last, the last chrono that I have there

6   is from, should be on, on my, on my file.   Right

7   before, before I got here in '89.   No.   '98.   You

8   have on your list '98?

9          **PRESIDING COMMISSIONER DAVIS:** You got

10  here in '98.

11         **INMATE HERNANDEZ:**   When I got here.

12  Thank you.

13         **DEPUTY DISTRICT ATTORNEY TURLEY:**   And how

14  long have you participated in AA?

15         **PRESIDING COMMISSIONER DAVIS:** In total

16  how long have you participated in AA?

17         **INMATE HERNANDEZ:**   Oh.   Since '79.

18         **PRESIDING COMMISSIONER DAVIS:**   Okay.

19         **DEPUTY DISTRICT ATTORNEY TURLEY:**   When

20  was it that the inmate first admitted to his

21  guilt in this offense to the authorities?

22         **PRESIDING COMMISSIONER DAVIS:** Do you

23  understand the question?

24         **INMATE HERNANDEZ:**   Yes.

25         **PRESIDING COMMISSIONER DAVIS:** Okay.

26         **INMATE HERNANDEZ:**   I admitted to this

27  crime during a session that my (inaudible) that

60

1    that I mastered the therapy that they had me do.

2    During that group, so possibly five or six

3    persons that have to talk about the crime and

4    have to admit that you commit the crime. And

5    that was, I was, I was believe number four or

6    five and as I heard each person I felt a lot of

7    guilt and that was the first time that I, that I

8    voiced (inaudible) as it happened and, and

9    admitted to, admitted to, to committing this,

10   this offense.

11        **PRESIDING COMMISSIONER DAVIS:** And what

12   year was that?

13        **INMATE HERNANDEZ:** I think it was '88.

14   Or '87.

15        **DEPUTY DISTRICT ATTORNEY TURLEY:** No

16   further questions.

17        **PRESIDING COMMISSIONER DAVIS:** All right.

18   Ms. Rutledge?

19        **ATTORNEY RUTLEDGE:** Just a question too.

20   I wanted to just review some of the skills that

21   you've learned since you've been in prison. You

22   worked as a clerk?

23        **INMATE HERNANDEZ:** Yes.

24        **ATTORNEY RUTLEDGE:** How many years did

25   you put in as a clerk all together, do you think,

26   in prison?

27        **INMATE HERNANDEZ:** This time (inaudible)

 1    say roughly '79 and I've done nothing but

 2    clerical except for some time that I spent doing

 3    vocational courses.  I've always -- I always have

 4    classes.

 5        **ATTORNEY RUTLEDGE:**  Did you complete

 6    (inaudible)?

 7        **INMATE HERNANDEZ:**  Yeah.  Data

 8    Processing.

 9        **ATTORNEY RUTLEDGE:**  Did that help your

10    typing or what did you learn in the Data

11    Processing?

12        **INMATE HERNANDEZ:**  It showed me to

13    manipulate difference softwares.  It showed me a

14    different aspect of computer hardware and how to

15    maintain records, things that are needed in the

16    clerical environment.

17        **ATTORNEY RUTLEDGE:**  All right.  And you,

18    what other jobs have you held at the prison that

19    taught you skills that would, you could use to be

20    employed on the outside?

21        **INMATE HERNANDEZ:**  Oh I think I've been

22    a -- I've been a -- I'm trying to remember the --

23    the title.

24        **ATTORNEY RUTLEDGE:**  Okay.  (inaudible).

25        **INMATE HERNANDEZ:**  I did all the, I typed

26    all of the, the, the invoices for purchasing.  I

27    was a purchasing clerk at the hospital, T and C.

62

 1    I dealt with the purchasing orders and then
 2    receiving and then we used clerical dealing with
 3    different aspects of, of maintaining the, the
 4    supplies. (inaudible) the culinary, on the
 5    culinary (inaudible). And I, I maintained a
 6    database on all the culinary workers. I did the
 7    payroll. I, I prepared the lists for the
 8    (inaudible) so they can come to work. It's been,
 9    then I worked as at different job positions.
10         **ATTORNEY RUTLEDGE:** All right. Any other
11    skill? You were loading docks before you
12    (inaudible) at that?
13         **INMATE HERNANDEZ:** Yes.
14         **ATTORNEY RUTLEDGE:** And you got your --
15    your speech thing for an auto accident?
16         **INMATE HERNANDEZ:** Yes, ma'am.
17         **ATTORNEY RUTLEDGE:** All right. No
18    further questions.
19         **PRESIDING COMMISSIONER DAVIS:** All right.
20    Thank you. Mr. Turley, (inaudible).
21         **DEPUTY DISTRICT ATTORNEY TURLEY:** Thank
22    you. The, very long-standing conventional list
23    in, you know, things you just said. Perhaps the
24    very best school to teach maturity and
25    responsibility is military service. And this
26    inmate had the benefit of that school for about
27    three and a half years. And apparently he was a

63

1    poor student.  Almost immediately after getting
2    out of the army rather than having learned
3    responsibility, rather than learn the, the
4    lessons of growing up, take control of himself,
5    keeping his nose clean and holding a good job he
6    seemed to learn irresponsibility and the only
7    meaningful experience that based on what we've
8    heard today evolved from the army was that he
9    came out of the army with a substantial amount of
10   experience in how to handle a handgun.  The
11   particular, the underlying offense here was
12   again, part of, of a pattern of, of the events
13   that were criminal tied to alcohol.  He was out
14   of the army a very short time, stole a taxicab
15   and then in less than a year after he got out of
16   the army he committed this offense.  By his own
17   admission fails to discuss what he believes was a
18   burglary with the police and decides to take
19   things into his own hand.  He was confronted by a
20   person, makes him angry, he's got a few beers
21   under his belt, he goes off, gets a gun, comes
22   back and without seeing (inaudible) over anything
23   else shoots another person right through the
24   heart.  Killed him dead.  Chases two others and
25   shoots at them.  Then for an additional period,
26   approximately eleven years of so by this
27   statement, eleven or twelve years, he still

1   refuses even to admit to the authorities his own
2   guilt in the matter. And that's, it's
3   commendable that he finally got around to that,
4   but this is a very serious crime, took a person's
5   life, didn't seem to give it any, any thought at
6   all.  Walked up to a person virtually at point
7   blank range and shoots him through the heart and
8   (inaudible) to that offense alone is the
9   appropriate for denial of parole. At the time
10  that he committed this offense, again he was 23
11  years old.  He'd had substantial experience with
12  law enforcement agencies due to his own
13  activities.  Highly improbable that he didn't
14  recognize that it was unlawful for him to even be
15  in possession of the firearm. And he -- he made
16  a concerted effort went, went right to the heart
17  of the matter indications criminal behavior.  I
18  think that for all these reasons, but primarily
19  focusing on the, on his failure to, to learn the
20  lessons of life at an age when he should have
21  been completely mature he engaged in this, this
22  offense for a very trivial reason showing no
23  regard to human life and killed another person
24  in, (inaudible) a sheer act of callous disregard
25  for human life. And the people would recommend
26  that parole be denied at this time. Thank you
27  very much.

65

1           **PRESIDING COMMISSIONER DAVIS:**   Thank you.
2     Thank you.   Ms. Rutledge?
3           **ATTORNEY RUTLEDGE:**   Thank you.   Mr.
4     Hernandez is 52 years old; is that correct?
5           **INMATE HERNANDEZ:**   Fifty-one.
6           **ATTORNEY RUTLEDGE:**   Fifty-one.   He's 51
7     years old.   At the time this commitment offense,
8     which was 29 years ago, is that right?   The
9     offense in itself --
10          **INMATE HERNANDEZ:**   Yes, ma'am.
11    (inaudible).
12          **ATTORNEY RUTLEDGE:**   -- was in 1977.   He
13    was 23?   Twenty-four, twenty-three?
14          **INMATE HERNANDEZ:**   Yes.
15          **ATTORNEY RUTLEDGE:**   Twenty-three years
16    old.   A lot of time, I mean this is a crime
17    that's nearly 30 years old.   So as far as, as,
18    him serving his time it's definitely met.   He, in
19    those 30 years he had four 115's?   Yeah.   I think
20    it's four.   I'm just going to look refer to that.
21    And --
22          **DEPUTY COMMISSIONER SMITH:**   That's
23    correct, Counselor.   It's four.
24          **ATTORNEY RUTLEDGE:**   It's four.   And they
25    were all; they all had big spans I want to note.
26    There were seven years from '83 to '90.   Four
27    years.   Got another one in '94.   Four more years.

66

1    So it, it wasn't like he was, you know, racking
2    them up one a year or one every other year.
3    There was just a significant amount of time that
4    transpired between each one.  And the last one
5    being more than eight years ago.  And I think
6    that, and prior to him coming here he didn't
7    really have a consistent record of any kind of
8    violence.  It sounds to me like when he went to
9    the military he learned how to shoot guns.  He
10   probably wouldn't have felt this confident that
11   day with a gun.  I mean I -- I was amazed to take
12   a gun that you, and never tried to shoot it
13   first, you know, unless you've got some kind of
14   skill in, in that regard.  This was a situational
15   circumstance where he just applied poor judgment
16   for whatever reason.  But that again was almost
17   30 years ago.  Today he's -- he's complied with
18   everything in the system that he's been asked to
19   do.  In fact, there's an, there's an old Board
20   Report I'll pull up where it was dated 1987, his
21   counselor at that time said that he'd been
22   complying with the Board of Prison, at that time
23   the Board of Prison Terms and Recommendations, he
24   remained disciplinary free, he upgraded
25   vocationally, participated in self-help, there's
26   lots of Board Reports that indicated a
27   participation and there was, he did another AB

67

1    Substance Abuse, and another course.  He'd done

2    countless self-help groups.  More recently some

3    prison fellowship work in fact a few years ago.

4    He has college courses.  He completed his

5    (inaudible).  Lots of (inaudible) chronos for his

6    different jobs he's had throughout the years and

7    I want to, I think the, the two main things

8    about, about him today are one, he meets the

9    suitability factors completely.  He's got

10   marketable skills, he has a place to live with

11   family members who know him in LA County upon his

12   release.  Second, he's been found suitable twice.

13   Two different Boards, two years apart, found Mr.

14   Hernandez suitable and other Boards too have

15   referred him to, you know, I guess to (inaudible)

16   commitment offense to, sent him back for psyches

17   and he did fine.  He did fine in the Cat X

18   program.  Going back to '87 he got a great psych

19   report.

20            "The probability of him committing a

21            violent act is considerably reduced

22            from what it was at the time of his

23            arrest and there was a high

24            probability that he could complete a

25            course of parole without incident.

26            He has the capacity to make a good

27            occupational and social adjustment

1          on release."

2          That's '87.  And then moving up to '99

3    he, he, on, on the diagnostic impressions he had

4    no personality disorder.  He had a gap of '90.

5    His prognosis is very positive for being able to

6    maintain his current mental (inaudible) in the

7    community upon parole.  And then review of the

8    life crime is that he understood several of the

9    key factors, which favorable of the crime.  He

10   acknowledged that he deserves whatever punishment

11   will come to him for his actions.  He stated it

12   was never his intention to kill anyone.  I

13   believe this inmate showed above average

14   understanding that why this crime occurred and

15   the appropriate and genuine amount of remorse.

16   And then, then up to a recent psyche report,

17   which you reviewed.  So over decades he'd gotten

18   good psyche reports.  Again he's been found

19   suitable twice and he's complied with everything,

20   as far as suitability factors goes.  He meets all

21   of them.  And he has, again, nearly 29 years in.

22   So all of those things considered, I would ask

23   the Board to give him a parole date today.  And,

24   and I would note too that because he's been found

25   suitable twice I would also ask the Board to set

26   a term.  Because I believe that the, the, under

27   the law that he was sentenced under when he's

69

1    found suitable a term is supposed to be set.

2            **PRESIDING COMMISSIONER DAVIS:** Okay.

3    Thank you.  Mr. Hernandez, now it's your

4    opportunity to address the Panel directly and

5    tell us why you believe that you are suitable for

6    parole.

7            **INMATE HERNANDEZ:** Yes' sir.  My thoughts

8    right now are running past me right now, but I

9    have to say that I don't blame nobody for

10   committing this crime, because I, I'm very sorry

11   for it.  And I was (inaudible) it's been this

12   long.  I feel, and I beg for, another chance just

13   to, to live this remaining years that I probably

14   have with my family.  And I wish then that, that

15   I probably have no right to, to ask for this.

16   And, and I know that this time that I've done

17   here is not going to be compared to, to finally

18   when I reach the judgment when I (inaudible).  So

19   that's --

20           **PRESIDING COMMISSIONER DAVIS:**  All right.

21   Thank you very much, sir.

22           **DEPUTY COMMISSIONER SMITH:**  Thank you.

23           **PRESIDING COMMISSIONER DAVIS:** We'll now

24   recess for deliberation.

25                      **R E C E S S**

26                        --oOo--

27

70

1      **CALIFORNIA BOARD OF PAROLE HEARINGS**

2      **D E C I S I O N**

3      **DEPUTY COMMISSIONER SMITH:** For the

4      record, everyone previously identified is back in

5      the hearing room.

6      **PRESIDING COMMISSIONER DAVIS:** This is the

7      matter of Peter Hernandez, CDC number C-03015.

8      In a review of all information received from the

9      public and relied on the following circumstances

10     in concluding the prisoner is not suitable for

11     parole, he would pose a reasonable risk of danger

12     to society or a threat (inaudible) he was in

13     prison we come to this conclusion by the

14     commitment offense that was committed in a

15     special callous manner.  There were multiple

16     victims attacked (inaudible) one was killed in

17     the same incident.  The motive for the crime was

18     very (inaudible) in relation to the offense.

19     These conclusions were drawn from the Statement

20     of Fact wherein the prisoner as to what he

21     describes as an attempt to recover stolen

22     property where he was threatened by what he

23     describes as an armed person.  He sought out a

24     weapon, put himself back into a dangerous

25     situation, confronted the person who may or may

26     not have been involved in the theft of his

27     **P. HERNANDEZ  C-03015  DECISION PAGE 1  7/13/06**

71

1   sister's property and without seeing a weapon or
2   any (inaudible) and threat he used this, he used
3   his own weapon to shoot and kill the victim then
4   turned the weapon on to the victims' two
5   companions shooting at them, striking them in the
6   leg.  We find there is basically a pattern of
7   criminal conduct and a failure to prophet from
8   the society previous attempt to correct
9   criminality specifically adult probation.  In
10  regard to institutional behavior we find that
11  there are seven 128A counseling chronos, the last
12  of which was in December of 2000, and four
13  serious 115 disciplinary (inaudible), the last of
14  which was in February of 1998.  The Psychological
15  Report of July of 2004 by Dr. (inaudible) is
16  supportive and the, with regard to parole plans,
17  we find that the parole plans are not realistic.
18  There is, there, there is virtually no employment
19  plan, there's no support of even employment
20  information by statements that there are some
21  distance, there's no real plan though.  And your
22  residential plans of sharing a two-bedroom
23  residence with two adults and three the children
24  seems suspect.  Now I say that understanding that
25  if that's the option then what you need to do is
26  come back in here with an
27  **P. HERNANDEZ  C-03015  DECISION PAGE 2  7/13/06**

72

1    explanation that, yes, we understand it's going

2    to be tight, we thought about this. We'll put a

3    cot up in the living, we're going to partition

4    off, what, whatever it is. If that's the case

5    then, then let us know that. And that's where

6    you need to, that's where you need to focus your

7    work. I understand and appreciate that at some

8    point in time you became embarrassed or, or you

9    didn't want to burden your family more with, with

10   denial after denial. I understand. But the

11   thing of it is this is a critical part of this

12   and there's -- you could earn a date, but this

13   has to be part of your earning that date. So you

14   need to spend this, this time now in figuring out

15   your parole plan. Get a job offer. You have

16   skills, there's no reason why you can't get a job

17   offer out there, or at least something lined up.

18   Do some research to determine where you can find

19   a job given the skills that you have. And let

20   your family help you.

21          **INMATE HERNANDEZ:** Okay, sir.

22          **PRESIDING COMMISSIONER DAVIS:** It's not

23   that difficult for them to do that. The, with

24   regard to the 3032 notices. The District

25   Attorney from Los Angeles County is here in

26   person by representative because (inaudible)

27   **P. HERNANDEZ  C-03015  DECISION PAGE 3  7/13/06**

73

1    parole.   Nonetheless we want to commend you for

2    several things.  Your 2005 Certificate for your

3    Entrepreneur of the workshop, your ten FEMA

4    Certificates including lessons in Leadership and

5    Planning, your Veterans Support Group of eight,

6    from eight of 2004 and two of 2005, your two

7    Health Certificates, Certificates of Achievement,

8    your work as a culinary clerk and as a receiving

9    clerk and then back again as a culinary clerk,

10   your work in the BRAG Group helping the new

11   inmates requiring an application process and

12   recommendation.  You should be very proud of

13   that.

14            **INMATE HERNANDEZ:**  Thank you.

15            **PRESIDING COMMISSIONER DAVIS:**  That's a

16   significant achievement to have to apply for

17   something, to have to work on, you had to work to

18   get that, that wasn't just something you could

19   say yeah, I'll do that.  You had to (inaudible)

20   on a record.  Put that same effort into your

21   parole plans.  And we appreciate the fact that

22   you're on the AA waiting list and that you're on

23   the waiting list for Alternatives to Violence, as

24   well as starting a new business course as of

25   November of '05.

26            **INMATE HERNANDEZ:**  Yes, sir

27   **P. HERNANDEZ  C-03015  DECISION PAGE 4  7/13/06**

74

1    **PRESIDING COMMISSIONER DAVIS:**  That's
2    excellent.  This is a one-year denial and the
3    Panel recommends that you, that you remain
4    disciplinary free, that as available that you
5    participate in self-help.  You're obviously an
6    intelligent man, so if you're on a waiting list
7    for any (inaudible) don't wait forever, get some
8    books on self-help, read them, keep track of what
9    you've read, writing a book a report or be
10   prepared next time you come in to discuss with
11   the Panel what you've read and how (inaudible)
12   some insight and how you took the initiative to,
13   to do that instead of just waiting for the list
14   to (inaudible).  And, and get your parole plans
15   squared away.  And we are going to also request a
16   new Psychological Evaluation be done.
17   Commissioner, do you have any other thoughts on
18   this?
19   **DEPUTY COMMISSIONER SMITH:**  Mr.
20   Hernandez, we're, you know, not, not to, to beat
21   you up, because we're not trying to do that.
22   **INMATE HERNANDEZ:**  Yes, sir.
23   **DEPUTY COMMISSIONER SMITH:**  You program
24   in, in a very, very positive manner.  You
25   certainly have been incarcerated for an extended
26   period of time.  You present yourself very well,
27   **P. HERNANDEZ  C-03015  DECISION PAGE 5  7/13/06**

75

1   you're clearly an intelligent man. You developed
2   a lot of skills that can be applied in a
3   community. And yet for some reason you simply
4   opted not to take that, that next necessary step
5   to establish your parole plans. You know, this,
6   this (inaudible) denial is as much your decision
7   as it was ours. You've got to have those parole
8   plans. You -- you've got to know where you're
9   going to be living, and it's got to be realistic.
10          **INMATE HERNANDEZ:** Yes, sir.
11          **DEPUTY COMMISSIONER SMITH:** You've got to
12  know where you're going to be working. You know,
13  if, if you got a job offer and it's specific,
14  what are you going to be doing, you know, how
15  much are you going to get paid. If it's some
16  distance away from where you're going to be
17  living, how are you going to get to point A to
18  point to point B and back again. There are a
19  number of reasons why those are very important.
20  And one of the reasons is that if, if we were to
21  grant you a date, or the next Panel grants you a
22  date, that decision goes in front of the whole
23  Board --
24          **INMATE HERNANDEZ:** Yes.
25          **DEPUTY COMMISSIONER SMITH:** -- and they
26  vote to either support the granting of the date
27  **P. HERNANDEZ C-03015 DECISION PAGE 6 7/13/06**

76

1    or to send it back.  If they vote to grant it
2    then it goes to the Governor.  Okay?  So it isn't
3    just our decision.  Well, even if we believe you
4    can be successful in spite of not having parole
5    plans, you're coming back because nobody else is
6    going to believe that.  Nobody else has the
7    opportunity to be able to sit here and talk to
8    you one-on-one face to face.

9            **INMATE HERNANDEZ:**  Yes, sir.

10           **DEPUTY COMMISSIONER SMITH:**  So, again,
11   I'm not trying, neither one of us is trying to,
12   you know, beat you up by telling you the same
13   thing over and over and over and over again.

14           **INMATE HERNANDEZ:**  Yeah.

15           **DEPUTY COMMISSIONER SMITH:**  But we want
16   you to hear us.

17           **INMATE HERNANDEZ:**  Okay.

18           **DEPUTY COMMISSIONER SMITH:**  And we want
19   you to hear us in a positive way.  Okay?  You got
20   to deal with the program.

21           **INMATE HERNANDEZ:**  It's a whole lot of
22   difference, the parole plans.  I'll -- I'll make
23   sure I do very extensive work on that.

24           **DEPUTY COMMISSIONER SMITH:**  Good.

25           **INMATE HERNANDEZ:**  And also I have a, you
26   know, a quarter report, quarterly report on how
27   **P. HERNANDEZ   C-03015   DECISION PAGE 7   7/13/06**

77

1    I'm going to live out there (inaudible).

2         **DEPUTY COMMISSIONER SMITH:**  You, you have

3    about a year to, to do that.

4         **INMATE HERNANDEZ:**  Yes, sir.

5         **DEPUTY COMMISSIONER SMITH:**  You know,

6    bring in the, the VA --

7         **INMATE HERNANDEZ:**  Yes, sir.

8         **DEPUTY COMMISSIONER SMITH:**  -- letters,

9    that information so we can present that and have

10   those documents.  You can't bring in too much

11   documentation.  You can only bring in too little.

12   Okay?

13        **PRESIDING COMMISSIONER DAVIS:**  Take a

14   lesson from your Entrepreneurial class thinking

15   you're developing a business plan.

16        **INMATE HERNANDEZ:**  Yes, sir.  That's what

17   I'll (inaudible).

18        **PRESIDING COMMISSIONER DAVIS:** There you

19   go.

20        **INMATE HERNANDEZ:**  Thank you very much

21    for --

22        **DEPUTY COMMISSIONER SMITH:** We wish you,

23   we wish you good luck sir.

24        **PRESIDING COMMISSIONER DAVIS:**  All right.

25   (inaudible).  Ms. Rutledge, thank you.

26        **ATTORNEY RUTLEDGE:**  (inaudible)

27   **P. HERNANDEZ  C-03015  DECISION PAGE 8  7/13/06**

78

1          **PRESIDING COMMISSIONER DAVIS:**  Mr.

2   Turley, thank you.

3          **ATTORNEY RUTLEDGE:**  Oh, it's my pleasure.

4                         **ADJOURNMENT**

5                          --oOo--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23   **PAROLE DENIED ONE YEAR**            NOV **1 0** 2006

24   **THIS DECISION WILL BE FINAL ON:_____**

25   **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

26   **DATE, THE DECISION IS MODIFIED**

27   **P. HERNANDEZ C-03015 DECISION PAGE 9 7/13/06**

79

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, PATTY L. DURAN, a duly designated
transcriber, NORTHERN CALIFORNIA COURT REPORTS,
do hereby declare and certify under penalty of
perjury that I have transcribed tape(s) which
total one in number and cover a total of pages
numbered 1 through 78, and which recording was
duly recorded at the CORRECTIONAL TRAINING
FACILITY, in SOLEDAD, CALIFORNIA, in the matter
of the SUBSEQUENT PAROLE CONSIDERATION HEARING of
PETER HERNANDEZ, CDC No. C-03015, on JULY 13,
2006, and that the foregoing pages constitute a
true, complete, and accurate transcription of the
aforementioned tape(s) to the best of my ability.

I hereby certify that I am a
disinterested party in the above-captioned matter
and have no interest in the outcome of the
hearing.

Dated OCTOBER 2, 2006 at Sacramento
County, California.

*Patty L. Duran*

----------------------------

Patty L. Duran, Transcriber
NORTHERN CALIFORNIA COURT RPTRS

# EXHIBIT   "C"

## PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
### (REVISED AUGUST 1998)
### PAROLE CONSIDERATION HEARING
### AUGUST 2004 LIFER CALENDAR

### CORRECTIONAL TRAINING FACILITY, SOLEDAD
### JULY 23, 2004

This is a psychological evaluation update for the Board of Prison Terms on inmate Peter Hernandez, CDC# C-03015. This report is based on personal clinical interviews of the inmate on 03/24/04 and 07/23/04. Additionally, in preparation for this report, the Central file, unit health records, and previous psychological assessment prepared by Dr. Steven Terrini were examined. The clinical interviews and the review of all pertinent documents were for the express purpose of preparing this report.

Inmate Hernandez has served 27 years of a 7-year-to-life sentence on a conviction of first degree murder.

His last violence-based 115 occurred in 1998. Although Dr. Terrini, in his previous report, assessed inmate Hernandez as low-risk in a community setting, the Board expressed some concern about a pattern of four violence-based 115s during the 27-year period of incarceration. A review of the actual 115s documented in the Central file, and subsequent discussion with inmate Hernandez, confirm that in each instance, inmate Hernandez was the victim of an assault perpetrated by another inmate, and reacted by defending himself. The recent CDC policy of classifying a majority of fights between inmates as mutual combat serves to further cloud actual issues and facts.

During the most recent Parole Board hearing, some concern was also expressed about a history of alcohol abuse as a probable contributing factor to the instant offense. In fairness, inmate Hernandez has now been incarcerated for 27 years, and has remained dry for this entire time.

Further, with respect to the Parole Board's concern about self-help issues, inmate Hernandez has successfully completed Impact, and has several documented certificates in religious spiritual growth. Currently, he is wait-listed for Alcoholics Anonymous and We Care. However, due to the popularity of these programs and staff shortage at CTF, inmates have limited access.

During incarceration, inmate Hernandez has completed vocational programming in television production, data processing, and basic electronics.

If released, inmate Hernandez plans to reside with his brother and sister-in-law in Pacoima, California. His cousin in nearby Rosemead has extended a job offer in an auto repair facility, which will utilize this inmate's skill in computer software.

Currently, inmate Hernandez is a suitable candidate for parole release consideration, with a recidivism and risk factor no greater than the average citizen in the community. Due to

**HERNANDEZ**     **C-03015**     **CTF-CENTRAL**     **07/23/04**     **gmj**

HERNANDEZ, PETER
CDC NUMBER: C-03015
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO

his marketable skills and close family support, it is expected that his transition to freedom and personal responsibility will be relatively smooth.

E. W. Hewchuk, Ph.D.
Staff Psychologist
Correctional Training Facility, Soledad

B. Zika, Ph.D.
Senior Supervising Psychologist
Correctional Training Facility, Soledad

EWH/gmj

D: 07/23/04
T: 07/27/04

D:\Word Files\BPT - 2004\HERNANDEZ, PETER  C-03015  08-04  HEWCHUK.doc

**PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS**
**(REVISED AUGUST 1998)**
**PAROLE CONSIDERATION HEARING**
**NOVEMBER 2002 LIFER CALENDAR**

**CORRECTIONAL TRAINING FACILITY, SOLEDAD**
**JUNE 14, 2002**

Inmate Peter Hernandez, CDC# C-03015, was seen for a
psychological evaluation for the Board of Prison Terms by
Steven J. Terrini, Ph.D., Staff Psychologist at the
Correctional Training Facility (CTF), on 09/21/99 for the
December 1999 Lifer Calendar.

According to the instructions given to Wardens and Health
Care Managers by Steven Cambra, Jr. (CDC), and G. Lewis
Chartrand, Jr. (BPT) in September 1998, once a mental health
evaluation is completed in the new format, revised in August
1998, a new evaluation is not necessary when an inmate
appears before the Board of Prison Terms unless the BPT has
filed a BPT 1000A request for a new report.

Since there is no BPT 1000A request on file, a mental health
evaluation was not conducted at this time.

**BILL ZIKA, Ph.D.**
**Senior Supervising Staff Psychologist**
**CORRECTIONAL TRAINING FACILITY, SOLEDAD**

BZ/gmj

D:   06/14/02
T:   06/14/02

**MENTAL HEALTH EVALUATION FOR THE BOARD OF PRISON TERMS
PAROLE CONSIDERATION HEARING
(REVISED AUGUST 1998)
JUNE 2001 LIFER CALENDAR**

**CORRECTIONAL TRAINING FACILITY, SOLEDAD
MARCH 9, 2001**

Inmate Peter Hernandez, CDC# C-03015, was seen for a mental
health evaluation for the Board of Prison Terms by Steven
Terrini, Ph.D., Clinical Psychologist at CTF, on 09/21/99
for the December 1999 Lifer Calendar.

According to the agreement that CDC psychologists and
psychiatrists made with the Board of Prison Terms, once a
mental health evaluation is completed in the new format
created in 1998, a new evaluation is not necessary each time
the inmate appears before the Board of Prison Terms.

Therefore, a mental health evaluation was not conducted at
this time.

*RS Coate*

**R. S. COATE, Psy.D.
Senior Supervising Clinical Psychologist
Correctional Training Facility, Soledad**

RSC/gmj

D:   03/09/01
T:   03/09/01

**HERNANDEZ       C-03015      CTF-CENTRAL       03/09/01        gmj**

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
PAROLE CONSIDERATION HEARING
DECEMBER 1999 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
SEPTEMBER 21, 1999

This is either the ninth or the tenth psychological
evaluation for the Board of Prison Terms on inmate Peter
Hernandez.  This report is the product of a personal
interview, conducted on 09/21/99, as well as a review of his
Central file and unit health record.  I have known this
inmate previously from a past BPT psychological evaluation.

## I.    IDENTIFYING INFORMATION:

Inmate Hernandez is a 45-year-old, divorced, Hispanic
male.  His date of birth is 08/17/54.  He stated his
religion is Catholic.  There were no unusual physical
characteristics noted and he denied any history of
nicknames or aliases.

## II.   DEVELOPMENTAL HISTORY:

Inmate Hernandez denied any history of birth defects,
abnormalities of developmental milestones, a history of
cruelty to animals, a history of arson, any significant
childhood medical history, or a history of physical or
sexual abuse as either a perpetrator or a victim.

## III.  EDUCATIONAL HISTORY:

Educationally, inmate Hernandez has a high school
degree and has taken some college courses.
Vocationally, he has participated in data processing,
TV production and electrical maintenance.

## IV.   FAMILY HISTORY:

Inmate Hernandez's parents are still alive, although he
has not had contact with his biological father for
several years.  His stepfather, who raised him, died a
few years ago.  His mother is in her 70s.  He stays in
contact with her through letters and telephone calls.
He has two remaining siblings and has limited contact
with them through his mother.  None of his family

**HERNANDEZ      C-03015      CTF-CENTRAL      09/27/99      gj**



HERNANDEZ, PETER
CDC NUMBER: C-03015
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO

members have ever had any significant criminal or
psychiatric problems, although he felt his stepfather
was an alcoholic.

V.    **PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:**

Inmate Hernandez is a heterosexual male.  He denied any
history of sexual aggression.

VI.   **MARITAL HISTORY:**

Inmate Hernandez was married on one occasion and later
divorced.  He has one child from that marriage and
stays in contact with that child.

VII.  **MILITARY HISTORY:**

Inmate Hernandez was in the Army for three years.  He
did not engage in any combat and received an honorable
discharge.

VIII. **EMPLOYMENT AND INCOME HISTORY:**

In the past, inmate Hernandez has been employed in
construction, working in a delivery service, working as
a security officer, and doing dock work.  When he
paroles, he hopes to find employment in office work.

IX.   **SUBSTANCE ABUSE HISTORY:**

Inmate Hernandez was recently on the waiting list for
Alcoholics Anonymous and stated that he had a ducat to
start participating in that program this evening
(09/21/99).  He acknowledged having an alcohol problem
in the past.  He also used marijuana occasionally in
the past.  He denied ever participating in any
treatment programs or placements in the community.

X.    **PSYCHIATRIC AND MEDICAL HISTORY:**

Inmate Hernandez's most significant medical problem
involved an automobile accident.  He still has throat
problems, he feels, as a result of that accident.  He
denied a history of other head injuries, suicidal
behavior, hospitalizations, or a history of seizures or
other neurological conditions.

HERNANDEZ      C-03015      CTF-CENTRAL      09/27/99      gj

HERNANDEZ, PETER
CDC NUMBER:  C-03015
BPT PSYCHOLOGICAL EVALUATION
PAGE THREE

XI.   <u>PLANS IF GRANTED RELEASE</u>:

When he paroles, he hopes to live with his brother and
his brother's family.  Given the information he
provided to me, it would appear his parole plans are
quite viable, as he has several skills that he can be
employed in and has a supportive family, and his
prognosis for community living is quite positive.

<div align="center">CLINICAL ASSESSMENT</div>

XII. <u>CURRENT MENTAL STATUS/TREATMENT NEEDS</u>:

Inmate Hernandez appeared his stated age.  He was
appropriately dressed and groomed.  He was pleasant,
coherent, cooperative, calm and alert.  His speech,
flow of thought and affect were all within the normal
range.  His intellectual functioning was estimated to
be above average.  There was no evidence of a mood or
thought disorder.  His judgment appeared to be sound.
He showed good insight into his commitment offense.

<u>CURRENT DIAGNOSTIC IMPRESSIONS</u>:

AXIS I:    Alcohol Abuse, in institutional remission.
AXIS II:   No Contributory Personality Disorder.
AXIS V:    GAF = 90.

His prognosis is very positive for being able to
maintain his current mental state in the community upon
parole.

XIII.<u>REVIEW OF LIFE CRIME</u>:

Inmate Hernandez described the circumstances
surrounding his commitment offense.  He understood
several of the key factors which played a role in this
crime, including his drinking that day, as well as
"acting like an egotistical tough guy."  He
acknowledged that he deserves whatever punishment will
come to him for his actions.  He stated it was never
his intention to kill anyone, but simply to recover the
objects that had been burglarized from his sister's
home.  I believe this inmate showed an above average
understanding of why this crime occurred and an
appropriate and genuine amount of remorse.

HERNANDEZ      C-03015      CTF-CENTRAL      09/27/99      gj

HERNANDEZ, PETER
CDC NUMBER:  C-03015
BPT PSYCHOLOGICAL EVALUATION
PAGE FOUR

## XIV. ASSESSMENT OF DANGEROUSNESS:

A.  In consideration of several factors, including his relative lack of CDC-115 violations, as well as his lack of a violent criminal history, and his prosocial attitude, his violence potential within a controlled setting is estimated to be significantly below average relative to this Level II inmate population.

B.  If released to the community, his violence potential is estimated to be no more than the average citizen in the community.

C.  The most significant risk factor which could be a precursor to violence for this inmate would be continued abuse of alcohol.  I strongly believe this man understands how alcohol affected him during this crime and he seems to have a strong intention to not drink again.

## XV.  CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

1)  This inmate is competent and responsible for his behavior.  He has the capacity to abide by institutional standards and has generally done so during his incarceration period.

2)  This inmate does not have a mental health disorder which would necessitate treatment either during his incarceration period or following parole.

3)  As this man has acknowledged a problem with alcohol, I would recommend, upon parole:

   A.  Abstinence from all alcohol and illegal drugs.

   B.  Monitoring.

   C.  Mandatory attendance at self-help groups such as Alcoholics Anonymous.

4)  Inmate Hernandez has received several, very positive, past evaluations.  The Category X report of 1995 stated, "We were most favorably impressed with his achievements during his incarceration and

HERNANDEZ, PETER
CDC NUMBER:  C-03015
BPT PSYCHOLOGICAL EVALUATION
PAGE FIVE

his current motivation and sincerity." The 1997
BPT psychological evaluation, done by Dr. Galbo,
stated that he has "grown significantly in his
years of incarceration," and he is "psychologically
suited and stable enough to be paroled." I am in
agreement with these past evaluations and believe
that this man is an excellent candidate for parole
consideration.


STEVEN J. TERRINI, Ph.D.
Senior Supervising Psychologist (A)
Correctional Training Facility, Soledad

SJT/gmj

d:  09/21/99
t:  09/27/99

**CALIFORNIA STATE PRISON - SOLANO**
**Vacaville, California**

**PSYCHOLOGICAL EVALUATION**
**FOR THE BOARD OF PRISON TERMS**

**NAME: HERNANDEZ, Peter**
**CDC#:    C-03015**
**HSG:      21-W1L**

The following is a psychological report to the Board of Prison Terms on this 43 year old Hispanic male who is serving 7 years to life for first degree murder and two counts of assault with intent of murder. This examiner interviewed Inmate Hernandez on 8-20-97 for approximately 1 hour. His central and medical files were reviewed in conjunction with this interview to ensure accuracy and completeness in this report. This exam was for the preparation of this board report only.

**BACKGROUND AND HISTORY:** Mr. Hernandez was born in Las Cruces but moved to Los Angeles with his family when he was 5. His parents were divorced when he was 6. They are both still living and his mother is in Fresno and is 65 years old. His father is in Texas but he has not communicated with his him since the divorce. The instant offense took place on April 25, 1977 when the inmate confronted three people whom he knew had burglarized his brother-in-law's home. When the victim came at him, he shot his gun killing him instantly. He shot at the other two also but they fled.

Mr. Hernandez says that his health is excellent and has had no health problems for the past 20 years. He admits he was an alcoholic and is actively involved in AA. At the time of the crime he was intoxicated and he feels that alcohol was a major cause of his problems when he was younger. He started drinking at age 14 and did not get involved with illicit drugs except marijuana occasionally.

Mr. Hernandez has had few disciplinary problems and says his last CDC-115 was in 1991 which was for fighting. He has had vocational training in data processing, electrical maintenance and TV productions. He feels that he could be actively and gainfully employed if he were to be paroled.

**MENTAL STATUS EXAMINATION:** Mr. Hernandez' intelligence is above average. He uses good judgment now and can make good decisions as well as plans for his life when he paroles. He is oriented in all spheres and has good sensitivity to other people's needs. Several projective personality tests were administered and there is no indication that he is a violent person and would pose no danger to the free community.

Several times during the interview, Mr. Hernandez was tearful and indicated he has experienced a sense of loneliness over the years. He states on the sentence completion test "Sometimes I long to have emotional ties," and "What pains me is I can't." He says he has been married for 22 years but his wife is in New Mexico and he has not been with her during the entire time of his incarceration. However, he does have one daughter with her who is 20 years old and lives in Lake Havasu, Arizona. He feels he will probably get divorced from his wife when paroled and go live with his brother in Los

1

NAME:  HERNANDEZ, Peter
CDC#:   C-03015

MENTAL STATUS EXAMINATION, continued: Angeles. All things considered, Mr. Hernandez is free from mental illness or other emotional disturbance. He is a thinking, feeling person who is trying to put the pieces of his life together again. This can be seen in the statement he makes that "My greatest fear is failing and not trying again." He adds that he feels the need to live his life over and do things much differently. At the present time he has a well developed conscience and is highly unlikely to commit a similar offense. What is most important is that he continue his AA affiliation and seek personal counseling from the Parole Outpatient Clinic in Los Angeles if he is paroled.

PSYCHIATRIC DIAGNOSIS:

Axis I:    No diagnosis.
Axis II:   No diagnosis.
Axis III:  None.
Axis IV:  Moderate stress due to life in prison.
Axis V:   GAF = 85.

PSYCHOLOGICAL CONCLUSIONS:    Mr. Hernandez is seen as a man who has grown significantly in his 20 years of incarceration and has developed numerous ego and intellectual resources to call upon when needed. He has learned to adapt to stressful situations when necessary and is not seen as a violent person or a parole risk when he is considered for it.

RECOMMENDATION FOR CLASSIFICATION COMMITTEE:    Inmate Hernandez is psychologically suited and stable enough to be paroled.

*Charles J. Galbo*

Charles J. Galbo, Ph.D.
Clinical Psychologist

NOTED AND APPROVED:

Michael Vasquez, Ph.D.
Senior Psychologist

CG/dh

D: 8-20-97
T: 9-02-97

COPY SENT TO
INMATE:

2

# EXHIBIT "D"

## LIFE PRISONER EVALUATION REPORT
## SUBSEQUENT PAROLE CONSIDERATION HEARING
## JANUARY 2006 CALENDAR

**HERNANDEZ, PETER**                                            **C03015**

### I.    COMMITMENT FACTORS:

A.    **Life Crime:**  Remain the same as stated in previous hearings.

    1.    **Summary of Crime:**  All relevant documents have been considered and that information remains the same.

    2.    **Prisoner's Version:**  All relevant documents have been considered and that information remains the same.

    3.    **Aggravating/Mitigating Circumstances:**

        a.    **Aggravating Factors:**  All relevant documents have been considered and that information remains the same.

        b.    **Mitigating Factors:**  All relevant documents have been considered and that information remains the same.

B.    **Multiple Crime(s):**  N/A.

    1.    **Summary of Crime:**  N/A.

    2.    **Prisoner's Version:**  N/A.

### II.    PRECONVICTION FACTORS:

A.    **Juvenile Record:**  All relevant documents have been considered and that information remains the same.

B.    **Adult Convictions and Arrests:**  All relevant documents have been considered and that information remains the same.

C.    **Personal Factors:**  All relevant documents have been considered and that information remains the same.

**Inmate Copy**

LIFE PRISONER EVALUATION REPORT
PAROLE CONSIDERATION HEARING
JANUARY 2006 CALENDAR

## III.   POSTCONVICTION FACTORS:

A.   **Special Programming/Accommodations:** N/A.

B.   **Custody History:** All relevant documents have been considered and that information remains the same. Since his last board appearance Hernandez has been assigned as a Clerk in the Culinary. On 7/2/05, Hernandez was reassigned as the Receiving and Release Clerk where he currently remains assigned. He has remained at CTF in the general population with Medium A custody. (See Post Conviction Progress Report).

C.   **Therapy and Self-Help Activities:** Documents from previous hearings remain valid. Hernandez has participated in Impact, FEMA Certificates, and the Veteran's Self Help Group. (See Post Conviction Progress Reports).

D.   **Disciplinary History:** Documents from previous hearings remain valid. Hernandez continues to remain disciplinary free.

E.   **Other:** Hernandez attended his Subsequent #12 Parole Consideration Hearing on 1/6/05. Parole was denied for 1 year. The Board recommended that Hernandez remains disciplinary free; participate in self help programs; and earn positive chronos.

## IV.   FUTURE PLANS:

A.   **Residence:** All relevant documents have been considered and all information remains the same.

B.   **Employment:** All relevant documents have been considered and all information remains the same.

C.   **Assessment:** In review of Hernandez' parole plans, this counselor does not foresee any problems, however, it is recommended that Hernandez updates his support letters prior to his hearing.

## V.   USINS STATUS: N/A.

## VI.   SUMMARY:

A.   Prior to release the prisoner could benefit from:
1.   Continuing to be disciplinary free.

HERNANDEZ, PETER          C03015                    CTF-SOLEDAD          JAN/2006

      2.     Participation in self-help and earn positive chronos.

**B.**     This report is based upon a thorough review of Hernandez' Central File and a one hour interview with Hernandez.

**C.**     Per the Olson Decision, Hernandez was afforded an opportunity to review his Central File. Hernandez did examine his Central File. (Refer to CDC 128-B dated 11/4/05 in the General Chrono Section of the Central File.)

**D.**     No accommodation was required per the Armstrong vs. Davis BPH Parole Proceedings Remedial Plan (ARP) for effective communication.

LIFE PRISONER EVALUATION REPORT
PAROLE CONSIDERATION·HEARING
JANUARY 2006 CALENDAR

K. Heinly                          *11-17-05*
                                   Date

Correctional Counselor I


D. Carnazzo         *CCTI   11·17-05*
                                   Date

Correctional Counselor II


I. Guerra           *FC (A)   11-17-05*
                                   Date

Facility Captain


D.S. Levorse        *C&PR   11·18-05*
                                   Date

Classification and Parole Representative


HERNANDEZ, PETER        C03015              CTF-SOLEDAD        **JAN/2006**

**BOARD OF PRISON TERMS**                                          STATE OF CALIFORNIA
LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐   DOCUMENTATION HEARING

☒   PAROLE CONSIDERATION HEARING

☐   PROGRESS HEARING

INSTRUCTIONS
TO CDC STAFF:  DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
TO BPT STAFF:  FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 9/1/04 to 10/31/05 | | | **PLACEMENT:**  Remained at CTF in the general population.<br>**CUSTODY:**  Medium A.<br>**VOC. TRAINING:**  None noted this period.<br>**ACADEMICS:** None noted this period.<br>**WORK RECORD:**  Hernandez was assigned as a Clerk in the Culinary until 7/2/05.  He received satisfactory to above average ratings verified by CDC 101's dated 10/1/04 and 6/1/05.  On 7/2/05, Hernandez was reassigned as a Receiving and Release Clerk (non-adverse).  He has no CDC 101's for this period.<br>**GROUP ACTIVITIES:**  Hernandez participated in the Veteran's self help group as verified by CDC 128B dated 3/12/05.<br>**PSYCH. TREATMENT:**  None noted during this period.<br>**PRISON BEHAVIOR:**  Hernandez remained disciplinary free during this period.<br>**OTHER:**  Hernandez successfully completed an Impact workshop verified by CDC 128B dated 9/21/04.<br><br>Hernandez has numerous FEMA certificates dated 7/14/05 located in the miscellaneous section of his Central File. |

| CORRECTIONAL COUNSELOR'S SIGNATURE | | | DATE |
|---|---|---|---|
| | | | $11-18-05$ |
| HERNANDEZ | C03015 | CTF-SOLEDAD | JAN/2006 |

THIS IS AN IMPORTANT RECORD
SAFEGUARD IT.

| 1. LAST NAME - FIRST NAME - MIDDLE NAME | 2. SEX | 3. SOCIAL SECURITY NUMBER | 4. DATE OF BIRTH | YEAR | MONTH | DAY |
|---|---|---|---|---|---|---|
| HERNANDEZ, PETER JR | M | 573 88 5259 | | 54 | 08 | 17 |

| 5. DEPARTMENT, COMPONENT AND BRANCH OR CLASS | 6a. GRADE - RATE OR RANK | 6b. PAY GRADE | 7. DATE OF RANK | YEAR | MONTH | DAY |
|---|---|---|---|---|---|---|
| ARMY        RA | SP4 | E4 | | 74 | 04 | 30 |

| 8a. SELECTIVE SERVICE NUMBER | 8b. SELECTIVE SERVICE LOCAL BOARD NUMBER, CITY, STATE AND ZIP CODE | 8c. HOME OF RECORD AT TIME OF ENTRY INTO ACTIVE SERVICE (Street, RFD, City, State and ZIP Code) |
|---|---|---|
| Not available | | 242½ E. 27th Street Los Angeles, CA 90011 |

| 9a. TYPE OF SEPARATION | 9b. STATION OR INSTALLATION AT WHICH EFFECTED |
|---|---|
| Relief from active duty | Fort Hood, Texas |

| 9c. AUTHORITY AND REASON | 9d. EFFECTIVE DATE | YEAR | MONTH | DAY |
|---|---|---|---|---|
| CHap 2 AR 635-200    SPD LBK | | 76 | 02 | 11 |

| 9e. CHARACTER OF SERVICE | 9f. TYPE OF CERTIFICATE ISSUED | 10. REENLISTMENT CODE |
|---|---|---|
| HONORABLE | None | RE-1B |

| 11. LAST DUTY ASSIGNMENT AND MAJOR COMMAND | 12. COMMAND TO WHICH TRANSFERRED |
|---|---|
| Co A 2d Bn 66th Armor 2d Armd Div FORSCOM | USAR Control Gp(Reinf) RCPAC 9700 Page Blvd., St. Louis, MO 63132 |

| 13. TERMINAL DATE OF RESERVE/MSS OBLIGATION | 14. PLACE OF ENTRY INTO CURRENT ACTIVE SERVICE (City, State and ZIP Code) | 15. DATE ENTERED ACTIVE DUTY THIS PERIOD | | |
|---|---|---|---|---|
| YEAR MONTH DAY | | YEAR | MONTH | DAY |
| 79  02  11 | Los Angeles, CA 90000 | 73 | 02 | 12 |

| 16a. PRIMARY SPECIALTY NUMBER AND TITLE | 16b. RELATED CIVILIAN OCCUPATION AND D.O.T. NUMBER | 18. RECORD OF SERVICE | YEARS | MONTHS | DAYS |
|---|---|---|---|---|---|
| 11E20 Armor Crewman 73/06/15 | None | (a) NET ACTIVE SERVICE THIS PERIOD | 3 | 0 | 0 |
| None | | (b) PRIOR ACTIVE SERVICE | 0 | 0 | 0 |
| 17a. SECONDARY SPECIALTY NUMBER AND TITLE | 17b. RELATED CIVILIAN OCCUPATION AND D.O.T. NUMBER | (c) TOTAL ACTIVE SERVICE (a + b) | 3 | 0 | 0 |
| | | (d) PRIOR INACTIVE SERVICE | 0 | 0 | 0 |
| None | None | (e) TOTAL SERVICE FOR PAY (c + d) | 3 | 0 | 0 |
| | | (f) FOREIGN AND/OR SEA SERVICE THIS PERIOD | 0 | 5 | 15 |

| 19. INDOCHINA OR KOREA SERVICE SINCE AUGUST 5, 1964 | 20. HIGHEST EDUCATION LEVEL SUCCESSFULLY COMPLETED (In Years) |
|---|---|
| ☐ YES ☒ NO | SECONDARY/HIGH SCHOOL 10 YRS (1 - 12 grades) COLLEGE 0 YRS |

| 21. TIME LOST (Preceding Two Yrs) | 22. DAYS ACCRUED LEAVE PAID | 23. SERVICEMEN'S GROUP LIFE INSURANCE COVERAGE | 24. DISABILITY SEVERANCE PAY | 25. PERSONNEL SECURITY INVESTIGATION | | |
|---|---|---|---|---|---|---|
| None | 35½ days | ☐ $15,000  ☐ $5,000 ☒ $20,000 ☐ $10,000  ☐ NONE | ☐ NO  ☐ YES    NA AMOUNT | a. TYPE ENTNAC | b. DATE COMPLETED Unk | |

| 26. DECORATIONS, MEDALS, BADGES, COMMENDATIONS, CITATIONS AND CAMPAIGN RIBBONS AWARDED OR AUTHORIZED |
|---|
| National Defense Service Medal; Driver Mechanic Badge w/Dvr Bar(W); Marksman (Rifle); Sharpshooter (SMG); Sharpshooter (Pistol) |

| 27. REMARKS |
|---|
| Individual requests a copy of DD Form 214. Last overseas service: Germany USAARMC  – Leadership Crs |

| 28. MAILING ADDRESS AFTER SEPARATION (Street, RFD, City, County, State and ZIP Code) | 29. SIGNATURE OF PERSON BEING SEPARATED |
|---|---|
| 242 E. 27th Street Los Angeles, CA 90011 | |

| 30. TYPED NAME, GRADE AND TITLE OF AUTHORIZING OFFICER | 31. SIGNATURE OF OFFICER AUTHORIZED TO SIGN |
|---|---|
| SHIRLEY E. KLEIN, CW4, USA, Asst AG | |

DD FORM 214
1 NOV 72

PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE.

THIS IS AN IMPORTANT RECORD
SAFEGUARD IT.

REPORT OF SEPARATION FROM ACTIVE DUTY

2.

# EXHIBIT "E"

**BOARD OF PRISON TERMS**
**LIFE PRISONER HEARING DECISION FACE SHEET**

STATE OF CALIFORNIA

[ ] PAROLE GRANTED - (YES)
    CDC:  Do not release prisoner before
        Governor's review

<u>Records Use Only</u>

Parole Release Date

               YR    MO    DAY

[✓] PAROLE DENIED - (NO)
*One Year. 2006 Calendar.*

Attach Prison Calculation Sheet

[ ] AGREED UNSUITABLE (Attach 1001A Form) FOR:_____YEAR(S)
[ ] HEARING POSTPONED/REASON:_____



# EXHIBIT   "G"

The Judges Decision
①

1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10    MELVYN COLEMAN,

11            Petitioner,              No. CIV S-96-0783 LKK PAN P

12        vs.

13    BOARD OF PRISON TERMS, et al.,

14            Respondent.             ORDER

15    _____ /

16        Petitioner, a state prisoner proceeding pro se, has filed this application for a writ

17    of habeas corpus. The matter was referred to a United States Magistrate Judge pursuant to 28

18    U.S.C. § 636(b)(1)(B) and Local General Order No. 262.

19        On December 22, 2004, the magistrate judge filed findings and recommendations

20    herein which were served on all parties and which contained notice to all parties that any

21    objections to the findings and recommendations were to be filed within twenty days. Respondent

22    has filed objections to the findings and recommendations.

23        In accordance with the provisions of 28 U.S.C. § 636(b)(1)(C) and Local Rule 72-

24    304, this court has conducted a de novo review of this case. Having carefully reviewed the

25    entire file, the court finds the findings and recommendations to be supported by the record and by

26    proper analysis.

*the case*

1   category of prisoners is illegal); In re Morrall, 102 Cal. App.

2   4th 280 (2003) (same). The guarantee of neutral parole officials

3   in a suitability hearing is just as fundamental as the right to a

4   neutral judge in a court proceeding. Compare Sellars v.

5   Procunier, 641 F.2d 1295 (9th Cir. 1981) (holding that California

6   parole officials, analogous to judges, are entitled to absolute

7   immunity).

8         The Ninth Circuit previously has acknowledged California

9   inmates' due process right to parole consideration by neutral

10   decision-makers. See O'Bremski v. Maas, 915 F.2d 418, 422 (9th

11   Cir. 1990). In that case the appellate court found that a

12   neutral parole panel at a new hearing would reach the same

13   outcome and so denied relief. The record in this case simply

14   will not permit the same conclusion. The requirement of an

15   impartial decision-maker transcends concern for diminishing the

16   likelihood of error. As the Supreme Court clearly held in

17   Balisok a decision made by a fact-finder who has predetermined

18   the outcome is per se invalid -- even where there is ample

19   evidence to support it. 520 U.S. at 648.

20         Petitioner presents a convincing case that a blanket policy

21   against parole for murderers prevented him from obtaining a

22   parole suitability determination made after a fair hearing.

23   Respondent offers nothing to counter petitioner's showing.

24         Accordingly, the court hereby recommends that the petition

25   for habeas corpus be granted unless, within 60 days of the

26   district court's adoption of these recommendations, respondent

**BOARD OF PRISON TERMS**                                    STATE OF CALIFORNIA
**LIFE PRISONER HEARING DECISION FACE SHEET**

---

[ ] PAROLE GRANTED - (YES)

   CDC:  Do not release prisoner before

      Governor's review

[✓] PAROLE DENIED - (NO)

*One Year. 2006 calendar .*

[ ] AGREED UNSUITABLE (Attach 1001A Form) FOR:_____YEAR(S)

[ ] HEARING POSTPONED/REASON:_____

| Records Use Only |
| --- |
| Parole Release Date |

|  | YR | MO | DAY |
| --- | --- | --- | --- |

Attach Prison Calculation Sheet

---

## PANEL RECOMMENDATIONS AND REQUESTS

**The Board Recommends:**

[ ] No more 115's or 128A's    [✓] Stay discipline free

[ ] Work to reduce custody level    [ ] Learn a trade*     [✓] Earn positive chronos

[✓] Get self-help*               [ ] Get therapy*         [ ] Get a GED*

[ ] Recommend transfer to_____

[ ] Other_____

   *These programs are recommended if they are offered at your prison and you are eligible/able to participate.

---

**Penal Code 3042 Notices**   [ X ] Sent  Date:  11-09-2004

---

| Commitment Offense(s) | **P187** | **MURDER 1ST** |
| --- | --- | --- |
|  | Code(s) | Crime(s) |
|  | **A526764** | **1** |
|  | Case #(s) | Count #(s) |

| Date Inmate Came to CDC | Date Life Term Began | Minimum Eligible Parole Date |
| --- | --- | --- |
| 3/23/79 | 3/23/79 | 9/3/85 |

| [ ] Initial Hearing | [ X ] Subsequent (Hearing No.) #12 | Date of Last Hearing_____ |
| --- | --- | --- |

| CDC Representative | D.S. LEVORSE, C&PR |  |
| --- | --- | --- |
| Attorney for Prisoner | M. TARDIFF | Address |
| D.A. Representative | A. SOUSA | County  LA |

This form and the Board's decision at the end of the hearing is only <u>proposed</u> and NOT FINAL. <u>It will not become final until it is reviewed.</u>

| Chair | *Sharon Lawin* | Date | 01/06/05 |
| --- | --- | --- | --- |
| Panel Member | | Date | |
| ~~Panel Member~~ | | ~~Date~~ | |

| NAME | CDC # | INSTITUTION | CALENDAR | DATE |
| --- | --- | --- | --- | --- |
| HERNANDEZ, PETER | C-03015 | CTF-SOLEDAD | JAN. 2005 | 1/6/05 |

BPT 1001 (REV. 08/03)

74

1          **CALIFORNIA BOARD OF PRISON TERMS**

2                    **D E C I S I O N**

3          **DEPUTY COMMISSIONER MEJIA:**  We're back on

4     record for our decision, Mr. Hernandez

5          **PRESIDING COMMISSIONER LAWIN:**  Thank you.

6     All parties have returned to the room.  The Panel

7     has reviewed all information received from the

8     public and relied on the following circumstances

9     in concluding that you, Mr. Hernandez, are not yet

10    suitable for parole and would pose an unreasonable

11    risk of danger to society or a threat to public

12    safety if released from prison.  This is a one

13    year denial.  The denial is based certainly in

14    part by or on rather the commitment offense which

15    was the shooting death of Tony Sanchez.  He was

16    shot one time by the inmate.  According to the

17    inmate's version there had been a confrontation

18    when the inmate was trying to retrieve property

19    that had been stolen from his sister and he had

20    been informed that Mr. Sanchez had the property

21    and was trying to sell it.  As I said, there was

22    one earlier confrontation.  The inmate left, went

23    and got a gun and went back to the location, shot

24    Mr. Sanchez to death, wounding the other occupants

25    or his friends that were there at the time.  The

26    inmate paints this to be a -- essentially that he

27    **PETER HERNANDEZ   C-03015   DECISION PAGE 1   1/6/05**

 1    was -- he went there to retrieve this property and
 2    that he first saw a weapon when he had the first
 3    confrontation with Mr. Sanchez's companions.  The
 4    victims instead state that Mr. Hernandez went --
 5    asked if they had any -- a lid, asked if they had
 6    any marijuana.  When they said, no, he left and
 7    then returned and essentially began firing, that
 8    there was not this -- the confrontation and the
 9    way that Mr. Hernandez paints it.  Regardless,
10    Mr. Sanchez lost his life for the most trivial of
11    reasons.  Whether it was to retrieve property, to
12    protect his honor, his family's honor, whatever it
13    happens to have been, Mr. Sanchez should not have
14    lost his life.  And the crime shows a clear
15    disregard for the life and suffering of others as
16    there were multiple victims involved in the same
17    incident.  And the crime was carried out in a
18    cruel fashion on unsuspecting victims.  The next
19    reason for our denial would be the inmate's parole
20    plans.  He does not have reasonable parole plans.
21    He says he'll live with a brother.  We have no
22    letters of support for a number of years.  He says
23    that he will work for a cousin.  Again, letters
24    are very old.  Yes, there has been a history of
25    family support, but nothing recent.  We do see
26    that he maintains contact.  There's a Christmas
27    PETER HERNANDEZ   C-03015   DECISION PAGE 2   1/6/05

1   card with a postmark of 2003, but nothing to
2   indicate that he's welcome to live with his
3   brother nor any recent letter stating he can live
4   with his cousin.  The next reason for our denial
5   would be the Panel's belief that the inmate has
6   not yet sufficiently participated in self-help
7   programs.  Also, the District Attorney's Office
8   responded to PC 3042 Notices.  They are opposed to
9   a finding of parole suitability, as is the Los
10  Angeles Police Department.  By most accounts,
11  Mr. Hernandez had a stable social history.  He had
12  served honorably in the military, been discharged,
13  had gone to high school, had not graduated, but he
14  had been working.  There is some use of alcohol
15  and marijuana.  There's a contradiction I guess in
16  Mr. Hernandez's life because of all these positive
17  things and then he ends up murdering Mr. Sanchez
18  and now all of a sudden alcohol and marijuana are
19  part of his lifestyle.  So there's really a
20  contradiction there.  The Panel finds that the
21  inmate needs participation in self-help for a
22  variety of reasons.  First of all, I really,
23  Mr. Hernandez, look at your ability to deal with
24  situations in an appropriate fashion when I look
25  at your lack of parole plans because here's a
26  situation where I can't help but project what you
27  **PETER HERNANDEZ   C-03015   DECISION PAGE 3   1/6/05**

```
1    did in 1977 on this situation.  I don't know what
2    it is, if it's honor, if it's -- if it's respect,
3    I don't know what it is that's keeping you from
4    asking your family for support, if you don't want
5    to ask people.  But that indicates you're not
6    willing to ask for help when you need it, and
7    that's a negative trait.  You need to be able to
8    ask for help when you need it, that's how you
9    solve situations.  And you need help here; you
10   need help from your family.  Like I said before,
11   you've got the key to get out of here.  We're not
12   going to let you out, no Panel's going to let you
13   out, with no offers of residence and no offers of
14   employment.  The Panel commends Mr. Hernandez for
15   the fact that he's not had a 115 in six years,
16   almost seven years, that last one was February 19,
17   1998 for mutual combat, it was the last of four;
18   for the fact that he's not had a 128(a) counseling
19   chronos in four years, the last one December 31,
20   2000, the last of seven for disobeying staff.
21   He's to be commended for having acquired his GED
22   high school equivalency early on, for taking some
23   college courses, for completing data processing,
24   spending time in and/or completing basic
25   electronics and TV production.  He's to be
26   commended for his recent participation in Impact,
27   PETER HERNANDEZ   C-03015   DECISION PAGE 4   1/6/05
```

1   taking Emergency Management Institute or FEMA
2   courses, for the completion of bible
3   correspondence courses and unverified but his
4   self-reported participation in the Veterans Group
5   and this Pre-Release Group. He's certainly to be
6   commended for his work ethic. He has received
7   laudatory chronos while serving as the Protestant
8   chapel clerk, in receiving and release and in the
9   culinary kitchen as a clerk, which is his current
10  position. But these positive aspects do not yet
11  outweigh the factors of unsuitability. I do also
12  want to note for the record that the July 23, 2004
13  psychological report by Dr. Hewchuk is supportive
14  of release. We make the following
15  recommendations, Mr. Hernandez. One, that you
16  remain disciplinary-free; two, when it's available
17  to you, that you continue your participation in
18  self-help. I wish I could give you a 115 or a 128
19  for not having parole plans because maybe that
20  would spur you into taking some action. I don't
21  know what it's going to take. I don't know how
22  many times and how many ways to tell you, but it's
23  very important. And I wish you good luck.

24          **INMATE HERNANDEZ:** Just for the record, that
25  card is not 2003.

26          **PRESIDING COMMISSIONER LAWIN:** Which card?
27  **PETER HERNANDEZ   C-03015   DECISION PAGE 5   1/6/05**

79

1            **INMATE HERNANDEZ:**  It's recent.

2            **PRESIDING COMMISSIONER LAWIN:**  Right, this

3    Christmas.

4            **INMATE HERNANDEZ:**  Yes.

5            **PRESIDING COMMISSIONER LAWIN:**  I'm sorry,

6    December 2004, that's what I meant.  I'm sorry.

7    Thank you.

8            **DEPUTY COMMISSIONER MEJIA:**  Good luck to

9    you, sir.

10           **INMATE HERNANDEZ:**  Thank you.

11           **PRESIDING COMMISSIONER LAWIN:**  That

12    concludes this hearing.  It is 12:43.

13                         --oOo--

14

15

16

17

18

19

20

21

22

23   **PAROLE DENIED ONE YEAR**

24   **THIS DECISION WILL BE FINAL ON** ____MAY - 6 2005____

25   **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

26   **DATE, THE DECISION IS MODIFIED.**

27   **PETER HERNANDEZ   C-03015   DECISION PAGE 6   1/6/05**

80

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, Marsha Mees, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 79, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, at SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of PETER HERNANDEZ, CDC No. C-03015 on JANUARY 6, 2005, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated January 21, 2005 at Sacramento County, California.

Marsha Mees
Transcriber
**CAPITOL ELECTRONIC REPORTING**

# EXHIBIT "F"



## LIFE PRISONER EVALUATION REPORT
### SUBSEQUENT PAROLE CONSIDERATION HEARING
### 2004 CALENDAR

**HERNANDEZ, PETER**                                        **C03015**

### I.    COMMITMENT FACTORS:

A.    **Life Crime:** Count 1: Murder First (PC 187), Count 2/3: Assault with Intent to Commit Murder, with Use of a Firearm (Pistol) (PC 217/12022.5): Sentence 7 years to Life. Case Number: A334928. Date received in CDC: 3/23/79. MEPD: 9/3/85. Victim: Tony Sanchez, age unknown.

1.    **Summary of Crime:** On 4/25/77, at approximately 9:00 p.m., Peter Hernandez and co-defendant, Jose Montez, approached three Mexican/American males in a residential area in Los Angeles. Following a brief conversation, Hernandez pulled a gun from his coat, fired a shot at victim Tony Sanchez at point blank range, killing him with a shot to the heart. Victims Rosales and Rodriguez ran from the scene but were pursued by Hernandez who continued firing the gun, striking both men in the leg as crime partner Montez yelled, "get them, get them." After emptying the weapon, Hernandez and Montez returned to the van that Hernandez had been driving and fled from the scene. Hernandez was later identified by the wounded victims. He and Montez were apprehended at their residences on the following morning. Subsequent investigation revealed that Hernandez had attempted to purchase marijuana from the victims and, when advised that they had none, opened fire. Both Hernandez and Montez denied any involvement in the crime, maintaining this denial through three trials, the third of which resulted in Hernandez' conviction for the present case and Montez' conviction for Murder Second Degree. It was noted that all three victims were known gang members and that the motive for the crime was believed by the District Attorney's Office to have been gang related. Hernandez continued to maintain his innocence until exhaustion of the appeals process at which time he admitted his guilt. (Information acquired from the 6/15/88 Diagnostic Unit Evaluation, pg 2-3; POR, pg 5-7, and Appellate Decision dated 6/20/81, pgs 8-12, 14-15).

2.    **Prisoner's Version:** In an interview for this report, Hernandez stated that his version of the offense summary remains the same as the one presented

HERNANDEZ, PETER        C03015                    CTF-SOLEDAD

SENT TO I/M ON 9.3.04

in the report for his January, 1990 Subsequent Hearing #5. In that report, Hernandez stated the following:

On the evening of April 25, 1977, I was at a friend's house drinking beer while we talked about the upcoming Cinco De Mayo celebration being planned for the community the following month. During the meeting or sometime after, I was informed of some guys being responsible for the burglary of my sister's home. After the meeting, I decided to go find out who these guys were, hoping to recover my sister's property. A friend volunteered to come along with me since he knew some of the guys around the area where they hang out. We drove approximate five or six miles across town to what is known as the "West Side" of Los Angeles.

On the corner of 24th Street and Magnolia, I pulled to the side, and my friend called some guy over and asked him if he knew a guy named Tito. He said, "Yeah, he lives over there," pointing to a green house not too far from the opposite corner. We then went around the block, coming to a stop and parking in front of the green house. While I was parking, I saw three guys on the porch of the house. I told my companion to wait, that I'd be back. As I walked over to the gate, one of the guys went inside and another started to walk towards the front of the gate. The third guy just stayed on the front of the porch. As I stopped at the gate and watched the guy stop about ten feet from the gate, I asked him if he knew a guy named Tito, who I was told lived here. He said, "Who are you? What do you want with him?" or words to that affect. As I told him that I wanted to talk to Tito about some hot stuff that he was trying to sell, the guy I was talking to looked familiar, so I asked him if his name was Noe. He then looked surprised and said, "No". (Noe is a guy who I knew years ago when I was in junior high school; it turned out that this was the same guy.) After an exchange of words, a guy came running up from the corner, the same guy who had told me and my companion that Tito lived at this house. He walked up and said to Noe, "What's going on? These guys are looking for Tito." By then, they guy on the porch started walking towards us. Then Noe said, "Man, you better split. Get the fuck out of here." I said, "No, I want to talk to Tito." The guy from the porch got close to Noe and asked him what I wanted from Tito. After Noe told him, the guy pulled out a gun and pointed it towards me and told me in a very angry way that I'd better leave or he'd blow my head off. Noe then said, "Go, man, you don't belong around here." Being frightened by the gun, I said, "Okay, man, I'm going. I'm going." So we left.

My friend brought out the idea that he knew where to get a gun and that we should go back. My fright turned to anger, and I agreed. We drove around the neighborhood for awhile trying to find a gun. In the meantime,

HERNANDEZ, PETER          C03015          CTF-SOLEDAD

I bought more beer, and we drank. Finally, we drove to some apartments where my friend got out and went inside. A few moments later, he came out and showed me a gun. I took the gun and asked him if he was loaded, and he said, "Yes". I put the gun inside my jacket pocket and drove back to find Tito. As we passed by the corner of 24th and Magnolia, we saw three guys not too far from the corner. They looked like the same guys we had seen earlier. I went around the block and parked right in front of them, across the street. I told my friend to wait, but he said that he would get out with me.

We both walked towards the guys who were standing on the sidewalk. As we walked, I had my hands in my jacket pockets. The guys looked us over and asked us what we wanted. I told them I was looking for Tito because I wanted to talk to him. One of them said, "I'm Tito. What do you want?". One of the other guys said something like, "Yeah, they were looking for you earlier." I told Tito that I wanted the stolen stuff that he had because it belonged to my sister, and I wanted it back. I told him that I didn't want any trouble. He looked at me and said, "Fuck you, man, who do you think you are?" He then began cursing in a threatening manner. He then started to charge at me, pulling his hands out from his pockets. I thought at the moment he was going for a gun. In a quick motion (I was trained and awarded the expect badge with the .45 caliber pistol in the U.S. Army), I pulled out my gun and shot him. I panicked for a while and, as the other guys ran, I began to shoot at them, too, chasing them a few yards before the gun went empty. Then my friend and I ran back to the van and left. I remember being very scared and my heart pumping faster than I could breathe.

### 3.    Aggravating/Mitigating Circumstances:

#### a.    Aggravating Factors:

- During the commission of the crime, the inmate had a opportunity to cease but instead continued.
- The manner in which the crime was committed created a potential for serious injury to persons other than the victims of the crime.
- There were multiple victims involved.
- Use of a weapon (pistol).
- The inmate was on probation at the time the crime was committed.

#### b.    Mitigating Factors:

HERNANDEZ, PETER        C03015        CTF-SOLEDAD

- Although the inmate was on probation he had a minimal history of criminal behavior.

**B.    Multiple Crime(s):** N/A.

    **1.    Summary of Crime:** N/A.

    **2.    Prisoner's Version:** N/A.

## II.    PRECONVICTION FACTORS:

**A.    Juvenile Record:** None noted.

**B.    Adult Convictions:** Hernandez' arrest history began on 5/13/76 when he was arrested by the Los Angeles Police on a charge of Possession/Manufactured/Sell Dangerous Weapon, PC 12020(a). He was released on 5/14/76 having been detained only due to insufficient evidence. He was again arrested on 1/8/77 by Los Angeles Police on a charge of Robbery, PC 211(a). He pleaded guilty on 2/1/77 to Taking a Vehicle Without Owner's Consent and was sentenced to 36 months summary probation without supervision and a $32.00 restitution. On 5/1/78 Hernandez was convicted on a misdemeanor charge of PC 484 and was sentenced to 24 months probation with four days in jail and 90 days jail suspended.

**C.    Personal Factors:** On 8/17/54, Peter Hernandez Jr. was born in Las Cruces, Mexico, the second of two children of Peter Hernandez Sr. and the former Martha Rodriguez. Hernandez was raised by his mother in part due to his parents divorcing when he was two years old. Several years following her divorce, his mother entered a common-law relationship that was formalized in 1972. Hernandez claims he had a satisfactory relationship with all family members including his stepfather and two half-brothers. Hernandez reports that no other family member has an arrest record and there is no family history of mental illness. He notes that his stepfather was an alcoholic.

Hernandez attended Belmont High School but dropped out to enlist in the U.S. Army. He served in the Army from 2/73 until 2/76 and received an honorable discharge. He achieved the rank of E-4 and served seven months in Germany. While in the Army, Hernandez began the occasional use of marijuana and social use of alcohol. He subsequently began spending most of his off-duty time drinking. In 1975 he married Josie Garcia while still in the Army. The relationship produced one daughter, Zita. There is no evidence of any sexual deviation, physical or mental disorder.

## III.    POSTCONVICTION FACTORS:

**A.    Special Programming/Accommodations:** N/A.

**B.    Custody History:** Hernandez remains Medium A custody level and has been housed at CTF throughout this review period.

**C.    Therapy and Self-Help Activities:** Since Hernandez' last BPT Hearing he has attended numerous Prison Fellowship Ministries Classes (Protestant Faith) and Impact Workshop's. (See Post Conviction Progress Report).

Hernandez stated he is currently on the waiting list for the following programs: In Cell Study Business Course, We Care Self-Help Group, and AA. Furthermore, Hernandez states he is a member of the Balance Reentry Activity Group (BRAG) and CTF Veterans Group (Army). Hernandez states he has tried to obtain documentation to verify his statements, but has been unsuccessful.

**D.    Disciplinary History:** Hernandez continues to remain disciplinary free.

**E.    Other:** Hernandez attended his Subsequent #11 Parole Consideration Hearing on 11/7/01. Parole was denied for 1 year. The Board recommended that Hernandez remains disciplinary free, and participate in self-help programs and group therapy.

## IV.    FUTURE PLANS:

**A.    Residence:** Hernandez continues to plan to reside with his brother Michael and sister-in-law Kim Montez at 11150 Glen Oaks Boulevard, Unit 227, in Pacoima, California. His telephone number is (818) 686-1152.

**B.    Employment:** Hernandez is certain that he will be able to secure employment with Marco Sanchez, a cousin who owns auto body/fender and mechanics shops in Rosemead and in San Fernando Valley. He would be employed for office clerical duties.

**C.    Assessment:** In review of Hernandez parole plans, this counselor does not foresee any problems. However, it was recommended that he obtain updated support letters since his current ones are dated 1998.

## V.    USINS STATUS: N/A.

HERNANDEZ, PETER        C03015            CTF-SOLEDAD

## VI. SUMMARY:

A. Considering the commitment offense, prior prison record and prison adjustment this writer believes Hernandez would pose a low degree of threat to the public if released. Hernandez has been incarcerated for over 25 years on a seven to Life sentence. Hernandez has also been given a parole date twice and both times been revoked by the Governor. Although I have not had alot of interaction with Hernandez throughout the year, he has taken great steps in the right direction. He has remained disciplinary free, has adequate parole plans, and maintains a good rapport with staff and inmates. Hernandez has received laudatory chronos from Correctional Officers W. Cleaver, G. Lavelle and Reverne Lindsey. They state that his work performance, attitude, and attendance are excellent.

Hernandez has taken responsibility for his crime and has expressed deep remorse for what he has done. He fully intends to better himself while incarcerated and will continue working on self-improvement upon his release.

A combination of the above factors, as well as support letters from family and friends, help point Hernandez in the direction of a successful parole.

B. Prior to release the prisoner could benefit from:

1. Continuing to be disciplinary free.
2. Participation in self-help and therapy programs.

C. This report is based upon a thorough review of the inmate's Central File and a (1) hour interview with Hernandez.

D. Per the Olson Decision, Hernandez was afforded an opportunity to review his Central File. (Refer to CDC 128B dated 8/10/04 in the General Chrono Section of the Central File).

E. No accommodation was required per the Armstrong vs. Davis BPT Parole Proceedings Remedial Plan (ARP) for effective communication.

**HERNANDEZ, PETER**          C03015                    **CTF-SOLEDAD**

BOARD OF PRISON TERMS                                                    STATE OF CALIFORNIA
## LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐    DOCUMENTATION HEARING

☒    PAROLE CONSIDERATION HEARING

☐    PROGRESS HEARING

INSTRUCTIONS
     TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
     TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
           ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 3/04 to 8/04 | | | **PLACEMENT**:  Remained at CTF in the general population. **CUSTODY**:  Medium A. **VOC. TRAINING**:  None noted this period. **ACADEMICS:**  None noted this period. **WORK RECORD**:  Hernandez was a Religious Clerk from 8/22/02 thru 7/14/04 and received above average ratings verified by CDC 101 dated 1/17/03.  On 7/15/04 Hernandez was assigned in the Culinary as a Clerk. **GROUP ACTIVITIES**:  Participated in Prison Fellowship verified by a certificate dated 6/5/04. **PSYCH. TREATMENT**:  None noted during this period. **PRISON BEHAVIOR**:  Hernandez remained disciplinary free during this period. **OTHER**:  None. |

| CORRECTIONAL COUNSELOR'S SIGNATURE | | DATE 8·31-04 |
|---|---|---|
| HERNANDEZ | C03015 | CTF-SOLEDAD |

BPT 1004 (REV 7/86)

_____   8-31-04
K. Heinly                          Date
Correctional Counselor I


_____ FC   8-31-04
D. Pherigo                        Date
Correctional Counselor II


_____ FC   8-31-4
I. Guerra                         Date
Facility Captain


_____ (o PR   9-1-04
D. S. Levorse                     Date
Classification and Parole Representative


HERNANDEZ, PETER        C03015          CTF-SOLEDAD

# EXHIBIT "G"

# EXHIBIT "G"

The Judges Decision
①

1
2
3
4
5
6
7
8                    IN THE UNITED STATES DISTRICT COURT
9                  FOR THE EASTERN DISTRICT OF CALIFORNIA
10    MELVYN COLEMAN,
11              Petitioner,              No. CIV S-96-0783 LKK PAN P
12        vs.
13    BOARD OF PRISON TERMS, et al.,
14              Respondent.             ORDER
15    _____/

16          Petitioner, a state prisoner proceeding pro se, has filed this application for a writ
17    of habeas corpus. The matter was referred to a United States Magistrate Judge pursuant to 28
18    U.S.C. § 636(b)(1)(B) and Local General Order No. 262.
19          On December 22, 2004, the magistrate judge filed findings and recommendations
20    herein which were served on all parties and which contained notice to all parties that any
21    objections to the findings and recommendations were to be filed within twenty days. Respondent
22    has filed objections to the findings and recommendations.
23          In accordance with the provisions of 28 U.S.C. § 636(b)(1)(C) and Local Rule 72-
24    304, this court has conducted a de novo review of this case. Having carefully reviewed the
25    entire file, the court finds the findings and recommendations to be supported by the record and by
26    proper analysis.

                                        1



Judges decision

1       Accordingly, IT IS HEREBY ORDERED that:

2       1. The findings and recommendations filed December 22, 2004, are adopted in

3   full; and

4       2. The petition for habeas corpus will be granted unless, within 60 days,

5   respondent provides a fair parole suitability hearing, conducted by a board free of any prejudice

6   stemming from a gubernatorial policy against parole for murderers.

7   DATED:  May 19, 2005.

8                               /s/Lawrence K. Karlton
                                LAWRENCE K. KARLTON
9                               SENIOR JUDGE
                                UNITED STATES DISTRICT COURT
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

bd

United States District Court
for the
Eastern District of California
December 22, 2004

\* \* CERTIFICATE OF SERVICE \* \*

2:96-cv-00783

Coleman

v.

Board of Prison Term

---

I, the undersigned, hereby certify that I am an employee in the Office of
the Clerk, U.S. District Court, Eastern District of California.

That on  December 22, 2004, I SERVED a true and correct copy(ies) ·of
the attached, by placing said copy(ies) in a postage paid envelope
addressed to the person(s) hereinafter listed, by depositing said
envelope in the U.S. Mail, by placing said copy(ies) into an inter-office
delivery receptacle located in the Clerk's office, or, pursuant to prior
authorization by counsel, via facsimile.

        Tami M Warwick                          TM/PAN
        Attorney General's Office for the State of California
        PO Box 944255                           AR/LKK
        1300 I Street
        Suite 125
        Sacramento, CA  94244-2550

        Ann Catherine McClintock
        Federal Defender
        801 I Street
        Third Floor
        Sacramento, CA  95814


                                        Jack L. Wagner, Clerk

                                        BY: _____
                                            Deputy Clerk

The case pages (1-11)

**FILED**

DEC 2 2 2004

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____

United States District Court

Eastern District of California

Melvyn H. Coleman,                       No. Civ. S-96-0783 LKK PAN P

      Petitioner,                        Findings and Recommendations

   vs.

Board of Prison Terms, et al.,

      Respondents.

                 -oOo-

   Petitioner seeks a writ of habeas corpus.

   In his November 14, 1997, second amended petition petitioner
claims his federal due process guarantee was violated because the
California Board of Prison Terms (Board) has failed to conduct a
fair parole suitability hearing.

   In 1974 petitioner was convicted of first degree murder,
attempted murder, first degree robbery, first degree burglary and
other charges. The victims, Mr. And Mrs. Ciewart, returned to
their home while petitioner was burglarizing it; he then

the case

1  approached before they got out of their car and robbed and shot
2  them, killing Mr. Siewart and seriously wounding Mrs. Siewart.
3  Petitioner had a prior juvenile record.

4       Under California law, a prisoner including a convicted
5  murderer serving an indeterminate term (i.e., seven years to
6  life) is entitled to a hearing before a panel composed of members
7  of the Board to determine his suitability for parole.  By
8  statute, parole at some point normally is appropriate and the
9  Board "shall set a release date unless it determines that the
10  gravity of the current convicted offense or offenses, or the
11  timing and gravity of current or past convicted offense or
12  offenses, is such that consideration of the public safety
13  requires a more lengthy period of incarceration. . . ."  Cal.
14  Penal Code § 3041(b).  Procedures  governing suitability hearings
15  are set forth in Penal Code § 3041.5 (providing prisoners with
16  notice and an opportunity to be heard and requiring a written
17  statement of reasons if the panel refuses to set a parole date).
18  Regulations prescribe factors for the panel to consider in
19  determining whether each prisoner is suitable or unsuitable for
20  parole.  15 CAC § 2281.[1]

21  _____

22      [1] Factors supporting a finding of unsuitability include: (1) whether the
     prisoner's offense for which he is confined was committed in an "especially
23   heinous, atrocious or cruel manner"; (2) the prisoner's record of violence prior
     to the offense; (3) whether the prisoner has an unstable social history; (4)
24   whether the prisoner has committed sadistic sexual offenses; (5) whether the
     prisoner has a lengthy history of severe mental problems related to the offense;
25   and (6) whether the prisoner has engaged in serious misconduct in prison or jail.
     Factors supporting a finding of suitability include: (1) whether the prisoner has
26   a juvenile record; (2) whether the prisoner has experienced reasonably stable
     relationships with others; (3) whether the prisoner shows signs of remorse; (4)

2

the case

1    Petitioner presents evidence that under Governors Wilson and
2  Davis the Board disregarded regulations ensuring fair suitability
3  hearings and instead operated under a sub rosa policy that all
4  murderers be found unsuitable for parole.  The record shows that
5  between 1992 and 1998 less than one percent of the prisoners in
6  this group were released on parole.  During the previous period
7  the parole rate had been about four percent.  Petitioner presents
8  sworn testimony that the policy was enforced by (1) appointing
9  Board members less likely to grant parole and more willing to
10 disregard their statutory duty; (2) removing Board members more
11 likely to grant parole; (3) reviewing decisions finding a
12 prisoner suitable and setting a new hearing before a different
13 panel; (4) scheduling rescission hearings for prisoners who had
14 been granted a parole date; (5) re-hearing favorable rescission
15 proceedings and hand-picking panels to ensure the desired
16 outcome; (6) panel members agreeing upon an outcome in advance of
17 the hearing; and (7) gubernatorial reversal of favorable parole
18 decisions.  See e.g., declaration of former BPT Commissioner
19 Albert Leddy (Leddy) paras. 5, 6, 8-17, 20 (attached as Ex. 17 to
20 petitioner's March 27, 2003, motion for discovery); deposition of
21 Leddy taken in In re Fortin, et al., San Diego Superior Court

22
   _____

23 whether the prisoner committed his crime as the result of significant stress in
   his life; (5) whether the prisoner suffered from Battered Woman Syndrome when she
24 committed the crime; (6) whether the prisoner lacks any significant history of
   violent crime; (7) whether the prisoner's present age reduces the probability of
25 recidivism; (8) whether the prisoner has made realistic plans for release or has
   developed marketable skills that can be put to use on release; and (9) whether
26 the prisoner's institutional activities indicate an enhanced ability to function
   within the law upon release.  15 CAC § 2281.

the case

1    case number HSC10279 at 18-19, 47-50, 56-59, 61-63, 65-66, 88-89,

2    95, 97-99, 102, 106, 110, 118 & 126 (attached as Ex. 10 to

3    petitioner's March 27, 2003, motion for discovery); deposition of

4    former BPT Commissioner Edmund Tong taken in <u>Kimble v. Cal. BPT</u>,

5    C.D. Cal. case number CV 97-2752 at 42-43, 45-47, 71, 73, 80-82,

6    85-86, 96, 103, 105, 107 & 109 (lodged December 30, 2003).[2]

7        The unrefuted record shows the no-parole-for-murderers

8    policy existed and continued under Governor Davis.    In <u>In re</u>

9    <u>Rosencrantz</u>, the California Supreme Court took note of evidence

10   presented in the state trial court establishing that the Board

11   held 4800 parole suitability hearings between January 1999

12   through April 2001, granting parole to 48 murderers (one

13   percent).    29 Cal. 4th 616, 685 (2003).    Of those 48, the

14   governor reversed 47 of the Board's decisions and only one

15   murderer out of 4800 actually was released on parole.    <u>Id.</u>

16   Petitioner in <u>Rosenkrantz</u> also submitted evidence of the

17   following interview of Governor Davis reflected in the April 9,

18   1999, edition of the Los Angeles Times: " '. . . [T]he governor

19   was adamant that he believes murderers – even those with second-

20   degree convictions – should serve at least a life sentence in

21   prison. [Para.]    Asked whether extenuating circumstances should

22

23      [2]  Meanwhile, the annual cost to taxpayers of conducting these "pro forma"
      hearings is enormous, amounting to millions of dollars per year.    <u>See</u> Exhibit 7
24   to petitioner's March 27, 2003, motion for discovery (California Legislative
      Analyst's Office – Analysis of the 2000-01 Budget Bill for the Board of Prison
25   Terms criticizing proposed $19 million annual budget and noting huge cost of
      additional incarceration resulting from no-parole policy).

26

the Case

1  be a factor in murder sentences, the governor was blunt: "No.
2  Zero . . .  They must not have been listening when I was
3  campaigning. . . .  If you take someone else's life, forget it.
4  I just think people dismiss what I said in the campaign as either
5  political hyperbole or something that I would back away from . .
6  . .  We are doing exactly what we said we were going to do."'"
7  29 Cal. 4th at 684.

8       Respondent does not refute the alleged facts.   Instead,
9  respondent argues that, assuming arguendo prisoners in California
10  have an interest in a parole date protected by the due process
11  clause, constitutional requirements are met so long as there is
12  "some evidence" supporting the findings petitioner is unsuitable.
13  See Oppo. at 7:20 (so long as "some evidence" standard is met,
14  "the Board decisions could not have been arbitrary.")  For the
15  reasons explained, this court rejects that claim.  As this court
16  previously has found, there always will be "some evidence" that
17  can be used to explain a denial or rescission under the
18  circumstances.  Federal due process requires more.

19      California's parole scheme gives rise to a protected liberty
20  interest in release on parole.  McQuillion v. Duncan, 306 F.3d
21  895, 902 (2002); Jancsek v. Oregon Bd. of Parole, 833 F.2d 1389,
22  1390 (9th Cir. 1987); Greenholtz v. Inmates of Nebraska Penal &
23  Correctional Complex, 442 U.S. 1 (1979); Biggs v. Terhune, 334
24
25
26

the case

1  F.3d 910, 915 (9th Cir. 2003); In re Rosenkrantz, 29 Cal. 4th 616

2  (2003).[3]

3      Therefore, petitioner is entitled to the process outlined in

4  Greenholtz, viz., notice, opportunity to be heard, a statement of

5  reasons for decision, and limited right to call and cross-examine

6  witnesses.  The determination that petitioner is unsuitable for

7  parole must be supported by some evidence bearing some indicia of

8  reliability.

9      These guarantees do not exhaust petitioner's right to due

10  process.  The fundamental core of due process is protection

11  against arbitrary action:

12      The principal and true meaning of the phrase has never
        been more tersely or accurately stated than by Mr.
13      Justice Johnson, in Bank of Columbia v. Okely, 17 U.S.
        235, 4 Wheat. 235-244, 4 L.Ed. 449 [(1819)]: "As to the
14      words from Magna Charta, incorporated into the
        Constitution of Maryland, after volumes spoken and
15      written with a view to their exposition, the good sense
        of mankind has at last settled down to this: that they
16      were intended to secure the individual from the
        arbitrary exercise of the powers of government,
17      unrestrained by the established principles of private
        right and distributive justice."
18
    Hurtado v. California, 110 U.S. 516, 527, (1884).  "The
19
    concessions of Magna Charta were wrung from the king as
20
    guaranties against the oppressions and usurpations of his
21

22

23      [3] That is so because the parole statute, Penal Code § 3041, uses mandatory
        language ("The panel or board shall set a release date unless it determines"
24      further incarceration is necessary in the interest of public safety) which
        "'creates a presumption that parole release will be granted," unless the
25      statutorily defined determinations are made. Board of Pardons v. Allen, 482 U.S.
        369, 378 (1987) (quoting Greenholtz, 442 U.S. at 12). As of 1988, by amendment
26      of the state constitution, a parole date given can be withdrawn by the Governor
        under the same factors considered by the Board.

the car

1 | prerogative." Id. at 531. "The touchstone of due process is
2 | protection of the individual against arbitrary action of
3 | government." Wolff v. McDonnell, 418 U.S. 539, 558 (1974),
4 | citing Dent v. West Virginia, 129 U.S. 114 (1889).

5 | A government official's arbitrary and capricious exercise of
6 | his authority violates the essence of due process, contrary to
7 | centureis of Anglo-American jurisprudence. See Yick Wo v.
8 | Hopkins, 118 U.S. 356, 369 (1886) ("When we consider the nature
9 | and the theory of our institutions of government, the principles
10 | upon which they are supposed to rest, and review the history of
11 | their development, we are constrained to conclude that they do
12 | not mean to leave room for the play and action of purely personal
13 | and arbitrary power."); United States v. Lee, 106 U.S. 196, 220
14 | (1882) ("No man in this country is so high that he is above the
15 | law.  No officer of the law may set that law at defiance with
16 | impunity.  All the officers of the government from the highest to
17 | the lowest, are creatures of the law and are bound to obey it.
18 | It is the only supreme power in our system of government, and
19 | every man who by accepting office participates in its functions
20 | is only the more strongly bound to submit to that supremacy, and
21 | to observe the limitations which it imposes upon the exercise of
22 | the authority which it gives."); U.S. v. Nixon, 418 U.S. 683,
23 | 695-96 (1974) (rule of law is "historic commitment"); Accardi v.
24 | O'Shaughnessy, 347 U.S. 260, 267-68 (1954) (Attorney General must
25 | abide by regulations and cannot dictate immigration board's
26 | exercise of discretion in decision on application to suspend

7

the case

1  deportation; remedy is new hearing where board will exercise it's
2  discretion free from bias).

3      Concomitant to the guarantee against arbitrary and
4  capricious state action is the right to a fact-finder who has not
5  predetermined the outcome of a hearing. See Withrow v. Larkin,
6  421 U.S. 35 (1975) (a fair trial in a fair tribunal is a basic
7  requirement of due process, and this rule applies to
8  administrative agencies which adjudicate as well as to courts);
9  Edwards v. Balisok, 520 U.S. 641 (1997) (recognizing due process
10  claim based on allegations that prison disciplinary hearing
11  officer was biased and would suppress evidence of innocence);
12  Bakalis v. Golembeski, 35 F.3d 318, 326 (7th Cir. 1994) (a
13  decision-making body "that has prejudged the outcome cannot
14  render a decision that comports with due process").

15      Courts too numerous to list have recognized that the right
16  to a disinterested decision-maker, who has not prejudged the
17  case, is part of the fundamental guarantee against arbitrary and
18  capricious government conduct in the California parole context.
19  See, e.g., Rosenkrantz, 29 Cal. 4th at 677 (parole decision "must
20  reflect an individualized consideration of the specified criteria
21  and cannot be arbitrary and capricious"); In re Ramirez, 94 Cal.
22  App. 4th 549, 563 (2001) ("some evidence" standard is "only one
23  aspect of judicial review for compliance with minimum standards
24  of due process" (citing Balisok) and Board violates due process
25  if its decision is "arbitrary and capricious"); In re Minnis, 7
26  Cal. 3d 639 (1972) (blanket no-parole policy as to certain

*the case*

1  category of prisoners is illegal); <u>In re Morrall</u>, 102 Cal. App.

2  4th 280 (2003) (same).  The guarantee of neutral parole officials

3  in a suitability hearing is just as fundamental as the right to a

4  neutral judge in a court proceeding.  <u>Compare Sellars v.

5  Procunier</u>, 641 F.2d 1295 (9th Cir. 1981) (holding that California

6  parole officials, analogous to judges, are entitled to absolute

7  immunity).

8      The Ninth Circuit previously has acknowledged California

9  inmates' due process right to parole consideration by neutral

10  decision-makers.  <u>See</u> <u>O'Bremski v. Maas</u>, 915 F.2d 418, 422 (9th

11  Cir. 1990).  In that case the appellate court found that a

12  neutral parole panel at a new hearing would reach the same

13  outcome and so denied relief.  The record in this case simply

14  will not permit the same conclusion.  The requirement of an

15  impartial decision-maker transcends concern for diminishing the

16  likelihood of error.  As the Supreme Court clearly held in

17  <u>Balisok</u> a decision made by a fact-finder who has predetermined

18  the outcome is <u>per se</u> invalid -- even where there is ample

19  evidence to support it.  520 U.S. at 648.

20      Petitioner presents a convincing case that a blanket policy

21  against parole for murderers prevented him from obtaining a

22  parole suitability determination made after a fair hearing.

23  Respondent offers nothing to counter petitioner's showing.

24      Accordingly, the court hereby recommends that the petition

25  for habeas corpus be granted unless, within 60 days of the

26  district court's adoption of these recommendations, respondent

9

the case

1  provides a fair parole suitability hearing, conducted by a board

2  free of any prejudice stemming from a gubernatorial policy

3  against parole for murderers.

4      Pursuant to the provisions of 28 U.S.C. § 636(b)(1), these

5  findings and recommendations are submitted to the United States

6  District Judge assigned to this case. Within 20 days after being

7  served with these findings and recommendations, respondent may

8  file written objections. The document should be captioned

9  "Objections to Magistrate Judge's Findings and Recommendations."

10  The district judge may accept, reject, or modify these findings

11  and recommendations in whole or in part.

12      Dated:  __DEC 2 1 2004__

13

14                                      _____
                                        Peter A. Nowinski
                                        Magistrate Judge

15

16

17

18

19

20

21

22

23

24

25

26  cole0783.f&r grant

**BOARD OF PRISON TERMS**
**LIFE PRISONER HEARING DECISION FACE SHEET**

STATE OF CALIFORNIA

Records Use Only

[ ] PAROLE GRANTED - (YES)

   CDC: Do not release prisoner before

      Governor's review

Parole Release Date

| YR | MO | DAY |
|----|----|-----|

[✓] PAROLE DENIED - (NO)

*One Year. 2006 calendar.*

Attach Prison Calculation Sheet

[ ] AGREED UNSUITABLE (Attach 1001A Form) FOR:_____YEAR(S)
[ ] HEARING POSTPONED/REASON:_____

---

## PANEL RECOMMENDATIONS AND REQUESTS

**The Board Recommends:**

[ ] No more 115's or 128A's   [✓] Stay discipline free

[ ] Work to reduce custody level  [ ] Learn a trade*   [✓] Earn positive chronos

[✓] Get self-help*   [ ] Get therapy*   [ ] Get a GED*

[ ] Recommend transfer to_____

[ ] Other_____

*These programs are recommended if they are offered at your prison and you are eligible/able to participate.

---

| Penal Code 3042 Notices | [X] Sent  Date: 11-09-2004 |
|---|---|

| Commitment Offense(s) | P187 | MURDER 1ST | |
|---|---|---|---|
| | Code(s) | Crime(s) | |
| | A526764 | 1 | |
| | Case #(s) | Count #(s) | |

| Date Inmate Came to CDC 3/23/79 | Date Life Term Began 3/23/79 | Minimum Eligible Parole Date 9/3/85 |
|---|---|---|
| [ ] Initial Hearing | [X] Subsequent (Hearing No.) #12 | Date of Last Hearing_____ |

| CDC Representative | D.S. LEVORSE, C&PR | |
|---|---|---|
| Attorney for Prisoner | M. TARDIFF | Address |
| D.A. Representative | A. SOUSA | County   LA |

This form and the Board's decision at the end of the hearing is only proposed and NOT FINAL. It will not become final until it is reviewed.

Chair *Sharon Lawin*   Date 01/06/05

Panel Member   Date

~~Panel Member~~   ~~Date~~

| NAME | CDC # | INSTITUTION | CALENDAR | DATE |
|------|-------|-------------|----------|------|
| HERNANDEZ, PETER | C-03015 | CTF-SOLEDAD | JAN. 2005 | 1/6/05 |

BPT 1001 (REV. 08/03)

74

1          **CALIFORNIA BOARD OF PRISON TERMS**

2                   **D E C I S I O N**

3          **DEPUTY COMMISSIONER MEJIA:**  We're back on

4    record for our decision, Mr. Hernandez

5          **PRESIDING COMMISSIONER LAWIN:**  Thank you.

6    All parties have returned to the room.  The Panel

7    has reviewed all information received from the

8    public and relied on the following circumstances

9    in concluding that you, Mr. Hernandez, are not yet

10   suitable for parole and would pose an unreasonable

11   risk of danger to society or a threat to public

12   safety if released from prison.  This is a one

13   year denial.  The denial is based certainly in

14   part by or on rather the commitment offense which

15   was the shooting death of Tony Sanchez.  He was

16   shot one time by the inmate.  According to the

17   inmate's version there had been a confrontation

18   when the inmate was trying to retrieve property

19   that had been stolen from his sister and he had

20   been informed that Mr. Sanchez had the property

21   and was trying to sell it.  As I said, there was

22   one earlier confrontation.  The inmate left, went

23   and got a gun and went back to the location, shot

24   Mr. Sanchez to death, wounding the other occupants

25   or his friends that were there at the time.  The

26   inmate paints this to be a -- essentially that he

27   **PETER HERNANDEZ   C-03015   DECISION PAGE 1   1/6/05**

75

1    was -- he went there to retrieve this property and

2    that he first saw a weapon when he had the first

3    confrontation with Mr. Sanchez's companions.  The

4    victims instead state that Mr. Hernandez went --

5    asked if they had any -- a lid, asked if they had

6    any marijuana.  When they said, no, he left and

7    then returned and essentially began firing, that

8    there was not this -- the confrontation and the

9    way that Mr. Hernandez paints it.  Regardless,

10   Mr. Sanchez lost his life for the most trivial of

11   reasons.  Whether it was to retrieve property, to

12   protect his honor, his family's honor, whatever it

13   happens to have been, Mr. Sanchez should not have

14   lost his life.  And the crime shows a clear

15   disregard for the life and suffering of others as

16   there were multiple victims involved in the same

17   incident.  And the crime was carried out in a

18   cruel fashion on unsuspecting victims.  The next

19   reason for our denial would be the inmate's parole

20   plans.  He does not have reasonable parole plans.

21   He says he'll live with a brother.  We have no

22   letters of support for a number of years.  He says

23   that he will work for a cousin.  Again, letters

24   are very old.  Yes, there has been a history of

25   family support, but nothing recent.  We do see

26   that he maintains contact.  There's a Christmas

27   **PETER HERNANDEZ    C-03015    DECISION PAGE 2    1/6/05**

1   card with a postmark of 2003, but nothing to
2   indicate that he's welcome to live with his
3   brother nor any recent letter stating he can live
4   with his cousin.  The next reason for our denial
5   would be the Panel's belief that the inmate has
6   not yet sufficiently participated in self-help
7   programs.  Also, the District Attorney's Office
8   responded to PC 3042 Notices.  They are opposed to
9   a finding of parole suitability, as is the Los
10   Angeles Police Department.  By most accounts,
11   Mr. Hernandez had a stable social history.  He had
12   served honorably in the military, been discharged,
13   had gone to high school, had not graduated, but he
14   had been working.  There is some use of alcohol
15   and marijuana.  There's a contradiction I guess in
16   Mr. Hernandez's life because of all these positive
17   things and then he ends up murdering Mr. Sanchez
18   and now all of a sudden alcohol and marijuana are
19   part of his lifestyle.  So there's really a
20   contradiction there.  The Panel finds that the
21   inmate needs participation in self-help for a
22   variety of reasons.  First of all, I really,
23   Mr. Hernandez, look at your ability to deal with
24   situations in an appropriate fashion when I look
25   at your lack of parole plans because here's a
26   situation where I can't help but project what you
27   **PETER HERNANDEZ   C-03015   DECISION PAGE 3   1/6/05**

77

1   did in 1977 on this situation.  I don't know what

2   it is, if it's honor, if it's -- if it's respect,

3   I don't know what it is that's keeping you from

4   asking your family for support, if you don't want

5   to ask people.  But that indicates you're not

6   willing to ask for help when you need it, and

7   that's a negative trait.  You need to be able to

8   ask for help when you need it, that's how you

9   solve situations.  And you need help here; you

10  need help from your family.  Like I said before,

11  you've got the key to get out of here.  We're not

12  going to let you out, no Panel's going to let you

13  out, with no offers of residence and no offers of

14  employment.  The Panel commends Mr. Hernandez for

15  the fact that he's not had a 115 in six years,

16  almost seven years, that last one was February 19,

17  1998 for mutual combat, it was the last of four;

18  for the fact that he's not had a 128(a) counseling

19  chronos in four years, the last one December 31,

20  2000, the last of seven for disobeying staff.

21  He's to be commended for having acquired his GED

22  high school equivalency early on, for taking some

23  college courses, for completing data processing,

24  spending time in and/or completing basic

25  electronics and TV production.  He's to be

26  commended for his recent participation in Impact,

27  **PETER HERNANDEZ    C-03015    DECISION PAGE 4    1/6/05**

1   taking Emergency Management Institute or FEMA

2   courses, for the completion of bible

3   correspondence courses and unverified but his

4   self-reported participation in the Veterans Group

5   and this Pre-Release Group.  He's certainly to be

6   commended for his work ethic.  He has received

7   laudatory chronos while serving as the Protestant

8   chapel clerk, in receiving and release and in the

9   culinary kitchen as a clerk, which is his current

10  position.  But these positive aspects do not yet

11  outweigh the factors of unsuitability.  I do also

12  want to note for the record that the July 23, 2004

13  psychological report by Dr. Hewchuk is supportive

14  of release.  We make the following

15  recommendations, Mr. Hernandez.  One, that you

16  remain disciplinary-free; two, when it's available

17  to you, that you continue your participation in

18  self-help.  I wish I could give you a 115 or a 128

19  for not having parole plans because maybe that

20  would spur you into taking some action.  I don't

21  know what it's going to take.  I don't know how

22  many times and how many ways to tell you, but it's

23  very important.  And I wish you good luck.

24       **INMATE HERNANDEZ:**  Just for the record, that

25  card is not 2003.

26       **PRESIDING COMMISSIONER LAWIN:**  Which card?

27  **PETER HERNANDEZ   C-03015   DECISION PAGE 5   1/6/05**

79

1          **INMATE HERNANDEZ:**  It's recent.

2          **PRESIDING COMMISSIONER LAWIN:**  Right, this

3     Christmas.

4          **INMATE HERNANDEZ:**  Yes.

5          **PRESIDING COMMISSIONER LAWIN:**  I'm sorry,

6     December 2004, that's what I meant.  I'm sorry.

7     Thank you.

8          **DEPUTY COMMISSIONER MEJIA:**  Good luck to

9     you, sir.

10          **INMATE HERNANDEZ:**  Thank you.

11          **PRESIDING COMMISSIONER LAWIN:**  That

12    concludes this hearing.  It is 12:43.

13                    --oOo--

14

15

16

17

18

19

20

21

22

23    **PAROLE DENIED ONE YEAR**

24    **THIS DECISION WILL BE FINAL ON** _____  MAY - 6 2005

25    **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

26    **DATE, THE DECISION IS MODIFIED.**

27    **PETER HERNANDEZ   C-03015   DECISION PAGE 6   1/6/05**

80

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, Marsha Mees, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 79, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, at SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of PETER HERNANDEZ, CDC No. C-03015 on JANUARY 6, 2005, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated January 21, 2005 at Sacramento County, California.


Marsha Mees
Transcriber
**CAPITOL ELECTRONIC REPORTING**

# EXHIBIT    "F"

# LIFE PRISONER EVALUATION REPORT
# SUBSEQUENT PAROLE CONSIDERATION HEARING
# 2004 CALENDAR

**HERNANDEZ, PETER** **C03015**

## I. COMMITMENT FACTORS:

A. **Life Crime**: Count 1: Murder First (PC 187), Count 2/3: Assault with Intent to Commit Murder, with Use of a Firearm (Pistol) (PC 217/12022.5): Sentence 7 years to Life. Case Number:A334928. Date received in CDC: 3/23/79. MEPD: 9/3/85. Victim: Tony Sanchez, age unknown.

1. **Summary of Crime:** On 4/25/77, at approximately 9:00 p.m., Peter Hernandez and co-defendant, Jose Montez, approached three Mexican/American males in a residential area in Los Angeles. Following a brief conversation, Hernandez pulled a gun from his coat, fired a shot at victim Tony Sanchez at point blank range, killing him with a shot to the heart. Victims Rosales and Rodriguez ran from the scene but were pursued by Hernandez who continued firing the gun, striking both men in the leg as crime partner Montez yelled, "get them, get them." After emptying the weapon, Hernandez and Montez returned to the van that Hernandez had been driving and fled from the scene. Hernandez was later identified by the wounded victims. He and Montez were apprehended at their residences on the following morning. Subsequent investigation revealed that Hernandez had attempted to purchase marijuana from the victims and, when advised that they had none, opened fire. Both Hernandez and Montez denied any involvement in the crime, maintaining this denial through three trials, the third of which resulted in Hernandez' conviction for the present case and Montez' conviction for Murder Second Degree. It was noted that all three victims were known gang members and that the motive for the crime was believed by the District Attorney's Office to have been gang related. Hernandez continued to maintain his innocence until exhaustion of the appeals process at which time he admitted his guilt. (Information acquired from the 6/15/88 Diagnostic Unit Evaluation, pg 2-3; POR, pg 5-7, and Appellate Decision dated 6/20/81, pgs 8-12, 14-15).

2. **Prisoner's Version:** In an interview for this report, Hernandez stated that his version of the offense summary remains the same as the one presented

INMATE COPY



SENT TO I/M ON 9.3.04

in the report for his January, 1990 Subsequent Hearing #5. In that report, Hernandez stated the following:

On the evening of April 25, 1977, I was at a friend's house drinking beer while we talked about the upcoming Cinco De Mayo celebration being planned for the community the following month. During the meeting or sometime after, I was informed of some guys being responsible for the burglary of my sister's home. After the meeting, I decided to go find out who these guys were, hoping to recover my sister's property. A friend volunteered to come along with me since he knew some of the guys around the area where they hang out. We drove approximate five or six miles across town to what is known as the "West Side" of Los Angeles.

On the corner of 24th Street and Magnolia, I pulled to the side, and my friend called some guy over and asked him if he knew a guy named Tito. He said, "Yeah, he lives over there," pointing to a green house not too far from the opposite corner. We then went around the block, coming to a stop and parking in front of the green house. While I was parking, I saw three guys on the porch of the house. I told my companion to wait, that I'd be back. As I walked over to the gate, one of the guys went inside and another started to walk towards the front of the gate. The third guy just stayed on the front of the porch. As I stopped at the gate and watched the guy stop about ten feet from the gate, I asked him if he knew a guy named Tito, who I was told lived here. He said, "Who are you? What do you want with him?" or words to that affect. As I told him that I wanted to talk to Tito about some hot stuff that he was trying to sell, the guy I was talking to looked familiar, so I asked him if his name was Noe. He then looked surprised and said, "No". (Noe is a guy who I knew years ago when I was in junior high school; it turned out that this was the same guy.) After an exchange of words, a guy came running up from the corner, the same guy who had told me and my companion that Tito lived at this house. He walked up and said to Noe, "What's going on? These guys are looking for Tito." By then, they guy on the porch started walking towards us. Then Noe said, "Man, you better split. Get the fuck out of here." I said, "No, I want to talk to Tito." The guy from the porch got close to Noe and asked him what I wanted from Tito. After Noe told him, the guy pulled out a gun and pointed it towards me and told me in a very angry way that I'd better leave or he'd blow my head off. Noe then said, "Go, man, you don't belong around here." Being frightened by the gun, I said, "Okay, man, I'm going. I'm going." So we left.

My friend brought out the idea that he knew where to get a gun and that we should go back. My fright turned to anger, and I agreed. We drove around the neighborhood for awhile trying to find a gun. In the meantime,

I bought more beer, and we drank. Finally, we drove to some apartments where my friend got out and went inside. A few moments later, he came out and showed me a gun. I took the gun and asked him if he was loaded, and he said, "Yes". I put the gun inside my jacket pocket and drove back to find Tito. As we passed by the corner of 24th and Magnolia, we saw three guys not too far from the corner. They looked like the same guys we had seen earlier. I went around the block and parked right in front of them, across the street. I told my friend to wait, but he said that he would get out with me.

We both walked towards the guys who were standing on the sidewalk. As we walked, I had my hands in my jacket pockets. The guys looked us over and asked us what we wanted. I told them I was looking for Tito because I wanted to talk to him. One of them said, "I'm Tito. What do you want?". One of the other guys said something like, "Yeah, they were looking for you earlier." I told Tito that I wanted the stolen stuff that he had because it belonged to my sister, and I wanted it back. I told him that I didn't want any trouble. He looked at me and said, "Fuck you, man, who do you think you are?" He then began cursing in a threatening manner. He then started to charge at me, pulling his hands out from his pockets. I thought at the moment he was going for a gun. In a quick motion (I was trained and awarded the expect badge with the .45 caliber pistol in the U.S. Army), I pulled out my gun and shot him. I panicked for a while and, as the other guys ran, I began to shoot at them, too, chasing them a few yards before the gun went empty. Then my friend and I ran back to the van and left. I remember being very scared and my heart pumping faster than I could breathe.

### 3. Aggravating/Mitigating Circumstances:

#### a. Aggravating Factors:

- During the commission of the crime, the inmate had a opportunity to cease but instead continued.
- The manner in which the crime was committed created a potential for serious injury to persons other than the victims of the crime.
- There were multiple victims involved.
- Use of a weapon (pistol).
- The inmate was on probation at the time the crime was committed.

#### b. Mitigating Factors:

HERNANDEZ, PETER         C03015         CTF-SOLEDAD

- Although the inmate was on probation he had a minimal history of criminal behavior.

**B.** **Multiple Crime(s):** N/A.

    **1.** **Summary of Crime:** N/A.

    **2.** **Prisoner's Version:** N/A.

## II. PRECONVICTION FACTORS:

**A.** **Juvenile Record:** None noted.

**B.** **Adult Convictions:** Hernandez' arrest history began on 5/13/76 when he was arrested by the Los Angeles Police on a charge of Possession/Manufactured/Sell Dangerous Weapon, PC 12020(a). He was released on 5/14/76 having been detained only due to insufficient evidence. He was again arrested on 1/8/77 by Los Angeles Police on a charge of Robbery, PC 211(a). He pleaded guilty on 2/1/77 to Taking a Vehicle Without Owner's Consent and was sentenced to 36 months summary probation without supervision and a $32.00 restitution. On 5/1/78 Hernandez was convicted on a misdemeanor charge of PC 484 and was sentenced to 24 months probation with four days in jail and 90 days jail suspended.

**C.** **Personal Factors:** On 8/17/54, Peter Hernandez Jr. was born in Las Cruces, Mexico, the second of two children of Peter Hernandez Sr. and the former Martha Rodriguez. Hernandez was raised by his mother in part due to his parents divorcing when he was two years old. Several years following her divorce, his mother entered a common-law relationship that was formalized in 1972. Hernandez claims he had a satisfactory relationship with all family members including his stepfather and two half-brothers. Hernandez reports that no other family member has an arrest record and there is no family history of mental illness. He notes that his stepfather was an alcoholic.

Hernandez attended Belmont High School but dropped out to enlist in the U.S. Army. He served in the Army from 2/73 until 2/76 and received an honorable discharge. He achieved the rank of E-4 and served seven months in Germany. While in the Army, Hernandez began the occasional use of marijuana and social use of alcohol. He subsequently began spending most of his off-duty time drinking. In 1975 he married Josie Garcia while still in the Army. The relationship produced one daughter, Zita. There is no evidence of any sexual deviation, physical or mental disorder.

## III.    POSTCONVICTION FACTORS:

A.    **Special Programming/Accommodations:** N/A.

B.    **Custody History:** Hernandez remains Medium A custody level and has been housed at CTF throughout this review period.

C.    **Therapy and Self-Help Activities:** Since Hernandez' last BPT Hearing he has attended numerous Prison Fellowship Ministries Classes (Protestant Faith) and Impact Workshop's. (See Post Conviction Progress Report).

Hernandez stated he is currently on the waiting list for the following programs: In Cell Study Business Course, We Care Self-Help Group, and AA. Furthermore, Hernandez states he is a member of the Balance Reentry Activity Group (BRAG) and CTF Veterans Group (Army). Hernandez states he has tried to obtain documentation to verify his statements, but has been unsuccessful.

D.    **Disciplinary History:** Hernandez continues to remain disciplinary free.

E.    **Other:** Hernandez attended his Subsequent #11 Parole Consideration Hearing on 11/7/01. Parole was denied for 1 year. The Board recommended that Hernandez remains disciplinary free, and participate in self-help programs and group therapy.

## IV.    FUTURE PLANS:

A.    **Residence:** Hernandez continues to plan to reside with his brother Michael and sister-in-law Kim Montez at 11150 Glen Oaks Boulevard, Unit 227, in Pacoima, California. His telephone number is (818) 686-1152.

B.    **Employment:** Hernandez is certain that he will be able to secure employment with Marco Sanchez, a cousin who owns auto body/fender and mechanics shops in Rosemead and in San Fernando Valley. He would be employed for office clerical duties.

C.    **Assessment:** In review of Hernandez parole plans, this counselor does not foresee any problems. However, it was recommended that he obtain updated support letters since his current ones are dated 1998.

## V.    USINS STATUS: N/A.

HERNANDEZ, PETER          C03015          CTF-SOLEDAD

## VI.    **SUMMARY:**

A.    Considering the commitment offense, prior prison record and prison adjustment this writer believes Hernandez would pose a low degree of threat to the public if released. Hernandez has been incarcerated for over 25 years on a seven to Life sentence. Hernandez has also been given a parole date twice and both times been revoked by the Governor. Although I have not had alot of interaction with Hernandez throughout the year, he has taken great steps in the right direction. He has remained disciplinary free, has adequate parole plans, and maintains a good rapport with staff and inmates. Hernandez has received laudatory chronos from Correctional Officers W. Cleaver, G. Lavelle and Reverne Lindsey. They state that his work performance, attitude, and attendance are excellent.

Hernandez has taken responsibility for his crime and has expressed deep remorse for what he has done. He fully intends to better himself while incarcerated and will continue working on self-improvement upon his release.

A combination of the above factors, as well as support letters from family and friends, help point Hernandez in the direction of a successful parole.

B.    Prior to release the prisoner could benefit from:

1.    Continuing to be disciplinary free.
2.    Participation in self-help and therapy programs.

C.    This report is based upon a thorough review of the inmate's Central File and a (1) hour interview with Hernandez.

D.    Per the Olson Decision, Hernandez was afforded an opportunity to review his Central File. (Refer to CDC 128B dated 8/10/04 in the General Chrono Section of the Central File).

E.    No accommodation was required per the Armstrong vs. Davis BPT Parole Proceedings Remedial Plan (ARP) for effective communication.

HERNANDEZ, PETER          C03015                CTF-SOLEDAD

**BOARD OF PRISON TERMS**                                                                STATE OF CALIFORNIA

## LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐  DOCUMENTATION HEARING

☒  PAROLE CONSIDERATION HEARING

☐  PROGRESS HEARING

**INSTRUCTIONS**
TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 3/04 to 8/04 | | | **PLACEMENT**: Remained at CTF in the general population. **CUSTODY**: Medium A. **VOC. TRAINING**: None noted this period. **ACADEMICS:** None noted this period. **WORK RECORD**: Hernandez was a Religious Clerk from 8/22/02 thru 7/14/04 and received above average ratings verified by CDC 101 dated 1/17/03. On 7/15/04 Hernandez was assigned in the Culinary as a Clerk. **GROUP ACTIVITIES**: Participated in Prison Fellowship verified by a certificate dated 6/5/04. **PSYCH. TREATMENT**: None noted during this period. **PRISON BEHAVIOR**: Hernandez remained disciplinary free during this period. **OTHER**: None. |

| CORRECTIONAL COUNSELOR'S SIGNATURE | | | DATE |
|---|---|---|---|
| HERNANDEZ | C03015 | CTF-SOLEDAD | 8-31-04 |

$8 \cdot 31 \cdot 04$

K. Heinly                                    Date
Correctional Counselor I

D. Pherigo                                   Date
Correctional Counselor II

I. Guerra                                    Date
Facility Captain

D. S. Levorse                                Date
Classification and Parole Representative

HERNANDEZ, PETER          C03015          CTF-SOLEDAD