1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  JULIE L. GARLAND
   Senior Assistant Attorney General
4  JENNIFER A. NEILL
   Supervising Deputy Attorney General
5  AMANDA J. MURRAY, State Bar No. 223829
   Deputy Attorney General
6    455 Golden Gate Avenue, Suite 11000
     San Francisco, CA  94102-7004
7    Telephone:  (415) 703-5741
     Fax:  (415) 703-5843
8    Email:  Amanda.Murray@doj.ca.gov

9  Attorneys for Respondent

10

11             IN THE UNITED STATES DISTRICT COURT

12          FOR THE NORTHERN DISTRICT OF CALIFORNIA

13                  SAN FRANCISCO DIVISION

14

| | |
|---|---|
| **PETER HERNANDEZ,** | C08-2278 JSW |
| Petitioner, | **ANSWER TO PETITION FOR WRIT OF HABEAS CORPUS; MEMORANDUM OF POINTS AND AUTHORITIES** |
| **v.** | |
| **BEN CURRY,** | Judge:     The Honorable Jeffrey S. White |
| Respondent. | |

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

Page

MEMORANDUM OF POINTS AND AUTHORITIES                                           5

    INTRODUCTION                                                              5

    ARGUMENT                                                                  5

        I.   HERNANDEZ HAS NOT SHOWN THAT HE IS ENTITLED TO
            RELIEF UNDER AEDPA.                                                   5

            A.  Hernandez Has Not Shown that the State Court Decisions Was
               Contrary to Clearly Established Federal Law.                      5

            B.  Hernandez Has Not Shown that the State Courts Unreasonably
               Applied Clearly Established Federal Law.                          7

            C.  Hernandez Has Not Shown that the State Court Decisions Were
               Based on an Unreasonable Determination of the Facts.             8

        II.  HERNANDEZ HAS NOT SHOWN THAT HE IS ENTITLED TO
            RELEASE UNDER THE BOARD'S REGULATORY MATRICES.                       9

        III. HERNANDEZ HAS NOT SHOWN THAT THE BOARD  HAS A NO-
            PAROLE POLICY IN DENYING HIM PAROLE.                                10

        IV. HERNANDEZ HAS NOT SHOWN THAT THE BOARD'S DENIAL
            VIOLATED HIS EQUAL PROTECTION RIGHTS.                               10

CONCLUSION                                                                    11

1

# TABLE OF AUTHORITIES

2                                                                          **Page**

3  **Cases**

4

5  *Ylst v. Nunnemaker*
   501 U.S. 797 (1991)                                                        8

6

7  *Earp v. Ornoski*
   431 F.3d 1158 (9th Cir. 2005)                                             7

8  *In re Rosenkrantz*
   29 Cal. 4th 616 (2002)                                                    8

9

10 *Baja v. Ducharme*
   187 F.3d 1075 (9th Cir. 1999)                                             4

11 *Benny v. U.S. Parole Comm'n*
   295 F.3d 977 (9th Cir. 2002)                                              4

12

13 *Biggs v. Terhune*
   334 F.3d 910 (9th Cir. 2003)                                             6, 7

14 *Carey v. Musladin*
   ___ U.S. ___, 127 S. Ct. 649 (2007)                                      5, 6

15

16 *Crater v. Galaza*
   491 F.3d 1119 (9th Cir. 2007)                                            6, 7

17 *Duhaime v. Ducharme*
   200 F.3d 597 (9th Cir. 2000)                                              7

18

19 *Foote v. Del Papa*
   492 F.3d 1026 (9th Cir. 2007)                                             6

20 *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*
   442 U.S. 1 (1979)                                                        2, 3, 5-8

21

22 *Gutierrez v. Griggs*
   695 F.2d 1195 (1983)                                                      9

23 *Hayward v. Marshall*
   527 F.3d 797 (9th Cir. 2008)                                             3

24

25 *In re Dannenberg*
   34 Cal. 4th 1061 (2005)                                                   3

26 *Irons v. Carey*
   505 F.3d 846 (9th Cir. 2007)                                             7

27

28 *Johnson v. Zerbst*
   304 U.S. 458 (1938)                                                      10

## TABLE OF AUTHORITIES (continued)

Page

*Langford v. Day*
110 F.3d 1380 (9th Cir. 1984)    4

*Lockyer v. Andrade*
538 U.S. 63 (2003)    5, 7

*Middleton v. Cupp*
768 F.2d 1083 (9th Cir. 1985)    9

*Nguyen v. Garcia*
477 F.3d 716 (9th Cir. 2007)    6

*Pulley v. Harris*
465 U.S. 37 (1984)    4, 9

*Rose v. Hodges*
423 U.S. 19 (1975)    9

*Sandin v. Connor*
515 U.S. 472 (1995)    2, 3, 6

*Sass v. California Board of Prison Terms*
461 F.3d 1123 (9th Cir. 2006)    3, 6

*Schriro v. Landrigan*
___U.S.___, 127 S. Ct. 1933 (2007)    6

*Superintendent v. Hill*
472 U.S. 445 (1985)    6, 8

*Wilkinson v. Austin*
545 U.S. 209 (2005)    3, 6

*Williams v. Taylor*
529 U.S. 362 (2000)    5, 7

*Wright v. Van Patten*
___U.S.___ 128 S. Ct. 743 (2008)    6

**Statutes**

United States Code, Title 28
   § 2244(d)(1)    2, 5, 7
   § 2254    2
   § 2254(a)    9
   § 2254(d)    7
   § 2254(d)(2)    5, 8
   § 2254(e)(1)    8

## TABLE OF AUTHORITIES  (continued)

**Page**

California Code of Regulations, Title 15
    § 2281 (a)                                                                              9
    § 2402                                                                                   9

**Other Authorities**

Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)                              5-7

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1 EDMUND G. BROWN JR.
Attorney General of the State of California
2 DANE R. GILLETTE
Chief Assistant Attorney General
3 JULIE L. GARLAND
Senior Assistant Attorney General
4 JENNIFER A. NEILL
Supervising Deputy Attorney General
5 AMANDA J. MURRAY, State Bar No. 223829
Deputy Attorney General
6  455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
7  Telephone: (415) 703-5741
Fax: (415) 703-5843
8  Email: Amanda.Murray@doj.ca.gov

9 Attorneys for Respondent

10

11             IN THE UNITED STATES DISTRICT COURT

12          FOR THE NORTHERN DISTRICT OF CALIFORNIA

13                 SAN FRANCISCO DIVISION

14

| | |
|---|---|
| **PETER HERNANDEZ,** | C08-2278 JSW |
| Petitioner, | **ANSWER TO PETITION FOR WRIT OF HABEAS CORPUS; MEMORANDUM OF POINTS AND AUTHORITIES** |
| v. | |
| **BEN CURRY,** | Judge:   The Honorable Jeffrey S. White |
| Respondent. | |

20     As an Answer to the Petition for Writ of Habeas Corpus filed by inmate Peter Hernandez,

21 Respondent, admits, alleges, and denies that:

22     1.   Hernandez is in the lawful custody of the California Department of Corrections and

23 Rehabilitation following his March 9, 1979 conviction for first-degree murder. (Pet. at p. 2.)

24 Hernandez is serving a sentence of seven years to life in prison. (*Id.*)

25     2.   In 2007, Hernandez filed a petition for writ of habeas corpus in Los Angeles County

26 Superior Court, alleging that the Board of Parole Hearings' 2006 decision denying him parole

27 violated his due process rights because the Board failed to provide him with individualized

28 consideration and there was insufficient evidence of his unsuitability. (Ex. A, Super. Ct. Pet.;

1  Ex. B, Super. Ct. Order.)  Hernandez also alleged that the denial violated his equal protection

2  rights, that the Board has a no-parole policy, and that he was entitled to immediate release based

3  on the Board's regulatory matrices.  The superior court denied the petition, finding that "the

4  record contains 'some evidence' to support a finding that petitioner would pose an unreasonable

5  risk of danger to society and is unsuitable for parole."  (Ex. B at 1.)

6      3.    Hernandez then raised the same claims in petitions to the California Court of Appeal

7  and the California Supreme Court.  (Ex. C, Ct. App. Pet.;  Ex. D, Resp't's Informal Resp.; Ex. E,

8  Pet'r's Reply; Ex. F, Ct. App. Order; Ex. G, Sup. Ct. Pet; Ex. H, Sup. Ct. Order.)  Both petitions

9  were summarily denied.  (Ex. D; Ex. F.)

10     4.    Respondent admits that Hernandez exhausted his state court remedies regarding his

11 claims that the Board failed to provide him with individualized consideration, that there was

12 insufficient evidence of his unsuitability, that the denial violated his equal protection rights, that

13 the Board has a no-parole policy, and that he was entitled to immediate release based on the

14 Board's regulatory matrices.  Respondent denies that Hernandez has exhausted his claims to the

15 extent they are interpreted more broadly to encompass any systematic issues beyond these claims.

16     5.    Respondent admits that the Petition is timely under 28 U.S.C. § 2244(d)(1).

17 Respondent admits that the Petition is not subject to any other procedural bar.

18     6.    Respondent denies that Hernandez is entitled to federal habeas relief under 28 U.S.C. §

19 2254 because the state court decisions were not contrary to, or an unreasonable application of

20 clearly established federal law as determined by the United States Supreme Court, or based on an

21 unreasonable determination of the facts.

22     7.    Respondent denies that Hernandez has a federally protected liberty interest in parole

23 and, therefore, alleges that he has not a stated a federal question invoking this court's

24 jurisdiction.  The Supreme Court has not clarified the methodology for determining whether a

25 state has created  a federally protected liberty interest in parole.  *See Greenholtz v. Inmates of*

26 *Neb. Penal & Corr. Complex,* 442 U.S. 1, 12 (1979) (liberty interest in conditional parole release

27 date created by unique structure and language of state parole statute); *Sandin v. Connor,* 515 U.S.

28 472, 484 (1995) (federal liberty interest in correctional setting created only when issue creates an

1  "atypical or significant hardship" compared with ordinary prison life); *Wilkinson v. Austin*, 545

2  U.S. 209, 229 (2005) (*Sandin* abrogated *Greenholtz's* methodology for establishing the liberty

3  interest).  California's parole statute does not contain mandatory language giving rise to a

4  protected liberty interest in parole under the mandatory-language approach announced in

5  *Greenholtz*.  *In re Dannenberg*, 34 Cal. 4th 1061, 1087 (2005) (California's parole scheme is a

6  two-step process that does not impose a mandatory duty to grant life inmates parole before a

7  suitability finding).  And continued confinement under an indeterminate life sentence does not

8  impose an "atypical or significant hardship" under *Sandin* since a parole denial does not alter an

9  inmate's sentence, impose a new condition of confinement, or otherwise restrict his liberty while

10  he serves his sentence.  Thus, Respondent asserts that Hernandez does not have a federal liberty

11  interest in parole under either *Greenholtz* or *Sandin*.  Respondent acknowledges that in *Sass v.*

12  *California Board of Prison Terms*, 461 F.3d 1123, 1128 (9th Cir. 2006) the Ninth Circuit held

13  that California's parole statute creates a federal liberty interest in parole under the mandatory-

14  language analysis of *Greenholtz*, but preserves the argument, which is pending en banc in

15  *Hayward v. Marshall*, 527 F.3d 797 (9th Cir. 2008).

16      8.  Even if Hernandez has a federal liberty interest in parole, he received all due process to

17  which he is entitled under clearly established federal law because he was provided with an

18  opportunity to be heard and a statement of reasons for the Board's decision.  *Greenholtz*, 442

19  U.S. at 16.

20      9.  Respondent denies that the some-evidence test is clearly established federal law in the

21  parole context.

22      10.  Respondent denies that the Board's 2006 decision violated Hernandez's federal due

23  process rights by failing to provide him with individualized consideration or that there was

24  insufficient evidence.  Respondent also denies that the decision was arbitrary and capricious.

25      11.  Respondent denies that the Board is biased or that it has a no-parole policy for life-term

26  inmates.

27      12.  Respondent denies that the Board's denial violated his equal protection rights.

28      13.  Respondent denies that Hernandez is entitled to immediate release based on the

1  Board's regulatory matrices.  Moreover, Respondent alleges that Hernandez fails to present a

2  federal question when he contends that the state courts improperly applied or interpreted state

3  law.  Alleged errors in the application of state law are not cognizable in federal habeas corpus.

4  *Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1984).

5      14.  Respondent submits that an evidentiary hearing is not necessary because the claims

6  can be resolved on the existing state court record.  *Baja v. Ducharme*, 187 F.3d 1075, 1078 (9th

7  Cir. 1999).

8      15.  Respondent denies that Hernandez is entitled to immediate release.  Rather,

9  Hernandez's remedy is limited to the process that is due, which is a new review by the Board

10  comporting with due process.  *See e.g. Benny v. U.S. Parole Comm'n*, 295 F.3d 977, 984-85 (9th

11  Cir. 2002) (a liberty interest in parole is limited by the Board's exercise of discretion, and a due

12  process error does not entitle an inmate to a favorable parole decision).

13      16.  Hernandez fails to state or establish any grounds for habeas corpus relief.

14      17.  Except as expressly admitted in this Answer, Respondent denies the allegations of the

15  Petition.

16  / / /

17  / / /

18  / / /

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

Answer and Supporting Memorandum of Points and Authorities          *Hernandez v. Curry*
                                                                     C08-2278 JSW

4

1  **MEMORANDUM OF POINTS AND AUTHORITIES**

2  **INTRODUCTION**

3       Hernandez claims that the Board's 2006 decision finding him unsuitable for parole violated

4  his due process rights.  But Hernandez merely alleges a disagreement with the Board's decision,

5  and fails to establish that the state court decisions denying his due process claims were contrary

6  to, or an unreasonable application of clearly established federal law as determined by the United

7  States Supreme Court, or were based on an unreasonable determination of the facts.  Moreover,

8  Hernandez fails to articulate a basis for federal habeas relief as to his other claims.  As such, his

9  Petition should be denied.

10  **ARGUMENT**

11  **I.**

12  **HERNANDEZ HAS NOT SHOWN THAT HE IS ENTITLED TO RELIEF
    UNDER AEDPA.**

13

14       Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) a federal court

15  may not grant a writ of habeas corpus unless the state court's adjudication was either: 1)

16  "contrary to, or involved an unreasonable application of, clearly established Federal law, as

17  determined by the Supreme Court of the United States;" or 2) "based on an unreasonable

18  determination of the facts in light of the evidence presented at the State Court proceeding."

19  28 U.S.C. § 2254(d)(1-2) (2000).  Hernandez has not demonstrated that he is entitled to relief

20  under this standard.

21       **A.    Hernandez Has Not Shown that the State Court Decisions Was
             Contrary to Clearly Established Federal Law.**

22

23       As a threshold matter, the Court must decide what, if any, "clearly established Federal law"

24  applies.  *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003).  In making this determination, the Court

25  may look only to the holdings of the United States Supreme Court governing at the time of the

26  state court's adjudication.  *Carey v. Musladin*, ___ U.S. ___, 127 S. Ct. 649, 653 (2007) (quoting

27  *Williams v. Taylor*, 529 U.S. 362 (2000)).  The only case in which the Supreme Court has

28  addressed the process due in state parole proceedings is *Greenholtz*.  *Greenholtz*, 442 U.S. 1.

1  The Supreme Court there held that due process is satisfied when the state provides an inmate an

2  opportunity to be heard and a statement of the reasons for the parole decision. *Id.* at 16. "The

3  Constitution does not require more." *Id.*[1] No other Supreme Court holdings require more at a

4  parole hearing.

5      Hernandez does not contest that he received the *Greenholtz* protections. (*See generally*

6  Pet.) Because *Greenholtz* was satisfied and *Greenholtz* is the only Supreme Court authority

7  regarding an inmate's due process rights during parole proceedings, the state court decision

8  upholding the Board's decision was not contrary to clearly established federal law. Thus, the

9  Petition should be denied.

10     Although Hernandez alleges that the Board's decision must be supported by some evidence,

11  there is no clearly established federal law applying this standard to parole decisions. The

12  Supreme Court has held that under AEDPA a test announced in one context is not clearly

13  established federal law when applied to another context. *Wright v. Van Patten*, ___U.S.___ 128

14  S. Ct. 743, 746-47 (2008); *Schriro v. Landrigan*, ___U.S.___, 127 S. Ct. 1933 (2007); *Musladin*,

15  127 S. Ct. at 652-54; *see also, Foote v. Del Papa*, 492 F.3d 1026, 1029 (9th Cir. 2007); *Nguyen*

16  *v. Garcia*, 477 F.3d 716, 718, 727 (9th Cir. 2007); *Crater v. Galaza*, 491 F.3d 1119, 1122 (9th

17  Cir. 2007). The Supreme Court developed the some-evidence standard in the context of a prison

18  disciplinary hearing, *Superintendent v. Hill*, 472 U.S. 445, 457 (1985), which is a fundamentally

19  different context than a parole proceeding. Because the tests and standards developed by the

20  Supreme Court in one context cannot be transferred to distinguishable factual circumstances for

21  AEDPA purposes, it is not appropriate to apply the some-evidence standard of judicial review to

22  parole decisions.

23     Thus, the Ninth Circuit's application of the some-evidence standard to parole decisions is

24  improper under AEDPA. *See, e.g., Biggs v. Terhune*, 334 F.3d 910 (9th Cir. 2003); *Sass*, 461

25  _____

26      1. The Supreme Court has cited *Greenholtz* approvingly for the proposition that the "level
    of process due for inmates being considered for release on parole includes an opportunity to be heard

27  and notice of any adverse decision" and noted that, although *Sandin* abrogated *Greenholtz's*
    methodology for establishing the liberty interest, *Greenholtz* remained "instructive for [its]

28  discussion of the appropriate level of procedural safeguards." *Austin*, 545 U.S. at 229.

Answer and Supporting Memorandum of Points and Authorities                    *Hernandez v. Curry*
                                                                              C08-2278 JSW

1   F.3d at 1128; *Irons v. Carey*, 505 F.3d 846, 851 (9th Cir. 2007). Moreover, AEDPA does not

2   permit relief based on circuit caselaw. *Crater*, 491 F.3d at 1123, 1126 (§ 2254(d)(1) renders

3   decisions by lower courts non-dispositive for habeas appeals); *Earp v. Ornoski*, 431 F.3d 1158,

4   1182 (9th Cir. 2005) ("Circuit court precedent is relevant only to the extent it clarifies what

5   constitutes clearly established law." . . ."Circuit precedent derived from an extension of a

6   Supreme Court decision is not clearly established federal law as determined by the Supreme

7   Court."); *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 2000).  Therefore, the Ninth

8   Circuit's use of the some-evidence standard is not clearly established federal law and is not

9   binding on this Court.

10   Similarly, Hernandez's related claim that the Board's reliance on the immutable factor of

11   his commitment offense violates due process finds no support in Supreme Court precedent.

12   Although the Ninth Circuit has suggested that this might amount to an additional due process

13   claim, *Biggs*, 334 F.3d at 917, because there is no clearly established federal law precluding

14   reliance on unchanging factors federal habeas relief is not available.  28 U.S.C. § 2254(d).

15   Moreover, Hernandez's claim that the Board's decision was arbitrary and capricious fails

16   because the Board and the state courts gave Hernandez individualized consideration and

17   evaluated the positive and negative factors in considering his eligibility for parole.  (Ex. B.)

18   In sum, the only clearly established federal law setting forth the process due in the parole

19   context is *Greenholtz*.  Hernandez does not allege that he failed to receive these protections.

20   Therefore Hernandez has not shown that the state court decisions denying habeas relief were

21   contrary to clearly established federal law.

22   **B.    Hernandez Has Not Shown that the State Courts Unreasonably
         Applied Clearly Established Federal Law.**

23

24   Habeas relief may only be granted based on AEDPA's unreasonable-application clause

25   where the state court identifies the correct governing legal rule from Supreme Court cases but

26   unreasonably applies it to the facts of the particular state case. *Williams*, 529 U.S. at 406.  The

27   petitioner must do more than merely establish that the state court was wrong or erroneous.  *Id.* at

28   410; *Lockyer*, 538 U.S. at 75.  Respondent recognizes that the Ninth Circuit applies the some-

1    evidence standard as clearly established federal law, but even accepting that premise, Hernandez

2    is not entitled to federal habeas relief. Indeed, the California Supreme Court has adopted *Hill*'s

3    some-evidence test as the judicial standard to be used in evaluating parole decisions, *In re*

4    *Rosenkrantz*, 29 Cal. 4th 616 (2002), and Hernandez has not shown that the state courts

5    unreasonably applied the standard.

6        Here, the superior court provided Hernandez with individualized consideration regarding

7    his suitability for parole and issued a reasoned decision finding that the facts of Hernandez's

8    commitment offense were some evidence to support denying him parole. *Ylst v. Nunnemaker*,

9    501 U.S. 797, 803-04 (1991) (federal court looks to the last reasoned state court decision as the

10    basis for the state court judgment); (Ex. B.)

11        Although Hernandez invites the Court to re-examine the facts of his case and re-weigh

12    the evidence presented to the Board, there is no Supreme Court law permitting this degree of

13    judicial intrusion. Indeed, the Supreme Court has recognized the difficult and sensitive task

14    faced by the Board in evaluating the advisability of parole release. *Greenholtz*, 442 U.S. at 9-10.

15    Thus, contrary to Hernandez's belief that he should be paroled based on the evidence in support

16    of his parole (*see generally*, Pet.), the Supreme Court has stated that in parole release, there is no

17    set of facts which, if shown, mandate a decision favorable to the inmate. *Id.*

18        Thus, the state court reasonably applied the minimal some-evidence test. *Hill*, 472 U.S.

19    at 457.

20    **C.    Hernandez Has Not Shown that the State Court Decisions**
       **Were Based on an Unreasonable Determination of the Facts.**

21

22        Under § 2254(d)(2), habeas corpus can not be granted unless the state courts' decisions

23    were based on an unreasonable determination of the facts in light of the evidence presented in the

24    state court. The state court's factual determinations are presumed to be correct, and the petitioner

25    has the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. §

26    2254(e)(1).

27        Although Hernandez alleges that the Board's decision is not supported by the evidence,

28    he does not show that the state court made factual errors. The superior court provided Hernandez

Answer and Supporting Memorandum of Points and Authorities                    *Hernandez v. Curry*
                                                                              C08-2278 JSW

8

1  with individualized consideration and concluded that there was some evidence to support the

2  Board's findings that the crime was committed in an especially heinous, atrocious, cruel manner,

3  and that multiple victims were attacked in that Hernandez shot and killed one victim, and then

4  shot two additional victims while emptying his gun. (Ex. B.)

5      Thus, for the foregoing reasons, Hernandez has not alleged by clear and convincing

6  evidence that the factual determinations are incorrect. Hernandez simply disagrees with the

7  weight the Board assigned to the evidence. This disagreement does not entitle Hernandez to

8  federal habeas relief.

9                                    **II.**

10  **HERNANDEZ HAS NOT SHOWN THAT HE IS ENTITLED TO
    RELEASE UNDER THE BOARD'S REGULATORY MATRICES.**

11

12      Hernandez wrongly alleges that the Board's regulatory matrices entitle him to immediate

13  release. Hernandez's claim fails to implicate a federal claim because it is based on his

14  construction of the state statutes and regulations regarding the manner in which the parole

15  authority determines suitability for parole. Accordingly, his claim is predicated on state law and

16  not cognizable in federal habeas corpus. 28 U.S.C. § 2254(a); *Rose v. Hodges*, 423 U.S. 19, 21

17  (1975); *Gutierrez v. Griggs*, 695 F.2d 1195, 1197-98 (1983). Moreover, even if Hernandez is

18  alleging that the state court erroneously rejected these claims, a federal court may not challenge a

19  state court's interpretation or application of state law, *Middleton v. Cupp*, 768 F.2d 1083, 1085

20  (9th Cir. 1985), or grant relief "on the basis of a perceived error of state law." *Pulley v. Harris*,

21  465 U.S. 37, 41 (1984). Accordingly, the Petition should be denied as to this claim.

22      Hernandez's claim also fails because there is no United States Supreme Court law

23  mandating that a release date be calculated before an inmate is found suitable for parole. Indeed,

24  while the Board's regulations set forth a matrix of factors used in setting a parole date (Cal. Code

25  Regs., tit. 15, § 2402), they also specify that the matrix is invoked only after a life inmate is

26  "found suitable for parole." (*Id.* at § 2402 (a); *see also id.* at § 2281 (a).) Here, the state courts

27  reasonably determined the facts in light of the evidence presented in determining the Board's

28  decision was supported by some evidence. (Ex. B.) Accordingly, Hernandez cannot prove that

Answer and Supporting Memorandum of Points and Authorities                        *Hernandez v. Curry*
                                                                                  C08-2278 JSW

1 | the state courts acted contrary to United States Supreme Court law or unreasonably determined

2 | the facts in light of the evidence presented with respect to this claim.

3 | **III.**

4 | **HERNANDEZ HAS NOT SHOWN THAT THE BOARD HAS A**
**NO-PAROLE POLICY IN DENYING HIM PAROLE.**

5 |

6 | The petitioner bears the burden of proving his allegations in a habeas corpus proceeding.

7 | *See Johnson v. Zerbst*, 304 U.S. 458, 468-69 (1938). Here, Hernandez has not shown any

8 | evidence that the Board was biased in denying him parole or that his parole denial was based on a

9 | no-parole policy. Hernandez's general allegations are insufficient to prove that the Board was

10 | biased or that it has a no-parole policy. Thus, because Hernandez fails to state a claim for federal

11 | habeas relief, the petition must be denied.

12 | **IV.**

13 | **HERNANDEZ HAS NOT SHOWN THAT THE BOARD'S DENIAL**
**VIOLATED HIS EQUAL PROTECTION RIGHTS.**

14 |

15 | Hernandez fails to prove that the Board's parole denial violated his equal protection

16 | rights. Indeed, the state courts provided Hernandez with individualized consideration regarding

17 | his suitability for parole and concluded that there was some evidence in the record supporting the

18 | Board's decision to deny parole. (Ex. B.) Thus, Hernandez fails to state a claim for federal

19 | habeas relief and his Petition should be denied.

20 | / / /

21 | / / /

22 | / / /

23 | / / /

24 | / / /

25 | / / /

26 | / / /

27 | / / /.

28 | / / /

Answer and Supporting Memorandum of Points and Authorities

*Hernandez v. Curry*
C08-2278 JSW

1

# CONCLUSION

2      Hernandez has not demonstrated that the state court decisions denying habeas relief were

3   contrary to, or an unreasonable application of, United States Supreme Court authority, or based

4   on an unreasonable determination of the facts.  Thus, the Petition should be denied.

5      Dated:  July 11, 2008

                        Respectfully submitted,

6

                        EDMUND G. BROWN JR.
7                       Attorney General of the State of California

8                       DANE R. GILLETTE
                        Chief Assistant Attorney General

9                       JULIE L. GARLAND
                        Senior Assistant Attorney General

10                      JENNIFER A. NEILL
                        Supervising Deputy Attorney General

11

12

13

14                      AMANDA J. MURRAY
                        Deputy Attorney General
15                      Attorneys for Respondent

16

17   20119568.wpd
     SF2008200067

18

19

20

21

22

23

24

25

26

27

28

Answer and Supporting Memorandum of Points and Authorities              *Hernandez v. Curry*
                                                                        C08-2278 JSW

11

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:    **Hernandez v. Curry**

No.:    **C08-2278 JSW**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age or older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On **July 14, 2008**, I served the attached

### ANSWER TO PETITION FOR WRIT OF HABEAS CORPUS; MEMORANDUM OF POINTS AND AUTHORITIES

by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal mail collection system at the Office of the Attorney General at 455 Golden Gate Avenue, Suite 11000, San Francisco, CA 94102-7004, addressed as follows:

**Peter Hernandez, C-03015**
**Correctional Training Facility**
**P.O. Box 689**
**Soledad, CA 93960-0686**
IN PRO PER

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on **July 14, 2008**, at San Francisco, California.

| | |
|---|---|
| M.M Argarin | _M. M. Argain_ |
| Declarant | Signature |

20122860.wpd

# EXHIBIT A
# Part 1 of 2

MC-275

Name    Peter Hernandez

Address    P.O. Box 689/F-237-L

Correctional Training Facility

Soledad, CA 93960-0689

CDC or ID Number    C-03015

## LOS ANGELES COUNTY SUPERIOR COURT

_____
(Court)

PETITION FOR WRIT OF HABEAS CORPUS

PETER HERNANDEZ,
Petitioner

vs.

B. CURRY, Warden, et al.,
Respondent

No. _____
(To be supplied by the Clerk of the Court)

## INSTRUCTIONS—READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Page one of six

Form Approved by the
Judicial Council of California
MC-275 [Rev July 1, 2005]

**PETITION FOR WRIT OF HABEAS CORPUS**

Penal Code, § 1473 et seq.,
Cal. Rules of Court, rule 60(a)

American LegalNet, Inc.
www.USCourtForms.com

6. GROUNDS FOR RELIEF
   **Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

PETITIONER'S FEDERAL AND STATE CONSITUTIONAL RIGHTS TO DUE PROCESS
AND EQUAL PROTECTION WERE VIOLATED BY RESPONDENTS WHEN THEY DENIED
TO HIM THE INDIVIDUALIZED CONSIDERATIONS MANDATED AND REQUIRED BY
STATUTORY AUTHORITIES AND ALL THE CLEARLY ESTABLISHED FEDERAL LAWS

a. Supporting facts:
   Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

In August of 1988 and again in January of 1990, Peter Hernandez,
(Petitioner), was found suitable for parole. Those Grants were sub-
sequently reversed and are attached as Exhibit "A".

On July 13, 2006, Petitioner appeared before the Board of Parole
Hearings (BPH) for his 13th subsequent hearing (14th overall), during
which Mr. J. Davis was Presiding Commissioner and Mr. D. Smith was
Deputy Commissioner. A copy of the Hearing transcript is attached
hereto as Exhibit "B", and incorporated by reference to bolster a
claim of a "no parole" policy and/or practice which has been found
to be patently unconstitutional by numerous state and federal courts.

Petitioner was represented by Ms. K. Rutledge. A staff psy-
chologist, Dr. E.W. Hewchuk, Ph.D., testified utilizing a filed Report
dated: 7-23-04, that in his opinion Petitioner is NOT a risk of CURRENT
                                          (continued on attached pages)

b. Supporting cases, rules, or other authority (optional):
   *(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

(SEE ATTACHED POINTS AND AUTHORITIES)

This petition concerns:

[ ] A conviction                    [xx] Parole

[ ] A sentence                      [ ] Credits

[ ] Jail or prison conditions       [ ] Prison discipline

[xx] Other (specify): __state and federal denial of due process and equal protection__

1. Your name: __Peter Hernandez__

2. Where are you incarcerated? __Correctional Training Facility, Soledad, CA 93960__

3. Why are you in custody?  [X] Criminal Conviction  [ ] Civil Commitment

   *Answer subdivisions a. through i. to the best of your ability.*

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

      __Homicide of the first degree, Assault w/intent to commit murder, firearm use__

   b. Penal or other code sections: __§§ 187, 217, 12022.5, 1203.06(a)(1) [under P.C. §1168]__

   c. Name and location of sentencing or committing court: __L.A. County Superior Court,__
      __111 N. Hill St., Los Angeles, CA 90012-3014__

   d. Case number: __A-334928__

   e. Date convicted or committed: __Mar. 9, 1979__

   f. Date sentenced: __Mar. 15, 1979__

   g. Length of sentence: __Seven (7) years to Life__

   h. When do you expect to be released? __Unknown, M.E.P.D.: 9-3-1985__

   i. Were you represented by counsel in the trial court?  [xx] Yes.  [ ] No. If yes, state the attorney's name and address:
      __Mr. Kenneth Cotton, L.A. County Public Defender,__

4. What was the LAST plea you entered? *(check one)*

   [xx] Not guilty  [ ] Guilty  [ ] Nolo Contendere  [ ] Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

   [xx] Jury  [ ] Judge without a jury  [ ] Submitted on transcript  [ ] Awaiting trial

6. **GROUNDS FOR RELIEF**
**Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

PETITIONER'S FEDERAL AND STATE CONSITUTIONAL RIGHTS TO DUE PROCESS AND EQUAL PROTECTION WERE VIOLATED BY RESPONDENTS WHEN THEY DENIED TO HIM THE INDIVIDUALIZED CONSIDERATIONS MANDATED AND REQUIRED BY STATUTORY AUTHORITIES AND ALL THE CLEARLY ESTABLISHED FEDERAL LAWS

a. Supporting facts:
Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

In August of 1988 and again in January of 1990, Peter Hernandez, (Petitioner), was found suitable for parole. Those Grants were subsequently reversed and are attached as Exhibit "A".

On July 13, 2006, Petitioner appeared before the Board of Parole Hearings (BPH) for his 13th subsequent hearing (14th overall), during which Mr. J. Davis was Presiding Commissioner and Mr. D. Smith was Deputy Commissioner. A copy of the Hearing transcript is attached hereto as Exhibit "B", and incorporated by reference to bolster a claim of a "no parole" policy and/or practice which has been found to be patently unconstitutional by numerous state and federal courts.

Petitioner was represented by Ms. K. Rutledge. A staff psychologist, Dr. E.W. Hewchuk, Ph.D., testified utilizing a filed Report dated: 7-23-04, that in his opinion Petitioner is NOT a risk of CURRENT
(continued on attached pages)

b. Supporting cases, rules, or other authority (optional):
*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

(SEE ATTACHED POINTS AND AUTHORITIES)

1   (continued from previous page):

2   danger to the public safety. A copy of that Report and Reports from 2004, 2002, 1999 and 1997 are

3   attached as Exhibit "C". A copy of the 2006 Correctional Counselor Level I report was prepared and filed

4   but not cited to and is attached hereto as Exhibit "D".

5        Copies of the 2005 and 2003 Decisions denying parole are attached as Exhibit "E" and are clearly

6   anecdotal evidence to further advance the allegation of a "no parole" policy and/or practice that has been

7   held to be unconstitutional as well as illegal by all courts that have ruled on the subject matter. With the

8   Court's leave, Petitioner respectfully requests that this anecdotal evidence be incorporated to this pleading.

9

10       Also present at the hearing was Mr. P. Turley, deputy district attorney for Los Angeles county,

11  parole division.

12       California's parole statutes and regulations bestow on life prisoners a liberty interest in parole

13  protected by due process. McQuillen v. Duncan (9th Cir. 2002) 306 F.3d 895, 901-903; In re Rosenkrantz[1]

14  (2002) 29 Cal.4th 616, 661 [Rosenkrantz V]. Petitioner's liberty interest required the BPH panel to find him

15  suitable for parole and set his prison term and a parole date because, when his MEPD lapsed, his parole

16  was evaluated to no longer pose an unreasonable risk of danger to society or public safety. (Penal Code

17  (PC) §3041(a); 15 California Code of Regulations (CCR) §§ 2280, 2281(a).)

18       In some cases, a lifer who otherwise qualifies for parole may be found unsuitable for and denied

19  parole if the commitment offense was especially egregious when compared to other instances of the same

20  offense. Such cases, however, are *exceptions*, not per the rule. Accordingly, the conduct of a to-life

21  sentenced inmate who committed first degree murder **must** be especially violent when compared to that of

22  other first-degree murderers for parole to be denied on the basis of the offense in the case of an otherwise

23  qualified inmate. However, the offense cannot serve as a basis for denying parole interminably. In re

24  Ramirez (2001) 94 Cal.App.4th 549, 569-570; Rosenkrantz II, 658; (cf: Biggs v. Terhune (9th Cir. 2003) 34

25

26

27  ---
    [1] There have seven (7) "Rosenkrantz" decisions: People v. Rosenkrantz (1988) 198 Cal.App.3d 1187; In re Rosenkrantz (2000) 80 Cal.App.4th 409; Davis
28  v. Superior Court (2-22-01, B146421 [non-pub.]; In re Rosenkrantz (2002) 95 Cal.App.4th 358; In re Rosenkrantz (2002) 29 Cal.4th 616; In re Rosenkrantz
    L.A. County Sup.Ct. no. BH003529, filed 6-26-2006 ;Rosenkrantz v. Marshall (2006) 444 F.Supp.2d 1063.

A

In re: Peter Hernandez, on habeas corpus

1    F.3d 910); <u>Irons v. Warden</u> (E.D. Cal. 2005) 358 F.Supp.2d 936; <u>Martin v. Marshall</u> (N.D. Cal. 2006) 431

2    F.Supp.2d 1038 (<u>Martin I</u>); <u>In re Rosenkrantz</u> (C.D. Cal. 2006) 444 F.Supp.2d 1063, 1081 [<u>Rosenkrantz VII</u>].

3            Substantive due process requires that the grounds set forth by a BPH panel for its decision must be

4    supported by at least some credible, relevant evidence in the record.  The panel was required to base its

5    findings on a weighing of all relevant, reliable evidence. (15 CCR § 2281(b); <u>In re Minnis</u> (1972) 7 Cal.3d

6    639, 646; <u>In re Rosenkrantz</u> (2000) 80 Cal.App.4th 409, 424-427 (<u>Rosenkrantz I</u>); <u>Rosenkrantz II</u>, 655;

7    <u>Ramirez</u>, supra, 566. The "some evidence" standard is satisfied if there is reliable evidence in the record that

8    could support the conclusion reached. <u>Powell v. Gomez</u> (9th Cir. 1994) 33 F.3d 39, 40; <u>Cato v. Rushen</u> (9th

9    Cir. 1987) 824 F.2d 703, 705. And federal due process requires *substantial* evidence having indicia of

10   reliability <u>Jancsek v. Oregon Bd. Of Parole</u> (9th Cir. 1987) 833 F.2d 1389, 1390; <u>In re Powell</u> (1988) 45

11   Cal.3d 894, 904; <u>In re Rosenkrantz II</u>, 658; <u>McQuillen</u>, supra, 306; <u>Biggs</u>, supra, 915; <u>Caswell v. Calderon</u>

12   (9th Cir.2004) 363 F.3d 832, 839.

13           Black's Law Dictionary 5th Ed. 1979 defines SUBSTANTIAL EVIDENCE as follows: "Such
14           evidence that a reasonable mind might accept as adequate to support a conclusion. *It is that*
             *quality of evidence necessary for a court to affirm a decision of an administrative board.*
15           (Black's p. 1281, citing <u>State v. Green</u> (1974) 544 P.2d 356, 362. Emphasis added.)

16           The Due Process clause of the Fourteenth Amendment prohibits state action that deprives a

17   person of life, liberty, or property without due process of law. A person alleging a due process violation

18   must first demonstrate that he or she was deprived of a liberty or property interest protected by the Due

19   Process Clause, and then show that the procedures that led to the deprivation were constitutionally

20   insufficient. <u>Kentucky Dept. of Corrections v. Thompson</u> (1989) 490 U.S. 454; <u>McQuillen</u>, supra, 900.

21           In the parole context, a prisoner alleging a due process claim must demonstrate the existence of a

22   protected liberty interest in parole, and the denial of one or more of the procedural protections that must be

23   afforded when a prisoner has a liberty interest in parole. The Supreme Court held in 1979, and reiterated in

24   1987, that "a state's statutory scheme, if it uses mandatory language, creates a presumption that parole

25   release will be granted when or unless certain designated findings are made, and thereby gives rise to a

26   constitutional liberty interest." <u>McQuillen</u>, supra, 901 (citing <u>Greenholtz v. Nebraska Penal Inmates</u> (1979)

27   442 U.S. 1, 7 and <u>Board of Pardons v. Allen</u> (1987) 482 U.S. 369, 373. Because no evidence supported the

28   panel member's finding that Petitioner's parole poses an "unreasonable risk of danger to society" or to

                                                         B

In re: Peter Hernandez, on habeas corpus

1    "public safety," and the finding was inapposite to the record, parole denial on that basis subverted due

2    process.

3        The reason stated by the panel for finding Petitioner unsuitable was BPH's boilerplate statement that

4    his parole "would pose an unreasonable risk of danger to society or a threat to public safety." (Exhibit "A", p.

5    70,) the sole ground set forth by the panel in support of its Decision to AGAIN, for at least the fourteenth

6    (14th) time, deny suitability and dismiss his warrant of parole which is tremendously long overdue!

7        (His M.E.P.D. was on the 9th of September, 1985!!)

8        Parole denial based on the "unreasonable risk" subterfuge abandoned principles of independence

9    and abrogated due process because it is supported by **NO EVIDENCE** whatsoever. **All** of the competent,

10    professionally-sanctioned evidence that addresses Petitioner's current **and** future dangerousness, parole

11    risk, etc., found it to be "low," "below average," or "no more than the average citizen," nor has it been for over

12    a score years. (See Exhibit "C", throughout, Exhibit "A", at pp. 45-46.)

13        Utilizing the legal precedent established as the focal criteria, all relevant, reliable evidence in

14    Petitioner's records that addresses his dangerousness and parole "risk" all assess these factors to be low,

15    and because not a scintilla of reliable, relevant evidence supports the panel's flawed findings, the sole

16    relevant reason for finding him unsuitable for parole sensibly suggests this was an illegitimate (ongoing)

17    basis for denial. Martin v. Marshall (N.D. Cal. 2006) 448 F.Supp.2d 1143, (Martin II), et al.

18        In Martin, supra, Justice Patel found NO justification for the panel's boilerplate lack of individual

19    consideration and in her July 21, 2006 Memorandum and Order she stated:

20        "In light of the Board's apparent abandonment of its independent role

21        **—which occurred AFTER Governor Schwarzenegger took office,**

22        *the court finds that a remand would indeed be futile.*" There can be no question but that the

23    implication here is exactly what it means: NO INDEPENDENT PAROLE DECISION BY THE WILSON,

24    DAVIS, OR SCHWARZENEGGER regimes for this Petitioner. Id. at p. 1144. (Emphasis added.)

25        In Rosenkrantz II, supra, at p. 655, the Supreme Court explained that parole release decisions

26    "entail the [BPH]'s attempt to predict by subjective analysis whether the inmate will be able to live in society

27    without committing additional antisocial acts."

28        Such a prediction requires analysis of individualized factors on a case-by-case basis and the BPH's

C

In re: Peter Hernandez, on habeas corpus

1  discretion in that regard is almost but NOT unlimited. Further, regardless of the tenet that the BPH's

2  discretion is exceedingly broad, it is circumscribed by the requirements of procedural due process.

3  (Rosenkrantz, id., Calif. Const. article I, § 7(a), and statutory directives.)

4      Absent reliable evidence of the presence of unsuitability factors, there must be some relevant,

5  reliable evidence that a petitioner is otherwise unsuitable for parole, such as by his having failed to meet the

6  suitability criteria under 15 CCR § 2402, subd. (d); §§ 1-4, 6-9. And, while the BPH has exceedingly broad

7  discretion in its parole decisions, the Findings must reflect "an individualized consideration of the specified

8  criteria and cannot be arbitrary or capricious." Rosenkrantz V, supra, 677; "[t]he liberty interest is created,

9  not upon the grant of a parole date, but upon the incarceration of the inmate." Biggs, supra, p. 914.

10      The failure to properly consider the post-incarceration factors highlights the inherent

11  misunderstanding and application of the "some evidence" standard and triggers the required scope of

12  judicial review of the federal questions presented here.

13      There are two sets of parole criteria regulations, not one. 15 CCR §§ 2402, subd. (c) [Circumstances

14  Tending To Show Unsuitability], and 2402 subd. (d) [Circumstances Tending To Show Suitability]. It appears

15  that the BPH's focused emphasis has been on, and remains on, subdivision (c), with little or no regard given

16  to subdivision (d). Petitioner asserts, as a matter of statutory construction, the "public safety" concern in PC

17  § 3041(b), demands an equal (or neutral) emphasis at the outset of a panel's deliberations AND on its

18  Findings under both sets of criteria and any balanced and reasonable interpretation should compel this

19  approach throughout the entire process due any inmate and to do so would virtually assure a Finding of

20  suitability.

21      Factors TENDING to show suitability or unsuitability must be weighed and balanced within the

22  parameters of a standard of proof. Without this critical, reliable component, the process is inherently

23  arbitrary, capricious, and defective. This standardless analysis would vitiate the individualized consideration

24  held appropriate in Rosenkrantz II. The crux of the matter is that of a standard of proof with indicia of

25  reliability as set forth below and reinforced with significant legal precedent.

26      The "some evidence" standard is NOT the sole standard of evidence to be applied to the BPH's

27  decisions. It is only one aspect of judicial review employed by a habeas court. Edwards v. Balisok (1997)

28  520 U.S. 640, 647. And, if the Rosenkrantz II decision implies, as it does, that the "some evidence" standard

D

In re: Peter Hernandez, on habeas corpus

1  should be applied to the BPH Findings, then this is a clear and unreasonable application of well-established

2  federal Constitutional law set forth by the High Court. Nothing in Superintendent v. Hill (1985) (Hill) 472 U.S.

3  445, 456, implies that it IS A STANDARD OF EVIDENCE to be applied by any agency, board, or executive

4  body outside a disciplinary committee within an exigent-circumstances prison setting that has no pressing

5  need for more formal evidentiary standards or anything warranting standardless precedents

6          What IS implied by the Rosenkrantz II court, when it held that a habeas court can't reverse a

7  decision denying parole even if it determines that the evidence overwhelmingly preponderates towards a

8  finding of suitability is completely unreasonable because it prevents effective habeas relief from an arbitrary

9  and capricious decision, and worse, stymies effective judicial review. This court is not obliged nor compelled

10 to defer to a state decision misapplying federal constitutional principles. Hubbart v. Knapp (9th Cir. 2004) 379

11 F.3d 773, 780; referencing Mullaney v. Wilbur 421 U.S. 684, 691; see also Peltier v. Wright (9th Cir. 1994) 15

12 F.3d 860, 862.

13         In Oxborrow v. Eikenberry (9th Cir. 1989) 877 F.2d 1395, 1399, the Circuit held that: "Our deference

14 to the [state court] is suspended only upon a finding that the court's interpretation of [state law] is untenable

15 or amounts to a subterfuge to avoid federal review of a constitutional violation." Thus, it is petitioner's

16 contention that respondents seek to avoid federal review by asserting that the "some evidence" standard 1)

17 is applied by the BPH and/or, 2) limits judicial review ONLY to the BPH's ultimate decision and not to a

18 finding of a defective pre-Decision process.

19         If Petitioner were the beneficiary of an individualized consideration utilizing real evidence with

20 reliable, articulable proof, it would have logically flowed that he is now MORE suitable than his previous

21 hearings wherein he was found suitable. (Exhibit "A"). All those laudatory words at his Hearing would have

22 had a consistent ring of truth to them in that he has progressed towards a more-suitable mien, not the

23 reverse. This highly illegal "boilerplate" denial now rises to the level of a federal due process violation. Biggs,

24 supra, 916-917; Martin, supra, 1046-1048.

25         The High Court in Greenholtz (at p. 7) Allen (at p. 373) , supra, established that:

26     "While there is no constitutional or inherent right of a convicted person to be conditionally
       released before the expiration of a valid sentence, a state's statutory scheme, if it uses
27     mandatory language, creates a presumption that parole release will be granted when or
       unless certain designated findings are made, and thereby gives rise to a constitutional
28     liberty interest." (citing McQuillen, supra, at 901.)

                                                    E

1   In the absence of any evidence in the record supporting the BPH's decision, remanding the case

2   back to be reheard is a futile act, and the appropriate remedy is release of the Petitioner. McQuillen II,

3   supra, p. 1015-15; Martin II, supra, 1144-45; Rosenkrantz VII, supra, 1087.

4   A petitioner is entitled to "something more than mere pro forma consideration.", e.g. meaningful

5   individual consideration. Not a sham hearing using rote words and repeating boilerplate from a pre-printed

6   form. The only mandate "normally" being followed under P.C. § 3041 (a), is a multi-year denial under § 3041

7   (b) to "swallow" the due process required under the 14th Amendment, an ingestion violating the equal

8   protection guarantees and abridges Petitioner's civil rights under both state and federal Constitution's

9   proscription against this tactic for all similarly-situated inmates. In re Sturm (1974) 11 Cal.3d 258, 268;

10   Ramirez, supra, at 570; Rosenkrantz V, at pp. 658, 683:

11   "Judicial oversight must be extensive enough to protect the limited right of parole applicants
     "'to be free from an arbitrary parole decision ... and to something more than mere pro forma
12   consideration.'" [citation omitted] The courts may properly determine whether the [BPH]'s
     handling of parole applications is consistent with the parole policies established by the
13   Legislature. [ ] while courts must give great weight to the [BPH]'s interpretation of the parole
     statutes and regulations, final responsibility for interpreting the law rests with the courts. [ ]
14   Courts must not second-guess the [BPH]'s evidentiary findings [ ] However, it is the proper
     function of judicial review to ensure that the [BPH] has honored in a '"practical sense"' the
15   applicant's right to '"due consideration."'" [ ] Ramirez supra, at 564.

16   Since it is clear that parole should be the rule and not the exception, a moderate or average risk

17   cannot be construed as "unreasonable." Were an average risk grounds for parole denial, then the exception

18   would "operate so as to swallow the rule that parole is 'normally' to be granted.

19   "All violent crime demonstrates the perpetrator's potential for posing a grave risk to public
     safety ... {However] the [BPH] "shall normally set a release date."' [citation omitted] The
20   [BPH]'s authority to make an exception ... should not operate to swallow the rule that parole
     is 'normally' to be granted. ...Therefore, a life term offense must be particularly egregious to
21   justify the denial of a parole date. In order to comply with the parole policy established by
     the Legislature in P.C. § 3041, the [BPH] must weigh the inmate's criminal conduct not
22   against ordinary social norms, but against other instances of the same crime or crimes."
     (Ramirez, supra, at 570, disapproved on other grounds, Emphasis added as usual in
23   published cases.)

24   The applicability of this standard to the review of decisions applies and Petitioner's right to

25   due consideration does not appear to have been honored in any practical sense by the panel in this case

26   and their Decision is facially and legally deficient. In the instant case the BPH made no effort to comply with

27   the controlling rules and seems to have merely stated its "predetermined conclusion." (See: In re Caswell

28

F

1  (2001) 94 Cal.App.4th 1017, 1030.)

2        In In re Smith (2003) (Smith II) 114 Cal.App.4th 343, 369, the Sixth District Court of Appeals found

3  that there was not some evidence that Smith's crime was more callous than the average for this type of

4  crime. There was nothing to "distinguish th[e] crime from other [serious] murders [involving a gun] ... the

5  record provides no reasonable grounds to reject, or even challenge, the findings and conclusions of the

6  psychologist and counselor[s] concerning [his] dangerousness."

7        Surely the same must appear to be true here. (See Exhibits "C" and 2004 Correctional Counselor's

8  Report, Exhibit "F", attached.) The Second District Court of Appeals, in the case of another life-term inmate

9  named Smith similarly found no evidence to support a parole denial based on the commitment offense. In re

10 Smith (2003) (Smith I) 109 Cal.App.4th 489.

11       Compare In re Scott (2004) 119 Cal.App.4th 871, 876-877 [Scott I], where the First District reversed

12 the BPH's standard statement of reliance on the gravity of the crime because in truth, "the relevant evidence

13 show[ed] no more callous disregard for human suffering than is shown by most [ ] murder offenses.

14 (Governor's rescission of Scott's parole unanimously reversed on 10-18-05, see: In re Scott 133 Cal.App.4th

15 538, Scott II.)

16       On 5-18-05, in Coleman v. BPT (E.D. Cal. No. 97-0783), Honorable Judge L. Karlton

17 adopted the Findings and Recommendations IN FULL. There, it was found that ex-governors Davis and

18 Wilson (and NOW Governor Schwarzenegger, too. See infra at p. C), had/have panels with a sub rosa "no

19 parole" policy and were/are carrying it out. Martin I supra, 1048-49, Martin II, supra, 1144; see Coleman and

20 Final Order, attached as Exhibit "G".

21       It is beyond debate that neither a state agency interpreting an enabling statute nor any court of the

22 state can construe a statute contrary to Legislative intent or the ordinary meaning of the words used in a

23 statute. Our Court, in the entire history of the statute, has never construed it with any adequacy according to

24 the plain meaning to create guidance and instill compliance by both the BPH panels and those who serve

25 the governors otherwise.

26       Instead, this lack of judicial construction has led to the many years of overwhelming denials that DO

27 NOT reflect in any clear way the presumptions of § 3041. Nor does it reflect instruction as to what the

28 agency's burden of proof is or the legal significance of relevant, reliable, or material evidence. This lack of

G

In re: Peter Hernandez, on habeas corpus

1   judicial guidance has left unfettered discretion in the hands of lay appointees to determine the legal import of

2   evidence (or lack thereof) although these persons are arguably unqualified by a dearth of professional

3   standing to make these determinations upon which a federal liberty interest depends.

4       Determining the legality and weight and of evidence requires some specific legal training in

5   evidentiary law; not by lay persons, and which lack of training is visibly evident in the incongruously

6   inapposite findings thus made. (McQuillen I, supra, 907-912; Rosenkrantz II, supra, 680; Rosenkrantz I,

7   supra, 424-426; Smith II, supra, 361; Smith I, supra, 501-506.) These are only a few of the published cases

8   but unpublished absurdities exponentially abound!

9       The Sixth district held for the proposition in Smith II at 361 that "[t]he weight given the specified

10   factors relevant to parole suitability lies within the discretion of the BP[H]."; a court's determination "of

11   whether the *preponderance of the evidence* supports a finding of suitability is irrelevant." (Emphasis added.)

12   This is the first time a published decision on the BPH has even mentioned a burden of proof. This reference

13   infers the BPH must honor this evidentiary standard as faithfully to the letter as legally possible.

14       Yet there is no settled bright line rule for a court to determine if the BPH has met that standard. Just

15   the opposite, in fact, since Smith II strongly suggests that even if a reviewing court finds the agency did not

16   meet the standard, an allegation of "some evidence" is sufficient to automatically require judicial deference.

17       The Third District Court of Appeals stated the following as fact:

18   "It is without doubt that a blanket no-parole policy would be contrary to the law, which
19   contemplates that persons convicted of murder without special circumstances may eventually
      become suitable for parole and that, when eligible, they should be considered on an
20   individualized basis. Thus, blanket policies have long been deemed to be improper. ¶ In
      Roberts v. Duffy (1914) 167 Cal. 629, a decision that predates the enactment of our state's
21   old indeterminate sentencing law, the Court condemned a blanket parole policy that was
      contrary to the statutory parole scheme then in place. It appeared that the statutory law
22   *allowed a prisoner to apply for parole after serving ONE YEAR* but that, **contrary to the
      statute, the parole authority adopted a rule precluding application until one-half the
      sentence was served.**

23       The Court held that, "'while the prisoner had no right to apply to release on parole at
24   any time, *he was entitled to apply* and have his application duly considered <u>on an
      individualized basis.</u>'" Id. at 640-641.

25   (Does this sound familiar? Emphasis added to original citation.)

26

27   "With respect to persons sentenced to indeterminate terms, the purpose of punish-ment is
      satisfied by the requirement of service of a minimum period before eligibility for parole and,
28   when suitable for parole, by determination of a release date **in a manner that will provide**

H

In re: Peter Hernandez, on habeas corpus

UNIFORM TERMS for offenses of similar gravity and magnitude with respect to their threat to the public." (P.C. §§ 3041, 3041(a), 3041.5, citing In re Morrall (2002) 102 Cal.App.4th 280, 291-292.)

The arbitrary or capricious misapplication of statutory law violates both state and federal due process. Hill, supra, at p. 428; Gordon v. Duran (9th Cir. 1990) 895 F.2d 610, 613; In re Edsel P. (1985) 165 Cal.App.3d 763, 779. "The touchstone of due process is protection of the individual against [the] arbitrary action of government." Wolff v. McDonnell (1974) 418 U.S. 539, 558.)

These principles apply in equal force to incarcerated prisoners. (In re Jones (1962) 57 Cal.2d 860, 862; ["a convicted felon, although civilly dead, is nevertheless a 'person' entitled to protection of the 14th Amendment."]; In re Price (1979) 24 Cal.3d 448, 453 [acknowledging that P.C. § 2600 limits a prisoner's deprivation to only such rights "as is necessary in order to provide for the reasonable security of the institution in which he is confined."].)

In interpreting a prisoner's rights of substantive due process the High Court has held that a prisoner may derive a due process liberty interest from administrative regulations, as well as state law and the U.S. Constitution. Sandin v. Conner (1995) 515 U.S. 472, 484; Hewitt v. Helms 459 U.S. 460, 469, receded from on p. 484, fn. 5; Meachum v. Fano (1976) 427 U.S. 215, 226; Wolff, supra, at p. 557. In applying these standards here, the BPH violated Petitioner's right to constitutional due process but he is not challenging the BPH's right to conduct professional psychological assessments as the main focus of the parole evaluation process, but does challenge their "normal" practice of summarily dismissing and patently ignoring their own experts.

Predictions of future conduct necessarily relate to public safety concerns but Judge Karlton in Irons v. Warden (E.D. Cal. 2004) 358 F.Supp.2d 936 (9th Cir. Review pending, filed on 5-18-05, No. 05-15275), discussed this conundrum and noted that the propensity analysis thusly:

"To a point, it is true, the circumstances of the crime and motivation for it may indicate a petitioner's instability, cruelty, impulsiveness, violent tendencies and the like. However, after 15 or so years in the cauldron of prison life, not exactly an ideal therapeutic environment to say the least, and after repeated demonstrations that despite recognized hardships of prison, [petitioner] does not possess these attributes, the predictive ability of the circumstances of the crime is near zero." [2]

---

[2] "It is worth noting, as has our [Calif.] Supreme Court (People v. Murtishaw (1981) 29 Cal.3d 733, 768, disapproved on other grounds in People v. Boyd (1985) 38 Cal.3d 762,, that a large number of legal and scientific authorities believe that, even where the passage of time is not a factor and the assessment is made by an expert, predictions of future dangerousness are exceedingly unreli- able. (See, e.g., Monahan, Violence Risk Assessment: Scientific Validity and Evidentiary Admissibility, 57 Wash. & Lee' L. Rev. 901 (2000); Otto, On the Ability of Mental Health Professionals to 'Predict Dangerousness,' 18 Law & Psychol. Rev. 43 (1994); Lidz, et al., The Accuracy of Predictions of Violence to Others, 269, Jour.Am.Med.Assn. 1007 (1993); Diamond, The Psychiatric Prediction of Dangerousness, 123 Pa.L.Rev. 439 (1974); Dershowitz, The Law of Dangerousness: Some Fictions About

1  (Irons, supra, at p. 947, fn. 2, this 'dicta' was also cited as Headnote #10 at p. 937; see additional discussion

2  of "need for more therapy" used as a ruse to deny suitability at p. 948.)

3       P.C. § 3041(a) governs parole suitability determination processes and does not define more than

4  one class of persons. The statute generalizes that it's focus is "any prisoner" who is serving an

5  indeterminate term. Through application, however, the agency's discrimination amongst the class serving

6  indeterminate sentences is in violation of the right to equal protection ensconced in the Fourteenth

7  Amendment. Equal protection is "[in essence] a direction that [a person] similarly situated should be treated

8  alike." (City of Cleburne v. Cleburne Living Ctr. (1985) 473 U.S. 432, 439, citing Plyler v. Doe (1982) 457

9  U.S. 202, 216,. "To state a claim ... for violation of the Equal Protection Clause of the 14[th] Amendment a

10  plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff

11  based upon membership in a protected class." Barren v. Harrington (9th Cir. 1998) 152 F.3d 1193, 1194,

12  cert. denied 525 U.S. 1154 (1999).)

13       Strict scrutiny, alternatively, is utilized if the government distributes benefits or burdens in a manner

14  inconsistent with fundamental rights. (See Sosna v. Iowa (1975) 419 U.S. 393; Shapiro v. Thompson (1969)

15  394 U.S. 618.) The fundamental right here is the due process right to relevant, reliable evidence being

16  considered when analyzing a right to release on parole. McQuillen I, supra, at 900; McQuillen II, supra, at

17  1012; Martin I , supra, at 1043: ("[T]he deferential 'some evidence' standard has outer limits. [citing

18  Coleman, supra,  with approval slip op. at 9] If it is established that a particular judgment was

19  predetermined, then a prisoner's due process rights will have been violated even if there is 'some evidence'

20  to support the decision. [See Bakalis v. Golembeski (7th Cir. 1994) 35 F.3d 318, 326] (a decision-making

21  "body that has prejudged the outcome cannot render a decision that comports with due process. ... The

22  California Supreme Court has explicitly stated that a blanket no-parole policy as to a certain category of

23  prisoners is illegal. [In re Minnis; In re Morrall] " ... Because petitioner cannot change the past, denying

24  [P]etitioner parole based only on the facts surrounding the crime itself effectively changes his sentence ...

25

26  Predictions (1970) 23 J. Legal Ed. 24. According to a Task Force of the American Psychiatric Assn., "[n]either psychiatrists nor anyone else have
    demonstrated an ability to predict future violence or dangerousness. (Am.Psych.Assn., Task Force Rpt. 8, Clinical Aspect of the Violent Individual (1974) at
    p. 28.) As our [Calif.] Supreme Court has also noted, "the same studies which proved the inaccuracy of psychiatric predictions [of dangerousness] have

27  demonstrated BEYOND DISPUTE the no less disturbing manner in which such prophecies consistently err: they predict acts of violence which will not take
    place (false positives)," thus branding as 'dangerous' many persons who are in reality totally harmless. [citation.]" (People v. Burnick (1975) 14 Cal.3d 306,
    327.) (all emphasis in original). (See: copy of Order denying Review, dated 11/30/05, Daily Journal 12/2/05, p. 13803, attached as Exhibit "B"). Scott, II,

28  supra, footnote #9.

                                                          J

In re: Peter Hernandez, on habeas corpus

1  into life imprisonment without the possibility of parole." Ibid. at 1046.) (cf: Martin II, supra, at 1144: "In sum,

2  the Board appears to have capitulated to the blanket no-parole policy described by this court in its previous

3  [Martin I] Order, abandoning its role as an independent assessor of petitioner's eligibility. This capitulation is

4  particularly troubling in light of the Board' vigorous assertions of independence during the 2003 hearing."

5  This Honorable Court should grant the writ and Order all appropriate relief including a complete discharge

6  from custody and sanction full redress for Petitioner.

7

8

9                                    CONCLUSION

10        WHEREFORE, Petitioner respectfully submits that the writ should be granted in full and all available

11  remedies leading to his immediate release from custody be Ordered at the earliest possible moment and

12  forthwith. It is respectfully requested that an evidentiary hearing be Ordered as an alternative to the above

13  should there be consideration of the "no parole" policy and/or practice by this previous administration.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

K

In re: Peter Hernandez, on habeas corpus

7  Ground 2 or Ground _____ (if applicable)

PETITIONER'S FEDERAL RIGHTS TO DUE PROCESS AND EQUAL PROTECTIONS WERE VIOLATED WHEN RESPONDENTS UTILIZED A LESSER STANDARD OF LEGAL PROOF REQUIRING EVIDENCE WITH SOME INDICIA OF RELIABILITY TO FIND THAT PETI- TONER IS UNSUITABLE TO PAROLE AND IS THEREFORE AN UNREASONABLE RISK

a. Supporting facts:

Nowhere is there any codification that avers petitioners must prove his or her suitability. Only if an inmate is found unsuitable does evidence become citable. (See Dannenberg, at 1095; Rosenkrantz at 658, 683.) Evidence must be specific, articulable, and have "some indicia of reliability." Respondents have the burden of proof to demonstrate, in the Record, why an inmate is not suitable and a denial of more than one year requires that the BPH panel state for the Record why it isn't likely that petitioners would be found suit- able any time sooner. There is a wholesale vitiation going on here.

Procedural safeguards require: a hearing one year prior to the MEPD, CCR §§2268(b)[2400 et sqq.], 2270(d), (e), (f); PC §3041 (a), CDC v. Morales (1995) 115 S.Ct. 1597, 1600; service and prior examination of all material considered; representation if desired.

The one-year lead on a MEPD imparts that the Legislature intended that some inmates will be suitable at an initial hearing otherwise why would such a gratuitous mandate exist? Govenor's- level review presumes a neutral, well-defined, professional body that will follow all the state and federal laws. Only this practice

b. Supporting cases, rules, or other authority:                  (continued on attached pages)

(SEE ATTACHED POINTS AND AUTHORITIES)

1   Ground 2, continued:

2   would meet the constitutional burden under the discretionary methods

3   needed to quickly resolve an uncertain matter.

4       The "some evidence" relied on to deny parole must be relevant

5   and reliable in establishing Petitioner is a <u>current</u>, unreasonable

6   threat to public safety and must not be grounded in an incomplete

7   or unreasonable assessment of the relevant factors.

8       In explaining what the "some evidence" standard meant, the

9   Court in <u>In re Rosenkrantz</u> (2002) 29 Cal.4th 616 at 677, stated

10   that "[o]nly a modicum of evidence is required." On its face, this

11   standard could thus be seen as remarkably broad—that a scintilla

12   of evidence (or the BPH's assessment of it)—would be enough to

13   completely immunize BPH decisions from judicial review. However,

14   such a reading would effectively serve to nullify the <u>Rosenkrantz</u>

15   court's holding rejecting the Executive's position that factual

16   decisions rejecting parole were immune from examination by the courts

17   and in point of fact were required.

18       A disection of the "some evidence" standard itself—both

19   conceptually and through a review of the application of the

20   <u>Rosenkrantz</u>' standard (and its progeny)—makes clear that this is

21   the meaningful standard. Properly understood, it strikes an

22   appropriate balance between judicial deference to difficult BPH

23   decisions and the protection of constitutional liberty interests.

24       The "some evidence" standard of review is laid out here:

25       "[W]e conclude that the judicial branch is authorized
to review the factual basis of a decision of the [BPH]

26       denying parole in order to ensure that the decison comports
with the requirements of due process of law, but that

27       in conducting such a review, the court may inquire only
whether some evidence in the record before the [BPH] sup-

28       ports the decision to deny parole, <u>based upon the factors</u>

[4-A]

1     specified by statute and regulation. Rosenkrantz, 658.
2 "[a]s long as the [BPH] decision reflects due consideration
3 of the specified factors as applied to the INDIVIDUAL
PRISONER in accordance with applicable legal standards,
the court's review is limited to ascertaining whether
4 there is some evidence in the record that supports the
[BPH] decision." Id. at 677. (emphasis added).

5     Thus, the inquiry into whether there is "some evidence" is

6 more complex than it might otherwise seem, as the standard MUST

7 be applied within the context of the statutory framework in which

8 it arises. This framework imposes at least 3 requirements on the

9 "some evidence" standard if it is used to deny parole.

10     First, the BPH must base their decisons only on evidence that

11 serves to establish that the inmate will or will not pose a

12 continuing, "unreasonable risk of danger to society if released from

13 prison." CCR, title 15, §2402(a), and PC §3041(b).

14     Second, the evidentiary basis for parole decisions must be

15 based on the factors specified in the regulations after

16 individualized considerations of all of the factors. Rosenkrantz

17 at 677 ("The precise manner in which the specified factors relevant

18 to parole suitability are considered and balanced lies within the

19 discretion of the [executive branch], but the decision must reflect

20 an individualized consideration of the specified criteria and CANNOT

21 BE ARBITRARY AND CAPRICIOUS."); see also In re Stanley (1976) 54

22 Cal.App.3d 1030, 1038 n.7 ("Other courts place more weight on the

23 prisoner's record of crime. We abstain from any argument over the

24 relative primacy of various parole factors. It is enough to say

25 that the Adult Authority must apply all the factors.") (citing In

26 re Minnis (1972) 7 Cal.3d 639). These factors naturally all relate

27 to whether the inmate poses a continuing, unreasonable risk of danger

28 to society if released from prison. (emphasis added).

[4-B]

1    Third, the evidence upon which the BPH relies must be relevant

2    and reliable. CCR §2402(b) ("All relevant, reliable information

3    available to the panel shall be considered in determining suitability

4    for parole.") (cf. CCR §§2402(d)(1-9).

5    In sum, a court examining parole decisions must determine

6    whether, after all consideration of all the factors enumerated in

7    the statute and regulations, the decison was based on: 1) some

8    evidence; 2) a reasonabe consideration of all the factors specified

9    by the statutory guidelines; 3) evidence that is both relevant and

10   reliable; and 4) factual determinations that suggest an inmate poses

11   a CURRENT, UNREASONABLE THREAT TO PUBLIC SAFETY.

12   A review of the post-Rosenkrantz legal panorama reveals that

13   California courts of appeals and federal courts have routinely

14   applied the above boundaries and checkpoints of relevance,

15   reliability and reasonableness to the "some evidence" standard.

16   The California Supreme Court has so far utterly failed to establish

17   a brightline Plimsoll mark to define the full depth of the inquiry.

18   The courts continue to assess the reasonableness of the BPH's

19   interpretation of the facts and circumstances used to legally sus-

20   tain a finding of parole suitability denial. The court in In re

21   Van Houten (2004) 116 Cal.App.4th 339, 356, assessed whether the

22   BPH was reasonably able to conclude that there was some evidence

23   of the inmate's need of continuing therapy and her dangerousnes

24   to the public. Though it found in the affirmative, the court took

25   a close look at whether the BPH "could reasonably conclude that

26   [her] defense, that Manson's influence overwhelmed [her], was

27   exagerated such that she is fully responsible for the LaBianca

28   murders" and whether "[t]he BPH could infer with sufficient

[4-C]

1  reasonableness to satisfy a minimal 'some evidence' standard that

2  [she] is a danger to the public and in need of continued therapy

3  and programming." Her denial was affirmed with instructions.

4         Judicial inquiry into the stated reasons for parole denial

5  have their place and numerous state and federal courts--in a wide

6  range of contexts--have similarly held the judicial inquiry into

7  the reasonableness of BPH determinations and conclusions is

8  appropriate, even when such determinations and conclusions are

9  accorded broad deference. (See, e.g., In re Farley (2003) 109

10 Cal.App.4th 1356, 1361-2: "Judicial review of a CDC custody

11 determination is limited to determining whether the classification

12 decision is arbitrary, capricious, irrational, or an abuse of the

13 discretion granted those given the responsibility for operating

14 prisons. While we must uphold respondent's classification action

15 if it is supported by "some evidence" and we must afford great

16 deference to an administrative agency's expertise, where the agency's

17 interpretation of the regulation is clearly arbitrary or capricious

18 or has no basis, COURTS SHOULD NOT HESITIATE TO REJECT IT."

19        Federal courts likewise require parole decisions to be

20 reasonable. As an example, in a parole rescission case, a federal

21 court in this state held: "the Court of Appeals conclusory findings

22 that there was 'some evidence' to support the rescinding the BPH's

23 decision that parole was improvidently granted to petitioner, are

24 contrary to clearly established federal law and, to the extent they

25 are fact-based, represent unreasonable determinations of the facts

26 in light of the evidence presented in the state court proceedings."

27 Stockton v. Hepburn (N.D Cal. 2005) 2005 U.S. Dist. LEXIS 4877 at

28 43; see also Irons v. Warden (N.D. Cal 2004) 358 F.Supp.2d 936,

1    948 ("Clearly, a conclusion by lay BP[H] commissioners that

2    petitioner has not yet acheived required therapy for insight OR

3    OTHER REASONS is not reasonably sustainable, and a state court's

4    conclusion to the contrary is patently unreasonable.")

5        The federal liberty interest is made an adjunct to the state

6    requirements of due process by and through the 14th Amendment to

7    the U.S. Constitution and the substantial evidence of the federal

8    standard must be overcome to meet federal guarantees to its citizens

9    who, before they became entitled to state civil rights, were first

10   bestowed by operation of their federal citizenship. A state cannot

11   lawfully deny any federal right to its citizens but that is exactly

12   what respondents are demanding of their agents in the BPH, and will

13   no doubt now ask this Honorable Court to signoff on. That must not

14   be allowed if the judiciary is to be truly separated from the

15   Executive charades disguised s a legitimate exercise in freedom.

16       The goal of indeterminate sentences and the parole system is

17   not only to punish, but also to provide for reformation and

18   rehabilitation as the CDC's renaming suggests:

19       "The belief no longer prevails that every offense in
         a like legal category calls for an identical punish-
20       ment without regard to past life and habits of a parti-
         cular offender. ... Retribution is no longer the domi-
21       nant objective of the criminal law. Reformation and
         rehabilitation of offenders have become important goals
22       of criminal jurisprudence."

23   People v. Morse (1964) 60 Cal.2d 631, 643 n.8 (quoting Williams

24   v. State of New York (1949) 337 U.S. 241, 247). In a lengthy discus-

25   sion of this topic, the Supreme Court stated the following:

26       "[T]he purpose of the indeterminate sentence law, like
         other modern laws in relation to the administration
27       of criminal law, is to migitate the punishment which
         would otherwise be imposed upon the offender. These
28       laws place emphasis upon the reformation of the offender.

                                [4-E]

1    They seek to make the punishment fit the criminal rather
     than the crime. They endeavor to put before the prisoner
2    great incentive to well-doing in order that his will
     to do well should be strengthened and confirmed by the
3    habit of well-doing. [...] [The] interests of society
     require that under prison discipline every effort should
4    be made to produce a reformation of the prisoner. ...
     The legislative policy [was to provide a system whereby]
5    a hope was to be held out to prisoners that through
     good conduct in prison and a disposition shown toward
6    reformation, they might be permitted a conditional liber-
     ty upon restraint under which they might be restored
7    again to society. ... Although good conduct while in-
     carcerated and potential for reform are not the only
8    relevant factors, this court has acknowledged their
     significance. Furthermore, the Authority has declared
9    that these factors are among those of 'paramount impor-
     tance.' In re Minnis, 7 Cal.3d 644-45.
10

11    The Rosenkrantz Court, at 656, citing to Minnis, reaffirmed

12   these principles: "[E]ven before factors relevant to parole de-

13   cisions had been set forth expressly by statute and regulations,

14   we concluded that '[a]ny official or board vested with discretion

15   is under an obligation to consider all relevant factors [], and

16   the [BPH] can't, consistently with its obligation, ignore post-

17   conviction factors UNLESS DIRECTED TO by the Legislature." (citing

18   Minnis at 645; emphasis added for illumination).

19    Petitioner has a Constitutional liberty interest in parole

20   decisions and "[P]arole applicants in this state have an expectation

21   that they will be granted parole unless the BPH finds, in its

22   reviewable discretion, that they are unsuitable for parole in light

23   of the circumstances specified by statute and regulation."

24   Rosenkrantz at 654 and at 659-61 this liberty interest is an

25   expectation protected by due process of law. (holding that the

26   California Constitution Art. V, §8(b) and PC §3041 "give rise to

27   a protected liberety interest" in that "a prisoner granted parole

28   by the BPH has an expectation that the Governor's decision to affirm

[4-F]

1   modify, or reverse the BPH's decision will be based upon the same

2   factors the BPH is required to consider," and that "this liberty

3   interest underlying a Governor's parole review decision is protected

4   by due process of law.").

5       Federal courts have also unequivocally held that California's

6   parole system gives rise to a liberty interest constitutionally

7   protected by due process. See: Allen, infra at 376-78; Greenholtz

8   v. Inmate of Neb. Penal & Corr. Complex (1979) 442 U.S. 1, 11-12

9   (holding a state's statutory parole scheme that uses mandatory

10  language may create a presumption that parole release will be

11  granted upon certain circumstances or findings, thus giving rise

12  to a constitutionally protected liberty interest); McQuillen, supra

13  at 902-3 n.1 (holding that because parole scheme uses mandatory

14  language and is largely parallel to the schemes found in Allen

15  and Greenholtz do give rise to a protected libety intrest in RELEASE

16  ON PAROLE, "California's parole scheme gives rise to a cognizable

17  liberty interest in release on parole.") Biggs v. Terhune (9th

18  Cir. 2003) 334 F.3d 910, 914-15 (same) and, ("[t]he liberty interest

19  is created, not upon the grant of a parole date, but upon the

20  incarceration of the inmate."

21  Rosenkrantz specifically rejected any position that a court

22  may not properly examine the factual basis of parole decisions

23  at 667, "[W]e conclude that the courts properly can review a

24  Governor's decisions whether to affirm, modify, or reverse a parole

25  decision by the BPH to determine whether they comply with due

26  process of law, and that such review properly can include a determi-

27  nation of whether the factual basis of such a decision is supported

28  by some evidence in the record that was before the BPH.

[4-G]

1   Post-Rosenkrantz, courts have reaffirmed the concepts of broad
2   executive deference but vigilant judicial review, by engaging care-
3   ful analysis, will ensure that the boundaries of due process are
4   respected and upheld. "[t]he exceedingly deferential nature of
5   the "some evidence" standard of judicial review set forth in
6   Rosenkrantz does not convert a court reviewing the denial of parole
7   into a potted plant." In re Scott (119 Cal.App.4th 871, 898, re-
8   cently affirmed).

9   The Court, in In re Dannenberg (2005) 34 Cal.4th 1061 at 1095
10  n.16 reaffirmed that effective judicial review is critical to due
11  process. Rejecting the dissent's suggestion that the opinion "per-
12  mits untethered pro forma parole denials that are insulated from
13  effective judicial review, thus contravening California life in-
14  mates' due process rights to individualized parole consideration,"
15  the majority made clear that the [BPH] must apply detailed standards
16  in evaluating individual inmates' suitability for parole on public
17  safety grounds, and that the Executive's broad discretion is subject
18  to meaningful judicial oversight.

19  There is no question that the discretion afforded to the BPH
20  with respect to parole decisions is great. However, the parole
21  system's very purpose is to provide for the reentry into society
22  of inmates who no longer pose a danger or unreasonable threat to
23  public safety, and those rights afforded thereunder are
24  constitutionally protected.

25  The BPH must abide by due process considerations, and the
26  courts are entrusted with ensuring that such considerations are
27  adequately respected and thus protected. Neither Rosenkrantz or
28  Dannenberg permits respondents to immunize themselves from re-

[4-H]

1  view by unreasonable and possibly unlawful assertion that certain
2  facts support a denial of parole. On the contrary, <u>Rosenkrantz</u>
3  and <u>Dannenberg</u> make clear that the courts have a vital and therefore
4  important role to play in ensuring that parole decisions are
5  actually supported by "some evidence" having a basis in fact, and
6  an indicia of reliability supported in the record.

7      Petitioner submits that there is a real danger that, improperly
8  understood, the guidelines articulated in <u>Rosenkrantz</u>, <u>Dannenberg</u>,
9  and the court of appeals will serve to provide respondents with
10  de facto immunity from judicial review, a result anathema to state
11  and federal due process protections. Properly understood, the "some
12  evidence" standard provides a fair and proper framework for review
13  of parole decisions in any venue, one that provides respondents
14  with an appropriate level of deference in making extremely difficult
15  decisions relating to inmates' liberty interests and public safety
16  concerns, while ensuring that statutory and constitutional liberty
17  interests are being adequately and lawfully safeguarded through
18  judicial review. And, when this standard is properly applied to
19  this case, there should be no doubt but that the BPH's denial of
20  suitability seems unsustainable and must be reversed, a new hearing
21  granted, and an Order with instructions issued.

22      WHEREFORE, Petitioner prays that the writ be granted in full
23  and all available relief be accorded to Petitioner to comply with
24  and comport to the state and federal Constitutions and the legal
25  adversarial process and resolution of a judicious nature in this
26  most important matter herein. Petitioner hereby incorporates by
27  reference, as though fully set forth, all papers, pleadings,
28  transcripts, exhibits and matters of record in the instant matter.

[4-I]

7. Ground 2 or Ground __3__ (if applicable):

PETITIONER HAS A FEDERALLY-COGNIZABLE LIBERTY INTEREST IN RELEASE
TO PAROLE CREATED BY RESPONDENT'S STATUTORY SCHEME AND MANDATORY
LANGUAGE OF THE ENABLING STATUTES THAT REQUIRES A SUITABILITY FINDING
UNDER STATUTORY CRITERIA AND RESPONDENTS' BURDEN IS NOT MET HEREIN

a. Supporting facts:

This petition is intended to give legitimate meaning to petition-
er's seven (7) years-to-Life sentence by seeking an Order in this
Court granting the writ to discharge petitioner from state prison,
or alternatively, compelling the BPH to conduct a new parole
consideration hearing and correctly weight their statutory findings
to view suitability and consequent release to parole for Petitioner.

The issues raised are of constitutional dimension, comporting
to petitioner's federal constitutional rights, and questioning the
legality of petitioner's continued confinement in the face of over-
whelming evidence of legally-sustainable proof of suitability and
unquestioned state-hired professionals and their proffered opinions
of reasonable assurance in adhering to concerns of public safety.

There is NO evidence having indicia of reliability that this
petitioner poses an unreasonable risk of danger to the public and
P.C. §3041(a) and California Code of Regulations (CCR), Title 15,
Division II §§2402(d)(1,2,3,4,6,7,8 & 9) (parole suitability criteria)
all make it clear that there IS A MANDATE, based on a legally-
sufficient standard, and that standard is subject to judicial review

(continued on attached pages)

b. Supporting cases, rules, or other authority:

(SEE ATTACHED POINTS AND AUTHORITIES)

1  (continued from previous page):

2  for abuse of discretion under a federal due process and equal protection umbrella with safeguards required in a

3  review of the "evidence" of unsuitability that is burdened upon respondents.

4      The California Supreme Court recognizes that prisoners have procedural due process protections in

5  connection with parole determinations. A legitimate expectancy of release to parole is created by PC § 3041. If

6  the statute creates the legitimate expectancy of parole, it is not legally sufficient to answer that the BPH may, in

7  its broad discretion, deny parole suitability.

8      This argument, that the BPH's broad discretion swallowed Petitioners liberty interest and expectation of

9  release was squarely rejected by the High court in Allen, supra. Additionally, the Court stated in Rosenkrantz IV:

10  "[P]arole applicants in this state *Have an expectation that they will be granted parole* unless the BP[H] finds in its

11  discretion, that they are unsuitable for parole **in light of the circumstances specified by statute and**

12  **regulation.**" Rosenkrantz V, supra, 29 Cal.4th at 654. And, [O]ur past decisions make clear that the *requirement*

13  of procedural due process embodied in [Art. I, § 7, subd. (a)], places some limitations upon the broad

14  discretionary authority of the BP[H]." Id. at 655.

15      Therefore, it is inherently clear that the presence of discretion held by the BPH does not, under either

16  state or federal law, diminish nor extinguish the expectancy of release to parole nor in any ways Petitioner's due

17  process rights. It thus follows that a liberty interest has existed under PC § 3041 that is embodied in, and

18  protected by, the Fourteenth Amendment's Due Process Clause.

19      Also, CCR regulations use the "shall/unless" language (§§ 2401-2402) and recognize all available rights

20  to Petitioners. Further, these regulations AS ORIGNIALLY WRITTEN, made it even clearer that parole was to

21  normally to be granted. This remained so until political operatives, presumably with a criminal bent, manipulated

22  the executive and legislative branches to repeal this proviso and substitute a "Willie Horton" revision that was

23  never fully explained to the public nor openly voted upon for acceptance and would've probably failed it there

24  had been an honest attempt to do so.

25      For respondents to abrogate this federal liberty interest they must provide *substantial* relevant, reliable

26  evidence having some indicia of credibility that Petitioner poses a CURRENT *unreasonable* threat to the public

27  safety, as noted in In re Lee (10-10-06) Second District Court of Appeals, Division Eight; 49 Cal.Rptr.3rd 931,

28

A

In re: Peter Hernandez, on habeas corpus

1    where the court cautioned:

2    ["The commitment offense can negate suitability [for parole] only if circumstances of the crime ...
rationally indicate that the offender will present an unreasonable public safety risk if released from
3    prison."] In re Scott (2005) 133 Cal.App.4[th] 573, 595, [however], In re Lowe (2005) 130 Cal.App.4[th]
1405, suggested "'some evidence" applies to the factors, not dangerousness.) Some evidence of
4    the existence of a particular factor does not necessarily equate to some evidence the [inmate's]
release unreasonably endangers public safety." Lee, supra, 936.

5        ¶The board and governor must focus their parole decisions on whether a prisoner
continues to pose an unreasonable risk to public safety. Such a practical inquiry, rooted in real
6    world crime and law and order, has no obvious intersection with incorporeal realm of legal
constructs." Id. at 940.

7

8        This is something they have patently failed to do, as testified to by virtually all of their own witnesses as

9    noted in attached Exhibit "C", which has been previously generated BY RESPONDENTS and provided to all

10   concerned parties prior to Petitioner's various hearings and with NO OBJECTIONS from respondents as being

11   accurate and meaningful to ascertain PRESENT DANGEROUSNESS.

12       "Unreasonable risk" evidence that meets the federal level of reliability must be drawn from an

13   individualized analysis of fifteen (15) factors identified by regulations: CCR § 2402(b); Rosenkrantz V at 653-54.

14   "Such information shall include circumstances of the prisoner's social history; past and present mental state; past

15   criminal history; [] the base and other commitment offenses; past and present attitude toward (sic) the crime; any

16   conditions of treatment or control ...; and any other information that bears on the prisoner's suitability for

17   release." (emphasis added.)

18       This extensive list of factors, including other relevant reliable information that must be considered, makes

19   it clear that the Legislature did not intend for any single factor to initially or consis-tently trump all the others. This

20   is exactly what is happening here however. Decision upon decisions by the BPH suggests that their focus is

21   exclusively on the commitment offense, a sub-factor among the total. The BPH insistently attempts to insulate

22   their failure to individually consider circumstances of suitability using makeweight exceptions to state by rote that,

23   'although post-conviction behavior was DULY CONSIDERED, and the inmate is otherwise suitable for release to

24   parole, the offense was so heinous, atrocious, or cruel, that Petitioner is ineligible for a finding of suitability. "The

25   evidence under-lying the BPH's decision must have some indicia of reliability." Jancsek v. Oregon Board of

26   Parole (9th Cir. 1987) 833 F.2d 1389, 1390.

27       The reduction of the parole assessment process to an occluded, myopic pseudo-consideration of the

28                                                                B
In re: Peter Hernandez, on habeas corpus

1  one factor, and it alone—unerringly as an unwritten but accepted general rule practiced in all circumstances—

2  was never intended by the Legislature and cannot be permitted nor allowed to continue and still comport with

3  Rosenkrantz, Biggs, Martin, Morrall, Irons, Coleman, et cetera. See also: Environmental Defense Center, Inc. v.

4  E.P.A. (2003) 344 f.3D 832, 858, fn. 36, (holding that a federal agency has acted in an arbitrary and capricious

5  fashion, if "the agency has relied on factors that Congress has not intended to consider, entirely failed to

6  consider an important aspect of the problem, and offered no explanation for its decision that runs counter to the

7  evidence before the agency, or is so implausible that it could not be ascribed to a different view or the product of

8  agency expertise."); Arizona Cattlegrower's Ass'n v. U.S. Fish & Wildlife, B.L.M. (9th Cir. 2001) 273 F.3d 1229,

9  1236 (holding judicial review under the "arbitrary and capricious" standard is "meaningless … unless we carefully

10  review the record to ensure that agency decisions are founded on a reasoned evaluation of the relevant factors

11  …[;] while reviewing courts should uphold reasonable and defensible constructions of an agency's enabling act,

12  they must not rubber-stamp … administrative decisions that they deem in-consistent with a or that frustrate the

13  congressional policy underlying a statute.")

14      First degree murder is not a crime that automatically allows one to be deemed unsuitable for release and

15  parole. And, given the above directive in Environmental Defense Center, Inc. v. E.P.A and Arizona

16  Cattlegrower's Ass'n v. U.S. Fish & Wildlife, B.L.M., coupled with Rosenkrantz, Biggs, Martin, Morrall, Irons,

17  Coleman, et al., there must be a base set of factors upon which a first degree murderer would have to be paroled

18  or the BPH would risk violating due process. To determine what would qualify as more than the minimum

19  necessary for a conviction, the courts must first consider what is required, at the minimum, for a conviction of

20  first-degree murder.

21      Now that the crime is defined, the question must be what evidence indicates that any particular first

22  degree murder was somehow "beyond the minimum necessary to sustain a conviction." In sum: what evidence

23  indicates the commitment offense was "especially heinous" or "exceptionally grave", given that there typically

24  must be a finding of some level of heinousness, callousness, and/or gravity of violence in order for a defendant

25  to have had his first degree murder conviction sustained by the appellate courts in the first place?

26      Two previous panels found Petitioner suitable long ago and the only changes to these original grants has

27  been a continued progress towards maturity, self-awareness, anger management and the kind of programming

28                                                    C
In re: Peter Hernandez, on habeas corpus

1   which will assure Petitioner's continued positive behavior and determination and almost certain success as a

2   parolee and valuable contributing member of the community.

3       The weapon enhancement does not reasonably demonstrate that this crime was "beyond the minimal

4   elements" of a first-degree murder conviction, and is in no way some evidence establishing that he is _currently_ an

5   unreasonable threat to public safety. Indeed, if the BPH were to be able to rely on "weapon of choice" evidence

6   in every case, **every** first degree murder would be "beyond the minimal elements" and there would be no way to

7   commit a first degree murder in California that did not qualify as an "especially" heinous crime and thereby justify

8   imprisonment for life, without any chance of parole. This is not what the Legislature wrote the enhancement

9   statutes for nor the intended outcome of any additional punishment attached thereto, and exceeds the bounds of

10  common sense in every conceivable manner.

11      This rendition illustrates further, the importance (given the short tenure of the suggestion that "some

12  evidence" may be found in facts 'beyond the minimum necessary elements' of the commitment offense) of all

13  courts providing enhanced guidance regarding what set of facts are sufficient to support a denial of parole

14  suitability. Invariably, any such guidance should summarily relate to the relevance of the evidence; whether or

15  not it is substantial for federal due process purposes; its relevance and its reliability; and the reasonableness one

16  should exact in being able to conclude that the evidence sub-stantiates that the inmate is a CURRENT,

17  UNREASONABLE THREAT to the safety and security of the public and the ability to lawfully abide within the

18  community.

19      Sole reliance on the commitment offense to deny parole not only augurs the serious risk of being

20  arbitrary AND capricious but is almost always counter-instructive. In the parole determination process, the panel

21  is tasked with assuring the Executive branch the parole-worthy inmate was duly considered by determining if the

22  prisoner is a CURRENT threat to the public safety. This determination is, in total, the only decision that the BPH

23  is sanctioned to make by the Penal Code and Regulations codified for that purpose. All interpretations of

24  mitigating and aggravating factors, and the weight given to the special circumstances of the offense, merely go

25  to instruct this final conclusion. "A determination of unsuitability is simply shorthand for a finding that a prisoner

26  CURRENTLY would pose an unreasonable risk of danger if released at this time." Smith, supra, at p. 370, (citing

27  C.C.R. § 2402(d), emphasis added.)

28                                                      D

In re: Peter Hernandez, on habeas corpus

1        WHEREFORE, Petitioner respectfully submits these issues, arguments and Exhibits and prays this

2   Honorable Court and all Honorable Justices will grant the writ and Order Petitioner's release forth-with. Or, in the

3   alternative, Order a Rehearing within thirty (30) days of the Order with instructions to individualize his complete

4   suitability consideration without bias or political, personal, or tenurial consid-erations, and in accordance with the

5   statutory mandate of P.C. § 3041(a), and any further relief as the Court may deem just and proper to protect

6   Petitioner's civil rights.

7   ///

8   ///

9   ///

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                            E
     In re: Peter Hernandez, on habeas corpus

8. Did you appeal from the conviction, sentence, or commitment? ☐ Yes. ☐ No. If yes, give the following information:
   a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):

   _____

   b. Result: _____ N/A _____ c. Date of decision: _____

   d. Case number or citation of opinion, if known: _____

   e. Issues raised: (1) _____

   (2) _____

   (3) _____

   f. Were you represented by counsel on appeal? ☐ Yes. ☐ No. If yes, state the attorney's name and address, if known:

   _____

9. Did you seek review in the California Supreme Court? ☐ Yes. ☐ No. If yes, give the following information:

   a. Result: _____ N/A _____ b. Date of decision: _____

   c. Case number or citation of opinion, if known: _____

   d. Issues raised: (1) _____

   (2) _____

   (3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

   THESE ISSUES ARE BEING TIMELY MADE FOR THE FIRST TIME ON THIS APPEAL

11. Administrative Review:
   a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

   THERE IS NO ADMINISTRATIVE REMEDY AVAILABLE TO PURSUE

   _____

   _____

   _____

   _____

   b. Did you seek the highest level of administrative review available? ☐ Yes. ☐ No.
   *Attach documents that show you have exhausted your administrative remedies.*

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court?  ☐ Yes. If yes, continue with number 13.   ☒ No. If no, skip to number 15.

13. a.  (1) Name of court: _____

      (2) Nature of proceeding (for example, "habeas corpus petition"): _____

      (3) Issues raised:  (a) _____

          (b) _____

      (4) Result *(Attach order or explain why unavailable):* _____

      (5) Date of decision: _____

  b.  (1) Name of court: _____

      (2) Nature of proceeding: _____

      (3) Issues raised:  (a) _____

          (b) _____

      (4) Result *(Attach order or explain why unavailable):* _____

      (5) Date of decision: _____

  c.  *For additional prior petitions, applications, or motions, provide the same information on a separate page.*

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

_____

_____

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.)

      THERE HAS BEEN NO DELAY IN SEEKING THIS PETITION

_____

16. Are you presently represented by counsel?  ☐ Yes.  ☒ No. If yes, state the attorney's name and address, if known:

_____

17. Do you have any petition, appeal, or other matter pending in any court?  ☐ Yes.  ☒ No. If yes, explain:

_____

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

      VENUE IS PROPER AND THIS COURT HAS LEGAL JURISDICTION

_____

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: *Jan. 15, 2007*    ▶ _____
                                  (SIGNATURE OF PETITIONER)

# EXHIBIT   "A"

BOARD OF PRISON TERMS                                                    STATE OF CALIFORNI

# LIFE PRISONER: PAROLE CONSIDERATION
## PROPOSED DECISION  (BPT §2041)

I.    [ ]    **PAROLE DENIED**

> If this proposed decision denying parole is approved, the Board will send you a copy of the approved decision, including the reasons for denial of parole, within 30 days of the hearing.

II.   [✓]    **PAROLE GRANTED**

A. Base Period of Confinement ................................... _180_ Months

   _A 334928_     _1_           _Murder 1st_
   Case No.        Count No.        Offense

B. Firearm Enhancement............................................+ _24_ Months

C. Other Crimes Total ..............................................+ _____ Months

   _A 334928_     _2_                      _36_ mos.
   Case No.        Count No.        Offense

   _A 334928_     _3_                      _12_ mos.
   Case No.        Count No.        Offense

   _____ mos.
   Case No.        Count No.        Offense

D. Total Term .......................................= ~~252~~ Months

E. Postconviction Credit From _3/24/79_ To _8/3/88_ – _30_ Months
                              (Date)              (Date)

F. Total Period of Confinement.......................= _222_ Months

The period of confinement indicated is a tentative decision proposed by this panel. The decision will be reviewed pursuant to BPT §2041, and, if approved, a copy of the approved decision will be sent to you within 30 days. At that time appropriate pre-prison credits will be applied and a parole release date computed.

You will not engage in any conduct specified in BPT §2451. Such conduct may result in rescission or postponement of your parole date.

III.  If the proposed decision denying or granting parole is disapproved, you will receive a copy of the proposed decision and the reasons for disapproval. You will then receive a copy of the modified decision or will be scheduled for a new hearing, as appropriate.

**PANEL HEARING CASE**

| Name | Date |
|---|---|
| _Alex M. Leddy_ | _8/_ |
| _Maureen O'Connell_ | _3_ |
| _Eileen Brown_ | _8_ |

| NAME | CDC NUMBER | INSTITUTION | HEARING DA |
|---|---|---|---|
| HERNANDEZ, PETER | C-03015 | CMC-E | 8-3-88 |

Distribution: Whi
Ca

CALIFORNIA BOARD OF PRISON TERMS

In the Matter of the                                    Life Prisoner

Hearing of                          Subsequent Parole Consideration (3)

HERNANDEZ, Peter                                         Granted

C-03015

CMC-E

This matter was heard before the Board of Prison Terms (BPT) on August 3, 1988, at the California Mens Colony - East.  The hearing panel was composed of A. Leddy, Commissioner; M. O'Connell, Commissioner; and C. Brown, Deputy Commissioner.

Present at the hearing were:  P. Hernandez, Prisoner; L. Clark, Counsel for Prisoner; and T. Craig, Deputy District Attorney, Los Angeles County.

Any others present are identified in the transcript.

Oral and documentary evidence was submitted and after due consideration of all the evidence, the panel makes the following findings:

Legal Status

On March 23, 1979, the prisoner was received in prison pursuant to Penal Code (PC) §1168 for a violation of PC §§187/12022/12022.5, and 217/12022.5, first degree murder while armed and with use of a firearm, and assault with intent to commit murder with use of a firearm, two counts, 1 - 14 years with the additional penalty offense of 5 - life, consecutive and concurrent with Count 1 (Los Angeles County Case No. A-334928, Counts 1, 2, and 3).  The controlling minimum eligible parole date (MEPD) is September 3, 1985.

PC §3041(a) provides that the BPT shall meet with
persons sentenced under PC §1168 and shall normally set a
parole release date unless, pursuant to PC §3041(b), the
Board determines that a parole date cannot be fixed at this
hearing.

This hearing is conducted pursuant to the California
Administrative Code (CAC), Division 2, Chapter 3, Article
5, which sets forth parole consideration criteria and
guidelines for life prisoners implementing PC §3041.

Statement of Facts

The prisoner was convicted of first degree murder in
the shooting death of victim Tony Sanchez. The prisoner
went through three trials and was committed to California
Department of Corrections (CDC) nearly two years after the
murder. The prisoner was arrested as a result of an
investigation into a triple shooting which occurred April
25, 1977, at about 9:10 p.m., near 1185 W. 24th Street in
Los Angeles. Three victims, Tony Sanchez, Eladoro Rosales
and Santo Rodriguez, were accosted by the prisoner and a
crime partner while standing in front of the 24th Street
address. After a few words between them, the prisoner drew
a handgun and began firing. Victim Sanchez was immediately
mortally wounded. Victim Rodriguez was shot in the left
thigh, but turned and ran. Victim Rosales was subsequently

HERNANDEZ, P.   C-03015          -2-          8/3/88
ld

shot in the buttocks as he and Rodriquez fled on foot.
Victim Rosales died shorty after the shooting, but his
death was not connected to this incident or the prisoner.

### Parole Suitability

CAC §2281(a) requires that the panel first determine
whether the prisoner is suitable for release on parole.
Regardless of the length of time served, a life prisoner
shall be found unsuitable for and denied parole if in the
judgment of the panel the prisoner will pose an
unreasonable risk of danger to society if released from
prison.  CAC §2281(c) sets forth circumstances tending to
show unsuitability and CAC §2281(d) sets forth
circumstances tending to show suitability.  These
regulations are guidelines only.

The panel relied on the following circumstances in
determining whether or not the prisoner is suitable for
parole:

1.  The prisoner has no juvenile record of assaulting
others;

2.  The prisoner has a stable social history as
exhibited by his reasonably stable relationships with
others;

3.  While imprisoned, the prisoner enhanced his ability
to function within the law upon release through

HERNANDEZ, P.  C-03015          -3-          8/3/88
ld

participation in educational programs; self-help and
therapy programs, i.e., Alcolhlics Anonymous (AA) and
Narcotics Anonymous (NA); vocational programs, and
institutional job assignments;

    4.  Motivation for crime.  The crime was committed as a
result of significant stress in the prisoner's life;

    5.  The prisoner lacks a significant criminal history
of violent crime;

    6.  The prisoner's maturation reduces the probability
of recidivism;

    7.  The prisoner has realistic parole plans which
include family support;

    8.  The prisoner has maintained close family ties while
imprisoned via letters and some visits;

    9.  The prisoner's positive institutional behavior
which indicates significant improvement in self-control

    10.  The prisoner shows signs of remorse and gives
indications that he understands the nature and magnitude of
the offense.  He accepts responsibility for his criminal
behavior and he has the desire to change toward good
citizenship;

    11.  The Category X Diagnostic Unit Evaluation dated
June 28, 1988, is favorable.

HERNANDEZ, P.  C-03015      -4-      8/3/88
ld

FOR
RECORDS OFFICER
USE

Pre-prison
Credit

Based on the information contained in the record and considered at this hearing, the panel states as required by PC §3043 that the prisoner would not pose a threat to public safety if released on parole.

Therefore, the prisoner is found suitable for a projected release date.

Base Term of Confinement

PC §3041(a) provides that if a prisoner is found suitable for parole, the Board shall set a parole release date in a manner "...that will provide uniform terms for offenses of a similar gravity and magnitude in respect to their threat to the public." CAC §§2282-2292 implement this policy. CAC §2282 requires that a term be set for the base offense, the most serious of all life offenses for which the prisoner has been committed to prison. Suggested base terms are set forth in CAC §§2282(b) and 2403(c). CAC §§2283 and 2284 set forth circumstances in aggravation and mitigation respectively. All of these regulations are guidelines only.

The term is derived from the matrix at BPT Rules (2282-B) (2282-C), Categories III-C, in that there was no prior relationship with the victim and death was immediate.

The panel assessed 180 months for the base offense and noted that this is the middle term.

HERNANDEZ, P.   C-03015         -5-         8/3/88
1d

### Firearm Enhancement

CAC §2285 provides for an additional term of 2 years if the prisoner personally used a firearm in the commission of any life crime unless the panel states specific reasons for not adding enhancement.

The term set forth above is increased by 2 years for the use of a firearm in the offense.

### Non-Life Commitment - Principal Term (BPT §2286(b)(1):

| Offense | PC§ | Case # | Ct. # | Time Assessed |
|---|---|---|---|---|
| Assault with intent to murder | 217 | A334928 | 2 | 36 |
| TOTAL | | | | 36 |

The panel did not enhance for firearm; already did so for the same gun on the murder, and felt the term was sufficient.

### Non-Life Commitments; Subordinate Terms:

| Offenses | PC § | Case # | Count | Time Assessed |
|---|---|---|---|---|
| Assault with intent to murder | 217 | | 3 | 12 |
| TOTAL | | | | 12 |

The panel did not enhance for the prior grand theft auto because the prisoner was drunk and he received probation and a $35 fine.

### Post-Conviction Behavior

CAC §2290 establishes procedures for the application of credit for good behavior in prison which may be used to reduce the term or advance a parole date already established.

Statements submitted into prisoner's record pursuant to PC §§1203.01 and 3042 have been considered by the Board panel in this hearing.

March 23, 1979 to March 1980:                                    MONTHS

RCC-CIM-SQ, vocational electrical maintenance 5/79 - 12/79, to school full time, group therapy, and disciplinary free -                                              4

March 1980 to March 1981:

SQ-Med A, school full time, Catholic chapel worker, group therapy, and disciplinary free-                                          4

March 1981 to March 1982:

7/20/87, received a California Department of Corrections (CDC) disciplinary (115) for marijuana

HERNANDEZ, P.   C-03015              -7-              8/3/88
ld

possession, 6/12/87, graduated from

high school, Mens Advisory Council

(MAN) vice president, janitor, self-

help-Navy video-with laudatories -                    0

    March 1982 to March 1983:

    MCF, captains clerk with

laudatories, assigned dental clinic,

MAC vice president, college courses -                  4

    March 1983 to March 1984:

    CTF, Medium A, received a CDC

115 for force and violence, maintenance

work crew, vocational TV prod. -                       0

    March 1984 to March 1985:

    CTF, Vocational TV prod, one year

completed, community awareness group,

self-help, and disciplinary free -                     4

    March 1985 to March 1986:

    CTF-CMC 12/85, vocational TV prod.

transferred to procurement clerk, and

disciplinary free -                                    4

    March 1986 to March 1987:

    CMC, vocational electronics,

data processing, participation in AA

and substance abuse group, and

HERNANDEZ, P.   C-03015        -8-        8/3/88
ld

FOR
RECORDS OFFICE
USE.
Pre-prison
Credit

disciplinary free –                                    4

   March 1987 to March 1988:

   CMC, vocational electrinocs,

data processing, participation in AA

and substance abuse group, and

disciplinary free –                                    4

   March 1988 to August 3, 1988:

   CMC-Category he participated in

the Category X program, AA, and

vocational data processing –                          2

   TOTAL                                            30

   <u>Order</u>

   PC §3041.5(b)(1) provides that within ten days

following any meeting where a parole date has been set, the

Board shall send the prisoner a written statement setting

forth his parole date, the conditions he must meet in order

to be released on the date set, and the consequences of

failure to meet such conditions.

   The total period of confinement pursuant to this

decision is composed of:   252 months Base Term and

enhancements; less 30 months post-conviction credits for a

total of 222 months.

   The prisoner shall not engage in the conduct specified

in CAC §2451.   Such conduct may result in rescission or

HERNANDEZ, P.   C–03015              –9–              8/3/88
ld

postponement of the parole date.

Parole Conditions

PC §3053 provides that the BPT, upon granting any
parole to any prisoner, may impose on the parole such
conditions as it may deem proper.

The prisoner is to be released pursuant to the notice
and general conditions of parole established in CAC §§2511
& 2512.

In addition, the prisoner is subject to the following
Special Conditions of Parole pursuant to CAC §2513:

1.  Do not use alcoholic beverages;

2.  Participate in anti-narcotic testing.


EFFECTIVE DATE OF THIS DECISION _____.


HERNANDEZ, P.  C-03015          -10-          8/3/88
1d

rd of Prison Terms                                                                                    State of Califo

MISCELLANEOUS DECISIONS

---
_____ FACTS _____
---

8-3-88    -    Life parole consideration hearing conducted at
               California Mens Colony-East.  Parole date granted.

9/19/88   -    Decision Review Committee met and vacated decision
               of 8/3/88 and ordered new hearing.

---
_____ RECOMMENDATION(S) _____
---

Schedule for new hearing as soon as possible on next available
calendar.

| STAFF (Name) | TITLE | DATE |
|---|---|---|
|  |  |  |

---
_____ DECISION(S) _____
---

1.

2.

3.

| PANEL HEARING CASE | DECISION DATE |
|---|---|
| NAME  *Robert L. Patterson* | 10/21/88 |

NAME

NAME

| NAME | NUMBER | INSTITUTION OR REGION (UNIT) |
|---|---|---|
| HERNANDEZ, P. | B-03015 | CMC-EAST |

BPT 1135 (Rev. 8/82)                                                          PERMANENT ADDEN

# REVIEW OF PROPOSED DECISION

| ☐ APPROVED | ☒ REFER TO DECISION REVIEW COMMITTEE | ☐ REFER TO RECONSIDERATION PANEL |

| INMATE  Hernandez, Peter | CDC NUMBER  C-03015 |
| TYPE OF HEARING  Life | DATE OF HEARING  August 3, 1988 |

The Decision Review Unit has completed a review of the above hearing and has identified the following issues which need further review: (Attach page 2 if necessary.)

1.  The panel, when dictating the "legal status," set forth that the murder first conviction (Count 1) was while armed (12022 PC) and that he used a firearm in the commission of the offense (12022.5 PC).

   Recommendation:  That the "12022/12022.5 "be stricken."

   a)  We believe, however, that notwithstanding the action of the court, the Board may, pursuant to CCR §2285, upon finding that the inmate personally used a firearm in the (a) life crime, the panel may properly assess an additional 24 month enhancement.

2.  We also note that the panel chose the base matrix of "III-C" stating, "...that there was no prior relationship with the victim and the death was immediate. While it is true that there was no prior relationship (known), if death was immediate (then the BPT matrix) III B appears to be the appropriate matrix to use. III C relates to "severe trauma."

3.  Number 5 for justification, "...prisoner lacks a significant criminal history of violent crime," while this appears to be correct, we discovered during our review that the inmate's juvenile record was destroyed (page 7 Institutional Programming Summary). Accordingly, and RECOMMENDATION
   See BPT 1139 Modification Ordered.

| DECISION REVIEW UNIT SIGNATURE                WILLIAM V. CASHDOLLAR | DATE  August 26, 1988 |

| REVIEWED BY LEGAL COUNSEL ☐ YES ☐ NO | LEGAL COUNSEL INITIALS | RESULT ☐ CONCUR ☐ DISSENT |
| LEGAL COUNSEL COMMENTS. | | |

I have reviewed the above-referenced file and ☒ concur  ☐ dissent with the Decision Review Unit.
COMMENTS.

*Refer to Decision Review Committee*

| CHIEF DEPUTY COMMISSIONER SIGNATURE | DATE  9/6/88 |

BPT 1139 (4/87)
BOARD OF PRISON TERMS                              Page 1 of 2                              STATE OF CALIFORNIA

## REVIEW OF PROPOSED DECISION

BOARD OF PRISON TERMS                                                    STATE OF CALIFORNIA
DECISION REVIEW COMMITTEE REVIEW OF PROPOSED DECISION

| INMATE Hernandez, Peter | CDC NUMBER C-03015 |
|---|---|
| TYPE OF HEARING Life | DATE OF HEARING August 3, 1988 |

☐ Affirm original decision    ☒ Schedule new hearing    ☐ Modify decision

MODIFICATION ORDERED: (Panel – Please Mark Appropriate Box Above)

1. Strike the "12022/12022.5 PC" from Count 1, page one of the proposed decision, under the category "Legal Status."
2. Since the matrix of III C is "14-16-18" and III B is "13-15-17," we order that this enti matter be reheard so that all circumstances may be given proper weight. We recommend that t rehearing panel, absent establishing cause not to, that it seriously consider following the intent of the first panel with respect to the granting of the date.
3. We order that the rehearing panel determine the appropriateness of relying on the absenc of a violent history since we are informed that the inmate's (24 years old at entry into pri juvenile record had been destroyed and therefore is not available to rely on.
4. We order a new hearing.

SUPPORTIVE REASONING FOR DECISION:

1. To comply with the court's finding.
2. To provide the Board with adequate discretion to structure a sentence in keeping with th facts of this case.
3. To provide for correct result.
4. To allow the Board the ability to fully consider all aspects of this case.

| COMMISSIONER SIGNATURE | DATE 9-19-88 | ☒ Concur / ☒ CONCUR ☐ DISSENT |
|---|---|---|
| COMMISSIONER/D. C. SIGNATURE | DATE 9-19-88 | ☒ CONCUR ☐ DISSENT |
| COMMISSIONER/D. C. SIGNATURE | DATE | ☐ CONCUR ☐ DISSENT |

I dissent from the majority for the following reasons:

_____

| SIGNATURE | DATE |
|---|---|

BPT 1139 (4/87)

absent such a record, reliance on such a "fact" should be reviewed by the Decision Review Committee.

4. Calculation error − (Count 3 only; may wish to consider Count 2).

| | Crime | Panel Calculation | | Recommended Calculati |
|---|---|---|---|---|
| Count 1 | 187 | Base | 180 | 180 |
| | 12022<br>12022.5 | (BPT 2285) | 24 | 24 |
| Count 2 | 217<br>12022.5 | Principal | 36<br>∅ | Principal | 36<br>(24)[1] |
| Count 3 | 217<br>12022.5 | Subordinate | 12<br>∅[2] | Subordinate | 12<br>8 |
| | | | 252 months | | 264 months<br>(+12 months) |

Note: if Panel calculation accepted, then only error relat to Count 3, regarding 12022.5.

1/ Panel did not enhance for firearm; already did so for the same gun on the murder, and felt the term was sufficient. This is entirely appropriate, and we only place the "24" within the Recommended Calculation category to (1) allow the Decision Review Committee the opportunity to review, but more importantly (2) to establish that it is entirely appropriate to assess a 24 month enhancement under PC 1170.1 as the enhancement relates to a "violent felony" (PC 667 and may be used for the life crime and the non-life crime.

2/ Panel failed to mention any reason to mitigate or to not impose.

LIFE PRISONER DECISION F

## PERIOD OF CONFINEMENT

### (RECORDS OFFICER USE ONLY)

|  | YR | MO | DA |
|---|---|---|---|
| Adjusted Period of Confinement ............... | 17 | 11 | 1c |
| Reception Date (See BPT §2289) ............... + | 79 | 3 | 2: |
| At Large Time ............... + |  | — |  |
| PAROLE DATE ............... = | 97 | – 3 | – S |

## MISCELLANEOUS

*Parole granted*
*Keep at CMC until finishes Vocation Training.*
*Place on appropriate progress calendar.* PH 8P

**PENAL CODE NOTICES**

SECTION 3042    [X] SENT _____ June 30, 1988 _____
                                          (DATE)

**COMMITMENT OFFENSE**

| 187PC | Murder 1st |
|---|---|
| [CODE SECTION] | [TITLE] |

| A334928 | Ct. 1 |
|---|---|
| [CASE NUMBER] | [COUNT NUMBER] |

| Date Received by CDC | Controlling MEPD |
|---|---|
| 3-23-79 | 9-3-85 |

| Type of Hearing | [ ] INITIAL  [X] SUBSEQUENT __3__ (HEARING NO.) | If Subsequent Hearing, Date of Last Hearing |
|---|---|---|
|  |  | 8-6-87 |

Department Representative

| Counsel for Prisoner | Address                                      93561 |
|---|---|
| Linda Clark | 102 South Robinson, PO Box 26, Tehachapi, C |
| District Attorney Representative | County |
|  | L.A. |

## PAROLE HEARING CALENDAR

*The following represents the findings, determination, and order of the Board of Prison Terms, State of California.*

**By:**

| Presiding (Name) | Date |
|---|---|
| Albert M. Leddy | A |

| Concurring (Name) | Date |
|---|---|
| Lawrence Clossen | 3 |

| Concurring (Name) | Date |
|---|---|
| Eleo Besim | 2 |

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| HERNANDEZ, PETER | C-03015 | CMC-E | 8/88 | 8-3-88 |

BOARD OF PRISON TERMS                                                    STATE OF CALIFORNIA
LIFE PRISONER DECISION FACE SHEET

## PERIOD OF CONFINEMENT
### (RECORDS OFFICER USE ONLY)

|  |  | YR | MO | DAY |
|---|---|---|---|---|
| Adjusted Period of Confinement | 15-05-10 | 15 - | 11 - | 10 |
| Reception Date (See BPT §2289) | 79-03-23 | + 79 - | 03 - | 23 |
| At Large Time | -0- | + | -0- | |
| PAROLE DATE | 94-09-02 | = 95 - | 03 - | 03 |

## MISCELLANEOUS

*Parole granted*

*PH 1/93*

PENAL CODE NOTICES

SECTION 3042    [X] SENT    11-30-89
                                    (DATE)

COMMITMENT OFFENSE

| 187 PC | | MURDER 1ST |
|---|---|---|
| (CODE SECTION) | | (TITLE) |
| A334928 | | 1 |
| (CASE NUMBER) | | (COUNT NUMBER) |

| Date Received by CDC 3-23-79 | Controlling MEPD 9-3-85 |
|---|---|
| Type of Hearing [ ] INITIAL [X] SUBSEQUENT __5__ (HEARING NO.) | If Subsequent Hearing, Date of Last Hearing 1-25-89 |

Department Representative

| Counsel for Prisoner MS. LINDA CLARK | Address P.O. BOX 26 TEHACHAPI, CA. 93561 |
|---|---|
| District Attorney Representative | County LOS ANGELES |

## PAROLE HEARING CALENDAR

*The following represents the findings, determination, and order of the Board of Prison Terms, State of California.*

By:

| Presiding (Name) | Date 1/23/90 |
|---|---|
| Concurring (Name) | Date |
| Concurring (Name) Ray Jauregui | Date |

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| HERNANDEZ, PETER | C-03015 | CMC-E | 1-90 | 1-23-90 |

BPT 1001 (Rev. 8/1/91)                                    PERMANENT ADDENDA

CALIFORNIA BOARD OF PRISON TERMS


In the Matter of the                                    Life Prisoner

Hearing of                          Subsequent Parole Consideration (5)

HERNANDEZ, Peter                                          Granted

C-03015

CMC-E

This matter was heard before the Board of Prison Terms (BPT) on January 23, 1990, at the California Mens Colony-East.   The hearing panel was composed of D. Brown, Commissioner; R. Jauregui, Commissioner; and E. Coldren, Deputy Commissioner.

Present at the hearing were:  P. Hernandez, Prisoner; L. Clark, Counsel for Prisoner; and H. Giss, Deputy District Attorney, Los Angeles County.

Any others present are identified in the transcript.

Oral and documentary evidence was submitted and after due consideration of all the evidence, the panel makes the following findings:

Legal Status

On March 23, 1979, the prisoner was received in prison pursuant to Penal Code (PC) §1168 for a violation of PC §187 and pursuant to PC §1170 for a violation of PC §§217/12022.5, first degree murder and assault with intent to commit murder with use of a firearm, two counts (Los Angeles County Case No. A-334928, Counts 1, 2 and 3).   The controlling minimum eligible parole date (MEPD) was September 3, 1985.

FOR
RECORDS OFFICE
USE
Pre-prison
Credit

PC §3041(a) provides that the BPT shall meet with persons sentenced under PC §1168 and shall normally set a parole release date unless, pursuant to PC §3041(b), the Board determines that a parole date cannot be fixed at this hearing.

This hearing is conducted pursuant to Title 15, California Code of Regulations (15 CCR), Division 2, Chapter 3, Article 5, which sets forth parole consideration criteria and guidelines for life prisoners implementing PC §3041.

Statement of Facts

The prisoner was convicted of first degree murder in the shooting death of victim Tony Sanchez. The prisoner went through three trials and was committed to the California Department of Corrections (CDC) nearly two years after the murder. The prisoner was arrested as a result of an investigation into a triple shooting which occurred April 25, 1977, at about 9:10 p.m., near 1185 West 24th Street in Los Angeles. Three victims, Tony Sanchez, Eledoro Rosales and Santo Rodriguez, were accosted by the prisoner and a crime partner while standing in front of the 24th Street address. After a few words between them, the prisoner drew a handgun and began firing. Victim Sanchez was immediately mortally wounded. Victim Rodriguez was

HERNANDEZ, P.   C-03015          -2-          1/23/90
km

FOR
RECORDS OFFIC.
USE

Pre-prison
Credit

shot in the left eye, but turned and ran. Victim Rosales
was subsequently shot in the buttocks as he and Rodriguez
fled on foot. Victim Rosales died shortly after the
shooting, but his death was not connected to this incident
or the prisoner.

Parole Suitability

15 CCR §2281(a) requires that the panel first determine
whether the prisoner is suitable for release on parole.
Regardless of the length of time served, a life prisoner
shall be found unsuitable for and denied parole if in the
judgment of the panel the prisoner will pose an
unreasonable risk of danger to society if released from
prison. 15 CCR §2281(c) sets forth circumstances tending
to show unsuitability and 15 CCR §2281(d) sets forth
circumstances tending to show suitability. These
regulations are guidelines only.

The panel relied on the following circumstances in
determining whether or not the prisoner is suitable for
parole:

1. The prisoner has a stable social history as
exhibited by his reasonably stable relationships with
others including an honorable discharge from the United
States Army.

2. While imprisoned, the prisoner enhanced his ability

HERNANDEZ, P.   C-03015            -3-            1/23/90
km

to function within the law upon release through
participation in:

a)  Educational programs which included a high school
diploma on June 12, 1987;

b)  Self-help and therapy programs, notably Alcoholics
Anonymous (AA) with attendance from 1986 and continuing to
the present date;

c)  Vocational programs, i.e., Vocational Television
Production, Vocational Electric Maintenance, Vocational
Electronics and Data Processing, all completed;

d)  Institutional job assignments including Procurement
Clerk and Hospital Purchasing Clerk with exceptional work
reports.

3.  The motivation for crime was committed as a result
of significant stress in the prisoner's life at that time.

4.  The prisoner lacks a significant history of violent
crime.  There was an arrest for robbery on January 8, 1977,
which was reduced to Vehicle Code Section 10851 with a 36
month summary probation and fine.

5.  The prisoner's maturation, growth and understanding
and age upon release reduces the probability of recidivism.

6.  The prisoner has realistic parole plans which
include family support and employment offers.

7.  The prisoner has maintained close family ties while

HERNANDEZ, P.  C-03015          -4-.          1/23/90
km

| Pre-prison Credit |
| --- |
|  |

imprisoned via letters and some visits.

8.   The prisoner's positive institutional behavior indicates significant improvement in self-control.   In 1988, the prisoner was granted a parole date but was not approved upon review, yet he continued to maintain positive adjustments giving a good indication of his ability to function under stress.

9.   The prisoner shows signs of remorse and gives indications that he understands the nature and magnitude of the offense.   He accepts responsibility for his criminal behavior, and has the desire to change toward good citizenship.

10.   The representative of the District Attorney's Office of Los Angeles who was at the hearing was not opposed to parole and this was considered by the Panel. The comments of the Decision Review Unit Report dated August 26, 1988 were also considered by the panel.

11.   Psychiatric Factors.   The Psychiatric Evaluation dated October 25, 1989, authored by Sherman E. Butler, M.D., Staff Psychiatrist, is favorable for parole release.

The Category X Psychiatric Council Evaluation dated June 28, 1988, authored by R. A. Orling, Ph.D., Senior Psychologist, Steven C. Walker, Ph.D., Staff Psychologist, and Ron Metz, Correctional Counselor II, is favorable and indicates that the prisoner's violence potential is less

than average and he is expected to remain psychiatrically
stable upon release.

Based on the information contained in the record and
considered at this hearing, the panel states as required by
PC §3043.5 that the prisoner would not pose a threat to
public safety if released on parole.

Therefore, the prisoner is found suitable for a
projected release date.

Base Term of Confinement

PC §3041(a) provides that if a prisoner is found
suitable for parole, the Board shall set a parole release
date in a manner "...that will provide uniform terms for
offenses of a similar gravity and magnitude in respect to
their threat to the public." 15 CCR §2280-2290 implement
this policy.  15 CCR §2282(a) requires that a term be set
for the base offense, the most serious of all life offenses
for which the prisoner has been committed to prison.
Suggested base terms are set forth in 15 CCR §2282(b).  15
CCR §§2283 and 2284 set forth circumstances in aggravation
and mitigation respectively.  All of these regulations are
guidelines only.

Based upon the facts set forth above, the base offense
is first degree murder, PC §187, Case No. A-334928, Count
one.

*16- 11- 3*
*— 00-06- 2*

*16- 05- 1*

HERNANDEZ, P.   C-03015              -6-              1/23/90
km

FOR
RECORDS OFFICE
USE
Pre-prison
Credit

The term is derived from the matrix at 15 CCR §2282(b), Category III-B, in that there was no prior relationship existed between the victim and the prisoner and death was immediate.

The panel assessed 204 months for the base offense and noted that this is the aggravated term due to the following reasons:

In committing the offense, the prisoner subjected two other persons to serious injury or death.

Firearm Enhancement

CAC §2285 provides for an additional term of 2 years if the prisoner personally used a firearm in the commission of any life crime unless the panel states specific reasons for not adding enhancement.

16-05-1
+ 02-00-0

18-05-0

The term set forth above is increased by 2 years for the use of a firearm in the offense.

The panel is not assessing any time for the charges for assault with intent to commit murder with use of firearm violation of PC §217 and 12022.5 Case No. A-334928 Counts 2 and three.

The panel elected not to assess any time for non-life commitments because they occurred in the same transaction as the life crime and the panel further believes that the time assessed for the base offense is appropriate for the

HERNANDEZ, P.   C-03015          -7-          1/23/90
km

total incident.

### Post-Conviction Behavior

15 CCR §2290 establishes procedures for the application
of credit for good behavior in prison which may be used to
reduce the term or advance a parole date already
established.

March 1979 to March 1980:

The prisoner participated in
Vocational Electrical Maintenance.
He went to school full time, participated
in group therapy programming and remained
disciplinary free —

March 1980 to March 1981:

The prisoner went to school full time
at SQ. He was a Catholic Chapel worker and
participated in group therapy programming.
He remained disciplinary free —

March 1981 to March 1982:

On 7/20/87, the prisoner received a
California Department of Corrections
(CDC) disciplinary (115) for marijuana
possession. On 6/12/87, he graduated from
high school. He was vice president of the
Mens Advisory Council (MAN) and a janitor —

**MONTHS**

4

4

0

HERNANDEZ, P.   C-03015          -8-          1/23/90
km

March 1982 to March 1983:

The prisoner was a Captains Clerk with
laudatories. He was assigned to the dental
clinic. He was the Mens Advisory Clinic
(MAC) Vice President and took college courses –          4

March 1983 to March 1984:

The prisoner received a CDC 115 for force
and violence. He was assigned to the
maintenance crew and Vocational TV Prod. –          0

March 1984 to March 1985:

The prisoner completed one year in
Vocational TV Prod. at CTF. He was involved
in the community awareness group and participated
in self-help. He remained disciplinary free –          4

March 1985 to March 1986:

The prisoner was assigned to Vocational
TV Prod. at CTF/CMC. He was a Procurement Clerk.
He remained disciplinary free –          4

March 1986 to March 1987:

The prisoner was at CMC and assigned to
Vocational Electronics and Data Processing.
He participated in AA and substance abuse
groups. He remained disciplinary free –          4

March 1987 to March 1988:

HERNANDEZ, P.  C-03015          –9–          1/23/90
km

Pre-prison
Credit

The prisoner continued Vocational
Electronics and Data Processing.  He continued
participation in AA and subtance abuse
groups.  He remained disciplinary free –                    4

March 1988 to March 1989:

The prisoner participated in the Category X
Program at CMC.  He continued participation in
Vocational Data Processing and AA.  He remained
disciplinary free –                                         4

March 1989 to January 23, 1989:

The prisoner was a Procurement Clerk.  He
continued Vocational Data Processing and
his participation in AA.  He remained disciplinary
free –                                                      4

    TOTAL                                                36

Statements submitted into the prisoner's record
pursuant to PC §§1203.01 and 3042 have been considered by
the Board panel in this hearing.

<u>Order</u>

PC §3041.5(b)(1) provides that within ten days
following any meeting where a parole date has been set, the
Board shall send the prisoner a written statement setting
forth his parole date, the conditions he must meet in order
to be released on the date set, and the consequences of

18-05-1
- 03-00-0

15-05-1

failure to meet such conditions.

The total period of confinement pursuant to this decision is composed of: 228 months Base Term and enhancements; less 36 months post-conviction credits for a total of 192 months.

The prisoner shall not engage in the conduct specified in 15 CCR §2451. Such conduct may result in rescission or postponement of the parole date.

Parole Conditions

PC §3053 provides that the BPT, upon granting any parole to any prisoner, may impose on the parole such conditions as it may deem proper.

The prisoner is to be released pursuant to the notice and general conditions of parole established in 15 CCR §§2511 & 2512.

In addition, the prisoner is subject to the following special conditions of parole pursuant to 15 CCR §2513:

1. Do not use alcoholic beverages.

2. Participate in anti-narcotic testing.

The reason for the imposition of Special Conditions is that Alcohol abuse was related to the instant offense.

NOTE TO CDC STAFF:

If the prisoner is released to a county other than the county of the commitment offense, the BPT is to be

FOR
RECORDS OFFICE
USE

Pre-prison
Credit

notified.


EFFECTIVE DATE OF THIS DECISION ⎯⎯ **FEB 2 2 1990** ⎯⎯⎯⎯


HERNANDEZ, P.   C-03015          -12-          1/23/90
km

2135

BOARD OF PRISON TERMS                                                STATE OF CALIFORNIA
## REVIEW OF PROPOSED DECISION
===============================================================

[ ] APPROVED    [X] REFER TO DECISION REVIEW COMMITTEE    [ ] REFER TO RECONSIDERATION PANEL

| INMATE    Peter Hernandez | CDC NUMBER  C 03015 |
|---|---|
| TYPE OF HEARING  Subsequent Parole Consideration Hearing | DATE OF HEARING 1/23/90 |

The Decision Review Unit (LMS) has completed a review of the above hearing and has identified the following issues which need further review.

The hearing panel in assessing the term gave the prisoner 6 months for a prior felony conviction under I5 CCR sec. 2286(c)(2). The conviction for which the time was assessed was a vehicle theft under VC sec. I0851 for which the prisoner was sentenced in I977 to 36 months summary probation and received a fine. This offense was not a felony (see PC § I7(b)(1) and the CII rap sheet). Therefore, six months should not have been assessed for this offense.

RECOMMENDATION:

Eliminate the paragraph (on page 7 of the yellow decision) assessing time for the prior felony conviction, change the total time assessed on page II of the blue decision to 228 months (instead of the panel's assessment of 234 months), and change the total decision time after deduction of credits to 192 months (from 198 months).

| DECISION REVIEW UNIT SIGNATURE | DATE |
|---|---|
| WILLIAM V. CASHDOLLAR | 2-5-90 |

| REVIEWED BY LEGAL COUNSEL | LEGAL COUNSEL INITIALS | RESULT |
|---|---|---|
| [ ] YES  [ ] NO | | [ ] CONCUR    [ ] DISSENT |

LEGAL COUNSEL COMMENTS:

I have reviewed the above-referenced file and [X] concur    [ ] dissent with the Decision Review Unit.
COMMENTS:  *Refer To Decision Review Committee*

CHIEF DEPUTY COMMISSIONER SIGNATURE                    DATE
*James B. Dowling*                                     2-7-90

===============================================================
BPT 1138 (4/87)                          Page 1 of 1                      BOARD
STATE OF CALIFORNIA

BOARD OF PRISON TERMS                                    STATE OF CALIFORNIA
# DECISION REVIEW COMMITTEE REVIEW OF PROPOSED DECISION

| INMATE    Peter Hernandez | CDC Number C 03015 |
|---|---|

| TYPE OF HEARING    Subsequent LIFE PAROLE CONSIDERATION | DATE OF HEARING  1/23/90 |
|---|---|

☐ Affirm original decision          ☐ Schedule new hearing          ☒ Modify decision

MODIFICATION ORDERED:

Eliminate the paragraph (on page 7 of the yellow decision) assessing time for the prior felony conviction, change the total time assessed on page II of the blue decision to 228 months (instead of the panel's assessment of 234 months), and change the total decision time after deduction of credits to 192 months (from 198 months).

SUPPORTIVE REASONING FOR DECISION:

This more closely carries out the intention of the hearing panel.

| COMMISSIONER SIGNATURE | DATE 2/14/90 | ☑ CONCUR | ☐ DISSENT |
|---|---|---|---|
| COMMISSIONER/D.C. SIGNATURE | DATE 2/14/90 | ☑ CONCUR | ☐ DISSENT |
| COMMISSIONER/D.C. SIGNATURE | DATE 2/14/90 | ☑ CONCUR | ☐ DISSENT |

I dissent from the majority for the following reasons:

SIGNATURE                                    DATE

BPT 1139  (4/87)

60

person's really should be taken away because of maybe's and innuendos. And I agree with Mr. Giss, I think letters from law enforcement agencies should be at least read between the lines, because, I mean, it's kind of a "them and us" attitude, you'll pardon me for saying this, Mr. Jauregui, but I think you know what I'm talking about, the "them and us" attitude, it seems to me, can go so far that it's overboard. And I don't, in my own mind, from having worked with and talked with Mr. Hernandez for several years, I don't believe this incident was gang related. I think it was what he says it was. He was counseled by his attorney or attorneys not to say what it was, not to discuss it, to the point that finally he came forward himself, after his appeal process was exhausted, and I believe he came in to a room like this and told the truth about it for the first time. I think he's telling the truth today. That's all I have to say.

PRESIDING DEPUTY COMMISSIONER COLDREN:    Thank you, Miss Clark. Mr. Hernandez?

INMATE HERNANDEZ:    Yes, sir. I have nothing.

PRESIDING DEPUTY COMMISSIONER COLDREN:    Okay. The time is now eight minutes before 10:00 o'clock. We're going to go into recess, deliberate, and we'll go off record at this time.

RECESS

PRESIDING DEPUTY COMMISSIONER COLDREN:    Okay. The

61

time is 10:40, and all parties previously assembled here, including the prisoner, Mr. Hernandez. Mr. Hernandez has found you suitable for parole and relied upon the following circumstances in determining that you are suitable and would not pose a threat to public safety if paroled. Number one. Stable social history, as exhibited by reasonably stable relationships with others, including an honorable discharge from the U.S. Army. While in prison, prisoner enhances ability to function within the law upon release through participation in educational programs, including a high school diploma, on 06/12/87. Self-help and therapy programs, notably Alcoholics Anonymous, with attendance from 1986 continuing to the present date. Vocational programs; Vocational T.V. Production, Vocational Electrical Maintenance, Vocational Electronics, Data Processing, all completed. Institutional job assignments, including Procurement Clerk and Hospital Purchasing Clerk, all with exceptional work reports. Motivation for the crime committed as a result of significant stresses in the prisoner's life at that time. There is a lack of significant criminal history of violent crime. There was an arrest for robbery on 01/08/77, but this was reduced to a violation of 10851 of the Vehicle Code, with a 36 months summary probation assessed, as well as a fine. Prisoner's maturation, growth, understanding, and age upon release reduces the probability of recidivism. Realistic parole

62

plans include family support and employment offers. Prisoner has maintained close family ties while in prison via letters and some visits. There is a positive institutional behavior which indicates significant improvement in self-control. The panel notes that in 1988, the prisoner was granted a parole date, but this was not approved upon review. Yet, prisoner continued to maintain positive adjustments, giving a good indication of his ability to function under stress. Signs of remorse. The prisoner gives indications that he understands the nature and magnitude of the offense, and accepts responsibility for his criminal behavior. He has the desire to change toward good citizenship. Other reasons or information bearing upon suitability for release include the following. The District Attorney's Office of Los Angeles is not opposed to parole, and this was considered by the panel. The comments of the Decision Review Unit Report dated 08/26/88 were also considered by the panel. Under psychiatric factors. The psychiatric report dated 10/25/89, authored by Dr. Butler, is favorable for parole release. The Category X evaluation report dated 06/28/88, authored by Dr. Orling, is favorable, and indicates that prisoner's violence potential is less than average, and he is expected to remain psychiatrically stable upon release. Base term of confinement. Based upon the facts set forth above, the base offense is murder first degree, a violation of Penal Code Section 187, case number

63

1 A-334928, count one. The term is derived from the matrix at

2 B.P.T. rules 2282-B, and 2282-C, categories 3-B, in that no

3 prior relationship existed between the victim and the

4 prisoner and death was immediate. The panel assessed 204

5 months for the base offense, and noted that this is the

6 aggravated term due to the following. In committing the

7 offense, prisoner subjected two other persons to serious

8 injury or death. Under firearm enhancement, the panel

9 assesses 24 months. Under non-life commitment, principle

10 term, and the other term, subordinate term, those were the

11 charges of assault with intent to commit murder with use of

12 firearm, a violation of Penal Code Section 217 and 12022.5

13 under case number A-334928, counts two and three, the panel

14 assessed zero time. Panel elected not to assess any term

15 for non-life commitments because they occurred in the same

16 transaction as the life crime, and panel further believes

17 that the time assessed for the base offense is appropriate

18 for the total incident. Prior felony convictions with

19 probation. On 01/08/77, for the offense of vehicle theft, a

20 violation of Penal Code Section 10851 of the Vehicle Code

21 under Los Angeles County, panel assesses a period of six

22 months for that offense. Total term, which is the base

23 offense, the fire enhancement, and other crimes, totals 238

24 months. Post-conviction credit from 03/23/79 to 01/23/90 is

25 36 months, giving a total period of confinement of 198

26 months. Special conditions of parole include the following.

27

28

64

1
2    Do not use alcoholic beverages and participate in anti-
3    narcotic testing.    The reasons for the imposition of these
4    special conditions are that alcohol abuse was related to the
5    incident offense.
6                    BOARD COMMISSIONER BROWN:    We should also add that
7    if the prisoner is paroled to any County other than the
8    County of commitment, that the Board of Prison Terms is to
9    be notified by the Department of Corrections.
10                    PRESIDING DEPUTY COMMISSIONER COLDREN:    That's
11    correct.    And that concludes the reading of the decision.
12    At this time I'll ask any members if they have any comments.
13                    BOARD COMMISSIONER BROWN:    Just wish you luck.
14    You've got a date, now.
15                    INMATE HERNANDEZ:    Thank you, Mr. Brown, Mr.
16    Coldren, Mr. Jauregui, Mr. Giss, and --
17                    PRESIDING DEPUTY COMMISSIONER COLDREN:    You know
18    this has to be reviewed by --
19                    INMATE HERNANDEZ:    I understand.
20                    PRESIDING DEPUTY COMMISSIONER COLDREN:    -- our
21    office.
22                    INMATE HERNANDEZ:    I understand that.    And I just,
23    you know, want to thank you again for giving me this second
24    chance.    I know the seriousness of the crime.    I know what I
25    did.    And nothing, doing this time probably will never pay
26    for what I did.    And I just want to make this the last time
27    I ever, you know, put myself in situations where I'm going
28

65

1
2  to end up in prison again.
3          PRESIDING DEPUTY COMMISSIONER COLDREN:    Okay.    The
4  time --
5          MR. GISS:    For my record keeping, have I done this
6  right, he's got 36 months to release?
7          BOARD COMMISSIONER BROWN:    No, we don't know.
8          MR. GISS:    Okay.
9          BOARD COMMISSIONER BROWN:    That would have to be
10  figured out by the records.
11          MR. GISS:    Okay.  He had 234, minus 198 for credit?
12          PRESIDING DEPUTY COMMISSIONER COLDREN:    No, he had
13  234    minus    36    for    credit,    leaving    a    total    period    of
14  confinement of 198.
15          MR. GISS:    Okay.
16          PRESIDING DEPUTY COMMISSIONER COLDREN:    And from
17  that, records personnel will subtract any pre-conviction
18  credit, and then any additional progress reports that can
19  give him additional good time credits will be calculated
20  later.
21          MR. GISS:    Okay.  Thank you.
22          PRESIDING DEPUTY COMMISSIONER COLDREN:    Okay.    The
23  time is now 12 minutes before the hour of 11:00 o'clock, and
24  we're going to go off record at this time.
25
26
27
28

66

CERTIFICATION AND

DECLARATION OF TRANSCRIBER


I, LINDA LARSON, a duly designated transcriber of PRESTON'S LEGAL SUPPORT SERVICES, do hereby declare and certify under penalty of perjury that I have transcribed Tape(s) which total **two** in number and cover a total of pages numbered **1 - 65**, and which recording was duly recorded at San Luis Obispo, California, in the Matter of SUBSEQUENT PAROLE CONSIDERATION HEARING OF PETER HERNANDEZ, on the **23rd** **day** of **January, 1990**, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.    I hereby certify that I am a disinterested party in the above captioned matter and have no interest in the outcome of the hearing.

Dated this **14th day of May, 1990** at Sacramento, California.



LINDA LARSON
TRANSCRIBER




-oOo-

# EXHIBIT   "B"

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PRISON TERMS

**INMATE COPY**

In the matter of the Life )
Term Parole Consideration )
Hearing of: )
)
PETER HERNANDEZ )
_____ )

CDC Number C-03015

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

JULY 13, 2006

PANEL PRESENT:

JAMES DAVIS, Presiding Commissioner
DENNIS SMITH, Deputy Commissioner

OTHERS PRESENT:

PETER HERNANDEZ, Inmate
PAUL TURLEY, Deputy District Attorney
KATERA E. RUTLEDGE, Attorney for Inmate
CORRECTIONAL OFFICERS UNIDENTIFIED

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____   No        See Review of Hearing
_____   Yes       Transcript Memorandum

---

Patty L. Duran, Northern California Court Reporters

ii

## INDEX

|                            | Page |
|----------------------------|------|
| Proceedings ............................................. 1 | |
| Case Factors ........................................... 9 | |
| Pre-Commitment Factors ................................ 19 | |
| Parole Plans .......................................... 45 | |
| Post-Commitment Factors ............................... 55 | |
| Closing Statements ................................... 62 | |
| Recess ............................................... 69 | |
| Decision ............................................. 70 | |
| Adjournment .......................................... 78 | |
| Transcriber Certification ............................ 79 | |

--oOo--

1

```
 1              P R O C E E D I N G S
 2         DEPUTY COMMISSIONER SMITH:  We're on the
 3    record.
 4         PRESIDING COMMISSIONER DAVIS: This is a
 5    subsequent parole consideration hearing for Peter
 6    Hernandez, CDC number C-03015.  Today's date is
 7    July the 13th, 2006.  We're located at the
 8    Correctional Training Facility in Soledad.  The
 9    inmate was received on March 23rd, 1979, from Los
10    Angeles County and a life term began on March
11    23rd, 1979, with a minimum eligible parole date
12    of September 3rd, 1985.  The controlling offense
13    was the inmate had been committed of murder
14    first, case number A334928, count one Penal Code
15    Section 187.  The inmate received a term of seven
16    years to life.  This hearing is being tape-
17    recorded and for the purposes of voice
18    identification, we'll each state our first and
19    last name.  When it reaches you Mr. Hernandez if
20    you'll also give us your CDC number first.
21         INMATE HERNANDEZ: Yes.
22         PRESIDING COMMISSIONER DAVIS: So I'll
23    start in with my left.  I'm James Davis, D-A-V-I-
24    S, Commissioner.
25         DEPUTY COMMISSIONER SMITH:  My name is
26    Dennis Smith, S-M-I-T-H.  I'm Deputy
27    Commissioner.
```

2

1              DEPUTY DISTRICT ATTORNEY TURLEY:  Paul

2     Turley, T-U-R-L-E-Y.  DA's Office, LA County.

3              ATTORNEY RUTLEDGE:  Katera E. Rutledge,

4     R-U-T-L-E-D-G-E, Attorney for Mr. Hernandez.

5              INMATE HERNANDEZ:  Peter Hernandez,

6     Prisoner.  Prisoner number C-03015.

7              DEPUTY COMMISSIONER SMITH:  Spell your

8     last name please, sir.

9              INMATE HERNANDEZ:  H-E-R-N-A-N-D-E-Z.

10             DEPUTY COMMISSIONER SMITH:  Thank you,

11    sir.

12             PRESIDING COMMISSIONER DAVIS:  And let

13    the record also reflect we're joined by two

14    Correctional Officers who are here for security

15    purposes only and will not be actively

16    participating in this hearing.  Before we begin,

17    Mr. Hernandez in front of you in the laminated

18    piece of paper if you would read the Americans

19    with Disabilities Act Statement please.

20             INMATE HERNANDEZ:  "ADA,

21             Americans with Disabilities Act.  The

22             Americans with Disability (sic) Act is

23             a law to help people with disability,

24             disability problems that make it hard

25             for some people to see, hear, to read,

26             talk, walk, learn, (inaudible), work,

27             take care of themselves and

3

1        (inaudible).  Nobody can be kept out of

2        business or activities because of

3        disability.  If you have a disability

4        you have the right to ask for help to

5        get ready for your BPT hearing.

6        (inaudible) hearing, talk, read forms

7        and papers and understand that

8        (inaudible) making sure what you ask

9        for to make sure that you have a

10       disability that is covered by the ADA

11       and that you have asked for the right

12       kind of help.  If you do not get help,

13       or if you don't think you got the kind

14       of help you need, ask for the BPT 1074

15       grievance form.  You can also get help

16       to fill it out."

17       PRESIDING COMMISSIONER DAVIS: That's very

18 good.  Thank you.

19       INMATE HERNANDEZ:  You're welcome.

20       PRESIDING COMMISSIONER DAVIS: And I

21 notice you were able to do that without glasses

22 today.  Do you normally wear glasses?

23       INMATE HERNANDEZ:  No, I don't.

24       PRESIDING COMMISSIONER DAVIS: Good for

25 you.  And you're able to hear me all right?

26       INMATE HERNANDEZ:  Yes, sir.

27       PRESIDING COMMISSIONER DAVIS: You walked

4

1  here today on your (inaudible)?

2      INMATE HERNANDEZ:  Yes, sir.

3      PRESIDING COMMISSIONER DAVIS: All right.

4  I see we're set and ready to go?

5      INMATE HERNANDEZ:  Yes, sir.

6      PRESIDING COMMISSIONER DAVIS: Excellent.

7  I notice that with regard to the 1073 form, BPT

8  1073 form you reviewed together with staff of the

9  institution and it being that you do not have any

10  disability that would be qualified under the

11  Americans with Disabilities Act.  Is that

12  correct?

13      INMATE HERNANDEZ:  That's correct.

14      PRESIDING COMMISSIONER DAVIS: All right.

15  Can you think of any reason why you would not be

16  able to actively participate in this hearing this

17  afternoon?

18      INMATE HERNANDEZ:  No, sir.

19      PRESIDING COMMISSIONER DAVIS: Okay.

20  Great.  And counselor, you're also satisfied with

21  that?

22      ATTORNEY RUTLEDGE:  Yes, sir.

23      PRESIDING COMMISSIONER DAVIS: Very well.

24  You, this hearing is being conducted pursuant to

25  Penal Code Sections 3041, 3042 and the Rules and

26  Regulations of the Board of Prison Terms covering

27  parole consideration terms for life inmates.  The

5

1    purpose of today's hearing is we once again

2    consider the number and nature of the crimes for

3    which you were committed, your prior criminal and

4    social history and your behavior in the

5    programming since you were committed.  We've had

6    the opportunity to review your Central File and

7    your prior transcripts and you'll be given an

8    opportunity to correct or clarify the record as

9    we proceed.  We will reach a decision today and

10   inform you of whether or not we find you suitable

11   for parole and the reasons for our decision.  If

12   you are found suitable for parole the length of

13   your confinement will be explained to you.

14   Nothing that happens in today's hearing will

15   change the findings of the court and we're not

16   here to retry your case.  The Panel is here for

17   the sole purpose of determining your suitability

18   for parole.  Do you understand that sir?

19            **INMATE HERNANDEZ:**  Yes, sir.

20            **PRESIDING COMMISSIONER DAVIS:** And the

21   hearing will be conducted in basically two

22   phases.  First, I will discuss with you the crime

23   for which you were committed, as well as your

24   prior criminal and social history.  And

25   Commissioner Smith will then discuss with you

26   your progress, your counselor's report and your

27   psychological evaluation, as well, as well as

6

1    your parole plans and any letters of support or

2    opposition, if they may exist.  Once that's

3    concluded the Commissioner, with District

4    Attorney and your Attorney will be given an

5    opportunity to ask you questions.  Questions that

6    come from the District Attorney will be asked

7    through the chair and you will respond back to

8    the Panel with your answer.  Next, the District

9    Attorney and then your Attorney and then finally

10    you will be given an opportunity to make a

11    closing statement.  Those statements are --

12    should focus on why you believe that you are

13    suitable for parole.  California Code of

14    Regulations states that regardless of time served

15    an inmate shall be found unsuitable for and

16    denied parole if in the judgment of the Panel the

17    inmate would pose an unreasonable risk of danger

18    to society if released from prison.  You have

19    certain rights.  Those rights include right to a

20    timely notice of this hearing, the right to

21    review your Central File and the right to present

22    relevant documents.  Counselor, are you satisfied

23    that your client's rights have been met today?

24         **ATTORNEY RUTLEDGE:**  Yes, sir.

25         **PRESIDING COMMISSIONER DAVIS:**  All right.

26    Mr. Hernandez, you also have an additional right

27    and that is to be heard by an impartial Panel.

7

1   Now you've heard Mr. Smith and I introduce

2   ourselves today.  Do you have any reason to

3   believe that we would not be impartial?

4       INMATE HERNANDEZ:  No, sir.

5       PRESIDING COMMISSIONER DAVIS:  ,Thank you.

6   And you will receive a written copy of our

7   tentative decision today.  That decision becomes

8   effect within 120 days.  A copy of the decision

9   and a copy of the transcript will be sent to you.

10  You are not required to admit your offense today

11  or discuss your offense, however the Panel does

12  accept the findings of the court to be true.  Do

13  you understand that?

14      INMATE HERNANDEZ:  Yes, sir.

15      PRESIDING COMMISSIONER DAVIS:  Great.

16  The Board has (inaudible) process.  If you

17  disagree with anything in today's hearing you

18  have the right to go directly to court with your

19  complaint.  Mr. Smith, we going to be dealing

20  with anything from the confidential file

21  (inaudible)?

22      DEPUTY COMMISSIONER SMITH:  No, we will

23  not.

24      PRESIDING COMMISSIONER DAVIS: Okay.  I'm

25  going to pass the checklist of documents to both

26  counsel.  If you would take a look at this and

27  make sure we're offering you all the same list of

8

1   documents.

2          DEPUTY DISTRICT ATTORNEY TURLEY:  I have

3   those.

4          ATTORNEY RUTLEDGE:  Yes, sir.  Thank you.

5   We have the document.

6          PRESIDING COMMISSIONER DAVIS:  All right.

7   Thank you.  Those will be marked as Exhibit 1

8   then.  (inaudible).  Ms. Rutledge, any additional

9   documents that you'd like us to consider today?

10          ATTORNEY RUTLEDGE:  No, sir.

11          PRESIDING COMMISSIONER DAVIS: Any

12   preliminary objections?

13          ATTORNEY RUTLEDGE:  We would just note

14   that Mr. Hernandez's hearing should have been in

15   December of last year.  Is that correct?

16          INMATE HERNANDEZ:  About, yes.

17          ATTORNEY RUTLEDGE:  But, so it's about

18   what, eight months behind?

19          PRESIDING COMMISSIONER DAVIS: It is.

20          ATTORNEY RUTLEDGE:  Okay.  We just wanted

21   to note for the record that is beings (sic)

22   approximately eight months behind.

23          PRESIDING COMMISSIONER DAVIS:  We -- we

24   apologize for the delay Mr. Hernandez.

25          INMATE HERNANDEZ:  Okay.

26          PRESIDING COMMISSIONER DAVIS:  Will your

27   client be speaking with us today?

9

1           ATTORNEY RUTLEDGE:  Yes.

2           DEPUTY COMMISSIONER SMITH:  Actually if I

3    can correct that.  His last hearing was in

4    January of '05.

5           ATTORNEY RUTLEDGE:  Oh.

6           DEPUTY COMMISSIONER SMITH:  So, so we're

7    roughly six months --

8           ATTORNEY RUTLEDGE:  Yeah.

9           DEPUTY COMMISSIONER SMITH:  -- past.

10   That was last year.

11          ATTORNEY RUTLEDGE:  Okay.  Thank you.

12          DEPUTY COMMISSIONER SMITH:  You're

13   welcome.

14          ATTORNEY RUTLEDGE:  There was another

15   question you had.

16          PRESIDING COMMISSIONER DAVIS: Will --

17   will Mr. Hernandez be speaking with us today?

18          ATTORNEY RUTLEDGE:  Yes, sir.  He'll be

19   speaking with you on all subjects and issues.

20          PRESIDING COMMISSIONER DAVIS:  Very well.

21   Mr. Hernandez, would you raise your right hand

22   please, sir?  Do you solemnly swear that the

23   testimony you will give at the hearing today will

24   be the truth and nothing but the truth?

25          INMATE HERNANDEZ:  Yes, sir.

26          PRESIDING COMMISSIONER DAVIS: Okay.  All

27   right.  Without objection I'm going to

10

1   incorporate by reference the court of appeals

2   document from April 21st, 1981, pages through,

3   through 8, pages 3 through 8.  And they refer to

4   the summary of the ward report of the 2004

5   calendar starting on page 1 where it states under

6   (a)1. Summary of the crime:

7           "On 4-25-77 at approximately 9:00

8           p.m. Peter Hernandez and co-

9           defendant Jose Montez approached

10          three Mexican-American males in a

11          residential area of Los Angeles.

12          Following a brief conversation

13          Hernandez pulled a gun from his

14          coat, fired a shot at victim Tony

15          Sanchez, S-A-N-C-H-E-Z, at point

16          blank range killing him with a shot

17          to the heart.  Victims Rosales and

18          Rodriguez, R-O-S-A-L-E-S, and

19          Rodriguez, R-O-D-R-I-G-U-E-Z, ran

20          from the scene, but were pursued by

21          Hernandez who continued firing the

22          gun striking both men in the leg as

23          crime partner Montez, M-O-N-T-E-Z,

24          yelled, 'Get them, get them'.  After

25          emptying the weapon Hernandez and

26          Montez returned to the van that

27          Hernandez had been driving and fled

11

1    the scene.  Hernandez was later

2    identified by the wounded victims.

3    He and Montez were apprehended at

4    their residences on the following

5    morning.  Subsequent investigation

6    revealed that Hernandez had

7    attempted to purchase marijuana from

8    the victims and when advised that

9    they had none opened fire.  Both

10   Hernandez and Montez denied any

11   involvement in the crime maintaining

12   this denial through three trials,

13   the third of which resulted in

14   Hernandez's conviction for the

15   present case and Montez's conviction

16   for murder second degree.  It was

17   noted that all three victims were

18   known gang members and that the

19   motive for the crime was believed by

20   the District Attorney's Office to

21   have been gang related.  Hernandez

22   continued to maintain his innocence

23   until exhaustion of all fuels

24   processed at which time he admitted

25   his guilt and the information for

26   this came from the 61588 diagnostic

27   being the evaluation pages 2 through

12

1          3 and the Probation Officer's quote

2          pages 5 through 7 and a (inaudible)

3          decision made on 6-28-1 pages 8

4          through 12 and 14 through 15."

5          So, Mr. Hernandez, did you commit this

6    crime?

7          INMATE HERNANDEZ:  Yes, sir.

8          PRESIDING COMMISSIONER DAVIS:  Now I know

9    that you have a, a fairly comprehensive statement

10   in this 2004 report as well.  Why don't you tell

11   me in your own words what happened?

12         INMATE HERNANDEZ:  That afternoon I'd

13   stopped work and, well a few weeks prior my

14   sister's house was burglarized.  We know what,

15   when was the --

16         DEPUTY DISTRICT ATTORNEY TURLEY:  Excuse

17   me, please.  Could you ask him if he could speak

18   up just a little bit?  He's (inaudible).

19         PRESIDING COMMISSIONER DAVIS:

20   (inaudible).

21         INMATE HERNANDEZ:  (inaudible).

22         PRESIDING COMMISSIONER DAVIS: (inaudible)

23   this.

24         ATTORNEY RUTLEDGE:  You (inaudible).

25         PRESIDING COMMISSIONER DAVIS: You also --

26         INMATE HERNANDEZ:  This is not

27   (inaudible).

13

1      PRESIDING COMMISSIONER DAVIS: (inaudible)
2  get you some water.
3      INMATE HERNANDEZ:  Thank you.  Two weeks
4  prior my sister's house had been burglarized and
5  we had made police reports about it, about the
6  burglary and at that time I (inaudible) I had low
7  confidence in the police being able to find out
8  who it was.  I thought that how, how it would be
9  easier for me to look around and find out more or
10 less anybody was involved in the burglary.  I run
11 down every idea that I -- there's a lot of gangs,
12 kids in gangs, people running around doing all
13 kinds of things like that.  So that afternoon
14 that I got off, got off of work one, one of the
15 friends that I, a (inaudible) told me he say, he
16 told me that he thought that he knew the person
17 that had the property I was looking for.  Cause I
18 had, I had told most of the persons in, in the,
19 in the neighborhood, the things that were missing
20 from my sister's home and that I had to have
21 them, that I needed to get them back.  When he
22 told me that he knew more or less the person
23 could have these, these belongings then I told
24 him, "Let's go over there and, and look for
25 them."  And that's what we did.  We went over
26 there and it must have been I think about six
27 o'clock in the afternoon, something like that.

14

1    And then I (inaudible) I got to the, to the

2    neighborhood and I spoke to one of the guys there

3    and asked him for, for, for a person by the name

4    of Tito that lived around there and he told me,

5    "Yes." He pointed to a green house and said, "He

6    lives over there." So I went over there to the

7    house. At that point there were three gentlemen

8    that I believe (inaudible) on the porch and one

9    of them came down to the fence as I went to the

10    fence and then he asked me, you know, what I

11    wanted. I told him that I was looking for Tito

12    and he told me that, first he said, "What for?"

13    as I recall and I told him, "Because I, I

14    understand he has some, some hot things for

15    sale." He said, "Well who told you that?" I

16    said that I just needed to talk to him. And at

17    that point one of the other, the guy at the

18    corner had told where the house was came, came on

19    to the site and he says, "This guy's looking for

20    Tito." And he goes, "Yeah, I know." So the, the

21    other person that was on the porch came down and

22    then he, and he, and he talked to -- so that guy

23    asked him what I, what I want and, and he says,

24    "He's looking for Tito for some hot stuff that he

25    says he's trying to, he's trying to get." He

26    said, "No, we don't have nothing like that." So

27    he says, "Who are you anyway?" I said well, "I

15.

1    don't know him that much, but you know." He

2    said, "No, you get out of here." And I said,

3    "Wait a minute I'm not leaving till I see him."

4    He says. "You better get out of here." And he

5    pulled out a weapon on me and he pointed it

6    towards me and I said. "Okay, no problem."

7    Probably I, so I, I got in the van and left. A

8    partner, a friend of mine was with me, he told

9    me, "You know what, you shouldn't let him get

10   away with that." I know where's a gun, so we'll

11   get a gun and we'll come back. And I said, "You

12   know what, okay, let's do it." And so we went

13   over there and he went to go see some friends, he

14   came back and he said, "Here, I got a gun." And,

15   and I said. "Okay, let me have it." Then I got

16   it and put it in my jacket pocket. At that point

17   I drove back to that area. I passed through the

18   house, I didn't see nobody there. As I was going

19   by the, as I was going to the corner and I saw

20   three individuals that were standing by, by the

21   corner market store and when I, when I passed

22   through slow I took a look at them then I noticed

23   that at least two of them were the same ones that

24   I was talking to. So then I went around, parked

25   the van, came back and then confronted them.

26   Crossed the street in front of them and, and the

27   first person -- happened to be people that was

16

1   standing.  I didn't know at that time because I
2   didn't know (inaudible).  So when, when, when I
3   went, came to the, to the parked cars onto the
4   sidewalk he kind of like went back and was
5   surprised to see us.  And goes, "Who are you?"  I
6   said, "I'm looking for Tito."  He says, "Well
7   what do you want from him?"  I said, "I'm looking
8   because he has some belongings that, that belong
9   to me."  He says, "No, no, no."  He says, "What
10  are you talking about."  I said, "You have an
11  amplifier that, that (inaudible) were," excuse
12  me, "those were the things that were, that were
13  missing after the burglary.  So I'm, I'm looking
14  for an amplifier and a, and a, and a color TV and
15  a guitar."  He said. "No we don't have none of
16  this.  Just get out of here."  At that point he
17  came toward me and he had his hand in his pocket.
18  And I had my, my weapon in my pocket also.  My,
19  my hand was in there.  So when he took two, I
20  recall two or three steps towards me I just
21  pulled the gun out and I fired.  At that point,
22  after the, after the, the first shot I felt the
23  other guys get up and I just turned around and,
24  and, and I fired at them.  And they began to run
25  and till this day I, I couldn't remember my, my,
26  my partner saying, "Get him", or anything.  I
27  was, I don't know, I, I just didn't, didn't feel

17

1  right and I kept firing till the gun went empty

2  and then I ran to, to the van and, and you know,

3  we got, I was shaking very, very hard and I, I

4  don't remember what I told my partner or

5  anything.  I just, just go, "You know, we got to

6  get out of here."  And I left.

7.          PRESIDING COMMISSIONER DAVIS: The, the

8  gun that you got, do you have any idea who, who

9  that came from?

10          INMATE HERNANDEZ:  It was some

11  apartments, but I waited outside and my crime

12  partner only went up there and got it.

13          PRESIDING COMMISSIONER DAVIS: Had you

14  ever gotten a gun from that apartment before?

15          INMATE HERNANDEZ:  No.

16          PRESIDING COMMISSIONER DAVIS: What kind

17  of gun was it?

18          INMATE HERNANDEZ:  I think it was a,

19  looked like a nine millimeter.

20          PRESIDING COMMISSIONER DAVIS: Did you

21  check and make sure it was loaded?

22          INMATE HERNANDEZ:  You know, no, I

23  didn't.

24          PRESIDING COMMISSIONER DAVIS: Had you

25  ever fired that kind of gun before?

26          INMATE HERNANDEZ:  No.  No, I hadn't.

27          PRESIDING COMMISSIONER DAVIS: So you had

# EXHIBIT A
# Part 2 of 2

18

1   no idea it was going to work or not?

2        INMATE HERNANDEZ: No, I didn't.

3        PRESIDING COMMISSIONER DAVIS: Did you

4   test it?

5        INMATE HERNANDEZ: No, I didn't.

6        PRESIDING COMMISSIONER DAVIS: So you went

7   back and, and confronted the, confronted the

8   person who turned out to be Tito. Was that the

9   same person that had the weapon before?

10       INMATE HERNANDEZ: No, it wasn't.

11       PRESIDING COMMISSIONER DAVIS: Did you see

12  a weapon on Tito?

13       INMATE HERNANDEZ: No, I didn't.

14       PRESIDING COMMISSIONER DAVIS: The other

15  people who were there that you fired at, did you

16  see any weapons that they might have had?

17       INMATE HERNANDEZ: No, sir.

18       PRESIDING COMMISSIONER DAVIS: Were either

19  one of them the, the person who had the weapon

20  before?

21       INMATE HERNANDEZ: Yes. One of them was.

22       PRESIDING COMMISSIONER DAVIS: One of them

23  was. But you didn't see it the second time,

24  correct?

25       INMATE HERNANDEZ: No, I didn't.

26       PRESIDING COMMISSIONER DAVIS: After all

27  of this happened, as you shot Tito, you shot the

19

1    other people, got back in the van and took off,

2    what did you do after that?

3            INMATE HERNANDEZ:   Yeah.   We ran and

4    bought some beer.

5            PRESIDING COMMISSIONER DAVIS: Okay.   You

6    ran and bought some beer, then what?

7            INMATE HERNANDEZ:   And then, and then I

8    went home.

9            PRESIDING COMMISSIONER DAVIS: Then what

10   did you do?

11           INMATE HERNANDEZ:   I remember going to

12   the restroom.

13           PRESIDING COMMISSIONER DAVIS:   What did

14   you do with the gun?

15           INMATE HERNANDEZ:   Oh the gun, I gave it

16   back to my crime partner.

17           PRESIDING COMMISSIONER DAVIS: So you

18   returned it?

19           INMATE HERNANDEZ:   Uh-huh.   Yes, sir.

20           PRESIDING COMMISSIONER DAVIS: When did

21   the police arrive?

22           INMATE HERNANDEZ:   As I recall it was

23   very early in the morning.   Could have been two

24   in the morning.   Something like that.

25           PRESIDING COMMISSIONER DAVIS: What

26   happened that evening?   For you, what happened,

27   what did you do?

20

1          INMATE HERNANDEZ:  Well after I went

2    back, it was about I think ten o'clock, eleven,

3    then I just, I went to bed.

4          PRESIDING COMMISSIONER DAVIS:  Did you

5    ever find out if these people were in any way,

6    shape or form associated with the original

7    burglary that you were trying to recover the

8    stuff for your sister?

9          INMATE HERNANDEZ:  No.

10         PRESIDING COMMISSIONER DAVIS: That never

11   came out?  All right.  When you didn't have

12   confidence in the police to find the, the, the

13   equipment once you had tracked down some of this

14   information did you ever think about calling them

15   and giving them that information?

16         INMATE HERNANDEZ:  No, sir.

17         PRESIDING COMMISSIONER DAVIS:  In terms of

18   personal factors, you were born in Las Cruces,

19   New Mexico, you're the second of two children,

20   and if I say anything in here that isn't right or

21   doesn't, isn't right on point please let me know.

22         INMATE HERNANDEZ:  Yes, sir.

23         PRESIDING COMMISSIONER DAVIS: We'll

24   correct that as we go along.  You were raised by

25   your mother in part and your, in part because

26   your parents divorced when you were two years

27   old, so you were raised by your mom?

21

1          INMATE HERNANDEZ:  Yes, sir.

2          PRESIDING COMMISSIONER DAVIS: And have a

3    good relationship with all your family members

4    and a stepfather and two half brothers?

5          INMATE HERNANDEZ:  Yes, sir.

6          PRESIDING COMMISSIONER DAVIS: No other

7    family members have a problem with any arrest

8    record or mental health issues, anything like

9    that?

10         INMATE HERNANDEZ:  No, sir.

11         PRESIDING COMMISSIONER DAVIS: But this

12   indicates that your stepfather's an alcoholic.

13         INMATE HERNANDEZ:  Yes, sir.

14         PRESIDING COMMISSIONER DAVIS: And how do

15   you know that?

16         INMATE HERNANDEZ:  Because he used to

17   drink a lot.  He was a hardworking man, but he'd

18   always --

19         PRESIDING COMMISSIONER DAVIS: So he

20   would -- did he abuse you at all?

21         INMATE HERNANDEZ:  No.  He, he never --

22   he was --

23         PRESIDING COMMISSIONER DAVIS: Was a,

24   wasn't a mean drunk then?

25         INMATE HERNANDEZ:  No.  He'd just come

26   home, drink his beer --

27         PRESIDING COMMISSIONER DAVIS: Okay.

22

1           INMATE HERNANDEZ:  -- and goes out on

2    the, the couch.

3           PRESIDING COMMISSIONER DAVIS: Okay.  And

4    so for all this purposes you had a -- had a

5    pretty normal childhood then?

6           INMATE HERNANDEZ: Yes.  Yes.

7           PRESIDING COMMISSIONER DAVIS: You

8    attended Belmont High School?

9           INMATE HERNANDEZ:  Yes, sir.

10          DEPUTY COMMISSIONER SMITH:  (inaudible)

11    about that.

12          PRESIDING COMMISSIONER DAVIS:  And you

13    dropped out to enlist in the United States Army?

14          INMATE HERNANDEZ:  Yes, sir.

15          PRESIDING COMMISSIONER DAVIS: And you

16    served in the army from 2/73 until 2 of '76 and

17    received an honorable discharge?

18          INMATE HERNANDEZ:  Yes, sir.

19          PRESIDING COMMISSIONER DAVIS: Received,

20    received the rank, or actually earned, it says

21    you earned the rank of an E4 and served seven

22    months in Germany while in the army?

23          INMATE HERNANDEZ:  Yes, sir.

24          PRESIDING COMMISSIONER DAVIS: And it was

25    in Germany that you began the occasional use of

26    alcohol and marijuana?

27          INMATE HERNANDEZ:  Yes, sir.

23

1          PRESIDING COMMISSIONER DAVIS: And you

2    said, well you began spending most of your time

3    off duty drinking.  Let me tell you, your first

4    experience with alcohol was when you entered,

5    after you entered the army?  Or had you drunk,

6    had you consumed alcohol before that?

7          INMATE HERNANDEZ:  Yes, but not much like

8    in a way I didn't --

9          PRESIDING COMMISSIONER DAVIS: Okay.

10          INMATE HERNANDEZ:  Very, very little.

11          PRESIDING COMMISSIONER DAVIS: So it was

12    in the army that you began to, well as abuse

13    alcohol?

14          INMATE HERNANDEZ:  Yeah.

15          PRESIDING COMMISSIONER DAVIS: In 1975 you

16    married Ms. Garcia and while you were in the

17    army, and you had one daughter?

18          INMATE HERNANDEZ:  Yes.

19          PRESIDING COMMISSIONER DAVIS: Are you

20    still married?

21          INMATE HERNANDEZ:  No, sir.

22          PRESIDING COMMISSIONER DAVIS: No?  When

23    did that, when did that marriage end?

24          INMATE HERNANDEZ:  Approximately seven

25    years.

26          PRESIDING COMMISSIONER DAVIS:  You

27    staying, you stay in touch with your daughter?

24

1          INMATE HERNANDEZ:  Yes, sir.

2          PRESIDING COMMISSIONER DAVIS: How, how do

3    you stay in touch with her?  Letters, phone

4    calls?

5          INMATE HERNANDEZ:  Yes, sir.

6          PRESIDING COMMISSIONER DAVIS: Okay.

7    Where does she live?

8          INMATE HERNANDEZ:  She lives right now in

9    El Paso, Texas.

10          PRESIDING COMMISSIONER DAVIS: So how

11    often --

12          INMATE HERNANDEZ:  (inaudible)

13          PRESIDING COMMISSIONER DAVIS: -- were you

14    able, are you able to talk with her?

15          INMATE HERNANDEZ:  Once a month.

16          PRESIDING COMMISSIONER DAVIS: How's she

17    doing?

18          INMATE HERNANDEZ:  She's doing fine.

19          PRESIDING COMMISSIONER DAVIS: What grade

20    did you drop out of high school?

21          INMATE HERNANDEZ:  Ninth grade.

22          PRESIDING COMMISSIONER DAVIS: The ninth

23    grade?  Why did you do that?

24          INMATE HERNANDEZ:  It was during the

25    summer, I got a job during the summer and I was

26    getting a little money and I was saving up and I

27    was, I was helping my, my mom and then it, it

25

1    just drove me from, from school.

2             PRESIDING COMMISSIONER DAVIS: Huh.

3             INMATE HERNANDEZ:  I said why should I go

4    back if I can make (inaudible).  And then about a

5    year and a half later after I was working then I

6    tried to enlist in the, in the army so I can get

7    some education.

8             PRESIDING COMMISSIONER DAVIS: So that was

9    the purpose, you wanted to, you wanted to

10   complete your education?

11            INMATE HERNANDEZ:  That was one of the

12   purposes.

13            PRESIDING COMMISSIONER DAVIS:  Were you

14   involved in any gang activity or anything at that

15   time?

16            INMATE HERNANDEZ:  No, sir.

17            PRESIDING COMMISSIONER DAVIS: No?

18            DEPUTY DISTRICT ATTORNEY TURLEY:  Ever?

19            PRESIDING COMMISSIONER DAVIS:  Ever?

20            INMATE HERNANDEZ:  Never.

21            PRESIDING COMMISSIONER DAVIS:  No never?

22            INMATE HERNANDEZ:  No.

23            PRESIDING COMMISSIONER DAVIS:  All right.

24   In terms of an arrest record, looks like you

25   were, no juvenile history that is known.  You're

26   arrested by Los Angeles, LAPD in, on 1/8 of 1977

27   for first-degree robbery.  You pled guilty to, to

26

1  auto theft.  You were placed on 36 months summary

2  probation without supervision and ordered to pay

3  a fine.  What was, what was the, what were the

4  circumstances of that?

5      INMATE HERNANDEZ:  I -- I took a, a

6  taxicab.

7      PRESIDING COMMISSIONER DAVIS:  Okay.

8  While the taxicab driver was in it?

9      INMATE HERNANDEZ:  No.  She just got, she

10  got off --

11     PRESIDING COMMISSIONER DAVIS:  Okay.

12     INMATE HERNANDEZ:  -- and that's when I

13  took the cab.

14     PRESIDING COMMISSIONER DAVIS:  Okay.  She

15  got out and you got in and took the cab?

16     INMATE HERNANDEZ:  Yeah.

17     PRESIDING COMMISSIONER DAVIS:  Was it a

18  (inaudible)?  What'd you do that for?

19     INMATE HERNANDEZ:  It, it was stupid now.

20  I was drinking, we had been drinking that night

21  and it was on a Saturday night I believe.

22     PRESIDING COMMISSIONER DAVIS:  Okay.  You

23  needed a ride home?

24     INMATE HERNANDEZ:  Actually I did have, I

25  had money, I had enough money I could have paid

26  for it.

27     PRESIDING COMMISSIONER DAVIS:  Okay.  How

27.

1   much had you had to drink before you stole the

2   cab?

3          INMATE HERNANDEZ:  See I got to that

4   party at about seven o'clock.  I had quite,

5   probably three.

6          PRESIDING COMMISSIONER DAVIS:  So, and

7   this is during the time, you're still in the army

8   at this time?

9          INMATE HERNANDEZ:  No.  No, sir.

10          PRESIDING COMMISSIONER DAVIS: You were

11   out of the army at this time?

12          INMATE HERNANDEZ:  Yes.

13          PRESIDING COMMISSIONER DAVIS:  Okay.  And

14   you're arrested in, on 4/26 of 1977 that actually

15   be for the (inaudible) offense, but now in, this

16   says in, in 1978 there was an arrest for, by the

17   LAPD for shoplifting?

18          INMATE HERNANDEZ:  Yes.

19          PRESIDING COMMISSIONER DAVIS: What was

20   that about?

21          INMATE HERNANDEZ:  I attempted to steal

22   some glasses.  Well, I did steal them.

23          PRESIDING COMMISSIONER DAVIS:  Okay.  And

24   then another contact with LAPD for drinking in

25   public?

26          INMATE HERNANDEZ:  Yes, sir.

27          PRESIDING COMMISSIONER DAVIS: So just

28

1    the, the one incident where you actually, you

2    received summary probation as well for the

3    shoplifting, so you're placed in probation?

4            INMATE HERNANDEZ:  Yes.

5            PRESIDING COMMISSIONER DAVIS: Was that --

6    alcohol have anything to do with the shoplifting

7    incident also?

8            INMATE HERNANDEZ:  Yes.

9            PRESIDING COMMISSIONER DAVIS: So there

10   was a thread running consistently through this?

11           INMATE HERNANDEZ:  Yes.

12           PRESIDING COMMISSIONER DAVIS:  What about

13   drug use?

14           INMATE HERNANDEZ:  I stay away from

15   drugs.

16           PRESIDING COMMISSIONER DAVIS: So you

17   (inaudible) that you smoked marijuana

18   occasionally starting at age 19?

19           INMATE HERNANDEZ:  Yes, sir.

20           PRESIDING COMMISSIONER DAVIS:  But no

21   other substances?

22           INMATE HERNANDEZ:  No.

23           PRESIDING COMMISSIONER DAVIS:  No

24   cocaine, no methamphetamine?  Nothing like that?

25           INMATE HERNANDEZ:  Yes.

26           PRESIDING COMMISSIONER DAVIS: Just the

27   alcohol?  The alcohol, so be fair to say that

29

1    alcohol was drug of choice at that time?

2            INMATE HERNANDEZ: Yes, sir.

3            PRESIDING COMMISSIONER DAVIS: Is there

4    anything that we haven't talked about, about the,

5    the offense itself, your history prior to coming

6    to the institution, your arrests, anything prior

7    to the incident offense that, or actually the

8    incident that your, actually prior to you coming

9    to the institution, that we haven't talked about

10   that you feel is important for this Panel to

11   understand?

12           INMATE HERNANDEZ: I was arrested twice

13   as a juvenile --

14           PRESIDING COMMISSIONER DAVIS: Okay.

15           INMATE HERNANDEZ: -- for truancy and I

16   don't think that -- that that was mentioned.

17           PRESIDING COMMISSIONER DAVIS: Right.

18   Right. I appreciate you bringing that up. And

19   you were a truant, why?

20           INMATE HERNANDEZ: I just didn't want to

21   go to school.

22           PRESIDING COMMISSIONER DAVIS: Just didn't

23   want to go to school?

24           INMATE HERNANDEZ: (inaudible).

25           PRESIDING COMMISSIONER DAVIS: Did you

26   get along all right in school?

27           INMATE HERNANDEZ: Yeah I, I did. It was

30

1    a (sic) inter, interracial at that time kind of a

2    thing going on in school.

3         PRESIDING COMMISSIONER DAVIS: With just

4    the --

5         INMATE HERNANDEZ: Majority blacks so

6    real, real an interrace (sic). But it, I had no

7    problems in school. As a matter of fact I kind

8    of like it, but I kind of let influences, you

9    know, of other people around.

10        PRESIDING COMMISSIONER DAVIS: Was it

11   just your general peer group that was doing the

12   influencing?

13        INMATE HERNANDEZ: Yeah. A few. But I

14   was mostly interested in sports. But, yeah.

15        PRESIDING COMMISSIONER DAVIS: Had you

16   been drinking prior to the incident offense?

17        INMATE HERNANDEZ: Yes, sir.

18        PRESIDING COMMISSIONER DAVIS: How much?

19        INMATE HERNANDEZ: Well, I got off of

20   work, cashed my check. I had about six of those

21   beers.

22        PRESIDING COMMISSIONER DAVIS: Okay.

23        INMATE HERNANDEZ: And --

24        PRESIDING COMMISSIONER DAVIS: Just you

25   personally or were you sharing it with your

26   friends?

27        INMATE HERNANDEZ: No. Just for me.

31

1          PRESIDING COMMISSIONER DAVIS:   Okay.

2          INMATE HERNANDEZ:   But the park that I

3   went to there was persons there that I'd give

4   them a beer.   Yeah.

5          PRESIDING COMMISSIONER DAVIS:   But you

6   didn't drink a whole six-pack yourself?

7          INMATE HERNANDEZ:   No.   I must have given

8   away three or four.

9          PRESIDING COMMISSIONER DAVIS:   Okay.   Was

10  that, was that the, the extent that you're, that

11  you'd been at work, you hadn't been drinking

12  during the time you're at work?

13         INMATE HERNANDEZ:   No.

14         PRESIDING COMMISSIONER DAVIS:   Okay.   So

15  you were drinking after work (inaudible) --

16         INMATE HERNANDEZ:   Yeah.   After my

17  work --

18         PRESIDING COMMISSIONER DAVIS:   Three or

19  four beers.

20         INMATE HERNANDEZ:   -- usually I would

21  (inaudible) after I got off of work.   First thing

22  I do is stop at a liquor store and buy, you know,

23  a six pack or, at that time they had tall boys,

24  maybe a couple of tall boys.

25         PRESIDING COMMISSIONER DAVIS:   Okay.   So

26  in addition to a six-pack you had a couple of

27  tall boys too?

32

1          INMATE HERNANDEZ:  Yes.

2          PRESIDING COMMISSIONER DAVIS: Okay.  So

3    how would you describe your ability to make good

4    judgments and so forth about the time that you

5    were, decided to go and check on this property

6    yourself?

7          INMATE HERNANDEZ:  Very bad.  I just, it

8    was a bad, real bad (inaudible).

9          PRESIDING COMMISSIONER DAVIS: It almost

10    seems like a pretty dangerous thing to have done

11    to go into a neighborhood that you weren't

12    familiar with and confront somebody about some

13    property.

14          INMATE HERNANDEZ:  Some (inaudible) it

15    is, it was dangerous.

16          PRESIDING COMMISSIONER DAVIS:

17    (inaudible).

18          INMATE HERNANDEZ:  But at that time my

19    reasoning was not, not of someone that's, you

20    know, capable to understand the consequences.

21          PRESIDING COMMISSIONER DAVIS:  The person

22    that you were with that day, was he a gang

23    member?

24          INMATE HERNANDEZ:  No, sir.

25          PRESIDING COMMISSIONER DAVIS: Anything

26    else that we haven't talked about that you feel

27    is, is important for us to understand today?

33

1          INMATE HERNANDEZ:  I don't understand

2    that.

3          PRESIDING COMMISSIONER DAVIS:  Is -- is

4    there anything that we haven't covered that,

5    that, anything about your, your past history,

6    your family life, any other influences on you,

7    things like that that you think would be

8    important for us to, to review and --

9          INMATE HERNANDEZ:  Oh.

10         PRESIDING COMMISSIONER DAVIS:  -- and

11   understand as we're going through all the

12   information?

13         INMATE HERNANDEZ:  Just that I've always

14   tried, you know, to, to be the best I could.  I

15   was always protective of my family and the area

16   that, that I live and where I come from -- one of

17   the other reasons I went into the military is

18   cause I didn't want to get involved with, you

19   know, the atmosphere at that time going around

20   the (inaudible) and I wanted to, to be the first

21   one other than my sister to be able to help our

22   family find a better place to -- to live.  And I

23   let everybody down because it's hard to do

24   anything.  That just became my --

25         PRESIDING COMMISSIONER DAVIS:  How did

26   you feel when they, when you were confronted with

27   a gun the first time when he pointed the gun at

34

1    you and, and you had to leave?

2            INMATE HERNANDEZ:  I felt scared

3    personally when -- when he pulled the gun out.

4            PRESIDING COMMISSIONER DAVIS: How about

5    after you'd already left?  How'd you feel then?

6            INMATE HERNANDEZ:  Felt anger and sort of

7    like, well nobody does this to me, you know.

8            PRESIDING COMMISSIONER DAVIS:  Feel

9    insulted, disrespected?

10           INMATE HERNANDEZ:  Yes, sir.  Very much.

11   So when my partner came with the idea of a gun I

12   made, says let's go.

13           PRESIDING COMMISSIONER DAVIS:  Any

14   questions, Commissioner?

15           DEPUTY COMMISSIONER SMITH:  Just that a

16   question of -- of clarification.  When

17   Commissioner Davis asked you earlier -- earlier

18   if your knew what kind of a gun it was, you --

19   you said you didn't know.  You thought it might

20   have been nine millimeter?

21           INMATE HERNANDEZ:  Yes.

22           DEPUTY COMMISSIONER SMITH:  In, in the

23   (inaudible) report when, when you were discussing

24   the commitment offense you'd indicated that when

25   you were in the army that you were trained with a

26   .45 caliber?

27           INMATE HERNANDEZ:  Yes, sir.

35

1        DEPUTY COMMISSIONER SMITH:  And when in

2   fact you had earned an expert badge --

3        INMATE HERNANDEZ:  Yes, sir.

4        DEPUTY COMMISSIONER SMITH:  -- in that

5   weapon?

6        INMATE HERNANDEZ:  Yes, sir.

7        DEPUTY COMMISSIONER SMITH:  I'm a little

8   confused by some one that would have earned an

9   expert badge shooting a .45 caliber wouldn't know

10  the difference between a nine millimeter, nine

11  millimeter and a .45.  I mean they're

12  dramatically different.

13        INMATE HERNANDEZ:  Of course.  It wasn't

14  a .45.  I knew that.  And the, the only reason it

15  was a nine millimeter that I became aware of just

16  through after the, you know, the arrest and all.

17        DEPUTY COMMISSIONER SMITH:  Okay.  So you

18  knew what it wasn't, you weren't sure what it

19  was?

20        INMATE HERNANDEZ:  Yes.

21        DEPUTY COMMISSIONER SMITH:  Okay.  Great.

22  I appreciate the clarification.  Thank you.

23        PRESIDING COMMISSIONER DAVIS:  Any further

24  questions?

25        DEPUTY COMMISSIONER SMITH:  No.

26        PRESIDING COMMISSIONER DAVIS:  All right.

27  I'll ask you to turn your attention, please, to

36

1    Commissioner Smith.

2           DEPUTY COMMISSIONER SMITH:    (inaudible)

3    to the C File you were received at the Department

4    of Corrections on, on March 23rd, 1979.    Received

5    here at CTF on June 24th, 1998.    You have a

6    classification score of 19, which is the lowest

7    classification score that a life inmate can

8    attain.    Your last hearing was held on January 6,

9    2005.    You received a one-year denial and that

10   was your twelfth subsequent hearing.    Since

11   you've been incarcerated you generally had a

12   positive adjustment history.    You've had seven

13   CDC 128A's, the last one being in December of

14   2000 for disobeying staff.    And I would have at

15   that part frankly where although you only have

16   seven 128's (inaudible) having been incarcerated

17   for as long as you have been and you've gone

18   through the number of parole hearings that you've

19   gone, gone through that you would have, worked

20   very hard to avoid even a 128.    I mean although

21   that's roughly five years ago, it's still

22   relatively current.    I'm a little surprised by

23   that.    You've had only four CDC 115's, and the

24   last one being December of '98 and that was from

25   mutual combat and, and three of the four 115's

26   had to do with fighting or mutual combat, which

27   was not simply you, you know, failing to report

37

1    for work or failing to follow instructions or, or

2    something of that, that nature.  You've received

3    two certificates of completion in the Infectious

4    Disease curriculum.  One in Sexually Transmitted

5    Infections and that's dated November of 2005.

6    The other Hepatitis and that's dated February of

7    2006.  And you received a Certificate of

8    Completion in Entrepreneurship, that was November

9    of 2005.  I haven't seen that before.  What is

10   that?  What is the basis of that program?

11        INMATE HERNANDEZ:  Oh it's to start

12   getting into the, into the world of business and

13   how to, the basics of starting a business.

14   The -- the investment that you have to make.

15   The -- the difference between a franchising and a

16   sole -- sole proprietor, different aspects of --

17   of a business.

18        DEPUTY COMMISSIONER SMITH:  Okay.  Yeah.

19   As I said I hadn't seen that before.  It sounds

20   like, it was a potentially very valuable program.

21        INMATE HERNANDEZ:  Oh, it is.  Yes.

22        DEPUTY COMMISSIONER SMITH: You received

23   ten Certificates of Achievement, Achievement for

24   completion of FEMA (inaudible) courses.

25        INMATE HERNANDEZ:  Uh-huh.

26        DEPUTY COMMISSIONER SMITH: They were all

27   issued the same month.

38

1          INMATE HERNANDEZ:  Yes.

2          DEPUTY COMMISSIONER SMITH:  They were all

3    issued July of 2005.  Did you take them all

4    during that month?

5          INMATE HERNANDEZ:  No.  What happened is

6    that when, when I chose a course and then I have

7    to wait for a book and then I sent them all at

8    one time.

9          DEPUTY COMMISSIONER SMITH:  Okay.

10         INMATE HERNANDEZ:  And that's how it came

11   in order to (inaudible) that.  Because everything

12   would have to stop on each one.  So I was, I was

13   keeping them all in --

14         DEPUTY COMMISSIONER SMITH:  All at once?

15         INMATE HERNANDEZ:  -- and then, then I

16   sent them all at once.

17         DEPUTY COMMISSIONER SMITH:  Okay.  I knew

18   there had to be a good reason.  Because you got

19   ten of them in this, all issued the, the same

20   month same year.  The -- the various programs

21   were entitled Decision Making, Managing

22   Volunteers, Leadership, Emergency Planning, State

23   Disaster Management, Orientation to Disaster

24   Exercises, Livestock and Disaster, Building for

25   the Earthquakes of Tomorrow, Introduction Into

26   Hazardous Materials and Functions of an Interview

27   Program Manager.

39

1        INMATE HERNANDEZ:  Yes, sir.

2        DEPUTY COMMISSIONER SMITH:  You also

3    participated in the Veterans' Self-help group

4    from August 2004 to February 2005 and your BRAG

5    Membership application was approved in April of

6    2005.  BRAG stands for Balance Re-entry Activity

7    Group.

8        INMATE HERNANDEZ:  Yes, sir.

9        DEPUTY COMMISSIONER SMITH:  Is that an

10   ongoing group?

11       INMATE HERNANDEZ:  Yes.

12       DEPUTY COMMISSIONER SMITH:  Okay.  So

13   you're still participating in that group?

14       INMATE HERNANDEZ:  We have, right now

15   because of staff shortages we're having a monthly

16   meeting.  If it wasn't for staff shortage, we

17   would have at least bi-weekly meetings.

18       DEPUTY COMMISSIONER SMITH:  Describe the

19   program to us.

20       INMATE HERNANDEZ:  The, the program is

21   to, to help inmates coming into prison to get

22   them adjusted into the different aspects of

23   parole.  To prepare them in education.

24   Vocational wise through in self-study or through,

25   through correspondence.  Give them peer group

26   help in the prison.  Let them know that, that

27   even though you're in prison you can help

40

1   yourself do whatever you, whenever your release

2   comes and we have a lot of, lot of inmates that

3   parole everyday and those are the ones that we,

4   we usually get a hold of so we can be able to

5   (inaudible).  If we can help with our, with our

6   own experience of being in prison and how in, in

7   my, my case when I came to prison the, there was

8   no inmate peer trying to help you to better

9   yourself to be able to get out and I felt that

10  the whole story here is of me in prison, had I

11  known about the, that there were any programs

12  like this and then they were going to help me out

13  in understanding way back when I first came to

14  prison instead of letting go two and three years

15  by without doing it.

16      DEPUTY COMMISSIONER SMITH:  Now, you, in

17  reading a little bit about it you, you had to

18  prepare an application and submit it for approval

19  and acceptance?

20      INMATE HERNANDEZ:  Yes, sir.

21      DEPUTY COMMISSIONER SMITH:  Is that

22  right?

23      INMATE HERNANDEZ:  That's true.

24      DEPUTY COMMISSIONER SMITH:  Sounds like

25  it's --

26      INMATE HERNANDEZ:  Only --

27      DEPUTY COMMISSIONER SMITH:  -- it's not

41

1    an easy -- an easy program to become a part of;

2    is that correct?

3             INMATE HERNANDEZ:  (inaudible).  You have

4    to do it a team.  You get a team to yourself and

5    that's at least two persons vouching for your,

6    you can't have no 115, no disciplinary.  You have

7    to have a good work record.  You have to be sort

8    of like an outstand still in prison.

9             DEPUTY COMMISSIONER SMITH:  And you're on

10   a number of waiting lists for a period of time.

11   Are you still on waiting lists?

12            INMATE HERNANDEZ:  Yes, sir.

13            DEPUTY COMMISSIONER SMITH:  What -- what

14   waiting lists are you on?

15            INMATE HERNANDEZ:  Two.  I got on one of

16   the, it's a (inaudible) program that, that's

17   known nationally.  It's called Alternative

18   Survivors and I'm on that waiting list and also

19   on the Alcoholics Anonymous.

20            DEPUTY COMMISSIONER SMITH:  Okay.  So

21   you're on those.  Okay.  Is it Narcotics

22   Anonymous or Alcoholics Anonymous?

23            INMATE HERNANDEZ:  Alcoholic Anonymous.

24            DEPUTY COMMISSIONER SMITH:  Okay.  And

25   how long have you been on, on that waiting list?

26   I would guess probably at least a year?

27            INMATE HERNANDEZ:  Something like that.

42

1    Yeah.  Because I'll be continuing (inaudible) yet
2    and sometime like when we're locked down that
3    would be like (inaudible) past three weeks some
4    of the sponsors they sort of like lose interest
5    and then we have to find another sponsor to be
6    able to, to, to sponsor the (inaudible).
7         DEPUTY COMMISSIONER SMITH:  You were
8    assigned as a culinary clerk until July 2005 and
9    then assigned to the receiving and release clerk.
10   Are you still in that assignment?
11        INMATE HERNANDEZ:  No, sir.  I'm back in
12   the culinary.
13        DEPUTY COMMISSIONER SMITH:  When -- when
14   did you go back in culinary?
15        INMATE HERNANDEZ:  Six months ago.
16        DEPUTY COMMISSIONER SMITH:  About the
17   first of the year then?
18        INMATE HERNANDEZ:  (inaudible).
19        DEPUTY COMMISSIONER SMITH:  Okay.
20        INMATE HERNANDEZ:  (inaudible).
21        DEPUTY COMMISSIONER SMITH:  And doing
22   clerk functions there in the culinary?
23        INMATE HERNANDEZ:  Yes, sir.  The same,
24   the same job I did.
25        DEPUTY COMMISSIONER SMITH:  You had a
26   psychological evaluation.  It's somewhat dated,
27   it's July 23 of 2004 prepared by Dr. Hewchuk, H-

43

1    E-W-C-H-U-K.  Before I go to that evaluation, are

2    there any other activities that you've been

3    involved in in the institution since your last

4    hearing that I haven't addressed that we should

5    be aware of?

6              INMATE HERNANDEZ:  Yes.  I'm taking now a

7    business course through the Education Department.

8    I have my, my credits.  I've -- I signed up

9    (inaudible) and now I'm doing Business Principles

10   and Management.  And I'm going on unit three,

11   with an overall course average of 93.

12             DEPUTY COMMISSIONER SMITH:  Good.  And

13   that's through the --

14             INMATE HERNANDEZ:  The Educational --

15             DEPUTY COMMISSIONER SMITH:  -- the

16   Education Department?

17             INMATE HERNANDEZ:  Yes.

18             DEPUTY COMMISSIONER SMITH:  Okay.  And

19   when did you start that?

20             INMATE HERNANDEZ:  In, I started that on,

21   on 11/17/2005.

22             DEPUTY COMMISSIONER SMITH:  Okay.  Thank

23   you.  Anything else?

24             INMATE HERNANDEZ:  No.

25             DEPUTY COMMISSIONER SMITH:  Okay.

26   Because the, the psychological evaluation is

27   somewhat dated and wouldn't have been used

44

1    (inaudible) from an assumption that it would have

2    been used at your last hearing I'm going to

3    identify only a couple of sections in what's a

4    fairly brief evaluation to begin with.  And then

5    if there are any comments or any parts of the

6    evaluation that you or Ms. Rutledge would like

7    to, to add for the record I'll certainly give you

8    that opportunity.

9         INMATE HERNANDEZ:  Yes, sir.

10        DEPUTY COMMISSIONER SMITH:  Running

11   through the, the first page the, the doctor

12   discusses basically your 115's.  And it talks

13   about the, the issue of alcohol abuse and, and

14   that's been, I'm not going to go into detail

15   there because we, we've addressed that with you

16   being on the waiting list for Alcoholics

17   Anonymous.  But the doctor does write,

18        "That during your incarceration you've

19        completed Vocational Programming and

20        Television Production, Data Processing

21        and Basic Electronics."

22        Is that --

23        INMATE HERNANDEZ:  Yes, sir.

24        DEPUTY COMMISSIONER SMITH:  That is

25   accurate?

26        INMATE HERNANDEZ:  Yes, sir.

27        DEPUTY COMMISSIONER SMITH:  Okay.

45

1    And that the doctor concludes that,

2        "Currently you are a suitable

3        candidate for parole with these

4        consideration with the recidivism

5        and risk factor no greater than

6        that of the average citizen in

7        community."

8        He goes on to note that,

9        "Due to your marketable skills and close

10       family support it's expected that your

11       transition to freedom and personal

12       responsibility would be relatively

13       smooth."

14   INMATE HERNANDEZ:  Yes.

15   DEPUTY COMMISSIONER SMITH:  Any comments

16   or any other sections of that evaluation that you

17   or Ms. Rutledge would like to address for the

18   record?

19   ATTORNEY RUTLEDGE:  I would.  Yes.  On

20   page 1, third paragraph, it says his last violent

21   based 115 occurred in 1998.  Although Dr. Turedey

22   (phonetic) in his previous report assessed inmate

23   Hernandez,

24       "As low risk in a community setting.

25       The Board expressed some concern

26       about a pattern of, of poor violence

27       based 115 during the 27-year period

46

1    of incarceration.  A review of the

2    actual 115 document is in the C-File

3    and subsequent discussion with

4    inmate Hernandez confirmed that each

5    instance inmate Hernandez was the

6    victim of an assault (inaudible) by

7    another inmate reacted by defending

8    himself.  The recent CC policy

9    classifying a majority of fights

10   between inmates and mutual combat

11   searched with further (inaudible).

12   Actual issues of fact -- and he

13   would -- part of it due to his

14   remarkable skills in (inaudible)

15   family support it is expected that

16   his transition and freedom and

17   personal responsibility would be

18   (inaudible) tight."

19   Thank you.

20   **DEPUTY COMMISSIONER SMITH:**  Anything

21   else?

22   **ATTORNEY RUTLEDGE:**  No, sir.

23   **DEPUTY COMMISSIONER SMITH:**  Okay.  Thank

24   you.  We're going to refer back again to the, the

25   04 Board Report.  Since the current Board Reports

26   I believe referred this all back to that one.

27   Under parole plans it indicates that you'd, you

47

1  plan on residing with your brother and sister-in-

2  law who at that time lived in Pacoima.

3         INMATE HERNANDEZ:  Yes, sir.

4         DEPUTY COMMISSIONER SMITH:  We have a

5  letter, which I'll address from your brother and

6  sister-in-law shortly, but they now live Sylmar.

7         INMATE HERNANDEZ:  Yes, sir.

8         DEPUTY COMMISSIONER SMITH:  And then

9  under employment indicates that you're confident

10  that you can employ, that you can get employment

11  with a Marco Sanchez who's a cousin?

12         INMATE HERNANDEZ:  Yes.

13         DEPUTY COMMISSIONER SMITH:  Who owns a

14  body and fender mechanic shop in Rosemead and in

15  the San Fernando Valley.  This -- he owns two

16  businesses?

17         INMATE HERNANDEZ:  Yes.  He, he owns --

18         DEPUTY COMMISSIONER SMITH:  And that you

19  would be employed by him to -- doing clerical

20  duties.

21         INMATE HERNANDEZ:  Yes.

22         DEPUTY COMMISSIONER SMITH:  And the

23  letter that, that we have, as I indicated is from

24  your brother and sister-in-law.  It stated that

25  December 26, 2005, indicates that writing on your

26  behalf they would welcome you into their home in

27  Sylmar.  And that, you know, they're well

48

1  established people because they're both employed.

2       Do you know what kind of a residence they

3  have in Sylmar?

4       INMATE HERNANDEZ:  Yeah.  It's, and it's

5  not, not considered a house and it's sort of

6  like, I don't know how you would say, duplex I

7  believe or something like that.

8       DEPUTY COMMISSIONER SMITH:  Like a duplex

9  or a townhouse?

10      INMATE HERNANDEZ:  Something like that.

11      DEPUTY COMMISSIONER SMITH:  Something

12 like that?  Something larger than an apartment?

13      INMATE HERNANDEZ:  Yes.  Something like,

14 yes.

15      DEPUTY COMMISSIONER SMITH:  Do you know

16 how many bedrooms it has?

17      INMATE HERNANDEZ:  I think they have two.

18 I don't honestly --

19      DEPUTY COMMISSIONER SMITH:  The, the

20 reason I'm asking is that in, in the letter it

21 indicates that beside your brother and his wife

22 they also have three children.

23      INMATE HERNANDEZ:  Yeah.

24      DEPUTY COMMISSIONER SMITH:  So if you

25 were residing there where would you, where would

26 you sleep?

27      INMATE HERNANDEZ:  Yeah.  Good question.

49

1    DEPUTY COMMISSIONER SMITH:  It's -- you

2  know, I'm not discounting the, the value of the

3  letter in terms of --

4    INMATE HERNANDEZ:  I understand.

5    DEPUTY COMMISSIONER SMITH:  -- your

6  brother would like to offer you a residence.

7    INMATE HERNANDEZ:  (inaudible).  No.  I'm

8  just (inaudible) --

9    DEPUTY COMMISSIONER SMITH:  But I'm, but,

10  but I'm wondering just how --

11    INMATE HERNANDEZ:  Exactly.

12    DEPUTY COMMISSIONER SMITH:  -- realistic

13  there is in the fact that such a five-person

14  family already --

15    INMATE HERNANDEZ:  Uh-huh.

16    DEPUTY COMMISSIONER SMITH:  The other

17  question I have is that if you were going to, and

18  I'm not familiar with that, with that area

19  geographically.  If you were going to be

20  residing, for the sake of conversation, in the

21  Sylmar area --

22    INMATE HERNANDEZ:  Yeah.

23    DEPUTY COMMISSIONER SMITH:  -- how far is

24  that from Rosemead or San Fernando Valley?

25    INMATE HERNANDEZ:  To Rosemead, I'd said

26  a good drive.

27    DEPUTY COMMISSIONER SMITH:  (inaudible).

50

1    Sometimes a good drive is on a sunny Sunday

2    afternoon and --

3            INMATE HERNANDEZ:  Yeah.

4            DEPUTY COMMISSIONER SMITH:    -- sometimes

5    it's in commute driving?

6            INMATE HERNANDEZ:  Yeah.  This, it, it is

7    a long commute.  It's going to be a long commute

8    for the I believe, you know, first four weeks

9    till I get established.  And then I -- I have a

10   plan also to be able to apply under the Veterans'

11   Assets, which it's going to help me under, for to

12   be able to find a larger place, you know,

13   hopefully, you know, I can use my GI Bill to be

14   able to get a down payment for a home being that

15   my brother's working, and he's also a Veteran,

16   and so these are, these are the things that I

17   have sort of looked at and be able to make it.

18           DEPUTY COMMISSIONER SMITH:  And have you

19   contacted the VA regarding those benefits would

20   be available to you?

21           INMATE HERNANDEZ:  I have.  Yes, I have.

22           DEPUTY COMMISSIONER SMITH:  Okay.

23           INMATE HERNANDEZ:  I have letters from

24   them and I have all of the, they sent me a, a

25   whole packet of the (inaudible).

26           DEPUTY COMMISSIONER SMITH:  So what's

27   the, what's the most recent letter?  Because

51

1    those are letters that, that this Panel, as past

2    Panels, you know, should be aware of.

3        INMATE HERNANDEZ:  And I, and I didn't

4    bring the copy of that letter.  But I'll, I'll be

5    glad to, I, I can show you the latest one that I

6    have.  I think it's, it's about a year old that,

7    that was on - I don't want to take much of your

8    time.

9        DEPUTY COMMISSIONER SMITH:  No.  We,

10   this, this is an extremely important hearing.

11   You have all the, all the time that you need.

12       INMATE HERNANDEZ:  I don't have it, but I

13   can get in touch with them because the GI Bill I

14   think, I understand it to be, has changed since I

15   think after I think '82.  And in the time that,

16   that I served was during the Viet Nam era time,

17   which means that all my benefits are different

18   than the benefits that are now given.  And in,

19   and in mine a lot of them are still there.  The

20   only, the only one that expired during my

21   incarceration was the education benefit that I

22   had.  That only lasted ten years and, and I'm

23   assuming that expired.  But that's the only

24   benefit that's, that, that has expired since I've

25   been in prison.  The home loan, the 1980 I

26   believe, 1986 Veterans' Benefit Bill that passed

27   by President, I believe it was, I forget the

52

1    President, but I recall --

2              DEPUTY COMMISSIONER SMITH:   (inaudible).

3              INMATE HERNANDEZ:   -- that it was, it

4    was, this was to help the Veterans that were

5    homeless and the persons that were, that were

6    also coming out of prison or that needed help in

7    adjustment that that was also going to be

8    beneficial to us.

9              DEPUTY COMMISSIONER SMITH:  Some --

10   something that, that I'm curious about, you know,

11   the, you know this is your 13th subsequent

12   hearing.

13             INMATE HERNANDEZ:  Seventeen.

14             DEPUTY COMMISSIONER SMITH:  No.  We had

15   your 12th was in '05.  So this, this is your 13th

16   subsequent hearing.  So you had one initial,

17   which was 14 and you probably had a couple of

18   document, documentation hearings prior to that.

19             INMATE HERNANDEZ:  Well, when I came in

20   at the time I never had a document, I had one

21   documentation in '80, in '80 --

22             DEPUTY COMMISSIONER SMITH:  Well, my

23   point is that, that I'm sure at least, if not in

24   every one of those instances the, in the majority

25   of those instances you would have been counseled

26   on how important it is to have letters of support

27   for residence, employment, from family and

53

1  friends and so forth.

2        INMATE HERNANDEZ:  Yes.

3        DEPUTY COMMISSIONER SMITH:  And you have,

4  you know, a very positive letter from your

5  brother.

6        INMATE HERNANDEZ:  Yes.

7        DEPUTY COMMISSIONER SMITH:  You know,

8  certainly some, some questions with regard to the

9  viability of the residential plan that we've

10  already addressed.  But there's no employment

11  letters.

12        INMATE HERNANDEZ:  Yes.

13        DEPUTY COMMISSIONER SMITH:  And, and I'm

14  wondering why.

15        INMATE HERNANDEZ:  Prior to '88 I used to

16  always get letters, a lot of letters, a lot of

17  jobs, opportunity.  I was found suitable in 1988

18  and then on review it was --

19        DEPUTY COMMISSIONER SMITH:  Yeah.  But,

20  but we're talking now.  We're talking now 2006.

21        INMATE HERNANDEZ:  Well I'm getting, I'm

22  getting there.

23        DEPUTY COMMISSIONER SMITH:  Okay.  Well I

24  don't want to roll the clock back for 20 years.

25        INMATE HERNANDEZ:  Okay.

26        DEPUTY COMMISSIONER SMITH:  But I want to

27  talk about right now, because it, because it's

54

1    right now that's critical to you.

2         INMATE HERNANDEZ:  Exactly.  I understand

3    that.  And my reason was that every year that I

4    come to this hearing my family, the person that I

5    love, used to get their hopes up high, real high.

6    And being that in 1990 I received a, I was

7    (inaudible) received a, a release date and I held

8    that for two years.  They had me coming home

9    already and then, you know, the extension period

10   and it was taken away and ever since then I kind

11   of like that, that I wasn't going to put them

12   through this again.  My grandmother died during

13   (inaudible) time and, you know, I, I (inaudible),

14   you know why should I be bothering them people

15   out there if I'm not never going to get out.

16        DEPUTY COMMISSIONER SMITH:  Well, I -- I

17   understand your, your point of courtesy and

18   certainly we're a long way from making a decision

19   about whether or not we're going to find you

20   eligible today.

21        INMATE HERNANDEZ:  Right.

22        DEPUTY COMMISSIONER SMITH:  But you need

23   to understand that if, if you don't have all the

24   I's dotted and all the, the T's crossed that to

25   an extent you may be handcuffing the Board.  And

26   again, you know, because of, of the number of

27   hearings you've had and, you know, other past

55

1    letters, you know, we'll certainly discuss those

2    at the recess, so I'm not suggesting that, you

3    know, we're not, not going to grant at this

4    point, because again I, I have no idea.  But you

5    need to understand at the very least that by not

6    establishing parole plans, your residence and

7    employment and getting the kinds of letters that

8    may get other people's hopes up that you tend to

9    handcuff the Panels.  And you're not doing

10    yourself the service; you're doing yourself a

11    disfavor.  You need to understand that.  I'm sure

12    you've heard that before.

13            INMATE HERNANDEZ:  Yes, I have.

14            DEPUTY COMMISSIONER SMITH:  But some,

15    some things bear repeating.

16            INMATE HERNANDEZ:  Yes, sir.  I, I

17    appreciate it.

18            PRESIDING COMMISSIONER DAVIS:  We'll take

19    a short recess.

20            DEPUTY COMMISSIONER SMITH:  Yes.

21                        R E C E S S

22            DEPUTY COMMISSIONER SMITH:  And the

23    previously identified is back in the hearing

24    room.

25            PRESIDING COMMISSIONER DAVIS: All right.

26    I appreciate everyone's indulgence.  It was

27    getting a little stuffy in here for me.  So I've

56

1    also given everyone permission to shed their

2    coats if that's all right with you Mr. Hernandez.

3              INMATE HERNANDEZ:  Oh, yes.

4              PRESIDING COMMISSIONER DAVIS: We don't

5    want to seem to informal to you, but --

6              INMATE HERNANDEZ:  Sure.

7              PRESIDING COMMISSIONER DAVIS: -- it, it

8    sure does get very stuff very quickly, so -- All

9    right.  With that we'll resume where we left off.

10             DEPUTY COMMISSIONER SMITH:  So we also,

11   also sent out what are known as 3042 notices.

12   Those are letters that go out to the various

13   Criminal Justice Agencies that were involved in

14   your commitment offense.  We didn't receive any

15   responses back to those notices, although you do

16   have Mr. Turley here representing the Los Angeles

17   County District Attorney's Office and he'll be

18   participating in the hearing in just a few

19   moments.  Before I return to Commissioner Davis

20   is there any, any comments that you'd like to

21   make with regard to your parole plans that I

22   haven't addressed?

23             INMATE HERNANDEZ:  No.

24             DEPUTY COMMISSIONER SMITH:  Okay.  Thank

25   you.

26             INMATE HERNANDEZ:  (inaudible).

27             DEPUTY COMMISSIONER SMITH:  Commissioner.

57

1          PRESIDING COMMISSIONER DAVIS:  Tell me

2    about your participation in AA.  How, what, what

3    kinds of things have you found (inaudible) in

4    there?

5          INMATE HERNANDEZ:  AA means, it's a grave

6    tool for a person that's in need of, of help

7    dealing with alcoholism.  It made me realize that

8    I can enjoy some activities without, without

9    drinking alcohol.  It made me realize that I

10   missed a lot of special events by drinking

11   alcohol.  I can remember in one day that my

12   sister brought pictures of the wedding.  I could

13   never, I couldn't remember the wedding.  I

14   couldn't remember the members that participated

15   in the wedding.  And because I was always

16   drinking.  And it made me realize that it's also

17   detrimental to your health.  Especially as you

18   get older.  It does a lot of damage to your

19   liver.

20         PRESIDING COMMISSIONER DAVIS: You

21   consider yourself to be an alcoholic?

22         INMATE HERNANDEZ:  Yes, sir.

23         PRESIDING COMMISSIONER DAVIS: Is that a

24   life-long issue for you?

25         INMATE HERNANDEZ:  Yes, it is going to be

26   a life long issue.

27         PRESIDING COMMISSIONER DAVIS:  What

58

1    things have you had to plan for your ultimate

2    release in terms of identifying AA programs on

3    the outside?

4           INMATE HERNANDEZ:  I know that in

5    anywhere, in any city, I can dial 1-800-AA and

6    I'll get a, a sponsor on the line that's going to

7    help me.  There are thousands and thousands of

8    organizations dealing with Alcohol Anonymous.

9    Not only for the alcoholic, but also for the

10   family members, because they too I believe suffer

11   and --

12          PRESIDING COMMISSIONER DAVIS:  All right.

13   Commissioner, any questions that you might have?

14          DEPUTY COMMISSIONER SMITH:  No.

15          PRESIDING COMMISSIONER DAVIS:  Mr.

16   Turley, questions?

17          DEPUTY DISTRICT ATTORNEY TURLEY:  Just a

18   couple.  I kind of missed something.  What

19   periods was, was the inmate actively

20   participating in AA?

21          PRESIDING COMMISSIONER DAVIS: Do you know

22   when you were participating in AA what years?

23          INMATE HERNANDEZ:  I believe it's going

24   on two years right now on, on the waiting list.

25          PRESIDING COMMISSIONER DAVIS: Well two

26   years on the waiting list, but prior to that what

27   was your, were you actively participating in AA

59

1    prior to that?

2            INMATE HERNANDEZ:  Not AA, but there was

3    a, a span of time that I had stopped

4    participating for what, (inaudible) AA.  That

5    being the last, the last chrono that I have there

6    is from, should be on, on my, on my file.  Right

7    before, before I got here in '89.  No.  '98.  You

8    have on your list '98?

9            PRESIDING COMMISSIONER DAVIS: You got

10   here in '98.

11           INMATE HERNANDEZ:  When I got here.

12   Thank you.

13           DEPUTY DISTRICT ATTORNEY TURLEY:  And how

14   long have you participated in AA?

15           PRESIDING COMMISSIONER DAVIS: In total

16   how long have you participated in AA?

17           INMATE HERNANDEZ:  Oh.  Since '79.

18           PRESIDING COMMISSIONER DAVIS:  Okay.

19           DEPUTY DISTRICT ATTORNEY TURLEY:  When

20   was it that the inmate first admitted to his

21   guilt in this offense to the authorities?

22           PRESIDING COMMISSIONER DAVIS: Do you

23   understand the question?

24           INMATE HERNANDEZ:  Yes.

25           PRESIDING COMMISSIONER DAVIS: Okay.

26           INMATE HERNANDEZ:  I admitted to this

27   crime during a session that my (inaudible) that

60

1    that I mastered the therapy that they had me do.

2    During that group, so possibly five or six

3    persons that have to talk about the crime and

4    have to admit that you commit the crime.  And

5    that was, I was, I was believe number four or

6    five and as I heard each person I felt a lot of

7    guilt and that was the first time that I, that I

8    voiced (inaudible) as it happened and, and

9    admitted to, admitted to, to committing this,

10   this offense.

11          PRESIDING COMMISSIONER DAVIS:  And what

12   year was that?

13          INMATE HERNANDEZ:  I think it was '88.

14   Or '87.

15          DEPUTY DISTRICT ATTORNEY TURLEY:  No

16   further questions.

17          PRESIDING COMMISSIONER DAVIS:  All right.

18   Ms. Rutledge?

19          ATTORNEY RUTLEDGE:  Just a question too.

20   I wanted to just review some of the skills that

21   you've learned since you've been in prison.  You

22   worked as a clerk?

23          INMATE HERNANDEZ:  Yes.

24          ATTORNEY RUTLEDGE:  How many years did

25   you put in as a clerk all together, do you think,

26   in prison?

27          INMATE HERNANDEZ:  This time (inaudible)

61

1    say roughly '79 and I've done nothing but

2    clerical except for some time that I spent doing

3    vocational courses.  I've always -- I always have

4    classes.

5         ATTORNEY RUTLEDGE:  Did you complete

6    (inaudible)?

7         INMATE HERNANDEZ:  Yeah.  Data

8    Processing.

9         ATTORNEY RUTLEDGE:  Did that help your

10   typing or what did you learn in the Data

11   Processing?

12        INMATE HERNANDEZ:  It showed me to

13   manipulate difference softwares.  It showed me a

14   different aspect of computer hardware and how to

15   maintain records, things that are needed in the

16   clerical environment.

17        ATTORNEY RUTLEDGE:  All right.  And you,

18   what other jobs have you held at the prison that

19   taught you skills that would, you could use to be

20   employed on the outside?

21        INMATE HERNANDEZ:  Oh I think I've been

22   a -- I've been a -- I'm trying to remember the --

23   the title.

24        ATTORNEY RUTLEDGE:  Okay.  (inaudible).

25        INMATE HERNANDEZ:  I did all the, I typed

26   all of the, the, the invoices for purchasing.  I

27   was a purchasing clerk at the hospital, T and C.

62

1   I dealt with the purchasing orders and then

2   receiving and then we used clerical dealing with

3   different aspects of, of maintaining the, the

4   supplies. (inaudible) the culinary, on the

5   culinary (inaudible). And I, I maintained a

6   database on all the culinary workers. I did the

7   payroll. I, I prepared the lists for the

8   (inaudible) so they can come to work. It's been,

9   then I worked as at different job positions.

10         ATTORNEY RUTLEDGE: All right. Any other

11   skill? You were loading docks before you

12   (inaudible) at that?

13         INMATE HERNANDEZ: Yes.

14         ATTORNEY RUTLEDGE: And you got your --

15   your speech thing for an auto accident?

16         INMATE HERNANDEZ: Yes, ma'am.

17         ATTORNEY RUTLEDGE: All right. No

18   further questions.

19         PRESIDING COMMISSIONER DAVIS: All right.

20   Thank you. Mr. Turley, (inaudible).

21         DEPUTY DISTRICT ATTORNEY TURLEY: Thank

22   you. The, very long-standing conventional list

23   in, you know, things you just said. Perhaps the

24   very best school to teach maturity and

25   responsibility is military service. And this

26   inmate had the benefit of that school for about

27   three and a half years. And apparently he was a

63

1    poor student.  Almost immediately after getting

2    out of the army rather than having learned

3    responsibility, rather than learn the, the

4    lessons of growing up, take control of himself,

5    keeping his nose clean and holding a good job he

6    seemed to learn irresponsibility and the only

7    meaningful experience that based on what we've

8    heard today evolved from the army was that he

9    came out of the army with a substantial amount of

10   experience in how to handle a handgun.  The

11   particular, the underlying offense here was

12   again, part of, of a pattern of, of the events

13   that were criminal tied to alcohol.  He was out

14   of the army a very short time, stole a taxicab

15   and then in less than a year after he got out of

16   the army he committed this offense.  By his own

17   admission fails to discuss what he believes was a

18   burglary with the police and decides to take

19   things into his own hand.  He was confronted by a

20   person, makes him angry, he's got a few beers

21   under his belt, he goes off, gets a gun, comes

22   back and without seeing (inaudible) over anything

23   else shoots another person right through the

24   heart.  Killed him dead.  Chases two others and

25   shoots at them.  Then for an additional period,

26   approximately eleven years of so by this

27   statement, eleven or twelve years, he still

64

1    refuses even to admit to the authorities his own
2    guilt in the matter.  And that's, it's
3    commendable that he finally got around to that,
4    but this is a very serious crime, took a person's
5    life, didn't seem to give it any, any thought at
6    all.  Walked up to a person virtually at point
7    blank range and shoots him through the heart and
8    (inaudible) to that offense alone is the
9    appropriate for denial of parole.  At the time
10   that he committed this offense, again he was 23
11   years old.  He'd had substantial experience with
12   law enforcement agencies due to his own
13   activities.  Highly improbable that he didn't
14   recognize that it was unlawful for him to even be
15   in possession of the firearm.  And he -- he made
16   a concerted effort went, went right to the heart
17   of the matter indications criminal behavior.  I
18   think that for all these reasons, but primarily
19   focusing on the, on his failure to, to learn the
20   lessons of life at an age when he should have
21   been completely mature he engaged in this, this
22   offense for a very trivial reason showing no
23   regard to human life and killed another person
24   in, (inaudible) a sheer act of callous disregard
25   for human life.  And the people would recommend
26   that parole be denied at this time.  Thank you
27   very much.

65

1          PRESIDING COMMISSIONER DAVIS:  Thank you.

2   Thank you.  Ms. Rutledge?

3          ATTORNEY RUTLEDGE:  Thank you.  Mr.

4   Hernandez is 52 years old; is that correct?

5          INMATE HERNANDEZ:  Fifty-one.

6          ATTORNEY RUTLEDGE:  Fifty-one.  He's 51

7   years old.  At the time this commitment offense,

8   which was 29 years ago, is that right?  The

9   offense in itself --

10          INMATE HERNANDEZ:  Yes, ma'am.

11  (inaudible).

12          ATTORNEY RUTLEDGE:  -- was in 1977.  He

13  was 23?  Twenty-four, twenty-three?

14          INMATE HERNANDEZ:  Yes.

15          ATTORNEY RUTLEDGE:  Twenty-three years

16  old.  A lot of time, I mean this is a crime

17  that's nearly 30 years old.  So as far as, as,

18  him serving his time it's definitely met.  He, in

19  those 30 years he had four 115's?  Yeah.  I think

20  it's four.  I'm just going to look refer to that.

21  And --

22          DEPUTY COMMISSIONER SMITH:  That's

23  correct, Counselor.  It's four.

24          ATTORNEY RUTLEDGE:  It's four.  And they

25  were all; they all had big spans I want to note.

26  There were seven years from '83 to '90.  Four

27  years.  Got another one in '94.  Four more years.

66

1    So it, it wasn't like he was, you know, racking

2    them up one a year or one every other year.

3    There was just a significant amount of time that

4    transpired between each one.  And the last one

5    being more than eight years ago.  And I think

6    that, and prior to him coming here he didn't

7    really have a consistent record of any kind of

8    violence.  It sounds to me like when he went to

9    the military he learned how to shoot guns.  He

10   probably wouldn't have felt this confident that

11   day with a gun.  I mean I -- I was amazed to take

12   a gun that you, and never tried to shoot it

13   first, you know, unless you've got some kind of

14   skill in, in that regard.  This was a situational

15   circumstance where he just applied poor judgment

16   for whatever reason.  But that again was almost

17   30 years ago.  Today he's -- he's complied with

18   everything in the system that he's been asked to

19   do.  In fact, there's an, there's an old Board

20   Report I'll pull up where it was dated 1987, his

21   counselor at that time said that he'd been

22   complying with the Board of Prison, at that time

23   the Board of Prison Terms and Recommendations, he

24   remained disciplinary free, he upgraded

25   vocationally, participated in self-help, there's

26   lots of Board Reports that indicated a

27   participation and there was, he did another AB

67

1    Substance Abuse, and another course.  He'd done
2    countless self-help groups..  More recently some
3    prison fellowship work in fact a few years ago.
4    He has college courses.  He completed his
5    (inaudible).  Lots of (inaudible) chronos for his
6    different jobs he's had throughout the years and
7    I want to, I think the, the two main things
8    about, about him today are one, he meets the
9    suitability factors completely.  He's got
10   marketable skills, he has a place to live with
11   family members who know him in LA County upon his
12   release.  Second, he's been found suitable twice.
13   Two different Boards, two years apart, found Mr.
14   Hernandez suitable and other Boards too have
15   referred him to, you know, I guess to (inaudible)
16   commitment offense to, sent him back for psyches
17   and he did fine.  He did fine in the Cat X
18   program.  Going back to '87 he got a great psych
19   report.
20            "The probability of him committing a
21            violent act is considerably reduced
22            from what it was at the time of his
23            arrest and there was a high
24            probability that he could complete a
25            course of parole without incident.
26            He has the capacity to make a good
27            occupational and social adjustment

1       on release."

2       That's '87. And then moving up to '99

3   he, he, on, on the diagnostic impressions he had

4   no personality disorder. He had a gap of '90.

5   His prognosis is very positive for being able to

6   maintain his current mental (inaudible) in the

7   community upon parole. And then review of the

8   life crime is that he understood several of the

9   key factors, which favorable of the crime. He

10  acknowledged that he deserves whatever punishment

11  will come to him for his actions. He stated it

12  was never his intention to kill anyone. I

13  believe this inmate showed above average

14  understanding that why this crime occurred and

15  the appropriate and genuine amount of remorse.

16  And then, then up to a recent psyche report,

17  which you reviewed. So over decades he'd gotten

18  good psyche reports. Again he's been found

19  suitable twice and he's complied with everything,

20  as far as suitability factors goes. He meets all

21  of them. And he has, again, nearly 29 years in.

22  So all of those things considered, I would ask

23  the Board to give him a parole date today. And,

24  and I would note too that because he's been found

25  suitable twice I would also ask the Board to set

26  a term. Because I believe that the, the, under

27  the law that he was sentenced under when he's

69

1   found suitable a term is supposed to be set.

2          PRESIDING COMMISSIONER DAVIS: Okay.

3   Thank you.  Mr. Hernandez, now it's your

4   opportunity to address the Panel directly and

5   tell us why you believe that you are suitable for

6   parole.

7          INMATE HERNANDEZ:  Yes' sir.  My thoughts

8   right now are running past me right now, but I

9   have to say that I don't blame nobody for

10  committing this crime, because I, I'm very sorry

11  for it.  And I was (inaudible) it's been this

12  long.  I feel, and I beg for, another chance just

13  to, to live this remaining years that I probably

14  have with my family.  And I wish then that, that

15  I probably have no right to, to ask for this.

16  And, and I know that this time that I've done

17  here is not going to be compared to, to finally

18  when I reach the judgment when I (inaudible).  So

19  that's --

20          PRESIDING COMMISSIONER DAVIS:  All right.

21  Thank you very much, sir.

22          DEPUTY COMMISSIONER SMITH:  Thank you.

23          PRESIDING COMMISSIONER DAVIS: We'll now

24  recess for deliberation.

25                          R E C E S S

26                          --oOo--

27

70

1           CALIFORNIA BOARD OF PAROLE HEARINGS

2                       D E C I S I O N

3           DEPUTY COMMISSIONER SMITH:  For the

4      record, everyone previously identified is back in

5      the hearing room.

6           PRESIDING COMMISSIONER DAVIS: This is the

7      matter of Peter Hernandez, CDC number C-03015.

8      In a review of all information received from the

9      public and relied on the following circumstances

10     in concluding the prisoner is not suitable for

11     parole, he would pose a reasonable risk of danger

12     to society or a threat (inaudible) he was in

13     prison we come to this conclusion by the

14     commitment offense that was committed in a

15     special callous manner.  There were multiple

16     victims attacked (inaudible) one was killed in

17     the same incident.  The motive for the crime was

18     very (inaudible) in relation to the offense.

19     These conclusions were drawn from the Statement

20     of Fact wherein the prisoner as to what he

21     describes as an attempt to recover stolen

22     property where he was threatened by what he

23     describes as an armed person.  He sought out a

24     weapon, put himself back into a dangerous

25     situation, confronted the person who may or may

26     not have been involved in the theft of his

27     P. HERNANDEZ  C-03015  DECISION PAGE 1  7/13/06

1    sister's property and without seeing a weapon or
2    any (inaudible) and threat he used this, he used
3    his own weapon to shoot and kill the victim then
4    turned the weapon on to the victims' two
5    companions shooting at them, striking them in the
6    leg.  We find there is basically a pattern of
7    criminal conduct and a failure to prophet from
8    the society previous attempt to correct
9    criminality specifically adult probation.  In
10   regard to institutional behavior we find that
11   there are seven 128A counseling chronos, the last
12   of which was in December of 2000, and four
13   serious 115 disciplinary (inaudible), the last of
14   which was in February of 1998.  The Psychological
15   Report of July of 2004 by Dr. (inaudible) is
16   supportive and the, with regard to parole plans,
17   we find that the parole plans are not realistic.
18   There is, there, there is virtually no employment
19   plan, there's no support of even employment
20   information by statements that there are some
21   distance, there's no real plan though.  And your
22   residential plans of sharing a two-bedroom
23   residence with two adults and three the children
24   seems suspect.  Now I say that understanding that
25   if that's the option then what you need to do is
26   come back in here with an
27   P. HERNANDEZ   C-03015   DECISION PAGE 2   7/13/06

72

1    explanation that, yes, we understand it's going

2    to be tight, we thought about this. We'll put a

3    cot up in the living, we're going to partition

4    off, what, whatever it is. If that's the case

5    then, then let us know that. And that's where

6    you need to, that's where you need to focus your

7    work. I understand and appreciate that at some

8    point in time you became embarrassed or, or you

9    didn't want to burden your family more with, with

10   denial after denial. I understand. But the

11   thing of it is this is a critical part of this

12   and there's -- you could earn a date, but this

13   has to be part of your earning that date. So you

14   need to spend this, this time now in figuring out

15   your parole plan. Get a job offer. You have

16   skills, there's no reason why you can't get a job

17   offer out there, or at least something lined up.

18   Do some research to determine where you can find

19   a job given the skills that you have. And let

20   your family help you.

21          INMATE HERNANDEZ:  Okay, sir.

22          PRESIDING COMMISSIONER DAVIS:  It's not

23   that difficult for them to do that. The, with

24   regard to the 3032 notices. The District

25   Attorney from Los Angeles County is here in

26   person by representative because (inaudible)

27   P. HERNANDEZ   C-03015   DECISION PAGE 3   7/13/06

73

1    parole.   Nonetheless we want to commend you for

2    several things.   Your 2005 Certificate for your

3    Entrepreneur of the workshop, your ten FEMA

4    Certificates including lessons in Leadership and

5    Planning, your Veterans Support Group of eight,

6    from eight of 2004 and two of 2005, your two

7    Health Certificates, Certificates of Achievement,

8    your work as a culinary clerk and as a receiving

9    clerk and then back again as a culinary clerk,

10   your work in the BRAG Group helping the new

11   inmates requiring an application process and

12   recommendation.   You should be very proud of

13   that.

14        INMATE HERNANDEZ:   Thank you.

15        PRESIDING COMMISSIONER DAVIS:   That's a

16   significant achievement to have to apply for

17   something, to have to work on, you had to work to

18   get that, that wasn't just something you could

19   say yeah, I'll do that.   You had to (inaudible)

20   on a record.   Put that same effort into your

21   parole plans.   And we appreciate the fact that

22   you're on the AA waiting list and that you're on

23   the waiting list for Alternatives to Violence, as

24   well as starting a new business course as of

25   November of '05.

26        INMATE HERNANDEZ:   Yes, sir

27   P. HERNANDEZ   C-03015   DECISION PAGE 4   7/13/06

74

1          PRESIDING COMMISSIONER DAVIS:  That's

2    excellent.  This is a one-year denial and the

3    Panel recommends that you, that you remain

4    disciplinary free, that as available that you

5    participate in self-help.  You're obviously an

6    intelligent man, so if you're on a waiting list

7    for any (inaudible) don't wait forever, get some

8    books on self-help, read them, keep track of what

9    you've read, writing a book a report or be

10   prepared next time you come in to discuss with

11   the Panel what you've read and how (inaudible)

12   some insight and how you took the initiative to,

13   to do that instead of just waiting for the list

14   to (inaudible).  And, and get your parole plans

15   squared away.  And we are going to also request a

16   new Psychological Evaluation be done.

17   Commissioner, do you have any other thoughts on

18   this?

19          DEPUTY COMMISSIONER SMITH:  Mr.

20   Hernandez, we're, you know, not, not to, to beat

21   you up, because we're not trying to do that.

22          INMATE HERNANDEZ:  Yes, sir.

23          DEPUTY COMMISSIONER SMITH:  You program

24   in, in a very, very positive manner.  You

25   certainly have been incarcerated for an extended

26   period of time.  You present yourself very well,

27   P. HERNANDEZ   C-03015   DECISION PAGE 5   7/13/06

75

1    you're clearly an intelligent man.  You developed

2    a lot of skills that can be applied in a

3    community.  And yet for some reason you simply

4    opted not to take that, that next necessary step

5    to establish your parole plans.  You know, this,

6    this (inaudible) denial is as much your decision

7    as it was ours.  You've got to have those parole

8    plans.  You -- you've got to know where you're

9    going to be living, and it's got to be realistic.

10          INMATE HERNANDEZ:  Yes, sir.

11         DEPUTY COMMISSIONER SMITH:  You've got to

12    know where you're going to be working.  You know,

13    if, if you got a job offer and it's specific,

14    what are you going to be doing, you know, how

15    much are you going to get paid.  If it's some

16    distance away from where you're going to be

17    living, how are you going to get to point A to

18    point to point B and back again.  There are a

19    number of reasons why those are very important.

20    And one of the reasons is that if, if we were to

21    grant you a date, or the next Panel grants you a

22    date, that decision goes in front of the whole

23    Board --

24         INMATE HERNANDEZ:  Yes.

25         DEPUTY COMMISSIONER SMITH:  -- and they

26    vote to either support the granting of the date

27    P. HERNANDEZ  C-03015  DECISION PAGE 6  7/13/06

76

1    or to send it back.  If they vote to grant it

2    then it goes to the Governor.  Okay?  So it isn't

3    just our decision.  Well, even if we believe you

4    can be successful in spite of not having parole

5    plans, you're coming back because nobody else is

6    going to believe that.  Nobody else has the

7    opportunity to be able to sit here and talk to

8    you one-on-one face to face.

9         INMATE HERNANDEZ:  Yes, sir.

10        DEPUTY COMMISSIONER SMITH:  So, again,

11   I'm not trying, neither one of us is trying to,

12   you know, beat you up by telling you the same

13   thing over and over and over and over again.

14        INMATE HERNANDEZ:  Yeah.

15        DEPUTY COMMISSIONER SMITH:  But we want

16   you to hear us.

17        INMATE HERNANDEZ:  Okay.

18        DEPUTY COMMISSIONER SMITH:  And we want

19   you to hear us in a positive way.  Okay?  You got

20   to deal with the program.

21        INMATE HERNANDEZ:  It's a whole lot of

22   difference, the parole plans.  I'll -- I'll make

23   sure I do very extensive work on that.

24        DEPUTY COMMISSIONER SMITH:  Good.

25        INMATE HERNANDEZ:  And also I have a, you

26   know, a quarter report, quarterly report on how

27   P. HERNANDEZ   C-03015   DECISION PAGE 7   7/13/06

77

1    I'm going to live out there (inaudible).

2              DEPUTY COMMISSIONER SMITH:  You, you have

3    about a year to, to do that.

4              INMATE HERNANDEZ:  Yes, sir.

5              DEPUTY COMMISSIONER SMITH:  You know,

6    bring in the, the VA --

7              INMATE HERNANDEZ:  Yes, sir.

8              DEPUTY COMMISSIONER SMITH:  -- letters,

9    that information so we can present that and have

10   those documents.  You can't bring in too much

11   documentation.  You can only bring in too little.

12   Okay?

13             PRESIDING COMMISSIONER DAVIS:  Take a

14   lesson from your Entrepreneurial class thinking

15   you're developing a business plan.

16             INMATE HERNANDEZ:  Yes, sir.  That's what

17   I'll (inaudible).

18             PRESIDING COMMISSIONER DAVIS: There you

19   go.

20             INMATE HERNANDEZ:  Thank you very much

21   for --

22             DEPUTY COMMISSIONER SMITH: We wish you,

23   we wish you good luck sir.

24             PRESIDING COMMISSIONER DAVIS:  All right.

25   (inaudible).  Ms. Rutledge, thank you.

26             ATTORNEY RUTLEDGE:  (inaudible)

27   P. HERNANDEZ  C-03015  DECISION PAGE 8  7/13/06.

78

1                PRESIDING COMMISSIONER DAVIS:  Mr.

2    Turley, thank you.

3                ATTORNEY RUTLEDGE:  Oh, it's my pleasure.

4                          ADJOURNMENT

5                           --oOo--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    PAROLE DENIED ONE YEAR
                                        NOV 1 0 2006
24    THIS DECISION WILL BE FINAL ON:_____

25    YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26    DATE, THE DECISION IS MODIFIED

27    P. HERNANDEZ C-03015 DECISION PAGE 9 7/13/06

79

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, PATTY L. DURAN, a duly designated transcriber, NORTHERN CALIFORNIA COURT REPORTS, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 78, and which recording was duly recorded at the CORRECTIONAL TRAINING FACILITY, in SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of PETER HERNANDEZ, CDC No. C-03015, on JULY 13, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated OCTOBER 2, 2006 at Sacramento County, California.

_Patty L. Duran_

_____

Patty L. Duran, Transcriber

NORTHERN CALIFORNIA COURT RPTRS

# EXHIBIT    "C"

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
(REVISED AUGUST 1998)
PAROLE CONSIDERATION HEARING
AUGUST 2004 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
JULY 23, 2004

This is a psychological evaluation update for the Board of Prison Terms on inmate Peter Hernandez, CDC# C-03015. This report is based on personal clinical interviews of the inmate on 03/24/04 and 07/23/04. Additionally, in preparation for this report, the Central file, unit health records, and previous psychological assessment prepared by Dr. Steven Terrini were examined. The clinical interviews and the review of all pertinent documents were for the express purpose of preparing this report.

Inmate Hernandez has served 27 years of a 7-year-to-life sentence on a conviction of first degree murder.

His last violence-based 115 occurred in 1998. Although Dr. Terrini, in his previous report, assessed inmate Hernandez as low-risk in a community setting, the Board expressed some concern about a pattern of four violence-based 115s during the 27-year period of incarceration. A review of the actual 115s documented in the Central file, and subsequent discussion with inmate Hernandez, confirm that in each instance, inmate Hernandez was the victim of an assault perpetrated by another inmate, and reacted by defending himself. The recent CDC policy of classifying a majority of fights between inmates as mutual combat serves to further cloud actual issues and facts.

During the most recent Parole Board hearing, some concern was also expressed about a history of alcohol abuse as a probable contributing factor to the instant offense. In fairness, inmate Hernandez has now been incarcerated for 27 years, and has remained dry for this entire time.

Further, with respect to the Parole Board's concern about self-help issues, inmate Hernandez has successfully completed Impact, and has several documented certificates in religious spiritual growth. Currently, he is wait-listed for Alcoholics Anonymous and We Care. However, due to the popularity of these programs and staff shortage at CTF, inmates have limited access.

During incarceration, inmate Hernandez has completed vocational programming in television production, data processing, and basic electronics.

If released, inmate Hernandez plans to reside with his brother and sister-in-law in Pacoima, California. His cousin in nearby Rosemead has extended a job offer in an auto repair facility, which will utilize this inmate's skill in computer software.

Currently, inmate Hernandez is a suitable candidate for parole release consideration, with a recidivism and risk factor no greater than the average citizen in the community. Due to

HERNANDEZ        C-03015        CTF-CENTRAL        07/23/04        gmj

HERNANDEZ, PETER
CDC NUMBER: C-03015
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO

his marketable skills and close family support, it is expected that his transition to freedom and personal responsibility will be relatively smooth.

E. W. Hewchuk, Ph.D.
Staff Psychologist
Correctional Training Facility, Soledad

B. Zika, Ph.D.
Senior Supervising Psychologist
Correctional Training Facility, Soledad

EWH/gmj

D: 07/23/04
T: 07/27/04

D:\Word Files\BPT - 2004\HERNANDEZ, PETER  C-03015  08-04  HEWCHUK.doc

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
(REVISED AUGUST 1998)
PAROLE CONSIDERATION HEARING
NOVEMBER 2002 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
JUNE 14, 2002


Inmate Peter Hernandez, CDC# C-03015, was seen for a psychological evaluation for the Board of Prison Terms by Steven J. Terrini, Ph.D., Staff Psychologist at the Correctional Training Facility (CTF), on 09/21/99 for the December 1999 Lifer Calendar.

According to the instructions given to Wardens and Health Care Managers by Steven Cambra, Jr. (CDC), and G. Lewis Chartrand, Jr. (BPT) in September 1998, once a mental health evaluation is completed in the new format, revised in August 1998, a new evaluation is not necessary when an inmate appears before the Board of Prison Terms unless the BPT has filed a BPT 1000A request for a new report.

Since there is no BPT 1000A request on file, a mental health evaluation was not conducted at this time.


BILL ZIKA, Ph.D.
Senior Supervising Staff Psychologist
CORRECTIONAL TRAINING FACILITY, SOLEDAD

BZ/gmj

D:  06/14/02
T:  06/14/02

MENTAL HEALTH EVALUATION FOR THE BOARD OF PRISON TERMS
PAROLE CONSIDERATION HEARING
(REVISED AUGUST 1998)
JUNE 2001 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
MARCH 9, 2001

Inmate Peter Hernandez, CDC# C-03015, was seen for a mental
health evaluation for the Board of Prison Terms by Steven
Terrini, Ph.D., Clinical Psychologist at CTF, on 09/21/99
for the December 1999 Lifer Calendar.

According to the agreement that CDC psychologists and
psychiatrists made with the Board of Prison Terms, once a
mental health evaluation is completed in the new format
created in 1998, a new evaluation is not necessary each time
the inmate appears before the Board of Prison Terms.

Therefore, a mental health evaluation was not conducted at
this time.

R S Coate

R. S. COATE, Psy.D.
Senior Supervising Clinical Psychologist
Correctional Training Facility, Soledad

RSC/gmj

D:   03/09/01
T:   03/09/01

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
PAROLE CONSIDERATION HEARING
DECEMBER 1999 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
SEPTEMBER 21, 1999

This is either the ninth or the tenth psychological
evaluation for the Board of Prison Terms on inmate Peter
Hernandez.  This report is the product of a personal
interview, conducted on 09/21/99, as well as a review of his
Central file and unit health record.  I have known this
inmate previously from a past BPT psychological evaluation.

I.    IDENTIFYING INFORMATION:

      Inmate Hernandez is a 45-year-old, divorced, Hispanic
      male.  His date of birth is 08/17/54.  He stated his
      religion is Catholic.  There were no unusual physical
      characteristics noted and he denied any history of
      nicknames or aliases.

II.   DEVELOPMENTAL HISTORY:

      Inmate Hernandez denied any history of birth defects,
      abnormalities of developmental milestones, a history of
      cruelty to animals, a history of arson, any significant
      childhood medical history, or a history of physical or
      sexual abuse as either a perpetrator or a victim.

III.  EDUCATIONAL HISTORY:

      Educationally, inmate Hernandez has a high school
      degree and has taken some college courses.
      Vocationally, he has participated in data processing,
      TV production and electrical maintenance.

IV.   FAMILY HISTORY:

      Inmate Hernandez's parents are still alive, although he
      has not had contact with his biological father for
      several years.  His stepfather, who raised him, died a
      few years ago.  His mother is in her 70s.  He stays in
      contact with her through letters and telephone calls.
      He has two remaining siblings and has limited contact
      with them through his mother.  None of his family

HERNANDEZ      C-03015      CTF-CENTRAL      09/27/99      gj

HERNANDEZ, PETER
CDC NUMBER:  C-03015
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO

members have ever had any significant criminal or
psychiatric problems, although he felt his stepfather
was an alcoholic.

V.  PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

Inmate Hernandez is a heterosexual male.  He denied any
history of sexual aggression.

VI.  MARITAL HISTORY:

Inmate Hernandez was married on one occasion and later
divorced.  He has one child from that marriage and
stays in contact with that child.

VII.  MILITARY HISTORY:

Inmate Hernandez was in the Army for three years.  He
did not engage in any combat and received an honorable
discharge.

VIII. EMPLOYMENT AND INCOME HISTORY:

In the past, inmate Hernandez has been employed in
construction, working in a delivery service, working as
a security officer, and doing dock work.  When he
paroles, he hopes to find employment in office work.

IX.  SUBSTANCE ABUSE HISTORY:

Inmate Hernandez was recently on the waiting list for
Alcoholics Anonymous and stated that he had a ducat to
start participating in that program this evening
(09/21/99).  He acknowledged having an alcohol problem
in the past.  He also used marijuana occasionally in
the past.  He denied ever participating in any
treatment programs or placements in the community.

X.  PSYCHIATRIC AND MEDICAL HISTORY:

Inmate Hernandez's most significant medical problem
involved an automobile accident.  He still has throat
problems, he feels, as a result of that accident.  He
denied a history of other head injuries, suicidal
behavior, hospitalizations, or a history of seizures or
other neurological conditions.

HERNANDEZ, PETER
CDC NUMBER:  C-03015
BPT PSYCHOLOGICAL EVALUATION
PAGE THREE

XI.    PLANS IF GRANTED RELEASE:

When he paroles, he hopes to live with his brother and
his brother's family.  Given the information he
provided to me, it would appear his parole plans are
quite viable, as he has several skills that he can be
employed in and has a supportive family, and his
prognosis for community living is quite positive.

CLINICAL ASSESSMENT

XII.  CURRENT MENTAL STATUS/TREATMENT NEEDS:

Inmate Hernandez appeared his stated age.  He was
appropriately dressed and groomed.  He was pleasant,
coherent, cooperative, calm and alert.  His speech,
flow of thought and affect were all within the normal
range.  His intellectual functioning was estimated to
be above average.  There was no evidence of a mood or
thought disorder.  His judgment appeared to be sound.
He showed good insight into his commitment offense.

CURRENT DIAGNOSTIC IMPRESSIONS:

AXIS I:    Alcohol Abuse, in institutional remission.
AXIS II:   No Contributory Personality Disorder.
AXIS V:    GAF = 90.

His prognosis is very positive for being able to
maintain his current mental state in the community upon
parole.

XIII. REVIEW OF LIFE CRIME:

Inmate Hernandez described the circumstances
surrounding his commitment offense.  He understood
several of the key factors which played a role in this
crime, including his drinking that day, as well as
"acting like an egotistical tough guy."  He
acknowledged that he deserves whatever punishment will
come to him for his actions.  He stated it was never
his intention to kill anyone, but simply to recover the
objects that had been burglarized from his sister's
home.  I believe this inmate showed an above average
understanding of why this crime occurred and an
appropriate and genuine amount of remorse.

HERNANDEZ    C-03015        CTF-CENTRAL        09/27/99        gj

HERNANDEZ, PETER
CDC NUMBER: C-03015
BPT PSYCHOLOGICAL EVALUATION
PAGE FOUR

XIV.  ASSESSMENT OF DANGEROUSNESS:

    A.  In consideration of several factors, including his relative lack of CDC-115 violations, as well as his lack of a violent criminal history, and his prosocial attitude, his violence potential within a controlled setting is estimated to be significantly below average relative to this Level II inmate population.

    B.  If released to the community, his violence potential is estimated to be no more than the average citizen in the community.

    C.  The most significant risk factor which could be a precursor to violence for this inmate would be continued abuse of alcohol. I strongly believe this man understands how alcohol affected him during this crime and he seems to have a strong intention to not drink again.

XV.  CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

    1)  This inmate is competent and responsible for his behavior. He has the capacity to abide by institutional standards and has generally done so during his incarceration period.

    2)  This inmate does not have a mental health disorder which would necessitate treatment either during his incarceration period or following parole.

    3)  As this man has acknowledged a problem with alcohol, I would recommend, upon parole:

        A.  Abstinence from all alcohol and illegal drugs.

        B.  Monitoring.

        C.  Mandatory attendance at self-help groups such as Alcoholics Anonymous.

    4)  Inmate Hernandez has received several, very positive, past evaluations. The Category X report of 1995 stated, "We were most favorably impressed with his achievements during his incarceration and

HERNANDEZ     C-03015     CTF-CENTRAL     09/27/99     gj

HERNANDEZ, PETER
CDC NUMBER:  C-03015
BPT PSYCHOLOGICAL EVALUATION
PAGE FIVE

> his current motivation and sincerity."  The 1997
> BPT psychological evaluation, done by Dr. Galbo,
> stated that he has "grown significantly in his
> years of incarceration," and he is "psychologically
> suited and stable enough to be paroled."  I am in
> agreement with these past evaluations and believe
> that this man is an excellent candidate for parole
> consideration.


STEVEN J. TERRINI, Ph.D.
Senior Supervising Psychologist (A)
Correctional Training Facility, Soledad

SJT/gmj

d:  09/21/99
t:  09/27/99

CALIFORNIA STATE PRISON - SOLANO
Vacaville, California

PSYCHOLOGICAL EVALUATION
FOR THE BOARD OF PRISON TERMS

NAME:  HERNANDEZ, Peter
CDC#:   C-03015
HSG:    21-W1L

The following is a psychological report to the Board of Prison Terms on this 43 year old Hispanic male who is serving 7 years to life for first degree murder and two counts of assault with intent of murder. This examiner interviewed Inmate Hernandez on 8-20-97 for approximately 1 hour. His central and medical files were reviewed in conjunction with this interview to ensure accuracy and completeness in this report. This exam was for the preparation of this board report only.

**BACKGROUND AND HISTORY:**  Mr. Hernandez was born in Las Cruces but moved to Los Angeles with his family when he was 5. His parents were divorced when he was 6. They are both still living and his mother is in Fresno and is 65 years old. His father is in Texas but he has not communicated with his him since the divorce. The instant offense took place on April 25, 1977 when the inmate confronted three people whom he knew had burglarized his brother-in-law's home. When the victim came at him, he shot his gun killing him instantly. He shot at the other two also but they fled.

Mr. Hernandez says that his health is excellent and has had no health problems for the past 20 years. He admits he was an alcoholic and is actively involved in AA. At the time of the crime he was intoxicated and he feels that alcohol was a major cause of his problems when he was younger. He started drinking at age 14 and did not get involved with illicit drugs except marijuana occasionally.

Mr. Hernandez has had few disciplinary problems and says his last CDC-115 was in 1991 which was for fighting. He has had vocational training in data processing, electrical maintenance and TV productions. He feels that he could be actively and gainfully employed if he were to be paroled.

**MENTAL STATUS EXAMINATION:**  Mr. Hernandez' intelligence is above average. He uses good judgment now and can make good decisions as well as plans for his life when he paroles. He is oriented in all spheres and has good sensitivity to other people's needs. Several projective personality tests were administered and there is no indication that he is a violent person and would pose no danger to the free community.

Several times during the interview, Mr. Hernandez was tearful and indicated he has experienced a sense of loneliness over the years. He states on the sentence completion test "Sometimes I long to have emotional ties," and "What pains me is I can't." He says he has been married for 22 years but his wife is in New Mexico and he has not been with her during the entire time of his incarceration. However, he does have one daughter with her who is 20 years old and lives in Lake Havasu, Arizona. He feels he will probably get divorced from his wife when paroled and go live with his brother in Los

1

COPY SENT TO SEP 1 1 1997

NAME:  HERNANDEZ, Peter
CDC#:  C-03015

**MENTAL STATUS EXAMINATION, continued:** Angeles.  All things considered, Mr. Hernandez is free from mental illness or other emotional disturbance.  He is a thinking, feeling person who is trying to put the pieces of his life together again.  This can be seen in the statement he makes that "My greatest fear is failing and not trying again."  He adds that he feels the need to live his life over and do things much differently.  At the present time he has a well developed conscience and is highly unlikely to commit a similar offense.  What is most important is that he continue his AA affiliation and seek personal counseling from the Parole Outpatient Clinic in Los Angeles if he is paroled.

**PSYCHIATRIC DIAGNOSIS:**

Axis I:    No diagnosis.
Axis II:   No diagnosis.
Axis III:  None.
Axis IV:  Moderate stress due to life in prison.
Axis V:   GAF = 85.

**PSYCHOLOGICAL CONCLUSIONS:**   Mr. Hernandez is seen as a man who has grown significantly in his 20 years of incarceration and has developed numerous ego and intellectual resources to call upon when needed.  He has learned to adapt to stressful situations when necessary and is not seen as a violent person or a parole risk when he is considered for it.

**RECOMMENDATION FOR CLASSIFICATION COMMITTEE:**   Inmate Hernandez is psychologically suited and stable enough to be paroled.

*Charles J. Galbo*

Charles J. Galbo, Ph.D.
Clinical Psychologist

NOTED AND APPROVED:

Michael Vasquez, Ph.D.
Senior Psychologist

CG/dh

D: 8-20-97
T: 9-02-97

COPY SENT TO
INMATE:

2

# EXHIBIT   "D"

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
JANUARY 2006 CALENDAR

HERNANDEZ, PETER                                                    C03015

I.   **COMMITMENT FACTORS:**

    A.   Life Crime:  Remain the same as stated in previous hearings.

        1.   Summary of Crime: All relevant documents have been considered and
            that information remains the same.

        2.   Prisoner's Version:  All relevant documents have been considered and
            that information remains the same.

        3.   Aggravating/Mitigating Circumstances:

            a.   Aggravating Factors:  All relevant documents have been
                considered and that information remains the same.

            b.   Mitigating Factors:  All relevant documents have been considered
                and that information remains the same.

    B.   Multiple Crime(s):  N/A.

        1.   Summary of Crime: N/A.

        2.   Prisoner's Version: N/A.

II.   **PRECONVICTION FACTORS:**

    A.   Juvenile Record:  All relevant documents have been considered and that
        information remains the same.

    B.   Adult Convictions and Arrests:  All relevant documents have been considered
        and that information remains the same.

    C.   Personal Factors:  All relevant documents have been considered and that
        information remains the same.

Inmate Copy

LIFE PRISONER EVALUATI  REPORT
PAROLE CONSIDERATION HEARING
JANUARY 2006 CALENDAR

## III.    POSTCONVICTION FACTORS:

A.    <u>Special Programming/Accommodations:</u>  N/A.

B.    <u>Custody History</u>:  All relevant documents have been considered and that information remains the same.  Since his last board appearance Hernandez has been assigned as a Clerk in the Culinary.  On 7/2/05, Hernandez was reassigned as the Receiving and Release Clerk where he currently remains assigned.  He has remained at CTF in the general population with Medium A custody.  (See Post Conviction Progress Report).

C.    <u>Therapy and Self-Help Activities</u>:  Documents from previous hearings remain valid.  Hernandez has participated in Impact, FEMA Certificates, and the Veteran's Self Help Group.  (See Post Conviction Progress Reports).

D.    <u>Disciplinary History</u>:  Documents from previous hearings remain valid.  Hernandez continues to remain disciplinary free.

E.    <u>Other</u>:  Hernandez attended his Subsequent #12 Parole Consideration Hearing on 1/6/05.  Parole was denied for 1 year.  The Board recommended that Hernandez remains disciplinary free; participate in self help programs; and earn positive chronos.

## IV.    FUTURE PLANS:

A.    <u>Residence</u>:  All relevant documents have been considered and all information remains the same.

B.    <u>Employment</u>:  All relevant documents have been considered and all information remains the same.

C.    <u>Assessment</u>:  In review of Hernandez' parole plans, this counselor does not foresee any problems, however, it is recommended that Hernandez updates his support letters prior to his hearing.

## V.    USINS STATUS:  N/A.

## ~~VI.    SUMMARY:~~

A.    Prior to release the prisoner could benefit from:
   1.    Continuing to be disciplinary free.

HERNANDEZ, PETER         C03015              CTF-SOLEDAD              JAN/2006

3

LIFE PRISONER EVALUATION REPORT
PAROLE CONSIDERATION HEARING
JANUARY 2006 CALENDAR

    2.    Participation in self-help and earn positive chronos.

**B.**    This report is based upon a thorough review of Hernandez' Central File and a one hour interview with Hernandez.

**C.**    Per the Olson Decision, Hernandez was afforded an opportunity to review his Central File. Hernandez did examine his Central File. (Refer to CDC 128-B dated 11/4/05 in the General Chrono Section of the Central File.)

**D.**    No accommodation was required per the Armstrong vs. Davis BPH Parole Proceedings Remedial Plan (ARP) for effective communication.

HERNANDEZ, PETER      C03015      CTF-SOLEDAD      JAN/2006

LIFE PRISONER EVALUATION REPORT
PAROLE CONSIDERATION HEARING
JANUARY 2006 CALENDAR

4

_____    11-17-05
K. Heinly                          Date
Correctional Counselor I

_____ CCTI  11-17-05
D. Carnazzo                        Date
Correctional Counselor II

_____ Fc (A)  11-17-05
I. Guerra                          Date
Facility Captain

_____ C&PR  11-18-05
D. S. Levorse                      Date
Classification and Parole Representative

_____

HERNANDEZ, PETER        C03015        CTF-SOLEDAD        JAN/2006

BOARD OF PRISON TERMS                                                                STATE OF CALIFORNIA

## LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐ DOCUMENTATION HEARING

☒ PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING

INSTRUCTIONS
    TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
    TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
       ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 9/1/04 to 10/31/05 | | | **PLACEMENT:** Remained at CTF in the general population. **CUSTODY:** Medium A. **VOC. TRAINING:** None noted this period. **ACADEMICS:** None noted this period. **WORK RECORD:** Hernandez was assigned as a Clerk in the Culinary until 7/2/05. He received satisfactory to above average ratings verified by CDC 101's dated 10/1/04 and 6/1/05. On 7/2/05, Hernandez was reassigned as a Receiving and Release Clerk (non-adverse). He has no CDC 101's for this period. **GROUP ACTIVITIES:** Hernandez participated in the Veteran's self help group as verified by CDC 128B dated 3/12/05. **PSYCH. TREATMENT:** None noted during this period. **PRISON BEHAVIOR:** Hernandez remained disciplinary free during this period. **OTHER:** Hernandez successfully completed an Impact workshop verified by CDC 128B dated 9/21/04. Hernandez has numerous FEMA certificates dated 7/14/05 located in the miscellaneous section of his Central File. |

CORRECTIONAL COUNSELOR'S SIGNATURE      DATE   11-18-05

HERNANDEZ     C03015      CTF-SOLEDAD      JAN/2006

# EXHIBIT "E"

BOARD OF PRISON TERMS                                              STATE OF CALIFORNIA
LIFE PRISONER HEARING DECISION FACE SHEET

| | |
|---|---|
| [ ] PAROLE GRANTED - (YES)<br>   CDC:  Do not release prisoner before<br>   Governor's review | **Records Use Only**<br><br>Parole Release Date |
| |       YR     MO     DAY |
| [ ] PAROLE DENIED - (NO)<br>*One Year. 2006 calendar* | Attach Prison Calculation Sheet |

[ ] AGREED UNSUITABLE (Attach 1001A Form) FOR:_____YEAR(S)
[ ] HEARING POSTPONED/REASON:_____

### PANEL RECOMMENDATIONS AND REQUESTS

**The Board Recommends:**

[ ] No more 115's or 128A's    [✓] Stay discipline free
[ ] Work to reduce custody level    [ ] Learn a trade*    [✓] Earn positive chronos
[✓] Get self-help*    [ ] Get therapy*    [ ] Get a GED*

[ ] Recommend transfer to_____
[ ] Other_____
  *These programs are recommended if they are offered at your prison and you are eligible/able to participate.

**Penal Code 3042 Notices**    [ X ] Sent   Date:  11-09-2004

| Commitment Offense(s) | **P187** | **MURDER 1ST** |
|---|---|---|
| | Code(s) | Crime(s) |
| | **A526764** | **1** |
| | Case #(s) | Count #(s) |

| Date Inmate Came to CDC<br>3/23/79 | Date Life Term Began<br>3/23/79 | Minimum Eligible Parole Date<br>9/3/85 |
|---|---|---|

[ ] Initial Hearing    [ X ] Subsequent (Hearing No.)  #12    Date of Last Hearing_____

| | |
|---|---|
| CDC Representative | D.S. LEVORSE, C&PR |
| Attorney for Prisoner | M. TARDIFF    Address |
| D.A. Representative | A. SOUSA    County  LA |

This form and the Board's decision at the end of the hearing is only proposed and NOT FINAL. It will not become final until it is reviewed.

| | | |
|---|---|---|
| Chair *Sharon Lawin* | Date | *01/* |
| Panel Member *Robert Prince* | Date | *4-06/05* |
| Panel Member | Date | |

| NAME | CDC # | INSTITUTION | CALENDAR | DATE |
|---|---|---|---|---|
| HERNANDEZ, PETER | C-03015 | CTF-SOLEDAD | JAN. 2005 | 1/6/05 |

74

1          CALIFORNIA BOARD OF PRISON TERMS

2                D E C I S I O N

3          DEPUTY COMMISSIONER MEJIA:  We're back on

4      record for our decision, Mr. Hernandez

5          PRESIDING COMMISSIONER LAWIN:  Thank you.

6  All parties have returned to the room.  The Panel

7  has reviewed all information received from the

8  public and relied on the following circumstances

9  in concluding that you, Mr. Hernandez, are not yet

10  suitable for parole and would pose an unreasonable

11  risk of danger to society or a threat to public

12  safety if released from prison.  This is a one

13  year denial.  The denial is based certainly in

14  part by or on rather the commitment offense which

15  was the shooting death of Tony Sanchez.  He was

16  shot one time by the inmate.  According to the

17  inmate's version there had been a confrontation

18  when the inmate was trying to retrieve property

19  that had been stolen from his sister and he had

20  been informed that Mr. Sanchez had the property

21  and was trying to sell it.  As I said, there was

22  one earlier confrontation.  The inmate left, went

23  and got a gun and went back to the location, shot

24  Mr. Sanchez to death, wounding the other occupants

25  or his friends that were there at the time.  The

26  inmate paints this to be a -- essentially that he

27  PETER HERNANDEZ    C-03015    DECISION PAGE 1    1/6/05

75

1    was -- he went there to retrieve this property and

2    that he first saw a weapon when he had the first

3    confrontation with Mr. Sanchez's companions.  The

4    victims instead state that Mr. Hernandez went --

5    asked if they had any -- a lid, asked if they had

6    any marijuana.  When they said, no, he left and

7    then returned and essentially began firing, that

8    there was not this -- the confrontation and the

9    way that Mr. Hernandez paints it.  Regardless,

10   Mr. Sanchez lost his life for the most trivial of

11   reasons.  Whether it was to retrieve property, to

12   protect his honor, his family's honor, whatever it

13   happens to have been, Mr. Sanchez should not have

14   lost his life.  And the crime shows a clear

15   disregard for the life and suffering of others as

16   there were multiple victims involved in the same

17   incident.  And the crime was carried out in a

18   cruel fashion on unsuspecting victims.  The next

19   reason for our denial would be the inmate's parole

20   plans.  He does not have reasonable parole plans.

21   He says he'll live with a brother.  We have no

22   letters of support for a number of years.  He says

23   that he will work for a cousin.  Again, letters

24   are very old.  Yes, there has been a history of

25   family support, but nothing recent.  We do see

26   that he maintains contact.  There's a Christmas

27   PETER HERNANDEZ    C-03015    DECISION PAGE 2    1/6/05

76

1    card with a postmark of 2003, but nothing to

2    indicate that he's welcome to live with his

3    brother nor any recent letter stating he can live

4    with his cousin.  The next reason for our denial

5    would be the Panel's belief that the inmate has

6    not yet sufficiently participated in self-help

7    programs.  Also, the District Attorney's Office

8    responded to PC 3042 Notices.  They are opposed to

9    a finding of parole suitability, as is the Los

10    Angeles Police Department.  By most accounts,

11    Mr. Hernandez had a stable social history.  He had

12    served honorably in the military, been discharged,

13    had gone to high school, had not graduated, but he

14    had been working.  There is some use of alcohol

15    and marijuana.  There's a contradiction I guess in

16    Mr. Hernandez's life because of all these positive

17    things and then he ends up murdering Mr. Sanchez

18    and now all of a sudden alcohol and marijuana are

19    part of his lifestyle.  So there's really a

20    contradiction there.  The Panel finds that the

21    inmate needs participation in self-help for a

22    variety of reasons.  First of all, I really,

23    Mr. Hernandez, look at your ability to deal with

24    situations in an appropriate fashion when I look

25    at your lack of parole plans because here's a

26    situation where I can't help but project what you

27    PETER HERNANDEZ    C-03015    DECISION PAGE 3    1/6/05

77

1    did in 1977 on this situation. I don't know what

2    it is, if it's honor, if it's -- if it's respect,

3    I don't know what it is that's keeping you from

4    asking your family for support, if you don't want

5    to ask people. But that indicates you're not

6    willing to ask for help when you need it, and

7    that's a negative trait. You need to be able to

8    ask for help when you need it, that's how you

9    solve situations. And you need help here; you

10   need help from your family. Like I said before,

11   you've got the key to get out of here. We're not

12   going to let you out, no Panel's going to let you

13   out, with no offers of residence and no offers of

14   employment. The Panel commends Mr. Hernandez for

15   the fact that he's not had a 115 in six years,

16   almost seven years, that last one was February 19,

17   1998 for mutual combat, it was the last of four;

18   for the fact that he's not had a 128(a) counseling

19   chronos in four years, the last one December 31,

20   2000, the last of seven for disobeying staff.

21   He's to be commended for having acquired his GED

22   high school equivalency early on, for taking some

23   college courses, for completing data processing,

24   spending time in and/or completing basic

25   electronics and TV production. He's to be

26   commended for his recent participation in Impact,

27   PETER HERNANDEZ    C-03015    DECISION PAGE 4    1/6/05

78

1    taking Emergency Management Institute or FEMA

2    courses, for the completion of bible

3    correspondence courses and unverified but his

4    self-reported participation in the Veterans Group

5    and this Pre-Release Group.  He's certainly to be

6    commended for his work ethic.  He has received

7    laudatory chronos while serving as the Protestant

8    chapel clerk, in receiving and release and in the

9    culinary kitchen as a clerk, which is his current

10    position.  But these positive aspects do not yet

11    outweigh the factors of unsuitability.  I do also

12    want to note for the record that the July 23, 2004

13    psychological report by Dr. Hewchuk is supportive

14    of release.  We make the following

15    recommendations, Mr. Hernandez.  One, that you

16    remain disciplinary-free; two, when it's available

17    to you, that you continue your participation in

18    self-help.  I wish I could give you a 115 or a 128

19    for not having parole plans because maybe that

20    would spur you into taking some action.  I don't

21    know what it's going to take.  I don't know how

22    many times and how many ways to tell you, but it's

23    very important.  And I wish you good luck.

24         INMATE HERNANDEZ:  Just for the record, that

25    card is not 2003.

26         PRESIDING COMMISSIONER LAWIN:  Which card?

27    PETER HERNANDEZ   C-03015    DECISION PAGE 5   1/6/05

79

1          INMATE HERNANDEZ:  It's recent.

2          PRESIDING COMMISSIONER LAWIN:  Right, this

3     Christmas.

4          INMATE HERNANDEZ:  Yes.

5          PRESIDING COMMISSIONER LAWIN:  I'm sorry,

6     December 2004, that's what I meant.  I'm sorry.

7     Thank you.

8          DEPUTY COMMISSIONER MEJIA:  Good luck to

9     you, sir.

10         INMATE HERNANDEZ:  Thank you.

11         PRESIDING COMMISSIONER LAWIN:  That

12    concludes this hearing.  It is 12:43.

13                     --oOo--

14

15

16

17

18

19

20

21

22

23    PAROLE DENIED ONE YEAR

24    THIS DECISION WILL BE FINAL ON _____MAY - 6 2005_____

25    YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26    DATE, THE DECISION IS MODIFIED.

27    PETER HERNANDEZ    C-03015    DECISION PAGE 6    1/6/05

80

# CERTIFICATE AND
# DECLARATION OF TRANSCRIBER

I, Marsha Mees, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 79, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, at SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of PETER HERNANDEZ, CDC No. C-03015 on JANUARY 6, 2005, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated January 21, 2005 at Sacramento County, California.


_____
Marsha Mees
Transcriber
CAPITOL ELECTRONIC REPORTING

# EXHIBIT "F"

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
2004 CALENDAR

**HERNANDEZ, PETER**                                          **C03015**

I.    **COMMITMENT FACTORS:**

A.    **Life Crime:** Count 1:  Murder First (PC 187), Count 2/3:  Assault with Intent to
Commit Murder, with Use of a Firearm (Pistol) (PC 217/12022.5):  Sentence 7
years to Life.  Case Number: A334928.  Date received in CDC: 3/23/79.  MEPD:
9/3/85.  Victim:  Tony Sanchez, age unknown.

1.    **Summary of Crime:**  On 4/25/77, at approximately 9:00 p.m., Peter
Hernandez and co-defendant, Jose Montez, approached three
Mexican/American males in a residential area in Los Angeles.  Following
a brief conversation, Hernandez pulled a gun from his coat, fired a shot at
victim Tony Sanchez at point blank range, killing him with a shot to the
heart.  Victims Rosales and Rodriguez ran from the scene but were
pursued by Hernandez who continued firing the gun, striking both men in
the leg as crime partner Montez yelled, "get them, get them."  After
emptying the weapon, Hernandez and Montez returned to the van that
Hernandez had been driving and fled from the scene.  Hernandez was later
identified by the wounded victims.  He and Montez were apprehended at
their residences on the following morning.  Subsequent investigation
revealed that Hernandez had attempted to purchase marijuana from the
victims and, when advised that they had none, opened fire.  Both
Hernandez and Montez denied any involvement in the crime, maintaining
this denial through three trials, the third of which resulted in Hernandez'
conviction for the present case and Montez' conviction for Murder Second
Degree.  It was noted that all three victims were known gang members and
that the motive for the crime was believed by the District Attorney's
Office to have been gang related.  Hernandez continued to maintain his
innocence until exhaustion of the appeals process at which time he
admitted his guilt.  (Information acquired from the 6/15/88 Diagnostic
Unit Evaluation, pg 2-3; POR, pg 5-7, and Appellate Decision dated
6/20/81, pgs 8-12, 14-15).

2.    **Prisoner's Version:**  In an interview for this report, Hernandez stated that
his version of the offense summary remains the same as the one presented

HERNANDEZ, PETER          C03015                    CTF-SOLEDAD

SENT TO I/M ON  9.3.04

in the report for his January, 1990 Subsequent Hearing #5. In that report, Hernandez stated the following:

On the evening of April 25, 1977, I was at a friend's house drinking beer while we talked about the upcoming Cinco De Mayo celebration being planned for the community the following month. During the meeting or sometime after, I was informed of some guys being responsible for the burglary of my sister's home. After the meeting, I decided to go find out who these guys were, hoping to recover my sister's property. A friend volunteered to come along with me since he knew some of the guys around the area where they hang out. We drove approximate five or six miles across town to what is known as the "West Side" of Los Angeles.

On the corner of 24th Street and Magnolia, I pulled to the side, and my friend called some guy over and asked him if he knew a guy named Tito. He said, "Yeah, he lives over there," pointing to a green house not too far from the opposite corner. We then went around the block, coming to a stop and parking in front of the green house. While I was parking, I saw three guys on the porch of the house. I told my companion to wait, that I'd be back. As I walked over to the gate, one of the guys went inside and another started to walk towards the front of the gate. The third guy just stayed on the front of the porch. As I stopped at the gate and watched the guy stop about ten feet from the gate, I asked him if he knew a guy named Tito, who I was told lived here. He said, "Who are you? What do you want with him?" or words to that affect. As I told him that I wanted to talk to Tito about some hot stuff that he was trying to sell, the guy I was talking to looked familiar, so I asked him if his name was Noe. He then looked surprised and said, "No". (Noe is a guy who I knew years ago when I was in junior high school; it turned out that this was the same guy.) After an exchange of words, a guy came running up from the corner, the same guy who had told me and my companion that Tito lived at this house. He walked up and said to Noe, "What's going on? These guys are looking for Tito." By then, they guy on the porch started walking towards us. Then Noe said, "Man, you better split. Get the fuck out of here." I said, "No, I want to talk to Tito." The guy from the porch got close to Noe and asked him what I wanted from Tito. After Noe told him, the guy pulled out a gun and pointed it towards me and told me in a very angry way that I'd better leave or he'd blow my head off. Noe then said, "Go, man, you don't belong around here." Being frightened by the gun, I said, "Okay, man, I'm going. I'm going." So we left.

~~My friend brought out the idea that he knew where to get a gun and that~~ we should go back. My fright turned to anger, and I agreed. We drove around the neighborhood for awhile trying to find a gun. In the meantime,

I bought more beer, and we drank. Finally, we drove to some apartments where my friend got out and went inside. A few moments later, he came out and showed me a gun. I took the gun and asked him if he was loaded, and he said, "Yes". I put the gun inside my jacket pocket and drove back to find Tito. As we passed by the corner of 24th and Magnolia, we saw three guys not too far from the corner. They looked like the same guys we had seen earlier. I went around the block and parked right in front of them, across the street. I told my friend to wait, but he said that he would get out with me.

We both walked towards the guys who were standing on the sidewalk. As we walked, I had my hands in my jacket pockets. The guys looked us over and asked us what we wanted. I told them I was looking for Tito because I wanted to talk to him. One of them said, "I'm Tito. What do you want?". One of the other guys said something like, "Yeah, they were looking for you earlier." I told Tito that I wanted the stolen stuff that he had because it belonged to my sister, and I wanted it back. I told him that I didn't want any trouble. He looked at me and said, "Fuck you, man, who do you think you are?" He then began cursing in a threatening manner. He then started to charge at me, pulling his hands out from his pockets. I thought at the moment he was going for a gun. In a quick motion (I was trained and awarded the expect badge with the .45 caliber pistol in the U.S. Army), I pulled out my gun and shot him. I panicked for a while and, as the other guys ran, I began to shoot at them, too, chasing them a few yards before the gun went empty. Then my friend and I ran back to the van and left. I remember being very scared and my heart pumping faster than I could breathe.

3.   **Aggravating/Mitigating Circumstances:**

a.   **Aggravating Factors:**

- During the commission of the crime, the inmate had a opportunity to cease but instead continued.
- The manner in which the crime was committed created a potential for serious injury to persons other than the victims of the crime.
- There were multiple victims involved.
- Use of a weapon (pistol).
- The inmate was on probation at the time the crime was committed.

b.   **Mitigating Factors:**

HERNANDEZ, PETER              C03015                    CTF-SOLEDAD

- Although the inmate was on probation he had a minimal history of criminal behavior.

**B.**     <u>Multiple Crime(s):</u> N/A.

    1.     <u>Summary of Crime:</u> N/A.

    2.     <u>Prisoner's Version:</u> N/A.

## II.    <u>PRECONVICTION FACTORS:</u>

**A.**     <u>Juvenile Record:</u> None noted.

**B.**     <u>Adult Convictions:</u> Hernandez' arrest history began on 5/13/76 when he was arrested by the Los Angeles Police on a charge of Possession/Manufactured/Sell Dangerous Weapon, PC 12020(a). He was released on 5/14/76 having been detained only due to insufficient evidence. He was again arrested on 1/8/77 by Los Angeles Police on a charge of Robbery, PC 211(a). He pleaded guilty on 2/1/77 to Taking a Vehicle Without Owner's Consent and was sentenced to 36 months summary probation without supervision and a $32.00 restitution. On 5/1/78 Hernandez was convicted on a misdemeanor charge of PC 484 and was sentenced to 24 months probation with four days in jail and 90 days jail suspended.

**C.**     <u>Personal Factors:</u> On 8/17/54, Peter Hernandez Jr. was born in Las Cruces, Mexico, the second of two children of Peter Hernandez Sr. and the former Martha Rodriguez. Hernandez was raised by his mother in part due to his parents divorcing when he was two years old. Several years following her divorce, his mother entered a common-law relationship that was formalized in 1972. Hernandez claims he had a satisfactory relationship with all family members including his stepfather and two half-brothers. Hernandez reports that no other family member has an arrest record and there is no family history of mental illness. He notes that his stepfather was an alcoholic.

Hernandez attended Belmont High School but dropped out to enlist in the U.S. Army. He served in the Army from 2/73 until 2/76 and received an honorable discharge. He achieved the rank of E-4 and served seven months in Germany. While in the Army, Hernandez began the occasional use of marijuana and social use of alcohol. He subsequently began spending most of his off-duty time drinking. In 1975 he married Josie Garcia while still in the Army. The relationship produced one daughter, Zita. There is no evidence of any sexual deviation, physical or mental disorder.

### III.    POSTCONVICTION FACTORS:

**A.**    <u>Special Programming/Accommodations:</u> N/A.

**B.**    <u>Custody History:</u> Hernandez remains Medium A custody level and has been housed at CTF throughout this review period.

**C.**    <u>Therapy and Self-Help Activities:</u> Since Hernandez' last BPT Hearing he has attended numerous Prison Fellowship Ministries Classes (Protestant Faith) and Impact Workshop's. (See Post Conviction Progress Report).

Hernandez stated he is currently on the waiting list for the following programs: In Cell Study Business Course, We Care Self-Help Group, and AA. Furthermore, Hernandez states he is a member of the Balance Reentry Activity Group (BRAG) and CTF Veterans Group (Army). Hernandez states he has tried to obtain documentation to verify his statements, but has been unsuccessful.

**D.**    <u>Disciplinary History:</u> Hernandez continues to remain disciplinary free.

**E.**    <u>Other:</u> Hernandez attended his Subsequent #11 Parole Consideration Hearing on 11/7/01. Parole was denied for 1 year. The Board recommended that Hernandez remains disciplinary free, and participate in self-help programs and group therapy.

### IV.    FUTURE PLANS:

**A.**    <u>Residence:</u> Hernandez continues to plan to reside with his brother Michael and sister-in-law Kim Montez at 11150 Glen Oaks Boulevard, Unit 227, in Pacoima, California. His telephone number is (818) 686-1152.

**B.**    <u>Employment:</u> Hernandez is certain that he will be able to secure employment with Marco Sanchez, a cousin who owns auto body/fender and mechanics shops in Rosemead and in San Fernando Valley. He would be employed for office clerical duties.

**C.**    <u>Assessment:</u> In review of Hernandez parole plans, this counselor does not foresee any problems. However, it was recommended that he obtain updated support letters since his current ones are dated 1998.

### V.    ~~USINS STATUS: N/A.~~

HERNANDEZ, PETER          C03015                    CTF-SOLEDAD

## VI.    SUMMARY:

A.    Considering the commitment offense, prior prison record and prison adjustment this writer believes Hernandez would pose a low degree of threat to the public if released. Hernandez has been incarcerated for over 25 years on a seven to Life sentence. Hernandez has also been given a parole date twice and both times been revoked by the Governor. Although I have not had alot of interaction with Hernandez throughout the year, he has taken great steps in the right direction. He has remained disciplinary free, has adequate parole plans, and maintains a good rapport with staff and inmates. Hernandez has received laudatory chronos from Correctional Officers W. Cleaver, G. Lavelle and Reverne Lindsey. They state that his work performance, attitude, and attendance are excellent.

Hernandez has taken responsibility for his crime and has expressed deep remorse for what he has done. He fully intends to better himself while incarcerated and will continue working on self-improvement upon his release.

A combination of the above factors, as well as support letters from family and friends, help point Hernandez in the direction of a successful parole.

B.    Prior to release the prisoner could benefit from:

1.    Continuing to be disciplinary free.
2.    Participation in self-help and therapy programs.

C.    This report is based upon a thorough review of the inmate's Central File and a (1) hour interview with Hernandez.

D.    Per the Olson Decision, Hernandez was afforded an opportunity to review his Central File. (Refer to CDC 128B dated 8/10/04 in the General Chrono Section of the Central File).

E.    No accommodation was required per the Armstrong vs. Davis BPT Parole Proceedings Remedial Plan (ARP) for effective communication.

HERNANDEZ, PETER          C03015                    CTF-SOLEDAD

BOARD OF PRISON TERMS                                                                    STATE OF CALIFORNIA

## LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐  DOCUMENTATION HEARING

☒  PAROLE CONSIDERATION HEARING

☐  PROGRESS HEARING

INSTRUCTIONS
　　TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
　　TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
　　　　ESTABLISHED, ie., 0-2  MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 3/04 to 8/04 | | | **PLACEMENT:** Remained at CTF in the general population. **CUSTODY:** Medium A. **VOC. TRAINING:** None noted this period. **ACADEMICS:** None noted this period. **WORK RECORD:** Hernandez was a Religious Clerk from 8/22/02 thru 7/14/04 and received above average ratings verified by CDC 101 dated 1/17/03. On 7/15/04 Hernandez was assigned in the Culinary as a Clerk. **GROUP ACTIVITIES:** Participated in Prison Fellowship verified by a certificate dated 6/5/04. **PSYCH. TREATMENT:** None noted during this period. **PRISON BEHAVIOR:** Hernandez remained disciplinary free during this period. **OTHER:** None. |

CORRECTIONAL COUNSELOR'S SIGNATURE

DATE  8-31-04

HERNANDEZ              C03015              CTF-SOLEDAD

BPT 1004 (REV 7/86)                          Page _1_

_____                8-31-04
K. Heinly                                        Date
Correctional Counselor I


_____  FC  8-31-04
D. Pherigo                                       Date
Correctional Counselor II


_____  FC 8-31-4
I. Guerra                                        Date
Facility Captain


_____  COPR  9-1-04
D. S. Levorse                                    Date
Classification and Parole Representative

_____


HERNANDEZ, PETER           C03015                    CTF-SOLEDAD

# EXHIBIT   "G"

The Judges Decision

①

<table>
<tr><td>1</td><td></td></tr>
<tr><td>2</td><td></td></tr>
<tr><td>3</td><td></td></tr>
<tr><td>4</td><td></td></tr>
<tr><td>5</td><td></td></tr>
<tr><td>6</td><td></td></tr>
<tr><td>7</td><td></td></tr>
</table>

8           IN THE UNITED STATES DISTRICT COURT

9         FOR THE EASTERN DISTRICT OF CALIFORNIA

10   MELVYN COLEMAN,

11              Petitioner,                No. CIV S-96-0783 LKK PAN P

12          vs.

13   BOARD OF PRISON TERMS, et al.,

14              Respondent.                ORDER

15   _____/

16          Petitioner, a state prisoner proceeding pro se, has filed this application for a writ

17   of habeas corpus.  The matter was referred to a United States Magistrate Judge pursuant to 28

18   U.S.C. § 636(b)(1)(B) and Local General Order No. 262.

19          On December 22, 2004, the magistrate judge filed findings and recommendations

20   herein which were served on all parties and which contained notice to all parties that any

21   objections to the findings and recommendations were to be filed within twenty days.  Respondent

22   has filed objections to the findings and recommendations.

23          In accordance with the provisions of 28 U.S.C. § 636(b)(1)(C) and Local Rule 72-

24   304, this court has conducted a de novo review of this case.  Having carefully reviewed the

25   entire file, the court finds the findings and recommendations to be supported by the record and by

26   proper analysis.

1



*Judges decision*

1   Accordingly, IT IS HEREBY ORDERED that:

2      1. The findings and recommendations filed December 22, 2004, are adopted in

3   full; and

4      2. The petition for habeas corpus will be granted unless, within 60 days,

5   respondent provides a fair parole suitability hearing, conducted by a board free of any prejudice

6   stemming from a gubernatorial policy against parole for murderers.

7   DATED: May 19, 2005.

8                                    /s/Lawrence K. Karlton
9                                    LAWRENCE K. KARLTON
                                     SENIOR JUDGE      –
10                                   UNITED STATES DISTRICT COURT

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

2

bd

United States District Court
for the
Eastern District of California
December 22, 2004

* * CERTIFICATE OF SERVICE * *

2:96-cv-00783

Coleman

v.

Board of Prison Term

---

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Eastern District of California.

That on December 22, 2004, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office, or, pursuant to prior authorization by counsel, via facsimile.

Tami M Warwick                                         TM/PAN
Attorney General's Office for the State of California
PO Box 944255                                         AR/LKK
1300 I Street
Suite 125
Sacramento, CA 94244-2550

Ann Catherine McClintock
Federal Defender
801 I Street
Third Floor
Sacramento, CA 95814

Jack L. Wagner, Clerk

BY: _____
Deputy Clerk

The case pages (1 - 11)

FILED

DEC 2 2 2004

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____

United States District Court

Eastern District of California

1

2

3

4

5

6

7

8

9

10

11

12  Melvyn H. Coleman,                    No. Civ. S-96-0783 LKK PAN P

13          Petitioner,                   Findings and Recommendations

14      vs.

15  Board of Prison Terms, et al.,

16          Respondents.

17                          -oOo-

18      Petitioner seeks a writ of habeas corpus.

19      In his November 14, 1997, second amended petition petitioner

20  claims his federal due process guarantee was violated because the

21  California Board of Prison Terms (Board) has failed to conduct a

22  fair parole suitability hearing.

23      In 1974 petitioner was convicted of first degree murder,

24  attempted murder, first degree robbery, first degree burglary and

25  other charges.  The victims, Mr. And Mrs. Ciewart, returned to

26  their home while petitioner was burglarizing it; he then

*the case*

1   approached before they got out of their car and robbed and shot

2   them, killing Mr. Siewart and seriously wounding Mrs. Siewart.

3   Petitioner had a prior juvenile record.

4          Under California law, a prisoner including a convicted

5   murderer serving an indeterminate term (i.e., seven years to

6   life) is entitled to a hearing before a panel composed of members

7   of the Board to determine his suitability for parole.  By

8   statute, parole at some point normally is appropriate and the

9   Board "shall set a release date unless it determines that the

10  gravity of the current convicted offense or offenses, or the

11  timing and gravity of current or past convicted offense or

12  offenses, is such that consideration of the public safety

13  requires a more lengthy period of incarceration. . . ."  Cal.

14  Penal Code § 3041(b).  Procedures  governing suitability hearings

15  are set forth in Penal Code § 3041.5 (providing prisoners with

16  notice and an opportunity to be heard and requiring a written

17  statement of reasons if the panel refuses to set a parole date).

18  Regulations prescribe factors for the panel to consider in

19  determining whether each prisoner is suitable or unsuitable for

20  parole.  15 CAC § 2281.[1]

21  _____

22      [1] Factors supporting a finding of unsuitability include: (1) whether the
    prisoner's offense for which he is confined was committed in an "especially
23  heinous, atrocious or cruel manner"; (2) the prisoner's record of violence prior
    to the offense; (3) whether the prisoner has an unstable social history; (4)
24  whether the prisoner has committed sadistic sexual offenses; (5) whether the
    prisoner has a lengthy history of severe mental problems related to the offense;
25  and (6) whether the prisoner has engaged in serious misconduct in prison or jail.
    Factors supporting a finding of suitability include: (1) whether the prisoner has
26  a juvenile record; (2) whether the prisoner has experienced reasonably stable
    relationships with others; (3) whether the prisoner shows signs of remorse; (4)

                                    2

*the case*

1    Petitioner presents evidence that under Governors Wilson and

2 Davis the Board disregarded regulations ensuring fair suitability

3 hearings and instead operated under a sub rosa policy that all

4 murderers be found unsuitable for parole.  The record shows that

5 between 1992 and 1998 less than one percent of the prisoners in

6 this group were released on parole.  During the previous period

7 the parole rate had been about four percent.  Petitioner presents

8 sworn testimony that the policy was enforced by (1) appointing

9 Board members less likely to grant parole and more willing to

10 disregard their statutory duty; (2) removing Board members more

11 likely to grant parole; (3) reviewing decisions finding a

12 prisoner suitable and setting a new hearing before a different

13 panel; (4) scheduling rescission hearings for prisoners who had

14 been granted a parole date; (5) re-hearing favorable rescission

15 proceedings and hand-picking panels to ensure the desired

16 outcome; (6) panel members agreeing upon an outcome in advance of

17 the hearing; and (7) gubernatorial reversal of favorable parole

18 decisions.  See e.g., declaration of former BPT Commissioner

19 Albert Leddy (Leddy) paras. 5, 6, 8-17, 20 (attached as Ex. 17 to

20 petitioner's March 27, 2003, motion for discovery); deposition of

21 Leddy taken in In re Fortin, et al., San Diego Superior Court

22

23 whether the prisoner committed his crime as the result of significant stress in
his life; (5) whether the prisoner suffered from Battered Woman Syndrome when she

24 committed the crime; (6) whether the prisoner lacks any significant history of
violent crime; (7) whether the prisoner's present age reduces the probability of

25 recidivism; (8) whether the prisoner has made realistic plans for release or has
developed marketable skills that can be put to use on release; and (9) whether

26 the prisoner's institutional activities indicate an enhanced ability to function
within the law upon release.  15 CAC § 2281.

*the case*

1   case number HSC10279 at 18-19, 47-50, 56-59, 61-63, 65-66, 88-89,

2   95, 97-99, 102, 106, 110, 118 & 126 (attached as Ex. 10 to

3   petitioner's March 27, 2003, motion for discovery); deposition of

4   former BPT Commissioner Edmund Tong taken in Kimble v. Cal. BPT,

5   C.D. Cal. case number CV 97-2752 at 42-43, 45-47, 71, 73, 80-82,

6   85-86, 96, 103, 105, 107 & 109 (lodged December 30, 2003).[2]

7        The unrefuted record shows the no-parole-for-murderers

8   policy existed and continued under Governor Davis.  In In re

9   Rosencrantz, the California Supreme Court took note of evidence

10  presented in the state trial court establishing that the Board

11  held 4800 parole suitability hearings between January 1999

12  through April 2001, granting parole to 48 murderers (one

13  percent).  29 Cal. 4th 616, 685 (2003).  Of those 48, the

14  governor reversed 47 of the Board's decisions and only one

15  murderer out of 4800 actually was released on parole.  Id.

16  Petitioner in Rosenkrantz also submitted evidence of the

17  following interview of Governor Davis reflected in the April 9,

18  1999, edition of the Los Angeles Times: " . . . . [T]he governor

19  was adamant that he believes murderers -- even those with second-

20  degree convictions - should serve at least a life sentence in

21  prison. [Para.]  Asked whether extenuating circumstances should

22

23       [2]  Meanwhile, the annual cost to taxpayers of conducting these "pro forma"
    hearings is enormous, amounting to millions of dollars per year.  See Exhibit 7
24  to petitioner's March 27, 2003, motion for discovery (California Legislative
    Analyst's Office - Analysis of the 2000-01 Budget Bill for the Board of Prison
25  Terms criticizing proposed $19 million annual budget and noting huge cost of
    additional incarceration resulting from no-parole policy).

26

the Case

1  be a factor in murder sentences, the governor was blunt: "No.
2  Zero . . . They must not have been listening when I was
3  campaigning. . . . If you take someone else's life, forget it.
4  I just think people dismiss what I said in the campaign as either
5  political hyperbole or something that I would back away from . .
6  . . We are doing exactly what we said we were going to do."''
7  29 Cal. 4th at 684.

8      Respondent does not refute the alleged facts.  Instead,
9  respondent argues that, assuming arguendo prisoners in California
10 have an interest in a parole date protected by the due process
11 clause, constitutional requirements are met so long as there is
12 "some evidence" supporting the findings petitioner is unsuitable.
13 See Oppo. at 7:20 (so long as "some evidence" standard is met,
14 "the Board decisions could not have been arbitrary.")  For the
15 reasons explained, this court rejects that claim.  As this court
16 previously has found, there always will be "some evidence" that
17 can be used to explain a denial or rescission under the
18 circumstances.  Federal due process requires more.

19     California's parole scheme gives rise to a protected liberty
20 interest in release on parole.  McQuillion v. Duncan, 306 F.3d
21 895, 902 (2002); Jancsek v. Oregon Bd. of Parole, 833 F.2d 1389,
22 1390 (9th Cir. 1987); Greenholtz v. Inmates of Nebraska Penal &
23 Correctional Complex, 442 U.S. 1 (1979); Biggs v. Terhune, 334
24
25
26

5

*the case*

1  F.3d 910, 915 (9th Cir. 2003); In re Rosenkrantz, 29 Cal. 4th 616

2  (2003).[3]

3      Therefore, petitioner is entitled to the process outlined in

4  Greenholtz, viz., notice, opportunity to be heard, a statement of

5  reasons for decision, and limited right to call and cross-examine

6  witnesses.  The determination that petitioner is unsuitable for

7  parole must be supported by some evidence bearing some indicia of

8  reliability.

9      These guarantees do not exhaust petitioner's right to due

10 process.  The fundamental core of due process is protection

11 against arbitrary action:

12         The principal and true meaning of the phrase has never
           been more tersely or accurately stated than by Mr.
13         Justice Johnson, in Bank of Columbia v. Okely, 17 U.S.
           235, 4 Wheat. 235-244, 4 L.Ed. 449 [(1819)]: "As to the
14         words from Magna Charta, incorporated into the
           Constitution of Maryland, after volumes spoken and
15         written with a view to their exposition, the good sense
           of mankind has at last settled down to this: that they
16         were intended to secure the individual from the
           arbitrary exercise of the powers of government,
17         unrestrained by the established principles of private
           right and distributive justice."
18
19 Hurtado v. California, 110 U.S. 516, 527, (1884).  "The

20 concessions of Magna Charta were wrung from the king as

21 guaranties against the oppressions and usurpations of his

_____

23      [3] That is so because the parole statute, Penal Code § 3041, uses mandatory
        language ("The panel or board shall set a release date unless it determines"
24      further incarceration is necessary in the interest of public safety) which
        "'creates a presumption that parole release will be granted," unless the
25      statutorily defined determinations are made. Board of Pardons v. Allen, 482 U.S.
        369, 378 (1987) (quoting Greenholtz, 442 U.S. at 12). As of 1988, by amendment
26      of the state constitution, a parole date given can be withdrawn by the Governor
        under the same factors considered by the Board

*the case*

prerogative." Id. at 531. "The touchstone of due process is

protection of the individual against arbitrary action of

government." Wolff v. McDonnell, 418 U.S. 539, 558 (1974),

citing Dent v. West Virginia, 129 U.S. 114 (1889).

A government official's arbitrary and capricious exercise of

his authority violates the essence of due process, contrary to

centureis of Anglo-American jurisprudence. See Yick Wo v.

Hopkins, 118 U.S. 356, 369 (1886) ("When we consider the nature

and the theory of our institutions of government, the principles

upon which they are supposed to rest, and review the history of

their development, we are constrained to conclude that they do

not mean to leave room for the play and action of purely personal

and arbitrary power."); United States v. Lee, 106 U.S. 196, 220

(1882) ("No man in this country is so high that he is above the

law. No officer of the law may set that law at defiance with

impunity. All the officers of the government from the highest to

the lowest, are creatures of the law and are bound to obey it.

It is the only supreme power in our system of government, and

every man who by accepting office participates in its functions

is only the more strongly bound to submit to that supremacy, and

to observe the limitations which it imposes upon the exercise of

the authority which it gives."); U.S. v. Nixon, 418 U.S. 683,

695-96 (1974) (rule of law is "historic commitment"); Accardi v.

O'Shaughnessy, 347 U.S. 260, 267-68 (1954) (Attorney General must

abide by regulations and cannot dictate immigration board's

exercise of discretion in decision on application to suspend

*the case*

1  deportation; remedy is new hearing where board will exercise it's

2  discretion free from bias).

3  Concomitant to the guarantee against arbitrary and

4  capricious state action is the right to a fact-finder who has not

5  predetermined the outcome of a hearing. See Withrow v. Larkin,

6  421 U.S. 35 (1975) (a fair trial in a fair tribunal is a basic

7  requirement of due process, and this rule applies to

8  administrative agencies which adjudicate as well as to courts);

9  Edwards v. Balisok, 520 U.S. 641 (1997) (recognizing due process

10  claim based on allegations that prison disciplinary hearing

11  officer was biased and would suppress evidence of innocence);

12  Bakalis v. Golembeski, 35 F.3d 318, 326 (7th Cir. 1994) (a

13  decision-making body "that has prejudged the outcome cannot

14  render a decision that comports with due process").

15  Courts too numerous to list have recognized that the right

16  to a disinterested decision-maker, who has not prejudged the

17  case, is part of the fundamental guarantee against arbitrary and

18  capricious government conduct in the California parole context.

19  See, e.g., Rosenkrantz, 29 Cal. 4th at 677 (parole decision "must

20  reflect an individualized consideration of the specified criteria

21  and cannot be arbitrary and capricious"); In re Ramirez, 94 Cal.

22  App. 4th 549, 563 (2001) ("some evidence" standard is "only one

23  aspect of judicial review for compliance with minimum standards

24  of due process" (citing Balisok) and Board violates due process

25  if its decision is "arbitrary and capricious"); In re Minnis, 7

26  Cal. 3d 639 (1972) (blanket no-parole policy as to certain

*the case*

1   category of prisoners is illegal); In re Morrall, 102 Cal. App.

2   4th 280 (2003) (same).  The guarantee of neutral parole officials

3   in a suitability hearing is just as fundamental as the right to a

4   neutral judge in a court proceeding.  Compare Sellars v.

5   Procunier, 641 F.2d 1295 (9th Cir. 1981) (holding that California

6   parole officials, analogous to judges, are entitled to absolute

7   immunity).

8   The Ninth Circuit previously has acknowledged California

9   inmates' due process right to parole consideration by neutral

10  decision-makers.  See O'Bremski v. Maas, 915 F.2d 418, 422 (9th

11  Cir. 1990).  In that case the appellate court found that a

12  neutral parole panel at a new hearing would reach the same

13  outcome and so denied relief.  The record in this case simply

14  will not permit the same conclusion.  The requirement of an

15  impartial decision-maker transcends concern for diminishing the

16  likelihood of error.  As the Supreme Court clearly held in

17  Balisok a decision made by a fact-finder who has predetermined

18  the outcome is per se invalid -- even where there is ample

19  evidence to support it.  520 U.S. at 648.

20  Petitioner presents a convincing case that a blanket policy

21  against parole for murderers prevented him from obtaining a

22  parole suitability determination made after a fair hearing.

23  Respondent offers nothing to counter petitioner's showing.

24  Accordingly, the court hereby recommends that the petition

25  for habeas corpus be granted unless, within 60 days of the

26  district court's adoption of these recommendations, respondent

9

*the case*

1 provides a fair parole suitability hearing, conducted by a board

2 free of any prejudice stemming from a gubernatorial policy

3 against parole for murderers.

4     Pursuant to the provisions of 28 U.S.C. § 636(b)(1), these

5 findings and recommendations are submitted to the United States

6 District Judge assigned to this case. Within 20 days after being

7 served with these findings and recommendations, respondent may

8 file written objections. The document should be captioned

9 "Objections to Magistrate Judge's Findings and Recommendations."

10 The district judge may accept, reject, or modify these findings

11 and recommendations in whole or in part.

12     Dated:   __DEC 2 1 2004__

13

14                       Peter A. Bowinski
                      Magistrate Judge

15

16

17

18

19

20

21

22

23

24

25

26 cole0783.fair grant

RECEIVED
ATTORNEY GENERAL
2007 JAN 24  AM 11:12
DEPARTMENT OF JUSTICE
SACRAMENTO OFFICE

DOCKETING UNIT
ATTORNEY GENERAL
SACRAMENTO OFFICE
2007 JAN 24  PM 11:38

## PROOF OF SERVICE BY MAIL

(C.C.P. §§1013A, 2015.5)

STATE OF CALIFORNIA )
                     ) SS. In re: Peter Hernandez, on habeas corpus
COUNTY OF MONTEREY )

I, ____WILLIAM WALKER_____, am a resident of the State of California,

County of Monterey. I am over the age of 18 years and I ☒☒☒/am not a party to the within action.

My business/residence address is P.O. Box 689, Soledad, California, 93960-0689.

On ____January 2 1_____, 20 __07__, I served the foregoing:

____PETITION FOR WRIT OF HABEAS CORPUS WITH POINTS_____

____AND AUTHORITIES, EXHIBITS IN SUPPORT THEREOF_____

on the parties listed below by placing a true copy thereof enclosed in a sealed envelope with postage

fully prepaid in the United States mail at Soledad, California, addressed as follows:

    California Attorney General
    P.O. Box 944255
    Sacramento, GA 94244-2550

There is regular delivery service by the U.S. Postal Service between the place of mailing

and the places so addressed.

I declare under the penalty of perjury under the laws of the State of California that the

foregoing is true and correct.

Executed this 21st day of ____January_____, 20 07_____, at

Soledad, California.

COPY                              /S/ William Walker

# EXHIBIT B

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DEPT 100

| Date: | SEPTEMBER 24, 2007 | | | |
|---|---|---|---|---|
| Honorable: | PETER ESPINOZA | Judge | JOSEPH M. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH004508

In re,
PETER HERNANDEZ,
           Petitioner,
On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

Nature of Proceedings: ORDER RE: WRIT OF HABEAS CORPUS

The Court has read and considered the Petition for Writ of Habeas Corpus filed by Petitioner on February 23, 2007 challenging a July 13, 2006 determination by the Board of Prison Terms (hereafter "Board") that Petitioner is not suitable for parole. Having independently reviewed the record, giving deference to the broad discretion of the Board in parole matters, the Court concludes that the record contains "some evidence" to support a finding that petitioner would pose an unreasonable risk of danger to society and is unsuitable for parole (See Cal. Code Reg. Tit. 15, §2281; In re Rosenkrantz (2002) 29 Cal.4th 616, 667).

Petitioner was received in the Department of Corrections on March 23, 1979 after a conviction for first degree murder and assault with intent to commit murder. Petitioner was sentenced to 7 years to life. His minimum parole eligibility date was September 3, 1985.

The record reflects that the commitment offense occurred on April 25, 1977 when Petitioner and his crime partner approached the three victims in a residential area of Los Angeles. Following a brief conversation, Petitioner pulled a gun from his coat and fired a shot at the victim at point blank range, killing him. The two remaining victims ran from the scene but were pursued by Petitioner who continued firing, striking both men in the leg as his crime partner yelled "Get them, Get them." After emptying the weapon, Petitioner returned with his crime partner to their vehicle and fled the scene.

Petitioner was later identified by his wounded victims. The record indicates that subsequent investigation revealed that Petitioner had attempted to purchase marijuana and, when advised that the victims had none, opened fire. Petitioner maintained his innocence until his appeals were exhausted after which time he admitted his guilt.

At his parole consideration hearing, Petitioner admitted that he had committed the crime and related the following details. The crime occurred while Petitioner was seeking to retrieve items that were previously stolen from his sister's house in a burglary. Petitioner's crime partner had identified someone who might be in possession of the stolen items. Petitioner unsuccessfully attempted to contact this person but was rebuffed by another who pulled a weapon and told him to leave. Petitioner did so but upon the suggestion of his crime partner obtained a gun and returned to the neighborhood to try to retrieve the property. During a discussion with the victim on a sidewalk, the victim denied having any of the property and approached Petitioner with his

1

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DEPT 100

| Date: | SEPTEMBER 24, 2007 | | | |
|---|---|---|---|---|
| Honorable: | PETER ESPINOZA | Judge | JOSEPH M. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

|  |  |
|---|---|
| BH004508 | (Parties and Counsel checked if present) |
| In re, | |
| PETER HERNANDEZ, | Counsel for Petitioner: |
| Petitioner, | |
| On Habeas Corpus | Counsel for Respondent: |

hand in his pocket. Petitioner pulled the gun from his pocket, fatally shot the decedent once in the chest and turned to shoot at the decedent's two companions, firing until the gun was empty.

The Board found Petitioner unsuitable for Parole, noting "we come to this conclusion by the commitment offense that was committed in a special callous manner." The Board noted that multiple victims were involved and cited the motive for the crime as a factor supporting its determination. The Board noted Petitioner's prior conviction for auto theft and a failure to avoid subsequent criminal conduct after probation. The Board noted Petitioner's institutional disciplinary history, including four CDC 115s, three of which were for fighting or mutual combat. The Board also considered Petitioner's positive 2004 psychological report, his extensive vocational training and other achievements. The Board also found Petitioner's parole plans to be unrealistic. The Board decision stated that "there is virtually no employment plan . . ., [a]nd your residential plans of sharing a two-bedroom residence with two adults and three . . . children seems suspect."

The Board's discretion in analyzing factors to determine whether the Petitioner "will be able to live in society without committing additional antisocial acts" is "almost unlimited." *In re Rosenkrantz, supra,* 29 Cal. 4th at 655. "[T]he court may inquire only whether *some evidence* in the record before the Board supports the decision to deny parole based upon the factors specified by statute and regulation." *In re Rosenkrantz, supra,* 29 Cal. 4th at 658. "Only a modicum of evidence is required. Resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of the [Board]. . . ." *In re Rosenkrantz, supra,* 29 Cal. 4th at 677.

In reaching its decision, the Board considered and weighed the factors bearing on Petitioner's suitability for parole, primarily basing its determination on the circumstances of the commitment offense. The commitment offense alone may be a circumstance tending to establish an inmate's unsuitability if the circumstances are beyond the minimum necessary to sustain a conviction for that offense. (*Rosenkrantz, supra,* 29 Cal. 4th 616, 683.). Such circumstances were found by the Board in the fact that multiple victims were attacked or injured. There is "some evidence" to support this finding, as Petitioner shot and killed one victim, then turned to the other two victims, shooting each in the leg while emptying his gun. One of the circumstances tending to indicate unsuitability for parole is that the offense was committed in an especially heinous, atrocious or cruel manner. (*Rosenkrantz, supra,* 29 Cal. 4th 616, 683.); Cal. Code Reg. Tit. 15, §2281(c)(1). The fact that multiple victims were attacked is a factor upon which the Board may properly rely in finding the commitment offense to be determinative of Petitioner's unsuitability for parole. Cal. Code Reg. Tit. 15, §2281(c)(1)(A).

2

| Minutes Entered |
|---|
| 09-24-07 |
| County Clerk |

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DEPT 100

| | | | |
|---|---|---|---|
| Date: | SEPTEMBER 24, 2007 | | |
| Honorable: | PETER ESPINOZA | Judge | JOSEPH M. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH004508

In re,
PETER HERNANDEZ,
                    Petitioner,
On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

Applying the extremely deferential standard required by *Rosenkrantz*, the court does not reweigh the relevant factors to determine whether the weight of the evidence supports a grant of parole. *See In re Jacobson*, No. BH003835 (August 28, 2007) Second Appellate District), slip op. at 18. Because there is "some evidence" to support the Board's determination, the petition is denied.

The court order is signed and filed this date. The clerk is directed to give notice.

A true copy of this minute order is sent via U.S. Mail to the following parties:

Peter Hernandez
C-03015
Correctional Training Facility
P.O. Box 689
Soledad, California 93960-0689

State of California- Department of Justice
Office of the Attorney General
110 West A Street, Suite 1100
P.O. Box 85266
San Diego, California 92186-5266
Attn: Ms. Cynthia Lumely

3

Minutes Entered
09-24-07
County Clerk

# EXHIBIT C

MC-275

Name    Peter Hernandez

Address    P.O. Box 689/F-237-L

Correctional Training Facility

Soledad, CA 93960-0689

CDC or ID Number    C-03015

COURT OF APPEAL - SECOND DIST.

# FILED

OCT 1 5 2007

JOSEPH A. LANE _____ Clerk

D. SANDERS _____ Deputy Clerk

SECOND DISTRICT COURT OF APPEALS

_____
(Court)

PETER HERNANDEZ,
Petitioner

vs.

B. CURRY, Warden, et al.,
Respondent

PETITION FOR WRIT OF HABEAS CORPUS

No.    B202757

_____
(To be supplied by the Clerk of the Court)

## INSTRUCTIONS—READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Page one of six

Form Approved by the
Judicial Council of California
MC-275 [Rev. July 1, 2005]

PETITION FOR WRIT OF HABEAS CORPUS

Penal Code, § 1473 at seq.;
Cal. Rules of Court, rule 60(a)

American LegalNet, Inc.
www.USCourtForms.com

This petition concerns:

☐ A conviction                      ☒ Parole

☐ A sentence                        ☐ Credits

☐ Jail or prison conditions         ☐ Prison discipline

☒ Other (specify):  state and federal denial of due process and equal protection

1. Your name:  Peter Hernandez

2. Where are you incarcerated?  Correctional Training FAcility, Soledad, CA 93960

3. Why are you in custody?  ☒ Criminal Conviction  ☐ Civil Commitment

   Answer subdivisions a. through i. to the best of your ability.

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

      Homicide of the first degree, Assault w/intent to commit murder, firearm use

   b. Penal or other code sections:  §§ 187, 217, 12022.5, 1203.06(a)(1) [under P.C. §1168]

   c. Name and location of sentencing or committing court:  L.A. County Superior Court,
      111 N. Hill St., Los Angeles, CA 90012-3014

   d. Case number:  A-334928

   e. Date convicted or committed:  Mar. 9, 1979

   f. Date sentenced:  Mar. 15, 1979

   g. Length of sentence:  Seven (7) years to Life

   h. When do you expect to be released?  Unknown, M.E.P.D.: 9-3-1985

   i. Were you represented by counsel in the trial court?  ☒ Yes.  ☐ No.  If yes, state the attorney's name and address:
      Mr. Kenneth Cotton, L.A. County Public Defender,

4. What was the LAST plea you entered? (check one)

   ☒ Not guilty  ☐ Guilty  ☐ Nolo Contendere  ☐ Other:

5. If you pleaded not guilty, what kind of trial did you have?

   ☒ Jury  ☐ Judge without a jury  ☐ Submitted on transcript  ☐ Awaiting trial

---

6. GROUNDS FOR RELIEF
- **Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

PETITIONER'S FEDERAL AND STATE CONSITUTIONAL RIGHTS TO DUE PROCESS
AND EQUAL PROTECTION WERE VIOLATED BY RESPONDENTS WHEN THEY DENIED
TO HIM THE INDIVIDUALIZED CONSIDERATIONS MANDATED AND REQUIRED BY
STATUTORY AUTHORITIES AND ALL THE CLEARLY ESTABLISHED FEDERAL LAWS

a. Supporting facts:
Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

In August of 1988 and again in January of 1990, Peter Hernandez,
(Petitioner), was found suitable for parole. Those Grants were sub-
sequently reversed and are attached as Exhibit "A".

On July 13, 2006, Petitioner appeared before the Board of Parole
Hearings (BPH) for his 13th subsequent hearing (14th overall), during
which Mr. J. Davis was Presiding Commissioner and Mr. D. Smith was
Deputy Commissioner. A copy of the Hearing transcript is attached
hereto as Exhibit "B", and incorporated by reference to bolster a
claim of a "no parole" policy and/or practice which has been found
to be patently unconstitutional by numerous state and federal courts.

Petitioner was represented by Ms. K. Rutledge. A staff psy-
chologist, Dr. E.W. Hewchuk, Ph.D., testified utilizing a filed Report
dated: 7-23-04, that in his opinion Petitioner is NOT a risk of CURRENT
(continued on attached pages)

b. Supporting cases, rules, or other authority (optional):
*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

(SEE ATTACHED POINTS AND AUTHORITIES)

1  (continued from previous page):

2  danger to the public safety. A copy of that Report and Reports from 2004, 2002, 1999 and 1997 are

3  attached as Exhibit "C". A copy of the 2006 Correctional Counselor Level I report was prepared and filed

4  but not cited to and is attached hereto as Exhibit "D".

5      Copies of the 2005 and 2003 Decisions denying parole are attached as Exhibit "E" and are clearly

6  anecdotal evidence to further advance the allegation of a "no parole" policy and/or practice that has been

7
8  held to be unconstitutional as well as illegal by all courts that have ruled on the subject matter. With the

9  Court's leave, Petitioner respectfully requests that this anecdotal evidence be incorporated to this pleading.

10      Also present at the hearing was Mr. P. Turley, deputy district attorney for Los Angeles county,

11  parole division.

12      California's parole statutes and regulations bestow on life prisoners a liberty interest in parole

13  protected by due process. McQuillen v. Duncan (9th Cir. 2002) 306 F.3d 895, 901-903; In re Rosenkrantz[1]

14  (2002) 29 Cal.4th 616, 661 [Rosenkrantz V]. Petitioner's liberty interest required the BPH panel to find him

15  suitable for parole and set his prison term and a parole date because, when his MEPD lapsed, his parole

16  was evaluated to no longer pose an unreasonable risk of danger to society or public safety. (Penal Code

17  (PC) §3041(a); 15 California Code of Regulations (CCR) §§ 2280, 2281(a).)

18      In some cases, a lifer who otherwise qualifies for parole may be found unsuitable for and denied

19  parole if the commitment offense was especially egregious when compared to other instances of the same

20  offense. Such cases, however, are exceptions, not per the rule. Accordingly, the conduct of a to-life

21  sentenced inmate who committed first degree murder must be especially violent when compared to that of

22  other first-degree murderers for parole to be denied on the basis of the offense in the case of an otherwise

23  qualified inmate. However, the offense cannot serve as a basis for denying parole interminably. In re

24  Ramirez (2001) 94 Cal.App.4th 549, 569-570; Rosenkrantz II, 658; (cf: Biggs v. Terhune   (9th Cir. 2003) 34

25

26

27
[1] There have seven (7) "Rosenkrantz" decisions: People v. Rosenkrantz (1988) 198 Cal.App.3d 1187; In re Rosenkrantz (2000) 80 Cal.App.4th 409; Davis v. Superior Court (2-22-01, B146421 [non-pub.]; In re Rosenkrantz (2002) 95 Cal.App.4th 358; In re Rosenkrantz (2002) 29 Cal.4th 616; In re Rosenkrantz
28  L.A. County Sup.Ct. no. BH003529, filed 6-26-2006 ;Rosenkrantz v. Marshall (2006) 444 F.Supp.2d 1063.

A

In re: Peter Hernandez, on habeas corpus

1  F.3d 910); Irons v. Warden (E.D. Cal. 2005) 358 F.Supp.2d 936; Martin v. Marshall (N.D. Cal. 2006) 431

2  F.Supp.2d 1038 (Martin I); In re Rosenkrantz (C.D. Cal. 2006) 444 F.Supp.2d 1063, 1081 [Rosenkrantz VII].

3     Substantive due process requires that the grounds set forth by a BPH panel for its decision must be

4  supported by at least some credible, relevant evidence in the record.  The panel was required to base its

5  findings on a weighing of all relevant, reliable evidence. (15 CCR § 2281(b); In re Minnis (1972) 7 Cal.3d

6  639, 646; In re Rosenkrantz (2000) 80 Cal.App.4th 409, 424-427 (Rosenkrantz I); Rosenkrantz II, 655;

7  Ramirez, supra, 566. The "some evidence" standard is satisfied if there is reliable evidence in the record that

8  could support the conclusion reached. Powell v. Gomez (9th Cir. 1994) 33 F.3d 39, 40; Cato v. Rushen (9th

9  Cir. 1987) 824 F.2d 703, 705. And federal due process requires *substantial* evidence having indicia of

10 reliability Jancsek v. Oregon Bd. Of Parole (9th Cir. 1987) 833 F.2d 1389, 1390; In re Powell (1988) 45

11 Cal.3d 894, 904; In re Rosenkrantz II, 658; McQuillen, supra, 306; Biggs, supra, 915; Caswell v. Calderon

12 (9th Cir.2004) 363 F.3d 832, 839.

13     Black's Law Dictionary 5th Ed. 1979 defines SUBSTANTIAL EVIDENCE as follows: "Such
        evidence that a reasonable mind might accept as adequate to support a conclusion. *It is that*
14      *quality of evidence necessary for a court to affirm a decision of an administrative board.*
        (Black's p. 1281, citing State v. Green (1974) 544 P. 2d 356, 362. Emphasis added.)

15

16     The Due Process clause of the Fourteenth Amendment prohibits state action that deprives a

17 person of life, liberty, or property without due process of law. A person alleging a due process violation

18 must first demonstrate that he or she was deprived of a liberty or property interest protected by the Due

19 Process Clause, and then show that the procedures that led to the deprivation were constitutionally

20 insufficient. Kentucky Dept. of Corrections v. Thompson (1989) 490 U.S. 454; McQuillen, supra, 900.

21     In the parole context, a prisoner alleging a due process claim must demonstrate the existence of a

22 protected liberty interest in parole, and the denial of one or more of the procedural protections that must be

23 afforded when a prisoner has a liberty interest in parole. The Supreme Court held in 1979, and reiterated in

24 1987, that "a state's statutory scheme, if it uses mandatory language, creates a presumption that parole

25 release will be granted when or unless certain designated findings are made, and thereby gives rise to a

26 constitutional liberty interest." McQuillen, supra, 901 (citing Greenholtz v. Nebraska Penal Inmates (1979)

27 442 U.S. 1, 7 and Board of Pardons v. Allen (1987) 482 U.S. 369, 373. Because no evidence supported the

28 panel member's finding that Petitioner's parole poses an "unreasonable risk of danger to society" or to

B

In re: Peter Hernandez, on habeas corpus

1   "public safety," and the finding was inapposite to the record, parole denial on that basis subverted due

2   process.

3       The reason stated by the panel for finding Petitioner unsuitable was BPH's boilerplate statement that

4   his parole "would pose an unreasonable risk of danger to society or a threat to public safety." (Exhibit "A", p.

5   70,) the sole ground set forth by the panel in support of its Decision to AGAIN, for at least the fourteenth

6   (14th) time, deny suitability and dismiss his warrant of parole which is tremendously long overdue!

7       (His M.E.P.D. was on the 9th of September, 1985!!)

8       Parole denial based on the "unreasonable risk" subterfuge abandoned principles of independence

9   and abrogated due process because it is supported by **NO** EVIDENCE  whatsoever. **All** of the competent,

10  professionally-sanctioned evidence that addresses Petitioner's current **and** future dangerousness, parole

11  risk, etc., found it to be "low," "below average," or "no more than the average citizen," nor has it been for over

12  a score years. (See Exhibit "C", throughout, Exhibit "A", at pp. 45-46.)

13      Utilizing the legal precedent established as the focal criteria, all relevant, reliable evidence in

14  Petitioner's records that addresses his dangerousness and parole "risk" all assess these factors to be low,

15  and because not a scintilla of reliable, relevant evidence supports the panel's flawed findings, the sole

16  relevant reason for finding him unsuitable for parole sensibly suggests this was an illegitimate (ongoing)

17  basis for denial. Martin v. Marshall (N.D. Cal. 2006) 448 F.Supp.2d 1143, (Martin II), et al.

18      In Martin, supra, Justice Patel found NO justification for the panel's boilerplate lack of individual

19  consideration and in her July 21, 2006 Memorandum and Order she stated:

20      "In light of the Board's apparent abandonment of its independent role

21      **—which occurred AFTER Governor Schwarzenegger took office,**

22      the court finds that a remand would indeed be futile." There can be no question but that the

23  implication here is exactly what it means: NO INDEPENDENT PAROLE DECISION BY THE WILSON,

24  DAVIS, OR SCHWARZENEGGER regimes for this Petitioner. Id. at p. 1144. (Emphasis added.)

25      In Rosenkrantz II, supra, at p. 655, the Supreme Court explained that parole release decisions

26  "entail the [BPH]'s attempt to predict by subjective analysis whether the inmate will be able to live in society

27  without committing additional antisocial acts."

28      Such a prediction requires analysis of individualized factors on a case-by-case basis and the BPH's

C

In re: Peter Hernandez, on habeas corpus

1    discretion in that regard is almost but NOT unlimited. Further, regardless of the tenet that the BPH's

2    discretion is exceedingly broad, it is circumscribed by the requirements of procedural due process.

3    (Rosenkrantz, id., Calif. Const. article I, § 7(a), and statutory directives.)

4          Absent reliable evidence of the presence of unsuitability factors, there must be some relevant,

5    reliable evidence that a petitioner is otherwise unsuitable for parole, such as by his having failed to meet the

6    suitability criteria under 15 CCR § 2402, subd. (d); §§ 1-4, 6-9. And, while the BPH has exceedingly broad

7    discretion in its parole decisions, the Findings must reflect "an individualized consideration of the specified

8    criteria and cannot be arbitrary or capricious." Rosenkrantz V, supra, 677; "[t]he liberty interest is created,

9    not upon the grant of a parole date, but upon the incarceration of the inmate." Biggs, supra, p. 914.

10         The failure to properly consider the post-incarceration factors highlights the inherent

11    misunderstanding and application of the "some evidence" standard and triggers the required scope of

12    judicial review of the federal questions presented here.

13         There are two sets of parole criteria regulations, not one. 15 CCR §§ 2402, subd. (c) [Circumstances

14    Tending To Show Unsuitability], and 2402 subd. (d) [Circumstances Tending To Show Suitability]. It appears

15    that the BPH's focused emphasis has been on, and remains on, subdivision (c), with little or no regard given

16    to subdivision (d). Petitioner asserts, as a matter of statutory construction, the "public safety" concern in PC

17    § 3041(b), demands an equal (or neutral) emphasis at the outset of a panel's deliberations AND on its

18    Findings under both sets of criteria and any balanced and reasonable interpretation should compel this

19    approach throughout the entire process due any inmate and to do so would virtually assure a Finding of

20    suitability.

21         Factors TENDING to show suitability or unsuitability must be weighed and balanced within the

22    parameters of a standard of proof. Without this critical, reliable component, the process is inherently

23    arbitrary, capricious, and defective. This standardless analysis would vitiate the individualized consideration

24    held appropriate in Rosenkrantz II. The crux of the matter is that of a standard of proof with indicia of

25    reliability as set forth below and reinforced with significant legal precedent.

26         The "some evidence" standard is NOT the sole standard of evidence to be applied to the BPH's

27    decisions. It is only one aspect of judicial review employed by a habeas court. Edwards v. Balisok (1997)

28    520 U.S. 640, 647. And, if the Rosenkrantz II decision implies, as it does, that the "some evidence" standard

D

In re: Peter Hernandez, on habeas corpus

1  should be applied to the BPH Findings, then this is a clear and unreasonable application of well-established

2  federal Constitutional law set forth by the High Court. Nothing in <u>Superintendent v. Hill</u> (1985) (<u>Hill</u>)  472 U.S.

3  445, 456, implies that it IS A STANDARD OF EVIDENCE to be applied by any agency, board, or executive

4  body outside a disciplinary committee within an exigent-circumstances prison setting that has no pressing

5  need for more formal evidentiary standards or anything warranting standardless precedents

6  What IS implied by the <u>Rosenkrantz II</u> court, when it held that a habeas court can't reverse a

7  decision denying parole even if it determines that the evidence overwhelmingly preponderates towards a

8  finding of suitability is completely unreasonable because it prevents effective habeas relief from an arbitrary

9  and capricious decision, and worse, stymies effective judicial review. This court is not obliged nor compelled

10  to defer to a state decision misapplying federal constitutional principles. <u>Hubbart v. Knapp</u> (9th Cir. 2004) 379

11  F.3d 773, 780; referencing <u>Mullaney v. Wilbur</u> 421 U.S. 684, 691; see also <u>Peltier v. Wright</u> (9th Cir. 1994) 15

12  F.3d 860, 862.

13  In <u>Oxborrow v. Eikenberry</u> (9th Cir. 1989) 877 F.2d 1395, 1399, the Circuit held that: "Our deference

14  to the [state court] is suspended only upon a finding that the court's interpretation of [state law] is untenable

15  or amounts to a subterfuge to avoid federal review of a constitutional violation." Thus, it is petitioner's

16  contention that respondents seek to avoid federal review by asserting that the "some evidence" standard 1)

17  is applied by the BPH and/or, 2) limits judicial review ONLY to the BPH's ultimate decision and not to a

18  finding of a defective pre-Decision process.

19  If Petitioner were the beneficiary of an individualized consideration utilizing real evidence with

20  reliable, articulable proof, it would have logically flowed that he is now MORE suitable than his previous

21  hearings wherein he was found suitable. (Exhibit "A"). All those laudatory words at his Hearing would have

22  had a consistent ring of truth to them in that he has progressed towards a more-suitable mien, not the

23  reverse. This highly illegal "boilerplate" denial now rises to the level of a federal due process violation. <u>Biggs</u>,

24  supra, 916-917; <u>Martin</u>, supra, 1046-1048.

25  The High Court in <u>Greenholtz</u> (at p. 7) <u>Allen</u> (at p. 373) , supra, established that:

26  "While there is no constitutional or inherent right of a convicted person to be conditionally
27  released before the expiration of a valid sentence, a state's statutory scheme, if it uses
   mandatory language, creates a presumption that parole release will be granted when or
   unless certain designated findings are made, and thereby gives rise to a constitutional
28  liberty interest." (citing <u>McQuillen</u>, supra, at 901.)

E

In re: Peter Hernandez, on habeas corpus

1    In the absence of any evidence in the record supporting the BPH's decision, remanding the case

2  back to be reheard is a futile act, and the appropriate remedy is release of the Petitioner. McQuillen II,

3  supra, p. 1015-15; Martin II, supra, 1144-45; Rosenkrantz VII, supra, 1087.

4    A petitioner is entitled to "something more than mere pro forma consideration.", e.g. meaningful

5  individual consideration. Not a sham hearing using rote words and repeating boilerplate from a pre-printed

6  form. The only mandate "normally" being followed under P.C. § 3041 (a), is a multi-year denial under § 3041

7  (b) to "swallow" the due process required under the 14th Amendment, an ingestion violating the equal

8  protection guarantees and abridges Petitioner's civil rights under both state and federal Constitution's

9  proscription against this tactic for all similarly-situated inmates. In re Sturm (1974) 11 Cal.3d 258, 268;

10  Ramirez, supra, at 570; Rosenkrantz V, at pp. 658, 683:

11    "Judicial oversight must be extensive enough to protect the limited right of parole applicants
       "'to be free from an arbitrary parole decision … and to something more than mere pro forma
12     consideration.'" [citation omitted] The courts may properly determine whether the [BPH]'s
       handling of parole applications is consistent with the parole policies established by the
13     Legislature. [ ] while courts must give great weight to the [BPH]'s interpretation of the parole
       statutes and regulations, final responsibility for interpreting the law rests with the courts. [ ]
14     Courts must not second-guess the [BPH]'s evidentiary findings [ ] However, it is the proper
       function of judicial review to ensure that the [BPH] has honored in a '"practical sense"' the
15     applicant's right to '"due consideration."'" [ ] Ramirez supra, at 564.

16    Since it is clear that parole should be the rule and not the exception, a moderate or average risk

17  cannot be construed as "unreasonable." Were an average risk grounds for parole denial, then the exception

18  would "operate so as to swallow the rule that parole is 'normally' to be granted.

19    "All violent crime demonstrates the perpetrator's potential for posing a grave risk to public
       safety … {However] the [BPH] "'shall normally set a release date.'" [citation omitted] The
20     [BPH]'s authority to make an exception … should not operate to swallow the rule that parole
       is 'normally' to be granted. …Therefore, a life term offense must be particularly egregious to
21     justify the denial of a parole date. In order to comply with the parole policy established by
       the Legislature in P.C. § 3041, the [BPH] must weigh the inmate's criminal conduct not
22     against ordinary social norms, but against other instances of the same crime or crimes."
       (Ramirez, supra, at 570, disapproved on other grounds, Emphasis added as usual in
23     published cases.)

24    The applicability of this standard to the review of decisions applies and Petitioner's right to

25  due consideration does not appear to have been honored in any practical sense by the panel in this case

26  and their Decision is facially and legally deficient. In the instant case the BPH made no effort to comply with

27  the controlling rules and seems to have merely stated its "predetermined conclusion." (See: In re Caswell

28

                                          F

In re: Peter Hernandez, on habeas corpus

1    (2001) 94 Cal.App.4th 1017, 1030.)

2          In In re Smith (2003) (Smith II) 114 Cal.App.4th 343, 369, the Sixth District Court of Appeals found

3    that there was not some evidence that Smith's crime was more callous than the average for this type of

4    crime. There was nothing to "distinguish th[e] crime from other [serious] murders [involving a gun] ... the

5    record provides no reasonable grounds to reject, or even challenge, the findings and conclusions of the

6    psychologist and counselor[s] concerning [his] dangerousness."

7          Surely the same must appear to be true here. (See Exhibits "C" and 2004 Correctional Counselor's

8    Report, Exhibit "F", attached.) The Second District Court of Appeals, in the case of another life-term inmate

9    named Smith similarly found no evidence to support a parole denial based on the commitment offense. In re

10   Smith (2003) (Smith I) 109 Cal.App.4th 489.

11         Compare In re Scott (2004) 119 Cal.App.4th 871, 876-877 [Scott I], where the First District reversed

12   the BPH's standard statement of reliance on the gravity of the crime because in truth, "the relevant evidence

13   show[ed] no more callous disregard for human suffering than is shown by most [ ] murder offenses.

14   (Governor's rescission of Scott's parole unanimously reversed on 10-18-05, see: In re Scott 133 Cal.App.4th

15   538, Scott II.)

16         On 5-18-05, in Coleman v. BPT (E.D. Cal. No. 97-0783), Honorable Judge L. Karlton

17   adopted the Findings and Recommendations IN FULL. There, it was found that ex-governors Davis and

18   Wilson (and NOW Governor Schwarzenegger, too. See infra at p. C), have/had panels with a sub rosa "no

19   parole" policy and were/are carrying it out. Martin I supra, 1048-49, Martin II, supra, 1144; see Coleman and

20   Final Order, attached as Exhibit "G".

21         It is beyond debate that neither a state agency interpreting an enabling statute nor any court of the

22   state can construe a statute contrary to Legislative intent or the ordinary meaning of the words used in a

23   statute. Our Court, in the entire history of the statute, has never construed it with any adequacy according to

24   the plain meaning to create guidance and instill compliance by both the BPH panels and those who serve

25   the governors otherwise.

26         Instead, this lack of judicial construction has led to the many years of overwhelming denials that DO

27   NOT reflect in any clear way the presumptions of § 3041. Nor does it reflect instruction as to what the

28   agency's burden of proof is or the legal significance of relevant, reliable, or material evidence. This lack of

G

In re: Peter Hernandez, on habeas corpus

1   judicial guidance has left unfettered discretion in the hands of lay appointees to determine the legal import of

2   evidence (or lack thereof) although these persons are arguably unqualified by a dearth of professional

3   standing to make these determinations upon which a federal liberty interest depends.

4        Determining the legality and weight and of evidence requires some specific legal training in

5   evidentiary law; not by lay persons, and which lack of training is visibly evident in the incongruously

6   inapposite findings thus made. (McQuillen I, supra, 907-912; Rosenkrantz II, supra, 680; Rosenkrantz I,

7   supra, 424-426; Smith II, supra, 361; Smith I, supra, 501-506.) These are only a few of the published cases

8   but unpublished absurdities exponentially abound!

9        The Sixth district held for the proposition in Smith II at 361 that "[t]he weight given the specified

10   factors relevant to parole suitability lies within the discretion of the BP[H]."; a court's determination "of

11   whether the *preponderance of the evidence* supports a finding of suitability is irrelevant." (Emphasis added.)

12   This is the first time a published decision on the BPH has even mentioned a burden of proof. This reference

13   infers the BPH must honor this evidentiary standard as faithfully to the letter as legally possible.

14        Yet there is no settled bright line rule for a court to determine if the BPH has met that standard.  Just

15   the opposite, in fact, since Smith II strongly suggests that even if a reviewing court finds the agency did not

16   meet the standard, an allegation of "some evidence" is sufficient to automatically require judicial deference.

17        The Third District Court of Appeals stated the following as fact:

18        "It is without doubt that a blanket no-parole policy would be contrary to the law, which
         contemplates that persons convicted of murder without special circumstances may eventually
19        become suitable for parole and that, when eligible, they should be considered on an
         individualized basis. Thus, blanket policies have long been deemed to be improper. ¶ In
20        Roberts v. Duffy (1914) 167 Cal. 629, a decision that predates the enactment of our state's
         old indeterminate sentencing law, the Court condemned a blanket parole policy that was
21        contrary to the statutory parole scheme then in place. It appeared that the statutory law
         *allowed a prisoner to apply for parole after serving ONE YEAR* but that, **contrary to the
22        statute, the parole authority adopted a rule precluding application until one-half the
         sentence was served.**

23        The Court held that, "'while the prisoner had no right to apply to release on parole at
         any time, *he was entitled to apply* and have his application duly considered <u>on an
24        individualized basis.</u>'" Id. at 640-641.

25            (Does this sound familiar? Emphasis added to original citation.)

26

27        "With respect to persons sentenced to indeterminate terms, the purpose of punish-ment is
         satisfied by the requirement of service of a minimum period before eligibility for parole and,
         when suitable for parole, by determination of a release date **in a manner that will provide**

28

                                              H

In re: Peter Hernandez, on habeas corpus

1    UNIFORM TERMS for offenses of similar gravity and magnitude with respect to their threat to
2    the public." (P.C. §§ 3041, 3041(a), 3041.5, citing In re Morrall (2002) 102 Cal.App.4th 280,
     291-292.)

3    The arbitrary or capricious misapplication of statutory law violates both state and federal due
4    process. Hill, supra, at p. 428; Gordon v. Duran (9th Cir. 1990) 895 F.2d 610, 613; In re Edsel P. (1985) 165
5    Cal.App.3d 763, 779. "The touchstone of due process is protection of the individual against [the] arbitrary
6    action of government." Wolff v. McDonnell (1974) 418 U.S. 539, 558.)

7    These principles apply in equal force to incarcerated prisoners. (In re Jones (1962) 57 Cal.2d 860,
8    862; ["a convicted felon, although civilly dead, is nevertheless a 'person' entitled to protection of the 14th
9    Amendment."]; In re Price (1979) 24 Cal.3d 448, 453 [acknowledging that P.C. § 2600 limits a prisoner's
10   deprivation to only such rights "as is necessary in order to provide for the reasonable security of the
11   institution in which he is confined."].)

12   In interpreting a prisoner's rights of substantive due process the High Court has held that a prisoner
13   may derive a due process liberty interest from administrative regulations, as well as state law and the U.S.
14   Constitution. Sandin v. Conner (1995) 515 U.S. 472, 484; Hewitt v. Helms 459 U.S. 460, 469, receded from
15   on p. 484, fn. 5; Meachum v. Fano (1976) 427 U.S. 215, 226; Wolff, supra, at p. 557. In applying these
16   standards here, the BPH violated Petitioner's right to constitutional due process but he is not challenging the
17   BPH's right to conduct professional psychological assessments as the main focus of the parole evaluation
18   process, but does challenge their "normal" practice of summarily dismissing and patently ignoring their own
19   experts.

20   Predictions of future conduct necessarily relate to public safety concerns but Judge Karlton in Irons
21   v. Warden (E.D. Cal. 2004) 358 F.Supp.2d 936 (9th Cir. Review pending, filed on 5-18-05, No. 05-15275),
22   discussed this conundrum and noted that the propensity analysis thusly:

23       "To a point, it is true, the circumstances of the crime and motivation for it may indicate a
         petitioner's instability, cruelty, impulsiveness, violent tendencies and the like. However,
24       after 15 or so years in the cauldron of prison life, not exactly an ideal therapeutic
         environment to say the least, and after repeated demonstrations that despite recognized
25       hardships of prison, [petitioner] does not possess these attributes, the predictive ability of
         the circumstances of the crime is near zero." [2]
26

27   _____
     [2] "It is worth noting, as has our [Calif.] Supreme Court (People v. Murtishaw (1981) 29 Cal.3d 733, 768, disapproved on other grounds in People v. Boyd
     (1985) 38 Cal.3d 762., that a large number of legal and scientific authorities believe that, even where the passage of time is not a factor and the
28   assessment is made by an expert, predictions of future dangerousness are exceedingly unreli- able. (See, e.g., Monahan, Violence Risk Assessment:
     Scientific Validity and Evidentiary Admissibility, 57 Wash. & Lee' L. Rev. 901 (2000); Otto, On the Ability of Mental Health Professionals to 'Predict
     Dangerousness,' 18 Law & Psychol. Rev. 43 (1994); Lidz, et al., The Accuracy of Predictions of Violence to Others, 269, Jour.Am.Med.Assn. 1007 (1993);
     Diamond, The Psychiatric Prediction of Dangerousness, 123 Pa.L.Rev. 439 (1974); Dershowitz, The Law of Dangerousness: Some Fictions About

In re: Peter Hernandez, on habeas corpus

1   (Irons, supra, at p. 947, fn. 2, this 'dicta' was also cited as Headnote #10 at p. 937; see additional discussion

2   of "need for more therapy" used as a ruse to deny suitability at p. 948.)

3       P.C. § 3041(a) governs parole suitability determination processes and does not define more than

4   one class of persons. The statute generalizes that it's focus is "any prisoner" who is serving an

5   indeterminate term. Through application, however, the agency's discrimination amongst the class serving

6   indeterminate sentences is in violation of the right to equal protection ensconced in the Fourteenth

7   Amendment. Equal protection is "[in essence] a direction that [a person] similarly situated should be treated

8   alike." (City of Cleburne v. Cleburne Living Ctr. (1985) 473 U.S. 432, 439, citing Plyler v. Doe (1982) 457

9   U.S. 202, 216, "To state a claim ... for violation of the Equal Protection Clause of the 14[th] Amendment a

10  plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff

11  based upon membership in a protected class." Barren v. Harrington (9th Cir. 1998) 152 F.3d 1193, 1194,

12  cert. denied 525 U.S. 1154 (1999).)

13      Strict scrutiny, alternatively, is utilized if the government distributes benefits or burdens in a manner

14  inconsistent with fundamental rights. (See Sosna v. Iowa (1975) 419 U.S. 393; Shapiro v. Thompson (1969)

15  394 U.S. 618.) The fundamental right here is the due process right to relevant, reliable evidence being

16  considered when analyzing a right to release on parole. McQuillen I, supra, at 900; McQuillen II, supra, at

17  1012; Martin I , supra, at 1043: ("[T]he deferential 'some evidence' standard has outer limits. [citing

18  Coleman, supra, with approval slip op. at 9] If it is established that a particular judgment was

19  predetermined, then a prisoner's due process rights will have been violated even if there is 'some evidence'

20  to support the decision. [See Bakalis v. Golembeski (7th Cir. 1994) 35 F.3d 318, 326] (a decision-making

21  "body that has prejudged the outcome cannot render a decision that comports with due process. ... The

22  California Supreme Court has explicitly stated that a blanket no-parole policy as to a certain category of

23  prisoners is illegal. [In re Minnis; In re Morrall] " ... Because petitioner cannot change the past, denying

24  [P]etitioner parole based only on the facts surrounding the crime itself effectively changes his sentence ...

25

26  Predictions (1970) 23 J. Legal Ed. 24. According to a Task Force of the American Psychiatric Assn., "[n]either psychiatrists nor anyone else have demonstrated an ability to predict future violence or dangerousness. (Am.Psych.Assn., Task Force Rpt. 8, Clinical Aspect of the Violent Individual (1974) at p. 28.) As our [Calif.] Supreme Court has also noted, "the same studies which proved the inaccuracy of psychiatric predictions [of dangerousness] have

27  demonstrated BEYOND DISPUTE the no less disturbing manner in which such prophecies consistently err: they predict acts of violence which will not take place (false positives)", thus branding as 'dangerous' many persons who are in reality totally harmless. [citation.]" (People v. Burnick (1975) 14 Cal.3d 306, 327.) (all emphasis in original). (See: copy of Order denying Review, dated 11/30/05, Daily Journal 12/2/05, p. 13803, attached as Exhibit "B"). Scott, II,

28  supra, footnote #9.

J

In re: Peter Hernandez, on habeas corpus

1 | into life imprisonment without the possibility of parole." Ibid. at 1046.) (cf: Martin II, supra, at 1144: "In sum,

2 | the Board appears to have capitulated to the blanket no-parole policy described by this court in its previous

3 | [Martin I] Order, abandoning its role as an independent assessor of petitioner's eligibility. This capitulation is

4 | particularly troubling in light of the Board' vigorous assertions of independence during the 2003 hearing."

5 | This Honorable Court should grant the writ and Order all appropriate relief including a complete discharge

6 | from custody and sanction full redress for Petitioner.

7

8

9 | <u>CONCLUSION</u>

10 | WHEREFORE, Petitioner respectfully submits that the writ should be granted in full and all available

11 | remedies leading to his immediate release from custody be Ordered at the earliest possible moment and

12 | forthwith. It is respectfully requested that an evidentiary hearing be Ordered as an alternative to the above

13 | should there be consideration of the "no parole" policy and/or practice by this previous administration.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

K

In re: Peter Hernandez, on habeas corpus

7. Ground 2 or Ground _____ (if applicable):

PETITIONER'S FEDERAL RIGHTS TO DUE PROCESS AND EQUAL PROTECTIONS WERE VIOLATED WHEN RESPONDENTS UTILIZED A LESSER STANDARD OF LEGAL PROOF REQUIRING EVIDENCE WITH SOME INDICIA OF RELIABILITY TO FIND THAT PETI- TONER IS UNSUITABLE TO PAROLE AND IS THEREFORE AN UNREASONABLE RISK

a. Supporting facts:

Nowhere is there any codification that avers petitioners must prove his or her suitability. Only if an inmate is found unsuitable does evidence become citable. (See Dannenberg, at 1095; Rosenkrantz at 658, 683.) Evidence must be specific, articulable, and have "some indicia of reliability." Respondents have the burden of proof to demonstrate, in the Record, why an inmate is not suitable and a denial of more than one year requires that the BPH panel state for the Record why it isn't likely that petitioners would be found suit- able any time sooner. There is a wholesale vitiation going on here.

Procedural safeguards require: a hearing one year prior to the MEPD, CCR §§2268(b)[2400 et sqq.], 2270(d), (e), (f); PC §3041 (a), CDC v. Morales (1995) 115 S.Ct. 1597, 1600; service and prior examination of all material considered; representation if desired.

The one-year lead on a MEPD imparts that the Legislature intended that some inmates will be suitable at an initial hearing otherwise why would such a gratuitous mandate exist? Govenor's- level review presumes a neutral, well-defined, professional body that will follow all the state and federal laws. Only this practice

(continued on attached pages)

b. Supporting cases, rules, or other authority:

(SEE ATTACHED POINTS AND AUTHORITIES)

Ground 2, continued:

would meet the constitutional burden under the discretionary methods needed to quickly resolve an uncertain matter.

The "some evidence" relied on to deny parole must be relevant and reliable in establishing Petitioner is a current, unreasonable threat to public safety and must not be grounded in an incomplete or unreasonable assessment of the relevant factors.

In explaining what the "some evidence" standard meant, the Court in In re Rosenkrantz (2002) 29 Cal.4th 616 at 677, stated that "[o]nly a modicum of evidence is required." On its face, this standard could thus be seen as remarkably broad--that a scintilla of evidence (or the BPH's assessment of it)--would be enough to completely immunize BPH decisions from judicial review. However, such a reading would effectively serve to nullify the Rosenkrantz court's holding rejecting the Executive's position that factual decisions rejecting parole were immune from examination by the courts and in point of fact were required.

A disection of the "some evidence" standard itself--both conceptually and through a review of the application of the Rosenkrantz' standard (and its progeny)--makes clear that this is the meaningful standard. Properly understood, it strikes an appropriate balance between judicial deference to difficult BPH decisions and the protection of constitutional liberty interests.

The "some evidence" standard of review is laid out here:

"[W]e conclude that the judicial branch is authorized to review the factual basis of a decision of the [BPH] denying parole in order to ensure that the decison comports with the requirements of due process of law, but that in conducting such a review, the court may inquire only whether some evidence in the record before the [BPH] supports the decision to deny parole, based upon the factors

1  specified by statute and regulation. Rosenkrantz, 658.
"[a]s long as the [BPH] decision reflects due consideration
2  of the specified factors as applied to the INDIVIDUAL
PRISONER in accordance with applicable legal standards,
3  the court's review is limited to ascertaining whether
there is some evidence in the record that supports the
4  [BPH] decision." Id. at 677. (emphasis added).

5      Thus, the inquiry into whether there is "some evidence" is

6  more complex than it might otherwise seem, as the standard MUST

7  be applied within the context of the statutory framework in which

8  it arises. This framework imposes at least 3 requirements on the

9  "some evidence" standard if it is used to deny parole.

10     First, the BPH must base their decisons only on evidence that

11  serves to establish that the inmate will or will not pose a

12  continuing, "unreasonable risk of danger to society if relesed from

13  prison." CCR, title 15, §2402(a), and PC §3041(b).

14     Second, the evidentiary basis for parole decisions must be

15  based on the factors specified in the regulations after

16  individualized considerations of all of the factors. Rosenkrantz

17  at 677 ("The precise manner in which the specified factors relevant

18  to parole suitability are considered and balanced lies within the

19  discretion of the [executive branch], but the decision must reflect

20  an individualized consideration of the specified criteria and CANNOT

21  BE ARBITRARY AND CAPRICIOUS."); see also In re Stanley (1976) 54

22  Cal.App.3d 1030, 1038 n.7 ("Other courts place more weight on the

23  prisoner's record of crime. We abstain from any argument over the

24  relative primacy of various parole factors. It is enough to say

25  that the Adult Authority must apply all the factors.") (citing In

26  re Minnis (1972) 7 Cal.3d 639). These factors naturally all relate

27  to whether the inmate poses a continuing, unreasonable risk of danger

28  to society if released from prison. (emphasis added).

4-B

1    Third, the evidence upon which the BPH relies must be relevant

2 and reliable. CCR §2402(b) ("All relevant, reliable information

3 available to the panel shall be considered in determining suitability

4 for parole.") (cf. CCR §§2402(d)(1-9).

5    In sum, a court examining parole decisions must determine

6 whether, after all consideration of all the factors enumerated in

7 the statute and regulations, the decison was based on: 1) some

8 evidence; 2) a reasonabe consideration of all the factors specified

9 by the statutory guidelines; 3) evidence that is both relevant and

10 reliable; and 4) factual determinations that suggest an inmate poses

11 a CURRENT, UNREASONABLE THREAT TO PUBLIC SAFETY.

12    A review of the post-Rosenkrantz legal panorama reveals that

13 California courts of appeals and federal courts have routinely

14 applied the above boundaries and checkpoints of relevance,

15 reliability and reasonableness to the "some evidence" standard.

16 The California Supreme Court has so far utterly failed to establish

17 a brightline Plimsoll mark to define the full depth of the inquiry.

18    The courts continue to assess the reasonableness of the BPH's

19 interpretation of the facts and circumstances used to legally sus-

20 tain a finding of parole suitability denial. The court in In re

21 Van Houten (2004) 116 Cal.App.4th 339, 356, assessed whether the

22 BPH was reasonably able to conclude that there was some evidence

23 of the inmate's need of continuing therapy and her dangerousnes

24 to the public. Though it found in the affirmative, the court took

25 a close look at whether the BPH "could reasonably conclude that

26 [her] defense, that Manson's influence overwhelmed [her], was

27 exaggerated such that she is fully responsible for the LaBianca

28 murders" and whether "[t]he BPH could infer with sufficient

1  reasonableness to satisfy a minimal 'some evidence' standard that

2  [she] is a danger to the public and in need of continued therapy

3  and programming." Her denial was affirmed with instructions.

4  Judicial inquiry into the stated reasons for parole denial

5  have their place and numerous state and federal courts--in a wide

6  range of contexts--have similarly held the judicial inquiry into

7  the reasonableness of BPH determinations and conclusions is

8  appropriate, even when such determinations and conclusions are

9  accorded broad deference. (See, e.g., In re Farley (2003) 109

10  Cal.App.4th 1356, 1361-2: "Judicial review of a CDC custody

11  determination is limited to determining whether the classification

12  decision is arbitrary, capricious, irrational, or an abuse of the

13  discretion granted those given the responsibility for operating

14  prisons. While we must uphold respondent's classification action

15  if it is supported by "some evidence" and we must afford great

16  deference to an administrative agency's expertise, where the agency's

17  interpretation of the regulation is clearly arbitrary or capricious

18  or has no basis, COURTS SHOULD NOT HESITIATE TO REJECT IT."

19  Federal courts likewise require parole decisions to be

20  reasonable. As an example, in a parole rescission case, a federal

21  court in this state held: "the Court of Appeals conclusory findings

22  that there was 'some evidence' to support the rescinding, the BPH's

23  decision that parole was improvidently granted to petitioner are

24  contrary to clearly established federal law and, to the extent they

25  are fact-based, represent unreasonable determinations of the facts

26  in light of the evidence presented in the state court preceedings."

27  Stockton v. Hepburn (N.D Cal. 2005) 2005 U.S. Dist. LEXIS 4877 at

28  43; see also Irons v. Warden (N.D. Cal 2004) 358 F.Supp.2d 936,

1  948 ("Clearly, a conclusion by lay BP[H] commissioners that

2  petitioner has not yet acheived required therapy for insight OR

3  OTHER REASONS is not reasonably sustainable, and a state court's

4  conclusion to the contrary is patently unreasonable.")

5      The federal liberty interest is made an adjunct to the state

6  requirements of due process by and through the 14th Amendment to

7  the U.S. Constitution and the substantial evidence of the federal

8  standard must be overcome to meet federal guarantees to its citizens

9  who, before they became entitled to state civil rights, were first

10  bestowed by operation of their federal citizenship. A state cannot

11  lawfully deny any federal right to its citizens but that is exactly

12  what respondents are demanding of their agents in the BPH, and will

13  no doubt now ask this Honorable Court to signoff on. That must not

14  be allowed if the judiciary is to be truly separated from the

15  Executive charades disguised is a legitimate exercise in freedom.

16      The goal of indeterminate sentences and the parole system is

17  not only to punish, but also to provide for reformation and

18  rehabilitation as the CDC's renaming suggests:

19      "The belief no longer prevails that every offense in
        a like legal category calls for an identical punish-
20      ment without regard to past life and habits of a parti-
        cular offender. ... Retribution is no longer the domi-
21      nant objective of the criminal law. Reformation and
        rehabilitation of offenders have become important goals
22      of criminal jurisprudence."

23  People v. Morse (1964) 60 Cal.2d 631, 643 n.8 (quoting Williams

24  v. State of New York (1949) 337 U.S. 241, 247). In a lengthy discus-

25  sion of this topic, the Supreme Court stated the following:

26      "[T]he purpose of the indeterminate sentence law, like
        other modern laws in relation to the administration
27      of criminal law, is to migitate the punishment which
        would otherwise be imposed upon the offender. These
28      laws place emphasis upon the reformation of the offender.

4-E

1    They seek to make the punishment fit the criminal rather
     than the crime. They endeavor to put before the prisoner
2    great incentive to well-doing in order that his will
     to do well should be strengthened and confirmed by the
3    habit of well-doing. [...] [The] interests of society
     require that under prison discipline every effort should
4    be made to produce a reformation of the prisoner. ...
     The legislative policy [was to provide a system whereby]
5    a hope was to be held out to prisoners that through
     good conduct in prison and a disposition shown toward
6    reformation, they might be permitted a conditional liber-
     ty upon restraint under which they might be restored
7    again to society. ... Although good conduct while in-
     carceratd and potential for reform are not the only
8    relevant factors, this court has acknowledged their
     significance. Furthermore, the Authority has declared
9    that these factors are among those of 'paramount impor-
     tance. In re Minnis, 7 Cal.3d 644-45.

10

11   The Rosenkrantz Court, at 656, citing to Minnis, reaffirmed

12   these principles: "[E]ven before factors relevant to parole de-

13   cisions had been set forth expressly by statute and regulations,

14   we concluded that '[a]ny official or board vested with discretion

15   is under an obligation to consider all relevant factors [], and

16   the [BPH] can't, consistently with its obligation, ignore post-

17   conviction factors UNLESS DIRECTED TO by the Legislature." (citing

18   Minnis at 645; emphasis added for illumination).

19   Petitioner has a Constitutional liberty interest in parole

20   decisions and "[P]arole applicants in this state have an expectation

21   that they will be granted parole unless the BPH finds, in its

22   reviewable discretion, that they are unsuitable for parole in light

23   of the circumstances specified by statute and regulation."

24   Rosenkrantz at 654 and at 659-61 this liberty interest is an

25   expectation protected by due process of law. (holding that the

26   California Constitution Art. V, §8(b) and PC §3041 "give rise to

27   a protected liberety interest" in that "a prisoner granted parole

28   by the BPH has an expectation that the Governor's decision to affirm

4-F

1    modify, or reverse the BPH's decision will be based upon the same

2    factors the BPH is required to consider," and that "this liberty

3    interest underlying a Governor's parole review decision is protected

4    by due process of law.").

5        Federal courts have also unequivocally held that California's

6    parole system gives rise to a liberty interest constitutionally

7    protected by due process. See: Allen, infra at 376-78; Greenholtz

8    v. Inmate of Neb. Penal & Corr. Complex (1979) 442 U.S. 1, 11-12

9    (holding a state's statutory parole scheme that uses mandatory

10   language may create a presumption that parole release will be

11   granted upon certain circumstances or findings, thus giving rise

12   to a constitutionally protected liberty interest); McQuillen, supra

13   at 902-3 n.1 (holding that because parole scheme uses mandatory

14   language and is largely parallel to the schemes found in Allen

15   and Greenholtz do give rise to a protected libety intrest in RELEASE

16   ON PAROLE, "California's parole scheme gives rise to a cognizable

17   liberty interest in release on parole.") Biggs v. Terhune (9th

18   Cir. 2003) 334 F.3d 910, 914-15 (same) and, ("[t]he liberty interest

19   is created, not upon the grant of a parole date, but upon the

20   incarceration of the inmate."

21       Rosenkrantz specifically rejected any position that a court

22   may not properly examine the factual basis of parole decisions

23   at 667, "[W]e conclude that the courts properly can review a

24   Governor's decisions whether to affirm, modify, or reverse a parole

25   decision by the BPH to determine whether they comply with due

26   process of law, and that such review properly can include a determi-

27   nation of whether the factual basis of such a decision is supported

28   by some evidence in the record that was before the BPH.

1    Post-Rosenkrantz, courts have reaffirmed the concepts of broad

2    executive deference but vigilent judicial review, by engaging care-

3    ful analysis, will ensure that the boundaries of due process are

4    respected and upheld. "[t]he exceedingly deferential nature of

5    the "some evidence" standard of judicial review set forth in

6    Rosenkrantz does not convert a court reviewing the denial of parole

7    into a potted plant." In re Scott (119 Cal.App.4th 871, 898, re-

8    cently affirmed).

9    The Court, in In re Dannenberg (2005) 34 Cal.4th 1061 at 1095

10   n.16 reaffirmed that effective judicial review is critical to due

11   process. Rejecting the dissent's suggestion that the opinion "per-

12   mits untethered pro forma parole denials that are insulated from

13   effective judicial review, thus contravening California life in-

14   mates' due process rights to individualized parole consideration,"

15   the majority made clear that the [BPH] must apply detailed standards

16   in evaluating individual inmates' suitability for parole on public

17   safety grounds, and that the Executive's broad discretion is subject

18   to meaningful judicial oversight.

19   There is no question that the discretion afforded to the BPH

20   with respect to parole decisions is great. However, the parole

21   system's very purpose is to provide for the reentry into society

22   of inmates who no longer pose a danger or unreasonable threat to

23   public safety, and those rights afforded thereunder are

24   constitutionally protected.

25   The BPH must abide by due process considerations, and the

26   courts are entrusted with ensuring that such considerations are

27   adequately respected and thus protected. Neither Rosenkrantz or

28   Dannenberg permits respondents to immunize themselves from re-

view by unreaonable and possibly unlawful assertion that certain facts support a denial of parole. On the contrary, Rosenkrantz and Dannenberg make clear that the courts have a vital and therefore important role to play in ensuring that parole decisions are actually supported by "some evidence" having a basis in fact, and an indicia of reliability supported in the record.

Petitioner submits that there is a real danger that, improperly understood, the guidelines articulated in Rosenkrantz, Dannenberg, and the court of appeals will serve to provide respondents with de facto immunity from judicial review, a result anathema to state and federal due process protections. Properly understood, the "some evidence" standard provides a fair and proper framework for review of parole decisions in any venue, one that provides respondents with an appropriate level of deference in making extremely difficult decisions relating to inmates' liberty interests and public safety concerns, while ensuring that statutory and constitutional liberty interests are being adequately and lawfully safeguarded through judicial review. And, when this standard is properly applied to this case, there should be no doubt but that the BPH's denial of suitability seems unsustainable and must be reversed, a new hearing granted, and an Order with instructions issued.

WHEREFORE, Petitioner prays that the writ be granted in full and all available relief be accorded to Petitioner to comply with and comport to the state and federal Constitutions and the legal adversarial process and resolution of a judicious nature in this most important matter herein. Petitioner hereby incorporates by reference, as though fully set forth, all papers, pleadings, transcripts, exhibits and matters of record in the instant matter.

7. Ground 2 or Ground __3__ *(if applicable)*:

PETITIONER HAS A FEDERALLY-COGNIZABLE LIBERTY INTEREST IN RELEASE

TO PAROLE CREATED BY RESPONDENT'S STATUTORY SCHEME AND MANDATORY

LANGUAGE OF THE ENABLING STATUTES THAT REQUIRES A SUITABILITY FINDING

UNDER STATUTORY CRITERIA AND RESPONDENTS' BURDEN IS NOT MET HEREIN

a. Supporting facts:

This petition is intended to give legitimate meaning to petition-

er's seven (7) years-to-Life sentence by seeking an Order in this

Court granting the writ to discharge petitioner from state prison,

or alternatively, compelling the BPH to conduct a new parole

consideration hearing and correctly weight their statutory findings

to view suitability and consequent release to parole for Petitioner.

The issues raised are of constitutional dimension, comporting

to petitioner's federal constitutional rights, and questioning the

legality of petitioner's continued confinement in the face of over-

whelming evidence of legally-sustainable proof of suitability and

unquestioned state-hired professionals and their proffered opinions

of reasonable assurance in adhering to concerns of public safety.

There is NO evidence having indicia of reliability that this

petitioner poses an unreasonable risk of danger to the public and

P.C. §3041(a) and California Code of Regulations (CCR), Title 15,

Division II §§2402(d)(1,2,3,4,6,7,8 & 9) (parole suitability criteria)

all make it clear that there IS A MANDATE, based on a legally-

sufficient standard, and that standard is subject to judicial review

(continued on attached pages)

b. Supporting cases, rules, or other authority:

(SEE ATTACHED POINTS AND AUTHORITIES)

1    (continued from previous page):

2    for abuse of discretion under a federal due process and equal protection umbrella with safeguards required in a

3    review of the "evidence" of unsuitability that is burdened upon respondents.

4         The California Supreme Court recognizes that prisoners have procedural due process protections in

5    connection with parole determinations. A legitimate expectancy of release to parole is created by PC § 3041. If

6    the statute creates the legitimate expectancy of parole, it is not legally sufficient to answer that the BPH may, in

7    its broad discretion, deny parole suitability.

8         This argument, that the BPH's broad discretion swallowed Petitioners liberty interest and expectation of

9    release was squarely rejected by the High court in Allen, supra. Additionally, the Court stated in Rosenkrantz IV:

10   "[P]arole applicants in this state *Have an expectation that they will be granted parole* unless the BP[H] finds in its

11   discretion, that they are unsuitable for parole **in light of the circumstances specified by statute and**

12   **regulation**." Rosenkrantz V, supra, 29 Cal.4th at 654. And, [O]ur past decisions make clear that the *requirement*

13   of procedural due process embodied in [Art. I, § 7, subd. (a)], places some limitations upon the broad

14   discretionary authority of the BP[H}." Id. at 655.

15        Therefore, it is inherently clear that the presence of discretion held by the BPH does not, under either

16   state or federal law, diminish nor extinguish the expectancy of release to parole nor in any ways Petitioner's due

17   process rights. It thus follows that a liberty interest has existed under PC § 3041 that is embodied in, and

18   protected by, the Fourteenth Amendment's Due Process Clause.

19        Also, CCR regulations use the "shall/unless" language (§§ 2401-2402) and recognize all available rights

20   to Petitioners. Further, these regulations AS ORIGNIALLY WRITTEN, made it even clearer that parole was to

21   normally to be granted. This remained so until political operatives, presumably with a criminal bent, manipulated

22   the executive and legislative branches to repeal this proviso and substitute a "Willie Horton" revision that was

23   never fully explained to the public nor openly voted upon for acceptance and would've probably failed it there

24   had been an honest attempt to do so.

25        For respondents to abrogate this federal liberty interest they must provide *substantial* relevant, reliable

26   evidence having some indicia of credibility that Petitioner poses a CURRENT *unreasonable* threat to the public

27   safety, as noted in In re Lee (10-10-06) Second District Court of Appeals, Division Eight; 49 Cal.Rptr.3rd 931,

28                                                                    A

In re: Peter Hernandez, on habeas corpus

1    where the court cautioned:

2        ["The commitment offense can negate suitability [for parole] only if circumstances of the crime ...
         rationally indicate that the offender will present an unreasonable public safety risk if released from
3        prison."] In re Scott (2005) 133 Cal.App.4th 573, 595, [however], In re Lowe (2005) 130 Cal.App.4th
         1405, suggested "'some evidence" applies to the factors, not dangerousness.) Some evidence of
4        the existence of a particular factor does not necessarily equate to some evidence the [inmate's]
         release unreasonably endangers public safety." Lee, supra, 936.
5            ¶The board and governor must focus their parole decisions on whether a prisoner
         continues to pose an unreasonable risk to public safety. Such a practical inquiry, rooted in real
6        world crime and law and order, has no obvious intersection with incorporeal realm of legal
         constructs." Id. at 940.

7

8        This is something they have patently failed to do, as testified to by virtually all of their own witnesses as

9    noted in attached Exhibit "C", which has been previously generated BY RESPONDENTS and provided to all

10   concerned parties prior to Petitioner's various hearings and with NO OBJECTIONS from respondents as being

11   accurate and meaningful to ascertain PRESENT DANGEROUSNESS.

12       "Unreasonable risk" evidence that meets the federal level of reliability must be drawn from an

13   individualized analysis of fifteen (15) factors identified by regulations: CCR § 2402(b); Rosenkrantz V at 653-54.

14   "Such information shall include circumstances of the prisoner's social history; past and present mental state; past

15   criminal history; [] the base and other commitment offenses; past and present attitude toward (sic) the crime; any

16   conditions of treatment or control ...; and any other information that bears on the prisoner's suitability for

17   release." (emphasis added.)

18       This extensive list of factors, including other relevant reliable information that must be considered, makes

19   it clear that the Legislature did not intend for any single factor to initially or consis-tently trump all the others. This

20   is exactly what is happening here however. Decision upon decisions by the BPH suggests that their focus is

21   exclusively on the commitment offense, a sub-factor among the total. The BPH insistently attempts to insulate

22   their failure to individually consider circumstances of suitability using makeweight exceptions to state by rote that,

23   'although post-conviction behavior was DULY CONSIDERED, and the inmate is otherwise suitable for release to

24   parole, the offense was so heinous, atrocious, or cruel, that Petitioner is ineligible for a finding of suitability. "The

25   evidence under-lying the BPH's decision must have some indicia of reliability." Jancsek v. Oregon Board of

26   Parole (9th Cir. 1987) 833 F.2d 1389, 1390.

27       The reduction of the parole assessment process to an occluded, myopic pseudo-consideration of the

28                                                                    B
     In re: Peter Hernandez, on habeas corpus

1   one factor, and it alone—unerringly as an unwritten but accepted general rule practiced in all circumstances—

2   was never intended by the Legislature and cannot be permitted nor allowed to continue and still comport with

3   Rosenkrantz, Biggs, Martin, Morrall, Irons, Coleman, et cetera. See also: Environmental Defense Center, Inc. v.

4   E.P.A. (2003) 344 f.3D 832, 858, fn. 36, (holding that a federal agency has acted in an arbitrary and capricious

5   fashion, if "the agency has relied on factors that Congress has not intended to consider, entirely failed to

6   consider an important aspect of the problem, and offered no explanation for its decision that runs counter to the

7   evidence before the agency, or is so implausible that it could not be ascribed to a different view or the product of

8   agency expertise."); Arizona Cattlegrower's Ass'n v. U.S. Fish & Wildlife, B.L.M. (9th Cir. 2001) 273 F.3d 1229,

9   1236 (holding judicial review under the "arbitrary and capricious" standard is "meaningless ... unless we carefully

10  review the record to ensure that agency decisions are founded on a reasoned evaluation of the relevant factors

11  ...[;] while reviewing courts should uphold reasonable and defensible constructions of an agency's enabling act,

12  they must not rubber-stamp ... administrative decisions that they deem in-consistent with a or that frustrate the

13  congressional policy underlying a statute.")

14    First degree murder is not a crime that automatically allows one to be deemed unsuitable for release and

15  parole. And, given the above directive in Environmental Defense Center, Inc. v. E.P.A and Arizona

16  Cattlegrower's Ass'n v. U.S. Fish & Wildlife, B.L.M., coupled with Rosenkrantz, Biggs, Martin, Morrall, Irons,

17  Coleman, et al., there must be a base set of factors upon which a first degree murderer would have to be paroled

18  or the BPH would risk violating due process. To determine what would qualify as more than the minimum

19  necessary for a conviction, the courts must first consider what is required, at the minimum, for a conviction of

20  first-degree murder.

21    Now that the crime is defined, the question must be what evidence indicates that any particular first

22  degree murder was somehow "beyond the minimum necessary to sustain a conviction." In sum: what evidence

23  indicates the commitment offense was "*especially* heinous" or "*exceptionally* grave", given that there typically

24  must be a finding of some level of heinousness, callousness, and/or gravity of violence in order for a defendant

25  to have had his first degree murder conviction sustained by the appellate courts in the first place?

26    Two previous panels found Petitioner suitable long ago and the only changes to these original grants has

27  been a continued progress towards maturity, self-awareness, anger management and the kind of programming

28

C

1    which will assure Petitioner's continued positive behavior and determination and almost certain success as a

2    parolee and valuable contributing member of the community.

3        The weapon enhancement does not reasonably demonstrate that this crime was "beyond the minimal

4    elements" of a first-degree murder conviction, and is in no way some evidence establishing that he is _currently_ an

5    unreasonable threat to public safety. Indeed, if the BPH were to be able to rely on "weapon of choice" evidence

6    in every case, **every** first degree murder would be "beyond the minimal elements" and there would be no way to

7    commit a first degree murder in California that did not qualify as an "especially" heinous crime and thereby justify

8    imprisonment for life, without any chance of parole. This is not what the Legislature wrote the enhancement

9    statutes for nor the intended outcome of any additional punishment attached thereto, and exceeds the bounds of

10   common sense in every conceivable manner.

11       This rendition illustrates further, the importance (given the short tenure of the suggestion that "some

12   evidence" may be found in facts 'beyond the minimum necessary elements' of the commitment offense) of all

13   courts providing enhanced guidance regarding what set of facts are sufficient to support a denial of parole

14   suitability. Invariably, any such guidance should summarily relate to the relevance of the evidence; whether or

15   not it is substantial for federal due process purposes; its relevance and its reliability; and the reasonableness one

16   should exact in being able to conclude that the evidence sub-stantiates that the inmate is a CURRENT,

17   UNREASONABLE THREAT to the safety and security of the public and the ability to lawfully abide within the

18   community.

19       Sole reliance on the commitment offense to deny parole not only augurs the serious risk of being

20   arbitrary AND capricious but is almost always counter-instructive. In the parole determination process, the panel

21   is tasked with assuring the Executive branch the parole-worthy inmate was duly considered by determining if the

22   prisoner is a CURRENT threat to the public safety. This determination is, in total, the only decision that the BPH

23   is sanctioned to make by the Penal Code and Regulations codified for that purpose. All interpretations of

24   mitigating and aggravating factors, and the weight given to the special circumstances of the offense, merely go

25   to instruct this final conclusion. "A determination of unsuitability is simply shorthand for a finding that a prisoner

26   CURRENTLY would pose an unreasonable risk of danger if released at this time." Smith, supra, at p. 370, (citing

27   C.C.R. § 2402(d), emphasis added.)

28                                                        D

In re: Peter Hernandez, on habeas corpus

1    WHEREFORE, Petitioner respectfully submits these issues, arguments and Exhibits and prays this

2  Honorable Court and all Honorable Justices will grant the writ and Order Petitioner's release forth-with. Or, in the

3  alternative, Order a Rehearing within thirty (30) days of the Order with instructions to individualize his complete

4  suitability consideration without bias or political, personal, or tenurial consid-erations, and in accordance with the

5  statutory mandate of P.C. § 3041(a), and any further relief as the Court may deem just and proper to protect

6  Petitioner's civil rights.

7  ///

8  ///

9  ///

E

In re: Peter Hernandez, on habeas corpus

8. Did you appeal from the conviction, sentence, or commitment? ☐ Yes. ☐ No.   If yes, give the following information:

   a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"): _____

   b. Result: _____ N/A _____   c. Date of decision: _____

   d. Case number or citation of opinion, if known: _____

   e. Issues raised:   (1) _____

       (2) _____

       (3) _____

   f. Were you represented by counsel on appeal? ☐ Yes. ☐ No.   If yes, state the attorney's name and address, if known:

   _____

9. Did you seek review in the California Supreme Court? ☐ Yes. ☐ No.   If yes, give the following information:

   a. Result: _____ N/A _____   b. Date of decision: _____

   c. Case number or citation of opinion, if known: _____

   d. Issues raised:   (1) _____

       (2) _____

       (3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

    THESE ISSUES ARE BEING TIMELY MADE FOR THE FIRST TIME ON THIS APPEAL

11. Administrative Review:

    a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

    THERE IS NO ADMINISTRATIVE REMEDY AVAILABLE TO PURSUE

    _____

    _____

    _____

    _____

    _____

    _____

    b. Did you seek the highest level of administrative review available? ☐ Yes. ☐ No.
    *Attach documents that show you have exhausted your administrative remedies.*

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court?  [XX] Yes. If yes, continue with number 13.    [ ] No. If no, skip to number 15.

13. a. (1) Name of court:    L.A. COUNTY SUPERIOR COURT

    (2) Nature of proceeding (for example, "habeas corpus petition"):    HABEAS PETITION

    (3) Issues raised: (a)  BPH VIOLATION OF FEDERAL DUE PROCESS

        (b)  BPH VIOLATION OF FEDERAL EQUAL PROTECTION

    (4) Result *(Attach order or explain why unavailable)*:    DENIED

    (5) Date of decision:    9-24-07

  b. (1) Name of court:

    (2) Nature of proceeding:

    (3) Issues raised: (a)

        (b)

    (4) Result *(Attach order or explain why unavailable)*:

    (5) Date of decision:

  c. *For additional prior petitions, applications, or motions, provide the same information on a separate page.*

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

N/A

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.)

THERE HAS BEEN NO DELAY IN SEEKING THIS PETITION FOR RELIEF AND ONLY

WITHIN THE ALLOTED AND MANDATED TIME FRAME HAS PETITIONER PROCEEDED

16. Are you presently represented by counsel?    [ ] Yes.    [XX] No.  If yes, state the attorney's name and address, if known:

17. Do you have any petition, appeal, or other matter pending in any court?    [ ] Yes.    [XX] No.  If yes, explain:

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

PETITIONER HAS PRESENTED THIS MATTER TO THE LOWER COURT FOR REMEDY

AND ONLY AFTER DENIAL OF REMEDY HAS VENUE BEEN SOUGHT IN THIS COURT

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date:    10-05-07

                                       (SIGNATURE OF PETITIONER)

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DEPT 100

| Date: | SEPTEMBER 24, 2007 | | |
|---|---|---|---|
| Honorable: | PETER ESPINOZA | Judge | JOSEPH M. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH004508

In re,
PETER HERNANDEZ,
                    Petitioner,
On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

Nature of Proceedings: ORDER RE: WRIT OF HABEAS CORPUS

The Court has read and considered the Petition for Writ of Habeas Corpus filed by Petitioner on February 23, 2007 challenging a July 13, 2006 determination by the Board of Prison Terms (hereafter "Board") that Petitioner is not suitable for parole.  Having independently reviewed the record, giving deference to the broad discretion of the Board in parole matters, the Court concludes that the record contains "some evidence" to support a finding that petitioner would pose an unreasonable risk of danger to society and is unsuitable for parole (See Cal. Code Reg. Tit. 15, §2281; In re Rosenkrantz (2002) 29 Cal.4th 616, 667).

Petitioner was received in the Department of Corrections on March 23, 1979 after a conviction for first degree murder and assault with intent to commit murder.  Petitioner was sentenced to 7 years to life.  His minimum parole eligibility date was September 3, 1985.

The record reflects that the commitment offense occurred on April 25, 1977 when Petitioner and his crime partner approached the three victims in a residential area of Los Angeles.  Following a brief conversation, Petitioner pulled a gun from his coat and fired a shot at the victim at point blank range, killing him.  The two remaining victims ran from the scene but were pursued by Petitioner who continued firing, striking both men in the leg as his crime partner yelled "Get them, Get them."  After emptying the weapon, Petitioner returned with his crime partner to their vehicle and fled the scene.

Petitioner was later identified by his wounded victims.  The record indicates that subsequent investigation revealed that Petitioner had attempted to purchase marijuana and, when advised that the victims had none, opened fire.  Petitioner maintained his innocence until his appeals were exhausted after which time he admitted his guilt.

At his parole consideration hearing, Petitioner admitted that he had committed the crime and related the following details.  The crime occurred while Petitioner was seeking to retrieve items that were previously stolen from his sister's house in a burglary.  Petitioner's crime partner had identified someone who might be in possession of the stolen items.  Petitioner unsuccessfully attempted to see this person but was rebuffed by another who pulled a weapon and told him to leave.  Petitioner did so but upon the suggestion of his crime partner obtained a gun and returned to the neighborhood to try to retrieve the property.  During a discussion with the victim on a sidewalk, the victim denied having any of the property and approached Petitioner with his

1

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| | | | | |
|---|---|---|---|---|
| Date: | SEPTEMBER 24, 2007 | | | |
| Honorable: | PETER ESPINOZA | Judge | JOSEPH M. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH004508

In re,
PETER HERNANDEZ,
        Petitioner,
On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

---

hand in his pocket. Petitioner pulled the gun from his pocket, fatally shot the decedent once in the chest and turned to shoot at the decedent's two companions, firing until the gun was empty.

The Board found Petitioner unsuitable for Parole, noting "we come to this conclusion by the commitment offense that was committed in a special callous manner." The Board noted that multiple victims were involved and cited the motive for the crime as a factor supporting its determination. The Board noted Petitioner's prior conviction for auto theft and a failure to avoid subsequent criminal conduct after probation. The Board noted Petitioner's institutional disciplinary history, including four CDC 115s, three of which were for fighting or mutual combat. The Board also considered Petitioner's positive 2004 psychological report, his extensive vocational training and other achievements. The Board also found Petitioner's parole plans to be unrealistic. The Board decision stated that "there is virtually no employment plan . . ., [a]nd your residential plans of sharing a two-bedroom residence with two adults and three . . . children seems suspect."

The Board's discretion in analyzing factors to determine whether the Petitioner "will be able to live in society without committing additional antisocial acts" is "almost unlimited." *In re Rosenkrantz, supra,* 29 Cal. 4th at 655. "[T]he court may inquire only whether *some evidence* in the record before the Board supports the decision to deny parole based upon the factors specified by statute and regulation." *In re Rosenkrantz, supra,* 29 Cal. 4th at 658. "Only a modicum of evidence is required. Resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of the [Board]. . . ." *In re Rosenkrantz, supra,* 29 Cal. 4th at 677.

In reaching its decision, the Board considered and weighed the factors bearing on Petitioner's suitability for parole, primarily basing its determination on the circumstances of the commitment offense. The commitment offense alone may be a circumstance tending to establish an inmate's unsuitability if the circumstances are beyond the minimum necessary to sustain a conviction for that offense. (*Rosenkrantz, supra,* 29 Cal. 4th 616, 683.). Such circumstances were found by the Board in the fact that multiple victims were attacked or injured. There is "some evidence" to support this finding, as Petitioner shot and killed one victim, then turned to the other two victims, shooting each in the leg while emptying his gun. One of the circumstances tending to indicate unsuitability for parole is that the offense was committed in an especially heinous, atrocious or cruel manner. (*Rosenkrantz, supra,* 29 Cal. 4th 616, 683.); Cal. Code Reg. Tit. 15, §2281(c)(1). The fact that multiple victims were attacked is a factor upon which the Board may properly rely in finding the commitment offense to be determinative of Petitioner's unsuitability for parole. Cal. Code Reg. Tit. 15, §2281(c)(1)(A).

2

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| Date: | SEPTEMBER 24, 2007 | | | |
|---|---|---|---|---|
| Honorable: | PETER ESPINOZA | Judge | JOSEPH M. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH004508

In re,
PETER HERNANDEZ,
            Petitioner,
On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

      Applying the extremely deferential standard required by *Rosenkrantz*, the court does not reweigh the relevant factors to determine whether the weight of the evidence supports a grant of parole. *See In re Jacobson*, No. BH003835 (August 28, 2007) Second Appellate District), slip op. at 18. Because there is "some evidence" to support the Board's determination, the petition is denied.

      The court order is signed and filed this date. The clerk is directed to give notice.

      A true copy of this minute order is sent via U.S. Mail to the following parties:

Peter Hernandez
C-03015
Correctional Training Facility
P.O. Box 689
Soledad, California 93960-0689

State of California- Department of Justice
Office of the Attorney General
110 West A Street, Suite 1100
P.O. Box 85266
San Diego, California 92186-5266
Attn: Ms. Cynthia Lumely

| Minutes Entered |
|---|
| 09-24-07 |
| County Clerk |

# EXHIBIT D

EDMUND G. BROWN JR. **CONFORMED COPY** *State of California*
Attorney General                                *DEPARTMENT OF JUSTICE*
                                                CLERK'S OFFICE
                                    COURT OF APPEAL SECOND DIST.
                                            RECEIVED

                                    2007 DEC 14  PM 3: 07

                                    JOSEPH A. LANE CLERK

                                                300 SOUTH SPRING STREET, SUITE 1702
                                                LOS ANGELES, CA  90013

                                                Public: (213) 897-2000
                                                Telephone: (213) 897-4908
                                                Facsimile: (213) 897-2263
                                                E-Mail: Charles.Chung@doj.ca.gov

                            December 14, 2007

Mr. Joseph Lane, Clerk
Court of Appeal of the State of California
Second Appellate District, Division One
300 South Spring Street, 2nd Floor
Los Angeles, CA  90013

RE:    INFORMAL OPPOSITION
       In re PETER HERNANDEZ, Case No. B202757

Dear Mr. Lane:

Respondent submits this letter pursuant to the Court's November 2, 2007 request for an informal opposition to the petition for writ of habeas corpus filed by Peter Hernandez. Petitioner claims the Board of Parole Hearings (Board) improperly denied his release on parole.

Hernandez asserts the Board's decision to deny parole is not supported by any evidence. However, Hernandez does not dispute the factual basis upon which the Board denied parole. Rather, Hernandez argues that the Board should have given greater weight to the positive parole factors in finding him suitable for parole. This claim lacks merit.

On July 13, 2006, the Board found Hernandez unsuitable for parole based upon: (1) the gravity of the commitment offenses; (2) previous criminal conduct; (3) previous failures at rehabilitation; (4) a record of violence and disciplinary problems in prison; and (5) unrealistic parole plans. (Ex. 1 - Tr. of 2006 Parole Consideration Hearing, at pp. 70-77.)

The Supreme Court outlined the applicable standard of review: "the court may inquire only whether some evidence in the record before the Board supports the decision to deny parole, based upon the factors specified by statute and regulation." (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 658.) Here, there is some evidence to support the Board's decision to deny parole.

Prior to committing the convicted offenses, Hernandez had convictions for auto theft, shoplifting, and public intoxication. (Ex. 1, at pp. 25-29.) The Board noted that despite two terms of probation, Hernandez failed to rehabilitate himself and continued with his criminal activity after each grant of probation. (Ex. 1, at pp. 26, 28, 71.) Hernandez continued his criminal behavior even in prison--resulting in eleven disciplinary violations. (Ex. 1, at p. 36.) He received seven misconduct reports, the last of which occurred in 2000 for disobeying staff. (Ex. 1, at p. 36.) Hernandez also committed four serious disciplinary violations, three of which

EDMUND G. BROWN JR.
*Attorney General*

*State of California*
*DEPARTMENT OF JUSTICE*



300 SOUTH SPRING STREET, SUITE 1702
LOS ANGELES, CA 90013

Public: (213) 897-2000
Telephone: (213) 897-4908
Facsimile: (213) 897-2263
E-Mail: Charles.Chung@doj.ca.gov

December 14, 2007

Mr. Joseph Lane, Clerk
Court of Appeal of the State of California
Second Appellate District, Division One
300 South Spring Street, 2nd Floor
Los Angeles, CA 90013

RE:    INFORMAL OPPOSITION
        In re PETER HERNANDEZ, Case No. B202757

Dear Mr. Lane:

      Respondent submits this letter pursuant to the Court's November 2, 2007 request for an informal opposition to the petition for writ of habeas corpus filed by Peter Hernandez. Petitioner claims the Board of Parole Hearings (Board) improperly denied his release on parole.

      Hernandez asserts the Board's decision to deny parole is not supported by any evidence. However, Hernandez does not dispute the factual basis upon which the Board denied parole. Rather, Hernandez argues that the Board should have given greater weight to the positive parole factors in finding him suitable for parole. This claim lacks merit.

      On July 13, 2006, the Board found Hernandez unsuitable for parole based upon: (1) the gravity of the commitment offenses; (2) previous criminal conduct; (3) previous failures at rehabilitation; (4) a record of violence and disciplinary problems in prison; and (5) unrealistic parole plans. (Ex. 1 - Tr. of 2006 Parole Consideration Hearing, at pp. 70-77.)

      The Supreme Court outlined the applicable standard of review: "the court may inquire only whether some evidence in the record before the Board supports the decision to deny parole, based upon the factors specified by statute and regulation." (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 658.) Here, there is some evidence to support the Board's decision to deny parole.

      Prior to committing the convicted offenses, Hernandez had convictions for auto theft, shoplifting, and public intoxication. (Ex. 1, at pp. 25-29.) The Board noted that despite two terms of probation, Hernandez failed to rehabilitate himself and continued his criminal activity after each grant of probation. (Ex. 1, at pp. 26, 28, 71.) Hernandez continued his criminal behavior even in prison--resulting in eleven disciplinary violations. (Ex. 1, at p. 36.) He received seven misconduct reports, the last of which occurred in 2000 for disobeying staff. (Ex. 1, at p. 36.) Hernandez also committed four serious disciplinary violations, three of which

Second Appellate District
December 13, 2007
Page 2

involved fighting or violent behavior. (Ex. 1, at pp. 36-37.) The last such violation occurred in December 1998 for mutual combat. (Ex. 1, at p. 36.)

The Board viewed the instant offenses as egregious crimes. (Ex. 1, at p. 70.) The Board noted Hernandez had armed himself and sought out a confrontation in which he attacked multiple victims. (Ex. 1, at p. 70.) Hernandez admitted to shooting three unarmed men, killing one and wounding the other two as they fled. (Ex. 1, at p. 10.) The Board found the claimed motive–to retrieve property–to be trivial or inexplicable in relation to the crime. (Ex. 1, at pp. 70-71.) Additionally, the Board found Hernandez did not have an employment plan and questioned his plan to live in a two-bedroom residence with five other people. (Ex. 1, at p. 71.)

The some evidentiary support for the Board's findings that previous rehabilitative efforts were futile, that Hernandez engaged in violent behavior in prison, that Hernandez's offenses were egregious crimes, and that Hernandez did not have adequate parole plans. As such, the Board properly exercised its discretion to deny parole.

The Board considered the positive elements of Hernandez's record, but placed greater weight upon the negative factors. The importance to be attributed to a particular parole factor is left to the judgment of the Board. (Cal. Code Regs., tit. 15, § 2402, subds. (c)-(d).) Thus, whether the Board could have emphasized the positive factors is not a basis for habeas corpus relief: "It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole." (*Rosenkrantz, supra,* 29 Cal.4th at p. 677.)

While Hernandez argues that the Board may not rely solely upon his commitment offenses, this argument is inapplicable here because the Board did not deny parole solely upon his convicted crimes. Additionally, Hernandez's request for a stricter standard of review than the some-evidence test has no legal basis. (See *id.* at p. 658.)

As there is some evidence supporting the Board's decision and Hernandez presents no adequate ground for habeas corpus relief, the petition must be denied.

Sincerely,

CHARLES CHUNG
Deputy Attorney General
State Bar No. 248806

For    EDMUND G. BROWN JR.
Attorney General

60264261.wpd

EXHIBIT 1

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PRISON TERMS

In the matter of the Life    )
Term Parole Consideration    )          CDC Number C-03015
Hearing of:                  )
                             )
PETER HERNANDEZ              )
_____)

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

JULY 13, 2006

PANEL PRESENT:

JAMES DAVIS, Presiding Commissioner
DENNIS SMITH, Deputy Commissioner

OTHERS PRESENT:

PETER HERNANDEZ, Inmate
PAUL TURLEY, Deputy District Attorney
KATERA E. RUTLEDGE, Attorney for Inmate
CORRECTIONAL OFFICERS UNIDENTIFIED

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____    No      See Review of Hearing
_____    Yes     Transcript Memorandum

Patty L. Duran, Northern California Court Reporters

ii

INDEX

                                                              Page

Proceedings ............................................. 1

Case Factors ........................................... 9

Pre-Commitment Factors ................................ 19

Parole Plans .......................................... 45

Post-Commitment Factors ............................... 55

Closing Statements .................................... 62

Recess ................................................ 69

Decision .............................................. 70

Adjournment ........................................... 78

Transcriber Certification ............................. 79

--oOo--

1

| 1 | P R O C E E D I N G S |
|---|---|

2          DEPUTY COMMISSIONER SMITH:  We're on the

3   record.

4          PRESIDING COMMISSIONER DAVIS: This is a

5   subsequent parole consideration hearing for Peter

6   Hernandez, CDC number C-03015.  Today's date is

7   July the 13th, 2006.  We're located at the

8   Correctional Training Facility in Soledad.  The

9   inmate was received on March 23rd, 1979, from Los

10  Angeles County and a life term began on March

11  23rd, 1979, with a minimum eligible parole date

12  of September 3rd, 1985.  The controlling offense

13  was the inmate had been committed of murder

14  first, case number A334928, count one Penal Code

15  Section 187.  The inmate received a term of seven

16  years to life.  This hearing is being tape-

17  recorded and for the purposes of voice

18  identification, we'll each state our first and

19  last name.  When it reaches you Mr. Hernandez if

20  you'll also give us your CDC number first.

21          INMATE HERNANDEZ: Yes.

22          PRESIDING COMMISSIONER DAVIS: So I'll

23  start in with my left.  I'm James Davis, D-A-V-I-

24  S, Commissioner.

25          DEPUTY COMMISSIONER SMITH:  My name is

26  Dennis Smith, S-M-I-T-H.  I'm Deputy

27  Commissioner.

2

1          **DEPUTY DISTRICT ATTORNEY TURLEY:**  Paul

2    Turley, T-U-R-L-E-Y.  DA's Office, LA County.

3          **ATTORNEY RUTLEDGE:**  Katera E. Rutledge,

4    R-U-T-L-E-D-G-E, Attorney for Mr. Hernandez.

5          **INMATE HERNANDEZ:**  Peter Hernandez,

6    Prisoner.  Prisoner number C-03015.

7          **DEPUTY COMMISSIONER SMITH:**  Spell your

8    last name please, sir.

9          **INMATE HERNANDEZ:**  H-E-R-N-A-N-D-E-Z.

10         **DEPUTY COMMISSIONER SMITH:** Thank you,

11   sir.

12         **PRESIDING COMMISSIONER DAVIS:**  And let

13   the record also reflect we're joined by two

14   Correctional Officers who are here for security

15   purposes only and will not be actively

16   participating in this hearing.  Before we begin,

17   Mr. Hernandez in front of you in the laminated

18   piece of paper if you would read the Americans

19   with Disabilities Act Statement please.

20         **INMATE HERNANDEZ:**  "ADA,

21         Americans with Disabilities Act.  The

22         Americans with Disability (sic) Act is

23         a law to help people with disability,

24         disability problems that make it hard

25         for some people to see, hear, to read,

26         talk, walk, learn, (inaudible), work,

27         take care of themselves and

3

1      (inaudible).  Nobody can be kept out of

2      business or activities because of

3      disability.  If you have a disability

4      you have the right to ask for help to

5      get ready for your BPT hearing.

6      (inaudible) hearing, talk, read forms

7      and papers and understand that

8      (inaudible) making sure what you ask

9      for to make sure that you have a

10     disability that is covered by the ADA

11     and that you have asked for the right

12     kind of help.  If you do not get help,

13     or if you don't think you got the kind

14     of help you need, ask for the BPT 1074

15     grievance form.  You can also get help

16     to fill it out."

17          PRESIDING COMMISSIONER DAVIS: That's very

18  good.  Thank you.

19          INMATE HERNANDEZ:  You're welcome.

20          PRESIDING COMMISSIONER DAVIS: And I

21  notice you were able to do that without glasses

22  today.  Do you normally wear glasses?

23          INMATE HERNANDEZ:  No, I don't.

24          PRESIDING COMMISSIONER DAVIS: Good for

25  you.  And you're able to hear me all right?

26          INMATE HERNANDEZ:  Yes, sir.

27          PRESIDING COMMISSIONER DAVIS: You walked

4

1    here today on your (inaudible)?

2            INMATE HERNANDEZ:  Yes, sir.

3            PRESIDING COMMISSIONER DAVIS:  All right.

4    I see we're set and ready to go?

5            INMATE HERNANDEZ:  Yes, sir.

6            PRESIDING COMMISSIONER DAVIS:  Excellent.

7    I notice that with regard to the 1073 form, BPT

8    1073 form you reviewed together with staff of the

9    institution and it being that you do not have any

10   disability that would be qualified under the

11   Americans with Disabilities Act.  Is that

12   correct?

13           INMATE HERNANDEZ:  That's correct.

14           PRESIDING COMMISSIONER DAVIS:  All right.

15   Can you think of any reason why you would not be

16   able to actively participate in this hearing this

17   afternoon?

18           INMATE HERNANDEZ:  No, sir.

19           PRESIDING COMMISSIONER DAVIS:  Okay.

20   Great.  And counselor, you're also satisfied with

21   that?

22           ATTORNEY RUTLEDGE:  Yes, sir.

23           PRESIDING COMMISSIONER DAVIS:  Very well.

24   You, this hearing is being conducted pursuant to

25   Penal Code Sections 3041, 3042 and the Rules and

26   Regulations of the Board of Prison Terms covering

27   parole consideration terms for life inmates.  The

5

```
1    purpose of today's hearing is we once again
2    consider the number and nature of the crimes for
3    which you were committed, your prior criminal and
4    social history and your behavior in the
5    programming since you were committed.  We've had
6    the opportunity to review your Central File and
7    your prior transcripts and you'll be given an
8    opportunity to correct or clarify the record as
9    we proceed.  We will reach a decision today and
10   inform you of whether or not we find you suitable
11   for parole and the reasons for our decision.  If
12   you are found suitable for parole the length of
13   your confinement will be explained to you.
14   Nothing that happens in today's hearing will
15   change the findings of the court and we're not
16   here to retry your case.  The Panel is here for
17   the sole purpose of determining your suitability
18   for parole.  Do you understand that sir?
19           INMATE HERNANDEZ:  Yes, sir.
20           PRESIDING COMMISSIONER DAVIS: And the
21   hearing will be conducted in basically two
22   phases.  First, I will discuss with you the crime
23   for which you were committed, as well as your
24   prior criminal and social history.  And
25   Commissioner Smith will then discuss with you
26   your progress, your counselor's report and your
27   psychological evaluation, as well, as well as
```

6

1    your parole plans and any letters of support or

2    opposition, if they may exist. Once that's

3    concluded the Commissioner, with District

4    Attorney and your Attorney will be given an

5    opportunity to ask you questions. Questions that

6    come from the District Attorney will be asked

7    through the chair and you will respond back to

8    the Panel with your answer. Next, the District

9    Attorney and then your Attorney and then finally

10   you will be given an opportunity to make a

11   closing statement. Those statements are --

12   should focus on why you believe that you are

13   suitable for parole. California Code of

14   Regulations states that regardless of time served

15   an inmate shall be found unsuitable for and

16   denied parole if in the judgment of the Panel the

17   inmate would pose an unreasonable risk of danger

18   to society if released from prison. You have

19   certain rights. Those rights include right to a

20   timely notice of this hearing, the right to

21   review your Central File and the right to present

22   relevant documents. Counselor, are you satisfied

23   that your client's rights have been met today?

24            ATTORNEY RUTLEDGE:  Yes, sir.

25            PRESIDING COMMISSIONER DAVIS:  All right.

26   Mr. Hernandez, you also have an additional right

27   and that is to be heard by an impartial Panel.

7

1    Now you've heard Mr. Smith and I introduce

2    ourselves today.  Do you have any reason to

3    believe that we would not be impartial?

4            INMATE HERNANDEZ:  No, sir.

5            PRESIDING COMMISSIONER DAVIS:  ,Thank you.

6    And you will receive a written copy of our

7    tentative decision today.  That decision becomes

8    effect within 120 days.  A copy of the decision

9    and a copy of the transcript will be sent to you.

10   You are not required to admit your offense today

11   or discuss your offense, however the Panel does

12   accept the findings of the court to be true.  Do

13   you understand that?

14           INMATE HERNANDEZ:  Yes, sir.

15           PRESIDING COMMISSIONER DAVIS:  Great.

16   The Board has (inaudible) process.  If you

17   disagree with anything in today's hearing you

18   have the right to go directly to court with your

19   complaint.  Mr. Smith, we going to be dealing

20   with anything from the confidential file

21   (inaudible)?

22           DEPUTY COMMISSIONER SMITH:  No, we will

23   not.

24           PRESIDING COMMISSIONER DAVIS: Okay.  I'm

25   going to pass the checklist of documents to both

26   counsel.  If you would take a look at this and

27   make sure we're offering you all the same list of

8

1    documents.

2              DEPUTY DISTRICT ATTORNEY TURLEY:    I have

3    those.

4              ATTORNEY RUTLEDGE:    Yes, sir.    Thank you.

5    We have the document.

6              PRESIDING COMMISSIONER DAVIS:    All right.

7    Thank you.    Those will be marked as Exhibit 1

8    then.    (inaudible).    Ms. Rutledge, any additional

9    documents that you'd like us to consider today?

10              ATTORNEY RUTLEDGE:    No, sir.

11              PRESIDING COMMISSIONER DAVIS:    Any

12    preliminary objections?

13              ATTORNEY RUTLEDGE:    We would just note

14    that Mr. Hernandez's hearing should have been in

15    December of last year.    Is that correct?

16              INMATE HERNANDEZ:    About, yes.

17              ATTORNEY RUTLEDGE:    But, so it's about

18    what, eight months behind?

19              PRESIDING COMMISSIONER DAVIS:    It is.

20              ATTORNEY RUTLEDGE:    Okay.    We just wanted

21    to note for the record that is beings (sic)

22    approximately eight months behind.

23              PRESIDING COMMISSIONER DAVIS:    We -- we

24    apologize for the delay Mr. Hernandez.

25              INMATE HERNANDEZ:    Okay.

26              PRESIDING COMMISSIONER DAVIS:    Will your

27    client be speaking with us today?

9

1           ATTORNEY RUTLEDGE:  Yes.

2           DEPUTY COMMISSIONER SMITH:  Actually if I

3    can correct that.  His last hearing was in

4    January of '05.

5           ATTORNEY RUTLEDGE:  Oh.

6           DEPUTY COMMISSIONER SMITH:  So, so we're

7    roughly six months --

8           ATTORNEY RUTLEDGE:  Yeah.

9           DEPUTY COMMISSIONER SMITH:  -- past.

10   That was last year.

11          ATTORNEY RUTLEDGE:  Okay.  Thank you.

12          DEPUTY COMMISSIONER SMITH:  You're

13   welcome.

14          ATTORNEY RUTLEDGE:  There was another

15   question you had.

16          PRESIDING COMMISSIONER DAVIS: Will --

17   will Mr. Hernandez be speaking with us today?

18          ATTORNEY RUTLEDGE:  Yes, sir.  He'll be

19   speaking with you on all subjects and issues.

20          PRESIDING COMMISSIONER DAVIS:  Very well.

21   Mr. Hernandez, would you raise your right hand

22   please, sir?  Do you solemnly swear that the

23   testimony you will give at the hearing today will

24   be the truth and nothing but the truth?

25          INMATE HERNANDEZ:  Yes, sir.

26          PRESIDING COMMISSIONER DAVIS:  Okay.  All

27   right.  Without objection I'm going to

10

```
1    incorporate by reference the court of appeals
2    document from April 21ˢᵗ, 1981, pages through,
3    through 8, pages 3 through 8.  And they refer to
4    the summary of the ward report of the 2004
5    calendar starting on page 1 where it states under
6    (a)1. Summary of the crime:
7              "On 4-25-77 at approximately 9:00
8              p.m. Peter Hernandez and co-
9              defendant Jose Montez approached
10             three Mexican-American males in a
11             residential area of Los Angeles.
12             Following a brief conversation
13             Hernandez pulled a gun from his
14             coat, fired a shot at victim Tony
15             Sanchez, S-A-N-C-H-E-Z, at point
16             blank range killing him with a shot
17             to the heart.  Victims Rosales and
18             Rodriguez, R-O-S-A-L-E-S, and
19             Rodriguez, R-O-D-R-I-G-U-E-Z, ran
20             from the scene, but were pursued by
21             Hernandez who continued firing the
22             gun striking both men in the leg as
23             crime partner Montez, M-O-N-T-E-Z,
24             yelled, 'Get them, get them'.  After
25             emptying the weapon Hernandez and
26             Montez returned to the van that
27             Hernandez had been driving and fled
```

11

1        the scene.  Hernandez was later

2        identified by the wounded victims.

3        He and Montez were apprehended at

4        their residences on the following

5        morning.  Subsequent investigation

6        revealed that Hernandez had

7        attempted to purchase marijuana from

8        the victims and when advised that

9        they had none opened fire.  Both

10       Hernandez and Montez denied any

11       involvement in the crime maintaining

12       this denial through three trials,

13       the third of which resulted in

14       Hernandez's conviction for the

15       present case and Montez's conviction

16       for murder second degree.  It was

17       noted that all three victims were

18       known gang members and that the

19       motive for the crime was believed by

20       the District Attorney's Office to

21       have been gang related.  Hernandez

22       continued to maintain his innocence

23       until exhaustion of all fuels

24       processed at which time he admitted

25       his guilt and the information for

26       this came from the 61588 diagnostic

27       being the evaluation pages 2 through

12

1           3 and the Probation Officer's quote

2           pages 5 through 7 and a (inaudible)

3           decision made on 6-28-1 pages 8

4           through 12 and 14 through 15."

5           So, Mr. Hernandez, did you commit this

6   crime?

7           INMATE HERNANDEZ:  Yes, sir.

8           PRESIDING COMMISSIONER DAVIS:  Now I know

9   that you have a, a fairly comprehensive statement

10  in this 2004 report as well.  Why don't you tell

11  me in your own words what happened?

12          INMATE HERNANDEZ:  That afternoon I'd

13  stopped work and, well a few weeks prior my

14  sister's house was burglarized.  We know what,

15  when was the --

16          DEPUTY DISTRICT ATTORNEY TURLEY:  Excuse

17  me, please.  Could you ask him if he could speak

18  up just a little bit?  He's (inaudible).

19          PRESIDING COMMISSIONER DAVIS:

20  (inaudible).

21          INMATE HERNANDEZ:  (inaudible).

22          PRESIDING COMMISSIONER DAVIS: (inaudible)

23  this.

24          ATTORNEY RUTLEDGE:  You (inaudible).

25          PRESIDING COMMISSIONER DAVIS: You also --

26          INMATE HERNANDEZ:  This is not

27  (inaudible).

13

1        PRESIDING COMMISSIONER DAVIS:  (inaudible)

2   get you some water.

3        INMATE HERNANDEZ:  Thank you.  Two weeks

4   prior my sister's house had been burglarized and

5   we had made police reports about it, about the

6   burglary and at that time I (inaudible) I had low

7   confidence in the police being able to find out

8   who it was.  I thought that how, how it would be

9   easier for me to look around and find out more or

10  less anybody was involved in the burglary.  I run

11  down every idea that I -- there's a lot of gangs,

12  kids in gangs, people running around doing all

13  kinds of things like that.  So that afternoon

14  that I got off, got off of work one, one of the

15  friends that I, a (inaudible) told me he say, he

16  told me that he thought that he knew the person

17  that had the property I was looking for.  Cause I

18  had, I had told most of the persons in, in the,

19  in the neighborhood, the things that were missing

20  from my sister's home and that I had to have

21  them, that I needed to get them back.  When he

22  told me that he knew more or less the person

23  could have these, these belongings then I told

24  him, "Let's go over there and, and look for

25  them."  And that's what we did.  We went over

26  there and it must have been I think about six

27  o'clock in the afternoon, something like that.

14

```
1    And then I (inaudible) I got to the, to the
2    neighborhood and I spoke to one of the guys there
3    and asked him for, for, for a person by the name
4    of Tito that lived around there and he told me,
5    "Yes." He pointed to a green house and said, "He
6    lives over there." So I went over there to the
7    house. At that point there were three gentlemen
8    that I believe (inaudible) on the porch and one
9    of them came down to the fence as I went to the
10   fence and then he asked me, you know, what I
11   wanted. I told him that I was looking for Tito
12   and he told me that, first he said. "What for?"
13   as I recall and I told him, "Because I, I
14   understand he has some, some hot things for
15   sale." He said, "Well who told you that?" I
16   said that I just needed to talk to him. And at
17   that point one of the other, the guy at the
18   corner had told where the house was came, came on
19   to the site and he says, "This guy's looking for
20   Tito." And he goes, "Yeah, I know." So the, the
21   other person that was on the porch came down and
22   then he, and he, and he talked to -- so that guy
23   asked him what I, what I want and, and he says,
24   "He's looking for Tito for some hot stuff that he
25   says he's trying to, he's trying to get." He
26   said, "No, we don't have nothing like that." So
27   he says, "Who are you anyway?" I said well, "I
```

1    don't know him that much, but you know."  He

2    said, "No, you get out of here."  And I said,

3    "Wait a minute I'm not leaving till I see him."

4    He says. "You better get out of here."  And he

5    pulled out a weapon on me and he pointed it

6    towards me and I said. "Okay, no problem."

7    Probably I, so I, I got in the van and left.  A

8    partner, a friend of mine was with me, he told

9    me, "You know what, you shouldn't let him get

10   away with that."  I know where's a gun, so we'll

11   get a gun and we'll come back.  And I said, "You

12   know what, okay, let's do it."  And so we went

13   over there and he went to go see some friends, he

14   came back and he said, "Here, I got a gun."  And,

15   and I said. "Okay, let me have it."  Then I got

16   it and put it in my jacket pocket.  At that point

17   I drove back to that area.  I passed through the

18   house, I didn't see nobody there.  As I was going

19   by the, as I was going to the corner and I saw

20   three individuals that were standing by, by the

21   corner market store and when I, when I passed

22   through slow I took a look at them then I noticed

23   that at least two of them were the same ones that

24   I was talking to.  So then I went around, parked

25   the van, came back and then confronted them.

26   Crossed the street in front of them and, and the

27   first person -- happened to be people that was

16

1     standing.  I didn't know at that time because I
2     didn't know (inaudible).  So when, when, when I
3     went, came to the, to the parked cars onto the
4     sidewalk he kind of like went back and was
5     surprised to see us.  And goes, "Who are you?"  I
6     said, "I'm looking for Tito."  He says, "Well
7     what do you want from him?"  I said, "I'm looking
8     because he has some belongings that, that belong
9     to me."  He says, "No, no, no."  He says, "What
10    are you talking about."  I said, "You have an
11    amplifier that, that (inaudible) were," excuse
12    me, "those were the things that were, that were
13    missing after the burglary.  So I'm, I'm looking
14    for an amplifier and a, and a, and a color TV and
15    a guitar."  He said. "No we don't have none of
16    this.  Just get out of here."  At that point he
17    came toward me and he had his hand in his pocket.
18    And I had my, my weapon in my pocket also.  My,
19    my hand was in there.  So when he took two, I
20    recall two or three steps towards me I just
21    pulled the gun out and I fired.  At that point,
22    after the, after the, the first shot I felt the
23    other guys get up and I just turned around and,
24    and, and I fired at them.  And they began to run
25    and till this day I, I couldn't remember my, my,
26    my partner saying, "Get him", or anything.  I
27    was, I don't know, I, I just didn't, didn't feel

17

1  right and I kept firing till the gun went empty

2  and then I ran to, to the van and, and you know,

3  we got, I was shaking very, very hard and I, I

4  don't remember what I told my partner or

5  anything.  I just, just go, "You know, we got to

6  get out of here."  And I left.

7      PRESIDING COMMISSIONER DAVIS:  The, the

8  gun that you got, do you have any idea who, who

9  that came from?

10     INMATE HERNANDEZ:  It was some

11 apartments, but I waited outside and my crime

12 partner only went up there and got it.

13     PRESIDING COMMISSIONER DAVIS:  Had you

14 ever gotten a gun from that apartment before?

15     INMATE HERNANDEZ:  No.

16     PRESIDING COMMISSIONER DAVIS:  What kind

17 of gun was it?

18     INMATE HERNANDEZ:  I think it was a,

19 looked like a nine millimeter.

20     PRESIDING COMMISSIONER DAVIS:  Did you

21 check and make sure it was loaded?

22     INMATE HERNANDEZ:  You know, no, I

23 didn't.

24     PRESIDING COMMISSIONER DAVIS:  Had you

25 ever fired that kind of gun before?

26     INMATE HERNANDEZ:  No.  No, I hadn't.

27     PRESIDING COMMISSIONER DAVIS:  So you had

18

1    no idea it was going to work or not?

2         INMATE HERNANDEZ:  No, I didn't.

3         PRESIDING COMMISSIONER DAVIS: Did you

4    test it?

5         INMATE HERNANDEZ:  No, I didn't.

6         PRESIDING COMMISSIONER DAVIS: So you went

7    back and, and confronted the, confronted the

8    person who turned out to be Tito.  Was that the

9    same person that had the weapon before?

10        INMATE HERNANDEZ:  No, it wasn't.

11        PRESIDING COMMISSIONER DAVIS: Did you see

12   a weapon on Tito?

13        INMATE HERNANDEZ:  No, I didn't.

14        PRESIDING COMMISSIONER DAVIS: The other

15   people who were there that you fired at, did you

16   see any weapons that they might have had?

17        INMATE HERNANDEZ:  No, sir.

18        PRESIDING COMMISSIONER DAVIS: Were either

19   one of them the, the person who had the weapon

20   before?

21        INMATE HERNANDEZ:  Yes.  One of them was.

22        PRESIDING COMMISSIONER DAVIS: One of them

23   was.  But you didn't see it the second time,

24   correct?

25        INMATE HERNANDEZ:  No, I didn't.

26        PRESIDING COMMISSIONER DAVIS: After all

27   of this happened, as you shot Tito, you shot the

19

1   other people, got back in the van and took off,

2   what did you do after that?

3        INMATE HERNANDEZ:  Yeah.  We ran and

4   bought some beer.

5        PRESIDING COMMISSIONER DAVIS: Okay.  You

6   ran and bought some beer, then what?

7        INMATE HERNANDEZ:  And then, and then I

8   went home.

9        PRESIDING COMMISSIONER DAVIS: Then what

10  did you do?

11        INMATE HERNANDEZ:  I remember going to

12  the restroom.

13        PRESIDING COMMISSIONER DAVIS:  What did

14  you do with the gun?

15        INMATE HERNANDEZ:  Oh the gun, I gave it

16  back to my crime partner.

17        PRESIDING COMMISSIONER DAVIS: So you

18  returned it?

19        INMATE HERNANDEZ:  Uh-huh.  Yes, sir.

20        PRESIDING COMMISSIONER DAVIS: When did

21  the police arrive?

22        INMATE HERNANDEZ:  As I recall it was

23  very early in the morning.  Could have been two

24  in the morning.  Something like that.

25        PRESIDING COMMISSIONER DAVIS: What

26  happened that evening?  For you, what happened,

27  what did you do?

20

1    INMATE HERNANDEZ:  Well after I went
2    back, it was about I think ten o'clock, eleven,
3    then I just, I went to bed.
4        PRESIDING COMMISSIONER DAVIS:  Did you
5    ever find out if these people were in any way,
6    shape or form associated with the original
7    burglary that you were trying to recover the
8    stuff for your sister?
9        INMATE HERNANDEZ:  No.
10       PRESIDING COMMISSIONER DAVIS: That never
11   came out?  All right.  When you didn't have
12   confidence in the police to find the, the, the
13   equipment once you had tracked down some of this
14   information did you ever think about calling them
15   and giving them that information?
16       INMATE HERNANDEZ:  No, sir.
17       PRESIDING COMMISSIONER DAVIS: In terms of
18   personal factors, you were born in Las Cruces,
19   New Mexico, you're the second of two children,
20   and if I say anything in here that isn't right or
21   doesn't, isn't right on point please let me know.
22       INMATE HERNANDEZ:  Yes, sir.
23       PRESIDING COMMISSIONER DAVIS: We'll
24   correct that as we go along.  You were raised by
25   your mother in part and your, in part because
26   your parents divorced when you were two years
27   old, so you were raised by your mom?

21

1          INMATE HERNANDEZ:  Yes, sir.

2          PRESIDING COMMISSIONER DAVIS: And have a

3     good relationship with all your family members

4     and a stepfather and two half brothers?

5          INMATE HERNANDEZ:  Yes, sir.

6          PRESIDING COMMISSIONER DAVIS: No other

7     family members have a problem with any arrest

8     record or mental health issues, anything like

9     that?

10         INMATE HERNANDEZ:  No, sir.

11         PRESIDING COMMISSIONER DAVIS: But this

12    indicates that your stepfather's an alcoholic.

13         INMATE HERNANDEZ:  Yes, sir.

14         PRESIDING COMMISSIONER DAVIS: And how do

15    you know that?

16         INMATE HERNANDEZ:  Because he used to

17    drink a lot.  He was a hardworking man, but he'd

18    always --

19         PRESIDING COMMISSIONER DAVIS: So he

20     would -- did he abuse you at all?

21         INMATE HERNANDEZ:  No.  He, he never --

22    he was --

23         PRESIDING COMMISSIONER DAVIS: Was a,

24    wasn't a mean drunk then?

25         INMATE HERNANDEZ:  No.  He'd just come

26    home, drink his beer --

27         PRESIDING COMMISSIONER DAVIS: Okay.

22

1          INMATE HERNANDEZ:  -- and goes out on

2   the, the couch.

3          PRESIDING COMMISSIONER DAVIS: Okay.  And

4   so for all this purposes you had a -- had a

5   pretty normal childhood then?

6          INMATE HERNANDEZ:  Yes.  Yes.

7          PRESIDING COMMISSIONER DAVIS: You

8   attended Belmont High School?

9          INMATE HERNANDEZ:  Yes, sir.

10          DEPUTY COMMISSIONER SMITH:  (inaudible)

11   about that.

12          PRESIDING COMMISSIONER DAVIS:  And you

13   dropped out to enlist in the United States Army?

14          INMATE HERNANDEZ:  Yes, sir.

15          PRESIDING COMMISSIONER DAVIS: And you

16   served in the army from 2/73 until 2 of '76 and

17   received an honorable discharge?

18          INMATE HERNANDEZ:  Yes, sir.

19          PRESIDING COMMISSIONER DAVIS: Received,

20   received the rank, or actually earned, it says

21   you earned the rank of an E4 and served seven

22   months in Germany while in the army?

23          INMATE HERNANDEZ:  Yes, sir.

24          PRESIDING COMMISSIONER DAVIS: And it was

25   in Germany that you began the occasional use of

26   alcohol and marijuana?

27          INMATE HERNANDEZ:  Yes, sir.

23

1          PRESIDING COMMISSIONER DAVIS: And you

2    said, well you began spending most of your time

3    off duty drinking. Let me tell you, your first

4    experience with alcohol was when you entered,

5    after you entered the army? Or had you drunk,

6    had you consumed alcohol before that?

7          INMATE HERNANDEZ: Yes, but not much like

8    in a way I didn't --

9          PRESIDING COMMISSIONER DAVIS: Okay.

10         INMATE HERNANDEZ: Very, very little.

11         PRESIDING COMMISSIONER DAVIS: So it was

12   in the army that you began to, well as abuse

13   alcohol?

14         INMATE HERNANDEZ: Yeah.

15         PRESIDING COMMISSIONER DAVIS: In 1975 you

16   married Ms. Garcia and while you were in the

17   army, and you had one daughter?

18         INMATE HERNANDEZ: Yes.

19         PRESIDING COMMISSIONER DAVIS: Are you

20   still married?

21         INMATE HERNANDEZ: No, sir.

22         PRESIDING COMMISSIONER DAVIS: No? When

23   did that, when did that marriage end?

24         INMATE HERNANDEZ: Approximately seven

25   years.

26         PRESIDING COMMISSIONER DAVIS: You

27   staying, you stay in touch with your daughter?

24

1           INMATE HERNANDEZ:  Yes, sir.

2           PRESIDING COMMISSIONER DAVIS: How, how do

3     you stay in touch with her?  Letters, phone

4     calls?

5           INMATE HERNANDEZ:  Yes, sir.

6           PRESIDING COMMISSIONER DAVIS: Okay.

7     Where does she live?

8           INMATE HERNANDEZ:  She lives right now in

9     El Paso, Texas.

10          PRESIDING COMMISSIONER DAVIS: So how

11    often --

12          INMATE HERNANDEZ:  (inaudible)

13          PRESIDING COMMISSIONER DAVIS: -- were you

14    able, are you able to talk with her?

15          INMATE HERNANDEZ:  Once a month.

16          PRESIDING COMMISSIONER DAVIS: How's she

17    doing?

18          INMATE HERNANDEZ:  She's doing fine.

19          PRESIDING COMMISSIONER DAVIS: What grade

20    did you drop out of high school?

21          INMATE HERNANDEZ:  Ninth grade.

22          PRESIDING COMMISSIONER DAVIS: The ninth

23    grade?  Why did you do that?

24          INMATE HERNANDEZ:  It was during the

25    summer, I got a job during the summer and I was

26    getting a little money and I was saving up and I

27    was, I was helping my, my mom and then it, it

25

1    just drove me from, from school.

2              PRESIDING COMMISSIONER DAVIS: Huh.

3              INMATE HERNANDEZ:  I said why should I go

4    back if I can make (inaudible).  And then about a

5    year and a half later after I was working then I

6    tried to enlist in the, in the army so I can get

7    some education.

8              PRESIDING COMMISSIONER DAVIS: So that was

9    the purpose, you wanted to, you wanted to

10   complete your education?

11             INMATE HERNANDEZ:  That was one of the

12   purposes.

13             PRESIDING COMMISSIONER DAVIS:  Were you

14   involved in any gang activity or anything at that

15   time?

16             INMATE HERNANDEZ:  No, sir.

17             PRESIDING COMMISSIONER DAVIS:  No?

18             DEPUTY DISTRICT ATTORNEY TURLEY:  Ever?

19             PRESIDING COMMISSIONER DAVIS:  Ever?

20             INMATE HERNANDEZ:  Never.

21             PRESIDING COMMISSIONER DAVIS:  No never?

22             INMATE HERNANDEZ:  No.

23             PRESIDING COMMISSIONER DAVIS:  All right.

24   In terms of an arrest record, looks like you

25   were, no juvenile history that is known.  You're

26   arrested by Los Angeles, LAPD in, on 1/8 of 1977

27   for first-degree robbery.  You pled guilty to, to

26

1    auto theft.  You were placed on 36 months summary

2    probation without supervision and ordered to pay

3    a fine.  What was, what was the, what were the

4    circumstances of that?

5              INMATE HERNANDEZ:  I -- I took a, a

6    taxicab.

7              PRESIDING COMMISSIONER DAVIS:  Okay.

8    While the taxicab driver was in it?

9              INMATE HERNANDEZ:  No.  She just got, she

10   got off --

11             PRESIDING COMMISSIONER DAVIS:  Okay.

12             INMATE HERNANDEZ:  -- and that's when I

13   took the cab.

14             PRESIDING COMMISSIONER DAVIS:  Okay.  She

15   got out and you got in and took the cab?

16             INMATE HERNANDEZ:  Yeah.

17             PRESIDING COMMISSIONER DAVIS:  Was it a

18   (inaudible)?  What'd you do that for?

19             INMATE HERNANDEZ:  It, it was stupid now.

20   I was drinking, we had been drinking that night

21   and it was on a Saturday night I believe.

22             PRESIDING COMMISSIONER DAVIS:  Okay.  You

23   needed a ride home?

24             INMATE HERNANDEZ:  Actually I did have, I

25   had money, I had enough money I could have paid

26   for it.

27             PRESIDING COMMISSIONER DAVIS:  Okay.  How

27

1   much had you had to drink before you stole the

2   cab?

3        INMATE HERNANDEZ:  See I got to that

4   party at about seven o'clock.  I had quite,

5   probably three.

6        PRESIDING COMMISSIONER DAVIS:  So, and

7   this is during the time, you're still in the army

8   at this time?

9        INMATE HERNANDEZ:  No.  No, sir.

10        PRESIDING COMMISSIONER DAVIS:  You were

11   out of the army at this time?

12        INMATE HERNANDEZ:  Yes.

13        PRESIDING COMMISSIONER DAVIS:  Okay.  And

14   you're arrested in, on 4/26 of 1977 that actually

15   be for the (inaudible) offense, but now in, this

16   says in, in 1978 there was an arrest for, by the

17   LAPD for shoplifting?

18        INMATE HERNANDEZ:  Yes.

19        PRESIDING COMMISSIONER DAVIS:  What was

20   that about?

21        INMATE HERNANDEZ:  1 attempted to steal

22   some glasses.  Well, I did steal them.

23        PRESIDING COMMISSIONER DAVIS:  Okay.  And

24   then another contact with LAPD for drinking in

25   public?

26        INMATE HERNANDEZ:  Yes, sir.

27        PRESIDING COMMISSIONER DAVIS:  So just

28

1    the, the one incident where you actually, you

2    received summary probation as well for the

3    shoplifting, so you're placed in probation?

4         INMATE HERNANDEZ:  Yes.

5         PRESIDING COMMISSIONER DAVIS: Was that --

6    alcohol have anything to do with the shoplifting

7    incident also?

8         INMATE HERNANDEZ:  Yes.

9         PRESIDING COMMISSIONER DAVIS: So there

10   was a thread running consistently through this?

11        INMATE HERNANDEZ:  Yes.

12        PRESIDING COMMISSIONER DAVIS:  What about

13   drug use?

14        INMATE HERNANDEZ:  I stay away from

15   drugs.

16        PRESIDING COMMISSIONER DAVIS: So you

17   (inaudible) that you smoked marijuana

18   occasionally starting at age 19?

19        INMATE HERNANDEZ:  Yes, sir.

20        PRESIDING COMMISSIONER DAVIS:  But no

21   other substances?

22        INMATE HERNANDEZ:  No.

23        PRESIDING COMMISSIONER DAVIS:  No

24   cocaine, no methamphetamine?  Nothing like that?

25        INMATE HERNANDEZ:  Yes.

26        PRESIDING COMMISSIONER DAVIS: Just the

27   alcohol?  The alcohol, so be fair to say that

29

1    alcohol was drug of choice at that time?

2              INMATE HERNANDEZ:   Yes, sir.

3              PRESIDING COMMISSIONER DAVIS:   Is there

4    anything that we haven't talked about, about the,

5    the offense itself, your history prior to coming

6    to the institution, your arrests, anything prior

7    to the incident offense that, or actually the

8    incident that your, actually prior to you coming

9    to the institution, that we haven't talked about

10   that you feel is important for this Panel to

11   understand?

12             INMATE HERNANDEZ:   I was arrested twice

13   as a juvenile --

14             PRESIDING COMMISSIONER DAVIS:   Okay.

15             INMATE HERNANDEZ:   -- for truancy and I

16   don't think that -- that that was mentioned.

17             PRESIDING COMMISSIONER DAVIS:   Right.

18   Right.  I appreciate you bringing that up.  And

19   you were a truant, why?

20             INMATE HERNANDEZ:   I just didn't want to

21   go to school.

22             PRESIDING COMMISSIONER DAVIS:  Just didn't

23   want to go to school?

24             INMATE HERNANDEZ:   (inaudible).

25             PRESIDING COMMISSIONER DAVIS:   Did you

26   get along all right in school?

27             INMATE HERNANDEZ:   Yeah 1, 1 did.   It was

30

1    a (sic) inter, interracial at that time kind of a

2    thing going on in school.

3        PRESIDING COMMISSIONER DAVIS:  With just

4    the --

5        INMATE HERNANDEZ:  Majority blacks so

6    real, real an interrace (sic).  But it, I had no

7    problems in school.  As a matter of fact I kind

8    of like it, but I kind of let influences, you

9    know, of other people around.

10       PRESIDING COMMISSIONER DAVIS:  Was it

11   just your general peer group that was doing the

12   influencing?

13       INMATE HERNANDEZ:  Yeah.  A few.  But I

14   was mostly interested in sports.  But, yeah.

15       PRESIDING COMMISSIONER DAVIS:  Had you

16   been drinking prior to the incident offense?

17       INMATE HERNANDEZ:  Yes, sir.

18       PRESIDING COMMISSIONER DAVIS:  How much?

19       INMATE HERNANDEZ:  Well, I got off of

20   work, cashed my check.  I had about six of those

21   beers.

22       PRESIDING COMMISSIONER DAVIS:  Okay.

23       INMATE HERNANDEZ:  And --

24       PRESIDING COMMISSIONER DAVIS:  Just you

25   personally or were you sharing it with your

26   friends?

27       INMATE HERNANDEZ:  No.  Just for me.

31

1       PRESIDING COMMISSIONER DAVIS: Okay.

2       INMATE HERNANDEZ: But the park that I

3 went to there was persons there that I'd give

4 them a beer. Yeah.

5       PRESIDING COMMISSIONER DAVIS: But you

6 didn't drink a whole six-pack yourself?

7       INMATE HERNANDEZ: No. I must have given

8 away three or four.

9       PRESIDING COMMISSIONER DAVIS: Okay. Was

10 that, was that the, the extent that you're, that

11 you'd been at work, you hadn't been drinking

12 during the time you're at work?

13       INMATE HERNANDEZ: No.

14       PRESIDING COMMISSIONER DAVIS: Okay. So

15 you were drinking after work (inaudible) --

16       INMATE HERNANDEZ: Yeah. After my

17 work --

18       PRESIDING COMMISSIONER DAVIS: Three or

19 four beers.

20       INMATE HERNANDEZ: -- usually I would

21 (inaudible) after I got off of work. First thing

22 I do is stop at a liquor store and buy, you know,

23 a six pack or, at that time they had tall boys,

24 maybe a couple of tall boys.

25       PRESIDING COMMISSIONER DAVIS: Okay. So

26 in addition to a six-pack you had a couple of

27 tall boys too?

32

1          INMATE HERNANDEZ:  Yes.

2          PRESIDING COMMISSIONER DAVIS: Okay.  So

3     how would you describe your ability to make good

4     judgments and so forth about the time that you

5     were, decided to go and check on this property

6     yourself?

7          INMATE HERNANDEZ:  Very bad.  I just, it

8     was a bad, real bad (inaudible).

9          PRESIDING COMMISSIONER DAVIS: It almost

10    seems like a pretty dangerous thing to have done

11    to go into a neighborhood that you weren't

12    familiar with and confront somebody about some

13    property.

14         INMATE HERNANDEZ:  Some (inaudible) it

15    is, it was dangerous.

16         PRESIDING COMMISSIONER DAVIS:

17    (inaudible).

18         INMATE HERNANDEZ:  But at that time my

19    reasoning was not, not of someone that's, you

20    know, capable to understand the consequences.

21         PRESIDING COMMISSIONER DAVIS:  The person

22    that you were with that day, was he a gang

23    member?

24         INMATE HERNANDEZ:  No, sir.

25         PRESIDING COMMISSIONER DAVIS: Anything

26    else that we haven't talked about that you feel

27    is, is important for us to understand today?

33

1            INMATE HERNANDEZ:   I don't understand

2    that.

3            PRESIDING COMMISSIONER DAVIS:   Is -- is

4    there anything that we haven't covered that,

5    that, anything about your, your past history,

6    your family life, any other influences on you,

7    things like that that you think would be

8    important for us to, to review and --

9            INMATE HERNANDEZ:   Oh.

10           PRESIDING COMMISSIONER DAVIS:   -- and

11   understand as we're going through all the

12   information?

13           INMATE HERNANDEZ:   Just that I've always

14   tried, you know, to, to be the best I could.   I

15   was always protective of my family and the area

16   that, that I live and where I come from -- one of

17   the other reasons I went into the military is

18   cause I didn't want to get involved with, you

19   know, the atmosphere at that time going around

20   the (inaudible) and I wanted to, to be the first

21   one other than my sister to be able to help our

22   family find a better place to -- to live.  And I

23   let everybody down because it's hard to do

24   anything.   That just became my --

25           PRESIDING COMMISSIONER DAVIS:   How did

26   you feel when they, when you were confronted with

27   a gun the first time when he pointed the gun at

34

1    you and, and you had to leave?

2            INMATE HERNANDEZ:  I felt scared

3    personally when -- when he pulled the gun out.

4            PRESIDING COMMISSIONER DAVIS: How about

5    after you'd already left?  How'd you feel then?

6            INMATE HERNANDEZ:  Felt anger and sort of

7    like, well nobody does this to me, you know.

8            PRESIDING COMMISSIONER DAVIS:  Feel

9    insulted, disrespected?

10           INMATE HERNANDEZ:  Yes, sir.  Very much.

11   So when my partner came with the idea of a gun I

12   made, says let's go.

13           PRESIDING COMMISSIONER DAVIS:  Any

14   questions, Commissioner?

15           DEPUTY COMMISSIONER SMITH:  Just that a

16   question of -- of clarification.  When

17   Commissioner Davis asked you earlier -- earlier

18   if your knew what kind of a gun it was, you --

19   you said you didn't know.  You thought it might

20   have been nine millimeter?

21           INMATE HERNANDEZ:  Yes.

22           DEPUTY COMMISSIONER SMITH:  In, in the

23   (inaudible) report when, when you were discussing

24   the commitment offense you'd indicated that when

25   you were in the army that you were trained with a

26   .45 caliber?

27           INMATE HERNANDEZ:  Yes, sir.

35

1         DEPUTY COMMISSIONER SMITH:  And when in

2    fact you had earned an expert badge --

3         INMATE HERNANDEZ:  Yes, sir.

4         DEPUTY COMMISSIONER SMITH:  -- in that

5    weapon?

6         INMATE HERNANDEZ:  Yes, sir.

7         DEPUTY COMMISSIONER SMITH:  I'm a little

8    confused by some one that would have earned an

9    expert badge shooting a .45 caliber wouldn't know

10   the difference between a nine millimeter, nine

11   millimeter and a .45.  I mean they're

12   dramatically different.

13        INMATE HERNANDEZ:  Of course.  It wasn't

14   a .45.  I knew that.  And the, the only reason it

15   was a nine millimeter that I became aware of just

16   through after the, you know, the arrest and all.

17        DEPUTY COMMISSIONER SMITH:  Okay.  So you

18   knew what it wasn't, you weren't sure what it

19   was?

20        INMATE HERNANDEZ:  Yes.

21        DEPUTY COMMISSIONER SMITH:  Okay.  Great.

22   I appreciate the clarification.  Thank you.

23        PRESIDING COMMISSIONER DAVIS: Any further

24   questions?

25        DEPUTY COMMISSIONER SMITH:  No.

26        PRESIDING COMMISSIONER DAVIS:  All right.

27   I'll ask you to turn your attention, please, to

36

1    Commissioner Smith.

2        **DEPUTY COMMISSIONER SMITH:**  (inaudible)

3    to the C File you were received at the Department

4    of Corrections on, on March 23rd, 1979.  Received

5    here at CTF on June 24th, 1998.  You have a

6    classification score of 19, which is the lowest

7    classification score that a life inmate can

8    attain.  Your last hearing was held on January 6,

9    2005.  You received a one-year denial and that

10    was your twelfth subsequent hearing.  Since

11    you've been incarcerated you generally had a

12    positive adjustment history.  You've had seven

13    CDC 128A's, the last one being in December of

14    2000 for disobeying staff.  And I would have at

15    that part frankly where although you only have

16    seven 128's (inaudible) having been incarcerated

17    for as long as you have been and you've gone

18    through the number of parole hearings that you've

19    gone, gone through that you would have, worked

20    very hard to avoid even a 128.  I mean although

21    that's roughly five years ago, it's still

22    relatively current.  I'm a little surprised by

23    that.  You've had only four CDC 115's, and the

24    last one being December of '98 and that was from

25    mutual combat and, and three of the four 115's

26    had to do with fighting or mutual combat, which

27    was not simply you, you know, failing to report

37

1    for work or failing to follow instructions or, or

2    something of that, that nature.  You've received

3    two certificates of completion in the Infectious

4    Disease curriculum.  One in Sexually Transmitted

5    Infections and that's dated November of 2005.

6    The other Hepatitis and that's dated February of

7    2006.  And you received a Certificate of

8    Completion in Entrepreneurship, that was November

9    of 2005.  I haven't seen that before.  What is

10    that?  What is the basis of that program?

11         INMATE HERNANDEZ:  Oh it's to start

12    getting into the, into the world of business and

13    how to, the basics of starting a business.

14    The -- the investment that you have to make.

15    The -- the difference between a franchising and a

16    sole -- sole proprietor, different aspects of --

17    of a business.

18         DEPUTY COMMISSIONER SMITH:  Okay.  Yeah.

19    As I said I hadn't seen that before.  It sounds

20    like, it was a potentially very valuable program.

21         INMATE HERNANDEZ:  Oh, it is.  Yes.

22         DEPUTY COMMISSIONER SMITH:  You received

23    ten Certificates of Achievement, Achievement for

24    completion of FEMA (inaudible) courses.

25         INMATE HERNANDEZ:  Uh-huh.

26         DEPUTY COMMISSIONER SMITH:  They were all

27    issued the same month.

38

1          INMATE HERNANDEZ:  Yes.

2          DEPUTY COMMISSIONER SMITH:  They were all

3  issued July of 2005.  Did you take them all

4  during that month?

5          INMATE HERNANDEZ:  No.  What happened is

6  that when, when I chose a course and then I have

7  to wait for a book and then I sent them all at

8  one time.

9          DEPUTY COMMISSIONER SMITH:  Okay.

10          INMATE HERNANDEZ:  And that's how it came

11  in order to (inaudible) that.  Because everything

12  would have to stop on each one.  So I was, I was

13  keeping them all in --

14          DEPUTY COMMISSIONER SMITH:  All at once?

15          INMATE HERNANDEZ:  -- and then, then I

16  sent them all at once.

17          DEPUTY COMMISSIONER SMITH:  Okay.  I knew

18  there had to be a good reason.  Because you got

19  ten of them in this, all issued the, the same

20  month same year.  The -- the various programs

21  were entitled Decision Making, Managing

22  Volunteers, Leadership, Emergency Planning, State

23  Disaster Management, Orientation to Disaster

24  Exercises, Livestock and Disaster, Building for

25  the Earthquakes of Tomorrow, Introduction Into

26  Hazardous Materials and Functions of an Interview

27  Program Manager.

39

1          INMATE HERNANDEZ:  Yes, sir.

2          DEPUTY COMMISSIONER SMITH:  You also

3   participated in the Veterans' Self-help group

4   from August 2004 to February 2005 and your BRAG

5   Membership application was approved in April of

6   2005.  BRAG stands for Balance Re-entry Activity

7   Group.

8          INMATE HERNANDEZ:  Yes, sir.

9          DEPUTY COMMISSIONER SMITH:  Is that an

10  ongoing group?

11         INMATE HERNANDEZ:  Yes.

12         DEPUTY COMMISSIONER SMITH:  Okay.  So

13  you're still participating in that group?

14         INMATE HERNANDEZ:  We have, right now

15  because of staff shortages we're having a monthly

16  meeting.  If it wasn't for staff shortage, we

17  would have at least bi-weekly meetings.

18         DEPUTY COMMISSIONER SMITH:  Describe the

19  program to us.

20         INMATE HERNANDEZ:  The, the program is

21  to, to help inmates coming into prison to get

22  them adjusted into the different aspects of

23  parole.  To prepare them in education.

24  Vocational wise through in self-study or through,

25  through correspondence.  Give them peer group

26  help in the prison.  Let them know that, that

27  even though you're in prison you can help

40

1    yourself do whatever you, whenever your release

2    comes and we have a lot of, lot of inmates that

3    parole everyday and those are the ones that we,

4    we usually get a hold of so we can be able to

5    (inaudible). If we can help with our, with our

6.   own experience of being in prison and how in, in

7    my, my case when I came to prison the, there was

8    no inmate peer trying to help you to better

9    yourself to be able to get out and I felt that

10   the whole story here is of me in prison, had I

11   known about the, that there were any programs

12   like this and then they were going to help me out

13   in understanding way back when I first came to

14   prison instead of letting go two and three years

15   by without doing it.

16           DEPUTY COMMISSIONER SMITH: Now, you, in

17   reading a little bit about it you, you had to

18   prepare an application and submit it for approval

19   and acceptance?

20           INMATE HERNANDEZ: Yes, sir.

21           DEPUTY COMMISSIONER SMITH: Is that

22   right?

23           INMATE HERNANDEZ: That's true.

24           DEPUTY COMMISSIONER SMITH: Sounds like

25   it's --

26           INMATE HERNANDEZ: Only --

27           DEPUTY COMMISSIONER SMITH: -- it's not

41

1    an easy -- an easy program to become a part of;

2    is that correct?

3            INMATE HERNANDEZ:    (inaudible).    You have

4    to do it a team.    You get a team to yourself and

5    that's at least two persons vouching for your,

6    you can't have no 115, no disciplinary.    You have

7    to have a good work record.    You have to be sort

8    of like an outstand still in prison.

9            DEPUTY COMMISSIONER SMITH:    And you're on

10    a number of waiting lists for a period of time.

11    Are you still on waiting lists?

12            INMATE HERNANDEZ:    Yes, sir.

13            DEPUTY COMMISSIONER SMITH:    What -- what

14    waiting lists are you on?

15            INMATE HERNANDEZ:    Two.    I got on one of

16    the, it's a (inaudible) program that, that's

17    known nationally.    It's called Alternative

18    Survivors and I'm on that waiting list and also

19    on the Alcoholics Anonymous.

20            DEPUTY COMMISSIONER SMITH:    Okay.    So

21    you're on those.    Okay.    Is it Narcotics

22    Anonymous or Alcoholics Anonymous?

23            INMATE HERNANDEZ:    Alcoholic Anonymous.

24            DEPUTY COMMISSIONER SMITH:    Okay.    And

25    how long have you been on, on that waiting list?

26    I would guess probably at least a year?

27            INMATE HERNANDEZ:    Something like that.

42

1    Yeah.  Because I'll be continuing (inaudible) yet
2    and sometime like when we're locked down that
3    would be like (inaudible) past three weeks some
4    of the sponsors they sort of like lose interest
5    and then we have to find another sponsor to be
6    able to, to, to sponsor the (inaudible).

7         DEPUTY COMMISSIONER SMITH:  You were
8    assigned as a culinary clerk until July 2005 and
9    then assigned to the receiving and release clerk.
10   Are you still in that assignment?

11        INMATE HERNANDEZ:  No, sir.  I'm back in
12   the culinary.

13        DEPUTY COMMISSIONER SMITH:  When -- when
14   did you go back in culinary?

15        INMATE HERNANDEZ:  Six months ago.

16        DEPUTY COMMISSIONER SMITH:  About the
17   first of the year then?

18        INMATE HERNANDEZ:  (inaudible).

19        DEPUTY COMMISSIONER SMITH:  Okay.

20        INMATE HERNANDEZ:  (inaudible).

21        DEPUTY COMMISSIONER SMITH:  And doing
22   clerk functions there in the culinary?

23        INMATE HERNANDEZ:  Yes, sir.  The same,
24   the same job I did.

25        DEPUTY COMMISSIONER SMITH:  You had a
26   psychological evaluation.  It's somewhat dated,
27   it's July 23 of 2004 prepared by Dr. Hewchuk, H-

43

1    E-W-C-H-U-K.  Before I go to that evaluation, are

2    there any other activities that you've been

3    involved in in the institution since your last

4    hearing that I haven't addressed that we should

5    be aware of?

6         INMATE HERNANDEZ:  Yes.  I'm taking now a

7    business course through the Education Department.

8    I have my, my credits.  I've -- I signed up

9    (inaudible) and now I'm doing Business Principles

10   and Management.  And I'm going on unit three,

11   with an overall course average of 93.

12        DEPUTY COMMISSIONER SMITH:  Good.  And

13   that's through the --

14        INMATE HERNANDEZ:  The Educational --

15        DEPUTY COMMISSIONER SMITH:  -- the

16   Education Department?

17        INMATE HERNANDEZ:  Yes.

18        DEPUTY COMMISSIONER SMITH:  Okay.  And

19   when did you start that?

20        INMATE HERNANDEZ:  In, I started that on,

21   on 11/17/2005.

22        DEPUTY COMMISSIONER SMITH:  Okay.  Thank

23   you.  Anything else?

24        INMATE HERNANDEZ:  No.

25        DEPUTY COMMISSIONER SMITH:  Okay.

26   Because the, the psychological evaluation is

27   somewhat dated and wouldn't have been used

44

1  (inaudible) from an assumption that it would have

2  been used at your last hearing I'm going to

3  identify only a couple of sections in what's a

4  fairly brief evaluation to begin with.  And then

5  if there are any comments or any parts of the

6  evaluation that you or Ms. Rutledge would like

7  to, to add for the record I'll certainly give you

8  that opportunity.

9          INMATE HERNANDEZ:  Yes, sir.

10         DEPUTY COMMISSIONER SMITH:  Running

11  through the, the first page the, the doctor

12  discusses basically your 115's.  And it talks

13  about the, the issue of alcohol abuse and, and

14  that's been, I'm not going to go into detail

15  there because we, we've addressed that with you

16  being on the waiting list for Alcoholics

17  Anonymous.  But the doctor does write,

18              "That during your incarceration you've

19              completed Vocational Programming and

20              Television Production, Data Processing

21              and Basic Electronics."

22         Is that --

23         INMATE HERNANDEZ:  Yes, sir.

24         DEPUTY COMMISSIONER SMITH:  That is

25  accurate?

26         INMATE HERNANDEZ:  Yes, sir.

27         DEPUTY COMMISSIONER SMITH:  Okay.

45

1    And that the doctor concludes that,

2            "Currently you are a suitable

3            candidate for parole with these

4            consideration with the recidivism

5            and risk factor no greater than

6            that of the average citizen in

7            community."

8            He goes on to note that,

9            "Due to your marketable skills and close

10            family support it's expected that your

11            transition to freedom and personal

12            responsibility would be relatively

13            smooth."

14    **INMATE HERNANDEZ:**  Yes.

15    **DEPUTY COMMISSIONER SMITH:**  Any comments

16    or any other sections of that evaluation that you

17    or Ms. Rutledge would like to address for the

18    record?

19    **ATTORNEY RUTLEDGE:**  I would.  Yes.  On

20    page 1, third paragraph, it says his last violent

21    based 115 occurred in 1998.  Although Dr. Turedey

22    (phonetic) in his previous report assessed inmate

23    Hernandez,

24            "As low risk in a community setting.

25            The Board expressed some concern

26            about a pattern of, of poor violence

27            based 115 during the 27-year period

46

1      of incarceration.  A review of the

2      actual 115 document is in the C-File

3      and subsequent discussion with

4      inmate Hernandez confirmed that each

5      instance inmate Hernandez was the

6      victim of an assault (inaudible) by

7      another inmate reacted by defending

8      himself.  The recent CC policy

9      classifying a majority of fights

10     between inmates and mutual combat

11     searched with further (inaudible).

12     Actual issues of fact -- and he

13     would -- part of it due to his

14     remarkable skills in (inaudible)

15     family support it is expected that

16     his transition and freedom and

17     personal responsibility would be

18     (inaudible) tight."

19     Thank you.

20          **DEPUTY COMMISSIONER SMITH:**  Anything

21 else?

22          **ATTORNEY RUTLEDGE:**  No, sir.

23          **DEPUTY COMMISSIONER SMITH:**  Okay.  Thank

24 you.  We're going to refer back again to the, the

25 04 Board Report.  Since the current Board Reports

26 I believe referred this all back to that one.

27 Under parole plans it indicates that you'd, you

47

1    plan on residing with your brother and sister-in-

2    law who at that time lived in Pacoima.

3            INMATE HERNANDEZ:  Yes, sir.

4            DEPUTY COMMISSIONER SMITH:  We have a

5    letter, which I'll address from your brother and

6    sister-in-law shortly, but they now live Sylmar.

7            INMATE HERNANDEZ:  Yes, sir.

8            DEPUTY COMMISSIONER SMITH:  And then

9    under employment indicates that you're confident

10   that you can employ, that you can get employment

11   with a Marco Sanchez who's a cousin?

12           INMATE HERNANDEZ:  Yes.

13           DEPUTY COMMISSIONER SMITH:  Who owns a

14   body and fender mechanic shop in Rosemead and in

15   the San Fernando Valley.  This -- he owns two

16   businesses?

17           INMATE HERNANDEZ:  Yes.  He, he owns --

18           DEPUTY COMMISSIONER SMITH:  And that you

19   would be employed by him to -- doing clerical

20   duties.

21           INMATE HERNANDEZ:  Yes.

22           DEPUTY COMMISSIONER SMITH:  And the

23   letter that, that we have, as I indicated is from

24   your brother and sister-in-law.  It stated that

25   December 26, 2005, indicates that writing on your

26   behalf they would welcome you into their home in

27   Sylmar.  And that, you know, they're well

48

1    established people because they're both employed.

2            Do you know what kind of a residence they

3    have in Sylmar?

4            INMATE HERNANDEZ:  Yeah.  It's, and it's

5    not, not considered a house and it's sort of

6    like, I don't know how you would say, duplex I

7    believe or something like that.

8            DEPUTY COMMISSIONER SMITH:  Like a duplex

9    or a townhouse?

10           INMATE HERNANDEZ:  Something like that.

11           DEPUTY COMMISSIONER SMITH:  Something

12   like that?  Something larger than an apartment?

13           INMATE HERNANDEZ:  Yes.  Something like,

14   yes.

15           DEPUTY COMMISSIONER SMITH:  Do you know

16   how many bedrooms it has?

17           INMATE HERNANDEZ:  I think they have two.

18   I don't honestly --

19           DEPUTY COMMISSIONER SMITH:  The, the

20   reason I'm asking is that in, in the letter it

21   indicates that beside your brother and his wife

22   they also have three children.

23           INMATE HERNANDEZ:  Yeah.

24           DEPUTY COMMISSIONER SMITH:  So if you

25   were residing there where would you, where would

26   you sleep?

27           INMATE HERNANDEZ:  Yeah.  Good question.

49

1          DEPUTY COMMISSIONER SMITH:  It's -- you
2     know, I'm not discounting the, the value of the
3     letter in terms of --
4          INMATE HERNANDEZ:  I understand.
5          DEPUTY COMMISSIONER SMITH:  -- your
6     brother would like to offer you a residence.
7          INMATE HERNANDEZ:  (inaudible).  No.  I'm
8     just (inaudible) --
9          DEPUTY COMMISSIONER SMITH:  But I'm, but,
10    but I'm wondering just how --
11         INMATE HERNANDEZ:  Exactly.
12         DEPUTY COMMISSIONER SMITH:  -- realistic
13    there is in the fact that such a five-person
14    family already --
15         INMATE HERNANDEZ:  Uh-huh.
16         DEPUTY COMMISSIONER SMITH:  The other
17    question I have is that if you were going to, and
18    I'm not familiar with that, with that area
19    geographically.  If you were going to be
20    residing, for the sake of conversation, in the
21    Sylmar area --
22         INMATE HERNANDEZ:  Yeah.
23         DEPUTY COMMISSIONER SMITH:  -- how far is
24    that from Rosemead or San Fernando Valley?
25         INMATE HERNANDEZ:  To Rosemead, I'd said
26    a good drive.
27         DEPUTY COMMISSIONER SMITH:  (inaudible).

50

1    Sometimes a good drive is on a sunny Sunday

2    afternoon and --

3              INMATE HERNANDEZ:  Yeah.

4              DEPUTY COMMISSIONER SMITH:  -- sometimes

5    it's in commute driving?

6              INMATE HERNANDEZ:  Yeah.  This, it, it is

7    a long commute.  It's going to be a long commute

8    for the I believe, you know, first four weeks

9    till I get established.  And then I -- I have a

10   plan also to be able to apply under the Veterans'

11   Assets, which it's going to help me under, for to

12   be able to find a larger place, you know,

13   hopefully, you know, I can use my GI Bill to be

14   able to get a down payment for a home being that

15   my brother's working, and he's also a Veteran,

16   and so these are, these are the things that I

17   have sort of looked at and be able to make it.

18             DEPUTY COMMISSIONER SMITH:  And have you

19   contacted the VA regarding those benefits would

20   be available to you?

21             INMATE HERNANDEZ:  I have.  Yes, I have.

22             DEPUTY COMMISSIONER SMITH:  Okay.

23             INMATE HERNANDEZ:  I have letters from

24   them and I have all of the, they sent me a, a

25   whole packet of the (inaudible).

26             DEPUTY COMMISSIONER SMITH:  So what's

27   the, what's the most recent letter?  Because

51

1   those are letters that, that this Panel, as past

2   Panels, you know, should be aware of.

3         INMATE HERNANDEZ:  And I, and I didn't

4   bring the copy of that letter.  But I'll, I'll be

5   glad to, I, I can show you the latest one that I

6   have.  I think it's, it's about a year old that,

7   that was on - I don't want to take much of your

8   time.

9         DEPUTY COMMISSIONER SMITH:  No.  We,

10  this, this is an extremely important hearing.

11  You have all the, all the time that you need.

12        INMATE HERNANDEZ:  I don't have it, but I

13  can get in touch with them because the GI Bill I

14  think, I understand it to be, has changed since I

15  think after I think '82.  And in the time that,

16  that I served was during the Viet Nam era time,

17  which means that all my benefits are different

18  than the benefits that are now given.  And in,

19  and in mine a lot of them are still there.  The

20  only, the only one that expired during my

21  incarceration was the education benefit that I

22  had.  That only lasted ten years and, and I'm

23  assuming that expired.  But that's the only

24  benefit that's, that, that has expired since I've

25  been in prison.  The home loan, the 1980 I

26  believe, 1986 Veterans' Benefit Bill that passed

27  by President, I believe it was, I forget the

52

1    President, but I recall --

2              DEPUTY COMMISSIONER SMITH:    (inaudible).

3              INMATE HERNANDEZ:    -- that it was, it

4    was, this was to help the Veterans that were

5    homeless and the persons that were, that were

6    also coming out of prison or that needed help in

7    adjustment that that was also going to be

8    beneficial to us.

9              DEPUTY COMMISSIONER SMITH:    Some --

10   something that, that I'm curious about, you know,

11   the, you know this is your 13th subsequent

12   hearing.

13             INMATE HERNANDEZ:    Seventeen.

14             DEPUTY COMMISSIONER SMITH:    No.   We had

15   your 12th was in '05.   So this, this is your 13th

16   subsequent hearing.   So you had one initial,

17   which was 14 and you probably had a couple of

18   document, documentation hearings prior to that.

19             INMATE HERNANDEZ:    Well, when I came in

20   at the time I never had a document, I had one

21   documentation in '80, in '80 --

22             DEPUTY COMMISSIONER SMITH:    Well, my

23   point is that, that I'm sure at least, if not in

24   every one of those instances the, in the majority

25   of those instances you would have been counseled

26   on how important it is to have letters of support

27   for residence, employment, from family and

53

1    friends and so forth.

2          INMATE HERNANDEZ:   Yes.

3          DEPUTY COMMISSIONER SMITH:   And you have,

4    you know, a very positive letter from your

5    brother.·

6          INMATE HERNANDEZ:   Yes.

7          DEPUTY COMMISSIONER SMITH:   You know,

8    certainly some, some questions with regard to the

9    viability of the residential plan that we've

10   already addressed.   But there's no employment

11   letters.

12         INMATE HERNANDEZ:   Yes.

13         DEPUTY COMMISSIONER SMITH:   And, and I'm

14   wondering why.

15         INMATE HERNANDEZ:   Prior to '88 I used to

16   always get letters, a lot of letters, a lot of

17   jobs, opportunity.   I was found suitable in 1988

18   and then on review it was --

19         DEPUTY COMMISSIONER SMITH:   Yeah.   But,

20   but we're talking now.   We're talking now 2006.

21         INMATE HERNANDEZ:   Well I'm getting, I'm

22   getting there.

23         DEPUTY COMMISSIONER SMITH:   Okay.·  Well I

24   don't want to roll the clock back for 20 years.

25         INMATE HERNANDEZ:   Okay.

26         DEPUTY COMMISSIONER SMITH:   But I want to

27   talk about right now, because it, because it's

54

1    right now that's critical to you.

2         INMATE HERNANDEZ:  Exactly.  I understand

3    that.  And my reason was that every year that I

4    come to this hearing my family, the person that I

5    love, used to get their hopes up high, real high.

6    And being that in 1990 I received a, I was

7    (inaudible) received a, a release date and I held

8    that for two years.  They had me coming home

9    already and then, you know, the extension period

10   and it was taken away and ever since then I kind

11   of like that, that I wasn't going to put them

12   through this again.  My grandmother died during

13   (inaudible) time and, you know, I, I (inaudible),

14   you know why should I be bothering them people

15   out there if I'm not never going to get out.

16        DEPUTY COMMISSIONER SMITH:  Well, I -- I

17   understand your, your point of courtesy and

18   certainly we're a long way from making a decision

19   about whether or not we're going to find you

20   eligible today.

21        INMATE HERNANDEZ:  Right.

22        DEPUTY COMMISSIONER SMITH:  But you need

23   to understand that if, if you don't have all the

24   I's dotted and all the, the T's crossed that to

25   an extent you may be handcuffing the Board.  And

26   again, you know, because of, of the number of

27   hearings you've had and, you know, other past

55

1    letters, you know, we'll certainly discuss those

2    at the recess, so I'm not suggesting that, you

3    know, we're not, not going to grant at this

4    point, because again I, I have no idea.  But you

5    need to understand at the very least that by not

6    establishing parole plans, your residence and

7    employment and getting the kinds of letters that

8    may get other people's hopes up that you tend to

9    handcuff the Panels.  And you're not doing

10   yourself the service; you're doing yourself a

11   disfavor.  You need to understand that.  I'm sure

12   you've heard that before.

13          INMATE HERNANDEZ:  Yes, I have.

14          DEPUTY COMMISSIONER SMITH:  But some,

15   some things bear repeating.

16          INMATE HERNANDEZ:  Yes, sir.  I, I

17   appreciate it.

18          PRESIDING COMMISSIONER DAVIS:  We'll take

19   a short recess.

20          DEPUTY COMMISSIONER SMITH:  Yes.

21                        R E C E S S

22          DEPUTY COMMISSIONER SMITH:  And the

23   previously identified is back in the hearing

24   room.

25          PRESIDING COMMISSIONER DAVIS: All right.

26   I appreciate everyone's indulgence.  It was

27   getting a little stuffy in here for me.  So I've

56

```
 1    also given everyone permission to shed their
 2    coats if that's all right with you Mr. Hernandez.
 3              INMATE HERNANDEZ:  Oh, yes.
 4              PRESIDING COMMISSIONER DAVIS: We don't
 5    want to seem to informal to you, but --
 6              INMATE HERNANDEZ:  Sure.
 7              PRESIDING COMMISSIONER DAVIS: -- it, it
 8    sure does get very stuff very quickly, so -- All
 9    right.  With that we'll resume where we left off.
10              DEPUTY COMMISSIONER SMITH:  So we also,
11    also sent out what are known as 3042 notices.
12    Those are letters that go out to the various
13    Criminal Justice Agencies that were involved in
14    your commitment offense.  We didn't receive any
15    responses back to those notices, although you do
16    have Mr. Turley here representing the Los Angeles
17    County District Attorney's Office and he'll be
18    participating in the hearing in just a few
19    moments.  Before I return to Commissioner Davis
20    is there any, any comments that you'd like to
21    make with regard to your parole plans that I
22    haven't addressed?
23              INMATE HERNANDEZ:  No.
24              DEPUTY COMMISSIONER SMITH:  Okay.  Thank
25    you.
26              INMATE HERNANDEZ:  (inaudible).
27              DEPUTY COMMISSIONER SMITH:  Commissioner.
```

57

1          PRESIDING COMMISSIONER DAVIS:  Tell me

2    about your participation in AA.  How, what, what

3    kinds of things have you found (inaudible) in

4    there?

5          INMATE HERNANDEZ:  AA means, it's a grave

6    tool for a person that's in need of, of help

7    dealing with alcoholism.  It made me realize that

8    I can enjoy some activities without, without

9    drinking alcohol.  It made me realize that I

10   missed a lot of special events by drinking

11   alcohol.  I can remember in one day that my

12   sister brought pictures of the wedding.  I could

13   never, I couldn't remember the wedding.  I

14   couldn't remember the members that participated

15   in the wedding.  And because I was always

16   drinking.  And it made me realize that it's also

17   detrimental to your health.  Especially as you

18   get older.  It does a lot of damage to your

19   liver.

20         PRESIDING COMMISSIONER DAVIS: You

21   consider yourself to be an alcoholic?

22         INMATE HERNANDEZ:  Yes, sir.

23         PRESIDING COMMISSIONER DAVIS: Is that a

24   life-long issue for you?

25         INMATE HERNANDEZ:  Yes, it is going to be

26   a life long issue.

27         PRESIDING COMMISSIONER DAVIS:  What

1    things have you had to plan for your ultimate

2    release in terms of identifying AA programs on

3    the outside?

4          INMATE HERNANDEZ:   I know that in

5    anywhere, in any city, I can dial 1-800-AA and

6    I'll get a, a sponsor on the line that's going to

7    help me.   There are thousands and thousands of

8    organizations dealing with Alcohol Anonymous.

9    Not only for the alcoholic, but also for the

10   family members, because they too I believe suffer

11   and --

12         PRESIDING COMMISSIONER DAVIS:   All right.

13   Commissioner, any questions that you might have?

14         DEPUTY COMMISSIONER SMITH:   No.

15         PRESIDING COMMISSIONER DAVIS:   Mr.

16   Turley, questions?

17         DEPUTY DISTRICT ATTORNEY TURLEY:   Just a

18   couple.   I kind of missed something.   What

19   periods was, was the inmate actively

20   participating in AA?

21         PRESIDING COMMISSIONER DAVIS: Do you know

22   when you were participating in AA what years?

23         INMATE HERNANDEZ:   I believe it's going

24   on two years right now on, on the waiting list.

25         PRESIDING COMMISSIONER DAVIS: Well two

26   years on the waiting list, but prior to that what

27   was your, were you actively participating in AA

59

1    prior to that?

2           INMATE HERNANDEZ:  Not AA, but there was

3    a, a span of time that I had stopped

4    participating for what, (inaudible) AA.  That

5    being the last, the last chrono that I have there

6    is from, should be on, on my, on my file.  Right

7    before, before I got here in '89.  No.  '98.  You

8    have on your list '98?

9           PRESIDING COMMISSIONER DAVIS: You got

10   here in '98.

11          INMATE HERNANDEZ:  When I got here.

12   Thank you.

13          DEPUTY DISTRICT ATTORNEY TURLEY:  And how

14   long have you participated in AA?

15          PRESIDING COMMISSIONER DAVIS: In total

16   how long have you participated in AA?

17          INMATE HERNANDEZ:  Oh.  Since '79.

18          PRESIDING COMMISSIONER DAVIS:  Okay.

19          DEPUTY DISTRICT ATTORNEY TURLEY:  When

20   was it that the inmate first admitted to his

21   guilt in this offense to the authorities?

22          PRESIDING COMMISSIONER DAVIS: Do you

23   understand the question?

24          INMATE HERNANDEZ:  Yes.

25          PRESIDING COMMISSIONER DAVIS: Okay.

26          INMATE HERNANDEZ:  I admitted to this

27   crime during a session that my (inaudible) that

60

1    that I mastered the therapy that they had me do.

2    During that group, so possibly five or six

3    persons that have to talk about the crime and

4    have to admit that you commit the crime.  And

5    that was, I was, I was believe number four or

6    five and as I heard each person I felt a lot of

7    guilt and that was the first time that I, that I

8    voiced (inaudible) as it happened and, and

9    admitted to, admitted to, to committing this,

10    this offense.

11          PRESIDING COMMISSIONER DAVIS:  And what

12    year was that?

13          INMATE HERNANDEZ:  I think it was '88.

14    Or '87.

15          DEPUTY DISTRICT ATTORNEY TURLEY:  No

16    further questions.

17          PRESIDING COMMISSIONER DAVIS:  All right.

18    Ms. Rutledge?

19          ATTORNEY RUTLEDGE:  Just a question too.

20    I wanted to just review some of the skills that

21    you've learned since you've been in prison.  You

22    worked as a clerk?

23          INMATE HERNANDEZ:  Yes.

24          ATTORNEY RUTLEDGE:  How many years did

25    you put in as a clerk all together, do you think,

26    in prison?

27          INMATE HERNANDEZ:  This time (inaudible)

61

1    say roughly '79 and I've done nothing but

2    clerical except for some time that 1 spent doing

3    vocational courses.  I've always -- I always have

4    classes.

5         ATTORNEY RUTLEDGE:  Did you complete

6    (inaudible)?

7         INMATE HERNANDEZ:  Yeah.  Data

8    Processing.

9         ATTORNEY RUTLEDGE:  Did that help your

10   typing or what did you learn in the Data

11   Processing?

12        INMATE HERNANDEZ:  It showed me to

13   manipulate difference softwares.  It showed me a

14   different aspect of computer hardware and how to

15   maintain records, things that are needed in the

16   clerical environment.

17        ATTORNEY RUTLEDGE:  All right.  And you,

18   what other jobs have you held at the prison that

19   taught you skills that would, you could use to be

20   employed on the outside?

21        INMATE HERNANDEZ:  Oh I think I've been

22   a -- I've been a -- I'm trying to remember the --

23   the title.

24        ATTORNEY RUTLEDGE:  Okay.  (inaudible).

25        INMATE HERNANDEZ:  I did all the, I typed

26   all of the, the, the invoices for purchasing.  I

27   was a purchasing clerk at the hospital, T and C.

62

1    I dealt with the purchasing orders and then

2    receiving and then we used clerical dealing with

3    different aspects of, of maintaining the, the

4    supplies. (inaudible) the culinary, on the

5    culinary (inaudible). And 1, I maintained a

6    database on all the culinary workers. I did the

7    payroll. I, I prepared the lists for the

8    (inaudible) so they can come to work. It's been,

9    then I worked as at different job positions.

10        ATTORNEY RUTLEDGE: All right. Any other

11    skill? You were loading docks before you

12    (inaudible) at that?

13        INMATE HERNANDEZ: Yes.

14        ATTORNEY RUTLEDGE: And you got your --

15    your speech thing for an auto accident?

16        INMATE HERNANDEZ: Yes, ma'am.

17        ATTORNEY RUTLEDGE: All right. No

18    further questions.

19        PRESIDING COMMISSIONER DAVIS: All right.

20    Thank you. Mr. Turley, (inaudible).

21        DEPUTY DISTRICT ATTORNEY TURLEY: Thank

22    you. The, very long-standing conventional list

23    in, you know, things you just said. Perhaps the

24    very best school to teach maturity and

25    responsibility is military service. And this

26    inmate had the benefit of that school for about

27    three and a half years. And apparently he was a

63

1  poor student.  Almost immediately after getting

2  out of the army rather than having learned

3  responsibility, rather than learn the, the

4  lessons of growing up, take control of himself,

5  keeping his nose clean and holding a good job he

6  seemed to learn irresponsibility and the only

7  meaningful experience that based on what we've

8  heard today evolved from the army was that he

9  came out of the army with a substantial amount of

10  experience in how to handle a handgun.  The

11  particular, the underlying offense here was

12  again, part of, of a pattern of, of the events

13  that were criminal tied to alcohol.  He was out

14  of the army a very short time, stole a taxicab

15  and then in less than a year after he got out of

16  the army he committed this offense.  By his own

17  admission fails to discuss what he believes was a

18  burglary with the police and decides to take

19  things into his own hand.  He was confronted by a

20  person, makes him angry, he's got a few beers

21  under his belt, he goes off, gets a gun, comes

22  back and without seeing (inaudible) over anything

23  else shoots another person right through the

24  heart.  Killed him dead.  Chases two others and

25  shoots at them.  Then for an additional period,

26  approximately eleven years of so by this

27  statement, eleven or twelve years, he still

64

1    refuses even to admit to the authorities his own

2    guilt in the matter.  And that's, it's

3    commendable that he finally got around to that,

4    but this is a very serious crime, took a person's

5    life, didn't seem to give it any, any thought at

6    all.  Walked up to a person virtually at point

7    blank range and shoots him through the heart and

8    (inaudible) to that offense alone is the

9    appropriate for denial of parole.  At the time

10   that he committed this offense, again he was 23

11   years old.  He'd had substantial experience with

12   law enforcement agencies due to his own

13   activities.  Highly improbable that he didn't

14   recognize that it was unlawful for him to even be

15   in possession of the firearm.  And he -- he made

16   a concerted effort went, went right to the heart

17   of the matter indications criminal behavior.  I

18   think that for all these reasons, but primarily

19   focusing on the, on his failure to, to learn the

20   lessons of life at an age when he should have

21   been completely mature he engaged in this, this

22   offense for a very trivial reason showing no

23   regard to human life and killed another person

24   in, (inaudible) a sheer act of callous disregard

25   for human life.  And the people would recommend

26   that parole be denied at this time.  Thank you

27   very much.

65

1          PRESIDING COMMISSIONER DAVIS:  Thank you.

2     Thank you.  Ms. Rutledge?

3          ATTORNEY RUTLEDGE:  Thank you.  Mr.

4     Hernandez is 52 years old; is that correct?

5          INMATE HERNANDEZ:  Fifty-one.

6          ATTORNEY RUTLEDGE:  Fifty-one.  He's 51

7     years old.  At the time this commitment offense,

8     which was 29 years ago, is that right?  The

9     offense in itself --

10          INMATE HERNANDEZ:  Yes, ma'am.

11     (inaudible).

12          ATTORNEY RUTLEDGE:  -- was in 1977.  He

13     was 23?  Twenty-four, twenty-three?

14          INMATE HERNANDEZ:  Yes.

15          ATTORNEY RUTLEDGE:  Twenty-three years

16     old.  A lot of time, I mean this is a crime

17     that's nearly 30 years old.  So as far as, as,

18     him serving his time it's definitely met.  He, in

19     those 30 years he had four 115's?  Yeah.  I think

20     it's four.  I'm just going to look refer to that.

21     And --

22          DEPUTY COMMISSIONER SMITH:  That's

23     correct, Counselor.  It's four.

24          ATTORNEY RUTLEDGE:  It's four.  And they

25     were all; they all had big spans I want to note.

26     There were seven years from '83 to '90.  Four

27     years.  Got another one in '94.  Four more years.

66

1    So it, it wasn't like he was, you know, racking

2    them up one a year or one every other year.

3    There was just a significant amount of time that

4    transpired between each one. And the last one

5    being more than eight years ago. And I think

6    that, and prior to him coming here he didn't

7    really have a consistent record of any kind of

8    violence. It sounds to me like when he went to

9    the military he learned how to shoot guns. He

10   probably wouldn't have felt this confident that

11   day with a gun. I mean I -- I was amazed to take

12   a gun that you, and never tried to shoot it

13   first, you know, unless you've got some kind of

14   skill in, in that regard. This was a situational

15   circumstance where he just applied poor judgment

16   for whatever reason. But that again was almost

17   30 years ago. Today he's -- he's complied with

18   everything in the system that he's been asked to

19   do. In fact, there's an, there's an old Board

20   Report I'll pull up where it was dated 1987, his

21   counselor at that time said that he'd been

22   complying with the Board of Prison, at that time

23   the Board of Prison Terms and Recommendations, he

24   remained disciplinary free, he upgraded

25   vocationally, participated in self-help, there's

26   lots of Board Reports that indicated a

27   participation and there was, he did another AB

67

1   Substance Abuse, and another course.  He'd done

2   countless self-help groups.  More recently some

3   prison fellowship work in fact a few years ago.

4   He has college courses.  He completed his

5   (inaudible).  Lots of (inaudible) chronos for his

6   different jobs he's had throughout the years and

7   I want to, I think the, the two main things

8   about, about him today are one, he meets the

9   suitability factors completely.  He's got

10  marketable skills, he has a place to live with

11  family members who know him in LA County upon his

12  release.  Second, he's been found suitable twice.

13  Two different Boards, two years apart, found Mr.

14  Hernandez suitable and other Boards too have

15  referred him to, you know, I guess to (inaudible)

16  commitment offense to, sent him back for psyches

17  and he did fine.  He did fine in the Cat X

18  program.  Going back to '87 he got a great psych

19  report.

20          "The probability of him committing a

21          violent act is considerably reduced

22          from what it was at the time of his

23          arrest and there was a high

24          probability that he could complete a

25          course of parole without incident.

26          He has the capacity to make a good

27          occupational and social adjustment

68

1          on release."

2          That's '87.  And then moving up to '99

3    he, he, on, on the diagnostic impressions he had

4    no personality disorder.  He had a gap of '90.

5    His prognosis is very positive for being able to

6    maintain his current mental (inaudible) in the

7    community upon parole.  And then review of the

8    life crime is that he understood several of the

9    key factors, which favorable of the crime.  He

10   acknowledged that he deserves whatever punishment

11   will come to him for his actions.  He stated it

12   was never his intention to kill anyone.  I

13   believe this inmate showed above average

14   understanding that why this crime occurred and

15   the appropriate and genuine amount of remorse.

16   And then, then up to a recent psyche report,

17   which you reviewed.  So over decades he'd gotten

18   good psyche reports.  Again he's been found

19   suitable twice and he's complied with everything,

20   as far as suitability factors goes.  He meets all

21   of them.  And he has, again, nearly 29 years in.

22   So all of those things considered, I would ask

23   the Board to give him a parole date today.  And,

24   and I would note too that because he's been found

25   suitable twice I would also ask the Board to set

26   a term.  Because I believe that the, the, under

27   the law that he was sentenced under when he's

69

1    found suitable a term is supposed to be set.

2          PRESIDING COMMISSIONER DAVIS: Okay.

3    Thank you.  Mr. Hernandez, now it's your

4    opportunity to address the Panel directly and

5    tell us why you believe that you are suitable for

6    parole.

7          INMATE HERNANDEZ:  Yes' sir.  My thoughts

8    right now are running past me right now, but I

9    have to say that I don't blame nobody for

10   committing this crime, because I, I'm very sorry

11   for it.  And I was (inaudible) it's been this

12   long.  I feel, and I beg for, another chance just

13   to, to live this remaining years that I probably

14   have with my family.  And I wish then that, that

15   I probably have no right to, to ask for this.

16   And, and I know that this time that I've done

17   here is not going to be compared to, to finally

18   when I reach the judgment when I (inaudible).  So

19   that's --

20         PRESIDING COMMISSIONER DAVIS:  All right.

21   Thank you very much, sir.

22         DEPUTY COMMISSIONER SMITH:  Thank you.

23         PRESIDING COMMISSIONER DAVIS: We'll now

24   recess for deliberation.

25                        R E C E S S

26                        --oOo--

27

70

```
 1              CALIFORNIA BOARD OF PAROLE HEARINGS
 2                    D E C I S I O N
 3           DEPUTY COMMISSIONER SMITH:  For the
 4    record, everyone previously identified is back in
 5    the hearing room.
 6           PRESIDING COMMISSIONER DAVIS: This is the
 7    matter of Peter Hernandez, CDC number C-03015.
 8    In a review of all information received from the
 9    public and relied on the following circumstances
10    in concluding the prisoner is not suitable for
11    parole, he would pose a reasonable risk of danger
12    to society or a threat (inaudible) he was in
13    prison we come to this conclusion by the
14    commitment offense that was committed in a
15    special callous manner.  There were multiple
16    victims attacked (inaudible) one was killed in
17    the same incident.  The motive for the crime was
18    very (inaudible) in relation to the offense.
19    These conclusions were drawn from the Statement
20    of Fact wherein the prisoner as to what he
21    describes as an attempt to recover stolen
22    property where he was threatened by what he
23    describes as an armed person.  He sought out a
24    weapon, put himself back into a dangerous
25    situation, confronted the person who may or may
26    not have been involved in the theft of his
27    P. HERNANDEZ   C-03015   DECISION PAGE 1   7/13/06
```

71

1    sister's property and without seeing a weapon or

2    any (inaudible) and threat he used this, he used

3    his own weapon to shoot and kill the victim then

4    turned the weapon on to the victims' two

5    companions shooting at them, striking them in the

6    leg.  We find there is basically a pattern of

7    criminal conduct and a failure to prophet from

8    the society previous attempt to correct

9    criminality specifically adult probation.  In

10   regard to institutional behavior we find that

11   there are seven 128A counseling chronos, the last

12   of which was in December of 2000, and four

13   serious 115 disciplinary (inaudible), the last of

14   which was in February of 1998.  The Psychological

15   Report of July of 2004 by Dr. (inaudible) is

16   supportive and the, with regard to parole plans,

17   we find that the parole plans are not realistic.

18   There is, there, there is virtually no employment

19   plan, there's no support of even employment

20   information by statements that there are some

21   distance, there's no real plan though.  And your

22   residential plans of sharing a two-bedroom

23   residence with two adults and three the children

24   seems suspect.  Now I say that understanding that

25   if that's the option then what you need to do is

26   come back in here with an

27   P. HERNANDEZ  C-03015  DECISION PAGE 2  7/13/06

72

1    explanation that, yes, we understand it's going
2    to be tight, we thought about this.  We'll put a
3    cot up in the living, we're going to partition
4    off, what, whatever it is.  If that's the case
5    then, then let us know that.  And that's where
6    you need to, that's where you need to focus your
7    work.  I understand and appreciate that at some
8    point in time you became embarrassed or, or you
9    didn't want to burden your family more with, with
10   denial after denial.  I understand.  But the
11   thing of it is this is a critical part of this
12   and there's -- you could earn a date, but this
13   has to be part of your earning that date.  So you
14   need to spend this, this time now in figuring out
15   your parole plan.  Get a job offer.  You have
16   skills, there's no reason why you can't get a job
17   offer out there, or at least something lined up.
18   Do some research to determine where you can find
19   a job given the skills that you have.  And let
20   your family help you.
21           INMATE HERNANDEZ:  Okay, sir.
22           PRESIDING COMMISSIONER DAVIS:  It's not
23   that difficult for them to do that.  The, with
24   regard to the 3032 notices.  The District
25   Attorney from Los Angeles County is here in
26   person by representative because (inaudible)
27   P. HERNANDEZ   C-03015   DECISION PAGE 3   7/13/06

73

```
1    parole.  Nonetheless we want to commend you for
2    several things.  Your 2005 Certificate for your
3    Entrepreneur of the workshop, your ten FEMA
4    Certificates including lessons in Leadership and
5    Planning, your Veterans Support Group of eight,
6    from eight of 2004 and two of 2005, your two
7    Health Certificates, Certificates of Achievement,
8    your work as a culinary clerk and as a receiving
9    clerk and then back again as a culinary clerk,
10   your work in the BRAG Group helping the new
11   inmates requiring an application process and
12   recommendation.  You should be very proud of
13   that.
14        INMATE HERNANDEZ:  Thank you.
15        PRESIDING COMMISSIONER DAVIS:  That's a
16   significant achievement to have to apply for
17   something, to have to work on, you had to work to
18   get that, that wasn't just something you could
19   say yeah, I'll do that.  You had to (inaudible)
20   on a record.  Put that same effort into your
21   parole plans.  And we appreciate the fact that
22   you're on the AA waiting list and that you're on
23   the waiting list for Alternatives to Violence, as
24   well as starting a new business course as of
25   November of '05.
26        INMATE HERNANDEZ:  Yes, sir
27   P. HERNANDEZ  C-03015  DECISION PAGE 4  7/13/06
```

77

1    I'm going to live out there (inaudible).

2        DEPUTY COMMISSIONER SMITH:  You, you have

3    about a year to, to do that.

4        INMATE HERNANDEZ:  Yes, sir.

5        DEPUTY COMMISSIONER SMITH:  You know,

6    bring in the, the VA --

7        INMATE HERNANDEZ:  Yes, sir.

8        DEPUTY COMMISSIONER SMITH:  -- letters,

9    that information so we can present that and have

10   those documents.  You can't bring in too much

11   documentation.  You can only bring in too little.

12   Okay?

13        PRESIDING COMMISSIONER DAVIS:  Take a

14   lesson from your Entrepreneurial class thinking

15   you're developing a business plan.

16        INMATE HERNANDEZ:  Yes, sir.  That's what

17   I'll (inaudible).

18        PRESIDING COMMISSIONER DAVIS:  There you

19   go.

20        INMATE HERNANDEZ:  Thank you very much

21    for --

22        DEPUTY COMMISSIONER SMITH:  We wish you,

23   we wish you good luck sir.

24        PRESIDING COMMISSIONER DAVIS:  All right.

25   (inaudible).  Ms. Rutledge, thank you.

26        ATTORNEY RUTLEDGE:  (inaudible)

27   P. HERNANDEZ  C-03015  DECISION PAGE 8  7/13/06

78

1          PRESIDING COMMISSIONER DAVIS:  Mr.

2    Turley, thank you.

3          ATTORNEY RUTLEDGE:  Oh, it's my pleasure.

4                   ADJOURNMENT

5                   --oOo--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    PAROLE DENIED ONE YEAR

24    THIS DECISION WILL BE FINAL ON:_____

25    YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26    DATE, THE DECISION IS MODIFIED

27    P. HERNANDEZ C-03015 DECISION PAGE 9 7/13/06

79

CERTIFICATE AND

DECLARATION OF TRANSCRIBER

I, PATTY L. DURAN, a duly designated transcriber, NORTHERN CALIFORNIA COURT REPORTS, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 78, and which recording was duly recorded at the CORRECTIONAL TRAINING FACILITY, in SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of PETER HERNANDEZ, CDC No. C-03015, on JULY 13, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated OCTOBER 2, 2006 at Sacramento County, California.

*Patty L. Duran*

_____

Patty L. Duran, Transcriber

NORTHERN CALIFORNIA COURT RPTRS

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:   **In re Hernandez**

No.:   **B202757**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age or older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On **December 14, 2007,** I served the attached **INFORMAL RESPONSE** by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal mail collection system at the Office of the Attorney General at 300 South Spring Street, Suite 1702, Los Angeles, CA 90013, addressed as follows:

Peter Hernandez
CDC # C-03015
Correctional Training Facility
P.O. Box 689
Soledad, CA 93960-0686

The Honorable Peter Paul Espinoza
Los Angeles County Superior Court
Clara Shortridge Foltz Criminal Justice Center
210 West Temple Street, Department 123
Los Angeles, CA 90012-3210

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on **December 14, 2007,** at Los Angeles, California.

| CL Castillo | CL Castillo (signature) |
| --- | --- |
| Declarant | Signature |

50206253.wpd

# EXHIBIT E

1   Peter Hernandez
    CDC # C-03015
2   P.O. Box 689/F-237-L
    Soledad, CA 93960

3

4   In pro per

5

6

7

8                   SECOND DISTRICT COURT OF APPEALS

9                            DIVISION ONE

10

11

12  In re:                      Case no. B202757

13      PETER HERNANDEZ          PETITIONER'S TRAVERSE TO
                                 RESPONDENT'S INFORMAL RETURN
14                               TO PETITION FOR WRIT OF HABEAS
         on habeas corpus. /     CORPUS; POINTS AND AUTHORITIES
15

16

17      Peter Hernandez (Petitioner), hereby submits this Traverse

18  to Respondent's Informal Return filed on Dec. 14, 2007, as

19  ordered by the O.S.C. filed in this Court on Nov. 2, 2007.

20  Petitioner incorporates by reference, as though fully set forth,

21  each and every point and authority alleged in his Petition.

22      Petitioner generally denies the allegations alleged and

23  inferred therein by the informal return and specifically denies

24  and admits those certain allegations and inferrences as follows:

25      Petitioner submits at the outset that Respondent(s) have

26  not addressed a single point raised in his Petition that his

27  continued confinement violates his FEDERAL Constitutional rights

28

Date Filed:
SAN DIEGO DOCKETING
JAN 25 2008
No. _____
BY MARIE RAYOS

and reasserts that he is in fact unlawfully incarcerated by Respondents in violation of the U.S. Constitution;

Respondent's allegations that, "[Petitioner asserted] the decision is not supported by any evidence.", is incorrect in that the actual allegation is that no SUBSTANTIAL evidence having indicia of reliability was proffered to deny parole where an illegal "no parole" policy and/or practice exists that is therefore unconstitutional by both state and federal laws and has been found to be so in several recent decisions;

Further, "[he] does not dispute the factual basis upon which the Board denied parole.", is in error because the denial of suitability was makeweight boilerplate found in 99.99 % of all Decisions without an individual consideration as required by statute and numerous courts have held this to be unreasonable in light of current case law (see Exhibit A, attached);

Petitioner denies that the allegations and assertions by the Board to deny suitability have any basis in fact to sustain "an unreasonable risk" finding (Respondent's Return Exhibit 1 at p. 70, (hereafter: [Ex.1]) and is not supported by ANY reliable evidence and that in point of fact Respondent's own expert testified their was NO significant risk factors associated with Petitioner's release to parole [Ex.1], p. 45;

Petitioner denies that the poffered Rosenkrantz decision supports Respondent's position when not only have there been several intervening Rosenkrantz decisions but that those superseding decisions fully supported his release and that, in point of fact, Mr. Rosenkrantz was released some time ago

-2-

1  and has continued to be an asset to his community;

2      Petitioner denies Respondent's allegations that past

3  events, the majority having transpired over THIRTY YEARS ago

4  are germane to his CURRENT DANGEROUSNESS and Honorable Judge

5  Hall-Patel noted this paradox in that,

6      "Because Petitioner cannot change the past, denying [him] parole based
       only on the facts surrounding the crime itself effectively changes
7      his sentence from 20-years-to-Life into life imprisonment without
       possibility of parole." Id. p. 1046.

8

9  and, as Respondents concede, "The last such violation occurred

10 in December 1998 for mutual combat.", hardly "criminal

11 behavior.", as Respondent would have this Court believe;

12      Petitioner is similarly caught in this spinning web and

13 Honorable Judge Karlton stated as much in Irons v. Carey (E.D.

14 Cal. 2005) 358 F.Supp.2d 936, 947, when he observed that this

15 vicious circle should be stopped when he remonstrated that,

16     "[C]ontinuous reliance on unchanging circumstances transforms an offense
       for which California law provides eligibility for parole into a de
17     facto life imprisonment without the possibility of parole.... Given
       that no one seriously contends lack of seriousness or lack of triviality
18     at the present time, the potential for parole in this case is remote
       to the point of non-existence. Petitioner's liberty interest should
19     not be determined by such an arbitrary, remote possibility."

20      Petitioner is unable to fully translate what is meant

21 by, "The some evidentiary support for the Board's findings",

22 as stated on Page 2 at paragraph two, but presumes that whatever

23 is alleged will make sense to someone however, Petitioner denies

24 whatever allegations are attempted and submits that this, too,

25 could be a further example of makeweight obfuscation;

26      Petitioner denies that "The Board [properly] considered

27 the positive elements of [his] record ....", and that Division

28                          -3-

1  Six of this Appellate District cuts to the nexus:

2  "Because the overarching consideration is public safety, the test in
   reviewing the Board's decision denying parole "is not whether some
3  evidence supports the reasons [the Board] cites for denying parole,
   but whether some evidence indicates a parolee's release unreasonably
4  endangers public safety."" In re Montgomery (2ndCiv. 2007), DJDAR 16717,
   citing In re Barker (1st Civ. 2007) 151 C.A.4th 346, 366.

5

6      Petitioner denies that the Board relied on any  evidence

7  having  indicia  of  reliability  to  reach  the  "overarching

8  consideration" and that all of the reasons stated by the panel

9  and alleged by respondents have been found to be part and parcel

10 of a "no parole" policy and/or practice as evidenced by

11 Petitioner's attached Exhibit A and that while it is true that

12 appeal has been taken, it is by the same grasping, nefarious

13 means cited by Honorable Judge Condlon, herself once a member

14 in good standing of the prosecutor's views, and dupliciousness

15 on the part of Respondents is visible and contemptible in the

16 extreme where, as here, Petitioner has previously TWICE been

17 found suitable and has achieved an exemplary record in the

18 vicious confines of an unconstitutional system.

19     Unless specifically admitted Petitioner denies each and

20 every one of the allegations as set down in the Informal Return

21 and submits that where, as here, long after the mandatory

22 minimum has been served (see  Irons v. Carey (9th Cir. 2007)

23 479 F.3d 658, 665), there is ample cause and prejudice arising

24 from a denial will be unjust.

25     Petitioner respectfully submits that Respondent's Informal

26 Return is unavailing and the writ should be granted in full.

27 ///

28                            -4-

1  WHEREFORE, Petitioner respectfully prays that this Honorable

2  Court will grant the writ, Order his immediate release from

3  custody and any and further relief as the Court may deem just

4  and proper in furtherance of that end.

5

6      Submitted this 28th day of December 2007.

7

8                                    _____

                                     Peter Hernandez, in pro per

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                          -5-

# EXHIBIT   "A"

"A"     EXHIBIT 1

1

2

3            SUPERIOR COURT OF CALIFORNIA

4              COUNTY OF SANTA CLARA



(ENDORSED)
F I L E D
AUG 3 0 2007
KIRI TORRE
Chief Executive Officer/Clerk
Superior Court of CA County of Santa Clara
BY BRET MORROW, DEPUTY

5

6

7    In re                                    No.: 71194

8        DONNELL JAMEISON,

9    On Habeas Corpus                         ORDER

10

11

12                    **INTRODUCTION**

13        Petitioner alleges that he has been denied due process of law

14   because the Board has used standards and criteria which are

15   unconstitutionally vague in order to find him unsuitable for parole.

16   Alternatively, he argues that those standards, even if

17   constitutionally sound, are nonetheless being applied in an arbitrary

18   and meaningless fashion by the Board.  He relies upon evidence that

19   in one hundred percent of 2690 randomly chosen cases, the Board found

20   the commitment offense to be "especially heinous, atrocious or

21   cruel", a factor tending to show unsuitability under Title 15

22   §2402(c)(1).

23        **Are the Board Criteria Unconstitutionally Vague?**

24        Our courts have long recognized that both state and federal due

25   process requirements dictate that the Board must apply detailed

26   standards when evaluating whether an individual inmate is unsuitable

27   for parole on public safety grounds.  (See *In re Dannenberg* (2005) 34

1    Cal.4th 1061 at p. 1096, footnote 16.)   Those standards are found in

2    15 CCR §2402(c) (*Dannenberg, supra,* 34 Cal.4th at p. 1080,) and do

3    include detailed criteria to be applied by the Board when considering

4    the commitment offense:

5         (c) Circumstances Tending to Show Unsuitability. The following
          circumstances each tend to indicate unsuitability for release.
6         These circumstances are set forth as general guidelines; the
          importance attached to any circumstance or combination of
7         circumstances in a particular case is left to the judgment of
          the panel. Circumstances tending to indicate unsuitability
8         include:

9         (1) Commitment Offense. The prisoner committed the offense in an
          especially heinous, atrocious or cruel manner. The factors to be
10        considered include:

11            (A) Multiple victims were attacked, injured or killed in
              the same or separate incidents.
12

13            (B) The offense was carried out in a dispassionate and
              calculated manner, such as an execution-style murder.

14            (C) The victim was abused, defiled or mutilated during or
              after the offense.
15

16            (D) The offense was carried out in a manner which
              demonstrates an exceptionally callous disregard for human
17            suffering.

18            (E) The motive for the crime is inexplicable or very
              trivial in relation to the offense.

19

20        In response to Petitioners claim that the regulations are

21   impermissibly vague, Respondent argues that while "especially

22   heinous, atrocious or cruel" might be vague in the abstract it is

23   limited by factors (A)-(E) of §2402(c)(1), and thus provides a

24   'principled basis' for distinguishing between those cases which are

25   contemplated in that section and those which are not. An examination

26   of cases involving vagueness challenges to death penalty statutes is

27   instructive here and shows that Respondent's position has merit:

28        "Our precedents make clear that a State's capital sentencing

1  scheme also must genuinely narrow the class of persons eligible
2  for the death penalty. When the purpose of a statutory
   aggravating circumstance is to enable the sentencer to
3  distinguish those who deserve capital punishment from those who
   do not, the circumstance must provide a principled basis for
4  doing so. If the sentencer fairly could conclude that an
   aggravating circumstance applies to every defendant eligible for
5  the death penalty, the circumstance is constitutionally infirm."
   (*Arave v. Creech* (1993) 507 U.S. 463, 474, citing *Maynard v.*
6  *Cartwright* (1988) 486 U.S. 356, 364: "invalidating aggravating
   circumstance that 'an ordinary person could honestly believe'
7  described every murder" and; *Godfrey v. Georgia* (1980) 446 U.S.
   420, 428-429: "A person of ordinary sensibility could fairly
8  characterize almost every murder as 'outrageously or wantonly
   vile, horrible and inhuman.'")
9

10     It cannot fairly be said that 'every murder' could be

11  categorized as "especially heinous, atrocious or cruel" under the

12  Board regulations, since the defining factors contained in

13  subdivisions (A)-(E) clearly narrow the group of cases to which it

14  applies.  Although Petitioner also argues that the "vague statutory

15  language is not rendered more precise by defining it in terms or

16  synonyms of equal or greater uncertainty" (*People v. Superior Court*

17  *(Engert)* (1982) 31 Cal.3d 797, 803, *Pryor v. Municipal Court* (1979)

18  25 Cal.3d 238, 249. See also *Walton v. Arizona* (1990) 497 U.S. 639,

19  654), the factors in those subdivisions are not themselves vague or

20  uncertain.  The mere fact that there may be some subjective component

21  (such as "exceptionally callous" disregard for human suffering) does

22  not render that factor unconstitutionally vague.  The proper degree

23  of definition of such factors is not susceptible of mathematical

24  precision, but will be constitutionally sufficient if it gives

25  meaningful guidance to the Board.

26     A law is void for vagueness if it "fails to provide adequate
   notice to those who must observe its strictures and
27  impermissibly delegates basic policy matters to policemen,
   judges, and juries for resolution on an ad hoc and subjective
28  basis, with the attendant dangers of arbitrary and

3

discriminatory application."  (People v. Rubalcava (2000) 23
Cal.4th 322, 332, quoting People ex rel. Gallo v. Acuna (1997)
14 Cal. 4th 1090, 1116, quoting Grayned v. City of Rockford
(1972) 408 U.S. 104, 108-109.)

A review of cases expressing approval of definitions to limit the
application of otherwise vague terms in death penalty statutes leads
inextricably to the conclusion that the limiting factors in §2402(c)
easily pass constitutional muster.  An Arizona statute was upheld
that provided a crime is committed in an 'especially cruel manner'
when the perpetrator inflicts mental anguish or physical abuse before
the victim's death," and that "mental anguish includes a victim's
uncertainty as to his ultimate fate."  (Walton v. Arizona (1990) 497
U.S. 639, 654.)  Similarly, the court in Maynard v. Cartwright, 486
U.S. at 364-365, approved a definition that would limit Oklahoma's
"especially heinous, atrocious, or cruel" aggravating circumstance to
murders involving "some kind of torture or physical abuse.  In
Florida, the statute authorizing the death penalty if the crime is
"especially heinous, atrocious, or cruel," satisfied due process
concerns where it was further defined as "the conscienceless or
pitiless crime which is unnecessarily torturous to the victim."
State v. Dixon (1973) 283 So. 2d 1 at p. 9.

Here, the factors in subdivisions (A)-(E) provide equally clear
limiting construction to the term "especially heinous, atrocious, or
cruel" in §2402(c).

## Has the Board Engaged in a Pattern of Arbitrary Application of the Criteria?

As previously noted, 15 CCR §2402 provides detailed criteria for
determining whether a crime is "exceptionally heinous, atrocious or
cruel" such that it tends to indicate unsuitability for parole.  Our

1   courts have held that to fit within those criteria and thus serve as
2   a basis for a finding of unsuitability, the circumstances of the
3   crime must be more aggravated or violent than the minimum necessary
4   to sustain a conviction for that offense.    (In re Rosenkrantz (2002)
5   29 Cal.4th 616, 682-683.)    Where that is the case, the nature of the
6   prisoner's offense, alone, can constitute a sufficient basis for
7   denying parole.    (In re Dannenberg, supra, 34 Cal.4th at p. 1095.)
8       Petitioner claims that those criteria, even if constitutionally
9   sound, have been applied by the Board in an arbitrary and capricious
10  manner rendering them devoid of any meaning whatever.    The role of
11  the reviewing court under these circumstances has been addressed
12  previously in the specific context of Parole Board actions:
13      "[Courts have] an obligation, however, to look beyond the facial
14      validity of a statute that is subject to possible
        unconstitutional administration since a law though fair on its
15      face and impartial in appearance may be open to serious abuses
        in administration and courts may be imposed upon if the
16      substantial rights of the persons charged are not adequately
        safeguarded at every stage of the proceedings.    We have
17      recognized that this court's obligation to oversee the execution
        of the penal laws of California extends not only to judicial
18      proceedings, but also to the administration of the Indeterminate
        Sentence Law."    (In re Rodriguez (1975) 14 Cal.3d 639, 648,
19      quoting Minnesota v. Probate Court (1940) 309 U.S. 270, 277.)

20      Similarly, in In re Minnis (1972) 7 Cal.3d 639, 645, the case
21  closest on point to the present situation, the California Supreme
22  Court stated: "This court has traditionally accepted its
23  responsibility to prevent an authority vested with discretion from
24  implementing a policy which would defeat the legislative motive for
25  enacting a system of laws."    Where, as here, the question is whether
26  determinations are being made in a manner that is arbitrary and
27  capricious, judicial oversight "must be extensive enough to protect
28

5

1 limited right of parole applicants 'to be free from an arbitrary
2 parole decision... and to something more than mere pro-forma
3 consideration.'" (In re Ramirez (2001) 94 Cal.App.4th 549 at p. 564,
4 quoting In re Sturm (1974) 11 Cal.3d 258 at p. 268.)

5    This Court, therefore, now examines Petitioner's "as applied"
6 void for vagueness challenge.

7

8    #### The Evidence Presented

9    A similar claim to those raised here, involving allegations of
10 abuse of discretion by the Board in making parole decisions, was
11 presented to the Court of Appeal in In re Ramirez, supra.' The court
12 there observed that such a "serious claim of abuse of discretion"
13 must be "adequately supported with evidence" which should be
14 "comprehensive." (Ramirez, supra, 94 Cal.App.4th at p. 564, fn. 5.)
15 The claim was rejected in that case because there was not "a
16 sufficient record to evaluate." (Ibid.) In these cases, however,
17 there is comprehensive evidence offered in support of Petitioner's
18 claims.

19    Discovery orders were issued in five different cases involving
20 life term inmates (Petitioners) who all presented identical claims.[1]
21

22 [1] This Court takes judicial notice of the several other cases currently
3 pending (Lewis #68038, Criscione #71614, Bragg #108543, Ngo #127611.) which
raise this same issue and in which proof was presented on this same point.
(Evidence Code § 452(d). See specifically, in the habeas corpus context,
4 In re Vargus (2000) 83 Cal.App.4th 1125, 1134-1136, 1143, in which judicial
notice was taken of the evidence in four other cases and in which the court
5 noted: "Facts from other cases may assist petitioner in establishing a
pattern." See generally McKell v. Washington Mutual, Inc. (2006) 142
Cal.App.4th 1457, 1491: "trial and appellate courts ... may properly take
5 judicial notice of ... established facts from both the same case and other
cases." And see AB Group v. Wertin (1997) 59 Cal.App.4th 1022, 1036:
Judicial notice taken of other cases when matters are "just as relevant to
the present [case] as they are to the others.")

1   The purpose of the discovery was to bring before the Court a
2   comprehensive compilation and examination of Board decisions in a
3   statistically significant number of cases.   The Board decisions under
4   examination consisted of final decisions of the Board for life-term
5   inmates convicted of first or second degree murder and presently
6   eligible for parole.  Included were all such decisions issued in
7   certain months, chosen by virtue of their proximity in time to the
8   parole denials challenged in the pending petitions.   All Board
9   decisions in the months of August, September and October of 2002,
10  July, August, September, October, November, and December of 2003,
11  January and February of 2004, February of 2005, and January of 2006
12  were compiled.   This resulted in a review of 2690 cases decided in a
13  total of 13 months.

14      The purpose of the review was to determine how many inmates had
15  actually been denied parole based in whole or in part on the Board's
16  finding that their commitment offense fits the criteria set forth in
17  Title 15 §2402(c)(1) as "especially heinous, atrocious or cruel." A
18  member of the research team conducting the review, Karen Rega,
19  testified that in its decisions the Board does not actually cite CCR
20  rule §2402(c), but consistently uses the specific words or phrases
21  ("verbiage from code") contained therein, so that it could easily be
22  determined when that criteria was being applied.   (For example,
23  finding "multiple victims" invokes §2402(c)(1)(A); finding the crime
24  "dispassionate" "calculated" or "execution style" invokes
25  §2402(c)(1)(B); that a victim was "abused" "mutilated" or "defiled"
26  invokes §2402(c)(1)(C);  a crime that is "exceptionally callous" or
27  demonstrated a "disregard for human suffering" fits criteria
28

7

1  §2402(c)(1)(D); and finding the motive for the crime "inexplicable"
2  or "trivial" invokes §2402(c)(1)(E).)

3      Petitioners provided charts, summaries, declarations, and the
4  raw data establishing the above in the cases of Lewis #68038,
5  Jameison #71194, Bragg #108543, and Ngo #127611.  In another case,
6  (Criscione #71614) the evidence was presented somewhat differently.
7  Both to spread the burden of the exhaustive examination, and to
8  provide a check on Petitioners' methods, this Court ordered
9  Respondent to undertake an examination of two randomly chosen months
10 in the same manner as Petitioner had been doing.  Respondent complied
11 and provided periodic updates in which they continued to report that
12 at all "the relevant hearings the Board relied on the commitment
13 offense as a basis for denying parole."  (See "Respondent's Final
14 Discovery Update" filed April 5, 2007.)  At the evidentiary hearing
15 on this matter counsel for Respondents stipulated that "in all of
16 those cases examined [by Respondent pursuant to the Criscione
17 discovery orders] the Board relied on the commitment offense as a
18 basis for denying parole."  (See pages 34-35 of the June 1, 2007,
19 evidentiary hearing transcript.)

20     The result of the initial examination was that in over 90
21 percent of cases the Board had found the commitment offense to be
22 "especially heinous, atrocious or cruel" as set forth in Title 15
23 §2402(c)(1).  In the remaining 10% of cases either parole had been
24 granted, or it was unclear whether §2402(c)(1) was a reason for the
25 parole denial.  For all such cases, the decisions in the prior
26 hearing for the inmate were obtained and examined.  In every case,
27 the Board had determined at some point in time that every inmates
28

8

1  crime was "especially heinous, atrocious or cruel" under Title 15

2  §2402(c)(1).

3      Thus, it was shown that 100% of commitment offenses reviewed by

4  the Board during the 13 months under examination were found to be

5  "especially heinous, atrocious or cruel" under Title 15 §2402(c)(1).

6      A further statistic of significance in this case is that there

7  are only 9,750 inmates total who are eligible for, and who are

8  currently receiving, parole consideration hearings as life term

9  inmates.  (See "Respondent's Evidentiary Hearing Brief," at p. 4,

10  filed April 16, 2007.)

11

12                      **USE OF STATISTICS**

13      In *International Brotherhood of Teamsters v. United States*

14  (1977) 431 U.S. 324, 338-340, the United States Supreme Court

15  reaffirmed that statistical evidence, of sufficient "proportions,"

16  can be sound and compelling proof.  As noted by the court in *Everett*

17  *v. Superior Court* (2002) 104 Cal.App.4th 388, 393, and the cases cited

18  therein, "courts regularly have employed statistics to support an

19  inference of intentional discrimination."

20      More recently, the United States Supreme Court, in *Miller-El v.*

21  *Cockrell* (2003) 537 U.S. 322, 154 L.Ed.2d 931, when examining a habeas

22  petitioner's allegations that the prosecutor was illegally using his

23  peremptory challenges to exclude African-Americans from the

24  petitioner's jury, noted that "the statistical evidence alone" was

25  compelling.  The high court analyzed the numbers and concluded:

26  "Happenstance is unlikely to produce this disparity."  (See also

27  *People v. Hofsheier* (2004) 117 Cal.App.4th 438 in which "statistical

28

1  evidence" was noted as possibly being dispositive.  And see *People v.*
2  *Flores* (2006) 144 Cal.App.4th 625 in which a statistical survey and
3  analysis, combined into an "actuarial instrument" was substantial
4  proof.)

5      A statistical compilation and examination such as has been
6  presented in these cases is entirely appropriate and sufficient
7  evidence from which to draw sound conclusions about the Board's
8  overall methods and practices.

9

10                          **THE EXPERT'S TESTIMONY**

11      Petitioners provided expert testimony from Professor Mohammad
12  Kafai regarding the statistics and the conclusions that necessarily
13  follow from them.  Professor Kafai is the director of the statistics
14  program at San Francisco State University, he personally teaches
15  statistics and probabilities, and it was undisputed that he was
16  qualified to give the expert testimony that he did.  No evidence was
17  presented that conflicts or contradicts the testimony and conclusions
18  of Professor Kafai.  By stipulation of the parties, Professor Kafai's
19  testimony was to be admissible and considered in the cases of all
20  five petitioners.  (See page 35 of the June 1, 2007, evidentiary
21  hearing transcript.)

22      Professor Kafai testified that the samples in each case, which
23  consisted of two or three months of Board decisions, are
24  statistically sufficient to draw conclusions about the entire
25  population of life term inmates currently facing parole eligibility
26  hearings.  Given that every inmate within the statistically
27  significant samples had his or her crime labeled "particularly

1  egregious'" or "especially heinous, atrocious or cruel" under Title
2  15 §2402(c)(1), it can be mathematically concluded that the same
3  finding has been made for every inmate in the entire population of
4  9,750.  Although he testified that statisticians never like to state
5  unequivocally that something is proven to a 100% certainty, (because
6  unforeseen anomalies are always theoretically possible,) he did
7  indicate the evidence he had thus far examined came as close to that
8  conclusion as could be allowed.  Not surprisingly, Professor Kafai
9  also testified that "more than 50% can't by definition constitute an
10 exception."

11      Having found the data provided to the expert to be sound this
12 Court also finds the expert's conclusions to be sound.  In each of
13 the five cases before the Court over 400 inmates were randomly chosen
14 for examination.  That number was statistically significant and was
15 enough for the expert to draw conclusions about the entire population
16 of 9,750 parole eligible inmates.  The fact that the approximately
17 2000 inmates examined in the other cases also had their parole denied
18 based entirely or in part on the crime itself (§2402(c)(1)), both
19 corroborates and validates the expert's conclusion in each individual
20 case and also provides an overwhelming and irrefutable sample size
21 from which even a non expert can confidently draw conclusions.

22

23                          DISCUSSION

24      Although the evidence establishes that the Board frequently says
25 parole is denied "first," "foremost," "primarily," or "mainly,"
26 because of the commitment offense, this statement of primacy or
27 weight is not relevant to the question now before the Court.
28

                              11

1 Petitioners acknowledge that the Board generally also cites other

2 reasons for its decision. The question before this Court, however,

3 is not whether the commitment offense is the primary or sole reason

4 why parole is denied -- the question is whether the commitment

5 offense is labeled "'particularly egregious'" and thus <u>could</u> be used,

6 under *Dannenberg,* primarily or exclusively to deny parole.

7 The evidence proves that in a relevant and statistically

8 significant period where the Board has considered life term offenses

9 in the context of a parole suitability determination, every such

10 offense has been found to be "particularly egregious" or "especially

11 heinous, atrocious or cruel."[2] This evidence conclusively

12 demonstrates that the Board completely disregards the detailed

13 standards and criteria of §2402(c). "Especially" means particularly,

14 or "to a distinctly greater extent or degree than is common."[3] (EC §

15 451(e).) By simple definition the term "especially" as contained in

16 section 2402(C)(1) cannot possibly apply in 100% of cases, yet that

17 is precisely how it has been applied by the Board. As pointed out by

18 the Second District Court of Appeal, not every murder can be found to

19 be "atrocious, heinous, or callous" or the equivalent without "doing

20 _____

21 [2] In a single case out of the 2690 that were examined Petitioner has conceded that the Board did not invoke §2402(c)(1). This Court finds that concession to be improvidently made and the result of over caution. When announcing the decision at

22 the initial hearing of S. Fletcher (H-10330) on 4/6/06, the commissioner did begin by stating "I don't believe this offense is particularly aggravated..." However the commissioner proceeds to describe the crime as a drug deal to which Fletcher

23 brought a gun so "we could say there was some measure of calculation in that." The commissioner continued by observing that the reason someone would bring a gun to a

24 drug transaction was to make sure things went according to their plan "so I guess we can say that that represents calculation and perhaps it's aggravated to that

25 extent." As is the Board's standard practice, by using the word 'calculated' from §2402(c)(1)(b) the Board was invoking that regulation. Certainly if Mr. Fletcher had brought a habeas petition Respondent's position would be that there is 'some

26 evidence' supporting this. The ambiguity created by the commissioner's initial statement was cleared up several pages later when he announces that "based upon the

27 crime, coupled with ..." parole was denied for four years. (See, *In re Burns* (2006) 136 Cal.App.4th 1318, 1326; holding §2402(c)(1) criteria are necessary for a multi-year denial.)

28

1  violence" to the requirements of due process.  (*In re Lawrence* (2007)
2  150 Cal.App.4th 1511, 1557.)  This is precisely what has occurred
3  here, where the evidence shows that the determinations of the Board
4  in this regard are made not on the basis of detailed guidelines and
5  individualized consideration, but rather through the use of all
6  encompassing catch phrases gleaned from the regulations.
7
8                          THE BOARD'S METHODS
9       Because it makes no effort to distinguish the applicability of
10  the criteria between one case and another, the Board is able to force
11  every case of murder into one or more of the categories contained in
12  §2402(c).
13       For example, if the inmate's actions result in an instant death
14  the Board finds that it was done in a "dispassionate and calculated
15  manner, such as an execution-style murder."  At the same time the
16  Board finds that a murder not resulting in near instant death shows a
17  "callous disregard for human suffering" without any further analysis
18  or articulation of facts which justify that conclusion.  If a knife
19  or blunt object was used, the victim was "abused, defiled, or
20  mutilated."  If a gun was used the murder was performed in a
21  "dispassionate and calculated manner, such as an execution-style
22  murder."  If bare hands were used to extinguish another human life
23  then the crime is "particularly heinous and atrocious."
24       Similarly, if several acts, spanning some amount of time, were
25  necessary for the murder the Board may deny parole because the inmate
26  had "opportunities to stop" but did not.  However if the murder was
27
28  [3] Princeton University World Net Dictionary (2006).

13

1  accomplished quickly parole will be denied because it was done in a
2  dispassionate and calculated manner and the victim never had a chance
3  to defend themselves or flee.  If the crime occurred in public, or
4  with other people in the vicinity, it has been said that the inmate
5  "showed a callous disregard" or "lack of respect" for the
6  "community."  However if the crime occurs when the victim is found
7  alone it could be said that the inmate's actions were aggravated
8  because the victim was isolated and more vulnerable.

9       In this manner, under the Board's cursory approach, every murder
10  has been found to fit within the unsuitability criteria.  What this
11  reduces to is nothing less than a denial of parole for the very
12  reason the inmates are present before the Board – i.e. they committed
13  murder.  It is circular reasoning, or in fact no reasoning at all,
14  for the Board to begin each hearing by stating the inmate is before
15  them for parole consideration, having passed the minimum eligible
16  parole date based on a murder conviction, and for the Board to then
17  conclude that parole will be denied because the inmate committed acts
18  that amount to nothing more than the minimum necessary to convict
19  them of that crime.  As stated quite plainly by the Sixth District:
20  "A conviction for murder does not automatically render one unsuitable
21  for parole."  (Smith, supra, 114 Cal.App.4th at p. 366, citing
22  Rosenkrantz, supra, 29 Cal.4th at p. 683.)

23       In summary, when every single inmate is denied parole because
24  his or her crime qualifies as a §2402(c)(1) exception to the rule
25  that a parole date shall normally be set, then the exception has
26  clearly swallowed the rule and the rule is being illegally
27  interpreted and applied.  When every single life crime that the Board
28

14

1  examines is "particularly egregious" and "especially heinous,

2  atrocious or cruel" it is obvious that the Board is operating without

3  any limits and with unfettered discretion.

4      Other examples of the failure to 'connect up' the facts of the

5  individual case with the criteria and the ultimate findings abound in

6  the decisions of the reviewing courts. Some of the state cases to

7  have reversed Parole Board or Governor abuses of discretion in

8  denying parole include *In re Roderick, In re Cooper, In re Lawrence,*

9  *In re Barker, In re Gray, In re Lee, In re Elkins, In re Weider, In*

10 *re Scott, In re Deluna, In re Ernest Smith, In re Mark Smith,* and *In*

11 *re Capistran.*

12     When "the record provides no reasonable grounds to reject, or

13 even challenge, the findings and conclusions of the psychologist and

14 counselor concerning [the inmate's] dangerousness" the Board may not

15 do so. (*In re Smith* (2003) 114 Cal.App.4th 343, 369.)

16     When an inmate, although only convicted of a second degree

17 murder, has been incarcerated for such time that, with custody

18 credits, he would have reached his MEPD if he had been convicted of a

19 first, the Board must point to evidence that his crime was aggravated

20 or exceptional even for a first degree murder if they are going to

21 use the crime as a basis for denying parole. (*In re Weider* (2006)

22 145 Cal.App.4th 570, 582-583.)[4]

23

24  [4]  This rule, rooted in Justice Moreno's concurrence in *Rosenkrantz, supra,* is
particularly applicable in the case of Arthur Crisione. Petitioner was convicted
of second degree, but acquitted of first degree murder over 25 years ago. (*People*

25 *v. Crisione* (1981) 125 Cal.App.3d 275.) With his custody credits he is beyond the
matrix even had he been convicted of a first. In a currently pending habeas

26 petition in which he challenges his 2007 parole denial the first reason the Board
gave was the crime itself and the presiding commissioner explained: "His actions go

27 well beyond the minimum necessary for a conviction of murder in the second degree."
(Decision page 2 of 4/2/07 transcript.) For the Board to penalize the Petitioner

28 for the fact that he was acquitted of first degree is further proof of their

15

1    A "petitioner's young age at the time of the offense" must be

2 considered.  (*In re Elkins* (2006) 144 Cal.App.4th 475, 500, quoting

3 *Rosenkrantz v. Marshall* (C.D.Cal. 2006) 444 F. Supp. 2d 1063, 1065,

4 1085: "The reliability of the facts of the crime as a predictor for

5 his dangerousness was diminished further by his young age of 18, just

6 barely an adult. 'The susceptibility of juveniles to immature and

7 irresponsible behavior means their irresponsible conduct is not as

8 morally reprehensible as that of an adult.'")[5]

9    The Board's formulaic practice of stating §2402(c)(1) phrased in

10 a conclusory fashion, and then stating "this is derived from the

11 facts" without ever linking the two together, is insufficient.  (*In*

12 *re Roderick*, (2007) ___ Cal.App.4th ___ (A113370): "At minimum, the

13 Board is responsible for articulating the grounds for its findings

14 and for citing to evidence supporting those grounds."  (See also *In*

15 *re Barker* (2007) 151 Cal.App.4th 346, 371, disapproving

16 "conclusorily" announced findings.)

17    After two decades, mundane "crimes have little, if any,

18 predictive value for future criminality.  Simply from the passing of

19 time, [an inmate's] crimes almost 20 years ago have lost much of

20 their usefulness in foreseeing the likelihood of future offenses than

21 if he had committed them five or ten years ago."  (*In re Lee* (2006)

22 143 Cal.App.4th 1400, 1412.)  It should be noted that this rule

23 
willfulness and bias.  The jury had a reasonable doubt that Petitioner committed
24 first degree murder but under the Board's 'reasoning' and 'analysis' this puts him
in a worse position than if they had not.  Had the jury convicted him of the
25 greater offense Petitioner has served so much time that he would already be having
subsequent parole hearings on a first and the Board would not have been able to use
26 the 'some evidence' of first degree behavior against him.  As observed previously,
the Board's position in this regard is "so ridiculous that simply to state it is to
27 refute it."  (*Weider, supra,* 145 Cal.App.4th at p. 583.)
[5] This point is particularly significant in the case of Mike Ngo.  Mr. Ngo was only
28 18 at the time of his crime.  The impetus behind the shooting was youth group or

1  applies with even more force when the Board is relying on any

2  criminality that occurred before the crime.  In that situation, just

3  as with the crime itself, the Board must explain why such old events

4  have any relevance and especially when the inmate has spent a decade

5  as a model prisoner.

6     Murders situationally related to intimate relationships are

7  unfortunately commonplace because emotions are strongest in such

8  domestic settings.  When a murder occurs because of "stress unlikely

9  to be reproduced in the future" this is a factor that affirmatively

10  points towards suitability.  (In re Lawrence (2007) 150 Cal.App.4th

11  1511 and cases cited therein.)

12     "The evidence must substantiate the ultimate conclusion that the

13  prisoner's release currently poses an unreasonable risk of danger to

14  the public.  It violates a prisoner's right to due process when the

15  Board or Governor attaches significance to evidence that forewarns no

16  danger to the public."  (In re Tripp (2007) 150 Cal.App.4th 306,

17  313.)

18     The Board "cannot rely on the fact that the killing could have

19  been avoided to show the killing was especially brutal."  (In re

20  Cooper (2007) 153 Cal.App.4th 1043, 1064.)

21     The Board's focus must be upon how the inmate "actually

22  committed his crimes" not the "incorporeal realm of legal

23  constructs."  (Lee, supra, 143 Cal.App.4th at p. 1413.)  This is

24  especially significant when the murder conviction is based on the

25  felony murder rule, provocative act doctrine, or accomplice liability

26  such that the inmate did not intend to kill or may not have even been

27  _____

28  gang rivalries, posturing, and threats which mature adults would not have been

1    the actual killer.

2        The Board has ample guidance before it in the decisions of the

3    various reviewing courts to constrain its abuse, but has failed to

4    avail itself of the opportunity to do so.

5

6                    ## SEPARATION OF POWERS DOCTRINE

7        The evidence presented, as discussed above, has established a

8    void for vagueness "as applied" due process violation. That same

9    evidence also proves a separate but related Constitutional violation

10   -- an as applied separation of powers violation.

11       The separation of powers doctrine provides "that the legislative

12   power is the power to enact statutes, the executive power is the

13   power to execute or enforce statutes, and the judicial power is the

14   power to interpret statutes and to determine their

15   constitutionality." (*Lockyer v. City and County of San Francisco*

16   (2004) 33 Cal.4th 1055, 1068.) Because the evidence has proven the

17   Board is not executing/enforcing the legislature's statutes as

18   intended it is this Court's duty to intervene. The question here is

19   whether the Board is violating the separation of powers doctrine by

20   appropriating to itself absolute power over parole matters and

21   disregarding the limits and guidelines placed by the statute.[6]

22       "Government Code section 11342.2 provides: 'Whenever by the

23

_____

caught up in.
[6] "It is settled that Administrative regulations that violate acts of the
Legislature are void and no protestations that they are merely an exercise of
administrative discretion can sanctify them. They must conform to the legislative
will if we are to preserve an orderly system of government. Nor is the motivation
of the agency relevant: It is fundamental that an administrative agency may not
usurp the legislative function, no matter how altruistic its motives are."
(*Agricultural Labor Relations Board v. Superior Court of Tulare County* (1976) 16
Cal.3d 392, 419 quoting *Morris v. Williams* (1967) 67 Cal.2d 733, 737, and *City of
San Joaquin v. State Bd. of Equalization* (1970) 9 Cal.App.3d 365, 374.)

1   express or implied terms of any statute a state agency has authority
2   to adopt regulations to implement, interpret, make specific or
3   otherwise carry out the provisions of the statute, no regulation
4   adopted is valid or effective unless consistent and not in conflict
5   with the statute and reasonably necessary to effectuate the purpose
6   of the statute.' Administrative regulations that alter or amend the
7   statute or enlarge or impair its scope are void and courts not only
8   may, but it is their obligation to strike down such regulations."
9   (Pulaski v. Occupational Safety & Health Stds. Bd. (1999) 75
10   Cal.App.4th 1315, 1341, citations omitted.)
11       The vice of overbroad and vague regulations such as are at issue
12   here is that they can be manipulated, or 'interpreted,' by executive
13   agencies as a source of unfettered discretion to apply the law
14   without regard to the intend of the people as expressed by the
15   legislature's enabling statutes.' In short, agencies usurp unlimited
16   authority from vague regulations and become super-legislatures that
17   are unaccountable to the people. As it has sometimes been framed and
18   addressed in the case law, a vague or all encompassing standard runs
19   the risk of "violat[ing] the separation of powers doctrine by
20   "transforming every [executive decisionmaker] into a "mini-
21   legislature" with the power to determine on an ad hoc basis what
22   types of behavior [satisfy their jurisdiction].'" (People v. Ellison
23   (1998) 68 Cal.App.4th 203, 211, quoting People v. Superior Court
24   (Caswell) (1988) 46 Cal.3d 381, 402.)
25       "It is concern about 'encroachment and aggrandizement,' the
26   [United States Supreme Court] reiterated, that has animated its
27   separation of powers jurisprudence. 'Accordingly, we have not
28

1  hesitated to strike down provisions of law that either accrete to a
2  single Branch powers more appropriately diffused among separate
3  Branches or that undermine the authority and independence of one or
4  another coordinate Branch.'" (*Kasler v. Lockyer* (2000) 23 Cal.4th
5  472, 493, quoting *Mistretta v. United States* (1989) 488 U.S. 361,
6  382.)  This articulation of the principle speaks directly to the
7  situation at hand.  The Board, by its enactment and interpretation of
8  Title 15, §2402, has appropriated to itself absolute power over
9  'lifer' matters.  Overreaching beyond the letter and spirit of the
10  Penal Code provisions, Title 15, §2402(c)(1) has been interpreted by
11  the Board to supply the power to declare every crime enough to deny
12  parole forever.  The fact that Title 15, §2402, has been invoked in
13  every case, but then sometime later not invoked, tends to show either
14  completely arbitrary and capricious behavior or that unwritten
15  standards are what really determine outcomes.  In either event, all
16  pretenses of taking guidance from, or being limited by, the
17  legislature's statutes have been abandoned.  "[I]t is an elementary
18  proposition that statutes control administrative interpretations."
19  (*Ohio Casualty Ins. Co. v. Garamendi* (2006) 137 Cal.App.4th 64, 78.)
20  Title 15 §2402 as applied, however, has no controls or limitations.
21     The PC § 3041(b) exception to the rule can only be invoked when
22  the "gravity of the current convicted offense or offenses, or the
23  timing and gravity of current or past convicted offense or offenses,
24  is such that consideration of the public safety requires a more
25  lengthy period of incarceration for this individual."  The word
26  "gravity" is a directive for comparison just as "more lengthy"
27  indicates a deviation from the norm.  While *Dannenberg* held there

1  does not need to be intra-case comparison for the purposes of
2  uniformity or proportionality, there necessarily has to be some sort
3  of comparison for the purposes of adhering to the legislative mandate
4  that parole is available.  The Board employs no meaningful yardstick
5  in measuring parole suitability.  This is a violation of the
6  separation of powers doctrine.  (*People v. Wright* (1982) 30 Cal.3d
7  705, 712-713.  And see *Terhune v. Superior Court* (1998) 65
8  Cal.App.4th 864, 872-873.  Compare *Whitman v. Am. Trucking Ass'ns*
9  (2001) 531 U.S. 457, 472, describing a delegation challenge as
10  existing when the legislature fails to lay down "an intelligible
11  principle to which the person or body authorized to act is directed
12  to conform.")

13

14                        RESPONDENT'S POSITION

15      The Attorney General has suggested, without pointing to any
16  concrete examples, that it is possible that the Board, when invoking
17  the crime as a reason to deny parole, is not placing it within
18  §2402(c)(1) but instead using is as some sort of 'lesser factor'
19  which, only when combined with other unsuitability criteria, can
20  contribute to a valid parole denial.  The two problems with this
21  position are, first, there is no evidentiary support for this
22  assertion, and second, it would have no impact on the constitutional
23  infirmities outlined and proven above.

24      Even if Respondent had produced evidence that the Board was
25  utilizing the crime as a 'lesser factor' which needs others to fully
26  support a parole denial, the Board would then be admitting it was
27  denying parole, in part, for the very reason that the person is

28

1  before the panel and eligible for parole in the first place – the
2  commitment offense.   Respondent's argument suggests that a crime that
3  only qualified as the *Dannenberg* "minimum necessary" could still be
4  invoked as a reason for denying parole.   Respondent argues that when
5  the crime is invoked 'not in the *Dannenberg* sense,' there must be
6  other reasons for the parole denial and the crime alone would not be
7  enough in this context.   This position is inconsistent with the law
8  and fundamental logic.

9      A crime qualifies under *Dannenberg* when it is "particularly
10 egregious," or one where "no circumstances of the offense reasonably
11 could be considered more aggravated or violent than the minimum
12 necessary to sustain a conviction for that offense."   (*Dannenberg,*
13 *supra,* 34 Cal.4th at pp. 1094–1095.)   These are the only two choices.
14 If a crime consists of only the bare elements then it is not
15 aggravated and it cannot, in and of itself, serve as a basis for
16 parole denials once the inmate becomes eligible for parole.   It is
17 the reason an inmate may be incarcerated initially for the equivalent
18 of 15 or 25 years, and then examined to determination rehabilitation
19 efforts when they come before the Board, but a crime that is no more
20 than the bare minimum cannot be factored into the equation pursuant
21 to PC § 3041(b) or any of the case law interpreting it.

22     In oral argument Respondent suggested a second way the
23 commitment offense can be used outside of §2402(c)(1).   If for
24 example a crime had its roots in gang allegiances or rivalries and
25 the inmate continued to associate with gangs while incarcerated, then
26 an aspect of the crime, even if the crime otherwise consisted of no
27 more than the minimum elements, could be combined with other behavior

1  to support a parole denial. Similarly, if a crime was rooted in an
2  inmate's then existing drug addiction, and the Board was to point to
3  a recent 115 involving drugs, the evidence that the inmate's drug
4  issues had not been resolved would justify a parole denial even if
5  the crime itself was not aggravated. A finding that the inmate is
6  not suitable for release under these circumstances, however, is not
7  based on the facts of the commitment offense as tending to show
8  unsuitability. It is based on the conclusion that can be drawn about
9  Petitioner's lack of rehabilitation or change since the offense, and
10 thus, his present dangerousness.

11      Respondent has not demonstrated any flaws in Petitioner's
12 methodology or analysis, nor provided any actual evidence of the
13 crime being invoked *other* than pursuant to §2402(c)(1). Drawing
14 conclusions from the Board's direct statements, or its precise
15 recitations of the §2402(c)(1) language, logically indicates an
16 invocation of §2402(c)(1), and Respondent's suggestion otherwise is
17 insupportable.

18

19                    __THE QUESTION OF BIAS__

20      Because the issue has been squarely presented, and strenuously
21 argued by Petitioners, this Court is obligated to rule on the charge
22 that the Board's actions prove an overriding bias and deliberate
23 corruption of their lawful duties.

24      In the discrimination and bias case of *USPS Bd. of Governors v.*
25 *Aikens* (1983) 460 U.S. 711, the United States Supreme Court
26 acknowledged "there will seldom be 'eyewitness' testimony as to the
27 [] mental processes" of the allegedly biased decisionmaker. Instead,
28

                                23

1  an examination of other cases for trends or patterns can provide the
2  necessary circumstantial evidence.  (See *Aikens, supra*, at footnote
3  2.)  Reaffirming that such circumstantial evidence will be sufficient
4  the Court stated: "The law often obliges finders of fact to inquire
5  into a person's state of mind.  As Lord Justice Bowen said in
6  treating this problem in an action for misrepresentation nearly a
7  century ago, 'The state of a man's mind is as much a fact as the
8  state of his digestion.  It is true that it is very difficult to
9  prove what the state of a man's mind at a particular time is, but if
10 it can be ascertained it is as much a fact as anything else.'"
11 (*Aikens*, at pp. 716-717, quoting *Edgington v. Fitzmaurice* (1885) 29
12 Ch. Div. 459, 483.)[7]

13     The discovery in these cases was granted in part due to the
14 Petitioners' prima facie showing of bias and the necessity that it be
15 "adequately supported with evidence" if such evidence is available.
16 (*Ramirez, supra*, 94 Cal.App.4th at p. 564, fn. 5.  See also *Nasha v.
17 City of Los Angeles* (2004) 125 Cal.App.4th 470, 483: "A party seeking
18 to show bias or prejudice on the part of an administrative decision
19 maker is required to prove the same 'with concrete facts.'"  And see
20 *State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674,
21 841: "The challenge to the fairness of the adjudicator must set forth
22 concrete facts demonstrating bias or prejudice."  See also *Hobson v.*

23 _____

[7] As occurred in *Aikens, supra*, and as suggested in prior orders of this Court, Respondent should have provided direct evidence from the decisionmakers.  While the fact that a *Defendant* does not explain his or her actions cannot be held against him, (*Griffin v. California* (1965) 380 U.S. 609; *Doyle v. Ohio* (1976) 426 U.S. 610,) it is appropriate to give some weight to the consideration that the Board has failed to offer any direct evidence or explanation on its own behalf.  While the case of *Hornung v. Superior Court* (2000) 81 Cal.App.4th 1095 stands for the proposition that *Petitioner* may not inquire into the Board members' mental processes, Respondent is not precluded from offering such direct evidence if they were able to testify as to their good faith and conscientious efforts.

24

1  *Hansen* (1967) 269 F.Supp. 401, 502, the watershed Washington D.C.
2  school desegregation case in which the court determined from a
3  statistical and factual analysis that racial bias was influencing
4  policy.)

5      In the case of *People v. Adams* (2004) 115 Cal.App.4th 243, 255,
6  a similar claim of biased decision making was asserted and it was
7  rejected because, although the defendant clearly articulated it, "he
8  has not demonstrated it. Therefore, he has failed to bear his burden
9  of showing a constitutional violation as a demonstrable reality, not
10  mere speculation." In the present cases Petitioners have provided
11  overwhelming concrete evidence. It is difficult to believe that the
12  Board's universal application of §2402(c)(1) has been an inadvertent
13  mistake or oversight on their part. It is hard to credit the Board's
14  position that it does not know its own patterns and practices reveal
15  a complete lack of standards or constraints on their power.
16  Respondent's protestations ring hollow, and it seems a statistical
17  impossibility, that the Board's use of "detailed" criteria in such a
18  fashion that they are rendered meaningless is a result of good faith
19  efforts on their part. That <u>every</u> murder is "especially heinous,
20  atrocious or cruel," and can therefore be an exception to the rule
21  that a parole date should be set, does not seem to be an accident on
22  their part.

23      Although no court has thus far agreed with the accusation that
24  the Board approaches its duties with a predetermination and a bias,
25  no court has previously been presented the comprehensive evidence
26  outlined herein. While this Court does not turn a blind eye to the
27  reasonable conclusion that the Board's unconstitutional practices are
28

1  willful, there is another possibility.  The pattern of errors
2  demonstrated by the discovery in this case, and the continuously
3  growing body of Court of Appeal opinions finding consistent and
4  persistent abuse of discretion, may instead be caused by the fact
5  that the Board is simply overworked and substantively untrained.  The
6  impossibility of the blanket applicability of §2402(c)(1) may be only
7  the result of sloppy preparation and inadvertent carelessness.

8      The Board must first be given an opportunity to comply with the
9  necessary remedy provided by this court before it is possible to
10 enter a finding of conscious bias and illegal sub rosa policy.  To do
11 otherwise would ignore the complexities and magnitude of the largely
12 discretionary duties with which that Board is vested.

13

14                    CONCLUSION

15     The conclusive nature of the proof in this case, and the
16 suggestion of institutional bias do not preclude formulation of an
17 remedy which will guarantee adequate restrictions on, and guidance
18 for, the Board's exercise of discretion in making parole suitability
19 determinations.  The Board can be made to lawfully perform its duties
20 if given explicit instructions.

21     As noted supra, a reason the proof in this case irrefutably
22 establishes constitutional violations is because the Board does not,
23 in actual fact, operate within the limiting construction of the
24 regulations.  The Board's expansive interpretation allows it to
25 operate without any true standards.  Although numerous rulings of
26 both state and federal courts of appeal have invalidated the Board's
27 application of the §2402(c) criteria to particular facts, the Board

28

1  does not take guidance from these binding precedents and ignores them
2  for all other purposes.  In the most recent of these cases, *In re*
3  *Roderick*, (2007) ___ Cal.App.4th ___ (A113370) the First District
4  held four of five §2402 factors "found" by the Board to be
5  unsupported by any evidence.  At footnote 14 the court took the time
6  to criticize the Board for its repeated use of a "stock phrase"
7  "generically across the state."  The court also clarified that "at
8  minimum, the Board is responsible for articulating the grounds for
9  its findings and for citing to evidence supporting those grounds."
10  There is nothing in the evidence presented that would allow any
11  conclusion but that, without intervention of the Courts, the Board
12  will ignore the lessons of these rulings in the future and continue
13  to employ its formulaic approach of citing a criteria from
14  §2402(c)(1), repeating the facts of the crime, but never
15  demonstrating a logical connection between the two.  This is the
16  core problem with the Board's methodology -- they provide no
17  explanation or rationale for the findings regarding the crime itself.
18      This practice results in violence to the requirements of due
19  process and individualized consideration which are paramount to the
20  appropriate exercise of its broad discretion.
21      The only solution is one that compels the Board to identify the
22  logical connection between the facts upon which it relies and the
23  specific criteria found to apply in the individual case.  For
24  example, the Board often finds that an inmate's motive is "trivial"
25  without ever suggesting why, on these facts, that motive is not just
26  as trivial as the motive behind any other murder.  What motive is not
27  trivial?  By any definition "trivial" is a word of comparison and
28

1 only has meaning when there can be examples that are not "trivial."

2     Similarly, although the Sixth District made it plain four years

3 ago that "all [] murders by definition involve some callousness," (*In*

4 *re Smith* (2003) 114 Cal.App.4th 343, 345,) the Board has continued to

5 deny countless paroles labeling the crime "callous" without ever

6 suggesting what crime would not qualify as "callous" and without

7 consistently explaining why the individual case before it

8 demonstrates "exceptional" callousness.

9     Respondent has consistently refused to suggest what possible

10 instances of murder would *not* fit the Board's amorphous application

11 of the §2402 criteria. Citing *Dannenberg*, Respondent insists such

12 comparative analysis is unnecessary. Respondent fundamentally

13 misunderstands the *Dannenberg* holding.

14     The PC § 3041(b) exception to the rule can only be invoked when

15 the "gravity of the current convicted offense or offenses, or the

16 timing and gravity of current or past convicted offense or offenses,

17 is such that consideration of the public safety requires a more

18 lengthy period of incarceration for this individual." The word

19 "gravity" is a directive for comparison just as "more lengthy"

20 indicates a deviation from the norm. While *Dannenberg* held there

21 does not need to be intra case comparison for the purposes of term

22 uniformity or proportionality, there necessarily has to be some sort

23 of comparison for the purposes of adhering to the legislative mandate

24 that parole is available. This is implicit in §2402 because the

25 qualifier "especially," in "especially heinous atrocious or cruel,"

26 requires that some form of comparison be made. While the original

27 drafters of §2402 seemed to have recognized this fact, the ongoing

28

1  conduct of the Board has completely ignored it, and this is the
2  essence of the due process violation Petitioners have asserted.
3      As noted in his dissent in the recent case of *In re Roderick*,
4  *supra*, Justice Sepulveda would have deferred to the Board's
5  'exercise' of discretion because "Board members have both training
6  and vast experience in this field. They conduct literally thousands
7  of parole suitability hearings each year. The Board therefore has
8  the opportunity to evaluate the egregiousness of the facts of a great
9  number of commitment offenses.  ...  The Board's training and
10  experience in evaluating these circumstances far exceeds that of
11  most, if not all, judges." The evidence in this case, however,
12  suggests a flaw in granting such deference. Since the Board
13  continues to place every murder in the category of offenses "tending
14  to show unsuitability," something is certainly wrong. Since the
15  Board's vast experience is undeniable, the problem must be in the
16  Board's training and understanding of the distinguishing features of
17  the guidelines and criteria. Although Justice Sepulveda presumes
18  that Board members receive substantive training, there is no evidence
19  before this court to suggest that it does, and substantial
20  circumstantial evidence to suggest that it does not.
21      In the vast numbers of Santa Clara County cases reviewed by this
22  Court, the Board's formulaic decisions regarding the commitment
23  offense do not contain any explanation or thoughtful reasoning.
24  Instead, the Board's conclusionary invocation of words from
25  §2402(c)(1) is linked to a repetition of the facts from the Board
26  report by the stock phrase: "These conclusions are drawn from the
27  statement of facts wherein ..." Thereafter the inmate files a habeas
28

29

1  corpus petition and Respondent, after requesting an extension of
2  time, files a boilerplate reply asserting the Board's power is
3  "great" and "almost unlimited" and thus any "modicum" of evidence
4  suffices.  Respondent does not cite or distinguish the expanding body
5  of case law that is often directly on point as to specific findings
6  made.  Thereafter, if the writ is granted, the Board is directed to
7  conduct a new hearing "in compliance with due process" and that order
8  is appealed by Respondent.  On appeal the order is usually upheld
9  with modifications and in the end, after countless hours of attorney
10  and judicial time, the Board conducts a new two hour hearing at which
11  they abuse their discretion and violate due process in some different
12  way.

13    This system is malfunctioning and must be repaired.  The
14  solution must begin with the source of the problem.  The Board must
15  make efforts to comply with due process in the first instance.  The
16  case law published over the last five years provides ample and
17  sufficient guidelines and must be followed.  Although the Board
18  methods suggest it believes this to be optional, it is not.
19
20                    **THE REMEDY**
21    Thus, it is the order of this Court that the Board develop,
22  submit for approval, and then institute a training policy for its
23  members based on the current and expanding body of published state,
24  and federal, case law reviewing parole suitability decisions, and
25  specifically the application of §2402 criteria.  In addition to
26  developing guidelines and further criteria for the substantive
27  application of §2402 the Board must develop rules, policies and

1  procedures to ensure that the substantive guidelines are followed.

2      This Court finds its authority to impose this remedy to flow

3  from the fundamental principles of judicial review announced over two

4  centuries ago in *Marbury v. Madison* (1803) 5 U.S. (1 Cranch) 137.

5  Citing that landmark case, the California Supreme Court has

6  recognized "Under time-honored principles of the common law, these

7  incidents of the parole applicant's right to 'due consideration'

8  cannot exist in any practical sense unless there also exists a remedy

9  against their abrogation." (*In re Sturm* (1974) 11 Cal.3d 258, 268.)

10     In *Strum* the court directed that the Board modify its rules and

11  procedures so that thereafter "The Authority will be required,

12  commencing with the finality of this opinion, to support all its

13  denials of parole with a written, definitive statement of its reasons

14  therefor and to communicate such statement to the inmate concerned."

15  (*Sturm* at p. 273.)

16     Similarly, in the case of *Minnis, supra*, the California Supreme

17  Court held the Board's policy of categorically denying parole to drug

18  dealers was illegal. Based on its analysis the court there was

19  clearly prepared to order that Board to modify its rules and

20  procedures however such was unnecessary because the Board

21  "voluntarily rescinded" the illegal policy. While the remedy in this

22  case is of greater scope than that necessary in either *Strum* or

23  *Minnis, supra*, so too has been the showing of a systematic abuse of

24  discretion and distortion of process.

25     The most recent case to address the court's roles and duties in

26  overseeing the parole suitability process has been *In re Rosenkrantz,*

27  *supra*, 29 Cal.4th 616. In that case the court explained that

28

1  judicial review of a Governor's parole determination comports with,
2  and indeed furthers, separation of powers principles because the
3  courts are not exercising "complete power" over the executive branch
4  and do not "defeat or materially impair" the appropriate exercise or
5  scope of executive duties. (*Rosenkrantz* at p. 662.)  Citing *Strum*,
6  *supra*, the court reaffirmed that a life term inmate's "due process
7  rights cannot exist in any practical sense without a remedy against
8  its abrogation." (*Rosenkrantz* at p. 664.)

9      The *Rosenkrantz* court also put forth what it believed was an
10 extreme example but which, unfortunately, has been shown to exist in
11 this case.  The court stated: "In the present context, for example,
12 judicial review could prevent a Governor from usurping the
13 legislative power, in the event a Governor failed to observe the
14 constitutionally specified limitations upon the parole review
15 authority imposed by the voters and the Legislature."  This is
16 exactly what the evidence in this case has proven.  As noted above
17 the Board has arrogated to itself absolute authority, despite
18 legislative limitations and presumptions, through the mechanism of a
19 vague and all inclusive, and thus truly meaningless, application of
20 standards.  The remedy this Court is imposing is narrowly tailored to
21 redress this constitutional violation.

22     The consequence of the Board's actions (of giving § 2402(c)(1)
23 such a broadly all encompassing and universal application) is that
24 they have unwittingly invalidated the basis of the California Supreme
25 Court's holding in *Dannenberg*.  The reason the four justice majority
26 in *Dannenberg* upheld the Board's standard operating procedures in the
27 face of the Court of Appeal and dissent position is because "the

1  Board must apply detailed standards when evaluating whether an

2  individual inmate is unsuitable for parole on public safety grounds."

3  (Dannenberg at p. 1096, footnote 16.  See also page 1080: "the

4  regulations do set detailed standards and criteria for determining

5  whether a murderer with an indeterminate life sentence is suitable

6  for parole.")  However, Petitioners in these cases have proven that

7  there are no "detailed standards" at all.  Instead the Board has

8  systematically reduced the "detailed standards" to empty words.  The

9  remedy this Court orders, that there truly be "detailed standards,"

10  requires the promulgation of further rules and procedures to

11  constrain and guide the Board's powers.  This remedy differs in

12  specifics, but not in kind, from what courts have previously imposed

13  and have always had the power to impose.

14      The Board must fashion a training program and further rules,

15  standards and regulations based on the opinions and decisions of the

16  state and federal court cases which provide a limiting construction

17  to the criteria which are applied.[8]  The Board must also make

18  provisions for the continuing education of its commissioners as new

19  case law is published and becomes binding authority.  This Court will

20  not, at this point, outline the requirements and lessons to be taken

21  from the above cases.  It is the Board's duty, in the first instance

22  to undertake this task.  The training program, and associated rules

23  and regulations, shall be served and submitted to this Court, in

24  _____

25  [8]While the showing and analysis in this case was limited to § 2402(c)(1), the
   conclusions that the evidence compelled, that the Board has been carelessly
   distorting and misapplying the regulations, is not so limited.  Accordingly, the

26  training program that is necessary for the Board can not reasonably be limited to
   just § 2402(c)(1).  Thus, to the extent case law recognizes, clarifies and

27  establishes remedies for other due process violations they must also be
   incorporated into the necessary rules and training the Board is required to abide
   by.

28

1  writing, within 90 days.  Counsel for Petitioners, and any other

2  interested parties, may submit briefs or comments within 30 days

3  thereafter.  After receipt and review of the materials this Court

4  will finalize the training program, and associated rules, and the

5  Petitioners in these cases shall receive a new hearing before a Board

6  that does not operate with the unfettered discretion and caprice

7  demonstrated by the evidence here presented.

8                              ORDER

9       For the above reasons the habeas corpus petition is granted and

10  it is hereby ordered that Petitioner be provide a new hearing which

11  shall comply with due process as outlined above.  Respondent shall

12  provide weekly updates to this Court on the progress of its

13  development of the new rules and regulations outlined above.

14

15

16

17  DATED:  *Aug 30*, 2007          *Linda R. Condron*
                                    LINDA R. CONDRON
18                                  JUDGE OF THE SUPERIOR COURT

19

20  cc:  Petitioner's Attorney (Jacob Burland)
21       Attorney General (Denise Yates, Scott Mather)

22

23

24

25

26

27

28

34

# EXHIBIT F

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

In re

    PETER HERNANDEZ,

on

    Habeas Corpus.

B202757

(L.A.S.C. No s. A334928, BH004508)

O R D E R

COURT OF APPEAL - SECOND DIST

F I L E D

JAN 1 1 2008

JOSEPH A. LANE       Clerk

S. LUI
          Deputy Clerk

THE COURT*:

    The petition for writ of habeas corpus, filed October 15, 2007; and the informal opposition thereto, filed December 14, 2007, have been read and considered.

    The petition is denied.

*MALLANO, Acting P. J.      VOGEL, J.      JACKSON, J.**

**Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

# EXHIBIT G

S160160



## SUPREME COURT OF CALIFORNIA

In re:

PETER HERNANDEZ,

_____ On habeas corpus. ___/

Case no._____

Sup. Ct. no. <u>BH004508</u>

App. Ct. no. <u>B-202757</u>

PETITION FOR REVIEW

COVER SHEET

RECEIVED

JAN 2 2 2008

CLERK SUPREME COURT

SUPREME COURT
**FILED**

JAN 2 2 2008

Frederick K. Ohlrich Clerk

_____
Deputy

Submitted by:

Peter Hernandez
CDC # C-03015
P.O. Box 689
Soledad, CA 93960

SUPREME COURT OF CALIFORNIA

In re:

PETER HERNANDEZ,

_____ On habeas corpus. _____/

Case no._____

Sup. Ct. no. <u>BH004508</u>

App. Ct. no. <u>B-202757</u>

PETITION FOR REVIEW

AFTER DENIAL IN THE CALIFORNIA COURT OF APPEALS,
SECOND DISTRICT; WHICH DENIAL WAS FILED ON _1_ _/_11_ /_08_.

TO:    HONORABLE CHIEF JUSTICE RONALD GEORGE AND THE ASSOCIATE JUSTICES
OF THE CALIFORNIA STATE SUPREME COURT IN SACRAMENTO, CALIFORNIA

INTRODUCTION

Peter Hernandez, (petitioner), hereby lodges this Petition For Review with this honorable Court after denial in

the Second District Court of Appeals, Division _ONE_. A copy of that denial is attached hereto as Exhibit "A".

Petitioner is seeking to settle important questions of law and secure privileges to which he is entitled under statutory

authority and that are fully embodied in both state and federal Constitution's rights pertaining to, but not limited to:

Due Process, Equal Protection, and the adequate representation of petitioner's interests during proceedings which

respondents have initiated. This is of no small import inasmuch as respondents are the sole provider of the

guarantees of which petitioner seeks to avail of in order to attempt to reclaim his liberty interests and release from

custody or to have his Hearing reheard with instructions to the panel.

Respondents are not only the sole providers of these guarantees but, by virtue of their position, have sway

over the methods and quality of the legal, ethical, and judicious assurance of those rights to comport with federal due

process guarantees which have become part and parcel of our legal fabric.

DISCUSSION

Petitioner is an inmate at Correctional Training Facility, Central Facility (CTF-C), in Soledad, California,

where he is serving a seven  (7) years-to-life term for murder of the first degree, Penal Code (PC) §§ 187, 12022(a),

as well as several related crimes when he confronted a suspected robber, after conviction in the Los Angeles County

Superior Court. Petitioner is not challenging his conviction in the within action and for the purposes of this matter

accepts the decision of the Los Angeles County Superior Court, notwithstanding those  viable claims in his direct

i

appeal which are not being addressed nor argued herein.

## QUESTIONS PRESENTED

1. Does Petitioner's state and federal constitutional rights to due process and equal protection become violated by respondents when they deny to him the individualized considerations mandated and required by statutory authority and all the clearly established laws?

2. Are Petitioner's federal rights to due process and equal protection violated when respondents utilize a lesser standard of legal proof which requires evidence with some indicia of reliability to find Petitioner unsuitable to parole and therefore an unreasonable risk to the public safety although contrary to the professional testimony?

3. Does petitioner's federally-cognizable liberty interests in release to parole created by respondent's statutory scheme and mandatory language of the enabling statute that requires a suitability finding under statutory criteria prevail when respondents "substantial evidence" burden of proof is not met herein by any standard relying on U.S. SUPREME Court case law?

## NECESSITY FOR REVIEW

In this case, the Board of Prison Hearings (BPH) refused to set a parole release date, relying on PC §3041(b). This Court's decision in In re Rosenkrantz (2002) 29 Cal.4th 616, and more recently in In re Dannenberg (2005) 34 Cal.4th 1061, do not appear to establish any limits to the BPH and/or governor whatsoever as to the use of the offense to deny parole in almost all meritorious cases that come before it.

Does PC §3041(b) then, allow the BPH or the governor to convert offenses for which the statutes create a presumption of suitability and term setting at the Minimum Eligible Parole Date (MEPD), into express Life-Without-Parole sentences at their discretion? In a similar fashion, can the California Code of Regulations (CCR), title 15, §2402(c), be used in perpetuity to deny parole, based on only those enumerated circumstances and factors specified in the Regulations focused on, despite the overwhelming and incontrovertible evidence of suitability and lack of danger to the public as expressed in the term matrices? May the BPH's and/or governor's lay opinions and standard-less assessment of the gravity of the offense disregard a jury's and/or court's determination and/or a plea agreement? Does such an interpretation of the statutes violate rules of statutory construction and unlawfully deprive petitioners of a state and/or federal liberty interest in parole release?

In reviewing the BPH's and/or governor's decisions, does the "some evidence" standard of review preclude meaningful judicial review for more than pro forma consideration as opposed to consistent due consideration? Moreover, is the "some evidence" standard an unreasonable application of U.S. Supreme Court authority, given the

obvious qualification as stated in <u>Superintendent v. Hill</u> (1985) 472 U.S. 445, when the hearings are not "exigent circumstances"?

Petitioner therefore respectfully requests that this Honorable Court and the Justices thereon grant this Petition For Review with a view towards settling important matters of statewide importance, affecting thousands of similarly-situated inmates. And, further, to consider whether or not federal constitutional laws have been violated by respondents and/or their agents of the Executive branch, i.e., BPH staff, California Department of Corrections and Rehabilitation, named or unknown, et al.

POINTS AND AUTHORITIES

ARGUMENT

1.

THE BPH'S REFUSAL TO SET PETITIONER'S PAROLE RELEASE DATE, BASED ON THE EVIDENCE PRESENTED, UNLAWFULLY DEPRIVED HIM OF A CONSTITUTIONALLY-PROTECTED STATE AND FEDERAL LIBERTY INTEREST.

A.  California's Statutes Give Rise To A Liberty Interest Protected
    By The Due Process Clauses Of California And U.S. Constitutions.

It has been long established that California's parole statutes contain sufficient substantive predicates to give rise to a constitutionally-protected liberty interest. <u>McQuillen v. Duncan</u> (9th Cir. 2002) 306 F.3d 895; <u>Biggs v. Terhune</u> (9th Cir. 2003) 334 F.3d 910; citing U.S. Supreme Court authority: <u>Wolff v. McDonnell</u> (1974) 418 U.S. 539; <u>Greenholtz v. Nebraska Penal Inmates</u> (1979) 442 U.S. 1; <u>Board of Pardons v. Allen</u> (1987) 482 U.S. 369.

Pursuant to PC §3041 and rules of statutory construction authority petitioner respectfully requests that, if possible, every word and clause of a statute SHALL be given effect. This becomes crucial where the statutory scheme mandates that parole release dates are normally to be set at the *initial* parole hearing which SHALL be held one year before an inmate becomes eligible. And, construed as closely to its actual meaning as is legally possible where, one year prior to the MEPD, an inmate SHALL have a parole release date set at that time in a manner that will provide for uniform terms based on certain criteria specified by statute and/or regulations as indicated by the matrices of similar crimes, and a date for parole may only be withheld if the BPH makes a reasonable determination that an extended period of incarceration is required in the interest of public safety due to the gravity of the current convicted offense, and/or the gravity and timing of a past offense.

This suitability determination, however, may not be arbitrary, capricious, or whimsical. The evidence relied upon must tend logically and by reasonable inference to establish facts relevant to suitability unless a factual determination is made of unsuitability. <u>In re Morrall</u> (2002) 102 Cal.App.4th 280, 298-99. Furthermore, that evidence must bear some indicia of reliability. <u>Jancsek v. Oregon</u> (9th Cir. 1987) 833 F.2d 1389, 1390. CCR, title 15, §§ 2402

EXHIBIT "A"

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

In re

PETER HERNANDEZ,

on

Habeas Corpus.

B202757

(L.A.S.C. No s. A334928, BH004508)

O R D E R

COURT OF APPEAL - SECOND DIST.

F I L E D

JAN 1 1 2008

JOSEPH A. LANE          Clerk

S. LUI
                    Deputy Clerk

THE COURT*:

The petition for writ of habeas corpus, filed October 15, 2007; and the informal opposition thereto, filed December 14, 2007, have been read and considered.

The petition is denied.

*MALLANO, Acting P. J.          VOGEL, J.          JACKSON, J.**

**Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

and 2281 set forth the criteria and general guidelines implementing the parole statutes and provide standards in making that determination. (See footnotes to Regulations, citing as authority PC §§ 3041, 3052, and 5076.2).

B.  The Parole Statutes Impose An Affirmative Obligation On The Board
To Set Release Dates; The Regulations Implement Those Statutes.

The BPH's regulations pursuant to PC §3041(b), state a prisoner may only be found unsuitable if the BPH determines that the offense or past (convicted) offenses and present timing is of such gravity that a longer period of incarceration is required in the interest of public safety. The determination is made based on the standards set forth by the BPH's regulations. The principle guideline in making the determination is CCR §2402(c), et seq., which, as is the Matrix, are now well-known to this Court. (A copy of those specified criteria are attached as Exhibit "B".)

As will be noted at Exhibit "B", Circumstances (1), (2), and (4) of CCR §2402(c), arguably reflect the subset of allowable exceptions in the criteria to setting parole release dates; the current or past offense(s). Factor (E) of subsection (1), however, is a rare circumstance as there is almost always as here, an explanation as to why the offense occurred. Whether the motive truly was trivial or inexplicable is another matter that, as one court noted, has a somewhat illusory acceptance:

"The epistemological and ethical problems involved in the ascertainment and evaluation of motive are among the reasons the law has sought to avoid the subject. As one authority has stated, "hardly any part of penal law is more settled than that motive is irrelevant." [Hall, General Principles of Criminal Law, (2nd ed.1960) at p.88; see also Husak, Motive and Criminal Liability (1989) vol.8, No.1 Crim. Justice Ethics 3.]"

The court further explained:

"The offense committed by most prisoners serving life sentences is, of course, murder. Given the high value our society places upon life, there is no motive for unlawfully taking the life of another human being that could not be deemed 'trivial'". The Legislature has foreclosed that approach; however, by declaring that murderers with life sentences must "normally" be given release dates when they approach their Minimum Eligible Parole Dates (MEPD). PC §3041(a)." In re Scott, (Scott I) (2004) 119 Cal.App.4th 871, 892-93. (governor's rescission of parole unanimously reversed, Scott II (2005) 133 Cal.App.4th 573; 34 Cal.Rptr.3d 905. Review/De-publication denied 12-2-05; see: attached copy of Dec. 2, 2005, Los Angeles edition of the Daily Journal, p. 13803, attached hereto as Exhibit "C").

It is therefore questionable whether the factor has any evidentiary value in this case. If the motive was indeed inexplicable, "A person whose motive for a criminal act cannot be explained or is unintelligible is therefore unusually unpredictable and dangerous." (Scott I, p. 893.) Such is certainly not the case presented here and warrants close scrutiny by this Court.

Justice Moreno's Dissent in Dannenberg illustrates just what is lacking in the present judicial interpretation of the statutory language and is notable because, as was written there:

"There is, as the majority notes, a tension between P.C. § 3041, subdivisions (a) and (b)[]. But [t]he function of the court in construing a statute 'is simply to ascertain and declare what is in the terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted; and where there are several provisions or particulars, such a construction is, if possible, to be adopted as to give effect to all.' (CCP, § 1858). Ventura County Sheriffs' Assn. v. Board of Retirement (1997) 16 Cal.4th 483, 492. The majority fails to perform this basic function, **reaching its result by ignoring or discounting much of section 3041.** (emphasis added to original)."

The primary circumstances and factors considered when making the determination, CCR §§2402(d)(1)(B) and (D), have been explained by the courts. To qualify for the authorized exception, an offense must be exceptionally egregious or especially grave.

The Court of Appeals characterized this as follows:

"In re Van Houten (2004) 116 Cal.App.4th 339, illustrates the sort of gratuitous cruelty required. The prisoner in that case was involved in multiple stabbings of a woman with a knife and bayonet. While she was dying, the victim was made aware her husband was suffering a similarly-gruesome fate. As stated by the court, "'[t]hese acts of cruelty far exceeded the minimum necessary to stab a victim to death.'" (Id. At p. 351) Other examples of aggravated conduct reflecting an "exceptionally callous disregard for human suffering", are set forth in BPH regulations relating to the matrix used to set base terms for life prisoners (§2283, subd. (b)); namely, "torture", as where the "[v]ictim was subjected to the prolonged infliction of physical pain through the use of non-deadly force prior to the act resulting in death", and "severe trauma: as where "[d]eath resulted from severe trauma inflicted with deadly intensity; e.g., beating, clubbing, stabbing, strangulation, suffocation, burning, multiple wounds inflicted with a weapon not resulting in immediate death or actions calculated to induce terror in the victim." (Ibid., Scott I, supra, at p. 892.)

In this case there is no gratuitous cruelty or torture. Moreover, even in such exceptional cases, the matrix suggests appropriate "extended" terms. CCR §§2402(a), (b).

Circumstance (3) of the unsuitability factors: "Unstable Social History" is not inapplicable where petitioner has demonstrated stable relationships with others since incarceration, nor is there a nexus between pre-conviction history and current threat to public safety in this matter.

Circumstance (5), Psychological Factors. "The prisoner has a lengthy history of severe mental problems related to the offense.", is hardly ever a factor to be considered in most parole situations in Level II prisons and is not applicable at all in this case, as indicated by the latest professionally-accepted Psychological Report or by previous reports by very different doctors; mental health experts specifically trained to evaluate and report their analysis. Not one of these experts has found petitioner wanting nor in need of therapy, (which is nonexistent for mainline inmates without a reality-based, professionally prescribed and verifiable need.)

Circumstance (6), Institutional Behavior. "The prisoner has engaged in serious misconduct in prison or in jail." Perhaps, pursuant to CCR §2410, which provides for the granting or denial of 'post-conviction credit', it is reasonable to deny credit to indeterminately sentenced prisoners, but this factor should not be used to substitute for a statutory provision which specifies that only the gravity of the current or past convicted offense(s) could be

grounds for withholding setting of a term, and __only__ when the __gravity__ is exceptional in light of PC §3041(a), that parole release dates should not __normally__ be set. (emphasis added.)

Petitioner submits that the Legislature would not have specified that the __gravity__ of the current or a past convicted offense could be a basis of denial if it had intended that the BPH has the broader discretion of PC §3041(b). Therefore, 'misconduct' or any other specious reasoning should not be used to deny parole __continuously__. As a point of fact, these same factors have been considered to be an "intrusion of irrelevant post-conviction factors in the determination of the punishment [that's] proportionate to the offense". In re Rodriguez (1975) 14 Cal.3d 639, 654-55, and those various cases following as its progeny.)

C.    The Board Of Parole Hearings Does Not Have The Almost Absolute Discretion It Had Under Determinate Sentencing And Should Normally Be Required To Set Parole Terms Within The Guidelines.

Notwithstanding that later decisions continue revising the interpretive gloss of the statutes and regulations, in 1982, immediately after the Determinate Sentence Law enactment and revised PC §3041 were enacted in 1977, the newly enacted law was interpreted by this Court as follows:

> "Under the ISL, we previously viewed parole thusly: "'In the general field of criminal law the Legislature has abandoned infliction of fixed terms for certain crimes, and substituted the indeterminate sentence, leaving to the Adult Authority the judgment of the period of incarceration. The Adult Authority does not fix that period pursuant to a formula of punishment, but in accordance with the adjustment and social rehabilitation of the individual analyzed as a human composite of intellectual, emotional, and genetic factors." People v. Morse (1964) 60 Cal.2d 631, 642-43, (footnotes omitted.) ¶ In contrast, by altering the statutory scheme and enacting the Determinate Sentencing, the Legislature recited specifically that it "'finds and declares that the purpose of imprisonment for crime is punishment.'" (PC §1170(a)(1), all subsequent statutory references are to this code.) The new law provides that an inmate's "'release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates. The BPH __shall establish criteria for the setting of parole release dates__ and in doing so __shall__ consider the number of victims of the crime for which the prisoner is sentenced and other factors in mitigation or aggravation of the crime.'" (§3041, subd. (a), emphasis added.) The present parole guidelines were promulgated pursuant to the new Act. _Thus, the guidelines are not mere administrative responses to the BPH's internal shifting discretion but rather reflect basic legislative alterations in the underlying parole scheme."_ In re Stanworth (1982) 33 Cal.3d 176, 182. (**bold** _Italics_ added.)

Stanworth noted, "Under both the 1976 [rules] and the current rules, a life prisoner must first be found suitable for parole before a parole date is set." (Id. At p.183.) However, the BPH's discretion in that respect has been limited, as in Montana:

> "That the Montana statute places significant limits on the BPH's discretion is further demonstrated by its replacement of an earlier statute which allowed absolute discretion ..." Allen, supra, at p. 369.) (**bold emphasis added.**)

In California, the former PC §3041, which granted the BPH's almost absolute discretion was replaced with

the current one that specifies when and why the BPH may act. PC §3041(b) specifies that in consideration of public safety, with respect to the gravity of the offense or timing and gravity of a past offense, an extended period of incarceration may be required. Rules of statutory construction mandate that PC §3041(b) must be construed in context with PC §3041(a), and the mandate that parole dates *shall* normally be granted one year prior to parole eligibility, which occurs when the MEPD (minus good-time) has been served. "With respect to persons sentenced to indeterminate terms, the purpose of punishment is satisfied by the requirement of service of a minimum period before eligibility for parole ..." Morrall, supra, at p. 292. An "extended period of incarceration", then, is with reference to that minimum "normal" term. The matrix guidelines provide suggested terms; some "extended" according to the gravity of the specified offenses, in complete accord with PC §3041 read as a whole.

The CCR's §§2282 and 2403 establish the circumstances and victim factors that suggest appropriate terms, but the same circumstances and factors are used instead to make unsuitability determinations of "inmate un- suitable" for parole release. Petitioner submits the guidelines have been, are being, and will be used in an unconstitutional manner. Practices like these have been condemned by Rodriguez, supra, and those condemned practices have resumed. Furthermore, the BPH continues invoking its discretion to disregard the reasonable execution of the statutes, refusing to normally set parole release dates. The Ninth Circuit has inferred that just such a practice could, or already may have, violate(d) due process:

> "The parole board's decision is one of 'equity' and requires a careful balancing and assessment of the factors considered. [cite] As in the present instance, the parole board's sole supportable reliance on the gravity of the offense and the conduct prior to imprisonment to justify a denial of parole can be initially justified as fulfilling the requirements set forth by state law. Over time, however, should [petitioner] continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of [his] offense and prior conduct would raise serious questions involving his liberty interest in parole." Biggs, supra, at p.916, citing to Greenholtz.

The minimum statutory term for kidnap for ransom/robbery is seven (7) years; for second degree murder it is ten (10) years with credit reduction; for first degree murder it is sixteen (16) years (8) months with credit reduction. At the other end of the spectrum, the highest matrix on: kidnap for ransom/robbery is seventeen (17) years; second degree murder up to twenty-one (21) years; first degree murder at up to thirty-three (33) years.

The reasonable meaning of "early parole" is the minimum eligible term, and extended terms logically are the highest matrix terms probably exceeding the normal terms due to "exceptional" offense circumstances, prior convictions involving violence, or substantial evidence of current dangerousness. More time could be exacted in accordance with CCR §2410, withholding "post-conviction" credit for failure to participate in self-help or similar programming, and/or avoiding available therapy, or for incurring (a) serious disciplinary infraction(s). Such factors should not be continuously used indefinitely, however, to find unsuitability and certainly not BY ROTE!

In the watershed case opinion leading up to the enactment of the current Determinate Sentence Law (DSL) and PC §3041, the Court explained:

> "Prompt term-fixing will not only serve to alleviate one of those causes of anxiety now affecting inmates, but will also *prevent the intrusion of irrelevant, **post-conviction** factors in the determination of the punishment that is proportionate to the offense of the particular inmate.*" Rodriguez, supra, 654-55. (emphasis added to accentuate current parole system failure.)

Although the most recent interpretation the statutes by Dannenberg, supra, now holds that proportionality or comparison of like offenses, as part of suitability determinations, is not required, the enactment of the DSL and enactment if PC §3041 was remedial for all similarly-situated inmates. (In re Neal (1980) 114 Cal.App.3d 141, 145.) Even if the state's interpretive gloss has changed, it is clear that because petitioner has a state and federal liberty interest vested by statute as determined by Supreme Court authority, the *constitutional* effect cannot be ignored:

> "While the interpretive gloss on the statute may bind this court as a matter of statutory construction, we are not, however, similarly bound as to the **constitutional effect** of that construction." (McSherry v. Block (1989) 880 F.2d 1053; Aponte v. Gomez (9th Cir.1993) 993 F.2d 705.) (emphasis added.)

The constitutional effect of the current interpretive gloss is that it deprives inmates of the remedial intent of the Legislative changes in PC §3041, and the vested liberty interest that parole dates were to be set one year prior to the eligible date. The words "shall normally" of PC §3041(a) have been omitted by the current construction of the statute section:

> "It is our duty 'to give effect, if possible, to every clause and word of a statute. Montclair v. Ramsdell (1882) 107 U.S. 147; rather than to emasculate an entire section, as the Government's interpretation requires." Minnesota v. Probate Court (1940) 309 U.S. 270, 277.

Lastly, the BPH has stated that the matrices do not apply unless and until an inmate is found suitable. Implementing PC §3041, the regulations state that the base term is to be set *solely* in accordance with the gravity of the offense. (CCR §2403(a).) The circumstances indicating the gravity, or seriousness, of offenses have been established by the matrices, yet the same circumstances and victim factors are used to find inmates unsuitable, continuously, as is "normally" done in virtually all cases.

> "It is simply irrational for [the] seriousness of the offense to be used first to determine the appropriate guideline period and then to be used again as the stated reason for confining a prisoner beyond that guideline." Little v. Hadden (1980) 504 F.Supp. 558, 562 (citing Lupo v. Norton (196_) 371 F.Supp 156, 163.)

The BPH's identical, and arbitrary, use of the Regulations is inconsistent with statutory language and unlawfully deprives similarly-situated inmates like petitioner of a vested liberty interest.

<u>Ground 2.</u>

APPLYING THE "SOME EVIDENCE" STANDARD FOR REVIEWING THE
BPH'S PAROLE SUITABILITY DECISIONS IS AN UNREASONABLE APPLICATION
OF PREVAILING U.S. SUPREME COURT AUTHORITY.

A.    The "Some Evidence" Standard Militates Against The
Reasonable Execution And Enforcement Of Applicable
Statutes and Regulations As Decisional Law States.

Petitioner contends that because the language of PC §3041 together with the kidnap/murder statutes'

minimum terms gives rise to a substantial federally-protected liberty interest which may not be abridged by the

institutional "some evidence" standard of judicial review.

The administratively-imposed and judicially-sanctioned minimally stringent "some evidence" standard of

judicial review of the Executive branch's decisions prevents a court from effectively safeguarding California prisoners'

Constitutionally-protected state and federal liberty interests. This is so because, under the present standard, a court's

review is limited to determining only whether "a modicum" of "some evidence" exists to support the BPH's finding of

unsuitability and without substantial evidence or preponderance of the evidence standards as the guidepost, a court

may not reweigh the evidence as it is proffered and thus, review will always fail to give appropriate respect to the

Legislature's clear intent in establishing minimum terms. Cabling these defined standards together with parole statute

language would fulfill the mandate that terms are "normally" to be set, ab initio.

Clear and convincing evidence demonstrates that the BPH and governors have failed to administer the

statutes and regulations in a manner reasonably faithful to the plain language of PC §3041, granting only a mere

token number of parole dates, the vast majority of which are reversed. The BPH's claim of almost absolute discretion

and the "duty to give individualized consideration" to rationalize and justify the fact fails, as is shown below.

B.    Differences Between Disciplinary Hearings And Parole
Suitability Hearings Precluded The Application Of
The "Some Evidence" Standard Which Does Not Meet The
Federal "Substantial Evidence" Standard Of Evidence To
The Review of BPH's Parole Suitability Hearings.

Although the Ninth Circuit adopted the "some evidence" standard in Jancsek, supra, the issue there

however, WAS NOT PAROLE SUITABILITY. And, this class of cases did not contemplate the qualitative nor

quantitative differences in parole denial, which has a substantial evidence test and credit revocation, which only

requires a preponderance of the evidence. The disparities in their results and magnitude of the respective

deprivations, as Superintendent v. Hill advised with respect to the sufficiency of the evidentiary standard, should not

be compromised.

Prison disciplinary proceedings often do involve "exigent" circumstances that require swift action on the basis

of minimal or insubstantial evidence in the interests of prison operations and security, e.g., prevention of riots, assaults, retaliations, or punishing actions that might not be legally provable but reasonably certain to have occurred, similar to the Hill case. Disciplinary proceedings are due to serious rules violations, sometimes involving new charges and court involvement. Disciplinary proceedings are very informal, usually involving only a correctional lieutenant conducting the hearing, and generally involving the loss of not more than six (6) months of credit, but oftener, just days or weeks. Credit loss can usually be regained after a certain period of good behavior, an incentive for better conduct, compliant programming, respect for staff; a legitimate and self-explanatory prison interest backed by all of the interested parties.

By contrast, parole suitability proceedings take place only after an inmate has become eligible for parole and has served a long period of incarceration sufficient to satisfy the MEPD requirement of the law. In the case of second degree murders, ten years is the minimum time required to satisfy statutory requirements. During that period, the prisoner has generally been working to get a high school certificate (GED), vocational/trade completions, attending self-help groups and therapy (if suggested and available). Also, participating in encounter groups such as Alcoholics Anonymous, Narcotics Anonymous, Anger Management and so forth, and generally maturing and staying out of trouble in expectation of receiving a parole in accordance with statutory language.

These hearings, if not as formal as court proceedings, are nonetheless very structured. Parole suitability hearings are scheduled with months (even years, due to systemic delays) of notice to judges, d.a.'s, victims or relatives of the deceased and/or their representatives, and other interested parties, as notice requires. An attorney is usually requested and appointed, the parole applicant is sworn in, put under oath, and hearings begin. One or two commissioners and a deputy commissioner conduct different aspects of the hearing, a deputy district attorney is usually present (via video-link) and may participate, ask questions, or make comments as asked through the commissioners. The entire proceedings are audio- and/or video-recorded, later transcribed and copies given to inmates and all concerned parties.

Qualitatively, then, parole suitability hearings do not involve "exigent circumstances", the qualifying consideration articulated by Hill. Reason dictates there are no day-to-day prison management interests at stake, unlike prison disciplinary proceedings. Quantitatively, parole suitability proceedings involve denial of parole for up two years, and after the 1994 Amendment to CCR §2270(d) for up to five (but compare §2268(b), §2400). These years of time, added in the "interests of public safety", cannot be restored nor replaced. Prison disciplinary proceedings generally involve the revocation of up to six months credit which can normally be restored after a disciplinary-free period and is normally granted at the first request.

The deprivation of parole for up to five years, multiple times, hardly seems comparable to a few month's credit loss, which, after restoration, puts an inmate in exactly the same position as before the infraction, unlike parole denial of many years, sometimes doubling the MEPD. These very significant differences illustrates why the High Court in Hill stated that the "some evidence" standard might not be constitutionally sound in "less exigent" circumstances than those involved *in prison disciplinary proceedings*. (Id. at p.455, emphasis added.)

A more recent High Court case addressed a similar issue involving prison administration concerns. Sandin v. Conner (1995) 515 U.S. 472, like Hill, was also concerned with prison regulations, involving "... the language of intricate, often routine prison guidelines", and whether mandatory language of regulations created a protected liberty interest. (Id. at 480.) In Sandin, the Court retreated from its previous approach in Hewitt v. Helms (1983) 459 U.S. 460, (prison regulation regarding administrative segregation), in determining whether a prison regulation created a protected liberty interest, because the ruling in Hewitt has led to "undesirable effects."

The Court noted that Hewitt had "created disincentives for states to codify prison management procedures" and had led to the "involvement of federal courts in the day-to-day management of prisons." Sandin, supra, at p. 482-483. In its decision, the Court explained how, for prison administrators, more flexibility was "warranted in the fine-tuning of the ordinary incidents of prison life." Id. The rule adopted in Sandin was whether the action taken "imposes atypical and significant hardship(s) on the inmate in relation to the ordinary incidents of prison life.", in determining whether due process protections were implicated.

Thus, Sandin, like Hill, involved due process liberty interests with respect to prison regulations and management concerns. It is, of course, not a prison regulation pertaining to prison management or related prison disciplinary proceedings at issue in the present matter, but rather statutes governing parole release, protected by the Due Process Clause because a cognizable liberty interest has been created by statutory language. McQuillen, supra, at p. 902; Biggs supra, at p. 915.

The issue here is a statutorily-mandated proceeding to determine whether, after many years of programming-oriented incarceration, a prisoner's offense was of such exceptional gravity, or whether the prisoner's post-conviction conduct has been so demonstrative of unsuitability, that consideration of public safety requires extended periods of further incarceration beyond the minimum requirements of normal terms. (If structured proportionality wasn't contemplated by the Legislative branch at the time of the statute's initiation, why was a different term set for the crimes of first, second, and attempted murder, and kidnap for ransom/robbery, and why were specifically-graded recommended matrix terms established? Why is PC §3041(a) worded as it is?).

Although, as previously discussed, both loss of credit and denial of parole both affect the duration of the

sentence, the magnitude of the deprivation is much greater when parole is denied after serving a lengthy term and more so when prisoners are repeatedly denied for up to five years, again. Also, because of the fact that no prison interests such as security, discipline or the like are involved, the <u>Hill</u> broadsword, like the <u>Sandin</u> rule, is wholly inappropriate. And, if anything, the "some evidence" standard has led to the necessity of federal court intervention and involvement to review the BPH's decisions because state courts are limited to only reviewing for "some evidence" and almost universally refuse to find federal constitutional violations when confronted with patently obvious violations of the same. As such, the "some evidence" standard has "created disincentives" for the BPH to apply its rules in a manner comporting to federal standards of evidence or in any seemingly reasonable manner and thus requiring federal review.

Even in the context of prison disciplinary proceedings, the High Court has explained that due process requires something more than "some evidence", and that this standard applies *only* to questions of evidentiary sufficiency as an <u>additional</u> requirement of due process, and "is not a substitute for other established due process requirements." <u>Edwards v. Balisok</u> (1997)520 U.S. 641, 648. As the Ninth Circuit has recognized, there will always be material that, under the "some evidence" standard, factors against a grant of parole:

> "[I]ndeed, 'some evidence of unsuitability for parole would exist in virtually *every* parole hearing, exposing every grant of parole to a BPH's subsequent change of heart or political whim." (<u>McQuillen</u>, supra, at p.905; <u>In re Caswell</u> (2001) 94 Cal.App.4th 1017.) (emphasis added).

In <u>Sandin</u>, supra, the High Court expressly reiterated that "states may, under certain circumstances, create liberty interests which are protected by the Due Process Clause." <u>id.</u> at 483-84, citing <u>Allen</u>, supra. Therefore, it is very clear that the Court did not mean to alter the rules set forth in <u>Greenholtz</u> and <u>Allen</u> with respect to liberty interests that a state's parole scheme may legitimately create. Logically neither, then, did <u>Hill</u> intend that it's "some evidence" decision there should apply to deprive petitioners of liberty interests created by state statutes. Petitioner submits that the application of the "some evidence" standard of review in the context of parole suitability determinations, where a vested liberty interest is at stake, is an unreasonable application of High Court authority and <u>must</u> fail:

> "Second, a state-court decision also involves an unreasonable application of this Court's precedent if the state court either *unreasonably extends a legal principle from our precedent to a new context where it should not apply* or *unreasonably* refused to extend that principle to a new context where it should apply." (<u>Williams v. Taylor</u> (2000) 529 U.S. 362, 407; citing <u>Green v. French</u> (4th Cir.1998) 143 F.3d 865, 869-70.) (emphasis added.)

C.    Not Only Is There A Statistically-Recognized No Parole
      Policy/Practice Prevalent At Suitability Hearings Which
      Precludes The Application Of PC § 3041(a) But The
      <u>BPH Panels Are Biased By Recognition of The Same.</u>

The Santa Clara County Superior Court, case no. 7/6/4, has recently ordered major changes to the BPH's

unfounded and consistently erroneous use of the unchanging facts to repeatedly deny parole worthy inmates a

release as mandated by PC § 3041(a) but the actual presence of bias is shown therefrom. Attached is a copy of the

Proof of Service in the matter of In re Criscione, et al., to give reference to this allegation; Exhibit "E".

CONCLUSION

Here, then, the abiding question in this case is whether the evidence will reasonably support a conclusion

that petitioner poses an unreasonable risk of danger or a threat to public safety, AT THIS MOMENT. Inherent in this

idea of finding "suitability first" as the leading procedure, where the suitability determination precedes any

consideration of the already-served term or lengthy period past the MEPD, must not devolve into casting a wide net

with the unstated intention of denying all otherwise suitable inmates by reciting a mantra of "some evidence,

suitability denied."

This, unfortunately, is essentially what has become the "normal" method currently utilized to deny parole-

ready and suitability-worthy petitioners of any semblance of fair play and any court's acquiescence in this charade

should be publicly aired and universally castigated as a political solution of the worst sort. Individual freedom is far

too important to lie fallow in a politically-driven and inspired climate where such greater minds exist and have an

imprimatur of trust.

Though a uniform term is based on historical facts, the issue as to whether petitioner is suitable for parole

must be based on whether the inmate is currently a threat to public safety and the state's experts should not be

ignored where their opinions are in harmony with a suitable-to-release finding. The question must be asked, "Does

the BPH or governor abuse it's discretion when they reject for the most specious of reasons, a professional Report

based on an ethical expert's opinion that cannot be contradicted by a lay assessment of alternative 'facts'?" If the

answer is "Yes.", then it is incumbent upon a Court of equity to review and, if necessary, reverse whatever damage

has been done by these scurrilous attempts to circumvent the legal process and deny a worthy individual a second

chance to succeed.

A second related question of importance is whether the "some evidence" standard for judicial review of

parole suitability decisions can continue to be considered constitutionally-sufficient in light of the <u>Sandin</u> decision

13

distinguishing liberty interests in the context of prison management and associated flexibility concerns and "the real concerns under girding the liberty protected by the Due Process Clause", citing Wolff, supra; Allen, supra. Sandin made it clear what Hill, supra, alluded to: that one is constitutionally permissible, but the other, not involving "exigent circumstances", is not. Hill, supra, at p.455. This is particularly so given statutory language vesting a liberty interest in the overall proceedings.

Petitioner respectfully requests review so that this Court may consider these questions of statewide and constitutional importance. Moreover, in light of Sandin, supra, and Irons v. Warden (2005) 358 F.Supp.2d 936, to provide the Court with an opportunity to consider whether the denial by the court of appeals is an unreasonable application of established U.S. Supreme Court precedent and authority, thereby depriving similarly-situated petitioners of a federal liberty interest protected by Due Process and Equal Protection Clauses of both state and federal Constitutions. This Court must now address these issues by way of Review.

Dated:  1-11-08

Respectfully submitted,

Peter Hernandez, petitioner

14

# EXHIBIT H

Court of Appeal, Second Appellate District, Div. 1 - No. B202757
**S160160**

DOCK     D
LOS ANGELES

MAR 2{ 2008

J SANTOS

NC LA 2007 602038

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re PETER HERNANDEZ on Habeas Corpus

The petition for review is denied.

SUPREME COURT
FILED

MAR 1 9 2008

Frederick K. Ohlrich Clerk

_____
Deputy

GEORGE
_____
Chief Justice