Peter Hernandez
CDC # C-03015
P.O. Box 689/F-237-L
Soledad, CA 93960

In pro se

FILED

C8 AUG 12 PM 2:51

[illegible stamp]
[illegible stamp]
N TH [illegible] DISTRICT OF CALIF [illegible]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

PETER HERNANDEZ,                    Case no. CV08-2278 JSW(PR)

    Petitioner,

vs.                                 TRAVERSE TO RETURN

B. CURRY, Warden, et al.,

    Respondents. _____/

Pursuant to this Court's Order filed May 30, 2008; the
Respondents' Return having been filed on July 16, 2008, Peter
Hernandez (Petitioner) responds as follows:

I

Petitioner expressly re-alleges each and every factual
contention made in his Petition and accompanying Memorandum
and Exhibits previously filed in this Court and incorporates
them by reference, as though fully set forth herein;

II

Petitioner denies allegations contained in ¶ 1 and submits

1  that he is being unlawfully held by Respondents. His Minimum
2  Eligible Parole Date (MEPD) was on 9-3-1985, almost 24 years
3  ago and well after serving his lawful minimum under Irons v.
4  Carey (9th Cir. 2007) 505 F.3d 846, 853-54, and with custody
5  credits he has served more than the TWICE the minimum for modern
6  FIRST DEGREE carrying a much higher minimum;

7                                  III

8      Petitioner denies allegations contained in ¶ 2 and sub-
9  mits the Superior Court of Los Angeles ignored Respondent's
10 OWN EXPERT finding the Petitioner WAS NOT A CURRENT THREAT
11 OR RISK TO PUBLIC SAFETY (see Respondent's Return, Exhibit
12 C at bottom of 1st page; Petitioner's Exhibit C);

13                                  IV

14     Petitioner admits allegations contained in ¶ 3;

15                                  V

16     Petitioner admits allegations contained in ¶ 4 but sub-
17 mits that he has fully exhausted any impediment to federal
18 review and there is no impediment to resolution;

19                                  VI

20     Petitioner admits allegations contained in ¶ 5;

21                                  VII

22     Petitioner denies allegations contained in ¶ 6;

23                                  VIII

24     Petitioner denies allegations contained in ¶ 7;

25                                  IX

26     Petitioner denies allegations contained in ¶ 8;

27                                  X

28     Petitioner denies allegations contained in ¶ 9 and submits

1  the salient fact Respondents equate federally-protected liberty
2  interests with a prison disciplinary matter is bereft of logic
3  and not only does the Court have jurisdiction but this
4  allegation smacks of usurpation of the Court's prerogatives;

5                              XI

6      Petitioner denies allegations contained in ¶ 10 and sub-
7  mits that the lay opinions stated at the hearing do not apply
8  here when individualized consideration was trumped by a decision
9  that WAS arbitrary AND capricious;

10                             XII

11     Petitioner denies the allegations contained in ¶ 11 and
12 submits that these "no parole" allegations are taken from the
13 Hearing transcript as well as Petitioner's Exhibit (Part 2)
14 A and D and the entire record of numerous panel's denials over
15 the years (compare: McQuillen v. Duncan (9th Cir. 2003) 306
16 F.3d 895, 898 as regards equal protection);

17                            XIII

18     Petitioner denies the allegations contained in ¶ 12;

19                             XIV

20     Petitioner admits allegations contained in ¶ 13 and sub-
21 mits the actual injury here devolves from federal law;

22                             XV

23     Petitioner denies allegations contained in ¶ 14 and sub-
24 mits an evidentiary hearing can fully resolve the rights alleged
25 by Petitioner to have been abridged by Respondents;

26                             XVI

27     Petitioner denies allegations contained in ¶ 15 and sub-

28                              3

1  mits this Court is empaneled with plenary powers to establish
2  any remedy that would be deemed appropriate for relief and
3  further, Respondent's acknowledgement that "a new review by
4  the Board comporting with due process.", is a tacit admission
5  that due process has not been met here;

6                              XVII

7       Petitioner denies allegations contained in ¶ 16 and sub-
8  mits it is unreasonable to continue to argue this illogical
9  argument when various courts have condemned these specious
10 assertions and that at least a dozen published cases belie
11 the untenable positions held and argued by Respondents;

12                              XVIII

13      Petitioner denies allegations contained in ¶ 17 and submits
14 that Respondents are fully versed in the knowledge that a
15 federal AND state liberty interest exists in behalf of
16 Petitioner and that they acknowledge as much by citing Sass,
17 at p. 3 of the Return but only acknowledge federal court
18 precedent when it suits their cant and are being duplicious;
19

20      Except as expressly admitted or submitted herein,
21 Petitioner denies each and every allegation contained in
22 Respondent's Return and respectfully submits the meritorious
23 points raised in his Petition and Traverse is dispositive and
24 worthy of due consideration prayed for and justly warranted
25 and which recognizes this Court's authority.

26
27
28                              4

1 Peter Hernandez
CDC # C-03015
2 P.O. Box 689/F-237-Low
Soledad, CA 93960
3

4 In pro se

5

6

7                     UNITED STATES DISTRICT COURT

8                   NORTHERN DISTRICT OF CALIFORNIA

9                       SAN FRANCISCO DIVISION

10

11 PETER HERNANDEZ,                    Case no. CV08-2278 JSW (PR)

12      Petitioner,

13 vs.                          TRAVERSE TO RETURN
                               POINTS AND AUTHORITIES
14 B. CURRY, Warden, et al.,

15      Respondents.          /

16

17                     POINTS AND AUTHORITIES

18                          Issue One

19    **PETITIONER HAS A LIBERTY INTEREST IN PAROLE.**

20      The crucial issue on appeal is whether a federal habeas court may

21 remedy a federal constitutional violation by a state agency; here a decision

22 to deny parole absent a scintilla of evidence that Petitioner's parole

23 would CURRENTLY pose an "unreasonable risk of danger to public safety."

24      Petitioner has a liberty interest in parole that is protected by the

25 Due Process Clause. Sass v. B.P.T. (9th Cir. 2006) 461 F.3d 1123, 1129;

26 Irons v. Carey (9th Cir. 2007) 479 F.3d 658, 662; Biggs v. Terhune (9th

27 Cir. 2003) 334 F.3d 910, 915; McQuillion v. Duncan (9th Cir. 2002) 306

28 F.3d 895, 904; In re Rosenkrantz (2002) 29 C.4th 616, 626.

                              -1-

1    As the above-noted decisions declare, there is no longer any question

2  albeit Respondents continue to deny this well-settled area of law.

3  Petitioner submits that their long-held position is unavailing and benign.

4

5                              Issue Two

6  THE SOME EVIDENCE STANDARD DOES NOT APPLY TO PETITIONER.

7    Respecting the Circuit Court's previous holdings, Petitioner

8  respectfully agrees with Respondents that the "some evidence" standard

9  of review is appropriate to prison disciplinary matters but an inappropriate

10  standard to apply to these issues. Thus, it is reasonable to encourage

11  this Court to revisit the standard.

12    Evolving from Superintendent v. Hill (1985) 472 U.S. 445, 455; and

13  first applied to a parole matter in In re Powell (1988) 45 C.3d 894, 904,

14  the High Court used the some evidence test to review a prison discipline

15  matter where charges were based on a confidential source. The Court held

16  the prison's need for security and confidentiality diminished the due pro-

17  cess involved. Petitioner's due process is not reduced therefrom because

18  neither a parole determination process nor adjudications of his habeas

19  claims required disclosure of confidential sources and involved no security

20  concern sufficient to lessen its liberty impact.

21    State courts that adapted Hill's some evidence standard of parole

22  decision review held that prisoners didn't have a liberty interest but

23  have since largely applied the previous cites statewide. Because the liberty

24  interest is now well-established, due process commands a finding of some-

25  thing more weighty than "some" (or any?) evidence reliably in the Record

26  to insure and incorporate a vested liberty right protected by the Due Pro-

27  cess Clause of the Constitution's Fourteenth Amendment.

28

                              -2-

One could arguably assert that no other state whose parole statutes provide a protected liberty interest allow it to be extinguished by the mere hint of any evidence whether reliable, relevant or ethereal. In contrast, Minnesota's Supreme Court recently held in Carrillo v. Fabian (2005) 701 N.W.2d 763, that Hill's some evidence standard for parole disciplinary matters is inapposite to review an agency's decision affecting an inmate's parole release date where state statutes provide a protected liberty interest. Based on the tripartite test prescribed by Hill, the Court there held the "substantial evidence" standard of review protects due process.

In Santosky v. Kramer (1982) 455 U.S. 747, the Court explained:

> "This court has mandated an intermediate standard of proof--'clear and convincing evidence'--when individual interests at stake in a state proceeding are both 'particularly important' and 'more substantial than mere loss of money.' Addington v. TX (1979) 441 U.S. 418, 424. ... the court has deemed this level of certainty necessary to preserve fundamental fairness in a variety of government-initiated proceedings that threaten the individual involved with 'a significant deprivation of liberty' or 'stigma.' ¶ The extent to which procedural due process must be afforded [to] the recipient is influenced by the extent to which he may be 'condemned to suffer grievous loss.' Goldberg v. Kelly (1970) 397 U.S. 254, 262-63; Joint Anti-Fascist Refugee Committee v. McGrath (1951) 341 U.S. 123 (Frankfurter, J., conc.). Santosky, supra, at pp. 756, 758.

There can be no challenge to the premise that Petitioner's interests at stake here aren't "particularly important" nor don't involve "a significant deprivation of liberty--or a grievous loss." (Compare: Davis v. B.P.T. (2005) 200 Or.App. 366, 371-373 ["clear and convincing evidence" required in parole cases]; Trantino v. N.J. State Bd. (2001) 764 A.2d 940, 976 ["substantial evidence" required]. Of significance is the fact that when reviewing decisions of state agencies for evidentiary support, California's statutory law mandates courts to apply the substantial evidence test. CA Civ.Code §1094.5(c). This Court should set forth why civil law grants such deference without including liberty interests as well.

Issue Three

**PETITIONER HAS NOT RECEIVED MEANINGFUL CONSIDERATION AND**
**PAROLE STATUTES AS APPLIED VIOLATE DUE PROCESS AND EQUAL PROTECTION.**

The Second District, Div. 7, located in L.A., recently held that:

(1) factors unrelated to commitment offense did not provide "some evidence" of unreasonable risk of danger to public;

(2) nature of prisoner's offense did not supply some evidence of unreasonable risk of danger to public; and

(3) any predictive value of commitment offense dissipated over time.

In re Lawrence (2007) 59 C.Rptr.3d 537. They noted there that state courts are not bound by the AEDPA, state courts are free to apply what they discern to the proper interpretation of federal due process standards .... Id. 59 C.Rptr.3d at pp. 557-558. The Sixth District in San Jose found that: [to lawfully deny parole "t]he evidence must substantiate the ultimate conclusion that the prisoner's release currently poses an unreasonable risk of danger to the public. In re Tripp (2007) 58 C.Rptr.3d 64; (citing Rosenkrantz, supra, p. 665; conc. In re Lee (2007) 49 C.Rptr.3d 931. It violates a prisoner's right to due process when the board or governor attaches significance to evidence that forewarns no danger to the public or relies on an unsupported conclusion. E.g., In re de Luna (2005) 24 C.Rptr.3d 643 [Board concluded, contrary to psychological evaluations, that inmate needed more therapy, ...]; In re Scott (2005, Scott II) 34 C.Rptr.3d 905 [governor was wrong about inmate's history of violent crime and the nature of the commitment offense]; Lee, supra, [Governor overstated seriousness of commitment offense and wrongly faulted inmate for late acceptance of responsibility].") In re Tripp at p. 68.

In what can only be described as an "omnibus ruling", the First District in San Francisco held that 1) "some evidence" did not support a finding that release on parole would unreasonably endanger public safety; and 2) reliance on circumstances no more aggravated or violent than the minimum necessary to sustain convictions violated due process. In re Barker (2007) 59 C.Rptr.3d 746. This TRIPLE murder conviction was not sufficient for the BPH to deny parole suitability and the reasoned court noted:

"In denying [petitioner]'s habeas corpus petition, the superior court did not conduct an evidentiary hearing. 'This is therefore an original proceeding in which we independently review the record.'In re Scott

(2004) (Scott I); 119 C.App.4th 871, 884; Id., p. 759.

Then, discussing the deferential "some evidence" review standard, Judge Richman in Footnote 16, makes an interesting aside which is both instructive and prescient in these proceedings:

> "The A.G. inexplicably argues that Barker does not have a liberty interest in parole and thus the BPH's decision should not be reviewed under the "some evidence" standard. Our Supreme Court has made it very clear that 'prisoners possess a protected liberty interest in connection with parole decisions rendered by the BPH,' and that imposition of 'a standard of review less stringent than the "some evidence" test would permit the BPH to render a decision without any basis in fact' which 'would be arbitrary and capricious, thereby depriving the prisoner of due process of law.' (US Const. Amnd. 14, (citing Rosenkrantz, supra, pp. 657, 661.) This holding of Rosenkrantz was cited and confirmed in In re Elkins (2006) 144 C.App.4th 475, 488, which was filed ... 3 weeks before the [A.G.'s] return here was signed and filed." Ibid. p. 760, (footnote 16).

Returning to the L.A. court case of Lawrence, after outlining the 3 societal goals of imprisonment: 1) retribution; 2) deterrence; and 3) incapacitation, Judge Johnson found:

> "California's sentencing structure in murder cases makes it clear the denial can only be justified by the third of these purposes ... Unless there is an unreasonable risk the parole applicant will re-offend and thus pose a risk to public safety she or he is to be released on parole. Id. p. 559 (Emphasis added.)

Just prior to this directive, the Judge observed that the Ninth Circuit and California Supreme Court articulated that:

> "the commitment crime can lack the power to supply "some evidence" supporting a denial of parole because of the interplay of 2 factors--the nature of that crime and the passage of time since its commitment. That is, the fact there is "some evidence" the crime was committed and committed a certain way at a certain time does not mean that crime necessarily represents "some evidence" the prisoner's release on parole will pose an unreasonable risk of danger to the public safety at the present time." Id. p. 558.

Summing up what is really at issue here, the Lawrence court neatly sewed up the various pieces of the "suitability puzzle":

> "We conclude the Governor's reversal of the Board's decision is therefore not supported by some evidence.

-5-

1 ¶"The Legislature has made this abundantly clear in [PC §§ 3041, (a) & (b)] which provide the Board 'shall normally set a parole release date ... that will provide uniform terms for offenses of similar gravity and magnitude with respect to their threat to the public'. ... As the California Supreme Court emphasized in In re Dannenberg (2005) 34 C.4th 1061, 1098, a prisoner can be found unsuitable for parole only when there is 'some evidence' ... [suggesting] he remains a danger to public safety." Lawrence, supra, at pp. 563-64.

2

3

4

5

6                              Issue Four

7       RESPONDENTS DO NOT SHOW, BY THEIR OWN EXPERTS,
        THAT PETITIONER IS A CURRENT THREAT AND THE IRON'S
8       MINIMUM SENTENCE HAS LONG SINCE PASSED.

9    A.   THE COURT'S DECISION IN IRONS SUPPORTS PETITIONER

10       1.   The 9th Circuit's Irons Decision Is On Point.

11       Irons, the 9th Circuit's THIRD parole analysis after Biggs and Sass,

12   supra, addressed the issue of whether, when deciding suitability and con-

13   sistent with due process, the immutable facts of the conviction may be

14   employed repeatedly (and interminably?), to preclude those like Petitioner

15   who unarguably satisfies all parole requirements, are forensically evaluated

16   repeatedly to pose no parole risk, and has served in excess of the

17   appropriate and/or maximum sentence imposed for an offense based on the

18   facts of their conviction.

19       The 9th Circuit held that the BPH's use of Iron's crime, a particularly

20   brutal murder, BEFORE he had served the mimimum prison sentence imposed

21   by the trial court, satisfied the "some evidence" test sufficiently to

22   uphold the BPH's decision finding he was unsuitable for release. They

23   focused on Iron's egregious murder, specifically reciting the facts, and

24   recognizing the nature of the crime. He received over TWICE the sentence as

25   Petitioner. By the time this matter is decided Petitioner will have served

26   over twenty years more than that prescribed for his conviction according

27   to the decision in Irons.

28

                                   -6-

1   · The Court emphasized that <u>Irons</u>, like Biggs and <u>Sass</u> before him, had

2   not served the "minimum number of years to which they had been sentenced

3   at the time of the challenged denial by the Board." They explained, contrary

4   to the Board's position, why Biggs was **not** overturned by Sass, and

5   re-emphasized that <u>continued use of the commitment offense facts to find</u>

6   <u>such an inmate unsuitable for parole may constitute a Due Process violation</u>

7   <u>AFTER THE MINIMUM TERM HAS BEEN SERVED</u>:

8   "... We note that in all cases in which we have held that a parole
    board's decision to deem a prisoner unsuitable for parole solely on
9   the basis of his commitment offense comports with due process, the
    decision was made **before the inmate had served the minimum number**
10  **of years required by his sentence.** Specifically, in Biggs,  Sass,
    and here, the petitioners had not served the minimum number of years
11  to which they had been sentenced at the time of the challenged parole
    denial by the Board. [] All we held in those cases and all we hold
12  today, therefore, is that, given the particular circumstances of the
    offenses in these cases, due process was not violated when these
13  prisoners were deemed unsuitable for parole **prior to the expiration**
    **of their minimum terms.** <u>Irons</u> at pp. 664-65, (emphasis added.)

14

15      **2.  Petitioner Has Been Denied Due Process Under Irons.**

16      Under the <u>Irons</u> standard, at the time of Petitioner's 13th subsequent

17  parole hearing in 2006, he had served (including jail time and credits)

18  <u>twenty-nine</u> (29) years in prison, 20 **more years** than the minimum sentence

19  <u>imposed by the trial court</u>. Petitioner calculated that when 9 years and

20  8 months post-conviction credit is deducted (per 15 CCR § 2410, at 4

21  months for eligible disciplinary-free years), he had credit for thirty-eight

22  years, eight months (38+.67) of confinement at the time of the Hearing.

23  The Board has never disputed these facts. Notably, this District has

24  recently made a similar ruling and has embodied the <u>Irons</u> holding that

25  bears repeating here with the Court's leave:

26  "Another critical difference between this case and Biggs, Sass, and
    <u>Irons</u> is that [petitioner] had served a substantial amount of time
27  beyond his minimum sentence. This court must consider that at some

28

                                    -7-

1  point after an inmate has served his minimum sentence the probative
value of his commitment offense as an indicator of "unreasonable risk
2  of danger to society" recedes below the "some evidence" required by
due process to support a denial of parole. Irons, supra at p. 665.
3  A decision to revoke parole based solely on an inmate's commit- ment
offense that can no longer be considered probative of danger- ousness
4  to society would be arbitrary and not comport with the "some evidence"
standard. Hill, supra at pp. 445-55, 557. This is one of those cases
5  . . . .

6  "Petitioner's commitment offense would be a sufficient basis to deny
his parole if it indicated a risk of re-offending and of a danger
7  to society. It does not. .... (Emphasis added).

8  "The state court's determination that the [Board's] sole reliance
on [petitioner's] commitment offense satisfied the 'some evidence'
9  standard was an objectively unreasonable application of Hill. See
28 U.S.C. §2254(d). Brown is entitled to federal habeas relief on
10  his due process claim." Brown v. Kane, 2007 WL 288488 at *6-7 (N.D.
Cal. 2007), opinion of Honorable Charles R. Breyer.
11
See Sanchez v. Kane (C.D. Cal. 2006) 444 F.Supp.2d 1049; Martin v. Marshall
12
(N.D. Cal. 2006) 431 F.Supp.2d 1038 amended at 448 F.Supp.2d 1143;
13
(N.D. Cal. 2006) 431 F.Supp.2d 1038 amended at 448 F.Supp.2d 1143;
14
Rosenkrantz v. Marshall (C.D. Cal. 2006) 444 F.Supp.2d 1063, 1083-1087.
15
On 1-3-03, the 9th circuit decided Hayward v. Marshall (2008) 512 F.3d
16
536 (en banc decision pending, 527 F.3d 797). Hayward, like Petitioner,
17
challenged the evidence to deny parole as a due process violation. "A proce-
18
dural due process claim has 2 distinct elements: 1) a deprivation of a con-
19
stitutionally protected liberty ... interest, and 2) a denial of adequate
20
procedural protections." Under that rubric, the "findings that are necessary
21
to deem a prisoner unsuitable for parole ... are not that a particular factor
22
or factors indicating unsuitability exist, but that a prisoner's release
23
will unreasonably endanger public safety." Ibid. pp. 542, 543. Many inmates
24
whose death penalties were recalled have long since been paroled.
25
"Although I agree that evidence of premeditation and deliberation
26  supports the conclusion that petitioner's crime was particularly
egregious for a second degree murder, it is another matter whether
27  any evidence would support the same conclusion for a first degree
murder. Other than felony murders, first degree murders by definition
28  involve premeditation and deliberation. Moreover, there was sufficient

-8-

doubt whether premediation and deliberation existed to persuade a jury to acquit petitioner of first degree murder ... . Rosenkrantz, supra, at p. 689, (dissenting Opinion.)

### 3. Petitioner Is NOT A Current Risk To Public Safety.

At this point, according to the California Supreme Court, the continued use of the facts of Petitioner's second degree murder commitment offense to preclude his parole violated Due Process:

"The significance of the above observations is this:

**there will come a point, which may have arrived, when petitioner would have become eligible for parole if he had been convicted of first degree murder. Once petitioner reaches that point, it is appropriate to consider whether his offense would still be considered especially egregious for a first degree murder in order to promote the parole statute's goal of proportionality between the length of sentence and the seriousness of the offense."** Rosenkrantz, supra, at pp. 689-90, Moreno, J. disntg., (emphasis added.)

Judge Richland has seen the expert's conclusions for what they are:

"These conclusions, of course, are the opinions of trained experts, all of whom said [petitioner] did not need therapy. We are troubled therefore by a contrary finding, especially in light of the uncontradicted evidence in the record. And we are particularly troubled by the mere presence of this finding, which appears to be, yet again, a boilerplate finding that seems to make its way into every denial of parole, whatever the record--and despite repeated ciriticisms from the courts. The harsh criticism by Division Three of this court in In re Ramirez (2001) 94 C.App.4th 549, disapproved on another ground in Dannenberg, supra, at pp. 1086-87, is illustrative. (Barker, p. 761.)

Respondents discredit the Circuit Court's reasoning in Irons, relying on Rosenkrantz and Dannenberg to submit that Irons countermands the BPH's statutory directive to continue to consider the gravity of the commitment offense to deny suitability, even after the maximum term for the offense has possibly even doubled the mandatory minimum. Petitioner's attached Exhibit "A" is so directly on point as to be astounding.

There are several flaws in the BPH's position. It misuses the definition of the words "minimum terms." Indeterminately sentenced inmates must be granted parole at the first or initial Hearing. If public safety

1   requires a more lengthy TERM based on forensic/professional opinion(s),

2   the inmate "shall" receive a term setting at the next or subsequent meeting.

3       Next, when denying parole, it is their duty to instruct the inmate

4   as to not only why he is being denied a parole term and for how long, but

5   they are to set meaningful guidelines and expectations that will encourage

6   the inmate to work towards becoming suitable through available self-help

7   and education, as well as participation in work, healthy activities, and

8   therapy or counseling if needed to comply with the risk to public safety.

9       Lastly, the BPH is to provide the inmate with all relevant paperwork

10  prior to the Hearing, to secure counsel and an interpreter if requested,

11  and to have professional opinions submitted upon which they can base their

12  term setting, decided upon the "overarching consideration" (see: Barker,

13  supra, p. 753), per decisional law and statutory authority.

14      Further, if the BPH disagrees with the Irons calculation when

15  designating the "minimum term", it is doubtful that they disagree that

16  the Court there failed to include any parole "term-reduction credits" per

17  CCR Title 15, Div. II, § 2410, (McQuillion, supra, p. 898 .)

18      Honorable Judge M.H. Patel, of this Court, has held that even the

19  second degree murder of one's own child and a coverup involving disposing

20  of the child is not sufficient, in the face of positive psychological

21  opinions, positive programming, and the remoteness of time after showing

22  remorse and rehabilitation. After a thoughtful and careful reading and

23  a review of the record before the panel, who again refused to adhere to

24  statute and decisional precedent, she made the following conclusions in

25  Willis v. Kane N.D. Cal. 2007) 435 F.Supp.2d 1126:

26  "A California prisoner with a sentence of a term of years to life with
    the possibility of parole has a protected liberty interest in release
27  on parole and therefore a right to due process in the parole suitability

28

-10-

proceedings. See Sass [supra, at [pp.] 1127-28; [PC] § 3041(b), ¶ "The some evidence standard provides protection against more than fabricated charges or bureaucratic mistakes--the some evidence standard also protects against arbitrary decisions. [Hill, supra], at [pp.] 454-55, 457. ... ¶ "Under these circumstances, the BPH's reliance on the circumstances of the murder to find Willis unsuitable for parole for the seventh time and at least 18 years into his 15-to-life sentence was arbitrary and therefore did not comport with the some evidence standard. It violated due process. The state court's unexplained decision to the contrary was an unreasonable application of [Hill]. Willis is entitled to relief under the standard of 28 U.S.C. § 2254(d). ¶ "Having decided that the petition will be granted, the next issue concerns the proper remedy. Because Willis has never been found suitable for parole, the BPH has never moved past the suitability-finding function in [PC] § 3041(b) to calculate a term and set a release date as required by [PC] § 3041(a). It is now time to do so." Id., at pp. 1129, 1136. (Emphasis added.)

Judge Patel ruled that where the petitioner had repeatedly been denied parole suitablity without some evidence to deny a term, Willis was denied due process in the proceedings and applied the facts before her to Order his term set. Id., at p. 1137. Petitioner has been denied due process.

"The vilest deeds, like poison weeds bloom well in prison air. It's only what is good in man, that wastes and withers there." (Oscar Wilde.)

The petition at issue here included the psychologist's Report and reports previous to this hearing to show a long-term substantiation of his lack of current risk. Petitioner is suitable for parole and has been for some time. If intervening events happen in the fetid aire of prison then respondents must accept that they are possibly culpable for the "continuing charade of meaningless hearings" as Judge Parilli noted in Ramirez, supra, "The Board's readiness to make a finding so at odds with the record supports Ramirez's (sic) claim that his parole hearing was a sham. It is not surprising that the trial court regarded the Board's findings with deep suspicion." Ramirez, supra, p. 571.

Where no evidence exists to deny parole, even in a first degree murder, there must be something other than the crime that presages an ongoing threat to public safety. There is simply no evidence of that here.

-11-

1

## CONCLUSION

2

3      It is axiomatic that the Penal Code mandates a fair process where
4  an inmate subject to statutory authority is given a just and meaningful
5  opportunity to benefit from his reformation and lack of risk of danger
6  to public safety to gain his parole release. The courts have long been
7  held the last, best bastion of our constitutional freedoms and a bulwark
8  againt their arbitray and capricious abrogation.

9      We all hold the freedoms of liberty, equality and justice as paramount
10  in value amongst ourselves and to lessen the quality for one is to diminish
11  those same rights to all who deserve to be able to enjoy the right of
12  association and the freedoms embodied therein. This Court has the plenary
13  power inherent in its office and should grant the writ submitted by
14  Petitioner, Order his immediate release from custody or, at the very least,
15  instruct Respondents to provide a new parole suitability hearing that in
16  all ways conforms to the Courts oversight, and maintain original
17  jurisdiction to see that this is so.

18

19  WHEREFORE, Petitioner respectfully prays this Honorable Court will grant
20  the writ, Order all available relief prayed for there, and any and further
21  relief as the Court may deem just and proper.

22

23      Respectfully submitted this 11th day of August, 2008,

24

25

26                                         Peter Hernandez, pro se

27

28

-12-

## PROOF OF SERVICE BY MAIL

(C.C.P. §§1013A, 2015.5)

STATE OF CALIFORNIA )
                 ) SS.  **In re: Peter Hernandez, on habeas corpus**
COUNTY OF MONTEREY )

I, _William Walker_, am a resident of the State of California,

County of Monterey. I am over the age of 18 years and I  am/am not  a party to the within action.

My  business/residence  address is P.O. Box 689, Soledad, California, 93960-0689.

On _August 10_, 20 08 , I served the foregoing:

PETITIONER'S TRAVERSE TO RESPONDENT'S RETURN TO PETITION

on the parties listed below by placing a true copy thereof enclosed in a sealed envelope with postage

fully prepaid in the United States mail at Soledad, California, addressed as follows:

```
California Attorney General
P.O. Box 944255
Sacramento, CA  94244-2550
```

There is regular delivery service by the U.S. Postal Service between the place of mailing

and the places so addressed.

I declare under the penalty of perjury under the laws of the State of California that the

foregoing is true and correct.

Executed this _10th_ day of _August_, 20 08 , at

Soledad, California.

/S/ _William Walker_

1    Accordingly, Petitioner prays that the writ be granted

2 and all relief prayed for therein be Ordered.

3

4

5    Respectfully submitted this 11th day of August, 2008.

6

7

8

9    Peter Hernandez, pro se

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                5

28

082278

# EXHIBIT    A

1

2

3          SUPERIOR COURT OF CALIFORNIA

4             COUNTY OF SANTA CLARA

5

6

7    In re                          )    No.: 68038
                                     )
8        DONALD RAY LEWIS,           )
                                     )    ORDER
9    On Habeas Corpus                )
                                     )

10

11

12                      INTRODUCTION

13       Petitioner alleges that he has been denied due process of law

14   because the Board has used standards and criteria which are

15   unconstitutionally vague in order to find him unsuitable for parole.

16   Alternatively, he argues that those standards, even if

17   constitutionally sound, are nonetheless being applied in an arbitrary

18   and meaningless fashion by the Board.  He relies upon evidence that

19   in one hundred percent of 2690 randomly chosen cases, the Board found

20   the commitment offense to be "especially heinous, atrocious or

21   cruel", a factor tending to show unsuitability under Title 15

22   §2402(c)(1).

23          Are the Board Criteria Unconstitutionally Vague?

24       Our courts have long recognized that both state and federal due

25   process requirements dictate that the Board must apply detailed

26   standards when evaluating whether an individual inmate is unsuitable

27   for parole on public safety grounds.  (See In re Dannenberg (2005) 34

28

1  Cal.4th 1061 at p. 1096, footnote 16.)  Those standards are found in

2  15 CCR §2402(c) (*Dannenberg, supra,* 34 Cal.4th at p. 1080,) and do

3  include detailed criteria to be applied by the Board when considering

4  the commitment offense:

5      (c) Circumstances Tending to Show Unsuitability. The following
       circumstances each tend to indicate unsuitability for release.
6      These circumstances are set forth as general guidelines; the
       importance attached to any circumstance or combination of
7      circumstances in a particular case is left to the judgment of
       the panel. Circumstances tending to indicate unsuitability
8      include:

9      (1) Commitment Offense. The prisoner committed the offense in an
       especially heinous, atrocious or cruel manner. The factors to be
10     considered include:

11         (A) Multiple victims were attacked, injured or killed in
           the same or separate incidents.
12
           (B) The offense was carried out in a dispassionate and
13         calculated manner, such as an execution-style murder.

14         (C) The victim was abused, defiled or mutilated during or
           after the offense.
15
           (D) The offense was carried out in a manner which
16         demonstrates an exceptionally callous disregard for human
           suffering.
17
           (E) The motive for the crime is inexplicable or very
18         trivial in relation to the offense.

19
       In response to Petitioners claim that the regulations are
20
   impermissibly vague, Respondent argues that while "especially
21
   heinous, atrocious or cruel" might be vague in the abstract it is
22
   limited by factors (A)-(E) of §2402(c)(1), and thus provides a
23
   'principled basis' for distinguishing between those cases which are
24
   contemplated in that section and those which are not.  An examination
25
   of cases involving vagueness challenges to death penalty statutes is
26
   instructive here and shows that Respondent's position has merit:
27
       "Our precedents make clear that a State's capital sentencing
28

2

1  scheme also must genuinely narrow the class of persons eligible
   for the death penalty. When the purpose of a statutory
2  aggravating circumstance is to enable the sentencer to
   distinguish those who deserve capital punishment from those who
3  do not, the circumstance must provide a principled basis for
   doing so.  If the sentencer fairly could conclude that an
4  aggravating circumstance applies to every defendant eligible for
   the death penalty, the circumstance is constitutionally infirm."
5     (Arave v. Creech (1993) 507 U.S. 463, 474, citing Maynard v.
   Cartwright (1988) 486 U.S. 356, 364: "invalidating aggravating
6  circumstance that 'an ordinary person could honestly believe'
   described every murder," and, Godfrey v. Georgia (1980) 446 U.S.
7  420, 428-429: "A person of ordinary sensibility could fairly
   characterize almost every murder as 'outrageously or wantonly
8  vile, horrible and inhuman.'")

9
10     It cannot fairly be said that 'every murder' could be

11  categorized as "especially heinous, atrocious or cruel" under the

12  Board regulations, since the defining factors contained in

13  subdivisions (A)-(E) clearly narrow the group of cases to which it

14  applies. Although Petitioner also argues that the "vague statutory

15  language is not rendered more precise by defining it in terms or

16  synonyms of equal or greater uncertainty" (People v. Superior Court

17  (Engert) (1982) 31 Cal.3d 797, 803, Pryor v. Municipal Court (1979)

18  25 Cal.3d 238, 249. See also Walton v. Arizona (1990) 497 U.S. 639,

19  654), the factors in those subdivisions are not themselves vague or

20  uncertain.  The mere fact that there may be some subjective component

21  (such as "exceptionally callous" disregard for human suffering) does

22  not render that factor unconstitutionally vague.   The proper degree

23  of definition of such factors is not susceptible of mathematical

24  precision, but will be constitutionally sufficient if it gives

25  meaningful guidance to the Board.

26     A law is void for vagueness if it "fails to provide adequate
   notice to those who must observe its strictures and
27  impermissibly delegates basic policy matters to policemen,
   judges, and juries for resolution on an ad hoc and subjective
28  basis, with the attendant dangers of arbitrary and

1 | discriminatory application." *(People v. Rubalcava* (2000) 23
2 | Cal.4th 322, 332, quoting *People ex rel. Gallo v. Acuna* (1997)
   | 14 Cal. 4th 1090, 1116, quoting *Grayned v. City of Rockford*
   | (1972) 408 U.S. 104, 108-109.)

3  A review of cases expressing approval of definitions to limit the

4  application of otherwise vague terms in death penalty statutes leads

5  inextricably to the conclusion that the limiting factors in §2402(c)

6  easily pass constitutional muster. An Arizona statute was upheld

7  that provided a crime is committed in an 'especially cruel manner'

8  when the perpetrator inflicts mental anguish or physical abuse before

9  the victim's death," and that "mental anguish includes a victim's

10 uncertainty as to his ultimate fate." *(Walton v. Arizona* (1990) 497

11 U.S. 639, 654.) Similarly, the court in *Maynard v. Cartwright*, 486

12 U.S. at 364-365, approved a definition that would limit Oklahoma's

13 "especially heinous, atrocious, or cruel" aggravating circumstance to

14 murders involving "some kind of torture or physical abuse. In

15 Florida, the statute authorizing the death penalty if the crime is

16 "especially heinous, atrocious, or cruel," satisfied due process

17 concerns where it was further defined as "the conscienceless or

18 pitiless crime which is unnecessarily torturous to the victim."

19 *State v. Dixon* (1973) 283 So. 2d 1 at p. 9.

20 Here, the factors in subdivisions (A)-(E) provide equally clear

21 limiting construction to the term "especially heinous, atrocious, or

22 cruel" in §2402(c).

**Has the Board Engaged in a Pattern of Arbitrary Application of the Criteria?**

As previously noted, 15 CCR §2402 provides detailed criteria for

determining whether a crime is "exceptionally heinous, atrocious or

cruel" such that it tends to indicate unsuitability for parole. Our

1   courts have held that to fit within those criteria and thus serve as

2   a basis for a finding of unsuitability, the circumstances of the

3   crime must be more aggravated or violent than the minimum necessary

4   to sustain a conviction for that offense. (*In re Rosenkrantz* (2002)

5   29 Cal.4th 616, 682-683.) Where that is the case, the nature of the

6   prisoner's offense, *alone,* can constitute a sufficient basis for

7   denying parole. (*In re Dannenberg, supra,* 34 Cal.4th at p. 1095.)

8        Petitioner claims that those criteria, even if constitutionally

9   sound, have been applied by the Board in an arbitrary and capricious

10  manner rendering them devoid of any meaning whatever. The role of

11  the reviewing court under these circumstances has been addressed

12  previously in the specific context of Parole Board actions:

13       "[Courts have] an obligation, however, to look beyond the facial
         validity of a statute that is subject to possible
14       unconstitutional administration since a law though fair on its
         face and impartial in appearance may be open to serious abuses
15       in administration and courts may be imposed upon if the
         substantial rights of the persons charged are not adequately
16       safeguarded at every stage of the proceedings. We have
         recognized that this court's obligation to oversee the execution
17       of the penal laws of California extends not only to judicial
         proceedings, but also to the administration of the Indeterminate
18       Sentence Law." (*In re Rodriguez* (1975) 14 Cal.3d 639, 648,
         quoting *Minnesota v. Probate Court* (1940) 309 U.S. 270, 277.)
19

20       Similarly, in *In re Minnis* (1972) 7 Cal.3d 639, 645, the case

21  closest on point to the present situation, the California Supreme

22  Court stated: "This court has traditionally accepted its

23  responsibility to prevent an authority vested with discretion from

24  implementing a policy which would defeat the legislative motive for

25  enacting a system of laws." Where, as here, the question is whether

26  determinations are being made in a manner that is arbitrary and

27  capricious, judicial oversight "must be extensive enough to protect

28

1 | limited right of parole applicants 'to be free from an arbitrary
2 | parole decision... and to something more than mere pro-forma
3 | consideration.'" (*In re Ramirez* (2001) 94 Cal.App.4th 549 at p. 564,
4 | quoting *In re Sturm* (1974) 11 Cal.3d 258 at p. 268.)

5 | This Court, therefore, now examines Petitioner's "as applied"
6 | void for vagueness challenge.

7 |

8 | ## The Evidence Presented

9 | A similar claim to those raised here, involving allegations of
10 | abuse of discretion by the Board in making parole decisions, was
11 | presented to the Court of Appeal in *In re Ramirez, supra*. The court
12 | there observed that such a "serious claim of abuse of discretion"
13 | must be "adequately supported with evidence" which should be
14 | "comprehensive." (*Ramirez, supra*, 94 Cal.App.4th at p. 564, fn. 5.)
15 | The claim was rejected in that case because there was not "a
16 | sufficient record to evaluate." (*Ibid.*) In these cases, however,
17 | there is comprehensive evidence offered in support of Petitioner's
18 | claims.

19 | Discovery orders were issued in five different cases involving
20 | life term inmates (Petitioners) who all presented identical claims.[1]

21 |

22 | [1] This Court takes judicial notice of the several other cases currently pending (Criscione #71614, Jameison #71194, Bragg #108543, Ngo #127611.)
23 | which raise this same issue and in which proof was presented on this same point. (Evidence Code § 452(d). See specifically, in the habeas corpus
24 | context, *In re Vargus* (2000) 83 Cal.App.4th 1125, 1134-1136, 1143, in which judicial notice was taken of the evidence in four other cases and in which
25 | the court noted: "Facts from other cases may assist petitioner in establishing a pattern." See generally *McKell v. Washington Mutual, Inc.*
26 | (2006) 142 Cal.App.4th 1457, 1491: "trial and appellate courts ... may properly take judicial notice of ... established facts from both the same case and other cases." And see *AB Group v. Wertin* (1997) 59 Cal.App.4th
27 | 1022, 1036: Judicial notice taken of other cases when matters are "just as relevant to the present [case] as they are to the others.")

28 |

1  The purpose of the discovery was to bring before the Court a
2  comprehensive compilation and examination of Board decisions in a
3  statistically significant number of cases.  The Board decisions under
4  examination consisted of final decisions of the Board for life-term
5  inmates convicted of first or second degree murder and presently
6  eligible for parole.  Included were all such decisions issued in
7  certain months, chosen by virtue of their proximity in time to the
8  parole denials challenged in the pending petitions.  All Board
9  decisions in the months of August, September and October of 2002,
10 July, August, September, October, November, and December of 2003,
11 January and February of 2004, February of 2005, and January of 2006
12 were compiled.  This resulted in a review of 2690 cases decided in a
13 total of 13 months.

14     The purpose of the review was to determine how many inmates had
15 actually been denied parole based in whole or in part on the Board's
16 finding that their commitment offense fits the criteria set forth in
17 Title 15 §2402(c)(1) as "especially heinous, atrocious or cruel."  A
18 member of the research team conducting the review, Karen Rega,
19 testified that in its decisions the Board does not actually cite CCR
20 rule §2402(c), but consistently uses the specific words or phrases
21 ("verbiage from code") contained therein, so that it could easily be
22 determined when that criteria was being applied.  (For example,
23 finding "multiple victims" invokes §2402(c)(1)(A); finding the crime
24 "dispassionate" "calculated" or "execution style" invokes
25 §2402(c)(1)(B); that a victim was "abused" "mutilated" or "defiled"
26 invokes §2402(c)(1)(C);  a crime that is "exceptionally callous" or
27 demonstrated a "disregard for human suffering" fits criteria
28

7

1 §2402(c)(1)(D); and finding the motive for the crime "inexplicable"
2 or "trivial" invokes §2402(c)(1)(E).)

3     Petitioners provided charts, summaries, declarations, and the
4 raw data establishing the above in the cases of Lewis #68038,
5 Jameison #71194, Bragg #108543, and Ngo #127611. In another case,
6 (Criscione #71614) the evidence was presented somewhat differently.
7 Both to spread the burden of the exhaustive examination, and to
8 provide a check on Petitioners' methods, this Court ordered
9 Respondent to undertake an examination of two randomly chosen months
10 in the same manner as Petitioner had been doing. Respondent complied
11 and provided periodic updates in which they continued to report that
12 at all "the relevant hearings the Board relied on the commitment
13 offense as a basis for denying parole." (See "Respondent's Final
14 Discovery Update" filed April 5, 2007.) At the evidentiary hearing
15 on this matter counsel for Respondents stipulated that "in all of
16 those cases examined [by Respondent pursuant to the Criscione
17 discovery orders] the Board relied on the commitment offense as a
18 basis for denying parole." (See pages 34-35 of the June 1, 2007,
19 evidentiary hearing transcript.)

20     The result of the initial examination was that in over 90
21 percent of cases the Board had found the commitment offense to be
22 "especially heinous, atrocious or cruel" as set forth in Title 15
23 §2402(c)(1). In the remaining 10% of cases either parole had been
24 granted, or it was unclear whether §2402(c)(1) was a reason for the
25 parole denial. For all such cases, the decisions in the prior
26 hearing for the inmate were obtained and examined. In every case,
27 the Board had determined at some point in time that every inmates

28

8

1   crime was "especially heinous, atrocious or cruel" under Title 15
2   §2402(c)(1).

3       Thus, it was shown that 100% of commitment offenses reviewed by
4   the Board during the 13 months under examination were found to be
5   "especially heinous, atrocious or cruel" under Title 15 §2402(c)(1).

6       A further statistic of significance in this case is that there
7   are only 9,750 inmates total who are eligible for, and who are
8   currently receiving, parole consideration hearings as life term
9   inmates.  (See "Respondent's Evidentiary Hearing Brief," at p. 4,
10  filed April 16, 2007.)

11

12                        **USE OF STATISTICS**

13      In *International Brotherhood of Teamsters v. United States*
14  (1977) 431 U.S. 324, 338-340, the United States Supreme Court
15  reaffirmed that statistical evidence, of sufficient "proportions,"
16  can be sound and compelling proof.  As noted by the court in *Everett*
17  *v. Superior Court* (2002) 104 Cal.App.4th 388, 393, and the cases cited
18  therein, "courts regularly have employed statistics to support an
19  inference of intentional discrimination."

20      More recently, the United States Supreme Court, in *Miller-El v.*
21  *Cockrell* (2003) 537 U.S. 322, 154 L.Ed.2d 931, when examining a habeas
22  petitioner's allegations that the prosecutor was illegally using his
23  peremptory challenges to exclude African-Americans from the
24  petitioner's jury, noted that "the statistical evidence alone" was
25  compelling.  The high court analyzed the numbers and concluded:
26  "Happenstance is unlikely to produce this disparity."  (See also
27  *People v. Hofsheier* (2004) 117 Cal.App.4th 438 in which "statistical

28

1  evidence" was noted as possibly being dispositive.  And see *People v.*
2  *Flores* (2006) 144 Cal.App.4th 625 in which a statistical survey and
3  analysis, combined into an "actuarial instrument" was substantial
4  proof.)

5      A statistical compilation and examination such as has been
6  presented in these cases is entirely appropriate and sufficient
7  evidence from which to draw sound conclusions about the Board's
8  overall methods and practices.

9

10                      **THE EXPERT'S TESTIMONY**

11      Petitioners provided expert testimony from Professor Mohammad
12  Kafai regarding the statistics and the conclusions that necessarily
13  follow from them.  Professor Kafai is the director of the statistics
14  program at San Francisco State University, he personally teaches
15  statistics and probabilities, and it was undisputed that he was
16  qualified to give the expert testimony that he did.  No evidence was
17  presented that conflicts or contradicts the testimony and conclusions
18  of Professor Kafai.  By stipulation of the parties, Professor Kafai's
19  testimony was to be admissible and considered in the cases of all
20  five petitioners.  (See page 35 of the June 1, 2007, evidentiary
21  hearing transcript.)

22      Professor Kafai testified that the samples in each case, which
23  consisted of two or three months of Board decisions, are
24  statistically sufficient to draw conclusions about the entire
25  population of life term inmates currently facing parole eligibility
26  hearings.  Given that every inmate within the statistically
27  significant samples had his or her crime labeled "'particularly
28

                                  10

1   egregious'" or "especially heinous, atrocious or cruel" under Title
2   15 §2402(c)(1), it can be mathematically concluded that the same
3   finding has been made for every inmate in the entire population of
4   9,750. Although he testified that statisticians never like to state
5   unequivocally that something is proven to a 100% certainty, (because
6   unforeseen anomalies are always theoretically possible,) he did
7   indicate the evidence he had thus far examined came as close to that
8   conclusion as could be allowed.  Not surprisingly, Professor Kafai
9   also testified that "more than 50% can't by definition constitute an
10  exception."

11      Having found the data provided to the expert to be sound this
12  Court also finds the expert's conclusions to be sound.  In each of
13  the five cases before the Court over 400 inmates were randomly chosen
14  for examination.  That number was statistically significant and was
15  enough for the expert to draw conclusions about the entire population
16  of 9,750 parole eligible inmates.  The fact that the approximately
17  2000 inmates examined in the other cases also had their parole denied
18  based entirely or in part on the crime itself (§2402(c)(1)), both
19  corroborates and validates the expert's conclusion in each individual
20  case and also provides an overwhelming and irrefutable sample size
21  from which even a non expert can confidently draw conclusions.

22

23                            DISCUSSION

24      Although the evidence establishes that the Board frequently says
25  parole is denied "first," "foremost," "primarily," or "mainly,"
26  because of the commitment offense, this statement of primacy or
27  weight is not relevant to the question now before the Court.

28

1  Petitioners acknowledge that the Board generally also cites other

2  reasons for its decision.  The question before this Court, however,

3  is not whether the commitment offense is the primary or sole reason

4  why parole is denied -- the question is whether the commitment

5  offense is labeled "'particularly egregious'" and thus could be used,

6  under *Dannenberg,* primarily or exclusively to deny parole.

7      The evidence proves that in a relevant and statistically

8  significant period where the Board has considered life term offenses

9  in the context of a parole suitability determination, every such

10  offense has been found to be "particularly egregious" or "especially

11  heinous, atrocious or cruel."[2]  This evidence conclusively

12  demonstrates that the Board completely disregards the detailed

13  standards and criteria of §2402(c).  "Especially" means particularly,

14  or "to a distinctly greater extent or degree than is common."[3]  (EC §

15  451(e).)  By simple definition the term "especially" as contained in

16  section 2402(C)(1) cannot possibly apply in 100% of cases, yet that

17  is precisely how it has been applied by the Board.  As pointed out by

18  the Second District Court of Appeal, not every murder can be found to

19  be "atrocious, heinous, or callous" or the equivalent without "doing

20

21  [2] In a single case out of the 2690 that were examined Petitioner has conceded that
    the Board did not invoke §2402(c)(1).  This Court finds that concession to be
    improvidently made and the result of over caution.  When announcing the decision at
22  the initial hearing of S. Fletcher (H-10330) on 4/6/06, the commissioner did begin
    by stating "I don't believe this offense is particularly aggravated..."  However
    the commissioner proceeds to describe the crime as a drug deal to which Fletcher
23  brought a gun so "we could say there was some measure of calculation in that."  The
    commissioner continued by observing that the reason someone would bring a gun to a
    drug transaction was to make sure things went according to their plan "so I guess
24  we can say that that represents calculation and perhaps it's aggravated to that
    extent."  As is the Board's standard practice, by using the word 'calculated' from
25  §2402(c)(1)(b) the Board was invoking that regulation.  Certainly if Mr. Fletcher
    had brought a habeas petition Respondent's position would be that there is 'some
26  evidence' supporting this.  The ambiguity created by the commissioner's initial
    statement was cleared up several pages later when he announces that "based upon the
    crime coupled with ..." parole was denied for four years.  (See *In re Burns* (2006)
27  136 Cal.App.4th 1318, 1326, holding §2402(c)(1) criteria are necessary for a multi-
    year denial.)

28

12

1 | violence" to the requirements of due process. (*In re Lawrence* (2007)
2 | 150 Cal.App.4th 1511, 1557.) This is precisely what has occurred
3 | here, where the evidence shows that the determinations of the Board
4 | in this regard are made not on the basis of detailed guidelines and
5 | individualized consideration, but rather through the use of all
6 | encompassing catch phrases gleaned from the regulations.

7 |

8 | **THE BOARD'S METHODS**

9 | Because it makes no effort to distinguish the applicability of
10 | the criteria between one case and another, the Board is able to force
11 | every case of murder into one or more of the categories contained in
12 | §2402(c).

13 | For example, if the inmate's actions result in an instant death
14 | the Board finds that it was done in a "dispassionate and calculated
15 | manner, such as an execution-style murder." At the same time the
16 | Board finds that a murder not resulting in near instant death shows a
17 | "callous disregard for human suffering" without any further analysis
18 | or articulation of facts which justify that conclusion.   If a knife
19 | or blunt object was used, the victim was "abused, defiled, or
20 | mutilated." If a gun was used the murder was performed in a
21 | "dispassionate and calculated manner, such as an execution-style
22 | murder." If bare hands were used to extinguish another human life
23 | then the crime is "particularly heinous and atrocious."

24 | Similarly, if several acts, spanning some amount of time, were
25 | necessary for the murder the Board may deny parole because the inmate
26 | had "opportunities to stop" but did not. However if the murder was

27 |
_____
[3] Princeton University World Net Dictionary (2006).
28 |

13

1 | accomplished quickly parole will be denied because it was done in a
2 | dispassionate and calculated manner and the victim never had a chance
3 | to defend themselves or flee. If the crime occurred in public, or
4 | with other people in the vicinity, it has been said that the inmate
5 | "showed a callous disregard" or "lack of respect" for the
6 | "community." However if the crime occurs when the victim is found
7 | alone it could be said that the inmate's actions were aggravated
8 | because the victim was isolated and more vulnerable.

9 |     In this manner, under the Board's cursory approach, every murder
10 | has been found to fit within the unsuitability criteria. What this
11 | reduces to is nothing less than a denial of parole for the very
12 | reason the inmates are present before the Board - i.e. they committed
13 | murder. It is circular reasoning, or in fact no reasoning at all,
14 | for the Board to begin each hearing by stating the inmate is before
15 | them for parole consideration, having passed the minimum eligible
16 | parole date based on a murder conviction, and for the Board to then
17 | conclude that parole will be denied because the inmate committed acts
18 | that amount to nothing more than the minimum necessary to convict
19 | them of that crime. As stated quite plainly by the Sixth District:
20 | "A conviction for murder does not automatically render one unsuitable
21 | for parole." (*Smith, supra*, 114 Cal.App.4th at p. 366, citing
22 | *Rosenkrantz, supra*, 29 Cal.4th at p. 683.)

23 |     In summary, when every single inmate is denied parole because
24 | his or her crime qualifies as a §2402(c)(1) exception to the rule
25 | that a parole date shall normally be set, then the exception has
26 | clearly swallowed the rule and the rule is being illegally
27 | interpreted and applied. When every single life crime that the Board
28 |

14

1  examines is "particularly egregious" and "especially heinous,

2  atrocious or cruel" it is obvious that the Board is operating without

3  any limits and with unfettered discretion.

4      Other examples of the failure to 'connect up' the facts of the

5  individual case with the criteria and the ultimate findings abound in

6  the decisions of the reviewing courts. Some of the state cases to

7  have reversed Parole Board or Governor abuses of discretion in

8  denying parole include *In re Roderick, In re Cooper, In re Lawrence,*

9  *In re Barker, In re Gray, In re Lee, In re Elkins, In re Weider, In*

10  *re Scott, In re Deluna, In re Ernest Smith, In re Mark Smith,* and *In*

11  *re Capistran.*

12      When "the record provides no reasonable grounds to reject, or

13  even challenge, the findings and conclusions of the psychologist and

14  counselor concerning [the inmate's] dangerousness" the Board may not

15  do so. (*In re Smith* (2003) 114 Cal.App.4th 343, 369.)

16      When an inmate, although only convicted of a second degree

17  murder, has been incarcerated for such time that, with custody

18  credits, he would have reached his MEPD if he had been convicted of a

19  first, the Board must point to evidence that his crime was aggravated

20  or exceptional even for a first degree murder if they are going to

21  use the crime as a basis for denying parole. (*In re Weider* (2006)

22  145 Cal.App.4th 570, 582-583.)[4]

23

24  [4]    This rule, rooted in Justice Moreno's concurrence in *Rosenkrantz, supra,* is
    particularly applicable in the case of Arthur Crisione. Petitioner was convicted
    of second degree, but acquitted of first degree, murder over 25 years ago. (*People*

25  *v. Criscione* (1981) 125 Cal.App.3d 275.) With his custody credits he is beyond the
    matrix even had he been convicted of a first. In a currently pending habeas

26  petition in which he challenges his 2007 parole denial the first reason the Board
    gave was the crime itself and the presiding commissioner explained: "His actions go

27  well beyond the minimum necessary for a conviction of murder in the second degree."
    (Decision page 2 of 4/2/07 transcript.) For the Board to penalize the Petitioner
    for the fact that he was acquitted of first degree is further proof of their

28

15

1    A "petitioner's young age at the time of the offense" must be
2    considered. (*In re Elkins* (2006) 144 Cal.App.4th 475, 500, quoting
3    *Rosenkrantz v. Marshall* (C.D.Cal. 2006) 444 F. Supp. 2d 1063, 1065,
4    1085: "The reliability of the facts of the crime as a predictor for
5    his dangerousness was diminished further by his young age of 18, just
6    barely an adult. 'The susceptibility of juveniles to immature and
7    irresponsible behavior means their irresponsible conduct is not as
8    morally reprehensible as that of an adult.'")[5]

9        The Board's formulaic practice of stating §2402(c)(1) phrased in
10   a conclusory fashion, and then stating "this is derived from the
11   facts" without ever linking the two together, is insufficient. (*In
12   re Roderick*, (2007) ___ Cal.App.4th ___ (A113370): "At minimum, the
13   Board is responsible for articulating the grounds for its findings
14   and for citing to evidence supporting those grounds." (See also *In
15   re Barker* (2007) 151 Cal.App.4th 346, 371, disapproving
16   "conclusorily" announced findings.)

17       After two decades, mundane "crimes have little, if any,
18   predictive value for future criminality. Simply from the passing of
19   time, [an inmate's] crimes almost 20 years ago have lost much of
20   their usefulness in foreseeing the likelihood of future offenses than
21   if he had committed them five or ten years ago." (*In re Lee* (2006)
22   143 Cal.App.4th 1400, 1412.) It should be noted that this rule

23   ----
     willfulness and bias. The jury had a reasonable doubt that Petitioner committed
24   first degree murder but under the Board's 'reasoning' and 'analysis' this puts him
     in a worse position than if they had not. Had the jury convicted him of the
     greater offense Petitioner has served so much time that he would already be having
25   subsequent parole hearings on a first and the Board would not have been able to use
     the 'some evidence' of first degree behavior against him. As observed previously,
26   the Board's position in this regard is "so ridiculous that simply to state it is to
     refute it." (*Weider, supra*, 145 Cal.App.4th at p. 583.)
27   [5] This point is particularly significant in the case of Mike Ngo. Mr. Ngo was only
     18 at the time of his crime. The impetus behind the shooting was youth group or
28

16

applies with even more force when the Board is relying on any
criminality that occurred before the crime. In that situation, just
as with the crime itself, the Board must explain why such old events
have any relevance and especially when the inmate has spent a decade
as a model prisoner.

Murders situationally related to intimate relationships are
unfortunately commonplace because emotions are strongest in such
domestic settings. When a murder occurs because of "stress unlikely
to be reproduced in the future" this is a factor that affirmatively
points towards suitability. (In re Lawrence (2007) 150 Cal.App.4th
1511 and cases cited therein.)

"The evidence must substantiate the ultimate conclusion that the
prisoner's release currently poses an unreasonable risk of danger to
the public. It violates a prisoner's right to due process when the
Board or Governor attaches significance to evidence that forewarns no
danger to the public." (In re Tripp (2007) 150 Cal.App.4th 306,
313.)

The Board "cannot rely on the fact that the killing could have
been avoided to show the killing was especially brutal." (In re
Cooper (2007) 153 Cal.App.4th 1043, 1064.)

The Board's focus must be upon how the inmate "actually
committed his crimes" not the "incorporeal realm of legal
constructs." (Lee, supra, 143 Cal.App.4th at p. 1413.) This is
especially significant when the murder conviction is based on the
felony murder rule, provocative act doctrine, or accomplice liability
such that the inmate did not intend to kill or may not have even been

_____

gang rivalries, posturing, and threats which mature adults would not have been

1  the actual killer.

2       The Board has ample guidance before it in the decisions of the

3  various reviewing courts to constrain its abuse, but has failed to

4  avail itself of the opportunity to do so.

5

6                    SEPARATION OF POWERS DOCTRINE

7       The evidence presented, as discussed above, has established a

8  void for vagueness "as applied" due process violation.  That same

9  evidence also proves a separate but related Constitutional violation

10  -- an as applied separation of powers violation.

11      The separation of powers doctrine provides "that the legislative

12  power is the power to enact statutes, the executive power is the

13  power to execute or enforce statutes, and the judicial power is the

14  power to interpret statutes and to determine their

15  constitutionality." (Lockyer v. City and County of San Francisco

16  (2004) 33 Cal.4th 1055, 1068.)  Because the evidence has proven the

17  Board is not executing/enforcing the legislature's statutes as

18  intended it is this Court's duty to intervene.  The question here is

19  whether the Board is violating the separation of powers doctrine by

20  appropriating to itself absolute power over parole matters and

21  disregarding the limits and guidelines placed by the statute.[6]

22      "Government Code section 11342.2 provides: 'Whenever by the

23  ─────────────────────────────────────────────────────

24  caught up in.
    [6] "It is settled that Administrative regulations that violate acts of the
    Legislature are void and no protestations that they are merely an exercise of
25  administrative discretion can sanctify them.  They must conform to the legislative
    will if we are to preserve an orderly system of government.  Nor is the motivation
26  of the agency relevant: It is fundamental that an administrative agency may not
    usurp the legislative function, no matter how altruistic its motives are."
27  (Agricultural Labor Relations Board v. Superior Court of Tulare County (1976) 16
    Cal.3d 392, 419 quoting Morris v. Williams (1967) 67 Cal.2d 733, 737, and City of
    San Joaquin v. State Bd. of Equalization (1970) 9 Cal.App.3d 365, 374.)

28

                                    18

1  express or implied terms of any statute a state agency has authority
2  to adopt regulations to implement, interpret, make specific or
3  otherwise carry out the provisions of the statute, no regulation
4  adopted is valid or effective unless consistent and not in conflict
5  with the statute and reasonably necessary to effectuate the purpose
6  of the statute.'  Administrative regulations that alter or amend the
7  statute or enlarge or impair its scope are void and courts not only
8  may, but it is their obligation to strike down such regulations."
9  (*Pulaski v. Occupational Safety & Health Stds. Bd.* (1999) 75
10  Cal.App.4th 1315, 1341, citations omitted.)

11       The vice of overbroad and vague regulations such as are at issue
12  here is that they can be manipulated, or 'interpreted,' by executive
13  agencies as a source of unfettered discretion to apply the law
14  without regard to the intend of the people as expressed by the
15  legislature's enabling statutes.  In short, agencies usurp unlimited
16  authority from vague regulations and become super-legislatures that
17  are unaccountable to the people.  As it has sometimes been framed and
18  addressed in the case law, a vague or all encompassing standard runs
19  the risk of "violat[ing] the separation of powers doctrine by
20  'transforming every [executive decisionmaker] into a "mini-
21  legislature" with the power to determine on an ad hoc basis what
22  types of behavior [satisfy their jurisdiction].'"  (*People v. Ellison*
23  (1998) 68 Cal.App.4th 203, 211, quoting *People v. Superior Court*
24  *(Caswell)* (1988) 46 Cal.3d 381, 402.)

25       "It is concern about 'encroachment and aggrandizement,' the
26  [United States Supreme Court] reiterated, that has animated its
27  separation of powers jurisprudence.  'Accordingly, we have not
28

1    hesitated to strike down provisions of law that either accrete to a
2    single Branch powers more appropriately diffused among separate
3    Branches or that undermine the authority and independence of one or
4    another coordinate Branch.'" (*Kasler v. Lockyer* (2000) 23 Cal.4th
5    472, 493, quoting *Mistretta v. United States* (1989) 488 U.S. 361,
6    382.)  This articulation of the principle speaks directly to the
7    situation at hand.  The Board, by its enactment and interpretation of
8    Title 15, §2402, has appropriated to itself absolute power over
9    'lifer' matters.  Overreaching beyond the letter and spirit of the
10   Penal Code provisions, Title 15, §2402(c)(1) has been interpreted by
11   the Board to supply the power to declare every crime enough to deny
12   parole forever.  The fact that Title 15, §2402, has been invoked in
13   every case, but then sometime later not invoked, tends to show either
14   completely arbitrary and capricious behavior or that unwritten
15   standards are what really determine outcomes.  In either event, all
16   pretenses of taking guidance from, or being limited by, the
17   legislature's statutes have been abandoned.  "[I]t is an elementary
18   proposition that statutes control administrative interpretations."
19   (*Ohio Casualty Ins. Co. v. Garamendi* (2006) 137 Cal.App.4th 64, 78.)
20   Title 15 §2402 as applied, however, has no controls or limitations.
21        The PC § 3041(b) exception to the rule can only be invoked when
22   the "gravity of the current convicted offense or offenses, or the
23   timing and gravity of current or past convicted offense or offenses,
24   is such that consideration of the public safety requires a more
25   lengthy period of incarceration for this individual."  The word
26   "gravity" is a directive for comparison just as "more lengthy"
27   indicates a deviation from the norm.  While *Dannenberg* held there
28

                                    20

1  does not need to be intra case comparison for the purposes of term
2  uniformity or proportionality, there necessarily has to be some sort
3  of comparison for the purposes of ·adhering to the legislative mandate
4  that parole is available.  The Board employs no meaningful yardstick
5  in measuring parole suitability.  This is a violation of the
6  separation of powers doctrine.  (*People v. Wright* (1982) 30 Cal.3d
7  705, 712-713.  And see *Terhune v. Superior Court* (1998) 65
8  Cal.App.4th 864, 872-873.  Compare *Whitman v. Am. Trucking Ass'ns*
9  (2001) 531 U.S. 457, 472, describing a delegation challenge as
10  existing when the legislature fails to lay down "an intelligible
11  principle to which the person or body authorized to act is directed
12  to conform.")

13

14                    RESPONDENT'S POSITION

15      The Attorney General has suggested, without pointing to any
16  concrete examples, that it is possible that the Board, when invoking
17  the crime as a reason to deny parole, is not placing it within
18  §2402(c)(1) but instead using is as some sort of 'lesser factor'
19  which, only when combined with other unsuitability criteria, can
20  contribute to a valid parole denial.  The two problems with this
21  position are, first, there is no evidentiary support for this
22  assertion, and second, it would have no impact on the constitutional
23  infirmities outlined and proven above.

24      Even if Respondent had produced evidence that the Board was
25  utilizing the crime as a 'lesser factor' which needs others to fully
26  support a parole denial, the Board would then be admitting it was
27  denying parole, in part, for the very reason that the person is

28

                              21

1  before the panel and eligible for parole in the first place - the
2  commitment offense.  Respondent's argument suggests that a crime that
3  only qualified as the *Dannenberg* "minimum necessary" could still be
4  invoked as a reason for denying parole.  Respondent argues that when
5  the crime is invoked 'not in the *Dannenberg* sense,' there must be
6  other reasons for the parole denial and the crime alone would not be
7  enough in this context.  This position is inconsistent with the law
8  and fundamental logic.

9      A crime qualifies under *Dannenberg* when it is "particularly
10  egregious," or one where "no circumstances of the offense reasonably
11  could be considered more aggravated or violent than the minimum
12  necessary to sustain a conviction for that offense."  (*Dannenberg*,
13  *supra,* 34 Cal.4th at pp. 1094-1095.)  These are the only two choices.
14  If a crime consists of only the bare elements then it is not
15  aggravated and it cannot, in and of itself, serve as a basis for
16  parole denials once the inmate becomes eligible for parole.  It is
17  the reason an inmate may be incarcerated initially for the equivalent
18  of 15 or 25 years, and then examined to determination rehabilitation
19  efforts when they come before the Board, but a crime that is no more
20  than the bare minimum cannot be factored into the equation pursuant
21  to PC § 3041(b) or any of the case law interpreting it.

22      In oral argument Respondent suggested a second way the
23  commitment offense can be used outside of §2402(c)(1).  If for
24  example a crime had its roots in gang allegiances or rivalries and
25  the inmate continued to associate with gangs while incarcerated, then
26  an aspect of the crime, even if the crime otherwise consisted of no
27  more than the minimum elements, could be combined with other behavior
29

22

1  to support a parole denial. Similarly, if a crime was rooted in an

2  inmate's then existing drug addiction, and the Board was to point to

3  a recent 115 involving drugs, the evidence that the inmate's drug

4  issues had not been resolved would justify a parole denial even if

5  the crime itself was not aggravated. A finding that the inmate is

6  not suitable for release under these circumstances, however, is not

7  based on the facts of the commitment offense as tending to show

8  unsuitability. It is based on the conclusion that can be drawn about

9  Petitioner's lack of rehabilitation or change since the offense, and

10 thus, his present dangerousness.

11     Respondent has not demonstrated any flaws in Petitioner's

12 methodology or analysis, nor provided any actual evidence of the

13 crime being invoked *other* than pursuant to §2402(c)(1). Drawing

14 conclusions from the Board's direct statements, or its precise

15 recitations of the §2402(c)(1) language, logically indicates an

16 invocation of §2402(c)(1), and Respondent's suggestion otherwise is

17 insupportable.

18

19                    **THE QUESTION OF BIAS**

20     Because the issue has been squarely presented, and strenuously

21 argued by Petitioners, this Court is obligated to rule on the charge

22 that the Board's actions prove an overriding bias and deliberate

23 corruption of their lawful duties.

24     In the discrimination and bias case of *USPS Bd. of Governors v.*

25 *Aikens* (1983) 460 U.S. 711, the United States Supreme Court

26 acknowledged "there will seldom be 'eyewitness' testimony as to the

27 [] mental processes" of the allegedly biased decisionmaker. Instead,

28

                                 23

1  an examination of other cases for trends or patterns can provide the
2  necessary circumstantial evidence. (See *Aikens, supra*, at footnote
3  2.) Reaffirming that such circumstantial evidence will be sufficient
4  the Court stated: "The law often obliges finders of fact to inquire
5  into a person's state of mind. As Lord Justice Bowen said in
6  treating this problem in an action for misrepresentation nearly a
7  century ago, 'The state of a man's mind is as much a fact as the
8  state of his digestion. It is true that it is very difficult to
9  prove what the state of a man's mind at a particular time is, but if
10 it can be ascertained it is as much a fact as anything else.'"
11 (*Aikens,* at pp. 716-717, quoting *Edgington v. Fitzmaurice* (1885) 29
12 Ch. Div. 459, 483.)[7]

13      The discovery in these cases was granted in part due to the
14 Petitioners' prima facie showing of bias and the necessity that it be
15 "adequately supported with evidence" if such evidence is available.
16 (*Ramirez, supra,* 94 Cal.App.4th at p. 564, fn. 5. See also *Nasha v.*
17 *City of Los Angeles* (2004) 125 Cal.App.4th 470, 483: "A party seeking
18 to show bias or prejudice on the part of an administrative decision'
19 maker is required to prove the same 'with concrete facts.'" And see
20 *State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674,
21 841: "The challenge to the fairness of the adjudicator must set forth
22 concrete facts demonstrating bias or prejudice." See also *Hobson v.*

23

24 [7] As occurred in *Aikens, supra,* and as suggested in prior orders of this Court,
Respondent should have provided direct evidence from the decisionmakers. While the
fact that a *Defendant* does not explain his or her actions cannot be held against
25 him, (*Griffin v. California* (1965) 380 U.S. 609, *Doyle v. Ohio* (1976) 426 U.S.
610,) it is appropriate to give some weight to the consideration that the Board has
26 failed to offer any direct evidence or explanation on its own behalf. While the
case of *Hornung v. Superior Court* (2000) 81 Cal.App.4th 1095 stands for the
proposition that *Petitioner* may not inquire into the Board members mental
27 processes, Respondent is not precluded from offering such direct evidence if they
were able to testify as to their good faith and conscientious efforts.
28

1 │ *Hansen* (1967) 269 F.Supp. 401, 502, the watershed Washington D.C.

2 │ school desegregation case in which the court determined from a

3 │ statistical and factual analysis that racial bias was influencing

4 │ policy.)

5 │      In the case of *People v. Adams* (2004) 115 Cal.App.4th 243, 255,

6 │ a similar claim of biased decision making was asserted and it was

7 │ rejected because, although the defendant clearly articulated it, "he

8 │ has not demonstrated it. Therefore, he has failed to bear his burden

9 │ of showing a constitutional violation as a demonstrable reality, not

10 │ mere speculation." In the present cases Petitioners have provided

11 │ overwhelming concrete evidence. It is difficult to believe that the

12 │ Board's universal application of §2402(c)(1) has been an inadvertent

13 │ mistake or oversight on their part. It is hard to credit the Board's

14 │ position that it does not know its own patterns and practices reveal

15 │ a complete lack of standards or constraints on their power.

16 │ Respondent's protestations ring hollow, and it seems a statistical

17 │ impossibility, that the Board's use of "detailed" criteria in such a

18 │ fashion that they are rendered meaningless is a result of good faith

19 │ efforts on their part. That every murder is "especially heinous,

20 │ atrocious or cruel," and can therefore be an exception to the rule

21 │ that a parole date should be set, does not seem to be an accident on

22 │ their part.

23 │      Although no court has thus far agreed with the accusation that

24 │ the Board approaches its duties with a predetermination and a bias,

25 │ no court has previously been presented the comprehensive evidence

26 │ outlined herein. While this Court does not turn a blind eye to the

27 │ reasonable conclusion that the Board's unconstitutional practices are

28 │

25

1 willful, there is another possibility. The pattern of errors
2 demonstrated by the discovery in this case, and the continuously
3 growing body of Court of Appeal opinions finding consistent and
4 persistent abuse of discretion, may instead be caused by the fact
5 that the Board is simply overworked and substantively untrained. The
6 impossibility of the blanket applicability of §2402(c)(1) may be only
7 the result of sloppy preparation and inadvertent carelessness.

8       The Board must first be given an opportunity to comply with the
9 necessary remedy provided by this court before it is possible to
10 enter a finding of conscious bias and illegal sub rosa policy. To do
11 otherwise would ignore the complexities and magnitude of the largely
12 discretionary duties with which that Board is vested.

13

14                              CONCLUSION

15      The conclusive nature of the proof in this case, and the
16 suggestion of institutional bias do not preclude formulation of an
17 remedy which will guarantee adequate restrictions on, and guidance
18 for, the Board's exercise of discretion in making parole suitability
19 determinations. The Board can be made to lawfully perform its duties
20 if given explicit instructions.

21      As noted supra, a reason the proof in this case irrefutably
22 establishes constitutional violations is because the Board does not,
23 in actual fact, operate within the limiting construction of the
24 regulations. The Board's expansive interpretation allows it to
25 operate without any true standards. Although numerous rulings of
26 both state and federal courts of appeal have invalidated the Board's
27 application of the §2402(c) criteria to particular facts, the Board
28

                                26

1  does not take guidance from these binding precedents and ignores them
2  for all other purposes.  In the most recent of these cases, *In re*
3  *Roderick*, (2007) ___ Cal.App.4th ___ (A113370) the First District
4  held four of five §2402 factors "found" by the Board to be
5  unsupported by any evidence.  At footnote 14 the court took the time
6  to criticize the Board for its repeated use of a "stock phrase"
7  "generically across the state."  The court also clarified that "at
8  minimum, the Board is responsible for articulating the grounds for
9  its findings and for citing to evidence supporting those grounds."

10  There is nothing in the evidence presented that would allow any
11  conclusion but that, without intervention of the Courts, the Board
12  will ignore the lessons of these rulings in the future and continue
13  to employ its formulaic approach of citing a criteria from
14  §2402(c)(1), repeating the facts of the crime, but never
15  demonstrating a logical connection between the two.  This is the
16  core problem with the Board's methodology -- they provide no
17  explanation or rationale for the findings regarding the crime itself.
18  This practice results in violence to the requirements of due
19  process and individualized consideration which are paramount to the
20  appropriate exercise of its broad discretion.

21  The only solution is one that compels the Board to identify the
22  logical connection between the facts upon which it relies and the
23  specific criteria found to apply in the individual case.  For
24  example, the Board often finds that an inmate's motive is "trivial"
25  without ever suggesting why, on these facts, that motive is not just
26  as trivial as the motive behind any other murder.  What motive is not
27  trivial?  By any definition "trivial" is a word of comparison and
28

1 | only has meaning when there can be examples that are not "trivial."
2 |     Similarly, although the Sixth District made it plain four years
3 | ago that "all [] murders by definition involve some callousness," (*In*
4 | *re Smith* (2003) 114 Cal.App.4th 343, 345,) the Board has continued to
5 | deny countless paroles labeling the crime "callous" without ever
6 | suggesting what crime would not qualify as "callous" and without
7 | consistently explaining why the individual case before it
8 | demonstrates "exceptional" callousness.

9 |     Respondent has consistently refused to suggest what possible
10 | instances of murder would *not* fit the Board's amorphous application
11 | of the §2402 criteria.  Citing *Dannenberg*, Respondent insists such
12 | comparative analysis is unnecessary.  Respondent fundamentally
13 | misunderstands the *Dannenberg* holding.

14 |     The PC § 3041(b) exception to the rule can only be invoked when
15 | the "gravity of the current convicted offense or offenses, or the
16 | timing and gravity of current or past convicted offense or offenses,
17 | is such that consideration of the public safety requires a more
18 | lengthy period of incarceration for this individual."  The word
19 | "gravity" is a directive for comparison just as "more lengthy"
20 | indicates a deviation from the norm.  While *Dannenberg* held there
21 | does not need to be intra case comparison for the purposes of term
22 | uniformity or proportionality, there necessarily has to be some sort
23 | of comparison for the purposes of adhering to the legislative mandate
24 | that parole is available.  This is implicit in §2402 because the
25 | qualifier "especially," in "especially heinous atrocious or cruel,"
26 | requires that some form of comparison be made.  While the original
27 | drafters of §2402 seemed to have recognized this fact, the ongoing
28 |

1  conduct of the Board has completely ignored it, and this is the
2  essence of the due process violation Petitioners have asserted.
3      As noted in his dissent in the recent case of *In re Roderick,*
4  *supra,* Justice Sepulveda would have deferred to the Board's
5  'exercise' of discretion because "Board members have both training
6  and vast experience in this field. They conduct literally thousands
7  of parole suitability hearings each year. The Board therefore has
8  the opportunity to evaluate the egregiousness of the facts of a great
9  number of commitment offenses. ... The Board's training and
10 experience in evaluating these circumstances far exceeds that of
11 most, if not all, judges." The evidence in this case, however,
12 suggests a flaw in granting such deference. Since the Board
13 continues to place every murder in the category of offenses "tending
14 to show unsuitability," something is certainly wrong. Since the
15 Board's vast experience is undeniable, the problem must be in the
16 Board's training and understanding of the distinguishing features of
17 the guidelines and criteria. Although Justice Sepulveda presumes
18 that Board members receive substantive training, there is no evidence
19 before this court to suggest that it does, and substantial
20 circumstantial evidence to suggest that it does not.
21     In the vast numbers of Santa Clara County cases reviewed by this
22 Court, the Board's formulaic decisions regarding the commitment
23 offense do not contain any explanation or thoughtful reasoning.
24 Instead, the Board's conclusionary invocation of words from
25 §2402(c)(1) is linked to a repetition of the facts from the Board
26 report by the stock phrase: "These conclusions are drawn from the
27 statement of facts wherein ..." Thereafter the inmate files a habeas
28

1 corpus petition and Respondent, after requesting an extension of
2 time, files a boilerplate reply asserting the Board's power is
3 "great" and "almost unlimited" and thus any "modicum" of evidence
4 suffices. Respondent does not cite or distinguish the expanding body
5 of case law that is often directly on point as to specific findings
6 made. Thereafter, if the writ is granted, the Board is directed to
7 conduct a new hearing "in compliance with due process" and that order
8 is appealed by Respondent. On appeal the order is usually upheld
9 with modifications and in the end, after countless hours of attorney
10 and judicial time, the Board conducts a new two hour hearing at which
11 they abuse their discretion and violate due process in some different
12 way.

13 This system is malfunctioning and must be repaired. The
14 solution must begin with the source of the problem. The Board must
15 make efforts to comply with due process in the first instance. The
16 case law published over the last five years provides ample and
17 sufficient guidelines and must be followed. Although the Board
18 methods suggest it believes this to be optional, it is not.

19
20                          **THE REMEDY**

21 Thus, it is the order of this Court that the Board develop,
22 submit for approval, and then institute a training policy for its
23 members based on the current and expanding body of published state,
24 and federal, case law reviewing parole suitability decisions, and
25 specifically the application of §2402 criteria. In addition to
26 developing guidelines and further criteria for the substantive
27 application of §2402 the Board must develop rules, policies and
28

30

1 | procedures to ensure that the substantive guidelines are followed.

2 | This Court finds its authority to impose this remedy to flow

3 | from the fundamental principles of judicial review announced over two

4 | centuries ago in *Marbury v. Madison* (1803) 5 U.S. (1 Cranch) 137.

5 | Citing that landmark case, the California Supreme Court has

6 | recognized "Under time-honored principles of the common law, these

7 | incidents of the parole applicant's right to 'due consideration'

8 | cannot exist in any practical sense unless there also exists a remedy

9 | against their abrogation." (*In re Sturm* (1974) 11 Cal.3d 258, 268.)

10 | In *Strum* the court directed that the Board modify its rules and

11 | procedures so that thereafter "The Authority will be required [,]

12 | commencing with the finality of this opinion, to support all its

13 | denials of parole with a written, definitive statement of its reasons

14 | therefor and to communicate such statement to the inmate concerned."

15 | (*Sturm* at p. 273.)

16 | Similarly, in the case of *Minnis, supra*, the California Supreme

17 | Court held the Board's policy of categorically denying parole to drug

18 | dealers was illegal. Based on its analysis the court there was

19 | clearly prepared to order that Board to modify its rules and

20 | procedures however such was unnecessary because the Board

21 | "voluntarily rescinded" the illegal policy. While the remedy in this

22 | case is of greater scope than that necessary in either *Strum* or

23 | *Minnis, supra*, so too has been the showing of a systematic abuse of

24 | discretion and distortion of process.

25 | The most recent case to address the court's roles and duties in

26 | overseeing the parole suitability process has been *In re Rosenkrantz,*

27 | *supra,* 29 Cal.4th 616. In that case the court explained that

28 |

31

1 | judicial review of a Governor's parole determination comports with,
2 | and indeed furthers, separation of powers principles because the
3 | courts are not exercising "complete power" over the executive branch
4 | and do not "defeat or materially impair" the appropriate exercise or
5 | scope of executive duties. (*Rosenkrantz* at p. 662.) Citing *Strum,*
6 | *supra*, the court reaffirmed that a life term inmate's "due process
7 | rights cannot exist in any practical sense without a remedy against
8 | its abrogation." (*Rosenkrantz* at p. 664.)

9 |     The *Rosenkrantz* court also put forth what it believed was an
10 | extreme example but which, unfortunately, has been shown to exist in
11 | this case.  The court stated: "In the present context, for example,
12 | judicial review could prevent a Governor from usurping the
13 | legislative power, in the event a Governor failed to observe the
14 | constitutionally specified limitations upon the parole review
15 | authority imposed by the voters and the Legislature."  This is
16 | exactly what the evidence in this case has proven.  As noted above
17 | the Board has arrogated to itself absolute authority, despite
18 | legislative limitations and presumptions, through the mechanism of a
19 | vague and all inclusive, and thus truly meaningless, application of
20 | standards.  The remedy this Court is imposing is narrowly tailored to
21 | redress this constitutional violation.

22 |     The consequence of the Board's actions (of giving § 2402(c)(1)
23 | such a broadly all encompassing and universal application) is that
24 | they have unwittingly invalidated the basis of the California Supreme
25 | Court's holding in *Dannenberg*.  The reason the four justice majority
26 | in *Dannenberg* upheld the Board's standard operating procedures in the
27 | face of the Court of Appeal and dissent position is because "the
28 |

32

1  Board must apply detailed standards when evaluating whether an

2  individual inmate is unsuitable for parole on public safety grounds."

3  (*Dannenberg* at p. 1096, footnote 16. See also page 1080: "the

4  regulations do set detailed standards and criteria for determining

5  whether a murderer with an indeterminate life sentence is suitable

6  for parole.") However, Petitioners in these cases have proven that

7  there are no "detailed standards" at all. Instead the Board has

8  systematically reduced the "detailed standards" to empty words. The

9  remedy this Court orders, that there truly be "detailed standards,"

10  requires the promulgation of further rules and procedures to

11  constrain and guide the Board's powers. This remedy differs in

12  specifics, but not in kind, from what courts have previously imposed

13  and have always had the power to impose.

14       The Board must fashion a training program and further rules,

15  standards and regulations based on the opinions and decisions of the

16  state and federal court cases which provide a limiting construction

17  to the criteria which are applied.[8] The Board must also make

18  provisions for the continuing education of its commissioners as new

19  case law is published and becomes binding authority. This Court will

20  not, at this point, outline the requirements and lessons to be taken

21  from the above cases. It is the Board's duty, in the first instance

22  to undertake this task. The training program, and associated rules

23  and regulations, shall be served and submitted to this Court, in

24

25  [8]While the showing and analysis in this case was limited to § 2402(c)(1), the conclusions that the evidence compelled, that the Board has been carelessly distorting and misapplying the regulations, is not so limited. Accordingly, the training program that is necessary for the Board can not reasonably be limited to just § 2402(c)(1). Thus, to the extent case law recognizes, clarifies and establishes remedies for other due process violations they must also be incorporated into the necessary rules and training the Board is required to abide by.

26

27

28

1  writing, within 90 days. Counsel for Petitioners, and any other
2  interested parties, may submit briefs or comments within 30 days
3  thereafter. After receipt and review of the materials this Court
4  will finalize the training program, and associated rules, and the
5  Petitioners in these cases shall receive a new hearing before a Board
6  that does not operate with the unfettered discretion and caprice
7  demonstrated by the evidence here presented.

8                                  ORDER

9       For the above reasons the habeas corpus petition is granted and
10 it is hereby ordered that Petitioner be provide a new hearing which
11 shall comply with due process as outlined above. Respondent shall
12 provide weekly updates to this Court on the progress of its
13 development of the new rules and regulations outlined above.

14
15
16
17 DATED: _Aug 30_, 2007
                                   LINDA R. CONDRON
18                                 JUDGE OF THE SUPERIOR COURT
19
20 cc:  Petitioner's Attorney (Jacob Burland)
        Attorney•General (Denise Yates, Scott Mather)
21
22
23
24
25
26
27
28

                                   34